USDC SCAN INDEX SHEET

















SWD    1/25/05    16:38

3:05-CV-00140    ALLOCCO V. GARDNER

*1*

*NTCREM.*

ORIGINAL

```
 1 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   | JAMES E. LYONS (State Bar No. 112582)
 2 | Four Embarcadero Center
   | San Francisco, CA 94111
 3 | Telephone: (415) 984-6400
   | Facsimile: (415) 984-2698
 4 |
   | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 5 | JENNIFER L. SPAZIANO (State Bar No. 180225)
   | 1440 New York Avenue, NW
 6 | Washington, DC 20005
   | Telephone: (202) 371-7000
 7 | Facsimile:  (202) 393-5760
 8 | OF COUNSEL:
   | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 9 | ROBERT S. BENNETT
   | RICHARD L. BRUSCA
10 | GARY DI BIANCO
   | 1440 New York Avenue, NW
11 | Washington, DC 20005
   | Telephone: (202) 371-7000
12 | Facsimile: (202) 393-5760
13 | Attorneys for Defendant BearingPoint, Inc.
```

FILED

JAN 2 5 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BY FAX
LAB (NLS)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Richard P. Allocco, Lori Barker, Kenneth Boyd, Jr., Ronald Cootes, Ronald J. Fior, Phyllis E. Friedman, Lawrence L. Garlick, Harold I. Goldberg, Victor Guerrieri, Harvey C. Jones, Jr., Klawans Family Trust, Arthur Kulakow, Michael F. Little, David Mahler, Charles Mousseau, Douglas Mueller, Judith Orah Mueller, James G. Peterson, Andrea Potts, Glenda Goulette Schwem, John F. Shoch, Richard Thomas, George A. De Urioste, Darius Wallace, and Daniel Weller

Plaintiffs,

v.

Stephen P. Gardner, Matthew C. Gless, John J. Moores, Thomas G. Watrous, Charles E. Noell, William D. Savoy, Douglas Powanda, Richard Nelson, Arthur Andersen LLP, Ernst & Young Revisions-und Treuhandgesellschaft mbH, Wirschaftsprüfungsgesellschaft Steuerberatungsgesellschaft (HRB 10482),

Case No. 05 CV 0140

NOTICE OF REMOVAL OF ACTION UNDER 15 U.S.C. § 78bb(f)(2) (SLUSA)

NOTICE OF REMOVAL OF ACTION UNDER 15 U.S.C. § 78bb(f)(2) (SLUSA)   Case No. _____

1 | AWSC Société Coopérative, En Liquidation,
Daniel Stulac, KPMG, L.L.P., BearingPoint,
2 | Inc., Critical Path, Inc., BT Group, PLC,
British Telecommunications, PLC, Bull, S.A.,
3 | Insight Enterprises, Inc., Bindview
Development Corporation, Fujitsu
4 | Transactions Solutions, Inc., and DOES 12-
100
5 |
|                                          Defendants.
6 |

7        TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

8 SOUTHERN DISTRICT OF CALIFORNIA:

9        PLEASE TAKE NOTICE that defendant BearingPoint, Inc. ("BearingPoint")

10 hereby removes to this Court, pursuant to the Securities Litigation Uniform Standards Act of 1998,

11 15 U.S.C. §§ 77p, 78bb(f)(2) ("SLUSA"), the state court action described below.

12 **I.    Background.**

13        1.    On or about March 3, 2003, Plaintiffs filed a Complaint in the Superior

14 Court for the State of California, County of San Diego, entitled <u>Richard P. Allocco, Lori Barker,</u>

15 <u>Kenneth Boyd, Jr., Ronald Cootes, Ronald J. Fior, Phyllis E. Friedman, Lawrence L. Garlick,</u>

16 <u>Harold I. Goldberg, Victor Guerrieri, Harvey C. Jones, Jr., Klawans Family Trust, Arthur</u>

17 <u>Kulakow, Michael F. Little, David Mahler, Charles Mousseau, Douglas Mueller, Judith Orah</u>

18 <u>Mueller, James G. Peterson, Andrea Potts, Glenda Goulette Schwem, John F. Shoch, Richard</u>

19 <u>Thomas, George A. De Urioste, Darius Wallace, and Daniel Weller v. Stephen P. Gardner,</u>

20 <u>Matthew C. Gless, John J. Moores, Thomas G. Watrous, Charles E. Noell, William D. Savoy,</u>

21 <u>Arthur Andersen LLP, Arthur Andersen Germany, Arthur Andersen Worldwide SC, Ernst &</u>

22 <u>Young, Daniel Stulac, and DOES 1-100</u>, Case No. GIC 806450.

23        2.    On or about July 8, 2003, Plaintiffs filed a First Amended Complaint.

24        3.    On or about December 12, 2003, Plaintiffs' Second Amended Complaint,

25 which added BearingPoint as a defendant, was deemed filed by the state court.

26        4.    On January 9, 2004, counsel for BearingPoint received the Summons and

27 Second Amended Complaint.

28

---

NOTICE OF REMOVAL OF ACTION UNDER 15 U.S.C. § 78bb(f)(2) (SLUSA)      Case No. _____
2

5.    On January 27, 2004, counsel for BearingPoint executed the Acknowledgment of Receipt of the Summons, and the Summons and Second Amended Complaint were deemed served on January 27, 2004.

6.    On or about August 6, 2004, Plaintiffs filed a Third Amended Complaint.

7.    On or about December 17, 2004, Plaintiffs filed a Fourth Amended Complaint.

8.    All process, pleadings, and orders served on BearingPoint in the state action are attached hereto as Exhibits 1-26.

## II.    This Action Is Removable Pursuant to SLUSA.

9.    SLUSA expressly provides, among other things, that any "covered class action" involving a "covered security" that is brought in state court "shall be removable":

> Removal of Covered Class Actions. Any covered class action brought in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending.

15 U.S.C. § 78bb(f)(2).

10.    This removal provision implements SLUSA's general limitation on class actions based upon state law: "No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging – (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

11.    A "covered class action" is "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which – (I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii).

12.    The present case, together with Bains, et al. v. Moores, et al., which initially was filed in the Superior Court of the State of California, County of San Diego, and which BearingPoint is removing concurrently herewith, constitutes a covered class action for purposes of

---

NOTICE OF REMOVAL OF ACTION UNDER 15 U.S.C. § 78bb(f)(2) (SLUSA)      Case No. _____

1  SLUSA because (i) prior to removal, the <u>Allocco</u> and <u>Bains</u> actions were pending in Department 69

2  of the San Diego Superior Court before the Honorable Jeffrey B. Barton; (ii) the <u>Allocco</u> and <u>Bains</u>

3  actions involve common questions of law and fact; (iii) the <u>Allocco</u> and <u>Bains</u> actions seek to

4  recover damages on behalf of more than 50 persons; and (iv) the <u>Allocco</u> and <u>Bains</u> actions are

5  proceeding as a single action for numerous purposes, including coordinated discovery, settlement

6  and case management.

7       13.   Plaintiffs assert claims for violation of the California Corporations Code,

8  common law fraud and deceit, common law negligent misrepresentation, common law conspiracy

9  and common law aiding and abetting.  Plaintiffs' claims are based, in significant part, on alleged

10  misrepresentations concerning the financial condition of Peregrine Systems, Inc. and Plaintiffs'

11  allegation that they purchased Peregrine stock in reliance on the purported misrepresentations.

12  This action therefore is based on alleged misrepresentations made in connection with the purchase

13  of securities.  <u>See</u> 15 U.S.C. § 78bb(f)(1).

14       14.   Peregrine stock is a nationally traded security listed on the NASDAQ

15  National Market and therefore is a "covered security" within the meaning of SLUSA.  <u>See</u> 15

16  U.S.C. § 78bb(f)(5)(E).

17       15.   Because this action is a covered class action brought in state court involving

18  a covered security, this Court has exclusive jurisdiction over Plaintiffs' claims and removal is

19  appropriate.   15 U.S.C. § 78bb(f)(2) ("Any covered class action brought in any State court

20  involving a covered security, as set forth in paragraph (1) [regarding class actions], shall be

21  removable to the Federal district court for the district in which the action is pending, and shall be

22  subject to paragraph (1).").  <u>See also</u> <u>Falkowski v. Imation Corp.</u>, 309 F.3d 1123, 1128 (9th Cir.

23  2002), <u>amended on other grounds</u>, 320 F.3d 905 (9th Cir. 2003) ("[u]nder SLUSA, federal court is

24  the exclusive venue for fraud claims 'in connection with the purchase or sale of a covered security'

25  and the statute itself specifically provides for removal of such claims to federal court"); <u>In re Enron</u>

26  <u>Corp. Sec., Derivative & ERISA Litig.</u>, 284 F. Supp. 2d 511, 633-34 (S.D. Tex. 2003) (SLUSA

27  "provides for <u>mandatory</u> removal" when its requirements are met).

28

---

**III.** **The Removal Prerequisites Have Been Satisfied.**

16. BearingPoint was not named as a defendant in the <u>Bains</u> case until December 1, 2004, and was not served with the Summons and the Second Amended Complaint in that case until December 27, 2004.

17. A notice of removal is timely if filed within thirty days after service of a copy of the complaint. <u>Murphy Bros. v. Michetti Pipe Stringing, Inc.</u>, 526 U.S. 344, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999). This Notice is being filed on January 25, 2005, less than 30 days after BearingPoint was served with the Second Amended Complaint in <u>Bains</u> and became capable of removing both the <u>Allocco</u> and <u>Bains</u> cases. BearingPoint's notice of removal, therefore, is timely.

18. BearingPoint has made no previous application for this or similar relief.

19. Consent of all defendants to removal is not required because this case is being removed pursuant to SLUSA and not 28 U.S.C. §§ 1441(b) and 1446.

**IV.** **Notice to Parties and to the Superior Court.**

20. On the day this Notice is filed, BearingPoint will provide notice to all parties and to the Clerk of the Court for the Superior Court of California, County of San Diego.

DATED:   January 24, 2005          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____
James E. Lyons
Attorneys for Defendant BearingPoint, Inc.

# TABLE OF CONTENTS FOR EXHIBITS

<u>Document</u>                                                                                                       <u>Page</u>

EXHIBIT 1

    Second Amended Complaint for Violations of: (1) Cal. Corp. Securities Law
of 1968; (2) Fraud and Deceit and Negligent Misrepresentation; and (3) The
Common Law of Conspiracy and Aiding and Abetting ..........................................1

EXHIBIT 2

    Notice and Acknowledgment of Receipt .............................................................74

EXHIBIT 3

    Order After Hearing.......................................................................................75

EXHIBIT 4

    Notice of Case Management Conference ..............................................................79

EXHIBIT 5

    Order Granting Application of Gary DiBianco for Admission to State Bar
*Pro Hac Vice*....................................................................................................80

EXHIBIT 6

    Amendment to Complaint..................................................................................82

EXHIBIT 7

    Amendment to Complaint..................................................................................83

EXHIBIT 8

    Notice of Case Management Conference ..............................................................89

EXHIBIT 9

    Stipulation and Order.......................................................................................90

EXHIBIT 10

    Amendment to Complaint..................................................................................95

EXHIBIT 11

    Stipulation and Protective Order.........................................................................96

1

EXHIBIT 12

2          Confidentiality Stipulation and Protective Order ..................................................116

3  EXHIBIT 13

4          Third Amended Complaint for Violations of:  (1) Cal. Corp. Securities Law
           of 1968; (2) Fraud and Deceit and Negligent Misrepresentation; and (3) The
5          Common Law of Conspiracy and Aiding and Abetting ......................................123

6  EXHIBIT 14

7          Order Granting Defendants Stephen P. Gardner's and Daniel Stulac's Motions
           to Stay Discovery Against Them ........................................................................236

8  EXHIBIT 15

9          Stipulation and Order Re Responses to Plaintiffs' Third Amended
10         Complaint............................................................................................................241

11 EXHIBIT 16

12         Stipulation and Order Re Response to Plaintiffs' Third Amended Complaint ....246

13 EXHIBIT 17

14         Case Management Order.......................................................................................254

15 EXHIBIT 18

16         Notice of Case Management Conference .............................................................262

17 EXHIBIT 19

18         Order Granting Plaintiffs' *Ex Parte* Application for Order Allowing Filing
           of Amendment to Third Amended Complaint .....................................................263
19
   EXHIBIT 20
20
           Case Management Order No. 2.............................................................................265
21
   EXHIBIT 21
22
           Notice of Case Management Conference .............................................................273
23
   EXHIBIT 22
24
           Notice of New Hearing ........................................................................................274
25
   EXHIBIT 23
26
           Order After Hearing.............................................................................................282

27

28

EXHIBIT 24

Fourth Amended Complaint for Violations of:  (1) Cal. Corp. Securities Law
of 1968; (2) Fraud and Deceit and Negligent Misrepresentation; and (3) The
Common Law of Conspiracy and Aiding and Abetting ....................................295

EXHIBIT 25

Answer of Defendant Stephen P. Gardner to Plaintiffs' Fourth Amended
Complaint..............................................................................................................422

EXHIBIT 26

Demurrer of Defendant BearingPoint to Plaintiffs' Fourth Amended
Complaint..............................................................................................................434

1   Richard M. Heimann (State Bar No. 063607)
    James M. Finberg (State Bar No. 114850)
2   Joy A. Kruse (State Bar No. 142799)
    Daniel E. Barenbaum (State Bar No. 209261)
3   Christopher K. Leung (State Bar No. 210325)
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4   Embarcadero Center West
    275 Battery Street, 30th Floor
5   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   Attorneys for Plaintiffs

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN DIEGO

10                    UNLIMITED JURISDICTION

11

12   RICHARD P. ALLOCCO, LORI BARKER,          Case No.  GIC 806450
     KENNETH BOYD, JR., RONALD
13   COOTES, RONALD J. FIOR, PHYLLIS E.        SECOND AMENDED COMPLAINT FOR
     FRIEDMAN, LAWRENCE L. GARLICK,            VIOLATIONS OF:
14   HAROLD I. GOLDBERG, VICTOR
     GUERRIERI, HARVEY C. JONES, JR.,          (1) CAL. CORP. SECURITIES LAW OF
15   KLAWANS FAMILY TRUST, ARTHUR                  1968;
     KULAKOW, MICHAEL F. LITTLE,
16   DAVID MAHLER, CHARLES                      (2) FRAUD AND DECEIT AND
     MOUSSEAU, DOUGLAS MUELLER,                     NEGLIGENT
17   JUDITH ORAH MUELLER, JAMES G.                  MISREPRESENTATION
     PETERSON, ANDREA POTTS, GLENDA
18   GOULETTE SCHWEM, JOHN F. SHOCH,           (3) THE COMMON LAW OF
     RICHARD THOMAS, GEORGE A.                      CONSPIRACY AND AIDING AND
19   de URIOSTE, DARIUS WALLACE, and               ABETTING
     DANIEL WELLER,
20
                  Plaintiffs,
21   v.                                        DEMAND FOR JURY TRIAL

22   STEPHEN P. GARDNER, MATTHEW C.
     GLESS, JOHN J. MOORES, THOMAS G.
23   WATROUS, CHARLES E. NOELL,
     WILLIAM D. SAVOY, ARTHUR
24   ANDERSEN LLP, ARTHUR ANDERSEN
     GERMANY, ARTHUR ANDERSEN
25   WORLDWIDE SC, DANIEL STULAC,
     KPMG d.b.a. KPMG CONSULTING, INC.;
26   BEARINGPOINT, INC.; CRITICAL
     PATH; and DOES 1-100,
27
                  Defendants.
28                                                          1
     2S8957: 1                                          EXHIBIT 1

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

I.    PEREGRINE'S ACCOUNTING PRACTICES INVOLVED SUBSTANTIAL
MISREPRESENTATIONS (MISSTATEMENTS AND OMISSIONS) ......................... 1

II.   PEREGRINE ACQUIRED REMEDY CORPORATION IN EXCHANGE FOR
PEREGRINE SECURITIES OF ARTIFICIALLY INFLATED VALUE ................. 7

III.  DEFENDANTS' MISREPRESENTATIONS INJURED PLAINTIFFS. .................. 8

THE PARTIES ......................................................................................................... 9

II.   PLAINTIFFS ......................................................................................... 9

III.  DEFENDANTS ....................................................................................... 13

    A.    Executive Defendants ................................................................ 13

    B.    Director Defendants .................................................................. 15

    C.    Accountant Defendants ............................................................ 16

    D.    Defendants ................................................................................ 17

    E.    Doe Defendants ........................................................................ 18

JURISDICTION AND VENUE ............................................................................... 19

FACTUAL ALLEGATIONS ................................................................................... 19

I.    MISCELLANY ....................................................................................... 19

    A.    Definitions and Abbreviations .................................................. 19

    B.    General Allegations .................................................................. 20

II.   THE HISTORY OF DEFENDANTS' WRONGDOING .................................... 22

    A.    Aiding/Abetting and Conspiracy. ............................................ 22

    B.    KPMG/BearingPoint. .............................................................. 23

    C.    Critical Path. ............................................................................ 25

    D.    Defendants Made Repeated Material Misstatements and Omissions About
Peregrine's Conditions. ........................................................... 27

    E.    Defendants' Misstatements and Omissions Carried Over Into Peregrine's
Merger Negotiation and Agreement With Remedy ................... 45

    F.    The Truth About Defendants' Misrepresentations Eventually Emerged. ............ 48

    G.    Defendants' Conduct Violated GAAP. ................................... 53

PRAYER FOR RELIEF .......................................................................................... 71

PLAINTIFFS DEMAND A TRIAL BY JURY ........................................................ 71

PLAINTIFFS DEMAND A TRIAL BY JURY ........................................................ 72

**2**
**EXHIBIT 1**

Plaintiffs, by their undersigned counsel, allege upon personal knowledge as to their own acts and upon counsel's investigation, which included, among other things, interviews and a review of public announcements, publicly filed documents, press releases, and media reports regarding Peregrine Systems, Inc. ("Peregrine" or the "Company"), as follows:

## INTRODUCTION

I.   ## PEREGRINE'S ACCOUNTING PRACTICES INVOLVED SUBSTANTIAL MISREPRESENTATIONS (MISSTATEMENTS AND OMISSIONS).

1.   Peregrine is a provider of software and services designed to reduce the frictional cost of doing business for its clients' organizations, addressing infrastructure resource management, employee relationship management, and e-commerce technologies and services. As of March 31, 2001, the end of fiscal year 2001 ("FY01"), Peregrine employed 2956 people worldwide. In FY01, according to its 10-K for that year, the Company collected $565 million in revenue but incurred a net loss of $852 million.

2.   Beginning in April 2002, Peregrine began to reveal to the public that it had grossly misstated its revenue for fiscal years 2000 and 2001 ("FY00" and "FY01") and the first three quarters of fiscal year 2002 ("FY02"), resulting in a drastic and sudden devaluation of Peregrine stock. On May 23, 2002, Peregrine announced the results of a previously announced internal audit, disclosing a massive restatement of revenues and consequently the entirety of the financial statements, which derived their numbers from those revenues. The Company estimated that as much as $100 million in revenues would be erased. Peregrine also disclosed that the SEC had commenced an investigation into the Company's accounting practices. Peregrine's disclosure of its misstatements and material omissions reflected improper sales practices and improper revenue recognition policies in violation of generally accepted accounting principles ("GAAP"). In that same announcement, Peregrine announced that its Chairman and Chief Executive Officer ("CEO") Stephen Gardner as well as its Chief Financial Officer ("CFO") and Executive Vice President ("EVP") Matthew Gless were resigning.

3.   On or about November 22, 2002, the SEC filed a civil lawsuit against Ilse Cappel, who worked at Peregrine from 1993 to June 2002, most recently as Assistant Treasurer,

1   Cappel was sued under section 10(b) of the 1933 Securities Act and for illegal insider trading.

2   Larry West, an SEC enforcement attorney, told the Los Angeles Times that the civil complaint

3   was the first such action involving the SEC's ongoing investigation of accounting practices at

4   Peregrine. The SEC accused Cappel of acting with other executives including Gless in a scheme

5   to hide the company's difficulties in collecting its accounts receivables. The company is also

6   under investigation by the Department of Justice for its accounting practices.

7       4.    The SEC alleges in its complaint against Cappel:

8       Beginning no later than 1999, Peregrine management engaged in a
        myriad of deceptive sales and accounting practices to create the
9       illusion of growth, including secretly adding material sale
        contingencies — by oral or written side agreement — to what
10      appeared on their face to be binding contracts.

11      Much of Peregrine's improper revenue recognition occurred in
        connection with its purported software sales to resellers, also
12      known as "channel partners." Peregrine's written contracts with
        channel partners typically appeared to bind the channel partners to
13      pay Peregrine. In reality, the channel partners' obligations to
        Peregrine often were not fixed, but instead were conditioned upon
14      resale to an end-user. Peregrine personnel typically concealed these
        contingencies in written or oral side agreements. Although
15      Peregrine personnel knew that the company's channel partners had
        not committed to purchase Peregrine's software, Peregrine
16      nevertheless recorded these transactions as revenue.

17      As a result of these improper revenue recognition practices, during
        Peregrine's 17 quarters of "growth," the company was
18      accumulating, on its balance sheet, millions of dollars of aging
        receivables that Peregrine management knew the company would
19      never collect. Large aged accounts receivable were not turning into
        cash, and as a result DSO and other important indicators of
20      Peregrine's financial health were deteriorating.

21      Certain Peregrine personnel understood that the company's
        customers would not pay invoices generated from contingent sales
22      and that if these purported accounts receivable remained on
        Peregrine's balance sheet, the company's DSO figure would
23      increase. They also understood that if DSO became too high,
        securities analysts might suspect that Peregrine had improperly
24      recorded revenue.

25      Peregrine's Chief Accounting Officer[1] directed Cappel to remove
        receivables from Peregrine's balance sheet by selling them to banks
26      at quarter end. Cappel followed the Chief Accounting Officer's
        instruction. Each quarter she calculated the dollar amount of

27

[1] In November 2000, the Chief Accounting Officer was promoted to Chief Financial Officer and became a Director
28  on the Board. In May 2001, he was given the additional title Executive Vice President.

**4**
                                                                              **EXHIBIT 1**

*SECOND AMENDED COMPLAINT*

1   receivables she needed to sell to manage the DSO number down to
    the target range the Chief Accounting Officer had set for her. After
2   Cappel sold the receivables for cash, Peregrine removed them from
    its balance sheet.² This practice, which Peregrine did not properly
3   disclose to investors, reduced the company's DSO to the level the
    Chief Accounting Officers prescribed, and perpetuated the illusion
4   that Peregrine's customers were promptly paying Peregrine.

5       5.      Also, on November 22, 2002, Cappel pled guilty to conspiracy to commit

6   bank fraud. She agreed to cooperate with investigators. United States Attorney Carol Lam told

7   the San Diego Union-Tribune that Cappel's plea was the "beginning of a process" and that

8   criminal conduct "extended deep into the ranks of Peregrine executives."

9       6.      Peregrine had misrepresented the truth about its business and financial

10  results, condition, projections, and prospects (its "Conditions") by making false statements of

11  material fact ("misstatements") and omitting to state material facts ("omissions"). Among other

12  things, Peregrine failed to disclose that:

13          a.      it had improperly recorded revenues that were later written off such

14  that the revenues initially reported were substantially inflated and did not reflect the Company's

15  true financial position;

16          b.      the Company's financial statements materially overstated the

·17 operating results due to the failure to properly record the revenues;

18          c.      earnings projections and statements about the Company were also

19  inflated, because those figures were derived from inflated revenues;

20          d.      Peregrine failed to disclose that it had recognized over $509 million

21  in excess revenues; and

22          e.      the revenue reporting problems were the direct result of not

23  complying with the General Accepted Accounting Principles.

24      7.      These misrepresentations were made in the Registration Agreement and

25  Plan of Merger and Reorganization ("Merger Agreement"), the Registration Statement filed by

26

27  ² On August 29, 2002, Peregrine announced that its management "believes that the company should have accounted
    for its accounts receivable factoring arrangements as loans instead of sales of receivables without recourse," and that
28  "previously reported balance sheets will be restated to reflect the loan balances, which were as high as $180 million
    in past periods."

                                                                            5
2280511                          - 3 -                          **EXHIBIT 1**

1  Peregrine with the Securities and Exchange Commission ("SEC") on July 23, 2001 ("the

2  Registration Statement"), and the Proxy Statement/Prospectus, SEC filings, press releases, and

3  elsewhere. This First Amended Complaint lists several specific misrepresentations, *infra*.

4        8.    The misrepresentations resulted in inflated revenue figures, which infected

5  figures throughout the financial statements. In turn, this false business and financial information

6  caused Peregrine's stock price to be substantially artificially inflated.

7        9.    The period of the misstatements and omissions lasted from July 21, 1999,

8  when Peregrine announced its first quarter ("Q1") results for FY00, to May 23, 2002, the date on

9  which Peregrine announced its restatement of revenues and other financial data spanning back to

10  Q1 FY00 (the "Relevant Period").

11        10.    On February 28, 2003, Peregrine filed restated consolidated financial

12  statements for the years ended March 31, 2001 and 2000. The consolidated financial results for

13  the fiscal year ended March 31, 2002 were not previously issued. Peregrine had previously

14  reported its results for the first three fiscal quarters of the March 31, 2002 fiscal year. Peregrine's

15  consolidated balance sheet as of March 31, 2002 and the consolidated statements of operations,

16  cash flows and changes in stockholders' equity (deficit) for the year ended March 31, 2002,

17  include restatement adjustments related to the first nine months of the fiscal year. The restated

18  financials show that Peregrine inflated revenue by $509 million from April 1999 through

19  December 2001. Approximately half of the $509 million, or $259 million, represented "non-

20  substantiated transactions." Peregrine had previously told investors and government regulators

21  that its losses during that time period amounted to $1.54 billion, but the restatement showed those

22  losses to be $4.09 billion.

23        11.    The accounting restatement adjustments relate primarily to revenue

24  recognition, accounting for business combinations, balance sheet presentation of factored

25  accounts receivable and accounting for stock options and the related income tax effects.

26  Generally, these adjustments corrected previously reported overstated revenue and previously

27  understated total liabilities and operating expenses of the Company.

28

**6**
**EXHIBIT 1**

1    12.    Revenues for the fiscal years ended March 31, 2001 and 2000 were

2    overstated $254.1 million and $121.7 million, respectively. While a portion of the revenue

3    reversal will be recognized in future periods and has been recorded in deferred revenue in the

4    respective balance sheets, a significant portion of the revenue reversal is permanent. There were

5    several categories of revenue recognition irregularities:

6         a.    Payment Conditions and Contingencies—In addition to selling

7    directly to end-users, Peregrine sells products and services through third party resellers. During

8    fiscal years 2002, 2001 and 2000, Peregrine recognized revenue when it "sold in" to a third party

9    reseller, regardless of whether the reseller had a firm commitment from an end-user to purchase

10   the software. In many cases, revenue was recognized despite the fact that the purchase

11   commitments with resellers were not fixed, but were subject to conditions and contingencies. As

12   a result, revenue has been restated to reflect revenue only upon completion of the ultimate sale to

13   an end-user customer.

14        b.    Reciprocal Transactions – Peregrine engaged in a number of

15   reciprocal transactions related to acquisitions, investments, and sales to customers. In certain

16   instances, Peregrine purchased product lines from or made investments in customers who agreed

·17   to license Peregrine products. In such instances, Peregrine generally recognized revenue for the

18   product licensed and capitalized the acquired product received from or investment made in the

19   licensee. In other instances, Peregrine engaged in non-monetary exchanges, trading Peregrine

20   software or services for a customer's product. In these instances, Peregrine recorded the product

21   or services received as either inventory or prepaid expenses and recognized license revenue for

22   the Peregrine product licensed. Accounting for these transactions has been restated as

23   appropriate, to reduce the original cost of the acquisition or investment or reflect the exchange at

24   historical cost when either (i) the value of the exchange could not be objectively measured or

25   (ii) the exchange was for product to be sold in the ordinary course of business.

26        c.    Timing Issues – Peregrine used long-term installment contracts as a

27   standard business practice during the restatement period. The contract fee was generally

28   recognized as revenue at the time the installment contract was signed. However, based on the

1   Company's review of the collection history of these contracts. along with the Company's history

2   of providing concessions to customers. the Company restated results to reflect revenue upon

3   collection of the extended payment. In addition, Peregrine previously recorded numerous

4   transactions as revenue in a given period, although the sales order was not completed until after

5   the end of the fiscal period. Revenue has been restated to record these transactions in the proper

6   periods.

7          d.      Improper Write-offs – Many accounts receivable balances arising

8   from improperly recorded revenue transactions, as described above. were inappropriately charged

9   to bad debt expense, cost of acquisitions, or accrued liabilities. The restated results reflect these

10  transactions as reductions in previously reported revenue.

11         13.     Peregrine sold, or factored, receivables to multiple financial institutions.

12  over the past three years. Peregrine recorded these factoring transactions as true sales of

13  receivables recording the cash received and removing the related receivables from the balance

14  sheet. as if the risk of collection loss had passed to the buyer without recourse. However. based

15  on the terms of the factoring agreements and based on past servicing practices of the Company.

16  these accounts receivable factoring arrangements should have been recorded as loans instead of

17  sales of receivables. As a result, the balance sheets have been restated to reflect the accounts

18  receivable and related bank loans.

19         14.     During the restatement period, Peregrine made several business

20  acquisitions, some of which were not properly recorded. In certain cases, reciprocal licensing

21  transactions were recorded as revenue from customers, instead of reducing acquisition cost. In

22  other instances, the value of in-the-money stock options was not included as a cost of the

23  acquisition. In many transactions, acquisition liability accruals were overstated and operating

24  expenses (such as bad debts or revenue reversals) were improperly offset against the accrual. The

25  consolidated financial statements have been restated for these matters.

26         15.     Tne Company previously recorded charges to reflect the impairment of

27  goodwill and other intangibles. strategic investments and other long-term assets. The Company

28  has determined that charges originally booked were understated. The restated consolidated[8]

**EXHIBIT 1**

1   financial statements reflect the proper amount of charges to reduce these assets to the appropriate

2   carrying values.

3         16.    Based on Peregrine's past practice, many employee stock options

4   contained exercise prices that were below the common stock mark

5   et values on the dates the options were granted.  Under APB Opinion No. 25, the Company

6   should have recorded compensation cost equal to the aggregate difference between the fair value

7   of the stock and the exercise price of the options granted.  The Company also accelerated the

8   vesting periods for certain options which had previously been granted to employees.  Under

9   FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock

10   Compensation, an Interpretation of APB Opinion No. 25" ("FIN 44"), the acceleration of vesting

11   of stock options after June 30, 2000 could cause an accounting charge for the affected options.

12   The consolidated financial statements, as restated, now reflect the appropriate accounting for

13   stock options.

14         17.    During the Relevant Period, Peregrine's common stock price was

15   artificially inflated due to Defendants' misrepresentations (including both their misstatements and

16   their omissions).  Peregrine's common stock peaked at $80.62 (during the week of March 27,

17   2000), but after the revenue restatement announcement on May 23, 2002, Peregrine stock closed

18   at $1.59.  After being delisted from NASDAQ on July 5, 2002, Peregrine stock has continued to

19   trade sparsely elsewhere.  In the past two months, its value has hovered around a dime.  Peregrine

20   stock was valued at $0.08 on November 11, 2002.

21   **II.   PEREGRINE ACQUIRED REMEDY CORPORATION IN EXCHANGE FOR
         PEREGRINE SECURITIES OF ARTIFICIALLY INFLATED VALUE.**

22   

23         18.    This action is brought by certain former shareholders of Remedy

     Corporation ("Remedy"), who were injured as a result of Remedy's merger with Peregrine and

24   their consequent acceptance of Peregrine securities, offered and accepted at substantially

25   artificially inflated valuations due to Defendants' misstatements and omissions.

26   

27         19.    Before merging with Peregrine, Remedy was a leading supplier of

28   information technology service management and customer relationship management solutions.

288031.1         - 7 -         **9**
                             ***EXHIBIT 1***
                SECOND AMENDED COMPLAINT

1    Remedy was a publicly held company with 1314 employees worldwide at the close of FY00, on

2    December 31, 2000, the last complete fiscal year before the Merger.  In that year it generated

3    $289 million in revenue and earned $34 million in net income.  During FY99 and FY00, Remedy

4    stock ranged in value from $10.62 to $64.22.

5           20.     After roughly two years of discussion and negotiation culminating on

6    August 27, 2001, Peregrine and Remedy completed a merger (the "Merger"), through which

7    Peregrine paid all Remedy shareholders $9.00 plus 0.9065 shares of Peregrine stock per share of

8    Remedy stock (the "Merger Exchange").  That day, Peregrine stock closed at $23.01, and

9    Remedy stock closed at $29.40.

10          21.     Plaintiffs invested substantial time, effort, and financial resources in the

11   Merger.  The acquisition was valued at approximately $1.1 billion.  After the Merger, Remedy

12   stockholders controlled approximately 14.7% of Peregrine.

13   **III.    DEFENDANTS' MISREPRESENTATIONS INJURED PLAINTIFFS.**

14          22.     During the Relevant Period, Plaintiffs were aware of Defendants'

15   misrepresentations (including both their misstatements and their omissions) and were unaware of

16   the truth regarding Peregrine's Conditions.  Defendants knew these realities and were the sole

17   possessors of the true, accurate, and complete information about Peregrine's Conditions, to which

18   Plaintiffs had no access.  Plaintiffs relied on the misrepresentations in considering and entering

19   into the Merger, through which they made substantial investments in Peregrine securities.  Such

20   investments became almost worthless once the markets reacted to Peregrine's revelations about

21   its misrepresentations and downwardly corrected Peregrine's stock price.

22          23.     Plaintiffs would not have acquired Peregrine's securities either at all or at

23   the price that they were purchased had the market price reflected their true value or had they

24   known the truth about Peregrine's Conditions.

25                              **THE PARTIES**

26          24.     This action is brought by the following Plaintiffs against the following

27   Defendants for violations of California statutory and common law and arises out of Defendants'

28   misrepresentations during the Relevant Period.

SECOND AMENDED COMPLAINT

II.   **PLAINTIFFS**

25.     Plaintiff Richard P. Allocco was the Executive Vice President of Global Sales and Services at Remedy at the time of the merger. Allocco acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. He currently has 379,800 shares. Allocco resides in Pleasanton, California.

26.     Plaintiff Lori Barker was employed by Remedy from February 1998 through the merger on August 27, 2001, most recently as Remedy's Director of Finance and Investor Relations. Barker acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. She also acquired 700 Peregrine shares on January 28, 2002. She currently has 63,134 shares and options. Barker resides in Redwood City, California.

27.     Plaintiff Kenneth Boyd, Jr. was CIO of Remedy from December 1998 through the merger on August 27, 2001. After the Merger, Boyd was Vice President of Business Development, Office of the Chairman. Boyd acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. He acquired additional options after the Merger and prior to May 23, 2002. Boyd resides in Sunnyvale, California.

28.     Plaintiff Ronald R. Cootes was a Distinguished Engineer at the time of the merger with Peregrine and is currently employed by Remedy. Cootes acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. He currently has 4,894 shares, and 99,698 options. Cootes resides in Los Gatos, California.

29.     Plaintiff Ronald J. Fior was the Vice President ("VP"), Finance and Operations, and CFO of Remedy from September 1998 through the Merger on August 27, 2001. Fior acquired Peregrine shares and options through the Merger Exchange on August 27, 2001, as well as making sales and option exchanges subsequent to that. Fior currently has 184,424 shares. Fior resides in Redwood City, California.

30.     Plaintiff Phyllis E. Friedman was the Office Manager and then Manager of Employee Programs of Remedy from January 3, 1993 through the Merger on August 27, 2001. Friedman acquired Peregrine shares and options through the Merger Exchange on August 27,

SECOND AMENDED COMPLAINT

1   2001. She currently has 2,969 shares and 10,297 unexercised options. Friedman resides in

2   Redwood City, California.

3          31.    Plaintiff Lawrence L. Garlick was the co-founder, chairman, and CEO of

4   Remedy from the inception of Remedy until the acquisition of Remedy by Peregrine (November

5   20, 1990 until August 27, 2001). Garlick acquired Peregrine shares and options through the

6   Merger Exchange on August 27, 2001. After the Merger until July 2002, Garlick served as a

7   director on the Board of Directors. He currently holds 2,156,633 shares. Garlick resides in Palo

8   Alto, California.

9          32.    Plaintiff Harold I. Goldberg was a Vice President and General Manager at

10  Remedy at the time of the Merger. He acquired Peregrine shares and options through the Merger

11  Exchange on August 27, 2001. He currently has approximately 355,004 options and 1,570

12  shares. Goldberg resides in San Jose, California.

13         33.    Plaintiff Victor Guerrieri was the Vice President of Sales Americas at

14  Remedy at the time of the Merger. Guerrieri acquired Peregrine shares and options through the

15  Merger Exchange on August 27, 2001. He sold his remaining Peregrine shares in December

16  2002. Guerrieri resides in Pleasanton, California.

17         34.    Plaintiff Harvey C. Jones, Jr. was a Remedy director from November 1994

18  through the Merger on August 27, 2001. Jones acquired Peregrine shares and options through the

19  Merger Exchange on August 27, 2001. On November 19, 2002, he liquidated his shares. Jones

20  resides in Palo Alto, California.

21         35.    Plaintiff Barry Klawans was a Software Engineer or Engineering Manager

22  at Remedy from 1991 through February 20, 1997. The Klawans Family Trust acquired Peregrine

23  shares and options through the Merger Exchange on August 27, 2001. The Klawans Family Trust

24  currently has 33,490 shares. Klawans resides in San Francisco, California.

25         36.    Plaintiff Arthur Kulakow was a Senior Software Engineer at Remedy from

26  September 1991 to January 1996. Before the Merger Exchange on August 27, 2001, Kulakow

27  held 15,000 shares through original stock options. He currently has 12,691 shares. Kulakow

28  resides in Saratoga, California.

255051 1                              - 10 -

**12**

**EXHIBIT 1**

37.     Plaintiff Michael F. Little was Vice President of Worldwide Support at Remedy at the time of the Merger. He acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. He currently has 468 shares and 203,147 options. Little resides in Fremont, California.

38.     Plaintiff David Mahler was a co-founder and director of Remedy from 1990 through the Merger. Mahler acquired Peregrine shares through the Merger Exchange on August 27, 2001. He currently has 562,571 shares. Mahler resides in Los Altos Hills, California.

39.     Plaintiff Charles Mousseau was a Senior Staff Engineer at the time of the merger with Peregrine and is currently employed by Remedy. Mousseau acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. He currently has 11,138 shares and 35,963 options. Mousseau resides in Palo Alto, California.

40.     Plaintiff Douglas Mueller was a co-founder and Software Engineer at Remedy from December 1990 through the Merger on August 27, 2001. Mueller acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. Mueller purchased 13,100 shares on the open market in January 2002. He currently has 1,095,654 shares/options. Mueller resides in Palo Alto, California.

41.     Plaintiff Judith Orah Mueller is the wife of Douglas Mueller. She acquired Peregrine shares through the Merger Exchange on August 27, 2001. She currently holds 26,354 shares. Mueller resides in Palo Alto, California.

42.     Plaintiff James G. Peterson was the Vice President of the Action Request System Business Unit for Remedy. Peterson acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. After the merger, Peterson was Vice President of Engineering. Peterson purchased 5,000 Peregrine shares on May 8, 2002. He currently has 5,989 shares and approximately 100,000 options. Peterson resides in San Jose, California.

43.     Plaintiff Andrea Potts was the Worldwide Vice President of Human Resources of Remedy from August 17, 1999 through November 31, 2001. Potts acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. She currently has 1860 shares and 184,475 options. Potts resides in Los Gatos, California.

**13**
**EXHIBIT 1**

44.   Plaintiff Glenda Goulette Schwem was a Director of Contracts and Intellectual Property at Remedy from April 1998 through October 2001. Schwem acquired Peregrine shares and options through the Merger Exchange on August 27, 2001. She currently has 246 shares. Schwem resides in Pleasanton, California.

45.   Plaintiff John F. Shoch was a Remedy director from January 1991 through the Merger on August 27, 2001. Shoch acquired Peregrine shares and options through the Merger Exchange on August 27, 2001, as well as sales and option exchanges subsequent to that. Shoch currently has 180,618 shares. Shoch resides in Woodside, California.

46.   Plaintiff Richard Thomas was a Quality Assurance Manager at Remedy from April 1993 through August 1996. Thomas acquired Peregrine shares through the Merger Exchange on August 27, 2001. Thomas liquidated his Peregrine shares on September 27, 2002. Thomas resides in Sunnyvale, California.

47.   Plaintiff George A. de Urioste was the VP, Finance and Operations, and CFO of Remedy from March 1993 until July 1998. De Urioste acquired Peregrine shares and options through the Merger Exchange on August 27, 2001, as well through an open market purchase of 1,000 shares on April 6, 2000. De Urioste currently has 178,707 shares. De Urioste resides in Atherton, California.

48.   Plaintiff Darius Wallace was Services Technical Director at Remedy at the time of the merger. Wallace acquired Peregrine shares through the bonus program and the ESPP program. He currently has approximately 90,000 shares. Wallace resides in San Jose, California.

49.   Plaintiff Daniel Weller was a Software Engineer or Engineering Manager of Remedy from 1991 through approximately April, 1997. Weller acquired Peregrine shares through the Merger Exchange on August 27, 2001. Weller also purchased 30,000 shares of Peregrine common stock on May 2, 2002. He currently has 166,349 shares. Weller resides in Palo Alto, California.

**14**
**EXHIBIT 1**

III.   **DEFENDANTS**

A.   **Executive Defendants**

50.   Defendant Stephen P. Gardner ("Gardner") served as Peregrine's Chairman of the board and CEO. Gardner first joined Peregrine in May 1997 as VP of Strategic Operations. In January 1998. he became EVP and Principal Executive Officer of the Company. He became CEO in April 1998. Gardner resigned from the Company on or about May 23, 2002. Gardner resides in San Diego, California.

51.   Gardner engaged in the following option and stock transactions from July 27, 1999 to May 23, 2002:

| Date | Transaction | Shares |
|---|---|---|
| August 4, 1999 | Option Sale | 12,500 |
| August 5, 1999 | Option Sale | 7,500 |
| August 5, 1999 | Option Sale | 7,500 |
| August 6, 1999 | Option Sale | 5,000 |
| August 9, 1999 | Option Sale | 5,000 |
| August 9, 1999 | Option Sale | 42,500 |
| August 9, 1999 | Sale | 80,000 |
| August 13, 1999 | Option Sale | 12,500 |
| August 13, 1999 | Option Sale | 7,500 |
| August 16, 1999 | Sale | 20,000 |
| February 22, 2000 | Option Sale | 35,000 |
| February 23, 2000 | Option Sale | 15,000 |
| February 23, 2000 | Option Sale | 25,000 |
| February 23, 2000 | Option Sale | 117,762 |
| February 24, 2000 | Option Sale | 37,238 |
| February 24, 2000 | Option Sale | 20,262 |
| February 28, 2000 | Sale | 157,762 |
| February 28, 2000 | Sale | 57,500 |
| March 2, 2000 | Sale | 35,000 |
| February 8, 2001 | Purchase | 2,500 |
| February 13, 2001 | Purchase | 2,500 |
| September 4, 2001 | Sale | 2,250 |
| September 13, 2001 | Sale | 144,000 |

**15
EXHIBIT 1**

SECOND AMENDED COMPLAINT

| Date | Transaction | Shares |
|---|---|---|
| September 21, 2001 | Purchase | 10,500 |
| February 8, 2002 | Purchase | 9,500 |

52.     Defendant Matthew C. Gless ("Gless") served as Peregrine's CFO and director. He first joined Peregrine as Corporate Controller in April 1996. In October 1998, he became VP of Finance and Chief Accounting Officer ("CAO"). From October 2000 until his resignation on or about May 23, 2002, Gless served as CFO and director. Gless resides in San Diego, California.

53.     Gless engaged in the following option and share transactions from July 1999 to May 2002:

| Date | Transaction | Shares |
|---|---|---|
| July 26, 1999 | Option Sale | 11,250 |
| July 26, 1999 | Option Sale | 3,125 |
| July 28, 1999 | Sale | 14,375 |
| August 17, 1999 | Option Sale | 1,250 |
| August 26, 1999 | Option Sale | 5,000 |
| August 26, 1999 | Option Sale | 5,000 |
| August 30, 1999 | Sale | 10,000 |
| February 15, 2000 | Option Sale | 9,000 |
| February 15, 2000 | Option Sale | 4,000 |
| February 15, 2000 | Option Sale | 5,000 |
| February 15, 2000 | Option Sale | 5,000 |
| February 15, 2000 | Option Sale | 2,500 |
| February 15, 2000 | Option Sale | 500 |
| February 15, 2000 | Option Sale | 7,750 |
| February 15, 2000 | Option Sale | 10,000 |
| February 15, 2000 | Option Sale | 6,250 |
| February 22, 2000 | Sale | 21,875 |
| February 23, 2000 | Option Sale | 5,000 |
| February 25, 2000 | Option Sale | 8,000 |
| February 25, 2000 | Option Sale | 500 |
| February 25, 2000 | Option Sale | 2,000 |
| February 25, 2000 | Option Sale | 1,000 |

**16**
**EXHIBIT 1**

| Date | Transaction | Shares |
|------|-------------|--------|
| February 25, 2000 | Option Sale | 1,500 |
| February 28, 2000 | Sale | 5,000 |
| February 28, 2000 | Sale | 8,000 |
| February 28, 2000 | Sale | 5,000 |
| February 7, 2002 | Purchase | 5,000 |
| February 7, 2002 | Purchase | 4,000 |
| February 7, 2002 | Purchase | 1,000 |

54.    Defendants Gardner and Gless are collectively referred to herein as the "Executive Defendants."

55.    The Executive Defendants, by reason of their executive positions with Peregrine, board membership and/or representations, were controlling persons of the Company and had and exercised the power and influence to cause Peregrine to engage in the conduct complained of herein. The Executive Defendants were in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the public dissemination of, the misrepresentations.

**B.    Director Defendants**

56.    Defendant John J. Moores was Peregrine's Chairman of the board. He first became a director in March 1989. During the decade from March 1990 until July 2000, which included all of FY00 and part of FY01, Moores served as Chairman of the board. Moores serves on the board's compensation committee, which determines salaries, incentives, and other forms of compensation for directors, officers, and other employees of Peregrine. Moores resides in Del Mar, California.

57.    Moores engaged in the following option and share transactions from July 1999 to May 2002:

a.    On July 26, 1999, he sold 2,493,642 shares.

b.    On February 23, 2000, he sold 571,508 shares.

c.    On February 23, 2000, he sold 1,061,368 shares.

d.    On February 29, 2000, he sold 816,440 shares.

**17**
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

1               e.       On February 29, 2000, he sold 4,980,186 shares.

2               f.       On February 21, 2001, he sold 716,223 shares.

3               g.       On February 22, 2001, he sold 280,000 shares.

4               h.       On February 28, 2001, he sold 3,456,223 shares.

5           58.     Defendant Thomas G. Watrous, Sr. was a Peregrine director who served on

6    the audit committee during the Relevant Period. Watrous resides in Atwood, California.

7           59.     Defendant Charles E. Noell was a Peregrine director who served on the

8    audit committee during the Relevant Period. Noell resides in San Diego, California.

9               a.       Noell made substantial sales of Peregrine shares before the stock

10   price crashed.

11              b.       On February 23, 2000, Noell sold 90,000 shares reaping proceeds

12   of approximately $3,897,900. On February 15, 2001, Noell sold 68,978 shares totaling

13   $2,052,785. On February 16, 2001, Noell sold 15,397 shares totaling $445,127.

14          60.     Defendant William D. Savoy was a Peregrine director who served on the

15   audit committee during the Relevant Period. Savoy resides in Bellevue, Washington.

16          61.     Defendants Moores, Watrous, Noell, and Savoy are collectively referred to

17   herein as the "Director Defendants."

18          62.     The Director Defendants, by reason of their director positions with

19   Peregrine and/or representations, were controlling persons of the Company and had and exercised

20   the power and influence to cause Peregrine to engage in the conduct complained of herein. The

21   Director Defendants were in a position to control or influence the contents of, or otherwise cause

22   corrective disclosures to have been made in the public dissemination of, the misrepresentations.

23       C.     **Accountant Defendants**

24          63.     In a related case filed in this Court, Peregrine Systems, Inc. v. Arthur

25   Andersen, LLP, et al., Case No. GIC 796594, Peregrine has identified Defendant Arthur

26   Andersen LLP, Arthur Andersen Worldwide SC ("Andersen Worldwide"), and Arthur Andersen

27   Germany ("Andersen Germany") as Peregrine's accountants from 1997 until April 2002.

28   Defendant Arthur Andersen LLP ("Andersen") is headquartered in Chicago, Illinois. Upon

**18**

**EXHIBIT 1**

SECOND AMENDED COMPLAINT

1  information and belief, Arthur Andersen Worldwide is also headquartered in Chicago, Illinois.

2  Arthur Andersen Germany is currently owned by Ernst and Young and was previously

3  headquartered in Eschborn, Germany.

4       64.   Arthur Andersen audited Peregrine's financial statements for FY00, FY01,

5  and the first three quarters of FY02, and issued an unqualified audit report on those statements,

6  which was included in the respective 10-Ks and 10-Qs. In each of these reports, Arthur Andersen

7  certified: (i) that it had audited Peregrine's financial statements in accordance with GAAP;

8  (ii) that it had planned and performed its audits "to obtain reasonable assurance about whether the

9  financial statements are free of material misstatement;" (iii) and that, in its opinion, Peregrine's

10  financial statements "present fairly, in all material respects, the financial position" of Peregrine

11  "in conformity with accounting principles generally accepted in the United States."

12       65.   Defendant Daniel Stulac was the Andersen audit partner in charge of

13  Peregrine's account during the Relevant Period. Stulac was ultimately responsible for Andersen's

14  audit of Peregrine's financial statements.

15       66.   Defendants Andersen, Andersen Worldside, Andersen Germany, and

16  Stulac are referred to herein as the "Accountant Defendants."

17       67.   The Accountant Defendants, by reason of their status as independent

18  auditors of Peregrine's finances, had access to extensive non-public information about

19  Peregrine's Conditions. They had the ability and duty to perform their work in accordance with

20  the prevailing professional standards and thereby exercised the power and influence to cause

21  Peregrine to engage in the conduct complained of herein. The Accountant Defendants were in a

22  position to control or influence the contents of, or otherwise cause corrective disclosures to have

23  been made in the public dissemination of, the misrepresentations.

24     D.  **Customer Defendants**

25       68.   Defendant KPMG d.b.a. KPMG Consulting, Inc. (hereafter "KPMG")

26  colluded with Peregrine Defendants to fraudulently omit and misrepresent information

27  concerning Peregrine's true financial condition. KPMG is headquartered at Three Chestnut Ridge

28  Road, Montvale, NJ 07645, and is incorporated in the State of Delaware. KPMG maintains at

- 17 -

**19**

**EXHIBIT 1**

SECOND AMENDED COMPLAINT

1   least twelve offices in California, including one office in San Diego, does extensive business in

2   California, has sufficient minimum contacts with California, and otherwise intentionally avails

3   itself of the markets in California through the promotion, marketing, sale, and distribution of

4   services in California to render the exercise of jurisdiction by the California courts permissible

5   under traditional notions of fair play and substantial justice.

6           69.     Defendant BearingPoint, Inc. (f.k.a. KPMG Consulting, Inc.) (hereafter

7   "BearingPoint") colluded with Peregrine Defendants to fraudulently omit and misrepresent

8   Peregrine's true financial condition.  BearingPoint is headquartered at 1676 International Drive,

9   McLean, VA 22102, and is incorporated in the State of Delaware.  KPMG Consulting, Inc. was

10  spun off by KPMG on or about October 2002 and was renamed BearingPoint, Inc..  BearingPoint

11  maintains at least six offices in California, including two offices in San Diego, does extensive

12  business in California, has sufficient minimum contacts with California, and otherwise

13  intentionally avails itself of the markets in California through the promotion, marketing, sale, and

14  distribution of services in California to render the exercise of jurisdiction by the California courts

15  permissible under traditional notions of fair play and substantial justice.

16          70.     Defendant Critical Path was a Peregrine business partner that aided and

17  abetted Peregrine Defendants to misrepresent Peregrine's true financial condition.  Critical Path is

18  headquartered at 320 First Street, San Francisco, CA, 94105, and is incorporated in the State of

19  California.  Critical Path does extensive business in California, has sufficient minimum contacts

20  with California, and otherwise intentionally avails itself of the markets in California through the

21  promotion, marketing, sale, and distribution of services in California to render the exercise of

22  jurisdiction by the California courts permissible under traditional notions of fair play and

23  substantial justice.

24      E.    **Doe Defendants**

25          71.     Plaintiffs does not know the true names and capacities of Does 1 through

26  100, inclusive, whether individual corporate, association, or otherwise, and, therefore, sues said

27  defendants, and each of them, by such fictitious names.  Plaintiffs will amend this Complaint to

28  show their true names and capacities when they have been ascertained.  Plaintiffs are informed

255031 1                         - 18 -                         **20**
                                                                **EXHIBIT 1**

1    and believe, and on the basis of that information and belief allege, that each of these defendants

2    was in some manner legally responsible for the events, happenings, injuries, and damages alleged

3    in this Complaint.

4        72.    Plaintiffs filed their original complaint on March 3, 2003 in San Diego

5    Superior Court.

6                        JURISDICTION AND VENUE

7        73.    This Court has jurisdiction over all causes of action asserted in Plaintiffs'

8    original complaint and this First Amended Complaint pursuant to the California Constitution,

9    Article VI, § 10. The claims asserted herein arise under Cal. Corp. Code §§ 25400 et seq. and

10   25500 et seq.; and common law.

11       74.    Plaintiffs contend venue is proper in the Superior Court for the County of

12   San Diego because one or more Defendants reside in San Diego County.

13       75.    The amount in controversy exceeds the jurisdictional minimum of the

14   Superior Court.

15       76.    This action is not preempted by the Federal Securities Litigation Uniform

16   Standards Act of 1998, 15 U.S.C. § 78bb(f) ("SLUSA"), because this Complaint asserts state law

17   claims and is not a class action, an action brought by a representative party, or an action that

18   seeks damages on behalf of more than fifty persons.

19                        FACTUAL ALLEGATIONS

20   I.   MISCELLANY

21       A.    Definitions and Abbreviations

22       77.    Peregrine's fiscal year ends March 31. Thus, FY00 refers to the year

23   ending March 31, 2000 and FY01 refers to the year ending March 31, 2001. Likewise, Q1 FY00

24   refers to the quarter ending June 30, 1999; Q2 FY00 refers to the quarter ending September 30,

25   1999; and Q3 FY00 refers to the quarter ending December 31, 1999; Q4 FY99 refers to the

26   quarter ending March 31, 20001.

27       78.    A 10-Q is a statement of financial results for the quarterly period filed with

28   the SEC. Likewise, a 10-K is a statement of financial results for the annual period filed with the

SEC. Investors; analysts, business partners, and others considering developing, maintaining, or ending business relationships with or investments in or by Peregrine look to and rely on these statements, among other things, for guidance in making their decisions.

79.    The term "Named Defendants" is used in each of the individual Counts to refer only to the Defendants named in that particular Count. Therefore, the term "Named Defendants" may apply to different subsets of Defendants in different parts of this Complaint.

80.    The term "Peregrine's Conditions" refers to Peregrine's business and financial results, conditions, projections, and prospects.

81.    The terms "purchase" and "acquire" and their synonyms are used to include, among other things, the Merger, through which Remedy shareholders gave Remedy securities in exchange for Peregrine securities and cash.

82.    The term "Transactions" refers to the negotiation and consummation of the Merger via the Merger Agreement, in which Defendants offered and gave to Plaintiffs cash and inflated-value Peregrine securities in exchange for Remedy securities.

83.    The terms "Misstatements and Omissions" and "Misrepresentations" are used interchangeably to refer to Peregrine's communications that included untrue statements of material facts (misstatements) or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading (omissions).

84.    The term "Communications" refers to the various written and oral communications, described infra, that included Misrepresentations: press releases, 10-Qs, 10-Ks, the Registration Statement, the Proxy Statement/Prospectus, conversations, meetings, and other communications, statements, and documents, both oral and written.

B.    **General Allegations**

85.    During the Relevant Period, shares of Peregrine common stock were actively traded on the NASDAQ National Market System ("NASDAQ"). NASDAQ is an efficient market.

86.    Because of their positions with the Company, Defendants controlled and/or possessed the power and authority to control the contents of the financial statements and press

1   releases. These Defendants prepared, oversaw the preparation of, or were provided with copies of

2   Peregrine's press releases and financial statements alleged herein to be misleading prior to their

3   issuance and/or had the ability and opportunity to prevent their issuance or cause them to be

4   corrected.

5          87.     Defendants knew of, or recklessly disregarded, the adverse non-public

6   information about Peregrine's business, operations, finances, markets, and present and future

7   business prospects because their executive and/or directorial positions provided them with access

8   to internal corporate documents and information (including the Company's actual results, plans,

9   budgets, forecasts, and projections regarding financial and operational conditions, as well as

10  comparisons and analyses thereof). Defendants had conversations and meetings with other

11  Peregrine officers, employees, and directors, and received internal reports and other information

12  in connection therewith.

13         88.     As executives, directors, and controlling persons of a publicly-held

14  company whose securities were, and are, registered with the SEC pursuant to the Exchange Act,

15  traded on the NASDAQ, and governed by the provisions of California and other securities laws,

16  Defendants each had a duty to promptly disseminate accurate and truthful information regarding

17  Peregrine's financial condition and performance, growth, operations, financial statements,

18  business, products, markets, management, earnings, and present and future business prospects, as

19  well as to correct any previously-issued statements that had become materially misleading or

20  false, so that the market price of the Company's publicly-traded securities would be based on

21  truthful and accurate information. Defendants were required to cause the Company to disclose in

22  its financial statements the existence of the material facts described herein and to appropriately

23  recognize and report revenues and expenses in conformity with GAAP. Defendants'

24  misrepresentations and omissions during the Relevant Period violated these specific requirements

25  and obligations.

26

27

28

II.   THE HISTORY OF DEFENDANTS' WRONGDOING

A.   Defendants Made Repeated Material Misstatements and Omissions About Peregrine's Conditions.

89.   On July 21, 1999, Peregrine issued a release that purported to announce "record" financial results for the first quarter ("Q1") of FY00 (the period ending June 30, 1999), which stated in part, the following:

> Peregrine Systems, Inc. . . . today announced *record* quarterly revenues for its first fiscal quarter ending June 30, 1999.  Overall results were driven by a 131 percent increase in license revenue over the comparable quarter in the prior year.
>
> Total revenues for the quarter grew 137 percent to a *record* $51.6 million, compared with revenues of $21.8 million in the first fiscal quarter of 1999.  Peregrine Systems posted net income excluding acquired in-process research and development costs and amortization of intangible assets of $7.1 million or $0.14 per diluted share for the first quarter . . . .

(emphasis added).  In addition to the foregoing, Defendant Gardner stated the following in that release:

> "We are extremely pleased with the outstanding growth in both our software license sales and our professional services activity in the first fiscal quarter . . . .  Our international operations had an exceptionally strong performance . . . .  We expanded our efforts during the quarter in every area of the business . . . ."

90.   On August 13, 1999, Peregrine filed its Q1 FY00 10-Q with the SEC, which incorporated the financial statements contained in the July 21, 1999 press release.  Defendant Gless signed this filing.

91.   Defendants' statements in this press release and this 10-Q were materially false and misleading when made, because they misstated and/or omitted the following adverse facts, which then existed and disclosure of which was necessary to make the statements made not false and/or misleading:

a.   Peregrine had improperly booked revenues from indirect channels that were written off in later quarters, such that the quarter's reported revenues were artificially inflated and did not reflect the true financial condition of the Company at that time;

24
EXHIBIT 1

b. Peregrine's operating results were materially overstated due to its failure to timely write down revenues recorded from indirect sales that were written off in a later quarter(s), and its failure to disclose those write-downs to shareholders;

c. Peregrine failed to accurately record revenues and/or write down impaired or adjusted asset values on a timely basis in accordance with GAAP;

d. Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenue from the sale of software to MSPs; and

e. as a result of the foregoing, Defendants' earnings projections and statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

92. On October 20, 1999, Peregrine issued a release that purported to announce "record" financial results for Q2 and first half of FY00 (the period ending September 30, 1999), which stated, in part, the following:

> Peregrine Systems, Inc. . . today announced *record results* for both the second quarter and six months ended September 30, 1999. The *record* second quarter and six month results were driven by a 114 and 121 percent increase in software license revenues, respectively, over the comparable prior year.

> Total revenues for the second quarter increased 95 percent to a *record* $57.8 million, compared with revenues of $29.7 million in the comparable prior year period. Net income excluding acquired in-process research and development costs and amortization of intangible assets amounted to $8.4 million or $0.16 per diluted share for the second quarter compared to $4.5 million or $0.10 per diluted share for the comparable prior year period . . . .

> Total revenues six months to date were a *record* $109.4 million, a 113 percent increase over comparable prior year total revenues of $51.4 million.

(emphasis added). In addition to the foregoing, Defendant Gardner stated the following in that release:

> "We are delighted with our continued rapid growth and with the ongoing development of customer demand for our N-2-N Infrastructure Management solutions . . . . As we move into the second half of our fiscal year, we do so from both a strong foundation of well-accepted products and with the momentum from our new [products] . . . ."

1    93.    On November 15, 1999, Peregrine filed its second quarter ("Q2") FY00

2   10-Q with the SEC, which incorporated the financial statements contained in the October 20,

3   1999 press release. Defendant Gless signed this filing.

4           94.    Defendants' statements in this press release and this 10-Q were materially

5   false and misleading when made, because they misstated and/or omitted the following adverse

6   facts, which then existed and disclosure of which was necessary to make the statements made not

7   false and/or misleading:

8                  a.    Peregrine had improperly booked revenues from indirect channels

9   that were written off in later quarters, such that the quarter's reported revenues were artificially

10  inflated and did not reflect the true financial condition of the Company at that time;

11                 b.    Peregrine's operating results were materially overstated due to its

12  failure to timely write down revenues recorded from indirect sales that were written off in a later

13  quarter(s), and its failure to disclose those write-downs to shareholders;

14                 c.    Peregrine failed to accurately record revenues and/or write down

15  impaired or adjusted asset values on a timely basis in accordance with GAAP;

16                 d.    Peregrine failed to disclose that it had prematurely recognized a

17  portion of $100 million in revenue from the sale of software to MSPs; and

18                 e.    as a result of the foregoing, Defendants' earnings projections and

19  statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

20          95.    On January 20, 2000, Peregrine issued a release that purported to announce

21  "record" financial results for Q3 and the first three quarters of FY00 (the period ending

22  December 31, 1999), which stated, in part, the following:

23          Peregrine Systems, Inc. . . . today announced *record* results for both
            the third quarter and nine months ended December 31, 1999. The
24          record third quarter and nine month results were driven by a 78 and
            102 percent increase in software license revenues, respectively,
25          over the comparable prior year periods..

26          Total revenues for the third quarter increased 67 percent to a *record*
            $67.5 million, compared with revenues of $40.5 million in the
27          comparable prior year period. Net income excluding acquired in-
            process research and development costs and amortization of
28          intangible assets amounted to $8.7 million or $0.16 per diluted

                                                                      **26**

                        SECOND AMENDED COMPLAINT

share for the third quarter compared to $6.2 million or $0.12 per diluted share for the comparable prior year period. . . .

Total revenues nine months to date were a *record* $177.0 million. a 92 percent increase over comparable prior year total revenues of $92.0 million.

(emphasis added). In addition to the foregoing. Defendant Gardner stated the following in that release:

> "[W]e had a number of large transactions and a remarkably strong surge of both interest and initial sales from our new Get.It! and Get.Resources! employee self service and e-procurement products. In addition, we exceeded our expectations for the launch of our new mid-range solution. InfraCenter for Workgroups. . . . [O]nce again. we report a record quarter for revenue and income. We . . . we . remain positive about our future prospects."

96.    On February 11, 2000. Peregrine filed its third quarter ("Q3") FY00 10-Q with the SEC, which incorporated the financial statements contained in the January 20, 2000 press release. Defendant Gless signed this filing.

97.    On April 26, 2000, Peregrine issued a release that purported to announce "record" financial results for the fourth quarter ("Q4") of FY00 (the period ending March 31. 2000). as well as for FY00.  That release stated, in part. the following:

> Peregrine Systems, Inc. . . today announced *record* results for both the fourth quarter and twelve months ended March 31, 2000.  The *record* fourth quarter and twelve month results were driven by a 76 and 93 percent increase in software license revenues, respectively, over the comparable prior year.
>
> Total revenues for the fourth quarter increased 66 percent to a *record* $76.3 million, compared with revenues of $46.1 million in the comparable prior year period. . . .
>
> Total revenues twelve months to date were a *record* $25.3 million, and an 83 percent increase over comparable prior year total revenues of $138.1 million.  Net income excluding acquired in-process research and development costs and amortization of intangible assets amounted to a *record* $34.2 million or $0.32 per diluted share for year-to-date results compared to $20.6 million or $0.22 per diluted share for comparable prior year results.

(emphasis added).

27
**EXHIBIT 1**

98.     On May 10, 2000, Peregrine filed its FY00 10-K with the SEC, which incorporated the financial statements contained in the April 26, 2000 press release.  Defendants Gardner, Moores, Noell, and Watrous signed this filing.

99.     Defendants' statements in this press release and this 10-K were materially false and misleading when made, because they misstated and/or omitted the following adverse facts, which then existed and disclosure of which was necessary to make the statements made not false and/or misleading:

100.     Peregrine had improperly booked revenues from indirect channels that were written off in later quarters, such that the quarter's reported revenues were artificially inflated and did not reflect the true financial condition of the Company at that time:

    a.     Peregrine's operating results were materially overstated due to its failure to timely write down revenues recorded from indirect sales that were written off in a later quarter(s), and its failure to disclose those write-downs to shareholders;

    b.     Peregrine failed to accurately record revenues and/or write down impaired or adjusted asset values on a timely basis in accordance with GAAP;

    c.     Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenue from the sale of software to MSPs; and

    d.     as a result of the foregoing, Defendants' earnings projections and statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

101.     The restated statement of operations for the year ended March 31, 2000 filed with the SEC in February 2003 is as follows:

**28**
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

| | Year Ended March 31, 2000 | | |
| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| | (In thousands, except per share data) | | |
| **Revenues:** | | | |
| Licenses | $ 1( | $ (1 | $ |
| Services | 84,833 | (6,530) | 78,303 |
| Total revenues | 253,300 | (121,668) | 131,632 |
| **Costs and Expenses:** | | | |
| Cost of licenses | 2,764 | 345 | 3,109 |
| Cost of services | 51,441 | 3,314 | 54,755 |
| Sales and marketing | 101,443 | 7,684 | 109,127 |
| Research and development | 28,517 | 4,974 | 33,491 |
| General and administrative | 19,871 | 7,789 | 27,660 |
| Impairments, amortization and other | 57,920 | 50,923 | 108,843 |
| Total operating costs and expenses | 261,956 | 75,029 | 336,985 |
| Loss from operations before interest and income tax expense | (8,656) | (196,697) | (205,353) |
| Interest expense, net | 38 | (2,043) | (2,005) |
| Loss before income tax expense | (8,618) | (198,740) | (207,358) |
| Income tax expense | 16,452 | (6,392) | 10,060 |
| Net loss | $ (2 | $ (1 | $ |
| Net loss per share basic and diluted: | | | |
| Net loss per share | $ (0 | | $ |
| Shares used in computation | 102,332 | | 102,332 |

102.   On July 19, 2000, Peregrine issued a press release that purported to announce "record" financial results for Q1 of FY01 (the period ending June 30, 2000), which stated, in part, the following:

> Peregrine Systems, Inc. . . today announced record results for the first quarter ended June 30, 2000 . . . .
>
> Total revenues for the first quarter increased 83 percent to a record $94.3 million, compared with revenues of $51.6 million in the comparable prior year period. Net income excluding aggregate acquisition costs and other related charges amounted to $12.1 million or $0.10 per diluted share for the first quarter compared to $7.1 million or $0.07 per diluted share for the comparable prior year period . . . .

(emphasis added). In addition to the foregoing, Defendant Gardner stated the following in that release:

> "Growth in the Get.It! business was very strong this quarter, and continued to reflect customer recognition that Get.Resources™ offers a unique lifecycle approach to the e-procurement process associated with assets used inside our customers' businesses . . . . We were also very pleased to see strong performance from our

**29**
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

Infrastructure Management products, including several large transactions and some key competitive wins . . . ."

103.    On August 14, 2000, the Company filed its Q1 FY01 10-Q with the SEC for the period ended June 30, 2000, reporting essentially the same results as reported in the July 19, 2000 press release. Defendant Gless signed this filing.

104.    Defendants' statements in this press release and this 10-Q were materially false and misleading when made, because they misstated and/or omitted the following adverse facts, which then existed and disclosure of which was necessary to make the statements made not false and/or misleading:

   a.    Peregrine had improperly booked revenues from indirect channels that were written off in later quarters, such that the quarter's reported revenues were artificially inflated and did not reflect the true financial condition of the Company at that time;

   b.    Peregrine's operating results were materially overstated due to its failure to timely write down revenues recorded from indirect sales that were written off in a later quarter(s), and its failure to disclose those write-downs to shareholders;

   c.    Peregrine failed to accurately record revenues and/or write down impaired or adjusted asset values on a timely basis in accordance with GAAP;

   d.    Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenue from the sale of software to MSPs; and

   e.    as a result of the foregoing, Defendants' earnings projections and statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

105.    On October 3, 2000, Defendants issued a press release that purported to inform investors and analysts that Peregrine was on track to meet previous Company-sponsored guidance for Q2 of FY01 (the period ending September 30, 2000), which stated, in part, the following:

> Peregrine Systems, Inc. . . today confirmed that results for the second fiscal quarter, ended September 30, 2000, would meet or exceed prior estimates.
>
> Peregrine said it expects to meet or exceed consensus earnings per share estimates of $.11 per share and total revenue of $142 million.

**30
EXHIBIT 1**

1    Earnings per share excludes the effects of non-cash acquisition
     related charges and financial results are still subject to review by
2    the company's independent auditors . . . .

3    Steve Gardner, chairman and CEO of Peregrine Systems Inc., said
     "Normally we would not make any pre-announcement in this
4    situation, but given the uncertainty surrounding the company,
     apparently triggered by a typographical error in a third party's
5    internal communication on Friday of last week, we felt it was
     important to clear the air and remove some of the uncertainty
6    surrounding second quarter results."

7    (emphasis added).

8          106.    Later, on October 24, 2000, Defendants issued a press release confirming

9    the October 3, 2000 release and purporting to announce "record" results for Q2 FY01, with

10   revenues of $142.7 million and net income of $0.12 per share. The release stated, in part, the

11   following:

12         Peregrine Systems, Inc. . . today announced *record* results for the
           second quarter ended September 30, 2000. The *record* second
13         *quarter results were driven by a 136% increase in software license*
           revenues over the comparable prior year period . . . .

14
           Total revenues for the second quarter increased 147% to a *record*
15         $142.7 million, compared with revenues of $57.8 million in the
           comparable prior year period. Net income excluding aggregate
16         acquisition costs and other related charges amounted to
           $18.3 million or $0.12 per diluted share for the second quarter
17         compared to $8.4 million or $0.08 per diluted share for the
           comparable prior year period . . . .

18

19   (emphasis added). Commenting on these purported "record" financial results, Defendant Gardner

20   was quoted in the release stating the following:

21         "We had a remarkable quarter of growth in our infrastructure
           management solutions and Get.It! employees self service
22         solutions . . . . This quarter saw a large number of new products,
           technology, and alliances come to fruition, further establishing the
23         basis for continued growth in the future."

24         107.    On November 14, 2000, the Company filed its Q2 FY01 10-Q with the

25   SEC for the period ended September 30, 2000, reporting essentially the same results as reported

26   in the October 3 and 24, 2000 press releases. Defendant Gless signed this filing.

27         108.    Defendants' statements in these press releases and this 10-Q were

28   materially false and misleading when made, because they misstated and/or omitted the following

31

**EXHIBIT 1**

1    adverse facts. which then existed and disclosure of which was necessary to make the statements

2    made not false and/or misleading:

3           a.     Peregrine had improperly booked revenues from indirect channels

4    that were written off in later quarters, such that the quarter's reported revenues were artificially

5    inflated and did not reflect the true financial condition of the Company at that time;

6           b.     Peregrine's operating results were materially overstated due to its

7    failure to timely write down revenues recorded from indirect sales that were written off in a later

8    quarter(s). and its failure to disclose those write-downs to shareholders;

9           c.     Peregrine failed to accurately record revenues and/or write down

10   impaired or adjusted asset values on a timely basis in accordance with GAAP;

11          d.     Peregrine failed to disclose that it had prematurely recognized a

12   portion of $100 million in revenue from the sale of software to MSPs; and

13          e.     as a result of the foregoing, Defendants' earnings projections and

14   statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

15          109.   On January 24, 2001, Defendants issued a release that again purported to

16   announce "record" results for Q3 FY01 (the period ending December 31, 2000). with revenues of

17   $156.6 million and net income of $0.15 per share, which stated, in part, the following:

18          Peregrine Systems, Inc. . . today announced *record* results for the
            third quarter ended December 31, 2000. The *record* third quarter
19          results were driven by a 114% increase in software license revenues
            over the comparable prior year period. . . .

20
            Total revenues for the third quarter climbed by 132% to a *record*
21          $156.6 million, compared with revenues of $67.5 million in the
            comparable prior year period.  Net income excluding aggregate
22          acquisition costs and other related charges amounted to
            $22.6 million or $0.15 per diluted share for the third quarter
23          compared to $8.7 million or $0.08 per diluted share for the
            comparable prior year period . . . .

24

25   (emphasis added).  Commenting on these purported "record" financial results, Defendant Gardner

26   was quoted in the release stating the following:

27          "Despite uncertainty and turbulence in the economy, particularly in
            the United States. we exceeded our objectives for the December
28          quarter . . . . This was a very important quarter for Peregrine."

SECOND AMENDED COMPLAINT

110.   On February 14, 2001, the Company filed its Q3 FY01 10-Q, reporting essentially the same results as the January 24, 2001 earnings release. The 10-Q was signed by Defendant Gless.

111.   Defendants' statements in this press release and this 10-Q were materially false and misleading when made, because they misstated and/or omitted the following adverse facts, which then existed and disclosure of which was necessary to make the statements made not false and/or misleading:

a.   Peregrine had improperly booked revenues from indirect channels that were written off in later quarters, such that the quarter's reported revenues were artificially inflated and did not reflect the true financial condition of the Company at that time;

b.   Peregrine's operating results were materially overstated due to its failure to timely write down revenues recorded from indirect sales that were written off in a later quarter(s), and its failure to disclose those write-downs to shareholders;

c.   Peregrine failed to accurately record revenues and/or write down impaired or adjusted asset values on a timely basis in accordance with GAAP;

d.   Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenue from the sale of software to MSPs; and

e.   as a result of the foregoing, Defendants' earnings projections and statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

112.   In response to the January 24, 2001 press release, the price of Peregrine common stock jumped $3.56 per share, or 14%, from $23.94 to $27.50.

113.   On April 4, 2001, Defendants issued a press release that purported to inform investors and analysts that the Company was on track to meet previous Company-sponsored guidance for Q4 FY01 and FY01 (the period ending March 31, 2001), which stated, in part, the following:

> Peregrine Systems, Inc., . . . one of the world's leading software companies, today announced preliminary fourth quarter results in line with consensus financial analyst expectations and company guidance.

33
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

For the fiscal fourth quarter ended March 31, 2001, the Company
expects to report license revenues of approximately $105 million,
total revenues of approximately $170 million and earnings per share
of $.16. . . .

Again, commenting on these purported "record" financial results, Defendant Gardner was quoted

in the release stating the following:

> "Despite challenging economic conditions worldwide, we were able
> to meet our objectives for the quarter and deliver strong profitable
> results, the sixteenth consecutive quarter we have done so.  Our
> success reflects the unique value proposition we bring to the
> market — removing friction, and therefore costs, from business
> processes — especially as companies look for ways to optimize the
> use of scarce capital."

114.    Following the publication of this release, the shares of Peregrine rallied

over $5.25, or over 25%, to close at $19.06 per share.

115.    Later, on April 26, 2001, Defendants issued a press release that confirmed

the April 4, 2001 release, purporting to announce "record" results for Q4 FY01 and FY01 (the

period ending March 31, 2001), which stated, in part, the following:

> Peregrine Systems, Inc. . . today released final results for the fiscal
> fourth quarter and year ended March 31, consistent with
> preliminary results announced April 4, 2001.  Revenue for the
> quarter was a record $171.0 million, an increase of 124 percent
> from the same quarter a year ago.  Net income, excluding non-cash
> acquisition and other acquisition related charges, increased 148
> percent to $24.8 million, or $.16 per share.
>
> For the fiscal year, revenue increased 123 percent to $564.7 million
> from $253.3 million in the prior year.  Excluding non-cash
> acquisition charges, net income was $77.8 million, or $.53 per
> share, an increase of 128 percent compared with fiscal year 2000.

Commenting on these purported "record" financial results, Defendant Gardner was quoted in the

release as stating the following:

> "In the past year, Peregrine has clearly established itself as the
> leading global provider of integrated infrastructure management
> and e-Market solutions.  We are driven by our vision of creating a
> highly efficient, frictionless business environment for our
> customers.  Our results this quarter in the face of challenging
> economic conditional demonstrate the value of our solutions . . . .
> As we enter fiscal 2002, we remain confident in our market position
> and the opportunity we address.  We believe our continued focus on
> our customers' return on investment, combined with the diversity of

**34**
**EXHIBIT 1**

our revenue base and industry-wide partnerships will allow us to build long-term shareholder value. At the same time, we are realistic in our assessment of current corporate spending patterns, and we are aligning our business model to improve our productivity and leverage our strengths.

"We were particularly pleased with the strength of our sales through managed services providers and our professional services partners. As we continue to meet major milestones in our corporate development and build our solutions portfolio, these relationships become increasingly important to our ability to extend our reach to new customers and markets . . . ."

116.    Shares of Peregrine continued to climb, closing at $25.14 per share on April 26, 2001.

117.    On May 25, 2001, Defendants issued a press release, which purported to announce the highlights of its analyst briefing conference held the prior day, May 24, 2001, at Peregrine's headquarters and broadcast live via Internet. This release stated, in part, the following:

Mr. Gless, the company's chief financial officer, reviewed financial results for the 2001 fiscal year and confirmed revenue and earnings guidance previously outlined during the company's fourth quarter conference call on April 26, 2001. An audio archive of the call is available on the company's website. Mr. Gless emphasized that this guidance reflects current economic conditions and corporate spending patterns, and any deterioration in the global economy or the outlook for the second half of the year could cause the company to revise its growth expectations.

Mr. Gless also reaffirmed acquisition activities as an important component of the company's growth strategy, and indicated that the company will continue to evaluate acquisition and investment opportunities that complement and enhance its product offerings or expand its distribution channels. Mr. Gless also commented that the company may consider raising additional capital in support of these activities in the future.

118.    Following the publication of this release, shares of Peregrine continued to climb, reaching $33.25 per share on May 25, 2001.

119.    On June 29, 2001, Peregrine filed its FY01 10-K with the SEC, which incorporated the financial statements contained in the May 25, 2001 press release as well as the press releases and 10-Qs for the preceding three quarters. Defendants Gless, Gardner, Moores, Noell, Savoy, and Watrous signed this filing.

**35**
**EXHIBIT 1**

120.   The restated statement of operations for the year ended March 31. 2001 filed with the SEC in February 2003 is as follows:

| | Year Ended March 31. 2001 | | | |
| --- | --- | --- | --- | --- |
| | As Previously Reported | Adjustments | As Restated | As Restated |
| | (In thousands. except per share data) | | | |
| Revenues: | | | | |
| Licenses......................................... | $ | $ | $ | $ |
| Services......................................... | 210.073 | (12.232) | (79.406) | 118.435 |
| Total revenues ................................ | 564.683 | (254.105) | (97.225) | 213.353 |
| Costs and Expenses: | | | | |
| Cost of licenses............................. | 14,426 | 5.372 | (7.546) | 12.252 |
| Cost of services............................. | 111.165 | 16.913 | (39.313) | 88.765 |
| Sales and marketing....................... | 223.966 | 47.716 | (35.805) | 235.877 |
| Research and development.............. | 61.957 | 12.824 | (10.193) | 64.588 |
| General and administrative.............. | 48,420 | 35.923 | (23.030) | 61.313 |
| Impairments. amortization and other......... | | | (1,450.25 | |
| | 918.156 | 645.628 | 1) | 113.533 |
| Total operating costs and expenses ................ | | | (1,566.13 | |
| | 1.378.090 | 764.376 | 8) | 576.328 |
| Loss from continuing operations before interest and income tax expense................ | | (1.018.48 | | |
| | (813.407) | 7) | 1,468.913 | (362,975) |
| Interest expense. net......................... | (538) | (5.480). | (174) | (6.192) |
| Loss from continuing operations before income tax expense.......................... | | (1,023.96 | | |
| | (813.945) | 1) | 1.468.739 | (369.167) |
| Income tax expense on continuing operations ................................ | 38.296 | (31.685) | (998) | 5.613 |
| Loss from continuing operations.................... | (852.241) | (992.276) | 1,469.737 | (374.780) |
| Loss from discontinued operations. net of income taxes of $998.................. | — | — | (1,469.73 7) | (1.469.73 7) |
| Net loss......................................... | $ | $ | $ | $ |
| Net loss per share basic and diluted: | | | | |
| Loss per share from continuing operations ................................ | | | | $ (2.71) |
| Loss per share from discontinued operations ................................ | | | | $ (10.62) |
| Net loss per share ....................... | | | | $ (13.32) |
| Shares used in computation...................... | $ 138.447 | | | 138.447 |

121.   Defendants' statements in the May 25, 2001 press release and this 10-K (as well as the 10-Qs and preceding press releases incorporated therein) were materially false and misleading when made, because they misstated and/or omitted the following adverse facts, which then existed and disclosure of which was necessary to make the statements made not false and/or misleading:

36
EXHIBIT 1

a. Peregrine had improperly booked revenues from indirect channels that were written off in later quarters, such that the quarter's reported revenues were artificially inflated and did not reflect the true financial condition of the Company at that time;

b. Peregrine's operating results were materially overstated due to its failure to timely write down revenues recorded from indirect sales that were written off in a later quarter(s), and its failure to disclose those write-downs to shareholders;

c. Peregrine failed to accurately record revenues and/or write down impaired or adjusted asset values on a timely basis in accordance with GAAP;

d. Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenue from the sale of software to MSPs; and

e. as a result of the foregoing, Defendants' earnings projections and statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

122. The Registration Statement filed on July 2, 2001 regarding the Peregrine and Remedy merger contained the misstatements or material omissions described below. The Registration Statement was signed by defendants Gardner, Gless, Noell, Watrous, Savoy, and Moores. Defendant Andersen LLP gave its consent "to the incorporation by reference in this registration statement of our report dated April 26, 2001 included in Peregrine Systems, Inc. Form 10-K for the year ended March 31, 2001 and to all references to our Firm included in this registration statement."

123. The Registration Statement contains the following statement which was false and misleading when made:

4.6 SEC Filings; Financial Statements

(a) Parent has made available to the Company a complete and accurate copy of each report, scheduled, registration statement, proxy and information statements and other documents filed by Parent with the SEC since December 31, 1997 (each, a "PARENT SEC REPORT" and collectively, the "PARENT SEC REPORTS"), which are all the reports, schedules, registration statements, proxy and information statements and other documents required to be filed by Parent with the SEC since such date. The Parent SEC Reports (i) were prepared in accordance with the requirements of the Securities Act or the Exchange Act, as the case may be, and (ii) did not at the time they were filed (or, if such Parent SEC Report

37

EXHIBIT 1

was amended or superseded by another filing, then on the date of filing of such amendment or superceding filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of Parent's subsidiaries is required to file any reports or other documents with the SEC.

(b) As of their respective dates, each set of consolidated financial statements (including, in each case, any related notes thereto) contained in the Parent SEC Reports, (i) complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, (ii) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or, in the case of unaudited statements, for the absence of footnotes as permitted by Form 10-Z promulgated under the Exchange Act), and (iii) fairly presents in all material respects the consolidated financial condition of Parent and its subsidiaries at the respective dates thereof and the consolidated results and cash flows of Parent and its subsidiaries for the periods indicated, except that the unaudited interim adjustments which were not or are not expected to be material in amount or significance.

124.   Peregrine incorporated by reference its financial statements contained in its annual report on Form 10-K for the fiscal year ended March 31, 2001. "The selected historical financial data of Peregrine have been derived from the audited historical financial data and related notes of Peregrine for each of the years in the five-year period ended March 31, 2001. These historical data provide only a summary. You should read them in conjunction with Peregrine's historical consolidated financial statements and related notes thereto contained in Peregrine's annual report on Form 10-K for the fiscal year ended March 31, 2001." The Peregrine selected consolidated historical financial information included a figure for "total revenues" for the years ended March 31st for 1999, 2000, and 2001. These figures were false and misleading because they contained revenues that should not have been recognized as described supra.

125.   On July 24, 2001, Peregrine issued a press release announcing its financial results for Q1 of FY02. The July 24, 2001 press release stated in relevant part:

Total revenues for the quarter were a record $172.0 million, an increase of 82 percent for the same quarter a year ago. Net income, excluding acquisition costs and other related charges, was $19.5 million, or $.12 diluted earnings per share, compared with $12.1 million, or $.01 diluted earnings per share, in the first quarter of fiscal 2001. License revenues were up 60 percent to

SECOND AMENDED COMPLAINT

**38**
**EXHIBIT 1**

1   $100.2 million. and service revenues increased 125 percent to
2   $71.8 million over the same period.

3   Commenting on the results, Defendant Gardner was quoted in the release as stating the following:

4       "We were pleased to post significant top-line growth in this
        challenging economic environment . . . . Our customers are seeking
5       ways to improve their productivity and achieve a rapid return on
        their investments. Our results in this quarter reflect our ability to
6       deliver on these objectives."

7       126.    On August 14, 2001. Peregrine filed its Q1 FY02 10-Q with the SEC,

8   incorporating the financial statements that were included with the July 24, 2001 press release.

9   Defendant Gless signed this filing.

10      127.    Defendants' statements in this press release and this 10-Q were materially

11  false and misleading when made, because they misstated and/or omitted the following adverse

12  facts, which then existed and disclosure of which was necessary to make the statements made not

13  false and/or misleading:

14          a.      Peregrine had improperly booked revenues from indirect channels

15  that were written off in later quarters, such that the quarter's reported revenues were artificially

16  inflated and did not reflect the true financial condition of the Company at that time;

17          b.      Peregrine's operating results were materially overstated due to its

18  failure to timely write down revenues recorded from indirect sales that were written off in a later

19  quarter(s), and its failure to disclose those write-downs to shareholders;

20          c.      Peregrine failed to accurately record revenues and/or write down

21  impaired or adjusted asset values on a timely basis in accordance with GAAP;

22          d.      Peregrine failed to disclose that it had prematurely recognized a

23  portion of $100 million in revenue from the sale of software to MSPs; and

24          e.      as a result of the foregoing, Defendants' earnings projections and

25  statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

26      128.    On October 3, 2001. Peregrine issued a press release announcing the

27  Company's preliminary Q2 FY02 results (for the period ending September 30. 2001). The

28  release stated in relevant part:

**39**
**EXHIBIT 1**

Peregrine expects to report quarterly revenue of approximately $175 million. Based on these revenues, the company expects to report net income of approximately $.05 per share, excluding acquisition costs and restructuring charges . . . .

"Like many companies in our industry, the tragic events of September 11 and the subsequent effect on the global economy impacted our September quarter results. However, even during these challenging times, we were able to generate approximately $175 million in total revenue, demonstrating the strength of our product portfolio and the value proposition we deliver to our customers," stated Steve Gardner, Peregrine's chairman and chief executive officer. "As we take steps to align our cost structure with the current economic environment and near-term revenue opportunities, we remain confident in our future. We believe our leadership in Infrastructure Management, Employee Relationship Management and B2B [business-to-business] Relationship Management will allow us to generate solid growth and increase our market share over the long-term," Gardner added. .

129.    On October 24, 2001, Peregrine issued another press release, confirming these Q2 FY02 results, stating in relevant part:  .

Total revenues for the quarter were a record $175.0 million, an increase of 23 percent from the $142.7 million reported in the second quarter of fiscal 2001. Net income, excluding acquisition costs and other charges, was $8.4 million, or $.05 diluted earnings per share, compared with $18.3 million, or $.12 diluted earnings per share, in the second quarter of fiscal 2001.

Commenting on the results, Defendant Gardner was quoted in the release as stating the following:

"While these results were disappointing relative to our original expectations, we met several major milestones in improving upon our overall position in the markets we serve . . . .

* * *

"Looking to the future, we remain cautiously optimistic as we continue to extend both the reach and the depth of our offerings . . . . [W]e remain focused on the priorities I outlined on Oct. 3, including realistic expense management and generating cash from operations. We have the financial strength, breadth of product and management talent to emerge from this economic cycle as the vendor of choice of businesses seeking to maximize return from their assets, their employees, and their business relationships by removing friction from their business processes through the use of our software and services . . . ."

**40**
**EXHIBIT 1**

130.   On November 13, 2001, Peregrine filed its Q2 10-Q with the SEC, which incorporated the financial statements contained in the October 24, 2001 press release. Defendant Gless signed the Q2 10-Q as EVP and CFO.

131.   Defendants' statements in this press release and this 10-Q were materially false and misleading when made, because they misstated and/or omitted the following adverse facts, which then existed and disclosure of which was necessary to make the statements made not false and/or misleading:

a.     Peregrine had improperly booked revenues from indirect channels that were written off in later quarters, such that the quarter's reported revenues were artificially inflated and did not reflect the true financial condition of the Company at that time;

b.     Peregrine's operating results were materially overstated due to its failure to timely write down revenues recorded from indirect sales that were written off in a later quarter(s), and its failure to disclose those write-downs to shareholders;

c.     Peregrine failed to accurately record revenues and/or write down impaired or adjusted asset values on a timely basis in accordance with GAAP;

d.     Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenue from the sale of software to MSPs; and

132.   as a result of the foregoing, Defendants' earnings projections and statements about Peregrine's prospects and outlook were not reasonable at all relevant times.

B.   **Defendants' Misstatements and Omissions Carried Over Into Peregrine's Merger Negotiation and Agreement With Remedy.**

133.   Software developers Peregrine and Remedy have been described as competitors. The companies were not identical, however. The Registration Statement highlighted their differences:

> Peregrine is a leading global provider of infrastructure resource management applications, employee relationship management (or self-service) solutions and e-commerce technologies and services. These products, services, and enabling technologies permit businesses to eliminate points of friction in the cost of doing business.
>
> Remedy is a leading provider of information technology service management and customer relationship management solutions.

**41**
**EXHIBIT 1**

Remedy's products provide a highly adaptable foundation for companies that require infrastructure support for management of corporate assets, service-intensive business processes, and customer acquisition and retention. . . . Remedy has been particularly successful in selling its products to small and medium-sized businesses.

Thus, the Merger would potentially create synergies:

The acquisition creates a company with unique strengths based on complementary technologies and distribution channels. Remedy has a long history of success in serving midsize companies and departmental needs with its IT Service Management (ITSM) applications, while its Action Request System® (AR System®) has offered a highly adaptable way to build custom applications in service management for both midsize and enterprise customers globally. In contrast, Peregrine has pioneered end-to-end Infrastructure Management and Employee Relationship Management solutions that feature extensive best practice workflows for enterprise customers with large, complex infrastructures.

134.    In late 1999, Defendant Gardner, as Peregrine's President and CEO, spoke by telephone with Remedy CEO Lawrence L. Garlick to discuss possibilities for strategic relationships. Defendant Gardner met with Garlick, Plaintiff Ron J. Fior, and other Remedy representatives in December 1999 to further discuss strategic alliances, but no agreements were reached.

135.    In February 2001, Peregrine representatives contacted Remedy representatives and indicated Peregrine's interest in renewing discussions regarding a strategic alliance. Defendant Gardner and Garlick met on April 9, 2001 to discuss the matter.

136.    On April 30, 2001, Defendant Gardner indicated to Garlick his company's interest in acquiring Remedy's stock, and he offered to acquire all outstanding shares at a price of $4.00 in cash plus 0.8631 shares of Peregrine common stock per share of Remedy common stock. Remedy's Board of Directors soon rejected that offer.

137.    In early May of 2001, Peregrine purchased 295,000 shares of Remedy's common stock on the open market without consulting Remedy.

**42**
**EXHIBIT 1**

138.   On May 14, 2001. Defendant Gardner proposed to Garlick that Peregrine acquire all outstanding shares of Remedy stock for 1.1882 shares of Peregrine stock per share of Remedy stock. That offer was rejected on May 15, 2001.

139.   On May 24, 2001. Defendant Gardner made a final offer to Garlick on behalf of Peregrine; he offered that Peregrine would acquire all outstanding shares of Remedy stock at $9.00 in cash plus 0.9065 shares of Peregrine common stock per share of Remedy common stock. After a meeting of Remedy's Board of Directors on May 30, 2001. that offer was accepted. Each company commenced due diligence soon thereafter.

140.   Both companies' Boards of Directors approved the Merger and executed the Merger Agreement on June 10, 2001. A press release was issued the next day announcing the Merger.

141.   The Merger Agreement required Remedy to prepare and file with the SEC a Proxy Statement/Prospectus for solicitation of proxies from its shareholders for consent to the Merger and their acquisition of approximately 28.3 million shares of Peregrine common stock and approximately $278 million in cash in exchange for approximately 30.9 million shares of Remedy's common stock. The Merger Agreement also required Peregrine to prepare and file with the SEC an S-4 Registration Statement for the Offer and Sale of Peregrine common stock ("Registration Statement"). The Merger Agreement further required that the Registration Statement contain the Proxy Statement/Prospectus. The Merger Agreement also warranted prior SEC filings and all statements contained in the Registration Statement.

142.   The Registration Statement, which included the Proxy Statement/Prospectus, was filed and distributed on July 23, 2001.

143.   The Registration Statement and Proxy Statement/Prospectus urged shareholders to vote in favor of the Peregrine/Remedy Merger. The Proxy Statement/Prospectus expressly incorporated Peregrine's FY01 10-K by reference.

144.   The cover letter addressed to shareholders indicated that (a) the Proxy Statement/Prospectus was attached: (b) a meeting of shareholders would be held at Remedy's headquarters in Mountain View. California on August 27, 2001. where the shareholders would

43

**EXHIBIT 1**

have an opportunity to vote on the Merger: and (c) the Directors of Remedy had unanimously recommended the Merger Agreement. The meeting location and the recommendation were stated again prominently in the Proxy Statement/Prospectus.

145.   The Merger became official on August 27, 2001, when the shareholders approved the Merger by vote at each company's August 27, 2001 shareholder meetings. Approximately 28.3 million shares of Peregrine stock and a sum of cash were issued to acquire all outstanding shares of Remedy stock. At that point, the former Remedy shareholders held approximately 14.7% of Peregrine's outstanding shares.

146.   Information provided by Peregrine in the Registration Statement. Proxy Statement/Prospectus. Merger Agreement. and elsewhere was vastly inflated and incorrect. Through those documents and otherwise. Peregrine provided information to the public. to Plaintiffs. to Remedy, and to others that included material misstatements and omitted pertinent facts. That information included historical, current, projected. forecast, and other aspects. as well as financial, accounting, strategic, operational, and other aspects.

147.   Remedy, Plaintiffs. Remedy's financial advisor Morgan Stanley, and others relied on that information.

148.   For example, Remedy's Board of Directors considered factors in approving the Merger such as "historical information concerning Peregrine's and Remedy's respective businesses, prospects, financial performance and condition[;] the market value of Peregrine common stock and various factors that might affect that value in the future[; and] detailed financial analysis and pro forma and other information presented to the board."

149.   Remedy shareholders were induced to exchange their Remedy securities for Peregrine securities on the basis of false and misleading representations made by Defendants to them.

C. ·   **The Truth About Defendants' Misrepresentations Eventually Emerged.**

150.   On April 5, 2002, Peregrine issued a press release announcing that it was replacing its independent auditor. Arthur Andersen LLP, with KPMG LLP, stating in relevant part:

**44
EXHIBIT 1**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Peregrine Systems. Inc. (NASDAQ: PRGN). a global Infrastructure Management software company. today announced that its Board of Directors has appointed KPMG as its independent auditors. effective immediately. The decision to replace Arthur Andersen LLP as the company's independent auditors was made after a thorough selection process that reviewed several firms. including Arthur Andersen.

> "Arthur Andersen has served as Peregrine's independent auditors since our initial public offering in 1997. and we have the highest regard for our audit team's work ethic and professionalism." said Steve Gardner. Peregrine's chairman and chief executive officer. "However. in light of the current uncertainties at Arthur Andersen. we felt it was in the best interest of our company and shareholders to retain KPMG as our independent auditors at this time."

The release further noted:

> Fourth Quarter Earnings Release and Conference Call Peregrine plans to release fourth quarter and audited fiscal year-end results after the market closes on May 2.

> Management will host a conference call to discuss these results on May 2.

>     151.    After the close of trading on April 30. 2002. Peregrine announced that it was postponing its Q4 FY02 and year-end FY02 results. In an April 30, 2002 press release, the Company stated:

> Peregrine Systems, Inc. (NASDAQ: PRGN). announced today that it will delay its planned earnings release and conference call related to results for the fiscal fourth quarter and full fiscal year 2002. pending continued audit activities by KPMG, the company's independent auditors. The date for these events had previously been set for May 2, 2002.

> KMPG was engaged by Peregrine earlier this month to replace Arthur Andersen LLP for the audit of the company's recently completed fiscal year. The company indicated that it would provide further information relative to the announcement of results during the week of May 6. 2002.

        152.    Before the market opened on Monday, May 6, 2002. Peregrine issued a press release announcing an internal accounting investigation into "inaccuracies" of an "[un]determined . . . scope and magnitude" uncovered by KPMG. Peregrine confessed "revenue recognition irregularities" amounting to "as much as $100 million." and noted that it was "keep[ing] the SEC informed." The press release also announced the resignation of Defendants

45
**EXHIBIT 1**

1  Gardner (Chairman and CEO) and Gless (Director, CFO, and EVP of Finance). The press release

2  stated in relevant part:

3      Peregrine Systems, Inc. (NASDAQ: PRGN) announced today that
        the board of directors has authorized the audit committee of the
4       board to conduct an internal investigation into potential accounting
        inaccuracies brought to the attention of the audit committee by
5       KPMG, the company's independent auditors. KPMG was engaged
        by Peregrine in April to replace Arthur Andersen LLP for the audit
6       of the company's recently completed fiscal year.

7       The scope and magnitude of these matters have not been
        determined. Based on the preliminary information reviewed to
8       date, certain transactions involving revenue recognition
        irregularities, totaling as much as $100 million, have been called
9       into question and may have been recorded during periods in fiscal
        2001 and 2002. These transactions were recorded initially as
10      revenue from the company's indirect channels and may have been
        written off in later quarters. These channel transactions and other
11      accounting matters to be investigated may impact financial results
        for periods in fiscal 2002 and prior. Peregrine has informed the
12      staff of the SEC of its audit committee's interval investigation and
        will keep the SEC informed of its progress.
13
        Additionally, the board announced the resignations of Steve
14      Gardner, chairman of the board and chief executive officer, and
        Matt Gless, chief financial officer, executive vice president of
15      finance and also a director on the board.

16      153.    Peregrine's stock price fell precipitously, dropping 61% in pre-market

17  trading on Monday, May 6, 2002, on this disclosure of a potential $100 million accounting error

18  and the resignations of its two top officers. It opened that day at $0.99, down $1.58 from its

19  Friday, May 3, close of $2.57.

20      154.    On May 23, 2002, Peregrine announced the results of its internal audit. It

21  disclosed a massive restatement of its financial statements for FY00, FY01, and the first three

22  quarters of FY02 (i.e., April 1, 1999 – December 31, 2001). The Company estimated that as

23  much as $100 million in revenue would need to be restated downward. Peregrine also disclosed

24  that the SEC had commenced an investigation into its accounting practices. The press release

25  stated in relevant part:

26      Peregrine Systems, Inc. (NASDAQ: PRGN) announced today that
        it will restate its financial statements for fiscal years 2000 and 2001
27      and in the first three quarters of fiscal year 2002 based on
        information that has resulted from the ongoing internal
28      investigation into accounting errors and irregularities. The

        234514                          - 44 -

46
**EXHIBIT 1**

company will among other possible adjustments, correct previously reported revenue regularities amounting to as much as S100 million.

In addition, the company has been advised that the staff of the Securities and Exchange Commission (SEC) has commenced a formal order of private investigation into the company's accounting practices. The company intends to fully cooperate with the SEC in the investigation.

155.   On May 28, 2002, Peregrine announced its dismissal of KPMG as its auditor, roughly only a month after it had dismissed Arthur Andersen. Peregrine explained: "In the course of the internal investigation being conducted by attorneys representing Peregrine's audit committee, KPMG informed Peregrine that approximately $35 million of the questionable transactions were with KPMG and KPMG Consulting."

156.   Before being fired, KPMG notified members of Peregrine's board of directors that it could "no longer be able to rely on representations by some members of management," having found "accounting inconsistencies, errors and irregularities" during its audit. KPMG warned the board of directors that it would have to "significantly expand the scope of its audit" to delve into the "appropriateness of the company's revenue recognition policy and practices." KPMG also informed the board that "it had reserved judgment as to whether" it would uncover "other accounting errors or inaccuracies" during its audit. After terminating its relationship with KPMG, Peregrine announced:

> In the course of their engagement, representatives of KPMG advised the company's audit committee and other members of the board of directors [that i]nformation had come to the attention of KPMG that had led it to *no longer be able to rely on representations by some members of management.* This information consisted principally of customer documentation and accounting information provided by personnel within the company's sales and finance organizations which, when taken together, pointed out *accounting inconsistencies, errors and irregularities,* principally in the company's indirect channel sales. . . . On the basis of issues relating to the completeness and consistency of the information that was provided to it during the course of its preliminary audit activities, KPMG had advised the company's audit committee and other members of the board of directors that it would be required to *significantly expand the scope of its audit* and to focus more particularly on the application and *appropriateness of the company's revenue recognition policy and practices.* KPMG had also advised that it had *reserved judgment as to whether other accounting errors or inaccuracies might be*

SECOND AMENDED COMPLAINT

47
**EXHIBIT 1**

*discovered and require correction* during the course of KPMG's audit activities.

(emphasis added).

157.    Peregrine faced such financial difficulty that it had to slash its workforce by half, firing approximately 1400 employees. "Peregrine announced that it intends to reduce its workforce by 48 percent in the next few weeks, reducing the number of employees from approximately 2,900 to 1,500."

158.    Peregrine finally confessed that it had to restate its financial results for the most recent eleven quarters for which it had filed results: FY00, FY01, and the first three quarters of FY02. Because of the magnitude and complexity of the misstatements and omissions, Peregrine could not file its 10-K for FY02 by the June 30, 2002 deadline, and could not even estimate when it might be able to do so:

> Pergrine [sic] has annouced [sic] that it intends to *restate its financial results for fiscal years 2000 and 2001 and the first three quarters of fiscal 2002* as a result of *accounting errors and irregularities* in prior fiscal periods brought to the company's attention by its independent auditors. The company also has announced that its audit committee has commenced an *internal investigation* of the company's accounting practices and *the Securities and Exchange Commission has initiated its own formal investigation.* The time required to complete the auidt [sic] committee's investigation and for the company to complete the restatement of its financial statements for prior periods will depend on the scope and magnitude of the accounting issues under review. The company cannot estimate at this time when it may file its Form 10-K for fiscal 2002.

(emphasis added).

159.    On February 28, 2003, Peregrine filed restated consolidated financial statements for the years ended March 31, 2001 and 2002. Peregrine's consolidated balance sheet as of March 31, 2002 and the consolidated statements of operations, cash flows, and changes in stockholders' equity (deficit) for the year ended March 31, 2002, include restatement adjustments related to the first nine months of the fiscal year.

**48
EXHIBIT 1**

### D. Defendants' Conduct Violated GAAP.

160.    During the Relevant Period. Defendants materially misled the investing public. including Plaintiffs. thereby inflating the price of Peregrine's securities. by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements. as set forth herein. not false and misleading.  The statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance. accounting. reporting. and financial condition in violation of California and federal securities laws and generally accepted accounting principles ("GAAP").

161.    GAAP consists of those principles recognized by the accounting profession as the conventions. rules. and procedures necessary to define accepted accounting practice at the particular time.  Regulations S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(l), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

162.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements not misleading.

163.    In addition, Item 303 of Regulation S-K requires that, for interim periods. the Management Discussion and Analysis Section ("MD&A") must include, among other things. a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income form
> continuing operations.  If the registrant knows of events that will
> cause a material change in the relationship between costs and

revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . . .

164.   Accounting Principles Board Opinion No. 28 requires that interim financial statements observe the GAAP requirement of recognition of an adequate provision for foreseeable costs and an associated allowance. Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even thought they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

165.   The Company's financial statements in the 10-Ks for FY00 and FY01 and 10-Qs for those eight quarters as well as the first three quarters of FY02 violated GAAP and the principles of fair financial reporting. Those principles are, among others:

   a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

   b.    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

   c.    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

   d.    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

**50**
**EXHIBIT 1**

e.     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

f.     The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements (APB Opinion No. 22).

g.     The principle that losses be accrued for when a loss contingency exists (Statement of Financial Accounting Standards No. 5).

h.     The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred (Statement of Financial Accounting Standards No. 5).

i.     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

j.     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

k.     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

166.     In addition, during the Relevant Period, Defendants violated SEC disclosure rules:

a.     Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made materially false and misleading; and

**51**

**EXHIBIT 1**

b.   By failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulations S-X, 17 C.F.R. § 210.4-01(a)(1).

167.   Defendants were required to disclose in the Company's financial statements the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the fiscal 2001 Form 10-K and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed, the Company's common stock would have traded at prices well below that which it did.

## III.   THE CUSTOMER DEFENDANTS CONSPIRED, AIDED AND ABETTED PEREGRINE'S FINANCIAL MISREPRESENTATIONS.

168.   In August of 1997, Peregrine hired Steven S. Spitzer ("Spitzer") as a Vice President of Peregrine's Sales Department. Until approximately April 2000, Spitzer worked on building sales alliances with entities who could serve as promoters of Peregrine's products throughout North America. From approximately April 2000 through April 2001, Spitzer focused on North American sales of Peregrine's GetIt! product. Thereafter, Spitzer focused on direct sales to managed service providers until he left Peregrine in June of 2002.

169.   During the 11-quarter fraud, Peregrine's senior management regularly held meetings with Spitzer near the ends of fiscal quarters to identify revenue shortfalls and discuss ways to close the gap between current and forecasted revenue. At their urging, Spitzer formed alliances and partnerships with a number of other software and related businesses. Under this "buddy system", the participants agreed to accommodate one another in structuring transactions with the intent of generating revenues so each company could show inflated or artificial revenues on their respective books.

170.   Peregrine and its "partners" used a variety of "creative accounting" techniques to generate income including "software swaps" also known as "Barney" deals. This term referred to Barney the purple dinosaur who tells his friends: "I love you, you love me."

171.   Peregrine's revenue goals were also frequently achieved by a fraudulent practice known as "parking software." The parking transactions were non-binding "sales" of software licenses to resellers with the understanding that they owed nothing to Peregrine unless the software was sold to end-users. Peregrine then recognized phantom revenues from the parking transactions in order to "make the quarter."

172.   In addition, Spitzer also booked sales deals with extended payment terms and improperly classified accounts receivable write-offs. Secret "side agreements" were made with customers, allowing the customers to not pay for Peregrine software and to otherwise allow Peregrine to manipulate the timing of payment on accounts so as to justify false and misleading financial reports.

173.   None of these "software swaps", "parked software" transactions, or transactions involving extended payment terms coupled together with improper classified accounts receivable write-offs complied with GAAP. Defendants knew, or were reckless in not knowing, that these practices were improper and would illicitly inflate Peregrine's revenue. At no point during the relevant time period did Defendants or their financial reports reveal the extent to which such improper transactions existed.

174.   In taking the actions, as particularized herein, to substantially assist the commission of the fraud complained of, each Customer Defendant (i.e., KPMG, BearingPoint, and Critical Path) acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that fraud, and was aware of his overall contribution to and furtherance of the fraud. Customer Defendants' act of aiding and abetting include, inter alia, the acts they are alleged to have committed in furtherance of the conspiracy and common course of conduct complained of herein.

175.   Each of the Customer Defendants either knew or recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein

53

**EXHIBIT 1**

would artificially inflate the prices of those securities. Each of the Customer Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

### B. KPMG/BearingPoint.

176.    KPMG/BearingPoint was a Peregrine "partner" who participated in these "parking" arrangements (also known as "channel stuffing" or "software swaps") and other creative accounting transactions. Creative accounting transactions with *KPMG/BearingPoint* formed a substantial portion of the $100 million KPMG auditors identified, in their aborted audit, as income Peregrine improperly recognized under GAAP.

177.    For instance, over the course of approximately nine software licensing agreements between KPMG/BearingPoint and Peregrine, Peregrine reported revenue of approximately $34.8 million. *KPMG/BearingPoint*, however, only paid approximately *$4.3* million for the licenses it ostensibly purchased from Peregrine. Eventually, Peregrine improperly wrote off approximately $30.8 million in purported receivables from KPMG/BearingPoint.

178.    The first of many sham transactions between KPMG/BearingPoint and Peregrine occurred near the end of the December 1999 quarter. At that time, a senior Peregrine officer told Spitzer that Peregrine expected to close a software sale to a certain end-user in the next quarter and that without the anticipated revenue, Peregrine could not meet its revenue goal for the December 1999 quarter. To close the revenue gap, the senior Peregrine officer urged Spitzer to park the potential software deal with KPMG/BearingPoint.

179.    Spitzer told his counterpart at KPMG/BearingPoint that Peregrine needed revenue to achieve its quarterly goal, and asked him to sign a licensing agreement for the Peregrine software. Spitzer orally promised the consulting firm partner that Peregrine would not require KPMG/BearingPoint to pay unless end-users were found for the software, and that Peregrine would also steer the services work associated with the end-user sale to KPMG/BearingPoint. The consulting firm partner signed a contract that on its face required *KPMG/BearingPoint to pay Peregrine $4 million for software.*

180.    Peregrine. however, never collected the purported the $4 million in revenue from the transaction during the December 1999 quarter. Despite this fact, Peregrine improperly recorded more than $4 million in revenue for Spitzer's parking transaction with KPMG/BearingPoint.

181.    Thereafter, KPMG/BearingPoint became Peregrine's "go to" reseller when revenue was needed to make quarterly forecasts. In late June 2000, Peregrine sales personnel were working on a $7.1 million software sale to an end-user, but Peregrine senior officers refused to wait until the sale closed before recognizing revenue. At their urging, Spitzer arranged to park the $7.1 million software deal with KPMG/BearingPoint pursuant to a similarly bogus contract and an oral side agreement.

182.    In the June 2000 quarter, Peregrine improperly recorded approximately $6.1 million in revenue for Spitzer's parking transaction with KPMG/BearingPoint.

183.    Within days of this parking transaction, Spitzer parked an additional $2.3 million in software with KPMG/BearingPoint, purportedly for resale to another end-user. Again, Peregrine recorded revenue in the June 2000 quarter. No sale to the end-user ever occurred, and Peregrine never collected from KPMG/BearingPoint.

184.    Near the close of the September 2000 quarter, a senior Peregrine officer told Spitzer that an end-user would likely buy $11.5 million of software, but that the sale would not close for several weeks. The senior officer urged Spitzer to park the anticipated sale with KPMG/BearingPoint so that Peregrine could record the revenue in the September quarter. The consulting firm partner signed a contract for KPMG/BearingPoint to buy $11.5 million worth of Peregrine software for resale to the end-user. Again, Spitzer and the consulting firm partner orally agreed that KPMG/BearingPoint had no obligation to pay the contract amount.

185.    In the September 2000 quarter, Peregrine improperly recorded approximately $11.5 million in revenue for Spitzer's parking transaction with KPMG/BearingPoint. No sale to the end-user ever occurred, and Peregrine never collected from KPMG/BearingPoint under the September 2000 contract.

C.    Critical Path.

186.    On January 19, 2000, Peregrine and Critical Path announced to the public that Peregrine and Critical Path were forming "a strategic relationship" to deliver an integrated Internet solution to manage their customers facilities.

187.    Prior to the commencement of this "strategic relationship", however, Defendant Gardner and other Peregrine officers had developed a significant working relationship with Critical Path President David A. Thatcher ("Thatcher"). Thatcher served as Peregrine's CFO from March 1993 through November 1995.

188.    In response to financial pressures at both companies, Peregrine and Critical Path both engaged in a series of transactions as part of a fraudulent scheme to falsely inflate each of their respective earnings in Peregrine's second financial quarter and Critical Path's third financial quarter. The response of Critical Path and Peregrine to these pressures to produce profits led to SEC enforcement actions against both Thatcher and Critical Path, and the eventual criminal conviction of Thatcher for securities fraud.

189.    On February 2, 2002, the SEC charged Thatcher with participating in a scheme to inflate Critical Path's revenues and earnings for the fiscal year 2000, in part based on its business dealings with Peregrine. According to the SEC's complaint, during the year 2000, Thatcher and other Critical Path employees caused Critical Path to record revenue from fictitious, contingent, or backdated transactions in its third quarter of the fiscal year 2000, one of which involved the "software swap" transaction between Peregrine and Critical Path. As a result, the United States District Court for the Northern District of California issued a permanent injunction against Thatcher from violating sections of the Securities Exchange Act of 1934 (Exchange Act) and the Exchange Act Rules.

190.    Thatcher admitted his participation in a conspiracy to commit securities fraud in violation of Title 18, U.S.C., Section 371, and pled guilty to criminal securities fraud charges. Thatcher's criminal conviction was based in part on the "software swap" transaction between Peregrine and Critical Path.

**56**
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

191.   Defendant Gardner and perhaps other Peregrine officers directly participated in the "software swap" between Peregrine and Critical Path. In his plea bargain agreement, Thatcher admitted that he negotiated with Defendant Gardner for the non-monetary exchange of software, i.e., the "software swap" between Peregrine and Critical Path. Under the terms of the "software swap", Critical Path provided Peregrine with software and cash in return for Peregrine software. Critical Path then accounted for the transaction as though it were a cash sale, without disclosing to investors that it had merely exchanged software with Peregrine. The effect of this "software swap" was to artificially inflate Critical Path's revenues for the third quarter and to artificially inflate Peregrine's revenues for its second quarter (Peregrine's fiscal year ends on March 31). Thatcher also admitted that he realized that Critical Path's recognition of revenue for the software swap was improper.

192.   Peregrine engaged in the fraudulent "software swap" transaction that formed a part of the basis for Thatcher's guilty plea to civil and criminal securities fraud in order to meet Peregrine's second quarter projections. As part of the Critical Path and Peregrine "software swap", on September 28, 2000, Peregrine agreed to buy out an existing periodic royalty obligation to Critical Path for $2.85 million and to purchase another $240,500 of software. In exchange, Thatcher signed an agreement obligating Critical Path to purchase about $4 million of software and services from Peregrine, $2.6 million more than Critical Path was set to purchase just days before. Peregrine improperly reported the Critical Path obligation as revenue for its second quarter.

193.   To recognize revenue from this barter transaction-an exchange of goods and services in which the two sides were contingent on one another-in conformity with GAAP, Peregrine had to (a) value the exchange at the fair value of either the software it received from, or the software it sent to, the business software company, and (b) ascribe a value to the software it was receiving that reasonably reflected its expected use of the software. Peregrine and Critical Path failed to properly comply with these GAAP principles.

194.   To make the two transactions look like they were not contingent on one another, defendant Gardner and Thatcher, along with others at Peregrine and Critical Path

- 55 -

57

EXHIBIT 1

1    arranged for the parties to prepare two separate contracts, exchange checks for the full amounts

2    owed, and make their payments to each other on different days.

3            195.    Defendant Peregrine recorded the sale to Critical Path as revenue for the

4    second quarter.

5            196.    On October 4, 2000, Peregrine announced that it would meet or exceed

6    consensus earnings per share estimates of $.11 per share and total revenue of $142 million.  On

7    October 24, 2000 Peregrine announced "record results" for the second quarter ended September

8    30, 2000.  A Peregrine news release claimed that total revenues for the second quarter increased

9    147% to a record $142.7 million, compared with revenues of $57.8 million in the comparable

10   prior year period.  Net income was reported to be $18.3 million or $.0.12 per diluted share for the

11   second quarter compared to $8.4 million or $0.08 per diluted share for the comparable prior year

12   period.

13           The financial statements, in addition to reflecting revenues derived from the

14   fraudulent "software swap" transaction between Peregrine and Critical Path also reflected other

15   improper income derived from "channel stuffing" in which revenue was realized for software that

16   was shipped to customers who did not intend to pay for the software and for which there was no

17   bona fide orders.

## COUNT I

### Against Executive Defendants and Director Defendants
### for Violations of Cal. Corp. Code § 25504
### (Control Person Liability for Peregrine's Violations of § 25401)

21           197.    Plaintiffs repeat and reallege each of the allegations set forth above, as if

22   fully set forth herein.  This claim is asserted against the Executive Defendants and Director

23   Defendants for violations of California Corporations Code § 25504.

24           198.    Peregrine committed violations of California Corporations Code § 25401:

25                   a.      Peregrine offered to sell and sold Peregrine securities and offered to

26   buy and bought Remedy securities by conducting the Transactions, as described above.  In

27   effecting the Merger, Plaintiffs purchased Peregrine securities and sold Remedy securities within

28   the meaning of Cal. Corp. Code § 25501:

- 56 -

**58**
**EXHIBIT 1**

b.      Peregrine performed these Transactions by means of various written and oral communications, described above.  Such communications included press releases, 10-Qs, 10-Ks, the Registration Statement, the Proxy Statement/Prospectus, conversations, meetings, and other communications, statements, and documents, both oral and written ("Peregrine's Communications");

c.      These communications included untrue statements of material facts and/or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading ("Misstatements and Omissions" or "Misrepresentations");

d.      Peregrine and Plaintiffs were in privity, because the Merger constituted a series of direct transactions between Peregrine and Plaintiffs; and

e.      Peregrine and Plaintiffs conducted these Transactions in California.

199.    Peregrine is civilly liable under California Corporations Code § 25501:

a.      In the Transactions, Plaintiffs purchased Peregrine shares and sold Remedy shares;

b.      Plaintiffs were unaware of the facts concerning Peregrine's Communications' untruths and omissions; and

c.      Defendants either (1) knew the facts concerning their untruths and omissions, or (2) did not exercise reasonable care to discern those facts, and, if they had, they would have known such facts.

200.    Defendants are liable to Plaintiffs under California Corporations Code § 25504:

a.      Executive Defendants are liable to Plaintiffs because they were principal executive officers of Peregrine within the meaning of California Corporations Code § 25504;

b.      Executive Defendants knew of and/or had reasonable grounds to believe in the existence of the facts alleged in this Count;

59
EXHIBIT 1

c.     Director Defendants are liable to Plaintiffs because they were directors of Peregrine within the meaning of California Corporations Code § 25504; and

d.     Director Defendants knew of and/or had reasonable grounds to believe in the existence of the facts alleged in this Count.

201.   As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury. The amount of such damages and prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the time of trial.

## COUNT II

### Against All Defendants for Fraud and Deceit

202.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This claim is asserted against all Defendants for violations of the California common law of fraud and deceit.

203.   Named Defendants misrepresented material facts by making false representations, concealing true information, or failing to disclose true material information.

204.   Named Defendants had scienter in that they knew that those misrepresentations were false or were reckless as to their falsity.

205.   Named Defendants made those misrepresentations with the intent to deceive Plaintiffs and to induce Plaintiffs and/or their agents to rely on them by purchasing or otherwise acquiring Peregrine securities and/or selling Remedy securities.

206.   Plaintiffs and/or their agents read and/or were aware of the misrepresentations and actually and justifiably relied on them in making their substantial investments and decisions to enter into the Merger on the agreed terms in exchange for Peregrine securities and other consideration. Such misrepresentations include, but are not limited to, those made in the Registration Statement, Proxy Statement/Prospectus, SEC filings, and press releases. Had Plaintiffs and/or their agents known the truth, they would have understood the true value of Peregrine securities and would not have entered into the Merger on such unfavorable terms, with

**60**
**EXHIBIT 1**

1 | Peregrine securities valued at the substantially inflated market prices, or would not have entered
2 | into the Merger at all.

3 | 207. At the time of the misrepresentations and of Plaintiffs' reliance thereon.
4 | Plaintiffs were unaware of the falsity of Named Defendants' misrepresentations and could not
5 | reasonably have known the truth. Defendants were the sole possessors of the true, accurate, and
6 | complete information about Peregrine's Conditions, to which Plaintiffs had no access.

7 | 208. As a direct, foreseeable, and proximate result of this wrongful conduct
8 | alleged herein. Plaintiffs suffered economic injury. The amount of such damages and
9 | prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the
10 | time of trial.

11 | **COUNT III**

12 | **Against Executive Defendants and Director Defendants**
13 | **For Negligent Misrepresentation**

14 | 209. Plaintiffs repeat and reallege each of the allegations set forth above as if
15 | fully set forth herein. This claim is asserted against the Executive Defendants and Director
16 | Defendants for violations of the California common law of negligent misrepresentation.

17 | 210. Named Defendants offered to sell and/or sold Peregrine securities and/or
18 | offered to buy and/or bought Remedy securities through the aforementioned Transactions.

19 | 211. Named Defendants performed these Transactions by means of various
20 | Communications, described above.

21 | 212. These communications included Misrepresentations: i.e., untrue statements
22 | of material facts and/or omitted to state material facts necessary to make the statements made, in
23 | the light of the circumstances under which they were made, not misleading.

24 | 213. Named Defendants had no reasonable ground for believing these
25 | communications to be true. If they did not know that these communications were untrue and/or
26 | misleading, they should have, and they would have, had they exercised the care a reasonable
27 | person would have in their circumstances. Thus, Defendants acted negligently.

28 |

**61**
**EXHIBIT 1**

214. Named Defendants and Plaintiffs were in privity, because the Merger constituted a series of direct transactions between Named Defendants and Plaintiffs.

215. Named Defendants conducted these Transactions in California.

216. Named Defendants made these representations and omissions of fact with the intent to induce Plaintiffs and/or their agents to act in reliance upon such by purchasing or otherwise acquiring Peregrine securities and/or selling Remedy securities.

217. At the time of the communications, and at the time Plaintiffs acted in reliance thereon, Plaintiffs did not know of their false and/or misleading nature and could not reasonably believe them to be untrue.

218. Plaintiffs and/or their agents read and/or were aware of the false and misleading representations and actually and justifiably relied on such in making their substantial investments and decisions to enter into the Merger on the agreed terms in exchange for Peregrine securities and other consideration. Such representations include, but are not limited to, those made in the Registration Statement, Proxy Statement/Prospectus, SEC filings, and press releases. Plaintiffs further did not know of the facts that Defendants suppressed and failed to disclose at the time of the failures to disclose and suppressions of fact, and at the time Plaintiffs acted in reliance thereon. Had Plaintiffs and/or their agents known the truth, they would have understood the true value of Peregrine securities and would not have entered into the Merger on such unfavorable terms, with Peregrine securities valued at the substantially inflated market prices, or would not have entered into the Merger at all.

219. As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury. The amount of such damages and prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the time of trial.

62
EXHIBIT 1

## COUNT IV

### Against Executive Defendants and Director Defendants for Violations of Cal. Corp. Code 25504.1 (Materially Assisting in Violations of § 25401)

220.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This claim is asserted against Executive Defendants and Director Defendants for violations of California Corporations Code § 25504.1.

221.    Named Defendants with knowledge directly or indirectly controlled and induced others to commit the violations of § 25401 described in Count I:

a.    Specifically, Named Defendants knew that they controlled others. Named Defendants knew that their actions, direct or indirect, would and did induce those others to commit such violations;

b.    Executive Defendants controlled Peregrine and induced it to commit these violations by exercising control over the day-to-day business of the Company and making and supervising specific individual decisions about the conduct of such business. Executive Defendants controlled Accountant Defendants by participating in hiring, supervising, and retaining them. Similarly, Executive Defendants substantially assisted all Defendants in their violations of Count I by contributing to the Misrepresentations; and

c.    Director Defendants controlled Peregrine and induced it to commit these violations by exercising supervisory control over the Company's general operations and representing the shareholders' interests in maximizing profitability, dividend yield, share price, and stability in the short- and long-run. Director Defendants controlled Accountant Defendants by participating in hiring, supervising, and retaining them. Similarly, Director Defendants substantially assisted all Defendants in their violations of Count I by contributing to the Misrepresentations.

222.    Named Defendants with knowledge substantially assisted others who committed the violations of § 25401 described in Count I.

223.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury. The amount of such damages and

**63**
**EXHIBIT 1**

1  prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

2  time of trial.

3  ## COUNT V

4  ### Against All Defendants for Violations of Cal. Corp. Code § 25504.1
   ### (Materially Assisting in Violations of § 25401)

5

6      224.   Plaintiffs repeat and reallege each of the allegations set forth above as if

7  fully set forth herein. This claim is asserted against all defendants for violations of California

8  Corporations Code § 25504.1.

9      225.   Named Defendants with knowledge directly or indirectly controlled and

10  induced others to commit the violations of § 25401 described in Count I:

11          a.   Specifically, Named Defendants knew that they controlled others.

12  Named Defendants knew that their actions, direct or indirect, would and did induce those others

13  to commit such violations; and

14          b.   Accountant Defendants substantially assisted all Defendants in their

15  violations of Count I by contributing to the Misrepresentations. Specifically, they purported to

16  audit Peregrine's financial statements and gave such financial statements the imprimatur of

17  propriety by stating that they had audited the Company's financial statements in accordance with

18  GAAP and found them to "present fairly, in all material respects," Peregrine's financial position,

19  operational results, and cash flows.

20          c.   Defendants KPMG, BearingPoint and Critical Path substantially

21  assisted all Defendants in their violations of Count I by contributing to the misrepresentations.

22  Specifically, they purported to engage in bona fide deals of actual value with Peregrine and gave

23  Peregrine's financial statements the imprimatur of propriety by representing that an actual bona

24  fide transaction of actual value had occurred between the companies. In truth, the transactions

25  between KPMG, BearingPoint, Critical Path and Peregrine, were sham transactions entered into

26  for the purpose of artificially inflating the value of each companies' revenue.

27      226.   Named Defendants with knowledge substantially assisted others who

28  committed the violations of § 25400 et seq. described in Count I.

64
**EXHIBIT 1**

227.   As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the time of trial.

## COUNT VI

### Against Gardner, Gless, Moores, and Noell for Violations of Cal. Corp. Code §§ 25402 and 25502 (Use of Non-Public Information Unavailable to Purchaser)

228.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This claim is asserted against Gardner, Gless, Moores, and Noell for violations of California Corporations Code §§ 25402 and 25502.

229.   Named Defendants were the officers, directors, or controlling persons of Peregrine, and/or other persons whose relationship to Peregrine gave them access, directly or indirectly, to material information about Peregrine not generally available to the public.

230.   Named Defendants sold Peregrine securities in California at a time when they knew material information about Peregrine gained from such relationship.

231.   Such information significantly affected the market price of Peregrine securities and was not generally available to the public.  Such securities would have had a substantially lower market value at the time of the purchase or sale if the information known to Named Defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb such information.

232.   Named Defendants knew that such information was not intended to be so available.  Named Defendants had no reason to believe that Plaintiffs were also in possession of such information.  Plaintiffs in fact did not possess that information, and gave Named Defendants no reason to think that they did.

233.   Plaintiffs purchased securities from Peregrine.

234.   Plaintiffs would not have purchased the securities at that price if they had been aware of such information.

235.   As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury. The amount of such damages and prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the time of trial.

## COUNT VII

### Liability of Defendants Gardner and Gless for
### Violations of Sections 25400(d) and 25500 of the California Corporations Code

236.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This Cause of Action is asserted against defendants Gardner and Gless.

237.   As set forth in detail in ¶¶ 50-55, Gardner and Gless engaged in market activities between the first quarter of 1997 and March, 1999.

238.   During the period from July 27, 1999 through May 23, 2002, defendants named in this count issued statements or participated in the issuance of statements regarding Peregrine's business and financial results and omitted to state material facts for the purpose of inducing the purchase of such securities by investors such as the Plaintiffs. These statements, on which Plaintiffs directly relied in purchasing Peregrine stock, included statements made in press releases, quarterly and annual reports filed with the SEC, as well as the Registration Statement and Prospectus.

239.   As discussed in greater detail above, the statements made were, at the time and in the light of the circumstances under which they were made, false and misleading with respect to material facts regarding Peregrine's financial results or omitted to state material facts which were necessary in order to make the statements made not misleading.

240.   Defendants named in this count knew that the statements set out herein were false and misleading or contained material omissions because they each had access to the material, adverse, non-public information about Peregrine's financial results and then-existing business conditions, which were not disclosed.

241.   The defendants named in this count directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a

- 64 -

**EXHIBIT 1**

1    scheme to defraud investors. This scheme included intentional and knowing conduct designed to

2    inflate Peregrine's financial results and conceal Peregrine's true financial condition and operating

3    results. It was accomplished by a variety of fraudulent devices to create revenue and earnings,

4    including contingent sales and side letter agreements, specified above. The purpose of this

5    scheme was to enable Peregrine to publish the false financial statements, specified above, to

6    allow Peregrine to acquire companies at artificially low prices by using inflated Peregrine stock

7    as currency and to accomplish the merger with Remedy.

8            242.    Each defendant named in this count is liable for, inter alia, the following

9    specific statements:

10             a.      The financial statements and results of Peregrine;

11             b.      The pro forma financial results of Peregrine and information

12    derived therefrom which included Peregrine's financial data issued by Gardner and Gless

13    between July 27, 1999 and May 23, 2002;

14             c.      The financial statements and results of Peregrine issued between

15    July 27, 1999 and May 23, 2002;

16             d.      The statements made by Peregrine in the Peregrine Press Releases

17    and other representations set forth above; and

18             e.      The statements made by Peregrine in its filings with the SEC, as set

19    forth above. Each of these statements was materially false and misleading for the reasons set

20    forth in the preceding paragraphs.

21            243.    Defendants Gardner and Gless are each liable for their own statements set

22    forth in above. Each of these statements was materially false and misleading for the reasons set

23    forth above.

24            244.    Defendants named in this count employed devices, schemes, and artifices

25    to defraud, including the withholding of material, adverse non-public information. They engaged

26    in acts, practices, and a course of conduct that included the making of, or participation in the

27    making of, untrue and misleading statement of material facts and omitting to state material facts

28    necessary in order to make the statements made about Peregrine not misleading. Specifically,

67

**EXHIBIT 1**

1  these defendants knew that Peregrine's financial statements and announced financial results were

2  materially overstated and were not presented in conformity with GAAP and they also knew that

3  the other representations by Peregrine set forth in the preceding paragraphs were materially false

4  and misleading for the reasons stated above.

5     245. Defendants named in this count acted with scienter.  Each one knowingly

6  participated in the scheme to inflate Peregrine's financial results and undertook deliberate acts

7  that furthered this scheme.  Each had actual knowledge of the misrepresentations and omissions

8  of material facts set forth herein.

9     246. As a result of the deceptive practices and false and misleading statements

10  and omissions described above, the market prices of Peregrine securities were artificially inflated

11  at relevant time periods and the market prices of Peregrine securities were artificially inflated

12  during relevant periods preceding May 23, 2002.  In ignorance of the false and misleading nature

13  of the representations and omissions described above and the deceptive and manipulative devices

14  employed by defendants named in this count, Plaintiffs, in reliance on both the integrity of the

15  market and directly on the statements and reports of those defendants, exchanged their Remedy

16  shares for Peregrine shares at artificially inflated prices and were damaged thereby.

17     247. Had Plaintiffs known of the material adverse information not disclosed by

18  defendants named in this count, or been aware of the truth behind those defendants  material

19  misstatements, they would not have purchased Peregrine securities at artificially inflated prices, if

20  at all.

21     248. By virtue of the foregoing, defendants named in this count violated

22  California Corporations Code sections 25400(d) and 25500, entitling Plaintiffs to damages and

23  prejudgment interest at the legal rate under §25500, all in an amount to be determined according

24  to proof at time of trial.

25

26

27

28

**68**
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

## COUNT VIII

### Against Accountant Defendants for Violations of Cal. Corp. Code §§ 25504.2
### (Joint and Several Liability of Accountants with Those Liable under § 25501)

249.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This claim is asserted against Accountant Defendants for violations of California Corporations Code §§ 25504.2.

250.    Named Defendants are accountants or other persons whose profession gives authority to their statements made by such person, who, pursuant to rule of the Commissioner, 10 Cal. Code Reg. §§ 260.504.2-260.504.24, gave written consent to be and was named in a prospectus or offering circular distributed in connection with the offer or sale of Peregrine securities as having prepared or certified in such capacity at least some part of such document(s) or a written report or valuation distributed with or referred to in such document(s).

251.    The part of such document so prepared or certified included untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

252.    Plaintiffs acquired the securities described in such document in reliance on such untrue statement or in reliance on such part of the document without notice of such omission.

253.    Named Defendants are jointly and severally liable with all Defendants liable under Section 25501.

254.    Named Defendants did not reasonably believe that the statements were true and not misleading. The prospectus represented fairly what Named Defendants actually stated. Named Defendants did not send written withdrawal of responsibility to the issuer and the Commissioner before Plaintiffs acquired the Peregrine securities.

255.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury. The amount of such damages and prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the time of trial.

**69**
**EXHIBIT 1**

# COUNT IX

## Against All Defendants for Violations of the California Common Law of Conspiracy

256.  Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This claim is asserted against all Defendants for violations of the California common law of conspiracy.

257.  The Defendants entered into the conspiracy with intent to agree or conspire to commit revenue recognition fraud.

258.  The conspiracy consisted of an agreement by its members to intend to commit the wrongful acts named in the above Counts. The members developed, maintained, promoted, and executed a common plan, scheme, or design to effect this conspiracy. The purpose and effect of the conspiracy was, among other things, to create and disseminate false statements about Peregrine's business and financial results, condition, and prospects; to artificially inflate the price of Peregrine securities; to relatively devalue the price of Remedy securities in the context of the Merger; to make the terms of the Merger seem more attractive than it otherwise would have seemed; to deceive Plaintiffs and/or their agents by means of such false statements; and to induce Plaintiffs to purchase or otherwise acquire Peregrine securities at artificially inflated prices.

259.  The Defendants committed at least one wrongful act in furtherance of the conspiracy, which caused Plaintiffs or others to sustain injury, damage, loss, or harm. Defendants secretly added material sale contingencies, by oral and written side agreement, to what appeared on their face to be binding contracts; defendants removed receivables from Peregrine's balance sheets by selling them to banks at the quarter's end to reduce its DSO figure and to make it appear Peregrine's customers were promptly paying Peregrine.

a.  The Defendants accomplished their conspiracy or common course of conduct of artificially inflating the price of Peregrine securities by issuing Misrepresentations through the Communications, which misrepresented Peregrine's Conditions. In doing so, the Defendants committed at least one illegal act listed in one of the above Counts, as part of the conspiracy.

**70**
**EXHIBIT 1**

SECOND AMENDED COMPLAINT

b.     During all relevant times hereto. Defendants KPMG. BearingPoint. and Critical Path, initiated and/or joined in a course of conduct which was designed to and did (i) deceive Plaintiffs and/or their agents regarding the accuracy of Peregrine's financial statements and condition; and (ii) cause Plaintiffs to exchange their Remedy shares for Peregrine shares at artificially inflated prices.   In furtherance of this plan, conspiracy and course of conduct. Defendants, and each of them, took the actions as set forth herein. Defendants engaged in a conspiracy or common course of conduct in violation of statutory and common law, the purpose and effect of which was, inter alia, to inflate the price of Peregrine's stock, and to conceal the adverse facts concerning Peregrine's financial condition.

c.     Plaintiffs suffered injury by negotiating and completing the Merger, which was effected by the purchase of Peregrine securities at artificially inflated prices and the sale of Remedy securities at relatively depressed prices.

260.    Each Defendant is liable for each act of every other member of the conspiracy that is in furtherance of the object of the conspiracy. Similarly, each Defendant is bound by each declaration of every other member of the conspiracy that is in furtherance of the object of the conspiracy.

261.    Each Defendant is liable for the natural and probable consequences of each wrongful act of every other member that furthered the object of the conspiracy, even though that particular act was not intended as a part of the agreed upon objective and even though he was not present at the time of the commission of that act.  The natural and probable consequences of the conspiracy generally was the artificial inflation of the price of Peregrine securities, the relative devaluation of Remedy securities, and the completion of the Merger at terms that did not reflect the true value of Peregrine securities.

262.    Each Defendant was a direct, necessary, and substantial participant in the conspiracy and common course of conduct complained of herein.

263.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein. Plaintiffs suffered economic injury.  The amount of such damages and

71
EXHIBIT 1

1  prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

2  time of trial.

3  <div align="center">**COUNT X**</div>

4  <div align="center">**Against All Defendants for Violations of the**
**California Common Law of Aiding and Abetting**</div>

5

6          264.    Plaintiffs repeat and reallege each of the allegations set forth above as if

7  fully set forth herein. This claim is asserted against all Defendants for violations of the California

8  common law of aiding and abetting.

9          265.    Named Defendants aided and abetted the commission of all preceding

10  counts by engaging in the acts described above.

11          266.    Named Defendants knowingly gave substantial assistance or

12  encouragement to Peregrine and each other to so act. The violations described in the Counts

13  above involved complicated activity, and their planning, execution, and concealment required the

14  cooperation of many Defendants.

15          267.    As a direct, foreseeable, and proximate result of this wrongful conduct

16  alleged herein, Plaintiffs suffered economic injury. The amount of such damages and

17  prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

18  time of trial.

19  <div align="center">**PRAYER FOR RELIEF**</div>

20          WHEREFORE, Plaintiffs pray for judgment as follows:

21          268.    Awarding Plaintiffs compensatory damages according to proof;

22          269.    Awarding Plaintiffs rescission to the extent that they still hold their

23  Peregrine securities or rescissionary damages to the extent that they do not;

24          270.    Awarding Plaintiffs exemplary/punitive damages;

25          271.    Awarding Plaintiffs pre-judgment and post-judgment interest

26          272.    Awarding Plaintiffs reasonable attorneys' fees and costs, including expert

27  witness fees and other fees.

28

**72**
**EXHIBIT 1**

<div align="center">SECOND AMENDED COMPLAINT</div>

273.    Awarding such other relief as this Court may deem just and proper.

Dated:  October , 2003                    Respectfully submitted.

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: _____
        Richard M. Heimann

Richard M. Heimann
Joy A. Kruse
Daniel E. Barenbaum
Christopher K. Leung

Attorneys for Plaintiffs

73
EXHIBIT 1

SECOND AMENDED COMPLAINT

ORIGINAL

982(a)(4)

| NAME AND ADDRESS OF SENDER: | TELEPHONE NO.: (415) 956-1000 | For Court Use Only: |
|---|---|---|
| Richard M. Heimann (SBN 063607)<br>Lieff, Cabraser, Heimann & Bernstein, LLP<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339 | | |

Insert name of court, judicial district or branch court, if any, and Post Office and Street Address:

San Diego County Superior Court
330 W. Broadway
San Diego, CA 92101

PLAINTIFF: Allocco, et al.

DEFENDANT: Gardner, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT | Case Number:<br>GIC 806450 |
|---|---|

TO: JENNIFER SPAZIANO ATTORNEY FOR BEARINGPOINT, INC.

(Insert name of individual being served)

This summons and other document(s) indicated below are being served pursuant to Section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it to me within 20 days may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. Section 415.30 provides that this summons and other document(s) are deemed served on the date you sign the Acknowledgment of Receipt below, if you return this form to me.

Dated: January 7, 2004

*(Signature of sender)*

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of: (To be completed by sender before mailing)
1. [✔] A copy of the summons and of the complaint.
2. [ ] A copy of the summons and of the Petition (Marriage) and:
   - [ ] Blank Confidential Counseling Statement (Marriage)
   - [ ] Order to Show Cause (Marriage)
   - [ ] Blank Responsive Declaration
   - [ ] Blank Financial Declaration
   - [ ] Other: (Specify)

(To be completed by recipient)

Date of receipt: January 9, 2004

Jennifer E. Spaziano counsel for BearingPoint, Inc
(Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Date this form is signed: January 27, 2004

Jennifer L. Spaziano counsel for BearingPoint, In
(Type or print your name and name of entity, if any, on whose behalf this form is signed)

Form Adopted by the
Judicial Council of California
Revised Effective January 1, 1975
[982(a)(4)]
Mandatory Form

NOTICE AND ACKNOWLEDGMENT OF RECEIPT

CCP 415.30, 417.10;
Cal. Rules of Court,
Rule 1216

297500_1.PDF

74
EXHIBIT 2

1

2                                          F I L E D
                                           Clerk of the Superior Court
3
                                           MAR 2 3 2004
4
                                           By: D. JELLISON, Deputy
5

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF SAN DIEGO

10

11   RICHARD P. ALLOCCO, et al.          )   CASE NO. GIC 806450
                                         )
12              Plaintiffs,              )   **ORDER AFTER HEARING**
                                         )
13      v.                               )
                                         )
14                                       )   Judge: Jeffrey B. Barton
     STEPHEN P. GARDNER, et al.; and DOES 1- )  Dept: 69
15   100,                                )   Oral argument:  March 19, 2004 at 3:00 p.m.
                                         )
16              Defendants.              )
                                         )
17                                       )
                                         )
18   _____)

19

20       This matter came on for oral argument on plaintiffs' motion to compel documents and

21   defendants' demurrers on March 19, 2004, Jeffrey B. Barton Judge Presiding. After reviewing the

22   moving and opposing papers, the Court rules as follows:

23       On defendants' demurrers to plaintiffs' Second Amended Complaint ("SAC"), the Court

24   confirms and incorporates by reference the tentative ruling of March 8, 2004.  The tentative ruling is

25   modified in that the plaintiffs shall have until June 18, 2004, to file a Third Amended Complaint.

26       On plaintiffs' motion to compel production of documents, the Court confirms and incorporates

27   by reference the tentative ruling of March 12, 2004.  However, the meet and confer and briefing

28

Order after hearing                          **75**
                                             **EXHIBIT 3**

1   schedule is modified as follows:  Plaintiffs and defendant Arthur Andersen shall meet and confer on the

2   disputed portions of the production by March 31, 2004.

3        Plaintiffs may file and serve a supplemental brief and revised separate statement by April 12,

4   2004.  Defendant Arthur Andersen's supplemental opposition and separate statement shall be filed and

5   served by April 20, 2004.  Plaintiffs' reply, if any, shall be filed and served by April 23, 2004.  Oral

6   argument on the motion shall be April 30, 2004 at 3:00 pm in Department 69.  Tentative ruling, if

7   applicable, will be made pursuant to Rule of Court, Rule 324 (a)(2), at 4:00 p.m. on April 29, 2004.

8

9   (See, Department Rules available on San Diego Superior Court website for information on obtaining the

10  tentative ruling.)

11

12  Dated:  March 22, 2004                          JEFFREY B. BARTON

13                                                  JEFFREY B. BARTON
                                                    Judge of the Superior Court
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order after hearing

76
EXHIBIT 3

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
☐ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814
☒ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ FAMILY COURT, 1555 6TH AVE, SAN DIEGO, CA 92101-3294
☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105
☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649
☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792
☐ JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92083-6634

**FILED**
Clerk of the Superior Court
MAR 2 3 2004
By: D. JELLISON, Deputy

PLAINTIFF(S)/PETITIONER(S)
RICHARD P. ALLOCCO, et al

DEFENDANT(S)/RESPONDENT(S)
STEPHEN P. GARDNER, et al

JUDGE:    JEFFREY B. BARTON
DEPT:    69

**CLERK'S CERTIFICATE OF SERVICE BY MAIL
(CCP 1013a(4))**

CASE NUMBER
GIC 806450

I, certify that:  I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):
ORDER AFTER HEARING

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:  ☒  San Diego   ☐  Vista   ☐  El Cajon   ☐  Chula Vista   ☐  Ramona, California.

<u>NAME & ADDRESS</u>

RICHARD HEIMANN
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 BATTERY STREET, 30TH FLOOR
SAN FRANCISCO, CA  94111-3330
(415) 956-1000
COUNSEL FOR PLAINTIFF

C. STEPHEN HOWARD
ALSCHULER, GROSSMAN, STEIN & KAHAN, LLP
1620 26TH STREET
SANTA MONICA, CA  90404-4060
(310) 907-1000
COUNSEL FOR ARTHUR ANDERSEN

DOUGLAS M. BUTZ
BUTZ DUNN DESANTIS & BINGHAM
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CA  92101
(619) 233-4777
COUNSEL FOR ARTHUR ANDERSEN

<u>NAME & ADDRESS</u>

MICHAEL A. ATTANASIO
COOLEY GOODWARD, LLP
4401 EASTGATE MALL
SAN DIEGO, CA  92121
(858) 550-6000
COUNSEL FOR DANIEL STULAC

DANIEL J. BERGESON and STEPHEN ROCKWELL
BERGESON, LLP
303 ALMADEN BLVD., SUITE 500
SAN JOSE, CA  95110-2712
(408) 291-6200
COUNSEL FOR STEPHEN GARDNER

THOMAS VANCE
VANCE, BLAIR AND GRADY
1201 CAMINO DEL MAR
DEL MAR, CA  92014
(858) 793-0040
COUNSEL FOR MATTHEW GLESS

**CLERK OF THE SUPERIOR COURT**

Date:  March 23, 2004        by  DEBORAH JELLISON        , Deputy
DEBORAH JELLISON

77
**EXHIBIT 3**

SDSC CIV-286(Rev. 12-02)        CLERK'S CERTIFICATE OF SERVICE BY MAIL

| CASE NAME | CASE NUMBER |
|---|---|
| RICHARD P. ALLOCCO, et al vs. STEPHEN P. GARDNER, et al | GIC 806450 |

NAME & ADDRESS

ROBERT STEWART and KATHRYN HORNIG
MCNAUL EBEL NAWROT HELGREN & VANCE PLLC
600 UNIVERSITY STREET, SUITE 2700
SEATTLE, WA  98101-3143
(206) 467-1816
COUNSEL FOR WILLIAM SAVOY

JOHN B QUINN and HARRY A. OLIVER, JR.
QUINN EMANUEL URQUHART OLIVER & HEDGES
865 SOUTH FIGUEROA STREET 10TH FLOOR
LOS ANGELES, CA 90017
(213) 624-7707
COUNSEL FOR JOHN MOORES

DOUGLAS W. LYTLE
HIGGS FLETCHER & MACK LLP
401 W A STREET, SUITE 2600
SAN DIEGO, CA  92101
(619) 236-1551
COUNSEL FOR ERNEST & YOUND REVISIONS-UND

JEN SPAZIAN
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 NEW YORK AVENUE NW
WASHINGTON, D.C. 20005
(202) 37107872
COUNSEL FOR BEARINGPOINT

NAME & ADDRESS

WAYNE LAMPREY and ANNE HARTMAN
GOODIN, MACBRIDE, SQUERI, RITCHIE & DAY LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO, CA  94111
(415) 392-7900
COUNSEL FOR THOMAS WATROUS

BRIAN PASTUSZENSKI and KENNETH WEISSMAN
TESTA HURWITZ & THIBEAULT
124 HIGH STREET
BOSTON, MA  02110
(617) 248-7000
COUNSEL FOR CHARLES E. NOELL, III

JAMES E. LYONS and GARY DIBIANCO
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
FOUR EMBARCADERO CENTER, SUITE 3800
SAN FRANCISCO, CA  94111
(415) 984-6400
COUNSEL FOR BEARINGPOINT

**78**
**EXHIBIT 3**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

330 W. Broadway, Dept. 69
San Diego, CA 92101
619-685-6137

TO:

JAMES E. LYONS      #112582
SKADDEN, ARPS, SLATE, MEAGER & FLOM
4 EMBARCADERO CENTER, SUITE 3800
SAN FRANCISCO, CA 94111-5974

| | |
|---|---|
| RICHARD P ALLOCCO, et al.<br><br>                     Plaintiff(s)<br><br>         vs.<br><br>STEPHEN P GARDNER, et al.<br><br>                     Defendant(s) | Case No.: GIC806450<br><br>**NOTICE OF<br>CASE MANAGEMENT CONFERENCE**<br><br>Sanctions pursuant to CCP 177.5, 575.2 and CRC 227(b)<br>may be imposed for failure to serve this notice. |

**COUNSEL: CHECK SERVICE LIST. IF YOU HAVE BROUGHT A PARTY INTO THIS CASE WHO IS NOT INCLUDED IN THE SERVICE LIST, Superior Court Rules, Division II, Rule 2.9 REQUIRES YOU TO SERVE THEM WITH A COPY OF THIS NOTICE.**

Notice is given that the above-entitled case has been set for the reason listed below and at the location shown above. All inquiries regarding this notice should be referred to the court and phone number listed above.

| TYPE OF HEARING | DATE | TIME | REPORT TO JUDGE |
|---|---|---|---|
| Case Management Conference | 05/07/04 | 02:15PM | JEFFREY B. BARTON |

*RESCHEDULED* from 03/26/04 01:30PM Judge JEFFREY B. BARTON

A Case Management Statement must be completed by counsel for all parties or parties in pro per and timely filed with the court at least 15 days prior to the initial Case Management Conference. (Rule 2.9, CRC Rule 212).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR options.

**CERTIFICATE OF SERVICE**

I certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at San Diego California.

DATED: 03/24/04                                    BY: CLERK OF THE SUPERIOR COURT

| | |
|---|---|
| ALISON P. ADEMA (D) | THOMAS V III LORAN (D) |
| MICHAEL ATTANASIO (D) | JAMES E. LYONS (D) |
| DOUGLAS M. BUTZ (D) | DOUGLAS W. LYTLE (D) |
| BRADLEY H ELLIS (D) | HARRY A. OLIVAR JR. (D) |
| JAMES M FINBERG (P) | BRIAN E. PASTUSZENSKI (D) |
| BENJAMIN HOLL (D) | THOMAS L. VANCE (D) |
| WAYNE T. LAMPREY (D) | KENNETH I. WEISSMAN (D) |

**79<br>EXHIBIT 4**

1

2

3

4

5

6

7

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF SAN DIEGO

10   RICHARD P. ALLOCCO, et al.,          | Case No. GIC 806450

11                         Plaintiffs,    | [~~PROPOSED~~] ORDER GRANTING
                                          | APPLICATION OF GARY DIBIANCO FOR
12     v.                                 | ADMISSION TO STATE BAR *PRO HAC*
                                          | *VICE*
13   STEPHEN P. GARDNER, et al.,          |
                                          | Hon. Jeffrey B. Barton
14                        Defendants.     | Complaint Filed:  March 3, 2003
                                          | Trial Date:  None Set
15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              **80**
                                          *EXHIBIT 5*

[PROPOSED] ORDER GRANTING APPLICATION FOR ADMISSION PRO HAC VICE – GARY DIBIANCO

F I L E D
Clerk of the Superior Court

APR 2 3 2004

By: D. JELLISON, Deputy

1     On April 23, 2004, the Application of Gary DiBianco for Admission to State Bar

2   *Pro Hac Vice* came on for hearing before this Court by regularly noticed motion.  After fully

3   considering the Notice of Application and Application, the memoranda of points and authorities

4   submitted by the parties, the pleadings and papers on file in this action, such other matters as were

5   presented at the hearing on the motion, and good cause appearing therein,

6                    **IT IS HEREBY ORDERED** that:

7           The Application of Gary DiBianco for Admission to State Bar *Pro Hac Vice* is

8   <u>granted</u> and Mr. DiBianco may appear in this action as counsel of record for BearingPoint, Inc.

9                                               JEFFREY B. BARTON

10    APR 2 2 2004                    Jeffrey B. Barton
                                      Superior Court Judge

11

12  Presented by:

13  SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP

14

15  By: *Jennifer L. Spaziano*

16          Jennifer L. Spaziano
            Attorneys for BearingPoint, Inc.

17

18

19

20

21

22

23

24

25

26

27

28                                                        **81**
                                                     **EXHIBIT 5**

| ATTORNEY OR PARTY WITHOUT ATTORNEY*(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Richard M. Heimann (SBN 063607) / Christopher Leung (SBN 210325)<br>LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP<br>275 Battery Street, 30th Floor, San Francisco, CA 94111-3339<br>TELEPHONE NO.: (415) 956-1000    FAX NO.: (415) 956-1008<br>ATTORNEY FOR *(Name):* Richard P. Allocco, et al. | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
☑ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649

| PLAINTIFF(S)<br>Richard P. Allocco, et al. | JUDGE: Hon. Jeffrey B. Barton |
|---|---|
| DEFENDANT(S)<br>Stephen P. Gardner, et al. | DEPT: 69 |

| **AMENDMENT TO COMPLAINT**<br>**(CCP 473, 474)** | CASE NUMBER<br>GIC 806450 |
|---|---|

Under Section 474, Code of Civil Procedure:
FICTITIOUS NAME (Court order required once case is at issue.  San Diego Superior Court Rules, Division II, rule 2.10)

Plaintiff(s), being ignorant of the true name of a defendant when the complaint in the above-named case was filed, and having designated said defendant in the complaint by the fictitious name of

_____

and having discovered the true name of the said defendant to be

_____

amends the complaint by inserting such true name in place and stead of such fictitious name wherever it appears in said complaint.

Date: _____          _____

Attorney(s) for Plaintiff(s)

Under Section 473, Code of Civil Procedure:
NAME - Add or Correct (Court order required)

Plaintiff(s), having designated a ☑ defendant ☐ plaintiff in the complaint by the name of

Arthur Andersen Germany
_____

and having discovered ☑ said name to be incorrect and the correct name is ☐ defendant also uses the name of

Ernst & Young Revisions - Und. Treuhandgesellschaft MBH, Wirtschaftsprufungsgesellschaft,
formerly known as Arthur Andersen Wirtschaftsprufungsgesellschaft Steuerberatungsgesellschaft MBH

amends the complaint by ☑ substituting ☐ adding such name(s) wherever the name of

Arthur Andersen Germany
_____

appears in said complaint.

Date: April 29, 2004          _____

Attorney(s) for Plaintiff(s)

**ORDER**
The above amendment to the complaint is allowed.

Date: _____          _____

Judge of the Superior Court

EXHIBIT 6

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*

Richard M. Heimann (SBN 063607) / Christopher Leung (SBN 210325)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor, San Francisco, CA 94111-3339
TELEPHONE NO.: (415) 956-1000    FAX NO.: (415) 956-1008
ATTORNEY FOR *(Name):* Richard P. Allocco, et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
☑ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649

PLAINTIFF(S)
    Richard P. Allocco, et al.

DEFENDANT(S)
    Stephen P. Gardner, et al.

JUDGE: Hon. Jeffrey B. Barton
DEPT: 69

**AMENDMENT TO COMPLAINT
(CCP 473, 474)**

CASE NUMBER
GIC 806450

Under Section 474, Code of Civil Procedure:
*FICTITIOUS NAME (Court order required once case is at issue.  San Diego Superior Court Rules, Division II, rule 2.10)*

Plaintiff(s), being ignorant of the true name of a defendant when the complaint in the above-named case was filed, and having designated said defendant in the complaint by the fictitious name of

Doe 4

and having discovered the true name of the said defendant to be

Insight Enterprises, Inc.

amends the complaint by inserting such true name in place and stead of such fictitious name wherever it appears in said complaint.

Date: May 3, 2004

*Karin Kramer*
Karin Kramer

Attorney(s) for Plaintiff(s)

Under Section 473, Code of Civil Procedure:
NAME - Add or Correct (Court order required)

Plaintiff(s), having designated a ☐ defendant ☐ plaintiff in the complaint by the name of

and having discovered ☐ said name to be incorrect and the correct name is ☐ defendant also uses the name of

amends the complaint by ☐ substituting ☐ adding such name(s) wherever the name of

appears in said complaint.

Date: _____          _____

Attorney(s) for Plaintiff(s)

**ORDER**

The above amendment to the complaint is allowed.

Date: _____          _____

Judge of the Superior Court

SDSC CIV-12(Rev. 10-02)          **AMENDMENT TO COMPLAINT**

320901_1.PDF
**83**
**EXHIBIT 7**

1    Richard M. Heimann (State Bar No. 063607)
      James M. Finberg (State Bar No. 114850)
2    Joy A. Kruse (State Bar No. 142799)
      Daniel E. Barenbaum (State Bar No. 209261)
3    Christopher K. Leung (State Bar No. 210325)
      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4    Embarcadero Center West
      275 Battery Street, 30th Floor
5    San Francisco, CA 94111-3339
      Telephone: (415) 956-1000
6    Facsimile: (415) 956-1008

7    Attorneys for Plaintiffs

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 COUNTY OF SAN DIEGO

10              UNLIMITED JURISDICTION

11

| | |
|---|---|
| 12   RICHARD P. ALLOCCO, LORI BARKER, KENNETH BOYD, JR., RONALD 13   COOTES, RONALD J. FIOR, PHYLLIS E. FRIEDMAN, LAWRENCE L. GARLICK, 14   HAROLD I. GOLDBERG, VICTOR GUERRIERI, HARVEY C. JONES, JR., 15   KLAWANS FAMILY TRUST, ARTHUR KULAKOW, MICHAEL F. LITTLE, 16   DAVID MAHLER, CHARLES MOUSSEAU, DOUGLAS MUELLER, 17   JUDITH ORAH MUELLER, JAMES G. PETERSON, ANDREA POTTS, GLENDA 18   GOULETTE SCHWEM, JOHN F. SHOCH, RICHARD THOMAS, GEORGE A. 19   de URIOSTE, DARIUS WALLACE, and DANIEL WELLER, 20 <br><br>            Plaintiffs, 21   v. 22   STEPHEN P. GARDNER, MATTHEW C. GLESS, JOHN J. MOORES, THOMAS G. 23   WATROUS, CHARLES E. NOELL, WILLIAM D. SAVOY, ARTHUR 24   ANDERSEN LLP, ARTHUR ANDERSEN GERMANY, ARTHUR ANDERSEN 25   WORLDWIDE SC, DANIEL STULAC, KPMG d.b.a. KPMG CONSULTING, INC.; 26   BEARINGPOINT, INC.; CRITICAL PATH; and DOES 1-100, 27 <br><br>            Defendants. 28 | Case No. GIC 806450 <br><br> **PROOF OF SERVICE BY FACSIMILE AND U.S. MAIL** |

1     I am employed in the County of San Francisco, State of California.  I am over the

2  age of eighteen (18) years and not a party to the within action; my business address is 275 Battery

3  Street, San Francisco, California 94111-3339.

4     On May 4, 2004, I served true and correct copies of the documents entitled:

5     1)     **AMENDMENT TO COMPLAINT**

6     2)     *PROOF OF SERVICE BY FACSIMILE AND U.S. MAIL*

7     I am readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's practice

8  for collection and processing of documents for mailing with the United States Postal Service, and

9  that practice is that the documents are deposited with the United States Postal Service with

10  postage fully prepaid the same day as the day of collection in the ordinary course of business.

11     I am readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's practice

12  for collection and processing of documents for *via facsimile transmission*, and that practice is that

13  the documents are transmitted electronically via fax machine the same day as the date listed on

14  this Proof of Service.

15     On May 4, 2004, I served the within document(s) upon the persons listed below by

16  placing the document(s) in a sealed envelope for deposit in the United States Postal Service

17  through the regular mail collection process at the law offices of Lieff, Cabraser, Heimann &

18  Bernstein, LLP, 275 Battery Street, 30th Floor, Embarcadero Center West, San Francisco,

19  California 94111-3339, *to be served by mail addressed as follows:*

20                    **[See attached list]**

21     I declare under penalty of perjury that the foregoing is true and correct.  Executed

22  at San Francisco, California on May 4, 2004.

23

24                              _____
                                     JOEL CALIP
25

26

27

28

321062.1                          - 1 -                          **85**
           PROOF OF SERVICE BY FACSIMILE AND U.S. MAIL        **EXHIBIT 7**

## PARTY AND COUNSEL LIST

| | |
|---|---|
| Harry A. Olivar, Jr.<br>David Azar<br>Sarah J. Cole<br>QUINN, EMANUEL, URQUHART, OLIVER<br>& HEDGES, LLP<br>865 Figueroa St., 10th Floor<br>Los Angeles, CA  90017-2543<br>Phone:  (213) 624-7707<br>Fax:  (213) 624-0643<br>email: hao@quinnemanuel.com<br>email: sarahcole@quinnemanuel.com<br><br>*Attorney for Defendant John J. Moores* | Jennifer Spaziano<br>Gary DiBianco<br>SKADDEN, ARPS, SLATE, MEAGHER &<br>FLOM LLP<br>1440 New York Avenue, N.W.<br>Washington, D.C. 20005<br>Phone: (202) 371-7000<br>Fax: (202) 393-5760<br>email: jspazian@skadden.com<br>email: gdibianco@skadden.com<br>*Attorney for BearingPoint, Inc.* |
| Scott Vick<br>Daniel Fiore<br>Melissa Miller<br>ALSCHULER GROSSMAN STEIN &<br>KAHAN LLP<br>The Water Garden<br>1620 26th Street<br>Fourth Floor, North Tower<br>Santa Monica, CA  90404-4060<br>Phone:  (310) 255-9183<br>Fax:  (310) 907-2000<br>email: svick@agsk.com<br>email: dfiore@agsk.com<br>email: mmiller@agsk.com<br><br>*Attorney for Defendant Arthur Andersen, LLP* | Jane Hahn<br>Alison Adema<br>HAHN & ADEMA<br>501 West Broadway, Suite 1730<br>San Diego, CA  92101<br>Phone:  (619) 235-2100<br>Fax:  (619) 235-2101<br>email: janehahn@pacbell.net<br>email: aadema@pacbell.net<br>*Attorney for Defendant Charles E. Noell, III* |
| Wayne T. Lamprey<br>Anne Hayes Hartman<br>GOODIN, MACBRIDE, SQUERI, RITCHIE<br>& DAY, LLP<br>505 Sansome Street, Suite 900<br>San Francisco, CA  94111<br>Phone:  (415) 392-7900<br>Fax:  (415) 398-4321<br>email: wlamprey@GMSSR.com<br>email: ahartman@GMSSR.com<br><br>*Attorney for Defendant Thomas Watrous* | George J. Berger<br>Yvonne Dutton<br>ALLEN MATKINS LECK GAMBLE &<br>MALLORY LLP<br>501 West Broadway, Suite 900<br>San Diego, CA  92101-3547<br>Phone:  (619) 233-3128<br>Fax:  (619) 233-1158<br>email: gberger@allenmatkins.com<br>email: ydutton@allenmatkins.com<br><br>*Attorney for Defendant William Savoy* |

1 of 3

315051.1

| | |
|---|---|
| Michael A. Attanasio<br>Chaise R. Bivin<br>Aaron P. Arnzen<br>COOLEY GODWARD LLP<br>4401 Eastgate Mall<br>San Diego, CA 92121-1909<br>Phone: (858) 550-6000<br>Fax: (858) 550-6420<br>email: mattanasio@cooley.com<br>email : cbivin@cooley.com<br>email : aarnzen@cooley.com<br><br>*Attorney for Defendant Daniel Stulac* | Daniel J. Bergeson<br>Caroline McIntyre<br>Stephen D. Rockwell<br>BERGESON, LLP<br>303 Almaden Boulevard<br>Suite 500<br>San Jose, CA 95110-2712<br>Phone: (408) 291-6200<br>Fax: (408) 297-6000<br>email: dbergeson@be-law.com<br>email: cmcintyre@be-law.com<br><br>*Attorney for Defendant Stephen Gardner* |
| Thomas L. Vance<br>VANCE, BLAIR & GRADY<br>1201 Camino Del Mar, Suite 205<br>Del Mar, CA 92014<br>Phone: (858) 793-0040<br>Fax: (858) 793-1655<br>email: tom@vbglaw.com<br><br>*Attorney for Defendant Matthew C. Gless* | Robert D. Stewart<br>Cyrus Vance, Jr.<br>McNAUL EBEL NAWROT<br> HELGREN & VANCE<br>One Union Square<br>Suite 2700<br>600 University St.<br>Seattle, WA 98101-1129<br>Tel: (206) 467-1816<br>Fax: (206) 624-5128<br>email: rstewart@mcnaul.com<br>email: cvance@mcnaul.com<br><br>*Attorney for William D. Savoy* |
| Brian Pastuszenski<br>Kenneth I. Weissman<br>TESTA HURWITZ & THIBEAULT<br>125 High Street<br>Boston, MA 02110<br>Phone: (617) 248-7253<br>Fax: (617) 248-7100<br>email: Pastuszenski@THT.com<br><br>*Attorney for Charles E. Noell, III* | Douglas M. Butz<br>Steve Uribe<br>BUTZ DUNN DESANTIS & BINGHAM<br>101 West Broadway, Suite 1700<br>San Diego, CA 92101<br>Phone: (619) 233-4777<br>Fax: (619) 231-0341<br>email: dbutz@butzdunn.com<br>email: kdesantis@butzdunn.com<br><br>*Attorney for Arthur Andersen LLP* |

2 of 3

315051.1

**87**
**EXHIBIT 7**

| | |
|---|---|
| Michael C. Kelley<br>Bradley H. Ellis<br>Garrett K. Craig<br>SIDLEY AUSTIN BROWN & WOOD LLP<br>555 W. Fifth Street, 40th Floor<br>Los Angeles, CA 90013<br>Phone: (213) 896-6632<br>Fax: (213) 896-6600<br>email: mkelley@sidley.com<br>email: bellis@sidley.com<br>email: gcraig@sidley.com<br><br>*Attorney for KPMG LLP* | Richard M. Segal<br>Thomas V. Loran III<br>Margaret M. Niver<br>Andrew D. Lanphere<br>PILLSBURY WINTHROP LLP<br>50 Fremont Street<br>San Francisco, CA 94105<br>Phone: (415) 983-1865<br>Fax: (415) 983-1200<br>email: rsegal@pillsburywinthrop.com<br>email: tloran@pillsburywinthrop.com<br>email: mniver@pillsburywinthrop.com<br>email: alanphere@pillsburywinthrop.com<br>*Attorney for Critical Path, Inc.* |
| James E. Lyons<br>SKADDEN, ARPS, SLATE, MEAGHER &<br>FLOM LLP<br>Four Embarcadero Center<br>San Francisco, California 94111<br>Telephone: 415.984.6400<br>Fax:        415.984.2698<br>email:     jlyons@skadden.com<br>email:     jspaziano@skadden.com<br><br><br>*Attorney for BearingPoint, Inc.* | |

315051.1

**88**
**EXHIBIT 7**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

330 W. Broadway, Dept. 69
San Diego, CA 92101
619-685-6137

TO:

JAMES E. LYONS    #112582
SKADDEN, ARPS, SLATE, MEAGER & FLOM
4 EMBARCADERO CENTER, SUITE 3800
SAN FRANCISCO, CA 94111-5974

---

| | |
|---|---|
| RICHARD P ALLOCCO, et al.<br>                          Plaintiff(s)<br><br>vs.<br><br>STEPHEN P GARDNER, et al.<br>                          Defendant(s) | **Case No.:** GIC806450<br><br># NOTICE OF<br># CASE MANAGEMENT CONFERENCE<br><br>Sanctions pursuant to CCP 177.5, 575.2 and CRC 227(b) may be imposed for failure to serve this notice. |

**COUNSEL:  CHECK SERVICE LIST.  IF YOU HAVE BROUGHT A PARTY INTO THIS CASE WHO IS NOT INCLUDED IN THE SERVICE LIST, Superior Court Rules, Division II, Rule 2.9 REQUIRES YOU TO SERVE THEM WITH A COPY OF THIS NOTICE.**

Notice is given that the above-entitled case has been set for the reason listed below and at the location shown above.

All inquiries regarding this notice should be referred to the court and phone number listed above.

| TYPE OF HEARING | DATE | TIME | REPORT TO JUDGE |
|---|---|---|---|
| Case Management Conference | 06/07/04 | 09:00AM | JEFFREY B. BARTON |

RESCHEDULED from 05/07/04 02:15PM Judge JEFFREY B. BARTON

A Case Management Statement must be completed by counsel for all parties or parties in pro per and timely filed with the court at least 15 days prior to the initial Case Management Conference. (Rule 2.9, CRC Rule 212).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR options.

## CERTIFICATE OF SERVICE

I certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at San Diego California.

DATED: 05/10/04                          BY: CLERK OF THE SUPERIOR COURT

| | |
|---|---|
| ALISON P. ADEMA (D) | JAMES E. LYONS (D) |
| MICHAEL ATTANASIO (D) | DOUGLAS W. LYTLE (D) |
| DOUGLAS M. BUTZ (D) | HARRY A. OLIVAR JR. (D) |
| BRADLEY H ELLIS (D) | BRIAN E. PASTUSZENSKI (D) |
| JAMES M FINBERG (P) | JENNIFER SPAZIANO (D) |
| BENJAMIN HOLL (D) | THOMAS L. VANCE (D) |
| WAYNE T. LAMPREY (D) | KENNETH I. WEISSMAN (D) |
| THOMAS V III LORAN (D) | |

**89**
**EXHIBIT 8**

05/18/2004 11:34 FAX 415 956 1008          LCH&B 4285P                                    ☑003

COPY

1  Richard M. Heimann (State Bar No. 063607)
   James M. Finberg (State Bar No. 114850)
2  Joy A. Kruse (State Bar No. 142799)
   Daniel E. Barenbaum (State Bar No. 209261)
3  Christopher K. Leung (State Bar No. 210325)
   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4  Embarcadero Center West
   275 Battery Street, 30th Floor
5  San Francisco, CA 94111-3339
   Telephone: (415) 956-1000
6  Facsimile: (415) 956-1008

7  Attorneys for Plaintiffs

F I L E D

MAY 1 9 2004

By: D. JELDSON, Deputy

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           COUNTY OF SAN DIEGO

10

11 RICHARD P. ALLOCCO, LORI BARKER,          Case No. GIC 806450         "BY FAX"
   KENNETH BOYD, JR., RONALD COOTES,
12 RONALD J. FIOR, PHYLLIS E. FRIEDMAN,
   LAWRENCE L. GARLICK, HAROLD I.            STIPULATION AND
13 GOLDBERG, VICTOR GUERRIERI,               [PROPOSED] ORDER
   HARVEY C. JONES, JR., KLAWANS FAMILY
14 TRUST, ARTHUR KULAKOW, MICHAEL F
   LITTLE, DAVID MAHLER, CHARLES
15 MOUSSEAU, DOUGLAS MUELLER, JUDITH
   ORAH MUELLER, JAMES G. PETERSON,
16 ANDREA POTTS, GLENDA GOULETTE
   SCHWEM, JOHN F. SHOCH, RICHARD
17 THOMAS, GEORGE A. de URIOSTE, DARIUS
   WALLACE, and DANIEL WELLER,
18
19              Plaintiffs,
20 v.
21 STEPHEN P. GARDNER, MATTHEW C. GLESS,
   JOHN J. MOORES, THOMAS G. WATROUS,
22 CHARLES E. NOELL, WILLIAM D. SAVOY,
   ARTHUR ANDERSEN LLP, ARTHUR
23 ANDERSEN GERMANY, ARTHUR ANDERSEN
   WORLDWIDE SC, DANIEL STULAC, KPMG
24 d.b.a. KPMG CONSULTING, INC.;
   BEARINGPOINT, INC.; CRITICAL PATH; and
25 DOES 1-100,
26
27              Defendants.
28

321577.2

1

2                                    **STIPULATION**

3          WHEREAS Defendants Stephen P. Gardner and Daniel Stulac have reserved the

4   date of June 25, 2004, at 9:00 a.m., for a hearing on their respective Motions to Stay;

5          WHEREAS Defendants Gardner and Stulac have agreed with Plaintiffs to the

6   following briefing schedule;

7          IT IS HEREBY STIPULATED:

8          1    Defendants Gardner and Stulac will file and serve their motions to stay and

9   related documents on or before May 25, 2004.

10         2    Plaintiffs will file and serve their opposition briefs and related documents

11  on or before June 8, 2004.

12         3    Defendants Gardner and Stulac will file and serve their reply briefs and

13  related documents on or before June 14, 2004.

14

15                                    Respectfully submitted,

16  Dated: May 18, 2004             By: _Joy A. Kruse_____

17

18                                    Richard M. Heimann
                                      James M. Finberg
19                                    Joy A. Kruse
                                      Daniel E. Barenbaum
20                                    Christopher K. Leung
                                      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
21                                    275 Battery Street, 30th Floor
                                      San Francisco, CA 94111-3339
22                                    Telephone: (415) 956-1000

23                                    Attorneys for Plaintiffs

24

25

26

27

28

05/18/2004 11:34 FAX 415 856 1008          LCBAB 428SP                              @005

MAY-14-04 09:46 From:                                                T-737 P.04/05 Job-382
08/13/2004 17:03 FAX 415 955 1006         LCBAB 428SP                              @004/025

1   Dated: May 14, 2004           By: _____

2

3                                    Michael A. Attanasio
                                     Chaise R. Blvin
4                                    Aaron P. Arnzen
                                     COOLEY GODWARD LLP
5                                    4401 Eastgate Mall
                                     San Diego, CA 92121-1909
6                                    Telephone: (858) 550-6000

7                                    Attorneys for Defendant Daniel Stulac

8

9   Dated: May ___, 2004           By: _____

10

11                                   Daniel J. Bergeson
                                     Caroline McIntyre
12                                   Stephen D. Rockwell
                                     BERGESON, LLP
13                                   303 Almaden Boulevard, Suite 500
                                     San Jose, CA 95110-2712
14                                   Telephone: (408) 291-6200

15                                   Attorneys for Defendant Stephen Gardner

16

17

18

19

20

21

22

23

24

25

26

27

28

325712                              -2-

STIPULATION AND [PROPOSED] ORDER

92
EXHIBIT 9

05/18/2004 11:35 FAX 415 858 100    LCB&B 428SP              ⍟006

MAY-14-2004 02:33PM    FROM-BERGESON, LLP         488 287 5080    T-865    P.002/002    F-618

1    Dated: May ___, 2004    By: _____

2         Michael A. Attanasio

3         Chaise R. Bivin
         Aaron P. Arnzen

4         COOLEY GODWARD LLP
         4401 Eastgate Mall

5         San Diego, CA 92121-1909
         Telephone: (858) 550-6000

6         Attorneys for Defendant Daniel Stulac

7

8

9    Dated: May 14, 2004    By: _Caroline McIntyre_

10

11         Daniel J. Bergeson
         Caroline McIntyre

12         Stephen D. Rockwell
         BERGESON, LLP

13         303 Almaden Boulevard, Suite 500
         San Jose, CA 95110-2712

14         Telephone: (408) 291-6200

15         Attorneys for Defendant Stephen Gardner

16

17

18

19

20

21

22

23

24

25

26

27

28

321577.1         -2-

STIPULATION AND (PROPOSED) ORDER

93
EXHIBIT 9



## ORDER

Upon considering the Stipulation between Defendants Stephen P. Gardner and Daniel Stulac and Plaintiffs, and good cause appearing,

IT IS HEREBY ORDERED:

1.   Defendants Gardner and Stulac will file and serve their motions to stay and related documents on or before May 25, 2004.

2.   Plaintiffs will file and serve their opposition briefs and related documents on or before June 8, 2004.

3.   Defendants Gardner and Stulac will file and serve their reply briefs and related on or before June 14, 2004.

SO ORDERED.

Dated: MAY 1 8 2004
_____, 2004

JEFFREY B. BARTON

_____
The Honorable Jeffrey B. Barton

331577.2                         -3-
                  STIPULATION AND [PROPOSED] ORDER

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Richard M. Heimann (SBN 063607) / Christopher Leung (SBN 210325)<br>LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP<br>275 Battery Street, 30th Floor, San Francisco, CA 94111-3339<br>TELEPHONE NO.: (415) 956-1000    · FAX NO.: (415) 956-1008<br>ATTORNEY FOR *(Name):*  Richard P. Allocco, et al. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
☑ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649

| PLAINTIFF(S)<br>    Richard P. Allocco, et al. | JUDGE: Hon. Jeffrey B. Barton |
|---|---|
| DEFENDANT(S)<br>    Stephen P. Gardner, et al. | DEPT: 69 |
| AMENDMENT TO COMPLAINT<br>(CCP 473, 474) | CASE NUMBER<br>GIC 806450 |

Under Section 474, Code of Civil Procedure:
FICTITIOUS NAME (Court order required once case is at issue. San Diego Superior Court Rules, Division II, rule 2.10)

Plaintiff(s), being ignorant of the true name of a defendant when the complaint in the above-named case was filed, and having designated said defendant in the complaint by the fictitious name of

Doe 5
_____,
and having discovered the true name of the said defendant to be

BT Group PLC
_____,
amends the complaint by inserting such true name in place and stead of such fictitious name wherever it appears in said complaint.

Date: June 2, 2004                          *Karin Kramer*
                                            Karin A. Kramer                    Attorney(s) for Plaintiff(s)

Under Section 473, Code of Civil Procedure:
NAME - Add or Correct (Court order required)

Plaintiff(s), having designated a ☐ defendant ☐ plaintiff in the complaint by the name of

_____,
and having discovered ☐ said name to be incorrect and the correct name is ☐ defendant also uses the name of

_____,
amends the complaint by ☐ substituting ☐ adding such name(s) wherever the name of

_____,
appears in said complaint.

Date: _____        _____
                                            Attorney(s) for Plaintiff(s)

**ORDER**
The above amendment to the complaint is allowed.

Date: _____        _____
                                            Judge of the Superior Court

EXHIBIT 10

1  Richard M. Heimann (State Bar No. 063607)
   James M. Finberg (State Bar No. 114850)
2  Joy A. Kruse (State Bar No. 142799)
   Karin A. Kramer (State Bar No. 087346)
3  Daniel E. Barenbaum (State Bar No. 209261)
   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4  Embarcadero Center West
   275 Battery Street, 30th Floor
5  San Francisco, CA  94111-3339
   Telephone:  (415) 956-1000
6  Facsimile:  (415) 956-1008

7  Attorneys for Plaintiffs

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  COUNTY OF SAN DIEGO

10               UNLIMITED JURISDICTION

11 RICHARD P. ALLOCCO, LORI BARKER,     Case No.  GIC 806450
   KENNETH BOYD, JR., RONALD
12 COOTES, RONALD J. FIOR, PHYLLIS E.   STIPULATION AND
   FRIEDMAN, LAWRENCE L. GARLICK,       [PROPOSED] PROTECTIVE ORDER
13 HAROLD I. GOLDBERG, VICTOR
   GUERRIERI, HARVEY C. JONES, JR.,
14 KLAWANS FAMILY TRUST, ARTHUR
   KULAKOW, MICHAEL F. LITTLE,          Court:       Hon. Jeffrey B. Barton
15 DAVID MAHLER, CHARLES               Department:  69
   MOUSSEAU, DOUGLAS MUELLER,
16 JUDITH ORAH MUELLER, JAMES G.
   PETERSON, ANDREA POTTS, GLENDA
17 GOULETTE SCHWEM, JOHN F. SHOCH,
   RICHARD THOMAS, GEORGE A.
18 de URIOSTE, DARIUS WALLACE, and
   DANIEL WELLER,
19
20              Plaintiffs,
   v.
21
   STEPHEN P. GARDNER, MATTHEW C.
22 GLESS, JOHN J. MOORES, THOMAS G.
   WATROUS, CHARLES E. NOELL,
23 WILLIAM D. SAVOY, ARTHUR
   ANDERSEN LLP, ARTHUR ANDERSEN
24 GERMANY, ARTHUR ANDERSEN
   WORLDWIDE SC, DANIEL STULAC,
25 KPMG d.b.a. KPMG CONSULTING, INC.;
   BEARINGPOINT, INC.; CRITICAL
26 PATH; and DOES 1-100,

27              Defendants.

28
   318568.7

FILED
Clerk of the Superior Court

JUN 0 4 2004

By: Y. BRENNAN, Deputy

"BY FAX"

96
EXHIBIT 11

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

EXHIBIT A

1    The parties hereto, by and through their respective undersigned counsel, hereby

2  stipulate and agree that the following Stipulation and Protective Order for Confidential

3  Information (the "Order") shall apply to and govern the production of CONFIDENTIAL

4  INFORMATION in connection with the above-referenced litigation matter..

5    NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED AS

6  FOLLOWS:

7    1.    CONFIDENTIAL INFORMATION shall be designated as follows:

8    a.    CONFIDENTIAL INFORMATION shall mean any information,

9  documents, testimony or things furnished in the course of this litigation matter containing

10  confidential, proprietary, and/or trade secret information that the producing party, in good faith,

11  deems confidential and designates as such by marking each such page with the legend

12  "CONFIDENTIAL" or "CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER." Except as

13  permitted by further order of the Court, or by subsequent written agreement of the producing

14  party, such designated documents or testimonial information shall be received by counsel of

15  record for a party pursuant to the terms and conditions of this Order.

16    b.    With regard to any written discovery response, the person or entity

17  shall designate as confidential those portions of the written discovery response containing such

18  CONFIDENTIAL INFORMATION by marking each such page with the appropriate designation.

19    c.    If, in the course of this litigation matter, depositions are conducted

20  that involve CONFIDENTIAL INFORMATION, counsel for the witness or the producing party

21  may designate, on the record, the portion of the deposition that counsel believes may contain

22  CONFIDENTIAL INFORMATION.  If such designation is made, those portions of said

23  depositions involving such CONFIDENTIAL INFORMATION will be taken with no one present

24  except those persons who are authorized to have access to such CONFIDENTIAL

25  INFORMATION in accordance with this Order, except that a witness whose deposition is being

26  taken may see any document identified as CONFIDENTIAL INFORMATION that indicates, on

27  the face of the document, that the witness has previously seen, or has been sent the document.

28  The producing party shall have until thirty (30) days after receipt of the deposition transcript

3185e8.7

- 1 -

**EXHIBIT 11**

1    within which to inform all parties to this litigation matter of any additional portions of the

2    transcript (by specific page and line reference) that are to be designated as CONFIDENTIAL

3    INFORMATION. Unless otherwise agreed by counsel, the right to make such designation shall

4    be waived unless made within the thirty (30) day period. Transcripts of testimony, or portions

5    thereof, or documents containing the CONFIDENTIAL INFORMATION shall be filed only

6    under seal as described in Paragraph 5, infra until further order of the Court. If any party believes

7    that any portion of any document, written discovery response or deposition transcript should not

8    be designated as CONFIDENTIAL INFORMATION, that party may challenge said designation

9    as provided in this Order, including paragraphs 8 and 9, infra.

10              2.      All CONFIDENTIAL INFORMATION produced or exchanged in the

11   course of this litigation matter, whether by a party or some other person, shall be used solely for

12   the purpose of the preparation and trial of this litigation matter and for no other purpose

13   whatsoever, absent further order of the Court. CONFIDENTIAL INFORMATION shall not be

14   disclosed to any person except in accordance with the terms and conditions of this Order or by the

15   written consent of the producing party or other person originally designating the information.

16   This Order does not govern, and shall not affect, the right of any party to disclose or use material

17   or information that it properly obtained independently, diminish any attorney-client or work

18   product privilege claim, or obligate any person to provide any discovery to which it asserts

19   objections.

20              3.      Any CONFIDENTIAL INFORMATION produced in accordance with the

21   provisions of this Order shall not be disclosed to any person other than those persons listed in

22   subparagraphs (a) through (g) below.  As used herein, "disclose" shall mean showing, quoting,

23   reading, excerpting, summarizing or otherwise communicating any CONFIDENTIAL

24   INFORMATION to any person or entity.

25              a.      Counsel of record for the receiving party, including support

26   personnel of counsel. Upon notice of entry of appearance, any additional counsel of record shall

27   automatically be added to this paragraph without the need to further petition the Court.

28

318568.7

-2-

1            b.    All parties to this litigation matter and their respective in-house

2   counsel. To the extent that CONFIDENTIAL INFORMATION is disclosed to such in-house

3   counsel, it is agreed that the use of the CONFIDENTIAL INFORMATION will be limited only to

4   rendering legal advice to a party, and that it shall not be used for any other purpose whatsoever.

5            c.    Outside experts and consultants who are engaged for the purpose of

6   providing services to a party to this litigation matter in connection with this litigation. Before an

7   expert or consultant receives any CONFIDENTIAL INFORMATION, he or she shall have first

8   read this Order and executed the Agreement to be Bound by Protective Order, attached hereto as

9   Exhibit A and incorporated herein by this reference.

10            d.    Any present or former officer, director, agent or employee of a

11   party to this litigation. To the extent that CONFIDENTIAL INFORMATION is disclosed to such

12   persons, it is agreed that the use of the CONFIDENTIAL INFORMATION will be limited to use

13   in this action. Before any former officer, director, agent or employee of a party to this litigation

14   receives any CONFIDENTIAL INFORMATION, he or she shall have first read this Order and

15   executed the Agreement to be Bound by Protective Order.

16            e.    Any person identified as an author (in whole or in part), or as a

17   recipient, of the CONFIDENTIAL INFORMATION.

18            f.    Non-parties may be examined and testify concerning

19   CONFIDENTIAL INFORMATION only after they have executed the Agreement to be Bound by

20   Protective Order, or if he or she authored or received the CONFIDENTIAL INFORMATION in

21   the ordinary course of business.

22            g.    Any prospective witness, but only after he or she has executed the

23   Agreement to be bound by Protective Order.

24         4.    Each individual who has executed an Agreement to be Bound by Protective

25   Order shall be responsible for maintaining each such agreement in accordance with the provisions

26   of this Order. Said agreements shall be available for inspection and copying if requested.

27         5.    In the event that any CONFIDENTIAL INFORMATION is included with,

28   or the contents thereof are in any way disclosed in any pleading, motion, deposition, transcript or

311568.7

- 3 -

1  other paper filed with the Court, the party seeking to introduce the CONFIDENTIAL

2  INFORMATION shall move the Court for an order granting permission to file the

3  CONFIDENTIAL INFORMATION under seal pursuant to California Rules of Court 243.1-

4  243.4.  If the Court grants the motion, the CONFIDENTIAL INFORMATION shall be filed and

5  kept under seal until further order.  If no motion or order is required by the rules, the

6  CONFIDENTIAL INFORMATION shall be filed and kept under seal until further order.  All

7  submissions of CONFIDENTIAL INFORMATION shall be lodged (not filed) with the Court in

8  sealed enclosures in compliance with Rule of Court 243.2(d) on which also shall be affixed the

9  title of the litigation matter, an indication of the nature of their contents, the word

10  "CONFIDENTIAL" and a statement substantially in the following form:

11          CONDITIONALLY UNDER SEAL

12          THIS ENVELOPE CONTAINS MATERIALS SUBJECT TO A
        PROTECTIVE ORDER ENTERED IN THIS ACTION.  IT IS
13          NOT TO BE OPENED NOR ARE ITS CONTENTS TO BE
        DISPLAYED, REVEALED OR MADE PUBLIC, EXCEPT BY
14          ORDER OF THE COURT.

15  The submission shall indicate clearly which portions are designated to be confidential.  A copy of

16  this Order shall be submitted with the lodged materials.  Lodged materials shall be returned by the

17  Court to the submitting party immediately after the hearing or as early as is otherwise practicable.

18  The materials shall then be preserved by the submitting party for the duration of the action.  At

19  the request of any party, any hearing which may refer to or describe CONFIDENTIAL

20  INFORMATION shall be held in camera.

21          6.    Nothing herein shall restrict a qualified recipient from making working

22  copies, abstracts, digests and analyses of CONFIDENTIAL INFORMATION for use as permitted

23  by this Order and such working copies, abstracts, digests and analyses shall be deemed to have

24  the same level of protection under the terms of this Order as the documents from which they are

25  derived.  Further, nothing herein shall restrict a qualified recipient from converting or translating

26  such CONFIDENTIAL INFORMATION into machine-readable form for incorporation in a data

27  retrieval system used in connection with the litigation, provided that access to such

28

3185683.1

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

05/28/2004  13:31    3105479985              HARBOR                    PAGE  10
05/28/2004  13:19 FAX  415 95    08         LIEF CABRASER             010/028

1   CONFIDENTIAL INFORMATION, in whatever form stored or reproduced, shall be limited to

2   recipients qualified under this Order.

3           7.      If a party through inadvertence produces any CONFIDENTIAL

4   INFORMATION without labeling, marking or otherwise designating it as such in accordance

5   with the provisions of this Order, the producing party may give written notice to the receiving

6   party that the document or thing produced is deemed CONFIDENTIAL INFORMATION and

7   should be treated as such in accordance with the provisions of this Order. The receiving party

8   must treat such documents and things as CONFIDENTIAL INFORMATION from the date such

9   notice is received. Disclosure prior to the receipt of such notice of such information to persons

10  not authorized to receive such information shall not be deemed a violation of this Order.

11          8.      A party shall not be obligated to challenge the propriety of a confidentiality

12  designation at the time made, and a failure to do so shall not preclude a subsequent challenge

13  thereto. All challenges to the propriety of a confidentiality designation shall first be made in

14  writing by overnight mail or courier or by facsimile to the designating party by letter or other

15  document identifying the material challenged. The challenge shall also be served on all parties to

16  this Order. Within twenty (20) business days of the designating party's receipt of such challenge,

17  the designating party shall substantiate the basis for such designation in writing by overnight mail

18  or courier, or by facsimile to the challenging party. The response to the challenge shall also be

19  served on all parties to this Order. If the designating party does not do so, the challenged

20  information need not thereafter be treated as CONFIDENTIAL INFORMATION pursuant to the

21  Order, unless the parties agree, or the Court orders otherwise. The parties shall first attempt to

22  resolve such challenges in good faith on an informal basis. If the dispute cannot be resolved, the

23  party challenging the designation may seek appropriate relief from this Court. The burden of

24  persuasion shall be on the party claiming confidentiality. The designating party shall distribute

25  clean unmarked copies of any documents found by the Court, or agreed to by the designating

26  party, not to be designated CONFIDENTIAL INFORMATION. Nothing in this paragraph shall

27  preclude any party from seeking expedited relief, as needed.

28

318568.7

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

101
EXHIBIT 11

     9. Nothing in this Order shall abridge the right of any person to seek any order or other appropriate relief which modifies or amends this Order.

10. Any person or party subject to this Order or having notice of this Order, that has possession, custody or control of any CONFIDENTIAL INFORMATION who receives a subpoena or other process or order to produce such CONFIDENTIAL INFORMATION, shall notify by facsimile or overnight delivery and made within two business days of receipt of a subpoena the counsel of record of the party or person claiming such confidential treatment of the documents sought by such subpoena or other process or order and shall furnish those counsel of record with a copy of said subpoena or other process or order. The subpoenaed party shall not produce the CONFIDENTIAL INFORMATION any sooner than ten (10) days from the date of transmission of the facsimile or overnight delivery notification, unless otherwise ordered by the Court, to allow the party asserting confidential treatment of the documents sought by the subpoena to take any action it deems necessary. The party asserting the confidential treatment shall have the burden of defending against such subpoena, process or order. The person or party receiving the subpoena or other process or order shall be entitled to object or comply with it to the extent permitted by law, unless and until order otherwise by the Court.

11. Nothing in this Order shall prevent or otherwise restrict counsel from rendering advice to their clients and, in the course, thereof, relying generally on examination of CONFIDENTIAL INFORMATION; provided, however, that in rendering such advice, counsel shall not make specific disclosure of any CONFIDENTIAL INFORMATION unless otherwise permissible under the terms of this Order.

12. Unless otherwise agreed in writing or by order of the Court:

a. Nothing in this order shall preclude any party from seeking and obtaining additional or different protection with respect to the confidentiality of discovery.

b. This order shall not diminish any existing obligation or right with respect to CONFIDENTIAL INFORMATION, nor shall it prevent a disclosure to which the producing party consents in writing before the disclosure takes place.

c.     The fact that a party has or has not designated a document as CONFIDENTIAL INFORMATION under this order shall not be admissible for any purpose.

     d.     A party may seek by stipulation or court order to make late designations of material otherwise entitled to protection under this order if the party failed to make a timely designation through mistake or inadvertence.

13.     Any non-party to this litigation matter who shall be called upon to make discovery or provide deposition or other testimony in this litigation matter shall be entitled to avail itself of this Order and supply its own CONFIDENTIAL INFORMATION pursuant to this Order and, by doing so, assume the duties and obligations imposed by this Order.

14.     Within sixty (60) days after final termination of the last litigation matter in which CONFIDENTIAL INFORMATION is authorized to be used by this Order, each party shall assemble all documents and things furnished and designated by any other party as containing CONFIDENTIAL INFORMATION, and shall (i) return such documents and things to the producing party, or (ii) destroy the documents and things, except for copies of pleadings and exhibits filed with the Court, internal memoranda, notes of, and correspondence to and from, counsel, and any other documents or information that counsel for all parties mutually agree may be retained.

15.     This Order shall survive the final determination of the litigation and shall remain in full force and effect after the conclusion of all proceedings herein to provide the Court with ancillary jurisdiction to enforce its terms and to insure compliance.

16.     Nothing in this Order is intended to or does waive any party's objection to the production of documents or other information, on the grounds of relevancy, privacy, trade secrets, confidentiality, privilege or any other grounds.

///
///
///
///
///

318568.7

-7-

EXHIBIT 11

05/28/2004  13:31   3105479  HARBOR                    PAGE  13
05/28/2004  13:20 FAX  415 956   08   LIEF CABRASER          @013/028

May-27-04   11:08am   From-QUINN EMANUEL        2135240843      T-983  P.002/002  F-713

1          17.   This Order may be executed in counterparts, each of which shall be

2     deemed an original, but all of which together shall constitute one and the same document.

3

4                                    Respectfully submitted,

5     Dated: May 26, 2004          By: _____
                                            Joy A. Kruse
6                                                        DEA

7                                    Richard M. Heimann
                                     James M. Finberg
                                     Joy A. Kruse
8                                    Karin A. Kramer
9                                    Daniel E. Barenbaum
                                     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
10                                   275 Battery Street, 30th Floor
11                                   San Francisco, CA 94111-3339
                                     Telephone: (415) 956-1000
12
                                     Attorneys for Plaintiffs
13

14    Dated: May 27, 2004          By: _____
                                            Harry A. Olivar, Jr.
15

16                                   Harry A. Olivar, Jr.
                                     David Azar
17                                   Sarah J. Cole
                                     QUINN, EMANUEL, URQUHART, OLIVER
18                                     & HEDGES, LLP
19                                   865 Figueroa St., 10th Floor
                                     Los Angeles, CA 90017-2543
20                                   Telephone: (213) 624-7707

21                                   Attorneys for Defendant John J. Moores
22
23    ///
24    ///
25    ///
26    ///
27    ///
28    ///

      318563.7                         - 8 -

                    STIPULATION AND [PROPOSED] PROTECTIVE ORDER

| | |
|---|---|
|1|Dated: May 26, 2004          By: _Scott Vick_ |
|2||
|3|Scott Vick|
||Daniel Flores|
|4|Melissa Miller|
||ALSCHULER GROSSMAN STEIN & KAHAN LLP|
|5|The Water Garden|
||1620 26th Street|
|6|Fourth Floor, North Tower|
||Santa Monica, CA 90404-4060|
|7|Telephone: (310) 255-9183|
|8||
||Douglas M. Butz|
|9|Steve Uribe|
||BUTZ DUNN DESANTIS & BINGHAM|
|10|101 West Broadway, Suite 1700|
||San Diego, CA 92101|
|11|Telephone: (619) 233-4777|
|12||
||Attorneys for Defendant Arthur Andersen LLP|
|13||
|14||
|15|Dated: May ___, 2004          By: _____|
|16|Jane Hahn|
||Alison Adema|
|17|HAHN & ADEMA|
||501 West Broadway, Suite 1730|
|18|San Diego, CA 92101|
||Telephone: (619) 235-2100|
|19||
|20|Brian Pastuszenski|
||Kenneth J. Weissman|
|21|TESTA HURWITZ & THIBEAULT|
||125 High Street|
|22|Boston, MA 02110|
||Telephone: (617) 248-7253|
|23||
|24|Attorneys for Defendant Charles E. Noell, III|
|25||
|26|///|
|27|///|
|28|///|

3183617                           - 9 -

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

Dated: May ___, 2004

By: ______________________________

Scott Vick
Daniel Fiore
Melissa Miller
ALSCHULER GROSSMAN STEIN & KAHAN LLP
The Water Garden
1620 26th Street
Fourth Floor, North Tower
Santa Monica, CA 90404-4060
Telephone: (310) 255-9183

Douglas M. Butz
Steve Uribe
BUTZ DUNN DESANTIS & BINGHAM
101 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 233-4777

Attorneys for Defendant Arthur Andersen LLP

Dated: May 25, 2004

By: Alison Adema

Jane Hahn
Alison Adema
HAHN & ADEMA
501 West Broadway, Suite 1730
San Diego, CA 92101
Telephone: (619) 235-2100

Brian Pastuszenski
Kenneth I. Weissman
TESTA HURWITZ & THIBEAULT
125 High Street
Boston, MA 02110
Telephone: (617) 248-7253

Attorneys for Defendant Charles E. Noell, III

///

///

///

05/28/2004  13:31   3105479904     HARBOR                    PAGE  16
05/28/2004  13:20 FAX  415 956  08  LIEF CABRASER            ☑ 016/028

05/26/04  11:30 FAX 415 398 4321   GMSKD                     ☑ 008
                                                             ☑ 014/018

05/25/2004 11:53 FAX 415 986 7103   LCHB 847 J

1    Dated: May 25, 2004          By: _____

2

3                                 Wayne T. Lamprey
                                  Anne Hayes Hartman
4                                 GOODIN, MACBRIDE, SQUERI, RITCHIE & DAY, LLP
                                  505 Sansome Street, Suite 900
5                                 San Francisco, CA 94111
                                  Telephone: (415) 392-7900
6
                                  Attorneys for Defendant Thomas Watrous
7

8

9    Dated: May ___, 2004         By: _____

10

11                                George J. Berger
                                  Yvonne Dutton
12                                ALLEN MATKINS LECK GAMBLE & MALLORY LLP
                                  501 West Broadway, Suite 900
13                                San Diego, CA 92101-3547
                                  Telephone: (619) 233-3128
14

15                                Robert D. Stewart
                                  Cyrus Vance, Jr.
16                                McNAUL EBEL NAWROT HELGREN & VANCE
                                  One Union Square, Suite 2700
17                                600 University St.
                                  Seattle, WA 98101-1129
18                                Telephone: (206) 467-1816

19                                Attorneys for William D. Savoy

20

21

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///
     316568.7                            - 10 -
                         STIPULATION AND [PROPOSED] PROTECTIVE ORDER

                                                              107
                                                         EXHIBIT 11

05/28/2004  13:31   3185479         HARBOR                    PAGE   17
05/28/2004  13:20 FAX   415 95      08   LIEF CABRASER                    017/028

MAY-25-2004  13:36   FROM  MCNAUL EBEL: SEATTLE,WA   TO        14159561008   P.02

1 | Dated: May ___, 2004          By: _____

2

3                                 Wayne T. Lamprey
                                  Anne Hayes Hartman
4                                 GOODIN, MACBRIDE, SQUERI, RITCHIE & DAY, LLP
                                  505 Sansome Street, Suite 900
5                                 San Francisco, CA  94111
                                  Telephone: (415) 392-7900
6

7                                 Attorneys for Defendant Thomas Watrous

8

9 | Dated: May 25, 2004          By: _Robert D Stewart_

10

11                                George J. Berger
                                  Yvonne Dutton
12                                ALLEN MATKINS LECK GAMBLE & MALLORY LLP
                                  501 West Broadway, Suite 900
13                                San Diego, CA  92101-3547
                                  Telephone:  (619) 233-3128
14

15                                Robert D. Stewart
                                  Cyrus Vance, Jr.
16                                McNAUL EBEL NAWROT HELGREN & VANCE
                                  One Union Square, Suite 2700
17                                600 University St.
                                  Seattle, WA 98101-1129
18                                Telephone: (206) 467-1816

19

20                                Attorneys for William D. Savoy

21

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///
     318568.7

108
EXHIBIT 11
TOTAL P.02

HARBOR  
LIEF CABRASER

1  Dated: May 27, 2004     By: _____

2

3     Michael A. Attanasio  
    Chaise R. Bivin  
4     Aaron P. Arnzen  
    COOLEY GODWARD LLP  
5     4401 Eastgate Mall  
    San Diego, CA 92121-1909  
6     Telephone: (858) 550-6000

7     Attorneys for Defendant Daniel Stulac

8

9

10  Dated: May ____, 2004     By: _____

11     Daniel J. Bergeson  
    Caroline McIntyre  
12     Stephen D. Rockwell  
13     BERGESON, LLP  
    303 Almaden Boulevard, Suite 500  
14     San Jose, CA 95110-2712  
    Telephone: (408) 291-6200  
15

16     Attorneys for Defendant Stephen Gardner

17

18  Dated: May ____, 2004     By: _____

19

20     Thomas L. Vance  
    VANCE, BLAIR & GRADY  
21     1201 Camino Del Mar, Suite 205  
    Del Mar, CA 92014  
22     Telephone: (858) 793-0040  
23

    Attorneys for Defendant Matthew C. Gless  
24

25 ///

26 ///

27 ///

28 ///

318568.7

- 11 -

1   Dated: May ___, 2004                 By: _____

2

3                                        Michael A. Attanasio
                                         Chaise R. Bivin
4                                        Aaron P. Arnzen
                                         COOLEY GODWARD LLP
5                                        4401 Eastgate Mall
                                         San Diego, CA 92121-1909
6                                        Telephone: (858) 550-6000

7                                        Attorneys for Defendant Daniel Stulac

8

9
                                         By: _Caroline M⁵ⁱⁿᵗʸʳᵉ_
10  Dated: May 25, 2004

11                                       Daniel J. Bergeson

12                                       Caroline McIntyre
                                         Stephen D. Rockwell
13                                       BERGESON, LLP
                                         303 Almaden Boulevard, Suite 500
14                                       San Jose, CA 95110-2712
                                         Telephone: (408) 291-6200
15

16                                       Attorneys for Defendant Stephen Gardner

17

18  Dated: May ___, 2004                 By: _____

19

20                                       Thomas L. Vance
                                         VANCE, BLAIR & GRADY
21                                       1201 Camino Del Mar, Suite 205
                                         Del Mar, CA 92014
22                                       Telephone: (858) 793-0040

23
                                         Attorneys for Defendant Matthew C. Gless
24  ///

25  ///

26  ///

27  ///

28
    5183683                          - 11 -

                                                      110
                                              EXHIBIT 11

05/28/2004  13:31    310547        HARBOR                        PAGE  20
05/28/2004  13:21 FAX  415 9      08    LIEF CABRASER          ☒ 020/028

FROM :VANCE, BLAIR & GRADY        FAX NO. :858 793 1655        May. 25 2004 12:09PM  P2

1   Dated: May ___, 2004            By: _____

2

3                                   Michael A. Attanasio
                                    Chaise R. Bivin
4                                   Aaron P. Arnzen
                                    COOLEY GODWARD LLP
5                                   4401 Eastgate Mall
                                    San Diego, CA 92121-1909
6                                   Telephone: (858) 550-6000

7                                   Attorneys for Defendant Daniel Stulac

8

9

10  Dated: May ___, 2004            By: _____

11

12                                  Daniel J. Bergeson
                                    Caroline McIntyre
13                                  Stephen D. Rockwell
                                    BERGESON, LLP
14                                  303 Almaden Boulevard, Suite 500
                                    San Jose, CA 95110-2712
15                                  Telephone: (408) 291-6200

16                                  Attorneys for Defendant Stephen Gardner

17

18  Dated: May 25, 2004             By: _____

19

20                                  Thomas L. Vance
                                    VANCE, BLAIR & GRADY
21                                  1201 Camino Del Mar, Suite 205
                                    Del Mar, CA 92014
22                                  Telephone: (858) 793-0040

23                                  Attorneys for Defendant Matthew C. Gless

24  ///

25  ///

26  ///

27  ///

28

318561.7

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

111
EXHIBIT 11

```
 1    Dated: May 2 b, 2004              By: Jennifer A. Spaziano

 2                                      Jennifer Spaziano
                                        Gary DiBianco
 3                                      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                        1440 New York Avenue, N.W.
 4                                      Washington, D.C. 20005
                                        Telephone: (202) 371-7000
 5

 6                                      James E. Lyons
                                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 7                                      Four Embarcadero Center
                                        San Francisco, California 94111
 8                                      Telephone: (415) 984-6400

 9
                                        Attorneys for BearingPoint, Inc.
10

11

12    Dated: May ___, 2004             By: _____

13

14                                     Michael C. Kelley
                                       Bradley H. Ellis
15                                     Garrett H. Craig
                                       SIDLEY AUSTIN BROWN & WOOD LLP
16                                     555 W. Fifth Street, 40th Floor
                                       Los Angeles, CA 90013
17                                     Telephone: (213) 896-6632

18                                     Attorneys for KPMG LLP

19

20

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///
      518508.7
```

- 12 -

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

1    Dated: May ___, 2004      By: _____

2

3                   Jennifer Spaziano
                  Gary DiBianco

4                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                  1440 New York Avenue, N.W.

5                   Washington, D.C. 20005
                  Telephone: (202) 371-7000

6

7                   James E. Lyons
                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

8                   Four Embarcadero Center
                  San Francisco, California 94111

9                   Telephone:  (415) 984-6400

10                  Attorneys for BearingPoint, Inc.

11

12    Dated: May 26, 2004      By: _____

13

14                 Michael C. Kelley
                Bradley H. Ellis

15                 Garrett H. Craig
                SIDLEY AUSTIN BROWN & WOOD LLP

16                 555 W. Fifth Street, 40th Floor
                Los Angeles, CA 90013

17                 Telephone: (213) 896-6632

18                Attorneys for KPMG LLP

19

20

21 /// 

22 /// 

23 /// 

24 /// 

25 /// 

26 /// 

27 /// 

28 ///

318568.7

- 12 -

113

EXHIBIT 11

05/28/2004  13:31   3105479~~5                    HARBOR                        PAGE   23
05/28/2004  13:22 FAX  415 95~  '08           LIEF CABRASER                     029/028

May-28-2004  11:56am  From-PILLSBURY-WINTHROP LLP          +4154474082          T-857  P.015/018  F-989



1   Dated: May 26 2004              By: _Margaret M Niver_

2

3                                   Richard M. Segal
                                    Thomas V. Loran III
4                                   Margaret Niver
                                    Andrew D. Lanphere
5                                   PILLSBURY WINTHROP LLP
                                    50 Fremont Street
6                                   San Francisco, CA 94105
                                    Telephone: (415) 983-1865
7

8                                   Attorneys for Critical Path, Inc.

9

10

11

12

13           IT IS SO ORDERED.

14

15   DATED: _JUN 0 4 2004_, 2004        JEFFREY B. BARTON
                                    _____
16                                  Honorable Jeffrey B. Barton

17

18

19

20

21

22

23

24

25

26

27

28

313361.7                            - 13 -

114
**EXHIBIT 11**

# EXHIBIT A

## AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

I, _____ hereby acknowledge that I have been provided with a copy of the Stipulation and Protective Order For Confidential Information ("Order") which has been entered by the Court in <u>Allocco, et al. v. Gardner, et al.</u>, San Diego Superior Court, Case No. GIC 866450.

I hereby agree to be bound by the terms of the Order; to not reveal any CONFIDENTIAL INFORMATION to anyone other than another person designated by said Order to receive such information; and to utilize such CONFIDENTIAL INFORMATION solely as authorized by this Order.

DATED: _____

318563.7

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

115
**EXHIBIT 11**



COPY

1   Richard M. Heimann (State Bar No. 063607)
    James M. Finberg (State Bar No. 114850)
2   Joy A. Kruse (State Bar No. 142799)
    Daniel E. Barenbaum (State Bar No. 209261)
3   Christopher K. Leung (State Bar No. 210325)
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4   Embarcadero Center West
    275 Battery Street, 30th Floor
5   San Francisco, CA  94111-3339
    Telephone: (415) 956-1000
6   Facsimile: (415) 956-1008

7   Attorneys for Plaintiffs

F I L E D

Clerk of the Superior Court

JUN 0 4 2004

By: Y. BRENNAN, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF SAN DIEGO

10                      UNLIMITED JURISDICTION

11

12   RICHARD P. ALLOCCO, LORI BARKER,         Case No.  GIC 806450
     KENNETH BOYD, JR., RONALD
13   COOTES, RONALD J. FIOR, PHYLLIS E.       CONFIDENTIALITY STIPULATION
     FRIEDMAN, LAWRENCE L. GARLICK,           AND PROTECTIVE ORDER
14   HAROLD I. GOLDBERG, VICTOR
     GUERRIERI, HARVEY C. JONES, JR.,
15   KLAWANS FAMILY TRUST, ARTHUR
     KULAKOW, MICHAEL F. LITTLE,
16   DAVID MAHLER, CHARLES
     MOUSSEAU, DOUGLAS MUELLER,
17   JUDITH ORAH MUELLER, JAMES G.
     PETERSON, ANDREA POTTS, GLENDA
18   GOULETTE SCHWEM, JOHN F. SHOCH,
     RICHARD THOMAS, GEORGE A.
19   de URIOSTE, DARIUS WALLACE, and
     DANIEL WELLER,
20
                    Plaintiffs,
21   v.

22   STEPHEN P. GARDNER, MATTHEW C.
     GLESS, JOHN J. MOORES, THOMAS G.
23   WATROUS, CHARLES E. NOELL,
     WILLIAM D. SAVOY, ARTHUR
24   ANDERSEN LLP, ARTHUR ANDERSEN
     GERMANY, ARTHUR ANDERSEN
25   WORLDWIDE SC, DANIEL STULAC,
     KPMG d.b.a. KPMG CONSULTING, INC.;
26   BEARINGPOINT, INC.; CRITICAL
     PATH; and DOES 1-100,
27
                    Defendants.
28

306759.3

EXHIBIT 11

1   WHEREAS, Plaintiffs in the above-captioned action, <u>Allocco, et al. v. Gardner, et</u>

2   <u>al.</u>, Case No. GIC 806450 (Cal. Sup. Ct., County of San Diego) ("the <u>Allocco</u> Action"), seek the

3   production of documents from Electronic Data Systems Corporation ("EDS") pursuant to the

4   Subpoena for Production of Business Records ("the Subpoena"), dated September 18, 2003,

5   issued by Plaintiffs;

6   WHEREAS, this Stipulation is intended to facilitate the delivery of confidential

7   information responsive to the Subpoena from EDS to Plaintiffs, and to establish the parties' rights

8   and obligations with respect to such information;

9   WHEREAS, "Confidential Information" shall mean all documents, e-mails, faxes,

10   computer files, agreements, records, reports, data, forecasts, projections, business plans,

11   interpretations, audit reports, and all other information, written, visual, or oral, regardless of how

12   transmitted, relating to or concerning EDS, and prepared by or on behalf of, or furnished by or on

13   behalf of, EDS which contain, or are based upon or derived from, in whole or in part, information

14   relating to or concerning EDS which, at the time it is furnished to Plaintiffs, is not available to the

15   general public and which  EDS believes in good faith is entitled to confidentilaity pursuant to San

16   Diego Superior Court Rule 2.48.

17   IT IS HEREBY STIPULATED AND AGREED, by and between the below-signed

18   counsel for Plaintiffs and EDS, as follows:

19   1.   EDS shall mark "Confidential" on any written Confidential Information

20   which it intends to subject to the provisions of this Stipulation prior to delivering that information

21   to Plaintiffs.  Confidential Information disclosed orally or visually, if any, shall be accompanied

22   by, or promptly followed by, a written statement from EDS designating the portion constituting

23   Confidential Information.  In designating information as Confidential Information, EDS will act

24   in good faith to protect only proprietary or other sensitive information whose confidentiality has

25   otherwise been maintained and which EDS believes in good faith is entitled to confidentiality

26   pursuant to San Diego Superior Court Rule 2.48.  EDS will not so mark any information that was

27   generally known or available to the public through no act of Plaintiffs or any of their agents or

28   representatives.

306759.3

- 1 -

117

**EXHIBIT 12**

2.    If EDS designates information as Confidential Information and Plaintiffs dispute this designation, Plaintiffs shall give prompt written notice of the dispute, stating with particularity the reasons for the proposed disclosure. Plaintiffs and EDS shall then negotiate in good faith to resolve the dispute. If any dispute cannot be resolved through negotiations, Plaintiffs shall notify EDS in writing of the impasse to allow EDS to move for an order from the Court in the <u>Allocco</u> Action ("the Court") to resolve the dispute. The disputed information shall be treated as Confidential Information pending the Court's decision and pending appeal if EDS appeals any decision adverse to EDS.

3.    Plaintiffs agree that they use their reasonable best efforts (a) to maintain the confidentiality of all Confidential Information in accordance with the terms of this Stipulation and (b) not to disclose any Confidential Information except as expressly provided in this Stipulation.

4.    Plaintiffs may disclose Confidential Information to any of its agents actively advising them with respect to the <u>Allocco</u> Action, provided that Plaintiffs first inform such person of the confidential nature of the Confidential Information and provide such person with a copy of this Stipulation and such person agrees in writing to be bound by this Stipulation.

5.    Plaintiffs may disclose Confidential Information in pleadings or other papers filed in the <u>Allocco</u> Action only if, prior to such disclosure, Plaintiffs' counsel (a) reasonably determine in good faith that such disclosure is necessary for any proper purpose related to Plaintiffs' prosecution of the <u>Allocco</u> Action; and (b) Plaintiffs promptly give EDS written notice of the proposed disclosure, stating with particularity the reasons for the proposed disclosure. If EDS objects to the proposed disclosure, it will promptly notify Plaintiffs and file a motion with the Court to bar such disclosure for good cause shown. The disclosure shall not be made pending the Court's ruling on the motion.

6.    If Plaintiffs wish to file any Confidential Information with the Court, Plaintiffs must file a motion pursuant to Rule 243.2 of the California Rules of Court seeking permission of the Court to do so. If Plaintiffs file such a motion, they will serve EDS with a copy thereby notifying them that Confidential Information will be filed with the Court. If, in any

306759.3

- 2 -

118

**EXHIBIT 12**

1   instance, the Court should decline to give its approval to accepting documents under seal or to

2   closing its courtroom, then Plaintiffs may seek to disclose Confidential Information without these

3   protections, or in such other manner as the Court shall direct; provided, however, that any such

4   request by Plaintiffs to disclose Confidential Information shall be without prejudice to the right of

5   EDS to oppose such disclosure by filing a motion with the Court. The unprotected disclosure

6   shall not be made pending the Court's ruling on the motion..

7           7.      If Plaintiffs, or any of them, are (a) subpoenaed in this or any other action,

8   (b) served with a discovery request in this or any other action, or (c) served with any legal process

9   by one not a party to this litigation, including, without limitation, any regulatory or governmental

10   agency (a "Requesting Party"), seeking Confidential Information, Plaintiffs shall give prompt

11   written notice, as soon as reasonably possible, to EDS.  To the extent permitted by law,

12   regulation, or relevant rule, Plaintiffs shall not produce the requested Confidential Information for

13   at least ten (10) business days after giving EDS notice of the relevant subpoena or other legal

14   process and underlying action.  In the event that EDS files an objection, motion to quash, or

15   motion for a protective order seeking to prevent the disclosure of such Confidential Information

16   to the Requesting Party within such ten-day period, Plaintiffs shall not produce such Confidential

17   Information to the Requesting Party during the pendency of such objection or motion.  If EDS

18   does not object or otherwise move too prevent the requested production within the above time

19   frame,  Plaintiffs may produce such Confidential Information to the Requesting Party.  Nothing

20   herein shall be construed as requiring Plaintiffs or anyone else covered by this Agreed Protective

21   Order to challenge or to appeal any Order by this Court or any other lawfully constituted court

22   requiring production of Confidential Information covered by this Agreed Protective Order, or to

23   subject itself to any penalties for noncompliance with any legal process or order, or to seek any

24   relief from this Court.

25           8.      Information designated Confidential Information shall not be entitled to the

26   protections of this Stipulation if Plaintiffs or any of Plaintiffs' agents receive such information

27   from a third party on a non-confidential basis, provided that Plaintiffs are not legally obligated to

28   maintain the confidentiality of such information. Confidential Information shall cease to be

306759.3

- 3 -

119
EXHIBIT 12

1   treated as Confidential Information if publicly disclosed by EDS or if they otherwise become

2   publicly known by any means other than wrongful disclosure attributable to Plaintiffs or any of

3   their agents.

4          9.      EDS and Plaintiffs shall have standing to enforce the terms of this

5   Stipulation, or to seek relief from its terms, by appropriate proceedings brought before the Court

6   on due notice thereof and opportunity to be heard.  Plaintiffs, EDS, and all persons agreeing to be

7   bound by the terms of this Stipulation hereby irrevocably and unconditionally submit to the

8   exclusive jurisdiction and venue of the Court for purposes of any suit, action, or other proceeding

9   arising out of or relating to the enforcement or interpretation of this Stipulation.

10          10.     This Stipulation may be executed by facsimile signature and in

11   counterparts and each such counterpart shall for all purposes be deemed an original, and all such

12   counterparts shall together constitute one and the same instrument.

13          11.     Upon execution, Plaintiffs shall submit this Stipulation for "so ordering"

14   by the Court, and shall promptly serve a conformed copy thereof on EDS.

15          12.     EDS shall, following the execution of this Stipulation and within five

16   business days of receipt of a "so ordered" copy of this Stipulation, produce the Confidential

17   Information contemplated herein.

18          13.     The Confidential Information, and any copies thereof, remain the property

19   of EDS, and shall be maintained as confidential during the remainder of the trial proceedings and

20   on any appeal. After all appeals, or rights thereto, have been exhausted, Plaintiffs shall promptly

21   certify to EDS that they have destroyed or returned to EDS all outstanding Confidential

22   Information and copies thereof.

23

24

25

26

27

28

306759.3                                    - 4 -

CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

120
EXHIBIT 12

1
2
Dated: May 25, 2004                           WARNER STEVENS & DOBY LLP

3
4                                             By: _Lewis T. Stevens /RAS_
5                                                 Lewis T. Stevens (SBN 67705)

6                                             301 Commerce Street, Suite 1700
                                              Fort Worth, Texas 76102
7                                             Tel: (817) 810-5250

8                                             Attorneys for Nonparty EDS Corp.

9   Dated: May ___, 2004                      LIEFF CABRASER HEIMANN
                                              & BERNSTEIN LLP
10
11
12                                            By: _____
                                                  Joy A. Kruse
13
                                              275 Battery Street, 30th Floor
14                                            San Francisco, California 94111
                                              Tel: (415) 956-1000
15
                                              Attorneys for Plaintiffs
16
17
18              SO ORDERED.
19
20
    Dated: May ___, 2004
21                                            _____
                                              Hon. Jeffrey B. Barton
22                                            Judge of the Superior Court

23
24
25
26
27
28

306759.3                              - 5 -

CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER          121

                                                          **EXHIBIT 12**

1
2     Dated: May ___, 2004                    WARNER STEVENS & DOBY LLP

3
4                                             By: _____
                                                  Lewis T. Stevens (SBN 67705)
5
6                                             301 Commerce Street, Suite 1700
                                              Fort Worth, Texas 76102
7                                             Tel: (817) 810-5250

8                                             Attorneys for Nonparty EDS Corp.

9     Dated: May 27, 2004                     LIEFF CABRASER HEIMANN
                                              & BERNSTEIN LLP
10
11
                                              By: _____
12                                                 Joy A. Kruse

13                                            275 Battery Street, 30th Floor
                                              San Francisco, California 94111
14                                            Tel: (415) 956-1000

15                                            Attorneys for Plaintiffs

16

17

18    SO ORDERED.

19

20                                            JEFFREY B. BARTON
      Dated: May 4, 2004                      _____
21                                            Hon. Jeffrey B. Barton
                                              Judge of the Superior Court
22

23

24

25

26

27

28                                                                  122
      306759.3                    - 5 -                         EXHIBIT 12

      CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

1  Richard M. Heimann (State Bar No. 063607)
   James M. Finberg (State Bar No. 114850)
2  Joy A. Kruse (State Bar No. 142799)
   Karin A. Kramer (State Bar No. 87346)
3  Scott P. Nealey (State Bar No. 193062)
   Daniel E. Barenbaum (State Bar No. 209261)
4  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   Embarcadero Center West
5  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
6  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
7
   Attorneys for Plaintiffs
8
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                      COUNTY OF SAN DIEGO
10
                      UNLIMITED JURISDICTION
11

| | |
|---|---|
| 12 RICHARD P. ALLOCCO, LORI BARKER, KENNETH BOYD, JR., RONALD COOTES, RONALD J. FIOR, PHYLLIS E. FRIEDMAN, LAWRENCE L. GARLICK, HAROLD I. GOLDBERG, VICTOR GUERRIERI, HARVEY C. JONES, JR., KLAWANS FAMILY TRUST, ARTHUR KULAKOW, MICHAEL F. LITTLE, DAVID MAHLER, CHARLES MOUSSEAU, DOUGLAS MUELLER, JUDITH ORAH MUELLER, JAMES G. PETERSON, ANDREA POTTS, GLENDA GOULETTE SCHWEM, JOHN F. SHOCH, RICHARD THOMAS, GEORGE A. de URIOSTE, DARIUS WALLACE, and DANIEL WELLER, | Case No.  GIC 806450 **THIRD AMENDED COMPLAINT FOR VIOLATIONS OF:** (1) **CAL. CORP. SECURITIES LAW OF 1968;** (2) **FRAUD AND DECEIT AND NEGLIGENT MISREPRESENTATION** (3) **THE COMMON LAW OF CONSPIRACY AND AIDING AND ABETTING** |

                        Plaintiffs,
   v.
   STEPHEN P. GARDNER, MATTHEW C.
   GLESS, JOHN J. MOORES, THOMAS G.             **DEMAND FOR JURY TRIAL**
   WATROUS, CHARLES E. NOELL,
   WILLIAM D. SAVOY, DOUGLAS
   POWANDA, RICHARD NELSON, ARTHUR
   ANDERSEN LLP, ERNST & YOUNG
   REVISIONS—UND
   TREUHANDGESELLSCHAFT MBH,
   WIRSCHAFTSPRÜFUNGSGESELLSCHAFT
   STEUERBERATUNGSGESELLSCHAFT
   (HRB 10482), AWSC SOCIÉTÉ
   COOPÉRATIVE, en liquidation, DANIEL
   STULAC, KPMG, L.L.P.,
   BEARINGPOINT, INC., CRITICAL PATH,
   INC.,
   (continued on next page)

324631.3

THIRD AMENDED COMPLAINT

123
**EXHIBIT 13**

1  BT, plc, BULL, S.A., INSIGHT
   ENTERPRISES, INC., BINDVIEW
2  DEVELOPMENT CORPORATION, and
   DOES 10-100,
3                    Defendants.

4

5

6          Plaintiffs Richard P. Allocco, Lori Barker, Kenneth Boyd, Jr., Ronald Cootes,

7  Ronald J. Fior, Phyllis E. Friedman, Lawrence L. Garlick, Harold I. Goldberg, Victor Guerrieri,

8  Harvey C. Jones, Jr., Klawans Family Trust, Arthur Kulakow, Michael F. Little, David Mahler,

9  Charles Mousseau, Douglas Mueller, Judith Orah Mueller, James G. Peterson, Andrea Potts,

10 Glenda Goulette Schwem, John F. Shoch, Richard Thomas, George A. de Urioste, Darius

11 Wallace, and Daniel Weller ("Plaintiffs"), by their undersigned counsel, allege as follows:

12 **I.    INTRODUCTION**

13         1.      Peregrine Systems, Inc. ("Peregrine" or the "Company") is a provider of

14 business software and services. First incorporated in 1981, Peregrine has been publicly traded

15 since 1997. Plaintiffs are a group of former shareholders of Remedy Corporation who exchanged

16 their Remedy stock and options for cash and Peregrine securities when Peregrine acquired

17 Remedy. Within months of the Remedy acquisition, Peregrine began to reveal to the public that

18 it had grossly overstated its revenue during the years 2000, 2001, and 2002. The announcement

19 led to a drastic and sudden devaluation of Peregrine stock. While the stock was artificially

20 inflated, certain Peregrine officers and directors, including defendants Stephen P. Gardner,

21 Matthew C. Gless, John J. Moores, Thomas G. Watrous, Charles E. Noell, Douglas Powanda and

22 Richard Nelson, sold off much of their stock at enormous profits. Meanwhile, plaintiffs, who just

23 months before had been shareholders and employees of a successful and valuable company, were

24 left holding worthless Peregrine stock.

25         2.      On May 23, 2002, Peregrine announced a massive restatement of revenues.

26 Although Peregrine initially announced that as much as $100 million of revenue would be erased,

27 that prediction proved optimistic; as the investigation continued, the restatement figure quintupled

28 to over $500 million. Peregrine further disclosed that the SEC was investigating the Company's

1  accounting practices and that Gardner, its Chairman and Chief Executive Officer, and Gless, its

2  Chief Financial Officer and Executive Vice President, were resigning.  In the ensuing months,

3  Gless, Peregrine's Assistant Treasurer Ilse Cappel, and Vice President for Sales Steven Spitzer

4  pled guilty to various criminal offenses, including conspiracy to commit securities fraud, bank

5  fraud, falsifying books and records, making false statements to auditors, and more.  Both the SEC

6  and the Department of Justice are still investigating illegal activities by Peregrine and the

7  individual defendants.

8            3.        The facts that have emerged reveal that there were two Peregrines.  The

9  Peregrine known to the public falsely announced record revenues and outstanding performance

10  quarter after quarter – reports that caused the price of Peregrine stock to soar.  The other

11  Peregrine, known only to Peregrine insiders, including executives, certain members of its Board

12  of Directors, its auditors, and other defendants participating in the fraud, was actively engaged in

13  fraudulent accounting practices designed to pump up the price of Peregrine stock by, among other

14  things, booking revenue for transactions that had no economic value.  Relying on the first

15  Peregrine, plaintiffs bought Peregrine stock.  Knowing the true Peregrine, insiders unloaded their

16  Peregrine stock before the truth about Peregrine was revealed.

17            4.        The practices that defendants engaged in to inflate Peregrine's revenues

18  violate the standards by which public corporations must operate, known as Generally Accepted

19  Accounting Practices ("GAAP").  At the heart of Peregrine's violation of GAAP was its decision

20  to recognize revenue where it had not received revenue and did not have a sufficient basis to

21  believe it ever would receive the revenue it recorded.  Peregrine's deceptive practices, which

22  created an illusion of growth, included such improprieties as using "side agreements" to excuse

23  customers from paying for products; "parking" product with cooperating resellers at the end of a

24  quarter so the Company could show it as sold, when in fact the purported customer had no

25  intention of paying for it; treating product transferred to resellers (known as channel partners) as

26  "sold" for accounting purposes, even though the reseller had no end-user and was permitted to

27  return the product; booking bank loans as sales; and booking revenue from "barter" transactions

28  or "swaps" in which Peregrine and another company would appear to sell product to each other so

EXHIBIT 13

1   that each could recognize revenue from the transaction when in fact no money changed hands and

2   the swaps were, economically, a wash.  These practices allowed Peregrine to perpetrate the

3   illusion that it was meeting and often exceeding its quarterly financial targets, which in turn kept

4   its stock price high.

5           5.      Peregrine's officers and directors did not perpetrate this fraud alone.

6   Without the assistance of certain entities that entered into fraudulent transactions with Peregrine,

7   as well as auditors who looked the other way, helped Peregrine structure improper transactions,

8   and certified Peregrine's false financial statements, Peregrine could not have effected this massive

9   fraud.  Among the acts of substantial assistance that such defendants provided to Peregrine were

10   the following:

11           a.      Defendants, the Arthur Andersen entities and Daniel Stulac, the

12   audit engagement partner for the Peregrine account, repeatedly issued unqualified audit opinions

13   knowing that Peregrine's statements of revenue were false and that huge losses were hidden in

14   acquisition costs;

15           b.      Defendants KPMG, L.L.P. ("KPMG") and BearingPoint, Inc.

16   ("Bearing Point") entered into at least nine phony transactions with Peregrine for the purpose of

17   allowing Peregrine to recognize revenue;

18           c.      Defendant Critical Path, Inc. ("Critical Path") entered into an illegal

19   "swap" transaction, exchanging documents with Peregrine to make it appear that the parties

20   entered into two separate transactions for value when in fact they merely traded software;

21           d.      Defendant BT, plc ("BT") backdated documents to permit

22   Peregrine to recognize revenue in a previous quarter, entered into a separate agreement on the

23   side which excused it from paying Peregrine any money at all, then falsely confirmed to auditors

24   that Peregrine had recognized revenue;

25           e.      Defendant Insight Enterprises, Inc. ("Insight") entered into a phony

26   transaction with Peregrine with a hidden side agreement that obviated any need for payment,

27   knowing that Peregrine needed and would record revenue from the deal;

28

324631.3

1            f.     Defendant Bindview Development Corporation ("Bindview")

2    agreed to a swap with Peregrine in which the parties "sold" matching amounts of software to each

3    other so that each could recognize revenue;

4            g.     Defendant Bull, S.A., tradestyle "Groupe Bull" ("Bull"), at

5    Peregrine's behest, backdated documents, to allow Peregrine to recognize revenue in the previous

6    quarter, and only after Peregrine entered into 2 secret side letters in which Peregrine agreed to pay

7    money and transfer business to Bull that equaled or exceeded the purported obligation from Bull

8    to Peregrine.

9            6.     The aim of this aggressive program of fraudulent transactions was to drive

10   up Peregrine's stock price, in part because it created wealth for the insiders, but also because it

11   allowed Peregrine to acquire other companies using its stock as currency. The Remedy merger

12   was one such acquisition. Remedy, a publicly held company with approximately 1300 employees

13   worldwide, was a leading supplier of information technology service management and customer

14   relationship management solutions. Following some two years of discussion and negotiation,

15   Peregrine finally convinced Remedy to agree to a merger and paid Remedy shareholders $9.00

16   plus 0.9065 shares of Peregrine stock per share of Remedy stock. On the day of the merger,

17   August 27, 2001, Peregrine stock closed at $23.01, and Remedy stock closed at $29.40. But for

18   the false statements, false records, and unlawful acts of defendants, plaintiffs would not have sold

19   their company to Peregrine in exchange for Peregrine stock.

20           7.     On February 28, 2003, Peregrine filed restated consolidated financial

21   statements for the years ended March 31, 2000 and 2001. Peregrine had previously reported its

22   results for the first three fiscal quarters of the March 31, 2002 fiscal year. The restated financials

23   show that Peregrine inflated revenue by $509 million from April 1999 through December 2001.

24   Approximately half of the $509 million, or $259 million, represented "non-substantiated

25   transactions." Peregrine had previously told investors and government regulators that its losses

26   during that time period amounted to $1.54 billion, but the restatement showed those losses to be

27   $4.09 billion.

28

- 4 -

**EXHIBIT 13**

8.      Peregrine's common stock, which once sold for over $80 per share, now hovers at around a dime.

## II.    THE PARTIES

### A.    PLAINTIFFS

9.      Plaintiff Richard P. Allocco was the Executive Vice President of Global Sales and Services at Remedy. At the time of the merger, Allocco had 244,900 Remedy options for which he received Peregrine options. Allocco resides in Pleasanton, California.

10.     Plaintiff Lori Barker was employed by Remedy from February 1998 through the merger, most recently as Remedy's Director of Finance and Investor Relations. At the time of the merger, Barker received approximately 2,511 shares of Peregrine stock. She also owned 49,210 Remedy options which were exchanged for Peregrine options. She then acquired 700 Peregrine shares on the open market on January 28, 2002. Barker resides in Redwood City, California.

11.     Plaintiff Kenneth Boyd, Jr. was Chief Information Officer of Remedy from December 1998 through the merger. After the merger, Boyd was Vice President of Business Development, Office of the Chairman. At the time of the merger, Boyd received approximately 1,098 shares of Peregrine stock. He also owned 125,000 Remedy options which were exchanged for Peregrine options. He acquired additional options after the merger and prior to May 23, 2002. Boyd resides in Sunnyvale, California.

12.     Plaintiff Ronald R. Cootes was a Distinguished Engineer at the time of the merger with Peregrine and is currently employed by Remedy. At the time of the merger, Cootes received Peregrine stock. He also owned 67,500 Remedy options, which were exchanged for Peregrine options. Cootes resides in Los Gatos, California.

13.     Plaintiff Ronald J. Fior was the Vice President for Finance and Operations, and CFO of Remedy from September 1998 through the merger. At the time of the merger, Fior received approximately 4,275 shares of Peregrine stock. He also owned 205,000 Remedy options which were exchanged for Peregrine options. Fior also made sales and option exchanges subsequent to that. Fior resides in Redwood City, California.

14.     Plaintiff Phyllis E. Friedman was the Office Manager and then Manager of Employee Programs of Remedy from January 3, 1993 through the merger. At the time of the merger, Friedman received approximately 23,976 shares of Peregrine stock. She also owned 7,850 Remedy options which were exchanged for Peregrine options. Friedman resides in Redwood City, California.

15.     Plaintiff Lawrence L. Garlick was the co-founder, chairman, and Chief Executive Officer of Remedy from its inception on November 20, 1990 until its acquisition by Peregrine. At the time of the merger, Garlick received approximately 2,176,433 shares of Peregrine stock. He also owned 565,500 Remedy options which were exchanged for Peregrine options. Garlick resides in Palo Alto, California.

16.     Plaintiff Harold I. Goldberg was a Vice President and General Manager at Remedy. At the time of the merger, Goldberg received approximately 1,570 shares of Peregrine stock. He also owned 129,460 Remedy options which were exchanged for Peregrine options. Goldberg resides in San Jose, California.

17.     Plaintiff Victor Guerrieri was the Vice President of Sales Americas at Remedy. At the time of the merger, Guerrieri owned approximately 1,326 shares of Peregrine stock. He also owned 73,000 Remedy options which were exchanged for Peregrine options. Guerrieri resides in Pleasanton, California.

18.     Plaintiff Harvey C. Jones, Jr. was a Remedy director from November 1994 through the merger. At the time of the merger, Jones received approximately 27,195 shares of Peregrine stock. He also owned 170,000 Remedy options which were exchanged for Peregrine options. Jones resides in Palo Alto, California.

19.     Plaintiff Barry Klawans was a Software Engineer and Engineering Manager at Remedy from 1991 through February 20, 1997. At the time of the merger, Klawans received approximately 32,340 shares of Peregrine stock. Klawans resides in San Francisco, California.

324631.3

- 6 -

20.     Plaintiff Arthur Kulakow was a Senior Software Engineer at Remedy from September 1991 to January 1996. At the time of the merger, Kulakow received approximately 13,597 shares of Peregrine stock. Kulakow resides in Saratoga, California.

21.     Plaintiff Michael F. Little was Vice President of Worldwide Support at Remedy. At the time of the merger, Little received approximately 467 shares of Peregrine stock. He also owned 65,500 Remedy options, which were exchanged for Peregrine options. Little resides in Fremont, California.

22.     Plaintiff David Mahler was a co-founder and director of Remedy from 1990 through the merger. At the time of the merger, Mahler received approximately 562,750 shares of Peregrine stock. He also owned 35,000 Remedy options which were exchanged for Peregrine options. Mahler resides in Los Altos Hills, California.

23.     Plaintiff Charles Mousseau was a Senior Staff Engineer at the time of the merger with Peregrine and is currently employed by Remedy. At the time of the merger, Mousseau received approximately 11,137 shares of Peregrine stock. He also owned 48,870 Remedy options which were exchanged for Peregrine options. Mousseau resides in Palo Alto, California.

24.     Plaintiff Douglas Mueller was a co-founder and Software Engineer at Remedy from December 1990 through the Merger. At the time of the merger, Mueller received approximately 763,491 shares of Peregrine stock. He also owned 224,498 Remedy options which were exchanged for Peregrine options. Mueller purchased 13,100 shares on the open market in January 2002. Mueller resides in Palo Alto, California.

25.     Plaintiff Judith Orah Mueller is the wife of Douglas Mueller. At the time of the merger, Mueller received approximately 26,353 shares of Peregrine stock. Mueller resides in Palo Alto, California.

26.     Plaintiff James G. Peterson was the Vice President of the Action Request System Business Unit for Remedy. At the time of the merger, Peterson received approximately 990 shares of Peregrine stock. He also owned 120,000 Remedy options which were exchanged

1   for Peregrine options. Peterson purchased 5,000 Peregrine shares on May 8, 2002. Peterson

2   resides in San Jose, California.

3            27.     Plaintiff Andrea Potts was the Worldwide Vice President of Human

4   Resources of Remedy from August 17, 1999 through November 31, 2001. At the time of the

5   merger, Potts received approximately1,860 shares of Peregrine stock. She also owned 110,000

6   Remedy options which were exchanged for Peregrine options. Potts resides in Los Gatos,

7   California.

8            28.     Plaintiff Glenda Goulette Schwem was a Director of Contracts and

9   Intellectual Property at Remedy from April 1998 through October 2001. At the time of the

10  merger, Schwem received approximately 245 shares of Peregrine stock. She also owned 95,100

11  Remedy options which were exchanged for Peregrine options. Schwem resides in Pleasanton,

12  California.

13           29.     Plaintiff John F. Shoch was a Remedy director from January 1991 through

14  the merger. At the time of the merger, Schoch received approximately 77,052 shares of Peregrine

15  stock. He also owned 120,000 Remedy options which were exchanged for Peregrine options.

16  Shock also engaged in sales and option exchanges subsequent to that. Shoch resides in

17  Woodside, California.

18           30.     Plaintiff Richard Thomas was a Quality Assurance Manager at Remedy

19  from April 1993 through August 1996. At the time of the merger, Thomas received

20  approximately 28,682 shares of Peregrine stock. Thomas resides in Sunnyvale, California.

21           31.     Plaintiff George A. de Urioste was the Vice President, Finance and

22  Operations, and Chief Financial Officer of Remedy from March 1993 until July 1998. At the

23  time of the merger, de Urioste received approximately 178,707 shares of Peregrine stock. He also

24  purchased 1,000 shares on April 6, 2000. De Urioste resides in Atherton, California.

25           32.     Plaintiff Darius Wallace was Services Technical Director at Remedy. At

26  the time of the merger, Wallace owned 118,750 Remedy options which were exchanged for

27  Peregrine options. Wallace resides in San Jose, California.

28

1   33.   Plaintiff Daniel Weller was a Software Engineer and Engineering Manager

2   of Remedy from 1991 through approximately April 1997. At the time of the merger, Weller

3   received approximately 136,349 shares of Peregrine stock. Weller also purchased 30,000 shares

4   of Peregrine common stock on May 2, 2002. Weller resides in Palo Alto, California.

5   34.   The value of the Peregrine stock and options obtained by Plaintiffs in

6   exchange for their Remedy shares and options was approximately $150,000,000.

7   **B.   DEFENDANTS**

8   **1.   Officer Defendants (Gardner, Gless, Powanda, Nelson)**

9   35.   Defendant Stephen P. Gardner ("Gardner") served as Peregrine's Chairman

10   of the Board and Chief Executive Officer. Gardner first joined Peregrine in May 1997 as Vice

11   President of Strategic Operations. In January 1998, he became Executive Vice President and

12   Principal Executive Officer of the Company. He became CEO in April 1998. Gardner was

13   forced to resign from the Company on or about May 3, 2002. Gardner resides in San Diego,

14   California.

15   36.   Defendant Matthew C. Gless ("Gless") served as Peregrine's Chief

16   Financial Officer and director. He first joined Peregrine as Corporate Controller in April 1996.

17   In October 1998, he became Vice President of Finance and Chief Accounting Officer ("CAO").

18   From October 2000 until his forced resignation on or about May 23, 2002, Gless served as CFO

19   and director. Gless resides in San Diego, California. He has pled guilty to securities fraud and is

20   awaiting sentencing.

21   37.   Defendant Douglas Powanda ("Powanda") is substituted herein as

22   Doe Defendant No. 5. Powanda joined Peregrine in February 1992 as Sales Manager. In 1998,

23   he became Executive Vice President, Worldwide Sales. In February 2001, he became a

24   "consultant" to the Company but continued to work on major accounts with a compensation plan

25   providing him with substantial incentives for generating revenue. He also constituted part of the

26   Office of the Chairman until he left the Company in the Spring of 2002.

27   38.   Richard Nelson ("Nelson") is substituted herein as Doe Defendant No. 6.

28   Nelson became Vice President and General Counsel of Peregrine in 1995. In 1997, he became

1  Secretary of the Corporation, and in 2000 became Vice President of Corporate Development,

2  reporting directly to Gardner.  Thereafter, he became a Senior Vice President and assumed the

3  role of interim CEO when the fraud was first announced.

4       **2.**   **Director Defendants** (Moores, Watrous, Noell, Savoy)

5       39.   Defendant John J. Moores ("Moores") was Peregrine's Chairman of the

6  Board. He first became a director in March 1989.  He served as Chairman from March 1990 until

7  July 2000.  Moores served on the Board's Compensation Committee, which determines salaries,

8  *incentives, and other forms of compensation for directors, officers, and other employees of*

9  Peregrine. Moores resides in Del Mar, California.

10       40.   Defendant Thomas G. Watrous, Sr. ("Watrous") was a Peregrine director

11  who served on the Audit Committee during the relevant period.  Watrous resides in Atwood,

12  California.

13       41.   Defendant Charles E. Noell ("Noell") was a Peregrine director who served

14  on the Audit Committee during the relevant period.  Noell resides in San Diego, California.

15       42.   Defendant William D. Savoy ("Savoy") was a Peregrine director who

16  *served on the Audit Committee during the relevant period.  Savoy resides in Bellevue,*

17  Washington.

18       **3.**   **Auditor Defendants** (Andersen, AWSC, Andersen Germany, Stulac)

19       43.   In a related case filed in this Court, Peregrine Systems, Inc. v. Arthur

20  Andersen, LLP, et al., Case No. GIC 796594,  Peregrine has identified Defendant Arthur

21  Andersen LLP ("Andersen"), AWSC Société Coopérative, en liquidation ("AWSC"), and Arthur

22  Andersen Germany ("Andersen Germany") as Peregrine's accountants from 1997 until April

23  2002.  *Andersen is headquartered in Chicago, Illinois.  Upon information and belief, AWSC is*

24  *also headquartered in Chicago, Illinois.*  Andersen Germany is currently owned by Ernst and

25  Young and was previously headquartered in Eschborn, Germany.  The formal name of Andersen

26  Germany is Ernst & Young Revisions–und Treuhandgesellschaft mbH,

27  Wirtschaftsprüfungsgesellschaft Steuerberatungsgesellschaft (HRB 10482).

28

44.     Defendant Daniel Stulac ("Stulac") was the Andersen audit engagement partner in charge of Peregrine's account during the relevant time. Stulac was responsible for Andersen's audit of Peregrine's financial statements for Fiscal Year 2001. (Peregrine's year began on April 1 and ended March 31. Thus, FY 2001 began April 1, 2000 and ended March 31, 2001.)

### 4.     Customer Defendants (KPMG, BearingPoint, Critical Path, Insight, BT, Bull, Bindview)

45.     Defendant KPMG LLP has been substituted herein as Doe Defendant No. 1. KPMG colluded with the Peregrine Officer and Director Defendants ("Peregrine Defendants") to fraudulently omit and misrepresent information concerning Peregrine's true financial condition. KPMG is headquartered at Three Chestnut Ridge Road, Montvale, NJ 07645, and is incorporated in the State of Delaware. KPMG maintains at least twelve offices in California, including one office in San Diego, does extensive business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing, sale, and distribution of services in California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

46.     Defendant BearingPoint, formerly known as KPMG Consulting, has been substituted herein as Doe Defendant No. 2. BearingPoint colluded with the Peregrine Defendants to fraudulently misrepresent Peregrine's true financial condition. BearingPoint is headquartered at 1676 International Drive, McLean, VA 22102, and is incorporated in the State of Delaware. BearingPoint maintains at least six offices in California, including two offices in San Diego, does extensive business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing, sale, and distribution of services in California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

47.     Defendant Critical Path has been substituted herein as Doe Defendant No. 3. Critical Path colluded with the Peregrine Defendants to fraudulently misrepresent

1   Peregrine's true financial condition.  Critical Path is headquartered at 320 First Street, San

2   Francisco, CA 94105, and is incorporated in the State of California.

3         48.    Defendant BT has been substituted herein as Doe Defendant No. 4.  BT

4   colluded with the Peregrine Defendants to fraudulently misrepresent Peregrine's true financial

5   condition.  BT is an English corporation headquartered in London, England, which is now a

6   wholly owned subsidiary of BT Group Investments Limited, which is itself wholly-owned by BT

7   Group, plc, a company listed on the New York and London stock exchanges.  BT, and its alter

8   egos and agents, including but not limited to BT Consulting, and BT Global Services (formerly

9   known as BT Ignite) purposefully engaged in activities directed at this State related to the

10  transactions described below, and do business continually in this State through their alter ego

11  and/or agent BT Americas, Inc., a Delaware corporation with headquarters in New York.

12        49.    Defendant Bull is substituted herein as Doe No. 7.  Headquartered in

13  Louneciennes (Paris), France, Bull does business in California through its agent and alter ego

14  Bull Data Systems, Inc., a Delaware corporation.  Bull participated directly in a fraudulent

15  transaction with Peregrine knowing that it would have effects within this State.

16        50.    Defendant Insight is substituted herein as Doe No. 8.  Formerly known as

17  Action Computer Supplies Holding, plc (UK), the company was acquired in December 2001 by

18  Insight.  Insight is a Delaware corporation headquartered in Tempe, Arizona.  It does business in

19  the State of California through its operations segments, Insight North America and Insight U.K.

20        51.    Defendant Bindview is substituted herein as Doe No. 9.  Bindview is a

21  Texas corporation headquartered in Houston, Texas.  Bindview took part in the transaction

22  referred to in this Complaint knowing and intending it would have effects in California.

23       **5.**    **Doe Defendants**

24        52.    Plaintiffs do not know the true names and capacities of Does 10 through

25  100, inclusive, whether individual, corporate, association, or otherwise, and, therefore, sues said

26  defendants, and each of them, by such fictitious names.  Plaintiffs will amend this Complaint to

27  show their true names and capacities when they have been ascertained.  Plaintiffs are informed

28  and believe, and on the basis of that information and belief allege, that each of these defendants

324631.3

- 12 -

1    was in some manner legally responsible for the events, happenings, injuries, and damages alleged

2    in this Complaint.

3    III.    **JURISDICTION AND VENUE**

4            53.    This Court has jurisdiction over all causes of action asserted in Plaintiffs'

5    original Complaint and this Third Amended Complaint pursuant to the California Constitution,

6    Article VI, § 10.  The claims asserted herein arise under Cal. Corp. Code §§ 25400 et seq. and

7    25500 et seq.; and common law.

8            54.    Venue is proper in the Superior Court for the County of San Diego because

9    one or more defendants reside in San Diego County.

10            55.    The amount in controversy exceeds the jurisdictional minimum of the

11    Superior Court.

12            56.    This action is not preempted by the Federal Securities Litigation Uniform

13    Standards Act of 1998, 15 U.S.C. § 78bb(f) ("SLUSA"), because this Complaint asserts state law

14    claims and is not a class action, an action brought by a representative party, or an action that

15    seeks damages on behalf of more than fifty persons.

16    IV.    **FACTS RELATED TO THE REMEDY MERGER**

17            57.    Peregrine aggressively pursued Remedy for almost two years, beginning its

18    overtures in late 1999.  Nothing came of these early discussions.  In February 2001, Peregrine

19    representatives made new overtures to Remedy and made a specific offer to acquire all

20    outstanding Remedy shares, which Remedy rejected.

21            58.    Shortly after Remedy rejected Peregrine's offer, Peregrine purchased

22    295,000 shares of Remedy on the open market without consulting Remedy.  Peregrine then made

23    another offer to Remedy, which Remedy again rejected.

24            59.    On May 24, 2001, Peregrine made its final offer.  After a meeting of

25    Remedy's Board of Directors on May 30, 2001, that offer, set forth in paragraph 6, was accepted.

26    Each company commenced due diligence soon thereafter.

27            60.    The merger agreement required Remedy to prepare and file with the SEC a

28    Proxy Statement/Prospectus for solicitation of proxies from its shareholders for consent to the

1   merger and their acquisition of approximately 28.3 million shares of Peregrine common stock and

2   approximately $278 million in cash in exchange for approximately 30.9 million shares of

3   Remedy's common stock. The merger agreement also required Peregrine to prepare and file with

4   the SEC an S-4 Registration Statement for the Offer and Sale of Peregrine common stock

5   ("Registration Statement"). The merger agreement further required that the Registration

6   Statement contain the Proxy Statement/Prospectus. The merger agreement warranted prior SEC

7   filings and all statements contained in the Registration Statement.

8          61.   The Registration Statement was filed and distributed on July 23, 2001. It

9   urged shareholders to vote in favor of the Peregrine/Remedy merger. The Proxy

10   Statement/Prospectus expressly incorporated Peregrine's FY01 10-K by reference.

11          62.   In approving the merger, Remedy's Board of Directors considered factors

12   such as "historical information concerning Peregrine's and Remedy's respective businesses,

13   prospects, financial performance and condition[;] the market value of Peregrine common stock

14   and various factors that might affect that value in the future[; and] detailed financial analysis and

15   pro forma and other information presented to the board." As Remedy, its Directors, and

16   shareholders later learned, the historical and financial information was rife with false and

17   misleading statements that vastly inflated Peregrine's revenue and the value of its stock.

18   ## V.   FACTS RELATED TO THE FRAUD

19          63.   For the 17 quarters prior to the Remedy merger, from April 1997 through

20   the quarter ended June 2001, Peregrine reported continuous growth, always meeting or exceeding

21   the expectations of securities analysts. Quarter after quarter, defendants engaged in persistent

22   efforts to create the appearance that Peregrine was meeting its announced revenue goals and

23   analysts' expectations, information material to the stock's performance on the efficient NASDAQ

24   exchange.

25          64.   An important feature of the Company's business plan was to achieve

26   growth through acquisitions and strategic alliances, a fact known to all defendants in this action.

27   The rise in the price of Peregrine stock that accompanied its assertedly "record" performance

28   each quarter allowed the Company to pursue acquisitions using its stock as consideration in the

1    transactions. Meeting its revenue projections — or, at least announcing that it had done so —

2    was thus a key building block in Peregrine's growth strategy.

3         65.    Software license fees accounted for the bulk of Peregrine's revenue.

4    Software sales are known to provide opportunities to inflate revenues through improper revenue

5    recognition and to thereby perpetrate financial statement fraud. Fully aware of this fact,

6    Peregrine executives and the Company's Board made a decision in April 1999 that materially

7    affected the truth of its public statements regarding its performance from at least that point

8    forward. At that meeting, the Board authorized the Company to recognize revenue based on

9    "sell-in" rather than "sell-through." Both terms refer to transactions with "resellers" or "channel

10   partners" as distinct from direct sales by Peregrine's own sales force. "Sell-in" refers to sales to

11   the channel partner with no confirmed end user. "Sell-through" refers to sales by channel

12   partners to end-users.

13        66.    Because of the opportunities for improper and fraudulent accounting,

14   Peregrine's Board was advised at the April 1999 meeting that revenue recognition based on "sell-

15   in" is not preferred and made the auditors uncomfortable. The weakness of recognizing revenue

16   on sell-in is that payment to Peregrine was contingent upon the reseller perfecting a sale to an end

17   user; no sale to an end user, no revenue. Thus, by recognizing revenue upon sell-in, Peregrine

18   was counting as certain revenue that was merely contingent. The Board nevertheless authorized

19   the Company to recognize revenue based on sell-in because that was the only way Peregrine

20   could meet its revenue projections for the previous quarter.

21        67.    A limited amount of revenue recognition on sell-in is permitted under

22   GAAP, but certain rules must be followed to ensure that the revenue is substantially certain to

23   follow. Peregrine permitted excessive amounts of revenue to be recognized on sell-in, and did so

24   without following the rules. Most of the sell-in revenue Peregrine recognized never materialized

25   and much of the revenue that did eventually materialize should have been recorded in quarters

26   other than those for which it was reported.

27        68.    In the 10-K and 10-Q statements Peregrine filed with the SEC for the

28   "Affected Period" (Fiscal Years 2000, 2001, and the first three quarters of 2002), Peregrine

1   represented that it recognized revenue in accordance with GAAP. Those representations were

2   false. The true facts were that Peregrine recognized revenue immediately upon sell-in, even

3   though one or more of the requirements of GAAP were not met, including the following: (1) the

4   fee owed to Peregrine was not fixed and determinable; (2) collectability of the fee was not

5   probable; or (3) the resellers' obligation to pay for the product was contingent upon subsequent

6   sale of the product to an end user. Moreover, Peregrine entered into side agreements with

7   resellers releasing them from their obligation to pay as well as offering discounts, kickbacks, and

8   other forms of inducement to entice resellers to "purchase" license agreements, even though no

9   actual purchase occurred. The sole purpose of these deceptive actions was to allow Peregrine to

10  off-load product, even if only temporarily, so it could report revenue consistent with what it had

11  told analysts to expect.

12          69.     Peregrine used several instruments of deception to inflate its revenues,

13  including, but not limited to:

14          a.      Side agreements: Peregrine and a complicit customer would

15  document a transaction showing a non-contingent sale to the customer. Peregrine and the

16  customer would then enter into an additional oral or written agreement releasing the customer

17  from its obligation to pay Peregrine unless and until it sold through to an end-user, thus rendering

18  the transaction contingent;

19          b.      Swaps: A swap occurred when a complicit customer would agree

20  to exchange some of its product or services for Peregrine product. Each party would document

21  the transaction as if it were a legitimate sale, disguising the fact that there was a reciprocal

22  transaction that cancelled out any gain. The swaps were engaged in purely for the purpose of

23  allowing the participating parties to book revenue. Among defendants, these phony transactions

24  were referred to as "Barney deals" – a reference to the refrain sung by the popular purple

25  dinosaur, "I love you, you love me, we're a happy family . . ."

26          c.      Parking: Parking occurred when Peregrine staged a fake "sale" to

27  a third party, with the understanding that the transaction would be undone after the quarter ended

28  and the revenue had been recorded;

1            d.     Calendar manipulation:  Peregrine would hold the quarters open,

2    sometimes as much as seven days longer than the true close of the quarter, to allow the Company

3    to count revenue generated during the extended period in the previous quarter;  and

4            e.     Manipulation of accounts receivable:  Among the forms this took

5    was counting as income loans received from banks in anticipation of payment of receivables.  At

6    the same time, the Company would remove the receivables from its balance sheet, giving the

7    impression that customers were paying on time, or sooner than was true.  Peregrine even prepared

8    false invoices and obtained funds from banks for transactions that had not closed.  Another

9    purpose of this manipulation of receivables was to manufacture a false number for the Company's

10   Days Sales Outstanding ("DSO").  DSO measures the time between sale and payment and is

11   considered a key indicator of a company's health.

12   ## VI.    THE FALSE STATEMENTS

13           70.     Following the Board's decision blessing sell-in as a basis for calculating

14   revenue, the Company issued a long series of false public statements including press releases,

15   financial statements, quarterly reports, earnings releases, and SEC filings.  These false statements

16   were material in that they were calculated to improve, and did improve, Peregrine's stock price by

17   causing investors to buy Peregrine stock.

18           71.     Each of the statements which are set forth in paragraphs 72 and 79

19   contained misrepresentations and/or omissions of at least the following adverse facts:

20           a.     Peregrine had improperly booked revenues from resellers that did

21   not comply with GAAP, thereby inflating the Company's revenues;

22           b.     Peregrine failed to disclose that it was forced to write off revenues

23   it had booked on transactions with resellers in previous quarters;

24           c.     Peregrine failed to disclose that it was engaging in swaps and that it

25   was parking product with complicit third parties, booking revenue that it knew it never would

26   receive;

27           d.     Peregrine failed to accurately record revenues and/or write down

28   impaired or adjusted asset values on a timely basis in accordance with GAAP; and

e.    Peregrine failed to disclose that it had prematurely recognized a portion of $100 million in revenues from the sale of software to MSPs (Managed Service Providers).

72.    These misrepresentations and omissions rendered at least the following public statements and filings false and misleading.  In every case, the true facts were that the revenues were substantially less than reported and the statements about the level of increased growth were known by defendants to be blatantly false:

a.    On April 26, 1999 the Company announced its revenues for the quarter ended March 31, 1999.  The Company falsely reported that it had met expectations with revenues of $46.1 Million, which it reported as an increase of 129% over the previous year's comparable quarter.

b.    On July 21, 1999, Peregrine issued a release that falsely announced "record" financial results for the first quarter ("Q1") of FY00 (the period ending June 30, 1999), including a 137% increase in revenue for the quarter to $51.6 million.

c.    On August 13, 1999, Peregrine filed its Q1 FY00 10-Q with the SEC, which incorporated the false financial statements contained in the July 21, 1999 press release.

d.    On October 20, 1999, Peregrine issued a release that falsely announced "record" financial results for Q2 and first half of FY00 (the period ending September 30, 1999), with a 95% increase in revenues over the comparable quarter from the previous year and a purported 113% increase over the comparable prior year total revenues.  The release followed Gardner's report to the Board that the level of channel activity was a problem and that direct sales were declining, neither of which were mentioned in the release.  Instead, Peregrine added to the release glowing statements regarding the "rapid growth" and future potential of the Company.

e.    On November 15, 1999, Peregrine filed its second quarter ("Q2") FY00 10-Q with the SEC, which incorporated the financial statements contained in the October 20, 1999 press release.

1              f.      On January 20, 2000, Peregrine issued a release that announced, yet

2  again, purported "record" financial results for Q3 and the first three quarters of FY00 (the period

3  ending December 31, 1999), including a 67% increase in revenues for the quarter and a 92%

4  increase for the nine-month period over the previous year's comparable period.  Peregrine capped

5  the release with more glowing comments about the "future prospects" for Peregrine.  These

6  statements were issued to the public notwithstanding that Gardner had told the Board just days

7  before that the Company's "bread and butter business" had gone "to hell," the productivity of the

8  direct sales force was at a "ridiculously low level," and the level of channel stuffing was a cause

9  for concern.

10             g.     On February 11, 2000, Peregrine filed its third quarter ("Q3") FY00

11  10-Q with the SEC, which incorporated the false financial statements contained in the January 20,

12  2000 press release.

13             h.     On April 26, 2000, Peregrine issued a release that announced more

14  purported "record" financial results for the fourth quarter ("Q4") of FY00 (the period ending

15  March 31, 2000), as well as for FY00.  This time, Peregrine claimed a 66% increase and an 83%

16  increase in revenues over the comparable prior year periods.

17             i.      On May 10, 2000, Peregrine filed its FY00 10-K with the SEC,

18  which incorporated the financial statements contained in the April 26, 2000 press release.

19             j.      On July 19, 2000, Peregrine issued a press release that falsely

20  announced more "record" financial results for Q1 of FY01 (the period ending June 30, 2000),

21  which stated, in part, that revenue had increased 83% over the prior year's first quarter.  Peregrine

22  projected a rosy future, notwithstanding that the Board had just been told that: the Company's

23  bread and butter deals had plummeted and were "off the radar screen," it would be difficult to

24  reach the goals set for the second quarter, the Company was short on cash, and that the state of

25  the Company was such that it could not do a public offering as it had hoped.

26             k.     On August 14, 2000, the Company filed its Q1 FY01 10-Q with the

27  SEC for the period ended June 30, 2000, reporting the same false results as reported in the

28  July 19, 2000 press release.

1      l.      On October 3, 2000, Defendants issued a press release that falsely

2      informed investors and analysts that Peregrine purportedly was on track to meet "or exceed"

3      previous Company-sponsored guidance for Q2 of FY01 (the period ending September 30, 2000).

4              m.      On October 24, 2000, Defendants issued a press release confirming

5      the October 3, 2000 release and falsely announcing "record" results for Q2 FY01, with revenues

6      of $142.7 million and net income of $0.12 per share. The release touted a 147% increase in

7      revenues over the prior year's comparable quarter. The Company issued this release

8      notwithstanding that Gardner had advised the Board that the numbers were camouflage, stating

9      that the Company had to "borrow from the future to make the present," that the quarter had been

10     "saved" by the huge but substanceless deals to resellers, that the productivity of the Company's

11     direct sales force was low, and that the Company lacked the cash that it needed.

12             n.      On November 14, 2000, the Company filed its Q2 FY01 10-Q with

13     the SEC for the period ended September 30, 2000, reporting essentially the same false results as

14     reported in the October 3 and 24, 2000 press releases.

15             o.      On January 24, 2001, Defendants issued a release that again

16     announced "record" results for Q3 FY01 (the period ending December 31, 2000), with revenues

17     of $156.6 million and net income of $0.15 per share. This time the Company claimed an increase

18     in revenues of 132%. Calling it a "very important quarter" for Peregrine, Gardener falsely told

19     the public that Peregrine again had exceeded its objectives, causing the price of Peregrine

20     common stock to jump. Prior to releasing the report, Gardner had told the Board that the

21     Company's direct sales in North America were "a disaster," that they were placing heavy reliance

22     on the channel, and that the company's sales force was not performing.

23             p.      On February 14, 2001, the Company filed its Q3 FY01 10-Q,

24     reporting the same false results as the January 24, 2001 earnings release.

25             q.      On April 4, 2001, after Gardner made a grim report to the Board

26     about the Company's status, Defendants issued a press release that falsely informed investors and

27     analysts that the Company was on track to meet previous Company-sponsored guidance for Q4

28     FY01 and FY01 (the period ending March 31, 2001). Commenting on these purported continued

1    "record" financial results, Gardner was quoted in the release with respect to Peregrine's "strong

2    profitable results" over sixteen "consecutive quarter[s]."  The report caused Peregrine's shares to

3    rally.

4                         r.       On April 26, 2001, Defendants issued a press release that confirmed

5    the April 4, 2001 release, purporting to announce "record" results for Q4 FY01 and FY01 (the

6    period ending March 31, 2001).  The Company reported the increase for the quarter at 124% and

7    for the fiscal year at 123%.  Gardner's accompanying statement attributed the strong performance

8    to the value of their product, rather than to channel stuffing and accounting manipulation, which

9    were the true causes of the purported revenue increase.  As a result, the price of Peregrine shares

10   continued to climb.

11                        s.       On June 29, 2001, Peregrine filed its FY01 10-K with the SEC,

12   which incorporated the financial statements contained in the May 25, 2001 press release as well

13   as the press releases and 10-Qs for the preceding three quarters.  Once again, Peregrine

14   proclaimed impressive revenue increases.  But the restatement, which shows the true facts,

15   showed that Peregrine's revenues had decreased, not increased, and were less than half of what

16   was reported.

17                        t.       On July 24, 2001, Peregrine issued a press release announcing its

18   financial results for Q1 of FY02.  As usual, Peregrine reported impressive increases in revenue

19   for the quarter (82%) despite its knowledge that much of the purported revenue resulted from

20   manipulation and improprieties.  That knowledge did not stop Gardner from telling the public that

21   the Company's continued growth resulted from their "ability to deliver on [our] objectives."

22                        u.       On August 14, 2001, Peregrine filed its Q1 FY02 10-Q with the

23   SEC, incorporating the false financial statements that were included with the July 24, 2001 press

24   release.

25               73.      The false information contained in the above filings, reports, and releases

26   was provided in connection with the Remedy merger discussions.  In addition, the Registration

27   Statement filed on July 2, 2001 regarding the Peregrine and Remedy merger represented that none

28   of the reports filed by the Company with the SEC since 1997 contained any false statements or

THIRD AMENDED COMPLAINT

1  omissions, that the financial statements incorporated in those reports complied with GAAP, and

2  that the information provided "fairly present[ed] in all material respects the consolidated financial

3  condition" of Peregrine. Each of these representations was false.

4          74.    After the Remedy merger, Peregrine continued to issue false statements

5  that masked the true state of the Company, causing plaintiffs to hold on to their Peregrine stock,

6  and, in some cases, to purchase additional stock:

7          a.    On October 3, the Company issued a press release proclaiming its

8  "strength" notwithstanding the events of September 11, 2001. On October 24, Peregrine issued

9  another press release proclaiming, once again, "record results," including a 23% increase in

10  revenue over the comparable quarter of FY 2001. These results were even more remarkable

11  given the depressed global economy in reaction to the recent historical events. This public

12  statement contrasted sharply with Gardner's report to the Board just days earlier, on October 15,

13  2001, wherein he advised that Peregrine was already in jeopardy of not meeting the targets it had

14  announced to analysts less than two weeks before. Gardner recommended, for the first time ever,

15  that employees be required to contribute to benefit plans in order to assist the Company in

16  meeting its earnings per share target for the quarter. He reported again that the Company's cash

17  situation was tight and suggested that the Company might need to raise additional capital, thus

18  creating even more motivation to artificially inflate the stock price. None of this was disclosed to

19  the public.

20          b.    Also, on October 24, Gardner held a conference call with investors

21  and analysts. In that call, Peregrine falsely reported that Peregrine was on track to meet

22  expectations and that its key economic indicators were sound. Based on those representations,

23  the analysts issued "buy" recommendations for Peregrine stock.

24          c.    On November 21, 2001, Peregrine filed its 10-Q for Q2 02. The

25  10-Q falsely stated that Peregrine complied with GAAP with respect to recording revenue on

26  license agreements. It failed to mention any of the other material adverse facts, such as the

27  change in its accounting policy to revenue recognition on sell-in, the understatement of its

28

324631.3

- 22 -

145

EXHIBIT 13

1 | accounts receivables, the overstatement of its cash balances, and the understatement of its

2 | liabilities and DSO.

3 |        d.     On January 2, 2002, Peregrine issued a press release regarding

4 | preliminary results for Q3 02. On January 3, 2002, Peregrine management held its call with

5 | investors and analysts. These public statements caused analysts to again issue a "buy" rating for

6 | Peregrine stock, notwithstanding that Gardner had reported to the Board on December 31, 2001

7 | that the Company would miss its targets "by a wide margin." Alluding to improper revenue

8 | recognition, Gardner referred to $50 million in expected revenue on license sales that was not

9 | "qualified or forecastable," identifying the EMEA division (Europe, Middle East, and Asia) as a

10 | major source of problems. None of this information was made known to investors or analysts.

11 |        e.     Gardner reiterated these problems in his report to the Board in the

12 | first half of January 2002. The situation was so dire that Gardner previewed in his report a

13 | *discussion he intended to have with the Board about a "poison pill" for the Company, now that it*

14 | had become weak enough to be a takeover target. He also suggested the need for significant

15 | structural changes. In the press release and analyst/investor call that followed on January 24,

16 | Gardner admitted to "disappointment" but attributed it to "global economic weakness." Omitted

17 | from the public statements were all the internal problems that Gardner had been reporting to the

18 | Board, including problems with revenue recognition and the accompanying widespread violations

19 | of GAAP.

20 |        f.     On February 14, 2002, Peregrine filed its 10-Q for Q3 2002. It

21 | incorporated the false financial statements that characterized the January 24 press release. The

22 | statements were materially false and misleading because Peregrine's reported revenue was

23 | significantly overstated, there was no disclosure of its sell-in revenue recognition policy, it had

24 | understated its receivables, liabilities, and DSO, and had overstated its cash position.

25 |      75.     On February 23, 2002, Gardner reported to the Board that Peregrine had

26 | been engaged in implementing a workforce reduction to help cut costs. He also updated the

27 | Board on merger discussions with BMC Software, thus necessitating that adverse facts continue

28 | to be kept quiet so as not to undermine the possibility of a successful merger.

1    76.    On March 23, 2002, Gardner again raised the spectre of a merger with

2  BMC Software as the mechanism to rescue Peregrine from its dire straits.

3    77.    On April 4, 2002, Gardner reported on the status of negotiations with BMC

4  Software. He offered his strong support for the merger which he indicated might be necessary for

5  the Company "even to survive."

6    78.    The truth regarding Peregrine's financial status first began to emerge in

7  April, 2002, when Peregrine issued a press release advising that it was replacing Andersen with

8  KPMG, although attributing the decision to Andersen's Enron troubles. On April 30, Peregrine

9  announced that its financial results for the fourth quarter and year-end for 2002 would be delayed

10  pending further analysis by KPMG. On May 6, Peregrine announced the "discovery" of

11  "accounting irregularities," an internal accounting investigation, and the resignations of Gardner

12  and Gless. It was not long before KPMG began to identify Peregrine's fraudulent activities that

13  form the basis of this lawsuit.

14    79.    On August 30, 2002 NASDAQ delisted Peregrine.

15    80.    On September 22, 2002, Peregrine filed for bankruptcy protection.

16    81.    On February 28, 2003, Peregrine filed with the SEC its restatement of its

17  financial statements for fiscal years 2000, 2001, and the first three quarters of fiscal year 2002.

18  For the two complete fiscal years prior to the Remedy merger the restatement revealed, *inter*

19  *alia,* the following material false representations related to Peregrine:

|         | Reported Revenue | Truth | Difference |
|---------|---|---|---|
| FY 2000 | $253,300,000 | $131,632,000 | ($121,668,000) |
| FY 2001 | $564,683,000 | $213,353,000 | ($351,330,000) |

|         | Reported Net Loss | Truth | Difference |
|---------|---|---|---|
| FY 2000 | ($25,070,000) | ($217,418,000) | ($192,348,000) |
| FY 2001 | ($852,241,000) | ($1,844,517,000) | ($992,276,000) |

| | Reported Net Loss Per Share | Truth | Difference |
|---|---|---|---|
| FY 2000 | ($0.24) | ($2.12) | ($1.88) |
| FY 2001 | ($6.16) | ($13.32) | ($7.16) |

## VII.   ROLE OF THE AUDIT COMMITTEE

82.     The Audit Committee for Peregrine was meant to be a robust committee with significant responsibility for financial controls and accounting oversight. During the time in question, members of the Audit Committee had access and exposure to significant troubling information regarding Peregrine's practices and true financial status. Defendants Watrous, Noell, and Savoy served on Peregrine's Audit Committee during the relevant time. In addition, Defendants Moores and Nelson, although not members of the Committee, attended Audit Committee meetings and implicated themselves in Audit Committee functions.

83.     The Audit Committee had responsibility for oversight of the accounting and reporting activities of Peregrine. By April 2000, Peregrine's Board of Directors had adopted a written Charter to govern its Audit Committee. The Charter required the Audit Committee to be closely involved in the Company's financial reporting and controls. Its list of duties was extensive, including, but not limited to, the following:

(1)     Reviewing on a continuing basis the Company's system of internal controls;

(2)     Reviewing the independent auditors' proposed audit scope and approach;

(3)     Reviewing and providing guidance with respect to the external audit and the Company's relationship with its external auditors by (i) selecting, and evaluating the performance of the independent auditors; (ii) reviewing the independent auditors' fee arrangements, proposed audit scope and approach; (iii) obtaining a statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the board, and to the extent there are relationships, monitoring and investigating them; (iv) reviewing the independent auditors' peer review conducted every three years; and (v) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, and significant new accounting policies;

THIRD AMENDED COMPLAINT

| | | |
|---|---|---|
| 1 | (4) | Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors; |
| 2 | | |
| 3 | (5) | Reviewing before release, and recommending to the Board of Directors for inclusion in the Company's annual report on Form 10-K, the audited financial statements and management's Discussion and Analysis of Financial Condition and Results of Operations; |
| 4 | | |
| 5 | | |
| 6 | (6) | Ensuring that the Company's independent auditors review the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews; |
| 7 | | |
| 8 | | |
| 9 | (7) | Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release; |
| 10 | (8) | Overseeing compliance with the requirements of the Securities and Exchange Commission for disclosure of auditor's services and audit committee members and activities; |
| 11 | | |
| 12 | (9) | Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act; |
| 13 | | |
| 14 | (10) | Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements; |
| 15 | | |
| 16 | (11) | Providing oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and short-term investments; |
| 17 | | |
| 18 | | |
| 19 | (12) | Reviewing the Company's compliance with employee benefit plans; |
| 20 | (13) | Overseeing and reviewing the Company's policies regarding information technology and management information systems; |
| 21 | | |
| 22 | (14) | If necessary, instituting special investigations and, if appropriate, hiring special counsel or experts to assist; |
| 23 | (15) | Reviewing related party transactions for potential conflicts of interest; |
| 24 | | |
| 25 | (16) | Reviewing its own structure, processes and membership requirements; |
| 26 | (17) | Providing a report in the Company's proxy statement in accordance with the requirements of Item 306 of Regulation S-K and Item 7(e) (3) of Schedule 14A; and |
| 27 | | |
| 28 | (18) | Performing other oversight functions as requested by the full Board |

324631.3

- 26 -

149
**EXHIBIT 13**

of Directors.

84.     The Charter also provided that the Audit Committee was required to meet at least three (3) times a year and maintain written minutes of its meetings. Notwithstanding the oversight duties imposed upon it, the Audit Committee permitted Peregrine to operate without adequate internal accounting controls.

## VIII.   OFFICER DEFENDANTS' PARTICIPATION IN THE FRAUD

### A.     Gardner

*Gardner's sales of Peregrine stock while in possession of material undisclosed adverse information: approx. 500,000 shares; gross proceeds: over $16.5M.*

85.     As the CEO of the Company during the time in question, Gardner is liable for its false statements, according to California Corporations Code § 25504 (". . . every principal executive officer . . . [is] also jointly and severally liable . . .") unless he can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the fraud.

86.     By virtue of his position and stock holdings, Gardner was a control person who exercised day-to-day control over the Company. Gardner had the power to influence and control, and did influence and control the Company's day-to-day decision making and management, including the content and dissemination of false statements. Among the activities that Gardner engaged in during the Affected Period that demonstrated his control, knowledge of, and participation in the fraud are:

a.     Helping to formulate, present to the Board of Directors, and continually authorize fraudulent accounting practices, such as the policy of recognizing revenue on sell-in. Gardner knew throughout at least the Affected Period that Peregrine was recognizing revenue on scores of transactions upon sell-in, under circumstances that did not comply with GAAP;

b.     Creating and communicating to analysts, investors, and the SEC, the false reports, releases, and statements set forth above in Paragraphs 71 - 74;

- 27 -

THIRD AMENDED COMPLAINT

1         c.     Participating in the creation and preparation of Registration

2  Statements, including the Registration Statement for the Remedy merger, which contained false

3  statements about the Company's financial health and accounting practices, as set forth in

4  Paragraphs 71 - 74;

5         d.     Directing and participating actively in the Company's sales efforts,

6  including setting targets, pressuring sales agents to close deals at quarter end with side

7  agreements and other contingent deals, working on negotiating and closing large deals, presiding

8  over sales meetings, and monitoring the progress of sales in the channel;

9         e.     Negotiating an unlawful barter with Critical Path in 2000 in which

10  both parties exchanged offsetting amounts of product in a deal documented by separate contracts,

11  neither of which mentioned the other, and authorizing the recognition of revenue from that deal,

12  even though neither side obtained any revenue;

13         f.     Authorizing other executives to obtain bank loans for receivables

14  and to treat the loan proceeds as revenue;

15         g.     Signing management representation letters during the course of

16  Andersen audits and reviews of financial statements representing there had been no fraud

17  affecting the accuracy of the Company's financial statements, on at least the following dates:

18  April 25, August 11, October 24, November 2, and December 13, 2000; January 23, April 26, and

19  October 23, 2001; and January 22 and April 10, 2002;

20         h.     Participating in discussions about numerous side letters affecting

21  very large transactions with other executives of the Company, including Gless and Nelson.

22         i.     Gardner attended two meetings of senior executives of the

23  Company, one in 2000 and one in early 2001 where the issue of improper revenue recognition

24  was discussed and a  suggestion was made to get rid of all the receivables and "take the hit."

25  Gardner refused.

26        87.     Gardner knew in each instance that these statements were false, or acted

27  with reckless disregard of their falsity, as demonstrated by his participation in the sales and

28

1   accounting activities that led to the false financial reports, as well as his presentations to the

2   Board preceding their quarterly release, some of which are set forth above in Paragraphs 71-174.

3          88.    At all times, Gardner intended to deceive plaintiffs into buying and holding

4   Peregrine stock as he benefited personally by his ability to sell stock at inflated prices, to acquire

5   Remedy using consideration worth substantially less than was represented, and by obtaining ever-

6   increasing performance-based bonuses.  The cash bonuses paid to Gardner as Peregrine falsely

7   reported "record" revenues increased almost ten-fold from $43,750 in 1999 to $400,000 in 2001.

8          89.    Gardner resigned from the Company after he was advised that he would be

9   terminated unless he agreed to an unprivileged interview as part of an investigation of the

10   Company's practices.  Gardner has since filed a motion to stay discovery against him, in this case,

11   asserting that his Fifth Amendment rights otherwise may be implicated "in light of the pending

12   criminal investigation."

13          90.    Other paragraphs referring specifically to Gardner by name include the

14   following: 1, 2, 35, 71, 74 – 78, 93, 101, 102, 110, 116, 117, 124, 125, 133, 141, 149, 186, 191,

15   192, 201, 203, 206, 207, 209, 214, 216, and 237.

16       **B.**    <u>**Gless**</u>

17   *Gless' sales of Peregrine stock while in possession of material undisclosed*
     *adverse information; 93,625; gross proceeds: $3.9 million.*
18

19          91.    In his plea agreement (referenced in Paragraph 36), Gless admits, among

20   other things, the following regarding his misstatements, knowledge, and intent:

21          a.    He conspired with others to use a variety of schemes, devices, and

22   artifices, to make false and misleading statements and omit material facts in their statements, and

23   to engage in acts, practices and courses of business which would operate as a fraud or deceit upon

24   a purchaser or seller of Peregrine's stock;

25          b.    He made and caused others to make materially false statements to

26   auditors, the SEC, and the investing public, and omitted and caused others to omit material facts

27   from statements to auditors, the SEC, and the investing public, intending to deceive these groups

28   regarding Peregrine's policies, transactions and financial condition;

THIRD AMENDED COMPLAINT        **152**

**EXHIBIT 13**

1            c.     He knowingly, willfully, and with an intent to defraud, created the

2    false impression that Peregrine was financially sound, to artificially increase the value of

3    Peregrine's stock, to induce the public to purchase and hold Peregrine's stock, to defraud

4    securities analysts and the public, and to enhance his reputation and enrich himself through

5    compensation, stock options, and other means.

6          92.    As the Executive Vice President, Chief Financial Officer, Chief

7    Accounting Officer, and member of the Board of Directors during the time in question, Gless is

8    liable for Peregrine's false statements by virtue of Corporations Code section 25504 (extending

9    joint and several liability to "every principal executive officer or director of a corporation so

10   liable") unless he can prove he had no knowledge of or reasonable grounds to believe in the facts

11   constituting the fraud.

12         93.    By virtue of his position and stock holdings, Gless was a control person

13   who exercised day-to-day control over the Company.  Gless had the power to influence and

14   control, and did influence and control the Company's decision making, including the content and

15   dissemination of false statements.  Among the activities that Gless engaged in that demonstrated

16   his control, knowledge of, and participation in the fraud include but are not limited to the

17   following, all of which occurred during the Affected Period:

18           a.     Gless participated in the day-to-day management of the Company,

19   actively consulting with and assisting CEO Gardner among others with decisions regarding the

20   Company's day-to-day operations, particularly with respect to sales, accounting, and preparation

21   and dissemination of the company's public financial information.  By reason of his key positions

22   in the Company, including as Chief Financial Officer, Chief Accounting Officer, and a member

23   of the Board of Directors, Gless used his power and influence to cause Peregrine to engage in the

24   unlawful conduct alleged herein.

25           b.     Gless was responsible for ensuring that the Company's financial

26   statements were accurate and complied with GAAP.  Instead, Gless actively participated in the

27   preparation and dissemination of the false financial information referred to in paragraphs 71 - 74,

28   above.  As a prominent member of the Company's accounting office, and its Chief Financial

EXHIBIT 13

1   Officer, as well as its Chief Accounting Officer, his signature on 10-Q and 10-K statements as

2   well as Registration Statements carried weight.  Among the official company documents that bear

3   his signed imprimatur are:  10-K statements for the years ended March 31, 1999; 2000, 2001;

4   10-Q's for the quarters ended:  June 30 and November 15, 1999; February 11, June 30, and

5   November 11, 2000; February 14, June 30, September 30, and December 31, 2001 and the

6   amendment to the 10-Q for December 31, 2001;

7              c.     Gless was a principal architect of the scheme to inflate reported

8   revenues.  He authorized sales personnel to engage in contingent transactions that did not comply

9   with GAAP and authorized the booking of revenue on those non-compliant transactions.  Some of

10   the improper transactions in which he was involved included booking revenue on potential deals

11   with KPN and Aranico, approving a transaction with Defendant BT, plc with an "out clause," to

12   allow Peregrine to book revenue at quarter's end, and booking revenue on quarter-end

13   transactions with extended payment terms to the KPMG Defendants (KPMG and BearingPoint),

14   even though the KPMG Defendants had a history of non-payment;

15              d.     He actively participated in sales meetings and monitored the

16   Company's exposure on contingent transactions, keeping Gardner informed of total exposure;

17              e.     He was responsible on an ongoing basis for reviewing and

18   approving software license agreements that departed from the norm, as well as those for large

19   transactions;

20              f.     He authorized the use of improper side agreements with resellers

21   allowing resellers to return product and releasing them from an obligation to pay;

22              g.     He instructed other company personnel to hide returned product and

23   bad debts in the accounting for acquisitions, rather than charging them against revenues.  In 2001

24   alone, he authorized concealment of $91.6 million of bad debts as acquisition costs, including

25   hiding $16.9 million in the Remedy acquisition;

26              h.     He actively participated in the unlawful swap transaction with

27   Critical Path, which led to a criminal conviction of Critical Path's CEO;

28

324631.3

THIRD AMENDED COMPLAINT

154

**EXHIBIT 13**

1                    i.     He instructed company employees to refrain from giving

2  confidential information to the head of investor relations so that she would not be in a position to

3  communicate the truth of Peregrine's financial condition and accounting practices to the investing

4  public;

5                    j.     He participated in decisions to falsify the Company's DSO number;

6                    k.     He directed other company personnel to recognize as revenue loan

7  funds received from banks based on receivables, at the same time removing those receivables

8  from the Company's balance sheet.  In instances when some of those receivables were in fact paid

9  by the customer, Gless then directed company personnel to count the payment as income again,

10  and again deducted the receivable from the balance sheet, engaging in a practice known as

11  "double dipping;"

12                    l.     He authorized another Peregrine employee, Ilse Cappel, to create

13  false invoices for non-existent receivables to present to banks in exchange for loan funds, which

14  he then added to Company revenue; Ms. Cappell has since pled guilty to crimes based on this

15  conduct.

16          94.     Gless knew in each instance that the statements referenced in paragraphs

17  71 - 74 were false, or acted with reckless disregard of their falsity, as demonstrated by his

18  participation in the sales and accounting activities that led to the false financial reports.

19          95.     At all times, Gless intended to deceive plaintiffs into buying and holding

20  Peregrine stock as he benefited personally from them by his ability to sell stock at inflated prices.

21          96.     Other paragraphs that mention Gless specifically by name include: 1, 2, 36,

22  78, 86, 101, 109, 110, 116, 117, 133, 149, 171, 172, 197, 198, 201, 203, 206, 207, 209, 211, 214,

23  217, and 237.

24

25

26

27

28

*THIRD AMENDED COMPLAINT*

**EXHIBIT 13**

C.    **Powanda**

*Powanda's sales of Peregrine stock while in possession of material undisclosed adverse information: 736,196 shares; gross proceeds: over $24 million.*

97.    Powanda had extensive experience in the software business and knew that revenue recognition practices were a key to perpetrating fraud. He thus knew or recklessly disregarded that the practices and transactions referred to herein were false and misleading.

98.    Powanda was hired by Peregrine on February 18, 1992 as Sales Manager with fifteen years of experience in the software business. Powanda's authority over Peregrine's sales continually increased in scope and by January 1998 he had been elevated to Executive Vice President, Worldwide Sales. In February 2001, he became a consultant to the company but continued to work on major accounts with a compensation plan providing him with substantial revenue. He also worked in the office of the Chairman until he left the Company in the Spring of 2002.

99.    During material times, Powanda was a senior executive of Peregrine and is thus liable for the fraud pursuant to California Corporations Code § 25504 ("Every . . . principal executive officer . . . every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, . . . [is] also liable jointly and severally . . .) unless he can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the fraud.

100.    By virtue of his executive status, direct participation and control over the improper transactions at the heart of the fraud, and his stock ownership, Powanda had the power to influence and control, and did influence and control the day-to-day decision-making and management of the Company, including the content of the various statements which plaintiffs contend are materially false and misleading. Powanda was provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements or cause the false statements to be corrected.

1 | Notwithstanding, he took no action whatsoever, but created the opportunities for false statements

2 | to be made and took no action to correct them.

3 |         101.    In addition, Powanda's status as a controlling person and as a person who

4 | materially aided in the fraud, is evident from at least the following facts:

5 |         a.    As early as 1998, Powanda was reporting directly to CEO Gardner.

6 | As the Company's leading salesman, Powanda participated in high level meetings with other top

7 | management to discuss strategy, operation, and management of the Company's campaign to meet

8 | revenue targets. On January 22, 2001, Powanda was appointed to the Operating Committee to

9 | help manage the company;

10 |         b.    Powanda had the power to pressure and did pressure the Peregrine

11 | sales force to enter into improper transactions at the end of the quarters in order to meet the

12 | earnings expectations. Powanda attended meetings in at least late 1998 and early 1999 with other

13 | company management to discuss and agree on the improper practice of revenue recognition at

14 | sell-in.

15 |         c.    Powanda exported the improper sell-in practices to Europe, which

16 | became heavily involved in booking fraudulent transactions;

17 |         d.    In June 1999, Powanda held a sales staff meeting where he

18 | discussed the concept of "Magic Quadrant Partners," that is, channel partners who would engage

19 | in fraudulent transactions for the purpose of revenue recognition, at quarter's end;

20 |         e.    When necessary, Powanda directed accounting staff to keep the

21 | quarter open for the purpose of meeting quarterly targets, booking revenue earned after the

22 | quarter as if it had been earned in the just previous quarter. For example, on October 2, 2001,

23 | Powanda engaged in an e-mail exchange with the Area Vice President for EMEA (Europe,

24 | Middle East, and Asia) regarding Powanda's help in closing deals so they could be counted in the

25 | quarter that already had ended on September 30;

26 |         f.    Powanda was a direct participant in and/or the primary participant

27 | on behalf of Peregrine in at least the following improper transactions which were entered into for

28 | the purpose of recognizing revenue and meeting revenue targets:  CI Software Solutions (Q4 00,

**EXHIBIT 13**

1   Q1-Q3 01), Corporate Software and Technology (Q4 00, Q2 01), BT (Q3 01), Action (Q3 01),

2   Systematics AG (Q4 01), Barnhill, IBM/Tivoli (Q3 01, Q4 01), and several transactions with the

3   KPMG Defendants (throughout 2000-2002).

4              g.     Powanda authorized his sales personnel to enter into improper side

5   agreements, knowing, through discussions with Gardner, Gless, and others, that revenue would be

6   recognized despite the side agreements;

7              h.     Powanda would travel to Europe at the end of quarters to "close"

8   deals so that revenue could be recognized even though the deals remained contingent;

9              i.     Powanda kept a drawer in his office, known as the "magic drawer,"

10  filled with phony contracts he used at quarter's end to book revenue.  An Area Vice President

11  who reported to Powanda said that Powanda had a secret fax machine in his office that was

12  backdated three days, to allow for deals closed after the quarter to be included in the just-closed

13  quarter.

14         102.    In addition to the allegations in the preceding paragraph showing

15  Powanda's control and material assistance in the fraud, the following facts show that he knew or

16  recklessly disregarded that Peregrine was engaged in cooking its books through channel stuffing

17  and contingent transactions:

18             a.     Powanda regularly reviewed reports tracking the Company's

19  "burn," that is, the rate at which inventory in the channel was actually sold to an end-user.  He

20  also closely monitored the progress of deals and the Company's progress toward meeting its

21  quarterly and annual revenue targets;

22             b.     Powanda attended a meeting in early 2001 with senior management

23  of the Company to discuss the issue of revenue recognition in the absence of bona fide deals.  At

24  that meeting, Vice President Joe Reichner proposed that the Company "clean up" its books and

25  start afresh.  Powanda was one of the most vocal opponents of Reichner's proposal;

26             c.     Powanda was present, along with Gardner, when defendant BT,

27  who had knowingly entered into a transaction with Peregrine to allow Peregrine to recognize

28  revenue, purported to eliminate the contingency (a cancellation right) in the contract in response

THIRD AMENDED COMPLAINT

1    to an audit confirmation request from Arthur Andersen; BT then confirmed to Arthur Andersen

2    that the deal was not contingent, even though it had been when the revenue was recognized.

3    These events are discussed in more detail in paragraphs 195-201.

4             103.    Powanda undertook these actions, perpetrated false statements, and failed

5    to disclose true facts with the specific intent to cause investors to buy and hold Peregrine stock,

6    motivated at least in part by his desire to sell his own stock at inflated prices and his pursuit of

7    compensation tied to revenue.

8             104.    Other paragraphs that mention Powanda specifically by name include the

9    following: 1, 37, 109, 201, 206, 214, 219, and 220.

10    **D.**    <u>Nelson</u>

11    *Nelson's sales of Peregrine stock while in possession of material undisclosed*

      *adverse information: 287,000 shares; gross proceeds: $8.8 million.*

12

13             105.    Nelson was a licensed CPA and an active member of the State Bar of

14    California. He had been employed by KPMG as an auditor. Nelson became Vice President and

15    General Counsel of Peregrine, through Moores, in 1995. Over the years, his authority,

16    responsibilities, and control continually increased. He became Secretary of the Corporation in

17    1997 and Vice President of Corporate Development in March, 2000, reporting directly to

18    Gardner. Thereafter, he became a Senior Vice President of the Company. When the accounting

19    fraud was first announced, it was Nelson who was installed as interim CEO.

20             106.    Despite his training, knowledge, and experience in the fields of both law

21    and accounting, Nelson not only did nothing to stop the fraud, he actively participated in it. He

22    was keenly aware of the improper transactions and revenue recognition therefrom as well as the

23    insider trading. During one particularly aggressive spate of insider trading in connection with the

24    acquisition of Harbinger, Nelson engaged in an e-mail exchange describing the insider trading

25    activity by Peregrine insiders as "hogs at the trough," but made no effort to stop the hogs or

26    expose their feeding frenzy.

27             107.    By virtue of his executive status, direct participation and control over the

28    improper transactions at the heart of the fraud, and his stock ownership, Nelson had the power to

1   influence and control and did influence and control the day-to-day decision-making and

2   management of the Company, including the content of the various statements which plaintiffs

3   contend are materially false and misleading.  Nelson was provided with or had unlimited access

4   to the Company's internal reports, press releases, public filings and other statements alleged by

5   plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

6   ability to prevent the issuance of the false statements or cause the false statements to be corrected.

7   Notwithstanding, he took no action whatsoever, but created the opportunities for false statements

8   to be made and took no action to correct them.

9          108.   By virtue of his various executive roles and as a member of senior

10   management of the Company, Nelson is liable under California Corporations Code § 25504

11   (". . . every principal executive officer . . ., every person occupying a similar status or performing

12   similar functions, . . . [is] also liable jointly and severally with and to the same extent as such

13   person, . . . ") unless he can prove that he had no knowledge of or reasonable grounds to believe

14   in the fraud.

15          109.   Other facts demonstrating Nelson's control over the Company during the

16   relevant time include at least the following:

17          a.   Nelson was responsible for corporate reporting and deal making,

18   including due diligence for Peregrine's many acquisitions, a key aspect of its growth strategy;

19          b.   In July, 2000, Nelson implemented the document and e-mail

20   destruction and shredding policy which mandated that Board materials could not be maintained

21   for more than one month.  Along with other key executives in the Company, including Gardner,

22   Gless, Powanda and virtual executive Moores, Nelson used the Company's state of the art

23   $100,000 e-mail shredding system, which allowed those individuals to e-mail each other without

24   concern that the content of their communications could be reviewed by others or reconstructed at

25   a later date;

26          c.   Nelson was responsible for keeping the Board minutes and

27   cleansing them of damaging information.  As a result, the minutes of Peregrine's Board meetings

28   exist largely in barebones form;

1     d.     Nelson participated in the executive effort at quarter's end to

2   pressure sales personnel to close deals to meet the Company's announced revenue targets;

3     e.     Nelson participated in the decision, made in late 1998, to start

4   booking revenue at sell-in regardless of contingencies;

5     f.     Nelson authorized Peregrine's sales personnel to enter into

6   transactions that did not obligate the reseller to pay until sell-through while recording revenue in

7   full to meet publicly announced revenue targets;

8     g.     Nelson regularly attended Audit Committee meetings as a

9   Company "representative," even though he was not a member of the Audit Committee.  He

10   attended meetings on at least the following dates:  July 1999; April, June, July, and October,

11   2001; and April 2002;

12     h.     As Corporate Secretary, Nelson prepared sanitized Board minutes

13   that did not accurately reflect the content of the meetings.  For example, although the improper

14   barter transaction with Critical Path was discussed at the July 18, 2001 meeting, the minutes

15   contain no mention of it;

16     i.     Nelson drafted and filed the Company's 10-K and 10-Q statements

17   and until October 2000 was also the principal drafter of the Company's false press releases

18   regarding quarterly results;

19     j.     Nelson was the compliance officer for the Company's insider

20   trading policy until March 2000;

21     k.     Nelson helped formulate the option pricing policy for the Company.

22     110.     Additional facts demonstrating Nelson's knowledge, or reckless disregard

23   of the fraud, include at least the following:

24     a.     Nelson knew of the SEC investigation and deposition of Gardner

25   and other Company employees related to the Critical Path transaction;

26     b.     In the fall of 2001, senior management of Peregrine, including

27   Nelson, were informed of numerous improper side letters and uncollectible accounts receivables

28   from channel deals by Vice Presidents in Europe and EMEA;

1            c.     Nelson received the reports to the Board chronicling the Company's

2 bleak financial picture, including at least the following: April and October 1999; January, July,

3 October, and December 2000; April, July, October, and December, 2001; and February and

4 March 2002. The content of these reports is set out in brief in paragraphs 71 and 74. In

5 conjunction with Nelson's other knowledge, these reports alone should have alerted Nelson to the

6 fact that the 10-K and 10-Q statements and press releases he prepared were false and misleading;

7            d.     Nelson received the Q2 02 Quarterly Review prepared for the Audit

8 Committee which identified six or seven transactions in which revenue was improperly

9 recognized;

10            e.     Nelson received a September 2001 e-mail from Gardner discussing

11 hiding unwarranted charges and expenses in the acquisition costs of the Remedy merger;

12            f.     Nelson, one of the architects of the Company's option pricing

13 policy, knew that Gardner dated option grants retroactively for the purpose of artificially

14 boosting reported earnings;

15            g.     Nelson was copied on a memo from Gless addressing the improper

16 revenue recognition related to a barter deal with CI Software Solutions. Nelson received an e-

17 mail in September 2001 from Gardner regarding improper revenue recognition in other improper

18 deals, including IDOM and MGX;

19            h.     In the spring of 2001, the Company Treasurer prepared and gave

20 Nelson a report regarding the Company's "sale" of receivables to banks to mask the problem the

21 Company was having with meeting its DSO expectations. The memo also addressed channel

22 stuffing and the existence of a massive amount of unpaid invoices;

23            i.     In the fall of 2001, Nelson received a copy of an e-mail from a

24 salesman based in Australia regarding sham transactions with resellers;

25            j.     In October 2001, Nelson met with Executive Vice President Andy

26 Cahill to discuss improper side letter transactions;

27

28

EXHIBIT 13

1            k.     In November 2001, an Assistant VP for the EMEA region,

2 forwarded Nelson a spreadsheet showing seven transactions for which revenue should not have

3 been recorded;

4            l.     In December of 2001, Nelson learned of an improper side letter

5 deal with Prokom Software, S.A.;

6            m.     In April 2002, Nelson learned of the improper deal with defendant

7 BT, plc that included a cancellation clause that made the deal illusory, which is discussed more

8 fully in paragraphs 195 - 201;

9          111.    Every action and inaction that Nelson took with respect to the fraud was

10 intended to defraud investors and cause them to buy and hold Peregrine stock.

11          112.    *Other paragraphs in which Nelson is specifically mentioned by name*

12 *include the following:* 1, 38, 82, 86, 105, 117, 149, 171, 214, and 218.

13 **IX.    DIRECTOR DEFENDANTS' PARTICIPATION IN THE FRAUD**

14     **A.    Moores**

15     *Moore's personal sales of Peregrine stock while in possession of material*
    *undisclosed adverse information: 10,930,051 shares; gross proceeds:*
16     *$401,640,096.08.*

17          113.    Moores played the single most influential role in the Company's

18 development, holding various roles as an executive, funder, director, and promoter of the

19 Company, maintaining at all times through its history since 1989 a special relationship with the

20 Company characterized by his close and constant involvement with and direction of the

21 Company's affairs. The Company's executive profile was to a large extent the result of Moores'

22 hand-picked choices consisting of his own close business associates, placed within the Company

23 to keep him apprised of its day-to-day operations so he could control them. Moores and his

24 affiliated entities sold more than $554 Million of Peregrine stock at prices he knew to be inflated,

25 thus rendering Moores the largest beneficiary of Peregrine's fraudulent practices. Because of his

26 important relationship to and positions with the Company during the time in question, Moores is

27 liable for its false statements as provided for by California Corporations Code § 25504 ("Every

28 person who directly or indirectly controls a person liable, . . . every principal executive officer or

1   director . . . every person occupying a similar status or performing similar functions, . . .[is] also

2   jointly and severally liable . . .") unless he can prove he had no knowledge or reasonable grounds

3   to believe in the facts constituting the fraud.

4           114.   As late as February 2001, just months before the Remedy merger, Moores

5   still owned 16.6% of Peregrine's stock, a higher percentage than was owned by all of the

6   Plaintiffs combined after the merger.

7           115.   Moores' influence over the Company began in 1989 when it was a

8   struggling young Company working on its first product.  Moores had extensive experience with

9   the development and sale of software products and thus was familiar both with the Company's

10  business and with the risk of fraud associated with improper or overly aggressive revenue

11  recognition policies.  He helped raise financing for the Company during its developmental stage

12  and by 1990 had become Chairman of the Board, a position which he held until July 2000, during

13  which time the Board approved the deceptive revenue recognition policy.  He stayed on the Board

14  through February 2003.

15          116.   During the relevant period, Moores carried on discussions with Noell

16  regarding strategies for inflating financial statements, which strategies would then be

17  implemented by Gardner, the former and now-deceased CFO David Farley, Gless, and Noell.

18  Noell spoke regularly to Moores regarding how Peregrine could make its target number and both

19  were deeply entrenched in the day-to-day decision making regarding this issue.

20          117.   Moores had the power to influence and control, and did influence and

21  control the Company's day-to-day decision making and management, including the content and

22  dissemination of false statements.  Among the activities that Moores engaged in that

23  demonstrated his control, knowledge of, and participation in the fraud are:

24          a.   Moores arranged for the Company to go public in 1997, at a time

25  when he and his business partners owned or had an interest in over 83% of the issued and

26  outstanding shares.  The prospectus identified Moores as a controlling person  At the time of the

27  IPO, business acquaintances, colleagues, and friends of Moores occupied most of the Board seats

28  as well as key executive and technical positions;

1       b.      Moores handpicked Gardner as the new CEO in 1998, a decision

2   that was ratified by the Board.  At the same time, an "Office of the Chairman" to assist Gardner

3   was established, and Moores was one of three members;

4       c.      A Peregrine PowerPoint presentation used to solicit business and

5   investors in 1999 showed Moores as a member of the senior management team of Peregrine;

6       d.      Moores was actively involved in securing financing for the

7   Company. In 1996, Moores personally guaranteed a line of credit and term loan for the Company

8   totaling $6 million. His company, JMI Equity Fund, L.P., of which he was Chair of the Board and

9   a limited partner, made working capital loans to the Company on an as needed basis;

10      e.      To help keep his hand in the Company's daily affairs, Moores

11  maintained an on-site presence through JMI's sublease of space from Peregrine at its facility

12  beginning in 1996 and through at least the summer of 2000, meeting on a regular basis with

13  Peregrine's top executives;

14      f.      He had a presence on key Board committees, including a

15  membership on the Compensation Committee (1999-2002) and representation through business

16  partners on the Audit Committee;

17      g.      Throughout the Company's history, Moores installed key operating

18  and executive personnel, including in accounting, finance, legal, corporate, technology, business

19  development, mergers & acquisitions, and customer service.  These individuals kept Moores

20  advised on operating and financial issues, allowing him to engage in hands-on management of the

21  Company.  Moores' influence was so pervasive that when the General Counsel, Nelson, decided

22  to leave the Company in 2001, Moores arranged for him instead to have a bigger role in the

23  Company, thus causing Nelson to stay.  Similarly, Moores arranged for his key confidant on the

24  Board (Taylor Barada) to be hired as Gardner's "Special Assistant," a position he held until

25  Gardner resigned;

26      h.      Moores had continuous contact with Gardner who was a frequent

27  passenger on Moore's private jet;

28

1              i.     Moores was so much an insider that when Gardner received a

2 lengthy e-mail in October 2001 detailing improper transactions and revenue recognition from an

3 Australian sales employee, advising that the Company was engaged in illegal "channel stuffing,"

4 Gardner forwarded it to Moores;

5              j.     Both CFOs, Farley and Gless, were close and long-time business

6 associates of Moores, holding positions in his other companies;

7              k.     Moores directed Gardner in the integration of Remedy after its

8 acquisition in 2001;

9              l.     It was Moores who stepped in and appointed General Counsel

10 Nelson as interim CEO in May 2002;

11             m.     In May 2002, after the announcement of the Critical Path

12 investigation, Moores convened and attended a special meeting of the Audit Committee of

13 Peregrine, even though he was not a member of the Committee;

14             n.     Moores signed group publications of the Company, including

15 10-K's (March 31, 2000, March 31, 2001) and Registration Statements and reviewed and

16 approved quarterly financial results for Fiscal Years 2000, 2001, and the first three quarters of

17 2002, which contained false statements regarding the Company's sales and accounting and

18 compliance with GAAP.  Moores knew these published materials contained false statements or

19 was reckless in not knowing.  He participated in making the Company's false statements and

20 failed to disclose true facts intending to cause others to buy and hold Peregrine stock;

21        118.     At all times, Moores intended to deceive Plaintiffs with false statements

22 regarding the financial status of the Company as he and his related partners had enormous

23 stockholdings in the Company and benefited from being able to sell their stock at inflated prices.

24        119.     Other paragraphs in which Moores is specifically mentioned by name

25 include the following:  1, 39, 82, 109, 129, 133, 159, 211, 214, 221, 222, and 264.

26

27

28

## B.    Watrous

*Watrous's sales of Peregrine stock while in possession of material undisclosed adverse information: 15,000 shares; gross proceeds: approx. $800,000.*

120.    Watrous was a Senior Partner of Andersen Consulting, a related company to Arthur Andersen. He served on the Board of Directors of Peregrine beginning in 1999 and on its Audit Committee beginning in April 2001. As such, he is liable for the false statements made by the Company pursuant to Corp. Code § 25504 ("Every . . . director of a corporation so liable" is jointly and severally liable for its fraud) unless he can prove he had no knowledge or reasonable grounds to believe in the existence of the facts constituting the fraud.

121.    By virtue of his Board membership and stock ownership, Watrous had the power to influence and control and did influence and control the day-to-day decision-making and management of the Company, including the content and dissemination of the various statements which plaintiffs contend are materially false and misleading. Watrous was provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements or cause the false statements to be corrected. Notwithstanding, he took no action whatsoever, but permitted these false statements to be disseminated and took no action to correct them.

122.    Watrous approved the sell-in method of accounting and revenue recognition at the April 1999 Board meeting.

123.    Watrous received and reviewed at least the following reports to the Board by Gardner: October 1998; April and October 15, 1999; January 8, July, and October 16, 2000; January, April 16, July, July 18, 2001; February 23, March 2, and March 22, 2002. As set forth in paragraphs 71 - 74, Watrous, along with other members of the Board, was advised through each of these reports of financial and/or accounting problems that the Company was experiencing. Despite being so advised, the Board, including Watrous, authorized and permitted the dissemination of false financial information about the Company in the quarterly and annual reports and Registration statements that followed these grim reports to the Board. Watrous and

1   his fellow Board members were thus advised of the true facts regarding the Company, but

2   authorized and did nothing to stop the dissemination of false information.

3        124.   Watrous was present at Board meetings when Gardner reported problems

4   to the Board on at least the following dates: October 1999; January, July, and October 2000;

5   January, April, July, October, and December 2001; and February, March, and April, 2002.

6   Notwithstanding the grim reports to the Board at these meetings regarding Peregrine's financial

7   condition, and notwithstanding his knowledge that Peregrine was improperly recognizing

8   revenue, Watrous approved and/or permitted dissemination of the false financial statements to the

9   public following the listed reports, the false contents of which are set forth more fully in

10   paragraphs 71 - 74. Watrous signed some of these false financial statements, including at least

11   the 2000 and 2001 10-K's as well as the Registration Statements for the Remedy merger as well

12   as for Peregrine's acquisition of a company known as Harbinger, either knowing, or recklessly

13   disregarding, that these group publications contained serious misstatements.

14        125.   Watrous also attended Audit Committee meetings at which he was advised

15   of the Company's dire financial situation and improper accounting practices, including at least on

16   the following dates:  April 25, June 29, July 23, and October 24, 2001; and February 12, April 2,

17   and April 29, 2002.  At these meetings, Watrous was advised of at least the following facts:

18        a.   that the Company was improperly recognizing revenue in its EMEA

19   division (Europe, Middle East, Asia);

20        b.   that the Company was improperly recognizing full revenue upon

21   sell-in and that this was not truthfully disclosed in SEC filings;

22        c.   that the Company had become involved in the SEC's investigation

23   of Critical Path and that the testimony of Gardner and his Special Assistant had been required;

24        d.   that channel sales in general were a problem and that Peregrine was

25   not implementing best practices;

26        e.   that numerous specific transactions involving such customers as the

27   KPMG Defendants were improper;

28

1             f.    that the Company was engaging in intentional and repeated

2    violations of GAAP and accounting fraud;

3             g.    that the SEC had opened an inquiry on Peregrine;

4             h.    that the Company had been embedding unpaid accounts receivables

5    in financial statements for acquisitions, showing them as "acquisition costs and other" rather than

6    the unpaid revenue that they actually represented;

7             i.    that the Company was engaging in transactions using improper

8    "side letters" excusing customers from payment obligations

9         126.    As an Audit Committee member, Watrous had control over Peregrine with

10   respect to the accounting and disclosure policies and practices of the Company but did nothing to

11   stop the fraud or advise the public of it.

12        127.    Watrous participated in the Company's false statements and failed to

13   disclose the true facts intending to cause investors to buy and hold Peregrine stock, motivated at

14   least in part by his desire to benefit from the sale of his own stock at inflated prices.

15        128.    Other paragraphs referring to Watrous by name  include the following:  1,

16   40, 82, and 224.

17   **C.    Noell**

18   *Noell's sales of Peregrine stock while in possession of material undisclosed*
     *adverse information: approximately 226,000 shares; gross proceeds:  $8.6*
19   *million.*

20        129.    Noell was a close confidant and business partner of defendant Moores,

21   serving in various capacities in companies owned and controlled by Moores.  Although Noell's

22   close connection to Moores goes back to at least 1988, since at least 1992 he has been employed

23   by and reports to Moores.  At Moore's behest, Noell serves on numerous Boards of Directors of

24   companies in which Moores has an interest.  As president and CEO of JMI Services and a general

25   partner of JMI Equity (companies that bear Moores' initials and which he controls), Noell's

26   duties have included becoming familiar with the financial condition and details of companies in

27   which Moores has an ownership interest.  One such company was Peregrine.  Noell functioned, in

28

- 46 -
169
**EXHIBIT 13**

essence, as an additional set of eyes and ears for Moores at Peregrine, and functioned as a conduit through which Moores exercised control.

130.   Noell served as a member of Peregrine's Board of Directors from January 1992 through February 2003. He was also a member of the Audit Committee and the Compensation Committee in the years preceding the Remedy merger: 2000 and 2001.

131.   As a member of the Board of Directors of Peregrine, Noell is liable for the fraud pursuant to California Corporations Code § 25504 ("Every . . . director of a corporation so liable . . .[is] also liable jointly and severally . . .) unless he can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the fraud.

132.   By virtue of his Board membership, stock ownership, and membership on the Audit and Compensation Committees, Noell had the power to influence and control and did influence and control the day-to-day decision-making and management of the Company, including the content and dissemination of the various statements which plaintiffs contend are materially false and misleading. Noell was provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements or cause the false statements to be corrected. Notwithstanding, he took no action whatsoever, but permitted these false statements to be disseminated and took no action to correct them.

133.   Other facts that demonstrate Noell's control over Peregrine during the Affected Period include the following:

a.   By virtue of Moores' sublease of space from Peregrine, which sublease ran from June 1996 through October 2003, Noell maintained an office on the premises of Peregrine through which he was able to and did maintain close contact with the Company's executive and financial staff. In 2000, when Noell's office was moved out of the building, he and Moores installed Noell's nephew, Taylor Barada, as Gardner's "Special Assistant" in order to maintain access to information and assert control.

1                b.       Along with Moores, Noell was instrumental in causing Allan Hunt

2    to be selected as the Company's CEO prior to the IPO and in installing Gardner as CEO in 1998;

3                c.       Noell participated in the selection and installation of the Company's

4    financial officers, who were imported from Moores' company, BMC, including the Company's

5    two CFOs during the time in question, Farley and Gless.  Farley, who became CFO in 1995, kept

6    Noell current on key operating and financial issues at Peregrine; after Farley died and Gless took

7    over as CFO, he continued Farley's practice of keeping Noell informed about the Company's

8    financial affairs so that Noell in turn could keep Moores informed;

9                d.       Noell discussed with Moores strategies to inflate Peregrine's

10   revenues and then would implement these strategies through discussions with Gardner and Gless;

11               e.       Noell was closely involved in Peregrine's preparation for its IPO.

12   At the time of the IPO, Noell had substantial related party transactions with Peregrine including:

13   that JMI (in which Noell was a general partner and which held more than 10% of Peregrine's

14   common stock) made working capital loans to Peregrine; JMI subleased space from Peregrine;

15   Peregrine sold a subsidiary to Skunkware, a Moores' company of which Noell had been

16   president;

17               f.       Noell met regularly with Gardener, Gless, and Moores to discuss

18   the fraudulent scheme;

19               g.       Noell signed the Company's 10-K's for 1999, 2000, and 2001, and

20   signed the Remedy Registration Statement, even though he knew that they contained false

21   statements about the Company's financial health and its compliance with GAAP;

22               h.       Noell remained actively involved in the day to day operations of the

23   Company until he was forced to resign in February 2003 as part of Peregrine's bankruptcy

24   proceedings;

25               i.       He actively directed the operations of Peregrine and set aggressive

26   financial goals for the Company and encouraged false and misleading revenue recognition. He

27   attended at least 38 board and operational meetings of the Company between 1999 and 2002 at

28   which false and misleading revenue recognition was discussed.

134.   In addition to the facts set forth in the preceding paragraphs, Noell's knowledge of the fraud, or reckless disregard of it is evident from the following:

a.   Noell had extensive experience in the software industry and knew of the risk of fraud associated with revenue recognition policies;

b.   He approved the issuance of quarterly financial results during Fiscal Years 2000 and 2001 and the first three quarters of 2002 (i.e., all material times) notwithstanding his attendance at Board and Audit Committee meetings where the Company's true financial status was discussed along with the Company's improper revenue recognition, side letters, channel stuffing, and non-compliance with GAAP, as alleged in paragraphs 71 – 74 and 125;

c.   In October 2001, Peregrine's General Counsel advised Noell about e-mails from a Peregrine salesman based in Australia who informed the Company of specific acts of improper sales transactions and channel stuffing;

d.   In January 2002, Noell became aware of a highly unusual representation letter to Andersen from the Company which would have raised a red flag for someone with Noell's experience and knowledge about Peregrine. The Company was asked to represent that it was not entering into improper side letter agreements in sales transactions – a representation the Company had not been asked to make in prior years.

135.   Noell's authorization and participation in the Company's false statements, as well as his failure to take any action to correct them were intended to cause investors to buy and hold Peregrine stock, motivated in part by his ownership of stock and his desire to sell his stock at inflated prices.

136.   Other paragraphs that refer specifically to Noell by name include the following: 1, 41, 82, 116, 214, and 223.

**D.   Savoy**

137.   Savoy was a Director of the Company during the time leading up to and just following the Remedy acquisition. Consequently, pursuant to California Corporations Code § 25504, Savory is liable for Peregrine's fraud ("Every . . . director of a corporation so liable, . . . [is] also liable jointly and severally with and to the same extent as such person, . . .") unless he

324631.3

THIRD AMENDED COMPLAINT

172
**EXHIBIT 13**

1    can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the

2    fraud.

3          138.     In addition to being a director during the critical period, Savoy exerted

4    influence and control over the Company by virtue of his position on the Audit Committee. As set

5    forth above in paragraphs 82 - 84, the Audit Committee had responsibility for assuring the

6    integrity of the financial controls and reporting of the Company. As set forth in paragraph 125,

7    the Audit Committee members received specific negative information about the Company and its

8    practices.

9          139.     By virtue of his Board membership and membership on the important

10    Audit Committee, Savoy had the power to influence and control and did influence and control the

11    day-to-day decision-making and management of the Company, including the content and

12    dissemination of the various statements which plaintiffs contend are materially false and

13    misleading and which were issued and in many cases signed off on by Savoy during the time he

14    served the Company. In that capacity, Savoy was provided with or had unlimited access to the

15    Company's internal reports, press releases, public filings and other statements alleged by

16    plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

17    ability to prevent the issuance of the false statements or cause the false statements to be corrected.

18    Notwithstanding, he took no action whatsoever, but permitted these false statements to be

19    disseminated and took no action to correct them. Savoy was consulted by Gardner, along with

20    executives and other favored directors, including Noell, Nelson, Gless and Moores regarding a

21    strategy for acquiring Remedy.

22          140.     Savoy signed the Company's 10-K for June 2001, which included 10-Q's

23    from the previous three quarters. He also signed the Remedy Registration statement on behalf of

24    the Company, which falsely asserted, among other things, that the Company was complying with

25    GAAP and that its financial statements contained no false statements.

26          141.     Savoy knew, or was reckless in not knowing, that the Company was

27    issuing false financial statements for at least the following reasons:

28

a.      Savoy had extensive experience in the software industry.  Based on that experience, he knew about the issues related to the propriety of revenue recognition and the risk of fraud in sales of software;

b.      During the time he was a director, Savoy received and reviewed Gardner's reports to the Board that laid out the Company's grim financial situation.  These reports are described in paragraphs 71 - 74, above.  Savoy thus knew that when the Company issued 10-Q's and press releases proclaiming record financial results that the Company was misleading the investing public.  For example, Savoy received the report to the Board before the July 18, 2000 Board meeting which advised the directors that the Company had had a tough quarter and that its "bread and butter deals" were "off the radar screen."  Three months later, Savoy received the October report to the Board that indicated the Company had to grant "extraordinary terms" on some deals in the closing hours of the quarter to make its numbers.  In December of that year, Savoy was advised by Gardner of the Company's heavy reliance on channel partners, as opposed to end users.  Gardner's reports to the Board of a foundering Company continued throughout Savoy's tenure at the Company.

c.      Savoy also learned through reports to the Board of at least one suspect transaction in which Peregrine was involved, when he was advised of the SEC investigation into the Critical Path barter transaction, which shortly thereafter resulted in a guilty plea by Critical Path's CEO.

142.    Despite his knowledge, Savoy made no effort to correct the misstatements he had authorized and issued as a member of the Company's Board and Audit Committees.  Nor did he take any steps to stop the improper revenue recognition practices at the heart of the fraud, despite his control over the Company's control and disclosure policies and practices.  Savoy engaged in these misstatements and omissions intending to cause investors to buy and hold Peregrine stock.

143.    Other paragraphs that mention Savoy by name  include:  42 and 82.

## X.   AUDITOR DEFENDANTS' PARTICIPATION IN THE FRAUD

### A.   Arthur Andersen

144.   Andersen acted as Peregrine's independent auditors from 1997 until April 5, 2002, when Peregrine announced it was replacing Andersen with KPMG. As such, Andersen was engaged to perform audits and reviews of Peregrine's financial statements included in its public filings with the SEC. Andersen thus had access to and knowledge of Peregrine's internal documents and knew of material misstatements in its public statements. During that time, Andersen not only ignored the improper accounting and financial statement activities that it knew Peregrine was engaging in, it actively participated in helping Peregrine structure transactions for the purpose of inflating revenue and perpetrating the fraud. In fact, without the active assistance and complicity of Andersen, Peregrine likely could not have perpetrated this fraud.

145.   Andersen knew its work would be relied on by third parties, in particular the Remedy shareholders. It gave its consent "to the incorporation by reference in [the Remedy] registration statement of our report dated April 26, 2001 included in Peregrine Systems, Inc. Form 10-K for the year ended March 31, 2001 and to all references to our Firm included in this registration statement."

146.   Andersen and the other Auditor Defendants (AWSC, Andersen Germany, and Stulac), by reason of their status as independent auditors of Peregrine's finances, had access to extensive non-public information about Peregrine. They had the ability and duty to perform their work in accordance with the prevailing professional standards. The Auditor Defendants were in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the public dissemination of the misrepresentations.

147.   On May 24, 2002, Andersen admitted that Peregrine's audited financials for 2000 and 2001 plus its interim financials for 1999-2001 and the first three quarters of 2002 could not be relied upon. Andersen's failure to prevent false financials from being disseminated and the admission which followed the discovery of the accounting fraud in which Andersen

1  played a heavy role led to the drop in the value of Peregrine stock that precipitated the losses

2  suffered by plaintiffs in this lawsuit.

3        148.    According to the accounting standards governing the Auditor Defendants,

4  known as Generally Accepted Auditing Standards ("GAAS"), when a financial statement

5  contains a material departure from GAAP, as Andersen knew Peregrine's did, audit opinions

6  should, at a minimum, be qualified. Andersen's unqualified confirmations of Peregrine's

7  financial for FY00 and FY01 were false and misleading in that:  (1) Andersen's auditing was not

8  conducted in accordance with GAAS; (2) the financial statements did not fairly present

9  Peregrine's financial position; and (3) the financial statements were not prepared in accordance

10 with GAAP.

11        149.    Facts demonstrating Andersen's knowledge of and participation in the

12 fraud include, but are not limited to, the following:

13        a.    Andersen was experienced, and touted itself as experienced, in the

14 software industry, where revenue recognition was known to be a problem.  In making the pitch to

15 be Peregrine's auditors, Andersen promised that it would monitor and oversee not just the

16 accounting and financing aspects of Peregrine's business, but also sales;

17        b.    Andersen provided financial services for Peregrine's 10-Q's from

18 1999 and through the first three quarters of 2002, which contained statements which Andersen

19 knew to be false and misleading.  It then issued false certifications for the financial statements

20 contained in Peregrine's 10 K's for at least 1999, 2000, and 2001.  These statements were

21 disseminated to the public and were responsible for inflating Peregrine's revenue and stock price;

22        c.    Andersen issued audit opinions that represented that Peregrine's

23 financials complied with GAAP, when it knew that was not the case.  Andersen knew, or was

24 reckless in not knowing, that Peregrine's financial statements were not in compliance with GAAP

25 because it had specific knowledge that Peregrine had improperly recorded revenue, had

26 understated its liabilities, had understated option compensation, had understated the size of its

27 account receivables, and had overstated its cash position.  Additional allegations regarding

28

324631.3

- 53 -

THIRD AMENDED COMPLAINT

176
EXHIBIT 13

1  Andersen's knowledge are found in the section of this Complaint regarding AWSC, Andersen

2  Germany, and Stulac;

3  　　　　　　　　d.　　　Andersen knew of and approved Peregrine's revenue recognition

4  practices, even though it knew them to be improper. In fact, Gless routinely consulted with

5  Andersen, and particularly audit engagement partner Stulac, regarding how to structure

6  transactions to allow for revenue recognition where no revenue had been received or reasonably

7  was expected;

8  　　　　　　　　e.　　　Andersen knew and approved of Peregrine's practice of treating

9  loans on accounts receivables as sales. In the first quarter of Fiscal Year 2002, Stulac specifically

10  approved Peregrine's practice of keeping these accounts receivables "sales" off of the balance

11  sheet even though Peregrine's Vice President of Finance, Berj Rassam, wanted to disclose them

12  on the balance sheet;

13  　　　　　　　　f.　　　Andersen routinely and falsely certified that its own conduct as

14  Peregrine's auditors complied with GAAS knowing that its reports would be relied upon by

15  current and potential investors in Peregrine;

16  　　　　　　　　g.　　　Andersen knew of inadequate internal accounting controls at

17  Peregrine, including but not limited to the following: (a) weak or non-existent internal controls;

18  (b) there were no minutes kept by the Audit Committee; (c) there were many manual adjustments

19  made to software revenue; (d) Peregrine was unable to quantify the amount of sales to resellers

20  during particular periods; (e) there routinely was a delay or a complete inability to provide

21  information that should have been readily available such as trial balances and general ledgers;

22  　　　　　　　　h.　　　In November 1998 the AICPA (American Institute of Certified

23  Public Accountants) issued a Practice Alert regarding revenue recognition issues that advised

24  accounting professional like Andersen that the following were red flags: (1) significant sales or

25  sales volume at the end of a reporting period; (2) an unusually high volume of sales to resellers;

26  (3) barter transactions; and (4) side agreements. Andersen knew that all of these red-flag

27  conditions existed at Peregrine yet it failed to take steps to reverse the practices or disclose them

28  to the investing public and continued to issue unqualified audit opinions;

1          i.     At the April 22, 1999 Board meeting, the Board was advised that

2    Andersen was not comfortable with channel sales that represented more than 25% of revenue

3    (itself an unusually high number in the industry).  By that point, Peregrine's channel sales were at

4    22% and were on the increase.  In January 2000, Andersen told Peregrine that it was

5    uncomfortable with the amount of inventory in the channel;

6          j.    During Fiscal Year 2000, channel sales represented 38% of all

7    license revenues, nearly triple the percentage of channel sales a year earlier and well past the

8    auditor's maximum of 25%;

9          k.    In the summer of 2000, Andersen designed the stock option

10   compensation plan for Peregrine that was an intentional violation of GAAP allowing for exercise

11   prices on options that were below the common stock market value on the date the options were

12   granted and allowed for improper acceleration of vesting.  In conjunction with the improper plan,

13   Andersen knew and approved of Peregrine's massive understatement of stock option

14   compensation expense;

15         l.    No later than January 24, 2001, Andersen knew that revenue had

16   been improperly recognized on transactions with New Era of Networks and Extricity, both of

17   which were barter transactions in which no revenue was received;

18         m.    At the Audit Committee meeting of April 25, 2001, Andersen audit

19   engagement partner Stulac participated in a discussion of revenue recognition problems in

20   Peregrine's EMEA division.  Stulac, knowing that the Company was improperly recognizing

21   revenue on sell-in, recommended that the Company move to sell-through accounting.  The

22   Company did not take up his recommendation;

23         n.    At the Audit Committee meeting of July 23, 2001 at which Stulac

24   was present, there was a discussion of problems with accounting and collections for channel sales

25   as well as a discussion that the Company's revenue recognition policy needed to be replaced.

26   Andersen was directed to review the Critical Path transaction, even though the revenue for that

27   transaction already had been recognized;

28

*THIRD AMENDED COMPLAINT*    **178**

**EXHIBIT 13**

1          o.     In the fall of 2001, Andersen repeatedly was advised of the

2 existence of side letters and large accounts receivables by at least Peregrine's in-house accounting

3 staff;

4          p.     In October, 2001, Andersen told the Audit Committee of specific

5 instances of questionable revenue recognition on channel sales;

6          q.     At the Audit Committee meeting on October 24, 2001, Andersen

7 employee Ross Baldwin and the National Practice Director for the western region were in

8 attendance to signify Andersen's concerns with the accounting issues at Peregrine. The Andersen

9 personnel handed out a report which referred to a breakdown in internal controls regarding

10 revenue recognition for the quarter ended September 30, 2001, including transactions that they

11 believed were improperly reported as full revenue. The report also advised that Andersen was

12 aware of side letters and other contingencies with deals, thus acknowledging Andersen's

13 knowledge that Peregrine was intentionally and repeatedly violating GAAP;

14          r.     In the fall of 2001, Andersen specifically rewrote the form of its

15 management representation letters for Peregrine, asking Peregrine to certify that it had not entered

16 into side letter agreements. Instead of complying, Peregrine, through Nelson, told Andersen

17 employee Ross Baldwin to back off from this request, another obvious red flag;

18          s.     Andersen's audit opinions for April 2000 and April 2001 were

19 materially false and misleading. Among other things, they failed to mention that the Company

20 had changed its accounting policy to recognize revenue on sell-in and failed to report specific

21 instances that it knew of involving improper revenue recognition. The reports failed to mention

22 Andersen's concerns about the amount of inventory in the channel, and falsely stated that

23 Peregrine's consolidated financial statements complied with GAAP;

24          t.     In April 2001, Andersen learned that Peregrine had written off $15

25 million as part of "acquisition costs and other expense" rather than properly disclosing it as bad

26 debt. Andersen learned of similar instances of burying bad debts in quarterly reports for June 30,

27 September 30 and December 31, 2000. Andersen did nothing in response;

28

- 56 -

THIRD AMENDED COMPLAINT

1               u.      In April, 2001, Stulac received an e-mail from Andersen Germany

2 and, on information and belief, AWSC warning of serious problems with revenue recognition

3 issues in EMEA and detailing specific contracts involved. The e-mail spoke of reseller

4 transactions worth EURO 14.6 in which there had been no sell-in, and warned that more could be

5 discovered. This was followed by another e-mail some two weeks later saying there were even

6 more serious problems involving "bad revenue" and insufficient bad debt reserves. Other e-mails

7 to Andersen from Andersen Germany and, on information and belief, AWSC followed in the

8 ensuing months (including but not limited to on May 30 and August 1, 2001) regarding revenue

9 recognition improprieties. This e-mail traffic reflects Andersen's actual knowledge of numerous

10 material deficiencies in Peregrine's accounting;

11               v.      In yet another instance of Andersen working together with Gless to

12 cook the Company's books, Stulac assisted Gless in structuring a swap transaction with

13 IBM/Tivoli so that it appeared as two separate transactions on Peregrine's books, even though

14 this treatment was patently improper and concocted for the purpose of hiding the fact that the

15 transaction was devoid of substance or revenue;

16               w.      Despite repeated complaints about the issue by Peregrine officers,

17 lower level Peregrine accounting employees, and even concerns expressed by Andersen's own

18 personnel, Andersen did not require an accounts receivable subledger tied to the balance sheet, a

19 basic and indispensable accounting requirement the absence of which made it difficult to verify

20 the accuracy of the amount reported receivables;

21               x.      On July 23, 2001, Rassam sent an e-mail to, among others,

22 defendants Gless, Nelson, and Stulac regarding "Disclosure of Impairment and Related Charges."

23 Referencing the fact that Peregrine had written off $600 million in Q4 01 without proper

24 disclosure, he warned that such practices could ignite SEC interest. Rassam's plea to defendants

25 Gless, Nelson, and Stulac, for full and truthful disclosure of the write offs which Peregrine buried

26 in the "acquisition and other" line item, were ignored;

27               y.      In July 2001, Rassam told Stulac of accounts receivables of $80 –

28 $100 million that had not been reflected in the published financial reports;

THIRD AMENDED COMPLAINT

**180**
**EXHIBIT 13**

1          z.     In the quarter ended September 30, 2001, Andersen put Peregrine

2    on its list of its most risky clients, along with Enron.  It replaced Stulac with Ross Baldwin,

3    noting, among other things, that the absence of an accounts receivable subledger was inexcusable.

4          aa.     In connection with its 2001 year end audit review, Andersen

5    received a very low rate of return on its audit confirmation letters, another red flag regarding the

6    validity of Peregrine's transactions;

7          bb.     In connection with its December 2001 review of financial results,

8    Andersen continued to note material deficiencies in Peregrine's accounting practices, including

9    problems with revenue recognition in specific transactions.  For example, Andersen notes that

10    Peregrine had accumulated receivables of $87 million for the third quarter of Fiscal Year 2002,

11    but took a bad debt reserve of only $14 million;

12          cc.     On March 11, 2002 Andersen told Gardner and Gless that the

13    Critical Path transaction violated SOP ("Statement of Position") 97-2, which sets forth the

14    requirements for GAAP with respect to revenue recognition in software transactions;

15          dd.     On March 29, 2002, Andersen, through Baldwin, suggested to

16    Peregrine that it issue a Restatement of its prior year financials based on its hiding of write-offs in

17    the "acquisition and other" category.  Peregrine chose not to do so, Andersen did not insist upon

18    it, nor did it disclose the matter to the investing public; and

19          ee.     As detailed above, Andersen knowingly or with deliberate

20    recklessness caused Peregrine to recognize revenue from sales to both resellers and end users

21    where one or more conditions for proper recognition of revenue under GAAP were not met,

22    including the following:  (i) the product was never delivered to the purchaser; (ii) the purchaser's

23    obligation to pay for the product was not fixed and determinable; (iii) collectability of the fee was

24    not probable; or (iv) the reseller's obligation to pay for the product was contingent upon

25    subsequent sale of the product to the end user.

26          150.     Andersen was heavily involved in the day-to-day accounting practices of

27    the Company, it had actual knowledge of specific improper transactions and accounting for such

28    transactions, it acquiesced in accounting judgments of its client which it knew to be wrong, and

THIRD AMENDED COMPLAINT

181
EXHIBIT 13

1  nonetheless issued unqualified audit opinions certifying that Peregrine's publicly filed financial

2  statements complied with GAAP and that its auditing complied with GAAS, as well as allowing

3  publication of, and failing to correct, interim financial statements it knew were materially

4  inaccurate.

5          151.   Based on Andersen's false audit opinions and the failure to qualify and/or

6  modify its reports to identify Peregrine's false financial reporting, Andersen violated the

7  following GAAS standards, among others:

8          a.   The auditors should maintain an independence in mental attitude in

9  all matters relating to the engagement;

10        b.   Due professional care is to be exercised in the performance of the

11  audit and preparation of the report;

12        c.   The auditor should obtain a sufficient understanding of internal

13  controls so as to plan the audit and determine the nature, timing and extent of tests to be

14  performed; and

15        d.   Sufficient competent evidential matter is to be obtained to afford a

16  reasonable basis for an opinion on the financial statements under audit.

17         152.   Andersen also was required to implement procedures to identify deviations

18  by the Company from GAAP, which it failed to do.  17 C.F.R. 210.4-01(a)(l), provides that

19  financial statements filed with the SEC which are not prepared in compliance with GAAP, are

20  presumed to be misleading and inaccurate.

21         153.   Moreover, Andersen was required to report if the Company was not in

22  compliance with fair accounting principles, but failed to do so.  Among the principles of fair

23  accounting with which Peregrine did not comply, and Andersen did not report, are the following:

24        a.   That financial reporting should provide information that is useful to

25  present and potential investors and creditors and other users in making rational investment, credit

26  and similar decisions (FASB Statement of Concepts No. 1);

27        b.   That financial reporting should provide information about an

28  enterprise's financial performance during a period (FASB Statement of Concepts No. 1);

1         c.  That financial reporting should be reliable in that it represents what

2    it purports to represent (FASB Statement of Concepts No. 2);

3         d.  The principle of completeness, which means that nothing material

4    is left out of the information that may be necessary to ensure that it validly represents underlying

5    events and conditions (FASB Statement of Concepts No. 2);

6         e.  That conservatism be used as a prudent reaction to uncertainty to

7    try to ensure that uncertainties and risks inherent in business situations are adequately considered

8    (FASB Statement of Concepts No. 2);

9         f.  That disclosure of accounting policies should identify and describe

10    the accounting principles followed by the reporting entity and the methods of applying those

11    principles that materially affect the financial statements (APB Opinion No. 22);

12         g.  That losses be accrued for when a loss contingency exists

13    (Statement of Financial Accounting Standards No. 5);

14         h.  That if no accrual is made for a loss contingency, then disclosure of

15    the contingency shall be made when there is at least a reasonable possibility that a loss or an

16    additional loss may have been incurred (Statement of Financial Accounting Standards No. 5);

17         i.  That contingencies and other uncertainties that affect the fairness of

18    presentation of financial data at an interim date shall be disclosed in interim reports in the same

19    manner required for annual reports (APB Opinion No. 28);

20         j.  That disclosures of contingencies shall be repeated in interim and

21    annual reports until the contingencies and have been removed, resolved, or have become

22    immaterial (APB Opinion No. 28); and

23         k.  That management should provide commentary relating to the

24    effects of significant events upon the interim financial results (APB Opinion No. 28);

25        154.  In addition, during the Affected Period, Peregrine Defendants violated, and

26    Andersen failed to report, violations of SEC disclosure rules.  For example, defendants failed to

27    disclose the existence of known trends, events or uncertainties that they reasonably expected

28    would have a material, unfavorable impact on net revenues or income or that were reasonably

324631.3       - 60 -

THIRD AMENDED COMPLAINT   **183**
                **EXHIBIT 13**

1   likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303

2   of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to

3   disclose the information rendered the statements that were made materially false and misleading.

4        155.   Andersen read and approved all of the press releases set forth in paragraphs

5   71 - 74, prior to their publication. For at least the reasons set forth in paragraphs 149-150,

6   Andersen either knew, or was reckless in not knowing, that each and every one of these press

7   releases was false and misleading and that the rosy picture of the Company's financial health

8   *painted by the press releases was contravened by the true state of facts. Nevertheless, Andersen*

9   *did nothing.*

10        156.   Andersen audited Peregrine's financial statements for FY00, FY01, and the

11   first three quarters of FY02, and issued an unqualified audit report on those statements, which

12   was included in the respective 10-Ks and 10-Qs. In each of these reports, Andersen certified:

13   (i) that it had audited Peregrine's financial statements in accordance with GAAS; (ii) that it had

14   planned and performed its audits "to obtain reasonable assurance about whether the financial

15   statements are free of material misstatement;" (iii) and that, in its opinion, Peregrine's financial

16   statements "present fairly, in all material respects, the financial position" of Peregrine "in

17   conformity with accounting principles generally accepted in the United States."

18        157.   Based on the information set forth in paragraphs 149 - 156, Andersen knew

19   or was reckless in not knowing that the financial information contained in the 10-K and 10-Q

20   statements was false and misleading and that the true facts were that Peregrine was improperly

21   recognizing revenue on contingent transactions, was misstating information regarding the

22   expenses and value of options, was counting as revenue loan funds on receivables, and was

23   burying write-offs as acquisition costs. Nevertheless, Andersen did nothing.

24        158.   On July 23, 2001, Peregrine filed its Registration Statement with the SEC

25   *for the Remedy merger. The Registration Statement contained a Joint Proxy Statement and*

26   Prospectus to solicit proxies from Remedy shareholders to approve the transaction. The Joint

27   Proxy Statement advised Remedy shareholders that Andersen had audited Peregrine's financial

28   statements.

THIRD AMENDED COMPLAINT

**184**
**EXHIBIT 13**

159.   Andersen's false statements and omissions were made with intent to defraud investors and members of the public, including Plaintiffs herein, as Andersen desired to retain Peregrine as a client, both because Peregrine itself generated substantial fees in the millions of dollars, and because its relationship with Peregrine could be used as leverage to obtain work from Moores and Moores' company, JMI.

### B.   AWSC and Andersen Germany

160.   AWSC is a Swiss entity composed of AWSC member firms and their partners, including Andersen and Andersen Germany, which member firms engage in fee sharing as a regular part oft their organizational structure.  AWSC is the coordinating entity for the international network of Andersen firms and sets policies and procedures for its members, which together, operate as a single global partnership or joint venture.

161.   The model adopted by AWSC Partners was meant to preserve "The Heart of Partnership Culture," including income sharing among the member firms of the two business units and common governance model.  The structure was and is designed to maintain the "one firm" concept, and was intended to foster the belief that the firm operated as a single entity.  In its promotional literature, including its web site, the firm marketed itself as "one firm" "a single worldwide operating structure" that "think[s] and act[s] as one."  AWSC is akin to the parent company of its member firms.  Therefore and because AWSC is the alter ego of the other Auditor Defendants, plaintiffs incorporate herein by reference all of the allegations pertaining to Andersen , Stulac, and Andersen Germany.

162.   Andersen Germany assisted in the year end audits for Peregrine Fiscal Years 2000 and 2001 and all quarterly reports implicated in this lawsuit.

163.   Andersen Germany and, on information and belief, AWSC, knew that Peregrine was experiencing pervasive deficiencies in its internal accounting controls, that Peregrine was improperly recognizing revenue on transactions, that Peregrine was violating GAAP, and that Andersen was itself violating GAAS.  Nevertheless, Andersen Germany and AWSC permitted Peregrine to improperly recognize revenue and neither disclosed these

1  violations to the investing public nor insisted upon the issuance of qualified audit reports or the

2  withdrawal of the Andersen entities as Peregrine's auditors.

3         164.   A series of e-mails that emanated from Andersen Germany and, on

4  information and belief, AWSC, to Andersen shows that Andersen Germany and, on information

5  and belief, AWSC, were fully cognizant of Peregrine's improper accounting and financial

6  activities. Among these e-mails are the following:

7         a.   April 14, 2000: an e-mail to the audit manager on the Peregrine

8  account noting material problems with the EMEA division. Among other things, the e-mail

9  stated that Peregrine had difficulty meeting budget and was advised to minimize its recording of

10 expenses. It also warned of "bad revenue" arising from contingent sales, excessively long due

11 dates, and dependency on resellers, as well as the failure to maintain an adequate bad debt

12 reserve;

13        b.   April 12, 2001: an e-mail regarding "serious problems" in the

14 EMEA division. Again it mentioned revenue recognition issues regarding specific transactions

15 and opined that revenue from these transactions should not be recognized in the previous quarters

16 financials. It further warned that it was expecting more bad news of the same kind;

17        c.   April 25, 2001: an e-mail regarding continued serious problems

18 with EMEA, repeating its concerns about bad revenue and the failure to set up bad debt reserves;

19        d.   May 30, 2001: an e-mail regarding Peregrine's improper

20 accounting practices noting in particular the absence of subledgers for accounts receivables and

21 accounts payables thus making it impossible to assess the accuracy of account balances.

22 Mentioning again the problems with improper revenue recognition, the e-mail stated that

23 Peregrine's accounting and financial reporting required significant improvement and immediate

24 attention;

25        e.   August 1, 2001: an e-mail repeating the serious issues and

26 concerns raised in previous e-mails regarding specific transactions for which revenue had been

27 misstated because there were no end-user agreements.

28

324631.3

- 63 -

165.    Andersen Germany and, on information and belief, AWSC, knew of Peregrine's accounting fraud through its accounting work on Peregrine's EMEA division, in particular, Peregrine Germany.  As a result of its work, these auditors learned (i) that a major division of Peregrine was engaged in revenue recognition fraud, (ii) that many of the contracts pursuant to which it reported revenue were undated and/or outside of the relevant period, (iii) that there were materially deficient internal accounting controls such that it was not possible for the auditors to completely understand EMEA's accounting transactions; and (iv) there were materially deficient bad debt reserves and that Company personnel actively resisted establishing appropriate reserves.

166.    Andersen Germany and, on information and belief AWSC, failed to require Peregrine to properly state its financial information or to revise its financial reports even though the defendants knew that these reports would be relied upon by investors.  These defendants knew that all of the red-flag conditions mentioned in the November 1998 AICPA Practice Alert (referenced in paragraph 149) existed at Peregrine yet it failed to take steps to reverse the practices or disclose them to the investing public and continued to issue unqualified audit opinions.

167.    Andersen Germany reviewed and approved each 10-K and 10-Q before Peregrine released it.

168.    AWSC's and Andersen Germany's participation in Peregrine's misrepresentations and its failures to disclose material facts were intended to defraud investors and the public and to cause them to buy and hold Peregrine stock.  AWSC and Andersen Germany were motivated to do this because their relationship with Peregrine was lucrative and generated substantial fee income for the Andersen entities and they did not wish to lose Peregrine as a client.

C.      **Stulac**

169.    Stulac was hand-in-glove with Peregrine insiders.  For most of the time in question, Stulac was the audit engagement partner for Andersen's audit of Peregrine's financial statements.  In particular, he was the audit engagement partner for the Fiscal Year 2001 financials

1  which falsely stated that Peregrine complied with GAAP and that Andersen had complied with

2  GAAS in auditing them. When Andersen replaced Stulac as the audit engagement partner in the

3  latter half of 2001 because they found the practices he had permitted "unforgivable," it was over

4  the objection of the Peregrine insiders who depended on him to help them perpetrate their fraud.

5     170.    Facts showing Stulac's knowledge of and participation in the fraud include

6  all of the facts alleged with respect to the Andersen entities and at least the following additional

7  facts:

8     a.     Stulac worked closely with Gless to structure transactions to allow

9  Peregrine to recognize revenue. For example, in December 2000 Stulac structured a swap deal

10  with IBM/Tivoli as two separate and unrelated deals to mask the fact that there was no revenue

11  realized from the transaction;

12     b.     From the beginning, Stulac knew that Peregrine's sell-in method of

13  accounting was improper. In January 2000, even before the Board adopted it, Stulac raised with

14  Peregrine the issue of the level of inventory in the channel;

15     c.     In January 2001, Stulac advised Nelson of barter transactions with

16  New Era of Networks and Extricity in which revenue was recognized on transactions with no

17  commercial substance;

18     d.     Between January and March 2001, Stulac had discussions with

19  Rassam about the Company's accounting for accounts receivable. Despite Stulac's actual

20  knowledge of questionable practices and outright misstatements regarding its revenue, Stulac

21  advised Rassam that Andersen had not asked for a management representation letter from

22  Peregrine in years. In response to Rassam's expression of disbelief, Stulac reportedly told

23  Rassam that "[a]t Peregrine, you've got to go along to get along;"

24     e.     In April 2001, Rassam and the Andersen audit manager (Nevanna

25  Sacks) both challenged Stulac about the lack of an accounts receivable subledger. Sacks also

26  complained to Stulac that the Peregrine personnel who should have been assisting with the

27  accounting were in fact either not helping and/or intimidating her. Stulac took no action to rectify

28  either situation;

1          f.      At an Audit Committee meeting on April 25, 2001 at which Stulac

2 was present, there was discussion of significant issues with revenue recognition in the Company's

3 EMEA division. Stulac knew that the Company's revenue recognition policy was not truthfully

4 disclosed in SEC filings;

5          g.      In April 2001, the Company took another large write off ($15

6 million) against the reserve for "acquisition and other" rather than properly disclosing it as a bad

7 debt. Stulac approved it. He approved other similar write-offs in June, September, and

8 December of 2000;

9          h.      At the June 29, 2001 Audit Committee meeting which Stulac

10 attended, there was a discussion of the Critical Path transaction, the SEC investigation, and the

11 fact that the SEC had taken testimony from Gardner and his special assistant, Taylor Barada.

12 This discussion of Peregrine's participation in the unlawful scheme was another red flag;

13          i.      In or about June 2001, Rassam and Stulac discussed Peregrine's

14 failure to disclose that its "sales" of accounts receivables were in fact loans. Stulac reportedly

15 told Rassam that Gless wanted the matter to stay off balance sheet and not to be disclosed in

16 public filings;

17          j.      At the July 23, 2001 Audit Committee meeting at which Stulac

18 attended, there was discussion of the serious problem presented by the non-collection of revenue

19 for channel sales and that the sell-in accounting practice needed to be replaced;

20          k.      In a July 23, 2001 e-mail, Rassam complained about the failure to

21 disclose very large write-offs, questioning the propriety of burying them in acquisition costs.

22 During that same time period, at a dinner, Rassam advised Stulac of $80-100 million in

23 receivables. This had not been disclosed in the relevant period financials nor were they corrected

24 to reflect it;

25          l.      In July 2001, Rassam sent an e-mail to Stulac complaining that he

26 still had not seen an accounts receivable detailed subledger tying to the general ledger.

27        171.      Because of his position as audit engagement partner, and his close

28 relationship with Company insiders, including Gless, Stulac had both the duty and the

1   opportunity to prevent, correct, and disclose Peregrine's fraud.  Instead, he assisted Peregrine

2   with it.  Stulac reviewed and approved press releases, 10-K and 10-Q statements during the

3   Affected Period.  He was indispensable to the Company's ability to cook its books and to issue its

4   false statements.  He was complicit in the fraud in assisting in structuring phony transactions,

5   excusing procedures necessary to keeping clean books, permitting revenue recognition in the

6   absence of revenue, and helping Peregrine disguise bad debts.  His inattention to sound and

7   honest accounting practices and his attention to helping further the fraud caused Peregrine to

8   request that he be restored as audit engagement partner after Andersen replaced him.

9          172.   Stulac's participation in the fraudulent statements and his failure to

10  disclose the true facts were intended to defraud the public and investors and to cause them to buy

11  and hold Peregrine stock.  As the audit engagement partner, he stood to gain financially from

12  generating fees from the Peregrine account, which he could only do by looking the other way,

13  staying in the good graces of the Peregrine insiders by assisting them in structuring unlawful

14  transactions.

15         173.   Other paragraphs which refer specifically to Stulac by name include the

16  following:  5, 44, 149, and 162.

17  **XI.   CUSTOMER DEFENDANTS' PARTICIPATION IN THE FRAUD**

18        **A.   The KPMG Defendants (KPMG and BearingPoint)**

19         174.   Defendant KPMG LLP (KPMG) is a firm of certified public accountants

20  which, at relevant times, was a provider of accounting, auditing, and consulting services.  During

21  the Affected Period, KPMG entered into agreements with Peregrine for the delivery of software

22  which it knew were nothing more than "parking" arrangements for which KPMG was not

23  obligated to pay.  KPMG knew that these arrangements were made for the purpose of permitting

24  Peregrine to recognize revenue and to publicly report revenue which KPMG knew Peregrine had

25  not obtained and would not obtain.  KPMG made and signed off on false statements on the

26  documents for these transactions regarding Peregrine's entitlement to payment.  KPMG, by virtue

27  of its professional expertise, knew that these reported revenues would be relied on by investors

28  and potential merger partners.

324631.3                           - 67 -

1      175.   On or about January 31, 2000, KPMG transferred its consulting business to

2   KPMG Consulting, which thereafter changed its name to BearingPoint, Inc. BearingPoint was

3   one of Peregrine's principal customers during the Affected Period, entering into arrangements for

4   the delivery of software which it knew were merely parking arrangements. BearingPoint knew

5   that these arrangements were for the sole purpose of permitting Peregrine to report revenues

6   which met Peregrine's published earnings estimates. BearingPoint knew that these published

7   reports would be relied upon by investors and others, such as merger partners.

8      176.   During the time in question, KPMG and its former consulting division,

9   BearingPoint, maintained close business and economic ties. This was particularly true in their

10   dealings with Peregrine in which the supposedly separate entities would enter into supposedly

11   separate transactions with Peregrine on the same day, with the agreements signed by the same

12   person as "Managing Director" of both KPMG and BearingPoint, with the same address. KPMG

13   and BearingPoint are therefore sometimes referred to hereafter as "the KPMG Defendants."

14      177.   Within weeks after Peregrine announced it was replacing Andersen with

15   KPMG as its independent auditor, KPMG resigned. The reason KPMG resigned was that it

16   discovered that the KPMG Defendants had entered into improper transactions with Peregrine

17   totaling $35 million.

18      178.   Over the course of approximately nine software licensing agreements

19   between the KPMG Defendants and Peregrine, Peregrine reported revenue of approximately

20   $34.8 million. The KPMG Defendants, however, only paid approximately $4.3 million for the

21   licenses it ostensibly purchased from Peregrine. Eventually, Peregrine improperly wrote off

22   approximately $30.8 million in purported receivables from the KPMG Defendants. A Peregrine

23   executive who participated in these transactions, Steven Spitzer, has since pled guilty to

24   conspiracy to commit securities fraud, admitting to falsifying books and records, among other

25   things.

26      179.   The KPMG Defendants' relationship with Peregrine began after Peregrine

27   entered into an "alliance agreement" with KPMG in which KPMG agreed to become a Peregrine

28   reseller and Peregrine funded the hiring and training of KPMG staff to do so. After the alliance

1   agreement was in place, Peregrine would come to the KPMG Defendants at the end of a quarter

2   and ask to park software to help Peregrine meet its publicly projected revenue targets. The

3   KPMG Defendants knew that Peregrine was doing this to book revenue and Peregrine would

4   assure the KPMG Defendants that it would not enforce payment terms for the software. In some

5   cases there was no end-user. In other cases, there was a potential end-user but the deal had not

6   closed and would not close by quarter's end. In return for helping out Peregrine, the KPMG

7   Defendants received the service portion of the contracts which were worth hundreds of thousands

8   of dollars. In many of these cases, although end-users were identified, the transactions never

9   closed.

10          180.    The first of many sham transactions between the KPMG Defendants and

11   Peregrine occurred at or about March 31, 1999 and had no identified end-user. Others included:

12   December 31, 1999 (Sodhexo Marriott – partial payment); March 30, 2000 (HHS); June 30, 2000

13   (Citigroup – no payment); June 30, 2000 (Avnet – no payment); September 29, 2000 (Morgan

14   Stanley – no payment); December 20, 2000 (Honeywell – no payment); December 22, 2000

15   (Boeing – no payment); December 27, 2000 (Honeywell – no payment); and June 29, 2001 (JP

16   Morgan – no payment). These sham transactions included affirmatively false representations by

17   the KPMG Defendants regarding the revenue to be recognized by Peregrine. The KPMG

18   Defendants knew that these false statements would be incorporated into Peregrine's financial

19   statements. The KPMG Defendants made these false statements intending to cause potential

20   investors to rely on them in evaluating Peregrine.

21          181.    In his plea agreement, Spitzer referred to the fact that he entered into these

22   fraudulent deals with a "consulting firm," that he was acting at the direction and behest of

23   Peregrine senior management and that he would meet with senior management at the end of the

24   quarter to determine how much revenue needed to be generated and how to go about structuring

25   transactions to get it. As is evident from the dates of these transactions, the KPMG Defendants

26   became Peregrine's "go to" resellers when revenue was needed to make quarterly forecasts.

27          182.    KPMG, one of the world's largest auditing and accounting firms, and

28   BearingPoint, a sophisticated financial consulting firm with great expertise in accounting matters,

1   knew, or recklessly disregarded, that Peregrine's recognition of revenue based upon contingent

2   software sales violated GAAP and was fraudulent. The principal representative of both KPMG

3   Defendants for these deals was Larry Rodda, who worked in KPMG's Risk and Advisory

4   Services and advised KPMG clients regarding accounting and auditing matters.

5          183.   KPMG received at least one audit confirmation letter from Peregrine

6   asking it to confirm to Peregrine's auditors the terms and any contingencies on the December 31,

7   1999 deal. Rodda falsely represented that there were no contingencies, even though he knew the

8   deal was phony and did not reflect a real transaction. KPMG, by virtue of its professional

9   knowledge and experience, knew and intended that the audit confirmation letter would form a

10  part of the analysis in Peregrine's financial statements which would be relied on by potential

11  investors.

12        184.   Other paragraphs referring to the KPMG defendants include:

13  **B.**   **Critical Path**

14        185.   On January 19, 2000, Peregrine and Critical Path publicly announced that

15  they had "formed a strategic relationship."

16        186.   Prior to the commencement of the "strategic relationship" between

17  Peregrine and Critical Path was announced, however, Gardner and others at Peregrine had

18  developed a significant working relationship with Critical Path President David A. Thatcher

19  ("Thatcher"), who had served as Peregrine's CFO from March 1993 through November 1995.

20        187.   In response to the pressures at both companies to produce profits in their

21  next quarters, Peregrine and Critical Path engaged in a series of transactions as part of a

22  fraudulent scheme to falsely inflate each of their respective earnings in Peregrine's quarter two

23  and Critical Path's quarter three. These actions led to SEC enforcement actions against both

24  Thatcher and Critical Path, and the eventual criminal conviction of Thatcher for securities fraud.

25        188.   On February 2, 2002, the SEC filed a civil action charging Thatcher with

26  participating in a scheme to inflate Critical Path's revenues and earnings for fiscal 2000, in part

27  based on its business dealings with Peregrine. The SEC Complaint alleges that during the year

28  2000, Thatcher and other Critical Path employees caused Critical Path to record revenue from

324631.3

THIRD AMENDED COMPLAINT

**193**
**EXHIBIT 13**

1    fictitious, contingent, or backdated transactions in its third quarter of the fiscal year 2000, one of

2    which involved the "software swap" transaction between Peregrine and Critical Path.

3         189.    The United States District Court for the Northern District of California

4    permanently enjoined Thatcher from violating sections of the Securities Exchange Act of 1934

5    (Exchange Act) and the Exchange Act Rules. Included as a basis for these charges against

6    Thatcher was the "software swap" transaction between Peregrine and Critical Path.

7         190.    Thatcher admitted his participation in a conspiracy to commit securities

8    fraud in violation of Title 18, U.S.C., Section 371, and pled guilty to criminal securities fraud

9    charges before United States District Judge William H. Alsup in San Francisco, California.

10    Thatcher's criminal conviction was based in part on the "software swap" transaction between

11    Peregrine and Critical Path.

12         191.    At least one Peregrine officer – Gardner – participated directly in that

13    conspiracy in connection with the "software swap" between Peregrine and Critical Path. In his

14    plea bargain agreement, Thatcher admitted he participated in negotiations with Peregrine's CEO

15    (Gardner) for a non-monetary exchange of software, the "software swap" between Peregrine and

16    Critical Path. Under the terms of the "software swap" with Peregrine, Critical Path provided

17    Peregrine with software and cash in return for Peregrine software. Critical Path then accounted

18    for the transaction as though it were a cash sale, without disclosing to investors that it had merely

19    exchanged software with Peregrine. The intent and effect of this "software swap" was to

20    artificially inflate Critical Path's revenues for the third quarter and to artificially inflate

21    Peregrine's revenues for its second quarter (Peregrine's fiscal year ends on March 31). Thatcher

22    also admitted that he realized that Critical Path's recognition of revenue for the software swap

23    was improper.

24         192.    To make the two transactions look like they were not contingent on one

25    another, defendant Gardner and Thatcher, along with others at Peregrine and Critical Path

26    arranged for the parties to prepare two separate contracts, exchange checks for the full amounts

27    owed, and make their payments to each other on different days.

28

194
EXHIBIT 13

1          193.   Peregrine falsely recorded the sale to Critical Path as revenue for the

2    second quarter.

3          194.   In documenting these improper transactions, Critical Path made false and

4    misleading statements regarding the revenue to be obtained by Peregrine as a result of them.

5    Critical Path knew these statements were false and that they would form part of the results for

6    Peregrine's financial statements and public reporting. Critical Path made these false statements

7    intending to defraud investors and the public and to cause them to rely on the false financial

8    results of which they were a part.

9    **C.**   **BT**

10         195.   In a contract dated December 29, 2000, BT agreed to license £10,000,000

11   of Peregrine software for resale to end users. Peregrine recognized revenue of $12,545,810 in

12   December 2000 from this transaction, as well as deferred revenue of $1,254,646 and royalties of

13   $547. The revenue from the BT deal was all reversed when Peregrine restated its earnings on

14   May 23, 2002.

15         196.   The actual contracts between BT and Peregrine were not signed on

16   December 29, 2000, the end of the quarter. Instead they were actually signed during the

17   following quarter, on or about January 8, 2001. Employees and/or agents of BT knew of

18   Peregrine's need to report that the deal had closed in the December 2000 quarter for purposes of

19   revenue recognition and agreed and intended to aid and abet Peregrine's fraudulent recognition of

20   revenue by back dating the contract documents so that the deal would appear to have been done in

21   the December 2000 quarter. In doing so, BT intentionally made false statements regarding the

22   revenue that Peregrine would recognize from the transaction, knowing and intending that this

23   fraudulently recognized revenue would be included in Peregrine's financial reports, and would be

24   relied upon by others, including potential investors and merger partners.

25         197.   Because BT had secured no end user for the software at the time of

26   contracting, it would only agree to the deal with a 30-day cancellation clause which was

27   memorialized in a side agreement. The side agreement was added at the suggestion of, among

28   others, Gless because Peregrine needed the revenue to meet projections for the quarter.

198.    In late January 2001, BT called Peregrine to cancel the deal. However, because Peregrine needed the BT deal to stay on the books, Peregrine, at Gless' behest, offered BT an extension of the 30-day cancellation clause. BT agreed. After several extensions of the 30-day clause by Peregrine, on April 5, 2001, BT cancelled the December 29, 2001 agreement. At this time no revenue had actually been received from, or product shipped to BT.

199.    In conjunction with Andersen's 2001 audit of Peregrine, Jane Balcombe, Peregrine's UK financial controller, received representation letters from Andersen regarding the phony deal. Ms. Balcombe resigned rather than sign the letter confirming the transaction and participate in the fraud.

200.    In conjunction with the 2001 audit, Peregrine, however, needed confirmation that the deal was an absolute commitment in order to meet its revenue targets for the quarter. With full knowledge of the falsity, BT obliged and sent a confirmation letter to Andersen. BT's statement confirming the deal was materially false when made, and was made to assist Peregrine in its fraudulent recognition of revenue. BT made this statement knowing, and intending that it would likely lead to the revenue being included in Peregrine's audited financial statements, which would be relied upon by investors and potential merger partners.

201.    The cancellation of the BT deal which had already been recognized by Peregrine as revenue, and knowingly and intentionally confirmed by BT as real revenue after it was cancelled, presented serious problems for both parties. As a result, in August 2000 BT and Peregrine agreed to an "amendment" to the cancelled contract converting the then cancelled BT deal into a contingent "barter" transaction — a deal that a Peregrine lawyer stated in an email: "make[s] no sense whatsoever [sic], commercially or legally — but fully appreciative of the spot we're in." Gardner, Gless, and Powanda were among those from Peregrine who participated in the decision. This new deal allowed Peregrine to continue to keep the BT deal on its books as revenue until the restatement on May 23, 2002. By entering into this "amendment," BT knowingly and intentionally assisted Peregrine in concealing the cancellation of the BT deal, and in continuing to fraudulently recognize revenue from that deal. In doing so, BT knew or should

1   have known that Peregrine would continue to misstate its financial condition, and that third

2   parties such as Plaintiffs would rely upon this financial condition to their detriment.

3   **D.   Bull**

4   202.   In June 2000, Peregrine was again desperate for revenue to meet its

5   quarter. Peregrine therefore asked Bull to enter into a fully contingent transaction, although

6   Peregrine would treat it as non-contingent and report virtually all of the revenue before June 30,

7   2000. Bull agreed to cooperate, signing an agreement dated June 30, 2000 for the unconditional

8   purchase of $5,000,000 in Peregrine software for resale. As it had told Bull it would do,

9   Peregrine immediately recognized license revenue of $4,299,850 and deferred revenue of

10   $700,150 in the June 2000 quarter.

11   203.   In fact, the deal was not signed until on or about July 7, 2000, and was

12   backdated by Bull to aid and abet Peregrine's recognition of the revenue in the June 2000 quarter.

13   Moreover, Bull only signed the deal after receiving two side letters dated July 5, 2000 under

14   which Peregrine agreed to (1) pay an invoice of up to $2.5 million to Bull to pay off the deal

15   and/or (2) to transfer up to $5 million in business to Bull to burn off the $5 million commitment

16   under the deal. Gless, Gardner, among others at Peregrine, knew of the contingent nature of the

17   Bull transaction.

18   204.   Bull falsely represented the amount and nature of the revenue deal knowing

19   that Peregrine intended to fraudulently recognize and back date revenue from the deal, with no

20   intention to fully perform under the deal, and with the intention to aid and abet Peregrine in its

21   fraudulent recognition of revenue. Bull further knew, or had reason to know, that investors would

22   then rely upon Peregrine's fraudulent financial numbers containing revenue recognized under the

23   Bull deal. After one payment by Bull of $1,000,000, the remainder of the revenue from this

24   transaction was restated by Peregrine in 2002.

25   **E.   Insight**

26   205.   In a contract dated December 28, 2000, Insight, then known as Action,

27   agreed to a £10,000,000 deal with Peregrine under which it would purchase certain software for

28   its own use, and certain software for resale. Absent this deal and the BT deal, Peregrine would

THIRD AMENDED COMPLAINT

**EXHIBIT 13**

1   have missed its quarterly numbers for the third quarter of FY01. Peregrine immediately

2   recognized $12,580,445 in license revenue and $1,492,000 in deferred revenue in the 3rd Quarter

3   ending December 31, 2000, from its transaction with Action. On June 1, 2001, Action's

4   Financial Controller, responding to an audit confirmation request from Andersen, falsely

5   represented that the deal was real, free from contingencies, and the sums claimed under it owed to

6   Peregrine were in fact owed.

7           206.    The deal as known to, and discussed by, among others, Gardner, Powanda,

8   and Gless and Action's CEO, was intended from the beginning as an improper swap which would

9   allow both parties to book significant revenue in the December 2000 quarter. Peregrine actually

10  funded the deal by agreeing to purchase a license for Action products. Peregrine paid Action

11  £2,7000,000, which sum was then repaid to Peregrine and recorded by Peregrine as income. A

12  further £5.5 million of the deal was contingent due to a hidden side agreement, under which

13  Peregrine agreed to cover these obligations by transferring other third-party sales to Action to run

14  through Action's books to burn off the obligation. It was further understood by Action's CEO,

15  Powanda, Gardner and Gless that the deal was an accommodation that Action could choose not to

16  perform, absent further accommodations from Peregrine.

17          207.    Action expressly agreed with, among others, Gardner and Gless, that

18  Peregrine would improperly recognize revenue from the Action deal, and agreed to structure the

19  deal, and to undertake all necessary actions, including falsely responding to audit confirmations,

20  to allow Peregrine to improperly recognize revenue. As agreed by the parties in advance, Action

21  later advised Peregrine that it would not perform, as was expected.

22          208.    Action agreed to a second £2,750,000 deal in March of 2001. Peregrine

23  recorded revenue of $3,128,340 on March 31, 2001 from this further deal. At the time this

24  revenue was recorded, Action did not intend to pay, and Peregrine had agreed Action would not

25  have to pay, any moneys under the contract. In an August 14, 2001 side letter pursuant to

26  Action's and Peregrine's agreement and conspiracy to misrepresent revenue, Peregrine absolved

27  Action of any need to perform under the agreement.

28

1    209.   Gardner, and Gless further agreed with Action to hide the fraudulent nature

2    of the deals by shifting other revenue through Action, thereby allowing Peregrine to keep both

3    deals on its books, until they were restated in 2002.

4    210.   Action entered into these fraudulent transactions knowing that Peregrine

5    would falsely inflate its financial statements in part by using the revenue attributed to these

6    transactions. Action knew, or should have known, that potential investors in Peregrine and

7    potential merger partners would rely on these false financial statements and would invest in

8    Peregrine based upon them.

9    F.    Bindview

10    211.   Moores was on the Board of Directors and a controlling shareholder of

11    Bindview. In early Spring of 2000, Bindview agreed to a concurrent swap transaction with

12    Peregrine under which Bindview and Peregrine would purchase software from each other, thereby

13    allowing each party to improperly recognize revenue. To allow Peregrine to recognize the

14    revenue, Moores, Gless, and others at Peregrine agreed not to disclose Moores' connection with

15    Bindview as it would have been a related management transaction.

16    212.   On April 30, 2000, pursuant to its agreement with Bindview, Peregrine

17    recognized revenue of $1,086,335 and deferred revenue of $367,165 on a purported transaction

18    with Bindview. Yet, as of this date, no deal documents had been signed and no actual transaction

19    had occurred. The deal was eventually signed on May 17, 2000 by Bindview and not until

20    September 30, 2000 by Peregrine, yet Peregrine recorded revenues well before any actual deal

21    occurred. In turn, pursuant to their agreement, Peregrine purchased a matching amount of

22    software from Bindview.

23    213.   Bindview knew or should have known that Peregrine would improperly

24    recognize revenue to inflate its financial statements and Bindview further knew and intended that

25    these false financial statements would be relied upon by investors and potential merger partners

26    who would invest in Peregrine based upon them.

27

28

- 76 -
THIRD AMENDED COMPLAINT          EXHIBIT 13

# XII. OFFICER AND DIRECTOR DEFENDANTS' UNLAWFUL MARKET ACTIVITY

214.   Defendants Moores, Gardner, Gless, Watrous, Noell, Powanda, and Nelson engaged in unlawful market activity.  They regularly traded on inside information, selling off huge quantities of stock after the Company released glowing public statements, knowing full well that those statements were untrue and that sale of their stock was advisable while they could profit from it.  Moreover, they also sold stock prior to public disclosure of the Company's acquisition of Harbinger because they knew that the purchase of Harbinger would depress the stock price for some time.  To avoid losing value, they sold off stock in massive amounts.

215.   Many of the sales came on the heels of Peregrine's various press releases falsely announcing positive and often "record" results, which these defendants knew or were reckless in not knowing, were materially false and misleading.  Defendants also sold stock during black-out periods.

216.   Gardner engaged in the following sales of Peregrine stock during the Affected Period while knowing of material adverse nonpublic information concerning the Company:

| Date | Number of Shares | Proceeds Received |
| --- | --- | --- |
| 08/04/99 | 12,500 | $ 357,875.00 |
| 08/04/99 | 7,500 | $ 214,725.00 |
| 08/05/99 | 7,500 | $ 215,325.00 |
| 08/06/99 | 5,000 | $ 142,500.00 |
| 08/09/99 | 5,000 | $ 143,600.00 |
| 08/09/99 | 42,500 | $ 1,220,600.00 |
| 08/13/99 | 12,500 | $ 399,125.00 |
| 08/13/99 | 7,500 | $ 239,475.00 |
| 02/22/00 | 35,000 | $ 1,515,850.00 |
| 02/23/00 | 15,000 | $ 658,500.00 |
| 02/23/00 | 25,000 | $ 1,097,500.00 |
| 02/23/00 | 117,762 | $ 5,169,751.80 |

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/24/00 | 37,238 | $ 1,679,806.18 |
| 02/24/00 | 20,262 | $ 914,018.82 |
| 09/04/01 | 2,250 | $ 61,875.00 |
| **Total Sold:** | **352,512**[1] | **$14,030,526.80** |

217.    Gless engaged in the following sales of Peregrine stock during the Affected Period while knowing of material adverse nonpublic information concerning the Company.

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 07/26/99 | 3,125 | $ 93,781.25 |
| 07/26/99 | 11,250 | $ 337,612.50 |
| 08/17/99 | 1,250 | $ 41,250.00 |
| 08/26/99 | 5,000 | $ 172,500.00 |
| 08/26/99 | 5,000 | $ 175,000.00 |
| 02/15/00 | 9,000 | $ 408,960.00 |
| 02/15/00 | 4,000 | $ 182,520.00 |
| 02/15/00 | 5,000 | $ 222,500.00 |
| 02/15/00 | 5,000 | $ 225,000.00 |
| 02/15/00 | 2,500 | $ 113,750.00 |
| 02/15/00 | 500 | $ 22,750.00 |
| 02/15/00 | 6,250 | $ 287,500.00 |
| 02/15/00 | 7,750 | $ 356,500.00 |
| 02/15/00 | 10,000 | $ 451,900.00 |
| 02/23/00 | 5,000 | $ 230,000.00 |
| 02/25/00 | 8,000 | $ 400,000.00 |

---

[1] This amount and others throughout the Complaint reflect the total number of shares unadjusted for stock splits.

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 02/25/00 | 500 | $ 27,000.00 |
| 02/25/00 | 2,000 | $ 109,000.00 |
| 02/25/00 | 1,000 | $ 54,380.00 |
| 02/25/00 | 1,500 | $ 81,285.00 |
| **Total Sold:** | **93,625** | **$3,993,188.75** |

218.   Nelson made the following sales of Peregrine common stock during the

Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 08/16/99 | 12,500 | $ 415,625.00 |
| 08/16/99 | 37,500 | $1,237,500.00 |
| 08/23/99 | 25,000 | $ 837,500.00 |
| 08/26/99 | 1,000 | $ 35,250.00 |
| 08/31/99 | 11,500 | $ 375,245.00 |
| 02/15/01 | 200,000 | $5,926,000.00 |
| **Total Sold:** | **287,500** | **$8,827,120.00** |

219.   Powanda made the following sales of Peregrine common stock during the

Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 08/16/99 | 10,000 | $ 330,000.00 |
| 08/16/99 | 6,250 | $ 206,250.00 |
| 02/17/00 | 30,000 | $ 1,379,400.00 |
| 02/17/00 | 20,000 | $ 923,800.00 |
| 02/17/00 | 10,000 | $ 459,400.00 |
| 02/17/00 | 20,000 | $ 922,600.00 |
| 02/17/00 | 20,000 | $ 924,400.00 |

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/17/00 | 10,000 | $ 464,400.00 |
| 02/23/00 | 2,500 | $ 112,350.00 |
| 02/23/00 | 5,000 | $ 225,950.00 |
| 02/24/00 | 22,500 | $ 1,012,500.00 |
| 02/24/00 | 10,000 | $ 451,300.00 |
| 02/24/00 | 10,000 | $ 460,000.00 |
| 02/24/00 | 2,500 | $ 113,900.00 |
| 02/24/00 | 10,000 | $ 463,800.00 |
| 02/24/00 | 7,500 | $ 341,250.00 |
| 02/25/00 | 5,000 | $ 238,750.00 |
| 02/25/00 | 10,000 | $ 481,300.00 |
| 02/25/00 | 5,000 | $ 235,000.00 |
| 02/08/01 | 400,000 | $11,232,000.00 |
| 05/10/01 | 10,000 | $282,000.00 |
| 05/16/01 | 8,750 | $231,875.00 |
| 05/16/01 | 30,000 | $795,000.00 |
| 05/16/01 | 1,250 | $33,125.00 |
| 05/21/01 | 20,946 | $586,488.00 |
| 05/21/01 | 14,000 | $392,700.00 |
| 05/21/01 | 10,000 | $281,000.00 |
| 05/21/01 | 10,000 | $281,500.00 |
| 05/21/01 | 1,900 | $53,675.00 |
| 05/21/01 | 600 | $16,950.00 |
| 05/21/01 | 2,500 | $70,625.00 |
| 05/21/01 | 10,000 | $ 283,000.00 |
| **Total Sold:** | **736,196** | **$24,286,288.00** |

220.    Powanda was constantly requesting that he be removed from the list of Company insiders subject to black-out periods. In an e-mail to Eric Deller on July 20, 2000,

THIRD AMENDED COMPLAINT

Powanda pleaded, "get me off the 16B list!!!"  Notwithstanding, Powanda sold 200,000 shares during Company imposed black-out periods.

221.   Moores made the following sales of Peregrine common stock during the Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 07/26/99 | 1,522,719 | $ 43,397,491.50 |
| 07/26/99 | 970,923 | $ 27,671,305.50 |
| 02/17/00 | 1,143,016 | $ 52,647,316.96 |
| 02/17/00 | 251,436 | $ 11,581,142.16 |
| 02/18/00 | 2,122,736 | $ 92,721,108.48 |
| 02/18/00 | 466,960 | $ 20,396,812.80 |
| 02/28/00 | 408,220 | $ 20,962,097.00 |
| 02/28/00 | 89,799 | $ 4,611,178.65 |
| 02/29/00 | 89,799 | $ 4,727,917.35 |
| 02/29/00 | 408,220 | $ 21,492,783.00 |
| 02/08/01 | 77,000 | $ 2,324,630.00 |
| 02/12/01 | 175,000 | $ 4,900,000.00 |
| 02/13/01 | 385,000 | $ 10,987,900.00 |
| 02/15/01 | 1,104,022 | $ 32,756,332.74 |
| 02/16/01 | 280,000 | $ 8,332,800.00 |
| 02/16/01 | 218,978 | $ 6,330,653.98 |
| 02/20/01 | 210,000 | $ 6,308,400.00 |
| 02/23/01 | 506,223 | $ 15,449,925.96 |
| 02/26/01 | 360,000 | $ 10,429,200.00 |
| 02/27/01 | 50,000 | $ 1,335,000.00 |
| 02/28/01 | 90,000 | $ 2,276,100.00 |
| **Total Sold:** | **10,930,051** | **$401,640,096.08** |

THIRD AMENDED COMPLAINT

222.   In addition, Moores' personal investment company (JMI Equity) sold the stock it owned as well, prior to Peregrine's May 6, 2002, announcement of its discovery of purported accounting irregularities.  In total, Moores obtained more than $554 million of proceeds from his sale of Peregrine stock, making him by far the largest beneficiary of the fraud.

223.   Noell made the following sales of Peregrine common stock during the Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/23/00 | 90,000 | $3,897,900.00 |
| 02/15/01 | 68,978 | $2,052,785.28 |
| 02/16/01 | 15,397 | $   445,127.27 |
| Total Sold: | 174,375 | $6,395,812.55 |

224.   Watrous engaged in the following insider selling of Peregrine shares during the Affected Period while knowing material adverse nonpublic information about the Company.

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/25/00 | 15,000 | $811,200.00 |
| Total Sold: | 15,000 | $811,200.00 |

## FIRST CAUSE OF ACTION

*(Against Officer and Director Defendants
for Violation of Cal. Corp. Code § 25504)*

225.   Plaintiffs incorporate here by reference the allegations contained in paragraphs 1 - 224, as though fully set forth herein.

226.   Under California Corporations Code § 25401:  "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact

324631.3

- 82 -

1   or omits to state a material fact necessary in order to make the statements made, in the light of the

2   circumstances under which they were made, not misleading."

3          227.   As set forth extensively throughout this Complaint, including but not

4   limited to paragraphs 71 - 74, Peregrine published numerous false and misleading statements of

5   material fact regarding its financial condition and prognosis and also failed to disclose material

6   facts.  These false and misleading statements were made in, among other things, press releases,

7   10-Q and 10-K statements, the Registration Statement for the Remedy transaction, the Proxy

8   Statement and Prospectus, as well as in other written and oral communications.

9          228.   Peregrine made these false statements and omissions in connection with the

10   purchase and sale of securities, including its purchase of Remedy stock from and its sale of

11   Peregrine stock to plaintiffs in the State of California.

12          229.   Under California Corporations Code § 25504, the following persons are

13   jointly and severally liable for violations of § 25401: "Every person who directly or indirectly

14   controls a person liable; . . . every principal officer or director of a corporation so liable, every

15   person occupying a similar status or performing similar functions, every employee of a person so

16   liable who materially aids in the act or transaction constituting the violation, . . ." unless such

17   person can show he had no knowledge or reasonable grounds to believe in the facts underlying

18   the allegations of liability.

19          230.   Each Officer Defendant and Director Defendant is presumptively liable by

20   virtue of his status as an officer or director of Peregrine.  Each Director Defendant had interests in

21   Peregrine and duties to the Company that went beyond merely serving on the Board of Directors.

22   These interests and duties are set forth more fully in those sections of the Complaint pertaining to

23   each such defendant.

24          231.   Moreover, each Officer Defendant and Director Defendant is also liable by

25   virtue of his status as a control person of Peregrine.  The facts demonstrating each defendant's

26   exercise of control over the Company are set forth in those sections of the Complaint pertaining

27   to each defendant.

28

1         232.   As a direct, foreseeable, and proximate result of this wrongful conduct

2   alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

3   prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

4   time of trial.

5   <div align="center">**SECOND CAUSE OF ACTION**</div>

6   <div align="center">(Against All Defendants for Fraud and Deceit)</div>

7         233.   Plaintiffs incorporate herein by reference the allegations contained in

8   paragraphs 1 - 232 as though fully set forth herein.

9         234.   As set forth more fully throughout the Complaint, defendants, directly and

10   indirectly, made numerous false statements regarding the financial status of Peregrine, as well as

11   its financial health and future.  The nature of these misrepresentations and omissions related to,

12   without limitation:  (a) the financial condition of Peregrine; (b) revenue to be recognized by

13   Peregrine on certain transactions; (c) the financial statements of Peregrine including falsely

14   asserting that those statements complied with GAAP; (d) the value of Peregrine common stock to

15   be exchanged in the merger with Remedy; and, (e) in the case of the Auditor Defendants, whether

16   their audit opinions complied with GAAS.  As set forth more fully in the paragraphs of the

17   Complaint related to each particular defendant, as well as the paragraphs describing the false

18   statements, each and every defendant in this action made material false statements or failed to

19   disclose information.  Each defendant had a duty to disclose the true facts, either by virtue of their

20   status as an officer or director of defendant, by virtue of the fact that they had superior knowledge

21   and made statements that required further disclosure to avoid their misleading nature, and by

22   virtue of the fact that they made statements knowing that third parties, such as investors and

23   Peregrine's merger partners, would rely on them.

24         235.   In each case, defendants acted with the requisite scienter, knowing that

25   their misstatements and failures to disclose were material, or recklessly disregarding their truth or

26   falsity.

27

28

**EXHIBIT 13**

1    236.   Defendants made those misrepresentations with the intent to deceive

2  Plaintiffs and to induce Plaintiffs and/or their agents to rely on them by purchasing or otherwise

3  acquiring Peregrine securities and/or selling Remedy securities.

4    237.   Plaintiffs and/or their agents read and/or were aware of the

5  misrepresentations and actually and justifiably relied on them in making their substantial

6  investments and decisions to enter into the merger on the agreed terms in exchange for Peregrine

7  securities and other consideration. Such misrepresentations include, but are not limited to, those

8  made in the Registration Statement, Proxy Statement/Prospectus, SEC filings, and press releases.

9  Had Plaintiffs and/or their agents known the truth, they would have understood the true value of

10  Peregrine securities and would not have entered into the merger on such unfavorable terms, with

11  Peregrine securities valued at the substantially inflated market prices, or would not have entered

12  into the merger at all. The reliance by each individual plaintiff is set forth as follows:

13    a.   Alloco: Prior to the merger Allocco reviewed numerous documents

14  containing Peregrine's audited sales figures. Allocco was aware of the contents of Peregrine's

15  audited financial numbers, specifically the revenue numbers. Allocco specifically was aware of,

16  and relied upon, the audited financial information and revenue numbers contained therein and

17  believed based upon them that Peregrine was a financially healthy company and that the merger

18  was beneficial. Allocco expected, and relied upon, Peregrine's officers, directors, and auditor to

19  ensure that Peregrine's financial information was accurate, and expected and relied upon third

20  parties confirming Peregrine's revenue to do so honestly and accurately. Had Allocco known of

21  Peregrine's true financial condition, and that it was booking revenue from contingent and swap

22  deals, he would have voted against the merger, and if the merger had still occurred, would have

23  sold all of his stock as soon as possible after the merger. Allocco further relied upon this

24  information in holding his stock after the merger. Had Allocco known of Peregrine's true

25  financial condition, or that it was booking revenue from contingent and swap deals, he would

26  immediately have sold all of his shares.

27    b.   Barker: Prior to the merger, Barker reviewed and relied upon,

28  among other documents, Peregrine's 10-K and 10-Q filings, quarterly reports, the July 23, 2001

THIRD AMENDED COMPLAINT
**EXHIBIT 13**

1  SEC registration statement, the proxy statement/prospectus, Peregrine's press releases containing

2  information on Peregrine's financial numbers, and analysis and press reports containing

3  Peregrine's financial information. Barker specifically reviewed and relied upon the audited

4  financial information and revenue numbers contained therein, and believed based upon them that

5  Peregrine was a financially healthy company, and that the merger was beneficial. As Remedy's

6  Investor Relations employee, Barker was also aware of the due diligence review of Peregrine's

7  financial information and believed based upon that review, that Peregrine's financial numbers

8  reflected the company's finances. Barker expected, and relied upon, Peregrine's officers,

9  directors, and auditors to ensure that Peregrine's financial information was accurate, and expected

10 and relied upon third parties confirming Peregrine's revenue to do so honestly and accurately.

11 Had Barker known of Peregrine's true financial condition, or that it was booking revenue from

12 contingent and swap deals, she would have voted against the merger, and would have

13 immediately reported any information she had obtained as to Peregrine's fraudulent financial

14 numbers. Barker further relied upon this information in purchasing Peregrine shares after the

15 merger. Had Barker known of Peregrine's true financial condition or that it was booking revenue

16 from contingent and swap deals, she would have immediately reported this information.

17         c.    Boyd: Prior to the merger, Boyd reviewed and relied upon, among

18 other documents, Peregrine's 10-K and 10-Q SEC filings, annual and quarterly reports, the

19 July 23, 2001 SEC registration statement, the proxy statement/prospectus, and financial

20 information contained in Peregrine's press release. Boyd specifically reviewed and relied upon

21 the audited financial information and revenue numbers contained therein, and believed based

22 upon them that Peregrine was a financially healthy company, and that the merger was beneficial.

23 Boyd further relied upon Peregrine's history of quarter after quarter exceeding revenue

24 expectations. Boyd expected, and relied upon, Peregrine's officers, directors, and auditors to

25 ensure that Peregrine's financial information was accurate, and expected and relied upon third

26 parties confirming Peregrine's revenue to do so honestly and accurately. Had Boyd known of

27 Peregrine's true financial condition, or that it was booking revenue from contingent and swap

28 deals, he would have voted against the merger, and if the merger had still occurred, would have

1   sold all of his stock as soon as possible after the merger. Boyd further relied upon this

2   information in holding his stock after the merger, and in working for Peregrine with

3   compensation that was partially provided through new option grants of Peregrine's stock. Had

4   Boyd known of Peregrine's true financial condition, or that it was booking revenue from

5   contingent and swap deals, he would have immediately sold all of his shares as soon as legally

6   possible.

7                d.     Cootes: Prior to the merger, Cootes reviewed and relied upon,

8   among other documents, Peregrine's annual reports from the two years preceding the merger, the

9   July 23, 2001 SEC registration statement, the proxy statement/prospectus, and Peregrine press

10  releases containing information from Peregrine's financial reports. Cootes further reviewed

11  analysis briefings which contained information on Peregrine's revenue numbers taken from

12  Peregrine's audited financial reports. Cootes specifically reviewed and relied upon the audited

13  financial information and revenue numbers contained therein, and believed based upon them that

14  Peregrine was a financially healthy company, and that the merger was beneficial. Cootes further

15  relied upon Peregrine's history of revenue growth and what appeared to be well-developed and

16  profitable resale channels, as reflected in Peregrine's financial reports. Cootes expected, and

17  relied upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial

18  information was accurate, and expected and relied upon third parties confirming Peregrine's

19  revenue to do so honestly and accurately. Had Cootes known of Peregrine's true financial

20  condition or that it was booking revenue from contingent and swap deals, he would have voted

21  against the merger, and if the merger had still occurred, would have sold all of his stock as soon

22  as possible after the merger. Cootes further relied upon this information in purchasing

23  Peregrine's shares after the merger, as well as in holding his stock after the merger. Had Cootes

24  known of Peregrine's true financial condition, or that it was booking revenue from contingent and

25  swap deals, he would not have purchased Peregrine shares after the merger, and would have

26  immediately sold all of his shares as soon as legally possible.

27               e.     Fior: Prior to the merger, Fior reviewed and relied upon, among

28  other documents, Peregrine's 10-K and 10-Q filings, Peregrine's annual and quarter reports,

1    Peregrine's financial information contained within the registration agreement and the plan of

2    merger and reorganization, the July 23, 2001 SEC registration statement, the proxy

3    statement/prospectus, and press releases and analyst reports containing information on

4    Peregrine's financial condition. Fior specifically reviewed and relied upon the audited financial

5    information and revenue numbers contained therein, and believed based upon them that Peregrine

6    was a financially healthy company and that the merger was beneficial. Fior expected, and relied

7    upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information

8    was accurate, and expected and relied upon third parties confirming Peregrine's revenue to do so

9    honestly and accurately. Fior further relied upon presentations made by defendant Gardner and

10   Gless to him regarding Peregrine's financial condition. Had Fior known of Peregrine's true

11   financial condition, or that it had booked revenue from contingent and swap deals, he would have

12   voted against the merger, and if the merger still occurred, would have sold all of his stock as soon

13   as possible after the merger. Fior further relied upon this information, in holding his stock after

14   the merger. Had Fior known of Peregrine's true financial condition and that it was booking

15   revenue from contingent and swap deals, he would have immediately sold all of his shares.

16            f.      Friedman: Prior to the merger, Friedman reviewed and relied upon,

17   among other documents, the proxy statement/prospectus as well as press reports and analysts

18   reports containing information taken from Peregrine's audited financial statements, and including

19   information on Peregrine's revenue numbers taken from those financial statements. Friedman

20   specifically reviewed, was aware of, and relied upon Peregrine's audited financial information

21   and the revenue numbers contained therein, and believed based upon them that Peregrine was a

22   financially healthy company and that the merger was beneficial. Friedman expected, and relied

23   upon Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information

24   was accurate, and expected and relied upon third parties confirming Peregrine's revenue to do so

25   honestly and accurately. Had Friedman known of Peregrine's true financial condition, or that it

26   was booking revenue from contingent and swap deals, she would have voted against the merger,

27   and if the merger had still occurred, would have sold all of her stock as soon as possible after the

28   merger. Friedman further relied upon this information, in holding her stock after the merger.

THIRD AMENDED COMPLAINT

1   Had Friedman known of Peregrine's true financial condition or that it was booking revenue from

2   contingent and swap deals, she would have immediately sold all of her shares as soon as legally

3   possible.

4                 g.      Garlick: Prior to the merger, Garlick reviewed and relied upon,

5   among other documents, Peregrine's 10-K's and 10-Q's from 1999 to 2001 as well as Peregrine's

6   press releases and analysts' reports containing information from Peregrine's financials from that

7   period and throughout his time at Remedy. This review included careful consideration of

8   Peregrine's revenue numbers taken from these financial statements, and Peregrine's consistent

9   history of revenue growth. Garlick specifically reviewed, was aware of, and relied upon

10  Peregrine's audited financial information and the revenue numbers contained therein, and based

11  upon them that Peregrine was a financially healthy company and that the merger was beneficial.

12  As part of his due diligence, Garlick specifically looked at the DSO number for Peregrine, which

13  he considered a key indicator of Peregrine's financial health, and specifically looked for the

14  "three standard paragraphs" and the lack of any exceptions to Arthur Andersen's unqualified

15  audit reports on Peregrine's financial statement. Garlick expected, and relied upon Peregrine's

16  officers, directors, and auditors to ensure that Peregrine's financial information was accurate and

17  expected and relied upon third parties confirming Peregrine's revenue to do so honestly and

18  accurately. Had Garlick known of Peregrine's true financial condition, or that it was booking

19  revenue from contingent and swap deals, he would not have gone through the merger and if he

20  had learned the truth after the merger he would have made an effort to rescind the transaction for

21  the benefit of all of Remedy's shareholders.

22                h.      Goldberg: Prior to the merger, Goldberg reviewed and relied upon,

23  among other documents, Peregrine's quarterly reports, the Registration Agreement and Plan of

24  Merger in the Organization, the July 23, 2001 SEC Registration Statement, and the entirety of the

25  Proxy Statement/Prospectus. Goldberg specifically reviewed, was aware of, and relied upon

26  Peregrine's audited financial information and the revenue numbers contained therein, and

27  believed based upon them that Peregrine was a financially healthy company and that the merger

28  was beneficial. Goldberg expected, and relied upon Peregrine's officers, directors, and auditors

1   to ensure that Peregrine's financial information was accurate, and expected and relied upon third

2   parties confirming Peregrine's revenue to do so honestly and accurately. Had Goldberg known of

3   Peregrine's true financial condition, or that it was booking revenue from contingent and swap

4   deals, he would have voted against the merger, and if the merger had still occurred, would have

5   sold all of his stock as soon as possible after the merger. Goldberg further relied upon this

6   information in holding his stock after the merger. Had Goldberg known of Peregrine's true

7   financial condition, or that it was booking revenue from contingent and swap deals, he would

8   have immediately sold all of his shares as soon as legally possible.

9           i.      Guerrieri: Prior to the merger, Guerrieri reviewed and relied upon,

10   among other documents, the July 23, 2001 SEC registration statement and the proxy

11   statement/prospectus, as well as Peregrine's press releases, and analyst reports repeating

12   information from Peregrine on Peregrine's financial condition. Guerrieri specifically reviewed

13   and relied upon the audited financial information and revenue numbers contained therein, and

14   believed based upon them that Peregrine was a financially healthy company and that the merger

15   was beneficial. Guerrieri expected, and relied upon, Peregrine's officers, directors, and auditors

16   to ensure that Peregrine's financial information was accurate, and expected and relied upon third

17   parties confirming Peregrine's revenue to do so honestly and accurately. Had Guerrieri known of

18   Peregrine's true financial condition, or that they had booked revenue from contingent and swap

19   deals, he would have voted against the merger, and if the merger had still occurred, would have

20   sold all of his stock as soon as possible after the merger. Guerrieri further relied upon this

21   information in holding his stock after the merger. Had Guerrieri known of Peregrine's true

22   financial condition, that it was booking revenue from contingent and swap deals, he would have

23   immediately sold all of his shares.

24           j.      Jones: Prior to the merger, Jones reviewed and relied upon, among

25   other documents, Peregrine's 10-K and 10-Q filings, Peregrine's annual quarterly reports, the

26   July 23, 2001 SEC registration statement, the proxy statement/prospectus, and financial

27   information contained in Peregrine's press releases, and in analyst reports. Jones specifically

28   reviewed and relied upon the audited financial information, revenue numbers contained therein,

1 │ and believed based upon them that Peregrine was a financially healthy company and that the

2 │ merger was beneficial. Jones expected, and relied upon, Peregrine's officers, directors, and

3 │ auditors to ensure that Peregrine's financial information was accurate, and expected and relied

4 │ upon third parties confirming Peregrine's revenue to do so honestly and accurately. Had Jones

5 │ known of Peregrine's true financial condition, or that it had booked revenue from contingent and

6 │ swap deals, he would have voted against the merger, and if the merger had still occurred, would

7 │ have sold all of his stock as soon as possible after the merger. Jones further relied upon this

8 │ information in holding his stock after the merger. Had Jones known of Peregrine's true financial

9 │ condition and that it was booking revenue from contingent and swap deals, he would have

10 │ immediately sold all of his shares.

11 │          k.      Klawans Family Trust: Prior to the merger, Klawans, on behalf of

12 │ the Trust, reviewed and relied upon, among other documents, Peregrine's 10-Q's, Peregrine's

13 │ then-current annual report, the July 23, 2001 SEC registration statement, the proxy

14 │ statement/prospectus, Peregrine's press releases from the time of the merger, and analyst and

15 │ press reports which contained information on Peregrine's financial condition taken from

16 │ Peregrine's audited financial reports. Klawans specifically reviewed, was aware of, and relied

17 │ upon the audited financial information and revenue numbers contained therein, and believed

18 │ based upon them that Peregrine was a financially healthy company and that the merger was

19 │ beneficial. Klawans expected, and relied upon, Peregrine's officers, directors, and auditors to

20 │ ensure that Peregrine's financial information was accurate, and expected and relied upon third

21 │ parties confirming Peregrine's revenue to do so honestly and accurately. Had Klawans known of

22 │ Peregrine's true financial condition, or that it was booking revenue from contingent and swap

23 │ deals, he would have voted the Trust's shares against the merger, and if the merger had still

24 │ occurred, would have sold all of the Trust's shares as soon as possible after the merger. Klawans

25 │ further relied upon this information in holding the Trust's shares after the merger. Had Klawans

26 │ known of Peregrine's true financial condition or that it was booking revenue from contingent and

27 │ swap deals, he would have immediately sold all of the Trust's shares as soon as legally possible.

28 │

1    l.    Kulakow:  Prior to the merger, Kulakow reviewed and relied upon,

2  among other documents, Peregrine's 10-K's and 10-Q's, annual and quarterly reports, July 23,

3  2001 SEC registration statement, and proxy statement/prospectus.  Kulakow specifically

4  reviewed, was aware of, and relied upon the audited financial information and revenue numbers

5  contained therein, and believed based upon them that Peregrine was a financially healthy

6  company and that the merger was beneficial.  Kulakow expected, and relied upon, Peregrine's

7  officers, directors, and auditors to insure that Peregrine's financial information was accurate, and

8  expected and relied upon third parties confirming Peregrine's revenue to do so honestly and

9  accurately.  Had Kulakow known of Peregrine's true financial condition, or that it was booking

10  revenue from contingent and swap deals, he would have voted against the merger, and if the

11  merger had still occurred, would have sold all his shares as soon as possible after the merger.

12  Kulakow further relied upon this information, in holding his stock after the merger.  Had

13  Kulakow known of Peregrine's true financial condition or that it was booking revenue from

14  contingent and swap deals, he would have immediately sold all of his shares as soon as legally

15  possible.

16    m.    Little:  Prior to the merger, Little reviewed and relied upon, among

17  other documents, Peregrine's July 23, 2001 SEC registration statement, Peregrine's SEC filings

18  10-K and 10-Q, the proxy statement and prospectus, and press releases and analysts reports which

19  contained information taken from Peregrine's audited financial statements.  Little specifically

20  reviewed, was aware of, and relied upon the audited financial information and revenue numbers

21  contained therein, and believed based upon them that Peregrine was a financially healthy

22  company and that the merger was beneficial.  Little expected, and relied upon, Peregrine's

23  officers, directors, and auditors to insure that Peregrine's financial information was accurate, and

24  expected and relied upon third parties confirming Peregrine's revenue to do so honestly and

25  accurately.  Had Little known of Peregrine's true financial condition, or that it was booking

26  revenue from contingent and swap deals, he would have voted against the merger, and if the

27  merger had still occurred, would have sold all of his stock as soon as possible after or before the

28  merger.  Little further relied upon this information in holding his stock after the merger.  Had

1   Little known of Peregrine's true financial condition or that it was booking revenue from

2   contingent and swap deals, he would have immediately sold all of his shares as soon as legally

3   possible.

4               n.      Mahler: Prior to the merger, Mahler reviewed and relied upon,

5   among other documents, the registration agreement and plan of merger and reorganization, the

6   July 23, 2001 SEC registration statement and remedy press release. Mahler specifically

7   reviewed, was aware of the contents of, and relied upon the audited financial information and

8   revenues numbers contained therein, and believed, based upon them, that Peregrine was a

9   financially healthy company and that the merger was beneficial. Based upon this financial

10  information, in its further review by the remedy due diligence team in Morgan Stanley, Mahler

11  believed that Peregrine was financially healthy, and had multiple quarters of increased revenue,

12  and it consistently met its financial targets. Mahler expected, and relied upon, Peregrine's

13  officers, directors, and auditors to insure that Peregrine's financial information was accurate, and

14  expected and relied upon third parties confirming Peregrine's revenue to do so honestly and

15  accurately. Had Mahler known of Peregrine's true financial condition, or that it was booking

16  revenue from contingent and swap deals, he would have done everything he could to persuade the

17  board not to vote in favor of the merger, would have voted against the merger, and if the merger

18  had still occurred, would have sold all of his stock as soon a legally possible. Mahler further

19  relied upon this information in holding his stock after the merger. Had Mahler known of

20  Peregrine's true financial condition or that it was booking revenue from contingent and swap

21  deals, he would have immediately sold all of his shares as soon as legally possible.

22              o.      Mousseau: Prior to the merger, Mousseau reviewed and relied

23  upon, among other documents, Peregrine's 10-K and 10-Q and annual and quarterly reports, and

24  Peregrine's press releases and analyst reports containing information on Peregrine's financial

25  condition. Mousseau specifically reviewed, was aware of, and relied upon the audited financial

26  information and revenue numbers contained therein, and believed based upon them that Peregrine

27  was a financially healthy company and that the merger was beneficial. Mousseau relied upon

28  Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information was

THIRD AMENDED COMPLAINT

**EXHIBIT 13**

1    accurate, and expected and relied upon third parties confirming Peregrine's revenue to do so

2    honestly and accurately.  Had Mousseau known of Peregrine's true financial condition or that it

3    booked revenue from contingent and swap deals, he would have voted against the merger, and if

4    the merger had still occurred, would have sold all of his stock as soon as possible after the

5    merger.  Mousseau further relied upon this information, in holding his stock after the merger.

6    Had Mousseau known of Peregrine's true financial condition or that it was booking revenue from

7    contingent and swap deals, he would have immediately sold all of his shares as soon as legally

8    possible.

9                  p.    Douglas Mueller:  Prior to the merger, Mueller reviewed and relied

10   upon, among other documents, Peregrine's 10-K, 4 annual reports preceding merger, registration

11   agreement and plan of merger, the July 23, 2001 SEC Registration Statement, and the July 23,

12   2001 Proxy Statement/Prospectus, as well as press releases and analyst reports containing

13   information on Peregrine's financial condition taken from Peregrine's financial reports.  Mueller

14   specifically reviewed and relied upon the audited financial information revenue numbers

15   contained therein and believed based upon them that Peregrine was a financially healthy

16   company.  Mueller relied upon, Peregrine's officers, directors, and auditors to ensure that

17   Peregrine's financial information was accurate, and expected and relied upon third parties

18   confirming Peregrine's revenue to do so honestly and accurately.  Mueller relied upon Peregrine's

19   revenue numbers, their revenue trends on a quarterly basis, and their history of meeting Wall

20   Street's expectations and history of revenue growth in the belief it provided in him that Peregrine

21   was a financially health company in not attempting to prevent a vote in favor of the merger.  Had

22   Mueller known of Peregrine's true financial condition or that it booked revenue from contingent

23   and swap deals, he would have actively opposed and attempted to prevent the merger, and if the

24   merger had still occurred, would have sold all of his stock as soon as possible after the merger.

25   Had Mueller known of Peregrine's true financial condition, or that it was booking revenue from

26   contingent and swap deals, he would have immediately sold all of his shares, and would not have

27   purchased additional shares in January of 2002.

28

324631.3

THIRD AMENDED COMPLAINT

EXHIBIT 13

1        q.    Judith Orah Mueller:   Through discussions with her husband,

2  Douglas Mueller, Mueller relied upon the same materials upon which he relied.  Among other

3  documents, these include Peregrine's 10-K, 4 annual reports preceding merger, registration

4  agreement and plan of merger, the July 23, 2001 SEC Registration Statement, and the July 23,

5  2001 Proxy Statement/Prospectus, as well as press releases and analyst reports containing

6  information on Peregrine's financial condition taken from Peregrine's financial reports.  Mueller

7  specifically relied upon the audited financial information revenue numbers contained therein and

8  believed based upon them that Peregrine was a financially healthy company.  Mueller relied

9  upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information

10  was accurate, and expected and relied upon third parties confirming Peregrine's revenue to do so

11  honestly and accurately.  Mueller relied upon Peregrine's revenue numbers, their revenue trends

12  on a quarterly basis, and their history of meeting Wall Street's expectations and history of

13  revenue growth in the belief it provided that Peregrine was a financially health company in not

14  attempting to prevent a vote in favor of the merger.  Had Mueller known of Peregrine's true

15  financial condition or that it booked revenue from contingent and swap deals, she would have

16  actively opposed and attempted to prevent the merger, and if the merger had still occurred, would

17  have sold all of her stock as soon as possible after the merger.  Had Mueller known of Peregrine's

18  true financial condition, or that it was booking revenue from contingent and swap deals, she

19  would have immediately sold all of her shares.

20        r.    Peterson:  Prior to the merger, Peterson reviewed, was aware of the

21  contents of, and relied upon, among other documents, Peregrine's 10-K and 10-Q filings, annual

22  reports, the July 23, 2001 NCC registration statement, and the proxy statement/prospectus.

23  Peterson specifically reviewed and relied upon the audited financial information and revenue

24  numbers contained therein, and believed, based upon them, that Peregrine was a financially

25  healthy company.  Peterson expected, and relied upon, Peregrine's officers, directors, and their

26  auditors to ensure that Peregrine's financial information was accurate. and expected and relied

27  upon third parties confirming Peregrine's revenue to do so honestly and accurately.  Peterson

28  relied upon Peregrine's revenue numbers, the revenue trends on a quarterly basis, and his belief

1    that Peregrine was a financially healthy company and not attempting to prevent a vote in favor of

2    the merger. Had Peterson known of Peregrine's true financial condition, or that it had booked

3    revenue from contingent and swap deals, he would have actively opposed and attempted to

4    prevent the merger, and if the merger had still occurred, would have sold all of his stock as soon

5    as possible after the merger. Had Peterson known of Peregrine's true financial condition, or that

6    it was booking revenue from contingent and swap deals, he would have immediately sold all of

7    his shares as soon as possible.

8            s.      Potts: Prior to the merger, Potts reviewed and relied upon, among

9    other documents the July 23, 2001 Proxy Statement/Prospectus and the July 23, 2001 SEC

10   Registration Statement, as well as Peregrine's financial information. Potts specifically knew the

11   contents of, and relied upon, the audited financial numbers contained therein, and believed based

12   upon them and her discussions with members of Remedy's executive team who had carefully

13   reviewed them, that Peregrine was a financially healthy company and that the merger was

14   beneficial. Potts relied upon Peregrine's officers, directors, and auditors to ensure that

15   Peregrine's financial information was accurate, and expected and relied upon third parties

16   confirming Peregrine's revenues to do so honestly and accurately. Had Potts known of

17   Peregrine's true financial condition or that it had booked from revenue from contingent and swap

18   deals, she would have voted against the merger, and if the merger had still occurred, would have

19   sold all of her shares as soon as possible after the merger. Potts further relied upon this

20   information in holding her stock after the merger. Had Potts known of Peregrine's true financial

21   condition or that it was booking revenue from contingent and swap deals, she would have

22   immediately sold all of her shares.

23           t.      Schwem: Prior to the merger, Schwem reviewed, was aware of the

24   contents of, and relied upon, among other documents, Peregrine's 10-K and 10-Q filings, annual

25   reports, quarterly reports, the registration agreement and plan of merger and reorganization, the

26   July 23, 2001 SEC registration statement, and the proxy statement/prospectus. Schwem

27   specifically knew the contents of, and relied upon, the audited financial numbers contained

28   therein, and believed, based upon them, and her discussions with employees of Peregrine during

324631.3                                  - 96 -

1   the due diligence period, that Peregrine was a financially healthy company and that the merger

2   was beneficial. Schwem expected, and relied upon, Peregrine's officers, directors, and auditors to

3   ensure that Peregrine's financial information was accurate, and expected and relied upon third

4   parties confirming Peregrine's revenue to do so honestly and accurately. Had Schwem known of

5   Peregrine's true financial condition, or that it booked revenue from contingent and swap deals,

6   she would have opposed the merger as part of her due diligence responsibilities, and would have

7   voted against the merger. Had this information been known, the merger would not have occurred

8   and if, hypothetically, the merger had still occurred, she would have sold all of her shares as soon

9   as legally possible after the merger. Schwem further relied upon this information in holding her

10   stock after the merger, and in holding off exercising her options until the following year. Had

11   Schwem known of Peregrine's true financial condition, or that it was booking revenue from

12   contingent and swap deals, she would have immediately sold all her shares as soon as legally

13   possible, and would have exercised her options as soon as possible, then selling any stock as soon

14   as legally possible.

15           u.      Shoch: Prior to the merger, Shoch reviewed, and relied upon,

16   among other documents, Peregrine's quarterly reports, the registration agreement and plan of

17   reorganization, the July 23, 2001 SEC registration statement, the proxy statement/prospectus,

18   Peregrine press releases, and analysis of press reports containing information on Peregrine's

19   finances taken from Peregrine's financial statements. Shoch specifically knew the contents of,

20   and relied upon, the audited financial numbers contained therein, believed based upon them and

21   presentations by Peregrine to Remedy's board of directors, attorneys, bankers, accountants, that

22   Peregrine was a financially healthy company and that the merger was beneficial. Shoch expected,

23   and relied upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial

24   information was accurate, and expected and relied upon third parties confirming Peregrine's

25   revenue to do so honestly and accurately. Shoch specifically relied upon, among other materials,

26   Peregrine's revenue numbers, revenue trends regarding Peregrine's quarterly numbers, and

27   history of meeting Wall Street's expectations and history of revenue growth. Had Shoch known

28   of Peregrine's true financial condition or that it had booked revenue from contingent and swap

1   deals, he would have voted against the merger, both as a shareholder and member of the board of

2   Remedy, and if the merger had still occurred would have sold all of his shares as soon as possible

3   after the merger.  Shoch further relied upon this information in holding his stock after the merger.

4   Had Shoch known of Peregrine's true financial condition or that it was booking revenue from

5   contingent swap deals, he would have immediately sold all of his shares as soon as legally

6   possible.

7                              v.      Thomas:  Prior to the merger, Thomas reviewed and relied upon,

8   among other documents, Peregrine's SEC filings 10-K and 10-Q and Peregrine's press releases

9   and analyst reports containing information on Peregrine's finances.  Thomas was aware of these

10  materials showing Peregrine's financial condition and relied upon his discussions with co-

11  workers who had reviewed Peregrine's audited financial information and revenue numbers, and

12  believed based upon them that Peregrine was a financially healthy company and that the merger

13  was beneficial.  Thomas relied upon Peregrine's officers, directors and auditors to ensure that

14  Peregrine's financial information was accurate, and expected and relied upon third parties

15  confirming Peregrine's revenue to do so honestly and accurately.  Had Thomas known of

16  Peregrine's true financial condition or that it had booked revenue from contingent and swap deals,

17  he would have voted against the merger, and if the merger had still occurred would have sold all

18  of his stock as soon as possible after the merger.  Thomas further relied upon this information to

19  hold his stock after the merger.  Had Thomas known of Peregrine's true financial condition or

20  that it was booking revenue from contingent and swap deals, he would have immediately sold all

21  of his shares.

22                             w.      de Urioste:  Prior to the merger De Urioste reviewed and relied

23  upon, among other documents, the July 23, 2001 Proxy Statement/Prospectus and the July 23,

24  2001 SEC Registration Statement.  De Urioste specifically reviewed and relied upon the audited

25  financial information and revenue numbers contained therein, and believed based upon them that

26  Peregrine was a financially healthy company and that the merger was beneficial.  De Urioste

27  relied upon Peregrine's officers, directors, and auditors to insure that Peregrine's financial

28  information was accurate, and expected and relied upon third parties confirming Peregrine's

1 | revenue to do so honestly and accurately. Had De Urioste known of Peregrine's true financial

2 | condition or that it had booked revenue from contingent and swap deals, he would have voted

3 | against the merger, and if the merger had still occurred would have sold all of his stock as soon as

4 | possible after the merger. De Urioste further relied upon this information, and representations by

5 | Gardner in an August 2001 call with former Remedy shareholders in holding his stock after the

6 | merger. Had De Urioste known of Peregrine's true financial condition or that it was booking

7 | revenue from contingent and swap deals he would have immediately sold all of his shares.

8 |       x.      Wallace: Prior to the merger, Mr. Wallace reviewed and relied

9 | upon, among other documents, Peregrine's annual and quarterly reports, the July 23, 2001 SEC

10 | registration statement, the proxy statement/prospectus, Peregrine's press releases, and analyst and

11 | press reports containing Peregrine's financial information taken from Peregrine's financial

12 | reports. Mr. Wallace specifically reviewed and relied upon the audited financial information and

13 | revenue numbers contained therein, and believed based upon his review of these materials in his

14 | discussion with Remedy people who had also reviewed Peregrine's financial numbers, that

15 | Peregrine was a financially healthy company and that the merger was beneficial. Mr. Wallace

16 | expected, and relied upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's

17 | financial information was accurate, and expected and relied upon third parties confirming

18 | Peregrine's revenue to do so honestly and accurately. Had Mr. Wallace known of Peregrine's

19 | true financial condition or that it had booked revenue from contingent and swap deals, he would

20 | have voted against the merger, and if the merger had still occurred, would have sold all of his

21 | stock as soon as possible after the merger. Mr. Wallace further relied upon this information, and

22 | representations by Gardner as to Peregrine's financial condition and continued revenue growth in

23 | holding his stock after the merger. Had Mr. Wallace known of Peregrine's true financial

24 | condition or that it was booking revenue from contingent and swap deals, he would have

25 | immediately sold all of his shares as soon as legally possible.

26 |       y.      Weller: Prior to the merger, Mr. Weller reviewed and relied upon,

27 | among other documents, Peregrine's 10-K and 10-Q filings, the July 23, 2001 SEC registration

28 | statement, and the proxy statement prospectus. Weller specifically reviewed and relied upon the

1 audited financial information and reviewed numbers contained within these documents, and based

2 upon them believed that Peregrine was a financially health company, and that the merger was

3 beneficial. Based upon his review of these materials, Weller specifically believed that

4 Peregrine's accounting was conservative, and that their financial performance regarding revenue

5 had been impressive. Weller expected, and relied upon, Peregrine's officers, directors, and

6 auditors to ensure that Peregrine's reported financial condition was accurate, and expected and

7 relied upon third parties confirming Peregrine's revenue to do so honestly and accurately. Had

8 Weller known of Peregrine's true financial condition, or that it was booking revenue from

9 contingent and swap deals, he would have voted against the merger, and would have sold all of

10 his stock as soon as legally possible after the merger. Mr. Weller further relied upon this

11 information in purchasing additional shares of Peregrine stock after the merger, and in holding his

12 stock after the merger. Had Mr. Weller known of Peregrine's true financial condition, or that it

13 was booking revenue from contingent and swap deals, he would have not purchased further

14 shares of Peregrine stock, and would have immediately sold all of his shares as soon as legally

15 possible.

16      238.   At the time of the misrepresentations and of Plaintiffs' reliance thereon,

17 Plaintiffs were unaware of the falsity of Defendants' misrepresentations and could not reasonably

18 have known the truth. Defendants were the sole possessors of the true, accurate, and complete

19 information about Peregrine, to which Plaintiffs had no access. Plaintiffs did not and could not

20 have, in the exercise of reasonable diligence, discovered the fraudulent acts constituting this cause

21 of action until after Peregrine announced its restatement of revenues in May 2002 when the true

22 information first became publicly available and still do not know all of the facts concerning

23 defendants' participation.

24      239.   As a direct, foreseeable, and proximate result of this wrongful conduct

25 alleged herein, Plaintiffs suffered economic injury. The amount of such damages and

26 prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

27 time of trial.

28

1       240.   Defendants acted with oppression, fraud, and/or malice, thereby entitling

2   Plaintiffs to punitive damages.

3   ### THIRD CAUSE OF ACTION

4   (Against the Officer and Director Defendants for Negligent Misrepresentation)

5       241.   Plaintiffs incorporate herein by reference the allegations contained in

6   paragraphs 1 - 240 as though fully set forth herein.

7       242.   The Officer and Director Defendants made misrepresentations of fact and

8   failed to disclose material facts, notwithstanding their duty to make full and complete disclosures.

9   As set forth throughout this Complaint, Defendants made numerous representations without

10   disclosure of additional facts necessary to make the disclosed matters not misleading.  Moreover,

11   Defendants had superior knowledge and Plaintiffs could not reasonably have discovered the true

12   facts.  The nature of these misrepresentations and omissions related to, without limitation:  (a) the

13   financial condition of Peregrine; (b) the financial statements of Peregrine including falsely

14   asserting that those statements complied with GAAP; and (3) the value of Peregrine common

15   stock to be exchanged in the merger with Remedy.

16       243.   Defendants also knew or should have known that material representations

17   would be relied upon by the Remedy negotiating and due diligence teams in conveying their

18   recommendations about the proposed merger to plaintiffs.

19       244.   These communications included misrepresentations, i.e., untrue statements

20   of material facts and/or omissions of material facts necessary to make the statements not

21   misleading in the light of the circumstances under which they were made.

22       245.   Defendants had no reasonable ground for believing these communications

23   to be true.

24       246.   Defendants made these representations and omissions of fact with the

25   intent to induce Plaintiffs and/or their agents to act in reliance upon such by purchasing or

26   otherwise acquiring Peregrine securities and/or selling Remedy securities.

27

28

324631.3

THIRD AMENDED COMPLAINT

**224**
**EXHIBIT 13**

247.    At the time of the communications, and at the time Plaintiffs acted in reliance thereon, Plaintiffs did not know of their false and/or misleading nature and could not reasonably believe them to be untrue.

248.   . Plaintiffs and/or their agents read and/or were aware of the false and misleading representations and actually and justifiably relied on such in making their substantial investments and decisions to enter into the merger on the agreed terms in exchange for Peregrine securities and other consideration, in purchasing Peregrine shares on the open market, and in holding on to their Peregrine stock until it became worthless.  Such representations include, but are not limited to, those made in the Registration Statement, Proxy Statement/Prospectus, SEC filings, and press releases.  Plaintiffs further did not know of the facts that Defendants suppressed and failed to disclose at the time of the failures to disclose and suppressions of fact, and at the time Plaintiffs acted in reliance thereon.  Had Plaintiffs and/or their agents known the truth, they would have understood the true value of Peregrine securities and would not have entered into the merger on such unfavorable terms, or at all.

249.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the time of trial.

## FOURTH CAUSE OF ACTION

(Against the Auditor Defendants for Negligent Misrepresentation)

250.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 - 249 as though fully set forth herein.

251.    The Auditor Defendants held themselves out as possessing superior knowledge and expertise in the field of accounting and the preparation of audit reports.  The audit reports that they issue are positive assertions of fact, intended to be regarded as affirmations of the matters contained in them.

252.    The Auditor Defendants each contributed to the preparation of Andersen's audit opinions with respect to each of Peregrine's annual financial statements and performed

1   quarterly review work with respect to Peregrine's interim quarterly statements.  In addition,

2   Stulac worked closely with Peregrine to structure transactions for the purpose of revenue

3   recognition, even though such transactions did not result in revenue as it was then reported on the

4   financial statements.

5        253.   The Auditor Defendants issued unqualified audit opinions for Peregrine's

6   financial statements for both Fiscal Year 2000 and 2001, the years just preceding the Remedy

7   merger.  In both cases, the Auditor Defendants falsely reported that Peregrine financial statements

8   fairly presented Peregrine's financial position, that Peregrine's financial statements were prepared

9   in conformity with GAAP, and that Andersen had conducted its audits in conformity with GAAS.

10       254.   The Auditor Defendants were fully aware of Peregrine's business strategy

11  of acquiring other companies and its strategy to attract investors with false financial reports.  The

12  Auditor Defendants knew that a key part of Peregrine's business strategy was to use its stock as

13  currency to fund acquisitions.  The Auditor Defendants understood that the companies to be

14  acquired, including their executives, directors, shareholders, and representatives in the merger

15  discussions would review and rely upon the audit opinions and reports, and that the Auditor

16  Defendants' statements that the financial reporting complied with GAAP and GAAS would be

17  material to their evaluation of Peregrine's financial condition.  The Auditor Defendants knew that

18  Remedy, on behalf of itself and its shareholders, would retain a firm to analyze the fairness of a

19  merger and that that firm would rely upon Peregrine's financial statements and the audit reports

20  of them.

21       255.   In representing that Peregrine's financial statements were prepared in

22  accordance with GAAP, that those financial statements presented fairly the financial position of

23  the Company, and that Arthur Andersen had conducted its audit in accordance with GAAS, the

24  Auditor Defendants made material false statements without reasonable grounds for believing

25  them to be true.

26       256.   As set forth in paragraphs 237 - 238, plaintiffs justifiably relied upon these

27  false statements in exchanging their Remedy shares for shares of Peregrine, in some cases in

28  purchasing additional Peregrine stock after the merger, and in holding on to their Peregrine stock

1 until it became worthless. But for these false and misleading statements, plaintiffs would not

2 have taken these actions.

3          257.   As a direct, proximate and foreseeable result of the inaccurate

4 misrepresentations of the Auditor Defendants, plaintiffs have been damaged in an amount to be

5 proven at trial.

6                              **FIFTH CAUSE OF ACTION**

7                  (Against All Defendants For Violations of Cal. Corp. Code § 25504.1)

8          258.   Plaintiffs incorporate herein by reference the allegations contained in

9 paragraphs 1 - 257 as though fully set forth herein.

10          259.   California Corporations Code § 25504.1 imposes joint and several liability

11 for false or misleading statements (Cal. Corps. Code § 25401) on: "Any person who materially

12 assists . . . with intent to deceive or defraud . . ."

13          260.   For the reasons sets forth more specifically in the sections of the Complaint

14 regarding each individual defendant, all defendants in this action materially assisted in the

15 violations of Cal. Corps. Code § 25401 in numerous ways, including but not limited to:

16 conceiving of, implementing, and approving revenue recognition upon sell-in; publishing and

17 failing to correct the Company's financial statements knowing that the financial statements were

18 false and misleading; structuring and participating in bogus transactions for the purpose of

19 revenue recognition; participating in and permitting fraudulent accounting practices such as

20 treating loan funds as revenue; making and failing to correct press releases proclaiming record

21 and otherwise positive results for the Company knowing that the Company was in desperate

22 financial circumstances; failing to implement sound audit practices and procedures and internal

23 controls; and publishing and failing to correct false and misleading materials including the

24 Registration Statement and Prospectus for the Remedy merger.

25          261.   Defendants had actual knowledge at all times of the false and misleading

26 nature of the statements as set forth more fully in the sections of the Complaint referring to each

27 individual defendant. Moreover, as also set forth in those sections of the Complaint, each Officer

28 and Director Defendant intended to deceive and defraud potential investors and merger prospects,

324631.3                              - 104 -

1   including Remedy and its shareholders, for their own financial gain.  These individuals sought to

2   increase the value of their Peregrine shares or the value of the shares and/or the value of the

3   shares of those whose interests they represented.  In the case of the Auditor Defendants, they

4   sought lucrative professional relationships and engagements and the fees they generated.  In the

5   case of the Customer Defendants, they sought various benefits from assisting in Peregrine's fraud,

6   including an opportunity to perpetrate their own fraud, or the deep discounts and other

7   commercial favors they could gain by participating in phony and otherwise fraudulent

8   transactions.

9        262.   As a direct, foreseeable, and proximate result of this wrongful conduct

10   alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

11   prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

12   time of trial.

### SIXTH CAUSE OF ACTION

13

14   (Against Defendants Gardner, Gless, Moores, Noell, Powanda, Nelson, and Watrous
     for Violation of Cal. Corps. Code § 25500 – Market Manipulation)

15

16        263.   Plaintiffs incorporate herein by reference the allegations contained in

17   paragraphs 1 - 262 as though fully set forth herein.

18        264.   As set forth in detail in the sections of the Complaint related to each

19   individual defendant, defendants herein made and/or directly and willfully participated in the

20   preparation and dissemination of the false press releases, financial statements, and documents

21   related to the Remedy transaction and/or were persons who controlled the day-to-day operations

22   of the Company.  In addition, defendant Moores had a special relationship with the Company,

23   acting at all material times both directly and through persons placed in executive, Board, and

24   Committee positions at his behest and for his benefit, as a virtual senior executive of the

25   Company with access to all aspects of the Company and input into its operations and key

26   decisions, including financial decisions.  The false statements spanned the period from July 27,

27   1999 through May 23, 2002.

28

324631.3                           - 105 -

265.    As discussed in greater detail above, the statements made were, at the time and in the light of the circumstances under which they were made, false and misleading with respect to material facts regarding Peregrine's financial results or omitted to state material facts which were necessary in order to make the statements made not misleading.  These statements were made specifically for the purpose of inducing plaintiffs and others to purchase Peregrine stock so that they themselves could engage in highly beneficial trading (market activity) of their own stock and so that they could induce shareholders of other companies, like Remedy, to trade their own stock for Peregrine stock.  Consequently, the value that plaintiffs received for their Remedy stock and the prices some plaintiffs paid for other purchases of Peregrine stock were directly affected by defendants' false statements and conduct.

266.    Defendants at all times knew that the statements in question were false and misleading.  The basis for each defendant's knowledge is set forth more specifically in the section of the Complaint related to him.

267.    As a result of the deceptive practices and false and misleading statements and omissions described above, the market prices of Peregrine securities were artificially inflated when plaintiffs obtained their Peregrine stock.  In ignorance of the false and misleading nature of the representations and omissions described above and the deceptive and manipulative devices employed by defendants named in this count, Plaintiffs paid far too much for their Peregrine stock.

268.    In conjunction with making these false statements, defendants engaged in significant market activity, reaping substantial benefits from sales of their own and their affiliated shareholders' stock at vastly inflated prices.  Defendants collectively, and in the case of defendant Moores, individually, made hundreds of millions of dollars from their unlawful market activity, the details of which are set forth in paragraphs 214 - 224.

269.    By virtue of the foregoing, defendants named in this count willfully violated California Corporations Code sections 25400(d) and 25500, entitling Plaintiffs to damages and prejudgment interest at the legal rate under § 25500, all in an amount to be determined according to proof at time of trial.

## SEVENTH CAUSE OF ACTION

### (Against All Defendants For Common Law Conspiracy)

270.   Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 - 269 as though fully set forth herein.

271.   Beginning in or about 1999, and continuing through in or about May 2002, defendants knowingly and willfully conspired among themselves to commit financial statement fraud by engaging in numerous acts to overstate Peregrine's revenue. The facts setting forth the fraud are detailed throughout the previous paragraphs of this Complaint. The members of the conspiracy developed, maintained, promoted, and executed a common plan, scheme, or design to effect this conspiracy. The purpose and effect of the conspiracy was, among other things, to create and disseminate false statements about Peregrine's business and financial results, condition, and prospects; to artificially inflate the price of Peregrine securities; to relatively devalue the price of Remedy securities in the context of the merger; to make the terms of the merger seem more attractive than it otherwise would have seemed; to deceive Plaintiffs and/or their agents by means of such false statements; and to induce Plaintiffs to purchase or otherwise acquire Peregrine securities at artificially inflated prices.

272.   As more specifically alleged above, defendants and each defendant committed numerous and continuing wrongful acts in furtherance of the conspiracy, including but not limited to secretly adding material contingencies, by oral and written side agreement, to what appeared on their face to be binding contracts, removing receivables from Peregrine's balance sheets by selling them to banks at the quarter's end to reduce its DSO figure and to make it appear Peregrine's customers were promptly paying Peregrine, preparing and or certifying Peregrine's false and fraudulent financial statements declaring that Peregrine had complied with GAAP engaging in mutually beneficial but commercially empty sales agreements for the purpose of revenue recognition; the specific acts of the specific defendants are set forth in detail in the Section of the Complaint related to each of them.

273.   As more specifically alleged above, defendants also furthered the conspiracy by cooperation with each other, and/or ratified the acts of each other by, among other

1  things, allowing the false statements set forth in paragraphs 71 - 74 to stand, knowing that they

2  were false and knowing that they were being disseminated for the purpose of inflating Peregrine's

3  stock price.

4      274.   Plaintiffs suffered injury by negotiating and completing the merger, which

5  was effected by the purchase of Peregrine securities at artificially inflated prices and the sale of

6  Remedy securities at relatively depressed prices.

7      275.   Each defendant is liable for each act of every other member of the

8  conspiracy that is in furtherance of the object of the conspiracy. Similarly, each Defendant is

9  bound by each declaration of every other member of the conspiracy that is in furtherance of the

10  object of the conspiracy.

11      276.   Each defendant is liable for the natural and probable consequences of each

12  wrongful act of every other member that furthered the object of the conspiracy, even though that

13  particular act was not intended as a part of the agreed upon objective and even though he was not

14  present at the time of the commission of that act. The natural and probable consequences of the

15  conspiracy generally was the artificial inflation of the price of Peregrine securities, the relative

16  devaluation of Remedy securities, and the completion of the Merger at terms that did not reflect

17  the true value of Peregrine securities.

18      277.   Each Defendant was a direct, necessary, and substantial participant in the

19  conspiracy and common course of conduct complained of herein.

20      278.   As a direct, foreseeable, and proximate result of this wrongful conduct

21  alleged herein, Plaintiffs suffered economic injury. The amount of such damages and

22  prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

23  time of trial.

24      279.   Defendants acted with oppression, fraud and/or malice, thereby entitling

25  Plaintiffs to punitive damages.

26

27

28

## EIGHTH CAUSE OF ACTION

### (Against all Defendants for Common Law Aiding and Abetting)

280.    Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 - 279 as though fully set forth herein.

281.    Each defendant knew that Peregrine had a duty to issue and publish written and oral statements regarding its financial status that were true and, with respect to the financial statements, were prepared in accordance with GAAP. Each of these defendant also knew that Peregrine's press releases and financial statements would be communicated to potential investors and acquisition prospects, such as Remedy and its shareholders, so that they could rely upon them in evaluating the fairness of a merger transaction and the value of Peregrine stock and options.

282.    Each defendant aided and abetted the commission of all preceding counts by engaging in the acts which are described more particularly in the sections of the Complaint relating to each individual defendant. In brief, the Officer Defendants were involved in the fraudulent transactions at the heart of the scheme, concocted, proposed, and carried out the fraudulent revenue recognition scheme and prepared the false financial statements. The Director Defendants approved the revenue recognition scheme knowing it was improper and permitted Peregrine to issue one false statement after another regarding its financial status without challenge and without requiring correction, even though they were cognizant of the false statements those public reports contained. Further, they participated in issuing group publications on behalf of the Company, and in many cases lent their imprimatur to them by signing them. The Auditor Defendants helped structure improper transactions, allowed financial statements to be issued falsely proclaiming that they complied with GAAP, and issued unqualified audit opinions that purportedly complied with GAAS, knowing that the books had been seriously cooked. The Customer Defendants engaged in phony transactions with Peregrine, knowing that Peregrine was entering into the deals for the purpose of improper revenue recognition. All of this conduct, as well as the conduct alleged throughout this Complaint which chronicles the web of improper activities, aided and abetted the fraud and allowed plaintiffs to be tricked into believing they were giving up their stock in Remedy for valuable Peregrine stock, and in some cases purchasing

324631.3

THIRD AMENDED COMPLAINT

232

EXHIBIT 13

1    valuable Peregrine stock, when in fact it was all but worthless. All Defendants knew Peregrine's

2    conduct constituted a breach of duty to Plaintiffs yet gave substantial assistance and/or

3    encouragement so to act.

4          283.    As a direct, foreseeable, and proximate result of this wrongful conduct

5    alleged herein, Plaintiffs suffered economic injury. The amount of such damages and

6    prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

7    time of trial.

8          284.    Defendants acted with oppression, fraud and/or malice, thereby entitling

9    Plaintiffs to punitive damages.

10                              **PRAYER FOR RELIEF**

11          WHEREFORE, Plaintiffs pray for judgment as follows:

12          1.     Awarding Plaintiffs compensatory damages according to proof;

13          2.     Awarding Plaintiffs rescission to the extent that they still hold their

14    Peregrine securities or rescissionary damages to the extent that they do not;

15          3.     Awarding Plaintiffs exemplary/punitive damages;

16          4.     Awarding Plaintiffs pre-judgment and post-judgment interest

17          5.     Awarding Plaintiffs reasonable attorneys' fees and costs, including expert

18    witness fees and other fees.

19          6.     Awarding such other relief as this Court may deem just and proper.

20

21

22

23

24

25

26

27

28

324631.3

- 110 -

*THIRD AMENDED COMPLAINT*

233
**EXHIBIT 13**

1

2    Dated:  June 30, 2004                    Respectfully submitted,

3                                             LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

4

5    By:
                                                   James M. Finberg

6    Richard M. Heimann
     Joy A. Kruse
7    Karin A. Kramer
     Scott P. Nealey
8    Daniel E. Barenbaum

9
     Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PLAINTIFFS DEMAND A TRIAL BY JURY

2

Plaintiffs hereby demand a trial by jury.

3

4      Dated: June 30, 2004                    Respectfully submitted,

5                                              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

6

7                                              By:
                                                   James M. Finberg

8

9                                              Richard M. Heimann
                                               Joy A. Kruse
                                               Karin A. Kramer
10                                             Scott P. Nealey
                                               Daniel E. Barenbaum
11

12                                             Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JUL-21-2004  11:52AM   FROM-BERGESON, LLP          408 297 6000        T-316  P.003/007  F-284

COPY

1  DANIEL J. BERGESON, Bar No. 105439
   CAROLINE McINTYRE, Bar No. 159005
2  STEPHEN D. ROCKWELL, Bar No. 196976
   BERGESON, LLP
3  303 Almaden Blvd., Suite 500
   San Jose, CA 95110-2712
4  Telephone: (408) 291-6200
   Facsimile: (408) 297-6000
5

6  Attorneys for Defendant
   STEPHEN P. GARDNER
7

F I L E D

JUL 2 2 2004

By: D. JELLISON, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         COUNTY OF SAN DIEGO

10

11  RICHARD P. ALLOCCO, et al.,          Case No. GIC 806450

12                      Plaintiffs,      [PROPOSED] ORDER GRANTING
                                         DEFENDANTS STEPHEN P. GARDNER'S
13  v.                                   AND DANIEL STULAC'S MOTIONS TO
                                         STAY DISCOVERY AGAINST THEM
14

15  STEPHEN P. GARDNER, et al.           Date:    June 25, 2004
                                         Time:    9:00 a.m.
16                      Defendants.      Dept.:   69
                                         Judge:   Honorable Jeffrey B. Barton
17

18                                       Action Filed:  March 3, 2003
                                         Trial Date:  None Set
19

20

21

22

23

24

25

26

27

28

          [PROPOSED] ORDER GRANTING DEFENDANTS GARDNER AND STULAC'S
              MOTIONS TO STAY DISCOVERY AGAINST THEM
                    Case No. GIC 806450

                                                        EXHIBIT A

JUL 21 2004 11:58                           4082976000      PAGE.03

                                                        236
                                                   EXHIBIT 14

1     On June 25, 2004, Defendants Stephen P. Gardner ("Gardner") and Daniel Stulac's

2  (Stulac) Motions To Stay Discovery Against Them ("the Motions") in the above-captioned action

3  (the "Action"), came on regularly for hearing in the above-entitled court, the Honorable Jeffrey B.

4  Barton presiding.  Caroline McIntyre, of Bergeson, LLP, appeared for defendant

5  Stephen P. Gardner.  Michael Attanasio, of Cooley Godward LLP, appeared for defendant Daniel

6  Stulac.  Karin Kramer, of Lieff Cabraser Heimann & Bernstein appeared for plaintiffs.

7  Steve Howard appeared by telephone for defendant Arthur Andersen.  Jerry Hawxhurst appeared

8  by telephone for defendant John Moores.  Jennifer Spaziano appeared by telephone for defendant

9  BearingPoint.  Having reviewed the papers submitted in support of and in opposition to the

10  Motions, as well as having considered the arguments of counsel, and the pleadings on file in this

11  Action, and good cause appearing;

12     IT IS HEREBY ORDERED that:

13     1.    The Motions are granted, and discovery is stayed against Gardner and Stulac in the

14  Action until October 8, 2004.

15     2.    A review hearing regarding the discovery stay is scheduled for October 8, 2004 at

16  3:00 p.m. in Department 69.

17     3.    Plaintiffs must file and serve any further briefing on the issue of the stay of

18  discovery by September 24, 2004.

19     4.    Defendants must file and serve any response to Plaintiffs' further briefing by

20  October 1, 2004.

21     5.    Plaintiffs must file and serve any reply to Defendants' response by 4:00 p.m. on

22  October 6, 2004.

23     6.    Further briefing regarding a request to extend the discovery stay should address:

24  (a) the categories of documents sought; (b) to what degree the documents are obtainable

25  elsewhere; (c) to what degree the documents have been produced by these individuals to

26  others, i.e., non-sealed depositions or other documents that they have already produced or

27  are in the public domain; (d) what alternatives are there to a verified production response;

28  and (e) whatever else counsel feels is appropriate.

- 1 -

[PROPOSED] ORDER GRANTING DEFENDANTS GARDNER AND STULAC'S
MOTIONS TO STAY DISCOVERY AGAINST THEM
Case No. GIC 806450

237
EXHIBIT 14

7.      After receiving this further briefing, the Court will be in a better position to conduct

the balancing process, determine if there is some way to begin the discovery process, or

whether indeed the defendants will need to be put to the task at that point of producing

documents or asserting their Fifth Amendment rights.

Dated:  **JUL 2 2 2004**                        **JEFFREY B. BARTON**

                                        JUDGE OF THE SUPERIOR COURT

- 2 -

[PROPOSED] ORDER GRANTING DEFENDANTS GARDNER AND STULAC'S
MOTIONS TO STAY DISCOVERY AGAINST THEM
Case No. GIC 806450

JUL-21-2004 11:52AM   FROM-BERGESON, LLP                    408 297 6000        T-316  P.006/007  F-294

**F I L E D**
JUL 22 2004
By: D. JELLISON

1    I, Sheila Yarbro, declare as follows:

2    I am an employee in Santa Clara County, the county in which the service described below

3    occurs. My business address is 303 Almaden Boulevard, Suite 500, San Jose, California 95110-

4    2712. I am over the age of eighteen (18) years and am not a party to the cause for which I am

5    serving the documents named below.

6        On July 21, 2004, I served the below listed documents as follows:

7    __X__    BY FACSIMILE: I caused the following documents to be sent via facsimile to
             the parties listed below at the following facsimile numbers listed below.
8            C.C.P. Section 1013.

9    __X__    BY MAIL: I caused such envelopes containing the following documents to be
             deposited in the mail at San Jose, California. I am readily familiar with
10           Bergeson, LLP's practice for collection and processing of correspondence for
             mailing with the United States Postal Service. In the ordinary course of
11           business, correspondence would be deposited with the United States Postal
             Service on this day. C.C.P. Section 1013(a). I deposited the following
12           documents addressed to the following parties:

13       [PROPOSED] ORDER GRANTING DEFENDANT
         STEPHEN P. GARDNER'S AND DANIEL STULAC'S MOTIONS
14       TO STAY DISCOVERY AGAINST THEM

| *Attorney for Plaintiff* | *Counsel for Matthew Gless* |
|---|---|
| James M. Finberg, Esq. | Thomas Vance, Esq. |
| Lieff, Cabraser, Heimann & Bernstein, LLP | Vance, Blair and Grady |
| 275 Battery Street, 30th Floor | 1202 Camino del Mar |
| Embarcadero Center West | Del Mar, CA 92014 |
| San Francisco, CA 94111-3339 | Facsimile: 858.793.1655 |
| Facsimile: 415.956.1008 | |
| *Counsel for Arthur Andersen* | *Counsel for William Savoy* |
| Marshall B. Grossman, Esq. | Cyrus R. Vance, Jr., Esq. |
| C. Stephen Howard, Esq. | Robert D. Stewart, Esq. |
| Gwyn Quillen, Esq. | McNaul Ebel Nawrot Helgren & Vance |
| Timothy Scott Vick, Esq. | PLLC |
| Alschuler, Grossman, Stein & Kahan LLP | 600 University Street, Suite 2700 |
| The Water Garden | Seattle, WA 98101-3143 |
| 1620 26th Street, Fourth Floor | Facsimile: 206.467.0873 |
| North Tower | |
| Santa Monica, CA 90404-4060 | George J. Berger, Esq. |
| Facsimile: 310.907.2000 | Yvonne Dutton, Esq. |
| | Allen Matkins Leck Gamble & Mallory LLP |
| | 501 West Broadway, Suite 900 |
| | San Diego, CA 92101 |
| | Facsimile: 619.233.1158 |

-1-
PROOF OF SERVICE
Case No. GIC 806450

JUL 21 2004 11:59                         4082976000    PAGE.06

239
**EXHIBIT 14**

| | |
|---|---|
| Douglas M. Butz, Esq.<br>Kevin DeSantis, Esq.<br>Butz, Dunn, Desantis & Bingham<br>101 West Broadway, Suite 1700<br>San Diego, CA 92101<br>Facsimile: 619.231.0341 | **Counsel for Bearing Point, Inc.**<br><br>Jennifer Spaziano, Esq.<br>Gary DiBianco, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>1440 New York Avenue, N.W.<br>Washington, DC 20005<br>Facsimile: 202-393.5760 |
| **Counsel for Daniel Stulac**<br><br>Michael A. Attanasio, Esq.<br>Cooley Godward LLP<br>4401 Eastgate Mall<br>San Diego, CA 92121-1909<br>Facsimile: 858.550.6420 | **Counsel for Thomas Watrous**<br><br>Wayne Lamprey, Esq.<br>Anne Hartman, Esq.<br>Goodin, MacBride, Squeri, Ritchie & Day,<br>LLP<br>505 Sansome Street, Suite 900<br>San Francisco, CA 94111<br>Facsimile: 415.398.4321 |
| **Counsel for John J. Moores**<br><br>Harry A. Olivar, Jr., Esq.<br>Quinn, Emanuel, Urquhart, Oliver &<br>Hedges, LLP<br>865 Figueroa Street, 10th Floor<br>Los Angeles, CA 90017-2543<br>Facsimile: 213.624.0643 | **Counsel for Charles E. Noell, III**<br><br>Jane Hahn, Esq.<br>Hahn & Adema<br>501 West Broadway, Suite 1730<br>San Diego, CA 92101<br>Facsimile: 619.235.2101<br><br>Brian Pastuszenski, Esq.<br>Christine Chung, Esq.<br>Testa, Hurwitz & Thibeault<br>125 High Street<br>Boston, Massachusetts 02110<br>Facsimile: 617 248.7100 |
| **Counsel for Critical Path**<br><br>Thomas V. Loran, III, Esq.<br>Margaret M. Niver, Esq.<br>Andrew D. Lanphere, Esq.<br>Pillsbury Winthrop LLP<br>50 Fremont Street<br>San Francisco, CA 94105<br>Facsimile: 415.983.1200 | **Counsel for KPMG LLP**<br><br>Bradley H. Ellis, Esq.<br>Frank Menetrez, Esq.<br>Sidley Austin Brown & Wood LLP<br>555 W. Fifth Street, 40th Floor<br>Los Angeles, CA 90013<br>Facsimile: 213. 896.6600 |

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on July 21, 2004, at San Jose, California.

*Sheila Yarbro*
Sheila Yarbro

- 2 -

PROOF OF SERVICE
Case No. GIC 806450

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2 |     Harry A. Olivar, Jr. (Bar No. 143089)
    Gerald E. Hawxhurst (Bar No. 220327)
3 |     Sarah J. Cole (Bar No. 222719)
    865 South Figueroa Street, 10th Floor
4 | Los Angeles, California 90017-2543
    Telephone:   (213) 624-7707
5 |     Facsimile:    (213) 624-0643

**F I L E D**

JUL 2 7 2004

By: D. JELLISON, Deputy

6 | Attorneys for Defendant John J. Moores

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN DIEGO

**VIA FAX**

10

11 | RICHARD P. ALLOCCO, et al.,                Case No. GIC 806450

12 |         Plaintiffs,            STIPULATION AND [PROPOSED]
ORDER RE RESPONSES TO
v.                                         PLAINTIFFS' THIRD AMENDED
13 | STEPHEN P. GARDNER, et al.,            COMPLAINT

14 |         Defendants.

15 |                     Court:  Hon. Jeffrey B. Barton
Department:  69

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION REGARDING RESPONSES TO PLAINTIFFS' THIRD AMENDED COMPLAINT

1  WHEREAS, Plaintiffs served their Third Amended Complaint by mail on

2  June 30, 2004;

3  WHEREAS, defendants John J. Moores and Charles E. Noell, III intend to

4  file demurrers to the Third Amended Complaint;

5  WHEREAS, pursuant to Sections 432.1 and 1013(a) of the California Code

6  of Civil Procedure, demurrers to the Third Amended Complaint are due on or before

7  August 4, 2004;

8  WHEREAS, Mr. Moores and Mr. Noell require additional time to prepare

9  their demurrers to the Third Amended Complaint;

10  WHEREAS, Mr. Moores requires not more than 25 pages to address the

11  allegations contained in Plaintiffs' Third Amended Complaint, which totals more than

12  100 pages;

13  WHEREAS, because Plaintiffs do not presently know how many of the 19

14  defendants named in their lawsuit will be filing demurrers or what the scope of those

15  demurrers will be, and therefore cannot presently determine whether they will be filing

16  individual oppositions, Plaintiffs, Mr. Moores, and Mr. Noell do not believe they are

17  currently in a position to negotiate and recommend to the Court a briefing schedule and

18  page limits for oppositions and replies with respect to the demurrers; and

19  WHEREAS, based on the foregoing, Plaintiffs, Mr. Moores, and Mr. Noell

20  believe that good cause exists to extend the time established by the Code for Mr. Moores

21  and Mr. Noell to file demurrers to Plaintiffs' Third Amended Complaint and to increase

22  the page limits for Mr. Moores' demurrer to Plaintiffs' Third Amended Complaint.

23  IT IS HEREBY STIPULATED AND AGREED, by and between the parties

24  hereto, subject to approval of the Court, as follows:

25  1.  Mr. Moores and Mr. Noell shall have until August 13, 2004 to file

26  demurrers to Plaintiffs' Third Amended Complaint.

27  2.  Mr. Moores' demurrer to Plaintiffs' Third Amended Complaint shall

28  not exceed 25 pages in length.

2

STIPULATION REGARDING RESPONSES TO PLAINTIFFS' THIRD AMENDED COMPLAINT

242
EXHIBIT 15

Sent by: quinn,emanuel          12136240643;          07/29/04      OPM;Jetfax #13; Page 4/6

Sent by: JetFax M920          12136240643;          07/22/04 12:40PM;Jetfax #647;Page 5/12

07/21/2004 16:56 FAX 415 956 6844          LCHB 916 F                            @002/003

 

1          3.     Mr. Noell's demurrer to Plaintiffs' Third Amended Complaint shall

2  not exceed 15 pages in length.

3          4.     Plaintiffs, Mr. Moores, and Mr. Noell shall work in good faith to set

4  a briefing schedule and page limits for oppositions and replies with respect to the

5  demurrers to Plaintiffs' Third Amended Complaint and shall raise and discuss the issue

6  with the Court and all other parties at the August 6, 2004 status conference.

7

8  DATED: July 21, 2004         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

9                    By  _Kevin Kramer_

10                     Kevin Kramer
                         Daniel E. Barenbaum

11                     Attorneys for Plaintiffs

12

  DATED: July 21, 2004         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

13

14                    By _____
                         Harry A. Olivar, Jr.

15                     Attorneys for Defendant
                         John J. Moores

16

17  DATED: July 21, 2004         TESTA, HURWITZ & THIBEAULT LLP
                         HAHN & ADEMA

18

19                    By _____
                         Alison Adema

20                     Attorneys for Defendant
                         Charles E. Noell, III

21

22

23

24

25

26

27

28

              STIPULATION REGARDING RESPONSES TO PLAINTIFFS' THIRD AMENDED COMPLAINT

1          3.     Mr. Noell's demurrer to Plaintiffs' Third Amended Complaint shall

2     not exceed 15 pages in length.

3          4.     Plaintiffs, Mr. Moores, and Mr. Noell shall work in good faith to set

4     a briefing schedule and page limits for oppositions and replies with respect to the

5     demurrers to Plaintiffs' Third Amended Complaint and shall raise and discuss the issue

6     with the Court and all other parties at the August 6, 2004 status conference.

7

8     DATED: July 21, 2004          LIEFF, CABRASER, HEIMANN & BERNSTEIN,
                                     LLP
9
                                     By _____
10                                      Karin Kramer
                                        Daniel E. Barenbaum
11                                      Attorneys for Plaintiffs

12    DATED: July 21, 2004          QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
13
                                     By  Harry Olivar by MCS
14                                      Harry A. Olivar, Jr.
                                        Attorneys for Defendant
15                                      John J. Moores

16

17    DATED: July 21, 2004          TESTA, HURWITZ & THIBEAULT LLP
                                     HAHN & ADEMA
18
                                     By  Alison Adema by MCS
19                                      Alison Adema
                                        Attorneys for Defendant
20                                      Charles E. Noell, III

21

22

23

24

25

26

27

28

STIPULATION REGARDING RESPONSES TO PLAINTIFFS' THIRD AMENDED COMPLAINT

Sent by: quinn,emanuel        12136240643;        07/29/04    0PM; JetFax #13; Page 6/6
Sent by: JetFax M920          12136240643;        07/22/04 12:41PM; JetFax #647;Page 7/12

## ORDER

The Court, for good cause shown, HEREBY ORDERS THAT:

1.      Defendants John J. Moores and Charles E. Noell, III shall have until August 13, 2004 to file demurrers to Plaintiffs' Third Amended Complaint.

2.      Mr. Moores' demurrer to Plaintiffs' Third Amended Complaint shall not exceed 25 pages in length.

3.      Mr. Noell's demurrer to Plaintiffs' Third Amended Complaint shall not exceed 15 pages in length.

JUL 2 7 2004

Dated: July ___, 2004

JEFFREY B. BARTON
_____
Jeffrey B. Barton
Judge of the Superior Court

STIPULATION REGARDING RESPONSES TO PLAINTIFFS' THIRD AMENDED COMPLAINT

245
**EXHIBIT 15**

F I L E D
Clerk of the Superior Court

AUG 0 2 2004

By: D. JELLISON, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| RICHARD P. ALLOCCO, et al., | CASE NO. GIC 806450 |
| Plaintiffs, | [Complaint Filed March 3, 2003; Assigned to the Honorable Jeffrey B. Barton Dept. 69] |
| vs. | STIPULATION AND [PROPOSED] ORDER RE RESPONSE TO PLAINTIFFS' THIRD AMENDED COMPLAINT |
| STEPHEN P. GARDNER, et al., | |
| Defendants. | Trial Date:  May 5, 2006 |

## STIPULATION

WHEREAS, Plaintiffs served their Third Amended Complaint by mail on June 30, 2004;

WHEREAS, Defendant Arthur Andersen LLP ("Arthur Andersen") intends to file a demurrer to the Third Amended Complaint;

WHEREAS, pursuant to Sections 432.1 and 1013(a) of the California Code of Civil Procedure, demurrers to the Third Amended Complaint are due on or before August 4, 2004;

WHEREAS, because Plaintiffs do not presently know how many of the 19 defendants named in their lawsuit will be filing demurrers or what the scope of those demurrers will be, and therefore cannot presently determine whether they will be filing

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

STIPULATION AND [PROPOSED] ORDER RE RESPONSE TO PLAINTIFFS'
THIRD AMENDED COMPLAINT

1  individual oppositions, Plaintiffs and Arthur Andersen do not believe that they are

2  currently in a position to negotiate and recommend to the Court a briefing schedule and

3  page limits for oppositions and replies with respect to the demurrers; and

4       WHEREAS, based on the foregoing, Plaintiffs and Arthur Andersen believe

5  that good cause exists to extend the time established by the California Code of Civil

6  Procedure for Arthur Andersen to file a demurrer to Plaintiffs' Third Amended

7  Complaint.

8       IT IS HEREBY STIPULATED AND AGREED, by and between the parties

9  hereto, subject to approval of the Court, as follows:

10       1.    Arthur Andersen shall have until August 13, 2004 to file a demurrer

11  to Plaintiffs' Third Amended Complaint.

12       2.    Plaintiffs and Arthur Andersen shall work in good faith to set a

13  briefing schedule and page limits for oppositions and replies with respect to the demurrers

14  to Plaintiffs' Third Amended Complaint and shall raise and discuss the issue with the

15  Court and all other parties at the August 6, 2004 status conference.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

-2-

STIPULATION AND [PROPOSED] ORDER RE RESPONSE TO PLAINTIFFS'
THIRD AMENDED COMPLAINT

**EXHIBIT 16**

1

2

3

4

5

6          3.    This Stipulation may be signed in counterparts and that signed copies thereof, including photocopy(ies) or facsimile(s) of this Stipulation, may be submitted to the Court for filing as though and in lieu of the original of same containing original signatures.

Dated: July 29, 2004

                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

7

8                      By: _____

9                         Joy A. Kruse
                       Karin A. Kramer

10                         Daniel E. Barenbaum

11                      Attorneys for Plaintiffs

12

13  Dated: July 27, 2004

                    ALSCHULER GROSSMAN STEIN & KAHAN LLP

14

15

16                      By: _____
                       Marshall B. Grossman

17                         C. Stephen Howard
                       Melissa Miller

18                      Attorney for Defendant
                    ARTHUR ANDERSEN LLP

19

20                      **ORDER**

21          The Court, for good cause shown, HEREBY ORDERS THAT:

22          1.    Defendant Arthur Andersen LLP shall have until August 13, 2004 to

23  file a demurrer to Plaintiffs' Third Amended Complaint.

24          AUG 0 2 2004

25  Dated: ~~July ___, 2004~~        **JEFFREY B. BARTON**

26                      The Honorable Jeffrey B. Barton
                    Judge of the Superior Court

27  195693_1 DOC

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

-3-

STIPULATION AND [PROPOSED] ORDER RE RESPONSE TO PLAINTIFFS'
THIRD AMENDED COMPLAINT

248
EXHIBIT 16

Case 3:05-cv-00140-BEN-RBB   Document 1   Filed 01/25/05   PageID.274   Page 274 of 497

F I L E D
Clerk of the Superior Court

AUG 0 2 2004

BY D. JELLISON, Deputy

## PROOF OF SERVICE

1

2        I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My
3   business address is Alschuler Grossman Stein & Kahan LLP, The Water Garden, 1620 26th Street, Fourth Floor, North Tower, Santa
4   Monica, California 90404-4060. On this 30th day of July, 2004, I served a true copy of the within documents:

5

6        STIPULATION AND [PROPOSED] ORDER RE RESPONSE
         TO PLAINTIFFS' THIRD AMENDED COMPLAINT

7

8   ☐    by transmitting via facsimile from 310-907-2000 the document(s) listed above to the fax number(s) set forth
9        below on this date before 5:00 p.m.

10       The above transmission was reported as complete and
         without error. Attached hereto is a copy of the
11       respective transmission report, which was properly
         issued by the transmitting facsimile machine.

12  ☒    by placing the document(s) listed above in a sealed
         envelope with postage thereon fully prepaid, in the
13       United States mail at Santa Monica, California,
         addressed as set forth below.

14

15  ☐    by placing the document(s) listed above in a sealed
         envelope, with the overnight delivery charge prepaid,
16       addressed as set forth below, and deposited in a box or
         facility regularly maintained by the overnight delivery
17       service carrier, _____

18  ☐    by personally delivering the document(s) listed above
         to the person(s) at the address(es) set forth below.

19       See Attached Service List

20       I am readily familiar with the firm's practice of
    collection and processing correspondence for mailing. Under that
21  practice it would be deposited with the U.S. Postal Service on
    that same day with postage thereon fully prepaid in the ordinary
22  course of business. I am aware that on motion of the party
    served, service is presumed invalid if postal cancellation date
23  or postage meter date is more than one day after date of deposit
    for mailing in affidavit.

24

25

26

27

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on this 30th day of July, 2004.

Deborah Favorite

-2-

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|---|---|---|
| **PLAINTIFFS** | | |
| Counsel for Plaintiffs | Richard A. Heimann, Esq.<br>James M. Finberg, Esq.<br>Joy A. Kruse, Esq.<br>Daniel E. Barenbaum, Esq.<br>Christopher Leung, Esq.<br>**Lieff, Cabraser, Heimann & Bernstein, LLP**<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3330 | Tel: (415) 956-1000<br>Fax: (415) 956-1008 |
| **DEFENDANTS** | | |
| Counsel for John J. Moores | John B. Quinn, Esq.<br>Harry A. Olivar, Jr., Esq.<br>**Quinn Emanuel Urquhart Oliver & Hedges, LLP**<br>865 South Figueroa Street,<br>10th Floor<br>Los Angeles, CA 90017-2543 | Tel: (213) 624-7707<br>Fax: (213) 624-0643 |
| Counsel for Stephen Gardner | Daniel J. Bergeson, Esq.<br>Caroline McIntyre, Esq.<br>Stephen D. Rockwell, Esq.<br>**Bergeson, LLP**<br>303 Almaden Blvd., Suite 500<br>San Jose, CA 95113-1611 | Tel: (408) 291-6200<br>Fax: (408) 297-6000 |
| Counsel for Charles E. Noell | Brian Pastuszenski, Esq.<br>Kenneth Weissman, Esq.<br>**Testa, Hurwitz & Thibeault**<br>125 High Street<br>Boston, Massachusetts 02110<br><br>Jane Hahn, Esq.<br>Alison Adema, Esq.<br>**Hahn & Adema**<br>501 West Broadway, Suite 1730<br>San Diego, California 92101 | Tel: (617) 248-7000<br>Fax: (617) 248-7100<br><br><br>Tel: (619) 235-2100<br>Fax: (619) 235-2101 |

**251**
**EXHIBIT 16**

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|---|---|---|
| Counsel for William Savoy | Cyrus Vance, Jr. Esq.<br>Robert D. Stewart, Esq.<br>McNaul Ebel Nawrot Helgren<br>   & Vance P.L.L.C<br>600 University Street, Suite 2700<br>Seattle, WA 98101-3143 | Tel: (206) 467-1816<br>Fax: (206) 467-0873 |
| | Kathryn D. Horning, Esq.<br>Allen Matkins Leck Gamble & Mallory LLP<br>501 West Broadway, Suite 900<br>San Diego, CA 92101 | Tel: (619) 233-1155<br>Fax: (619) 233-1158 |
| Counsel for Thomas Watrous | Wayne Lamprey, Esq.<br>Anne Hartman, Esq.<br>Goodin, MacBride, Squeri, Ritchie<br>   & Day, LLP<br>505 Sansome Street, Suite 900<br>San Francisco, CA 94111 | Tel: (415) 392-7900<br>Fax: (415) 398-4321 |
| Counsel for Matthew Gless | Thomas Vance, Esq.<br>Vance, Blair & Grady<br>1201 Camino Del Mar, Suite 205<br>Del Mar, CA 92014 | Tel: (858) 793-0040<br>Fax: (858) 793-1655 |
| Counsel for Daniel Stulac | Michael A. Attanasio, Esq.<br>Aaron P. Arzen, Esq.<br>Cooley Godward LLP<br>4401 Eastgate Mall<br>San Diego, CA 92121-1909 | Tel: (858) 550-6020<br>Fax: (858) 550-6420 |
| Counsel for KPMG LLP | Michael C. Kelley, Esq.<br>Bradley H. Ellis, Esq.<br>Garrett Craig, Esq.<br>Sidley Austin Brown & Wood LLP<br>555 W. Fifth Street, 40th Floor<br>Los Angeles, California 90013 | Tel: (213) 896-6632<br>Fax: (213) 896-6600 |

252
EXHIBIT 16

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|---|---|---|
| Counsel for Bearingpoint, Inc. and KPMG Consulting, Inc. | Gary DiBianco, Esq.<br>Jennifer L. Spaziano, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>1440 New York Avenue, N.W.<br>Washington, D.C. 20005<br><br>James E. Lyons, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Embarcadero Center<br>San Francisco, California 94111 | Tel: (202) 371-7000<br>Fax: (202) 393-5760<br><br><br>Tel: (415) 984-6400<br>Fax: (415) 984-2698 |
| Counsel for Critical Path, Inc. | Thomas V. Loran III, Esq.<br>Margaret M. Niver, Esq.<br>Andrew D. Lanphere, Esq.<br>Pillsbury Winthrop LLP<br>50 Freemont Street<br>Post Office Box 7880<br>San Francisco, CA 94120-7880 | Tel: (415) 983-1000<br>Fax: (415) 983-1200 |
| Counsel for AWSC Société Coopérative, en liquidation | Robert S. Gerber, Esq.<br>Betty Santohigashi, Esq.<br>Martha Sottosanti, Esq.<br>Sheppard, Mullin, Richter & Hampton LLP<br>12544 High Bluff Drive<br>Suite 300<br>San Diego, CA 92101-3505 | Tel: (858) 720-8907<br>Fax: (858) 509-3691 |

773089_1 DOC

3

253
EXHIBIT 16

F I L E D

AUG 0 6 2004

By: D. JELLISON, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

RICHARD P. ALLOCCO, et al.,

    Plaintiffs,

vs.

STEPHEN P. GARDNER, et al.,

    Defendants.

CASE NO. GIC 806450

[Complaint Filed March 3, 2003; Assigned to the Honorable Jeffrey B. Barton Dept. 69]

[REVISED PROPOSED] CASE MANAGEMENT ORDER

Date:  June 7, 2004
Time:  9:00 a.m.
Dept:  69

Following a Case Management Conference herein on June 7, 2004, at which all parties were represented by counsel in person or by telephone, and good cause appearing, the Court enters the following Order:

    1.   <u>Discovery Referee</u>.  With the consent of the parties and pursuant to CCP § 638, the Court hereby appoints the Honorable Raymond Zvetina as a discovery referee to hear all discovery disputes in this action and to make findings and recommendations to the Court in accordance with CCP § 639(a)(5).  In connection with his recommendation on any contested matter, Judge Zvetina shall also recommend how the cost of the proceeding should be allocated among the parties thereto.  With respect to non-contested matters before Judge Zvetina, such as status meetings, background meetings, or general discussions, the cost of such proceedings shall be born equally

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

790855_2 DOC

[REVISED PROPOSED] CASE MANAGEMENT ORDER

254

**EXHIBIT 17**

1   among all parties. For such purposes, all persons represented by the same law firm shall

2   be considered one party.

3         2.   Status Conference. A Status Conference shall be held in this matter

4   on August 6, 2004, at 3:00 p.m. One of the items to be addressed at said Status

5   Conference shall be the selection of a Mediator for this action, as further provided in

6   Paragraph 3 hereof.

7         3.   Process to Select Mediator. Prior to the Status Conference on

8   August 6, 2004, the parties shall meet and confer and select a Mediator for this action. If

9   the parties are not able to reach agreement, each of the parties shall submit to the Court by

10   July 30, 2004, and shall serve on all other parties by fax, the name of that party's

11   recommended Mediator together with a current curriculum vitae and a memorandum not

12   exceeding five pages setting forth the reasons why that person should be appointed as

13   Mediator in this action.

14         4.   Cross-Complaints. Any Defendant may file a Cross-Complaint or

15   bring in new parties without leave of Court at the time that it first files an Answer in this

16   action.

17         5.   Commencement of Discovery. If not already commenced, discovery

18   in this action may commence immediately, except that no depositions, other than

19   depositions of custodians of record, may be taken in this action prior to August 18, 2004.

20         6.   Depositions. All deposition notices served in this action shall also be

21   served on all counsel in the actions known as Pergrine v. Andersen, San Diego Superior

22   Court Case No. GIC 796594 and Bains v. Moores, San Diego Superior Court Case

23   No. GIC 806212. Deposition exhibits shall be consecutively numbered and bear the same

24   numbers if marked as exhibits at trial.

25         7.   Doe and Roe Defendants. All Doe and Roe defendants shall be

26   dismissed by March 31, 2005, unless good cause is shown why this date should be

27   extended.

28         8.   Designation of Experts. Initial designations of experts under CCP

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

790855_2 DOC

2

[REVISED PROPOSED] CASE MANAGEMENT ORDER

**EXHIBIT 17**

1    § 2034 shall be served no later than September 9, 2005; supplemental designations shall

2    be served no later than September 30, 2005.

3           9.    <u>Fact Discovery Cut-Off</u>. The last day to conduct fact discovery is

4    August 31, 2005.

5           10.    <u>Expert Discovery Cut-Off</u>. The last day to conduct expert discovery

6    is March 31, 2006.

7           11.    <u>Dispositive Motion Cut-Off</u>. Any motions for summary judgment or

8    other dispositive motions shall be noticed for hearing no later than February 10, 2006.

9           12.    <u>Non-Dispositive Motion Cut-Off</u>. All discovery and other non-

10    dispositive motions shall be noticed for hearing no later than March 31, 2006.

11           13.    <u>Trial Readiness Conference</u>. A trial readiness conference shall be

12    held in this action on April 21, 2006 at 3:00 p.m.

13           14.    <u>Trial</u>. Trial of this action shall commence in this action on May 5,

14    2006 at 8:45 a.m.

15           15.    Any party herein may move the Court to modify this Order upon a

16    showing of good cause.

17           16.    Counsel are directed to forward a list of all parties and counsel to

18    Judge Zvetina for a conflict check.

19    . . .

20    . . .

21    . . .

22    . . .

23    . . .

24    . . .

25    . . .

26    . . .

27    . . .

28    . . .

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

790855_2 DOC

3

[REVISED PROPOSED] CASE MANAGEMENT ORDER

1        17.    The Court finds that this case is complex under Rule of Court 1800 et

2  seq. and Government Code 26826.4.

3               IT IS SO ORDERED.

4  DATED: ___AUG 0 6 2004___, 2004

5

6

7                              **JEFFREY B. BARTON**

                                    Judge Jeffrey B. Barton

8

9  Presented By:

10  *ALSCHULER GROSSMAN STEIN & KAHAN LLP*

11  BUTZ DUNN DESANTIS & BINGHAM
    101 W. Broadway #1700
12  San Diego, CA 92101-3881
    Telephone: 619-233-4777
13  Facsimile: 619-231-0341

14

15

16  By_____
    Douglas M. Butz
17     Attorneys for Defendant ARTHUR ANDERSEN LLP

18

19

20

21

22

23

24

25

26

27

28

790855_2 DOC                             4

*[REVISED PROPOSED] CASE MANAGEMENT ORDER*

*RICHARD ALLOCCO, et al. v. ARTHUR ANDERSEN, LLP, et al.*
SDSC Case No. GIC 806450

## PROOF OF SERVICE BY MAIL
(Code Civ. Proc., §§ 1013A(1) & (3))

I, Mary Carpinelli, declare that: I am over 18 years of age, and not a party to this action; I am employed in the County of San Diego, California, wherein the mailing occurs; and my business address is 101 West Broadway, Suite 1700, San Diego, California 92101.

I further declare that I am readily familiar with the business practice for collection and processing of correspondence and/or document(s) for mailing with the United States Postal Service; and that the correspondence and/or document(s) shall be deposited with the United States Postal Service this same day in the ordinary course of business.

I caused to be served the following document(s): *CONFORMED COPY OF CASE MANAGEMENT ORDER* by placing a true copy of said document(s) in a separate envelope addressed to each addressee, respectively, as follows:

### SEE ATTACHED SERVICE LIST

I then sealed each envelope and, with the postage thereon fully prepaid, I placed each for deposit in the United States Postal Service, this same day, at my business address shown above, following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: August 10, 2004

_____
Bonnie J. MacCarthy

*BUTZ DUNN DESANTIS & BINGHAM*
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

258
**EXHIBIT 17**

SERVICE LIST
<u>Allocco, et al. v. Gardner, et al.</u>
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|---|---|---|
| **PLAINTIFFS** | | |
| Counsel for Plaintiffs | Richard A. Heimann, Esq.<br>James M. Finberg, Esq.<br>Joy A. Kruse, Esq.<br>Daniel E. Barenbaum, Esq.<br>Christopher Leung, Esq.<br>**Lieff, Cabraser, Heimann & Bernstein, LLP**<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3330 | Tel: (415) 956-1000<br>Fax: (415) 956-1008 |
| **DEFENDANTS** | | |
| Counsel for John J. Moores | John B. Quinn, Esq.<br>Harry A. Olivar, Jr., Esq.<br>**Quinn Emanuel Urquhart Oliver & Hedges, LLP**<br>865 South Figueroa Street,<br>10th Floor<br>Los Angeles, CA 90017-2543 | Tel: (213) 624-7707<br>Fax: (213) 624-0643 |
| Counsel for Stephen Gardner | Daniel J. Bergeson, Esq.<br>Caroline McIntyre, Esq.<br>Stephen D. Rockwell, Esq.<br>**Bergeson, LLP**<br>303 Almaden Blvd., Suite 500<br>San Jose, CA 95113-1611 | Tel: (408) 291-6200<br>Fax: (408) 297-6000 |
| Counsel for Charles E. Noell | Brian Pastuszenski, Esq.<br>Kenneth Weissman, Esq.<br>**Testa, Hurwitz & Thibeault**<br>125 High Street<br>Boston, Massachusetts 02110<br><br>Jane Hahn, Esq.<br>Alison Adema, Esq.<br>**Hahn & Adema**<br>501 West Broadway, Suite 1730<br>San Diego, California 92101 | Tel: (617) 248-7000<br>Fax: (617) 248-7100<br><br><br>Tel: (619) 235-2100<br>Fax: (619) 235-2101 |

**259**
**EXHIBIT 17**

SERVICE LIST
Allocco, et al. v. Gardner, et al.
*San Diego Superior Court - Case No. GIC 8064:0*

| Role | Address | Phone / Fax |
|------|---------|-------------|
| Counsel for William Savoy | Cyrus Vance, Jr. Esq.<br>Robert D. Stewart, Esq.<br>**McNaul Ebel Nawrot Helgren & Vance P.L.L.C**<br>600 University Street, Suite 2700<br>Seattle, WA 98101-3143 | Tel: (206) 467-1816<br>Fax: (206) 467-0873 |
|  | Kathryn D. Horning, Esq.<br>**Allen Matkins Leck Gamble & Mallory 1 LP**<br>501 West Broadway, Suite 900<br>San Diego, CA 92101 | Tel: (619) 233-1155<br>Fax: (619) 233-1158 |
| Counsel for Thomas Watrous | Wayne Lamprey, Esq.<br>Anne Hartman, Esq.<br>**Goodin, MacBride, Squeri, Ritchie & Day, LLP**<br>505 Sansome Street, Suite 900<br>San Francisco, CA 94111 | Tel: (415) 392-7900<br>Fax: (415) 398-4321 |
| Counsel for Matthew Gless | Thomas Vance, Esq.<br>**Vance, Blair & Grady**<br>1201 Camino Del Mar, Suite 205<br>Del Mar, CA 92014 | Tel: (858) 793-0040<br>Fax: (858) 793-1655 |
| Counsel for Daniel Stulac | Michael A. Attanasio, Esq.<br>Aaron P. Arzen, Esq.<br>**Cooley Godward LLP**<br>4401 Eastgate Mall<br>San Diego, CA 92121-1909 | Tel: (858) 550-6020<br>Fax: (858) 550-6420 |
| Counsel for KPMG LLP | Michael C. Kelley, Esq.<br>Bradley H. Ellis, Esq.<br>Garrett Craig, Esq.<br>**Sidley Austin Brown & Wood LLP**<br>555 W. Fifth Street, 40th Floor<br>Los Angeles, California 90013 | Tel: (213) 896-6632<br>Fax: (213) 896-6600 |

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|------|---------|-------------|
| Counsel for Bearingpoint, Inc. and KPMG Consulting, Inc. | Gary DiBianco, Esq.<br>Jennifer L. Spaziano, Esq.<br>**Skadden, Arps, Slate, Meagher & Flom LLP**<br>1440 New York Avenue, N.W.<br>Washington, D.C. 20005<br><br>James E. Lyons, Esq.<br>**Skadden, Arps, Slate, Meagher & Flom LLP**<br>Four Embarcadero Center<br>San Francisco, California 94111 | Tel: (202) 371-7000<br>Fax: (202) 393-5760<br><br><br>Tel: (415) 984-6400<br>Fax: (415) 984-2698 |
| Counsel for Critical Path, Inc. | Thomas V. Loran III, Esq.<br>Margaret M. Niver, Esq.<br>Andrew D. Lanphere, Esq.<br>**Pillsbury Winthrop LLP**<br>50 Freemont Street<br>Post Office Box 7880<br>San Francisco, CA 94120-7880 | Tel: (415) 983-1000<br>Fax: (415) 983-1200 |
| Counsel for AWSC Société Coopérative, en liquidation | Robert S. Gerber, Esq.<br>Betty Santohigashi, Esq.<br>Martha Sottosanti, Esq.<br>**Sheppard, Mullin, Richter & Hampton LLP**<br>12544 High Bluff Drive<br>Suite 300<br>San Diego, CA 92101-3505 | Tel: (858) 720-8907<br>Fax: (858) 509-3691 |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

330 W. Broadway, Dept. 69
San Diego, CA 92101
619-685-6137

TO:

JENNIFER SPAZIANO     #180225
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 NEW YORK AVE., NW
WASHINGTON, DC 20005

---

| | |
|---|---|
| RICHARD P ALLOCCO, et al.<br>**Plaintiff(s)**<br><br>vs.<br><br>STEPHEN P GARDNER, et al.<br>**Defendant(s)** | Case No.: GIC806450<br><br>## NOTICE OF<br>## CASE MANAGEMENT CONFERENCE<br><br>Sanctions pursuant to CCP 177.5, 575.2 and CRC 227(b)<br>may be imposed for failure to serve this notice. |

**COUNSEL: CHECK SERVICE LIST. IF YOU HAVE BROUGHT A PARTY INTO THIS CASE WHO IS NOT INCLUDED IN THE SERVICE LIST, Superior Court Rules, Division II, Rule 2.9 REQUIRES YOU TO SERVE THEM WITH A COPY OF THIS NOTICE.**

Notice is given that the above-entitled case has been set for the reason listed below and at the location shown above.
All inquiries regarding this notice should be referred to the court and phone number listed above.

| TYPE OF HEARING | DATE | TIME | REPORT TO JUDGE |
|---|---|---|---|
| Case Management Conference | 11/12/04 | 01:30PM | JEFFREY B. BARTON |

A Case Management Statement must be completed by counsel for all parties or parties in pro per and timely
filed with the court at least 15 days prior to the initial Case Management Conference. (Rule 2.9, CRC Rule 212).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and
be fully prepared to participate effectively in the hearing, including discussions of ADR options.

### CERTIFICATE OF SERVICE
I certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the
parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and,
with postage thereon fully prepaid, deposited in the United States Postal Service at San Diego
California.
DATED: 08/09/04                    BY: CLERK OF THE SUPERIOR COURT

| | |
|---|---|
| ALISON P. ADEMA (D) | THOMAS V III LORAN (D) |
| MICHAEL ATTANASIO (D) | JAMES E. LYONS (D) |
| DOUGLAS M. BUTZ (D) | DOUGLAS W. LYTLE (D) |
| BRADLEY H ELLIS (D) | HARRY A. OLIVAR JR. (D) |
| JAMES M FINBERG (P) | BRIAN E. PASTUSZENSKI (D) |
| BENJAMIN HOLL (D) | JENNIFER SPAZIANO (D) |
| KATHRYN D HORNING (D) | THOMAS L. VANCE (D) |
| WAYNE T. LAMPREY (D) | KENNETH I. WEISSMAN (D) |

**EXHIBIT 18**

ORIGINAL

F I L E D
Clerk of the Superior Court

AUG 0 6 2004

By C. REIN, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

UNLIMITED JURISDICTION

| | |
|---|---|
| RICHARD P. ALLOCCO, et al.,<br><br>             Plaintiffs,<br><br>v.<br><br>STEPHEN P. GARDNER, et al.,<br><br>             Defendants. | Case No.  GIC 806450<br><br>~~[PROPOSED]~~ ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION FOR ORDER ALLOWING FILING OF AMENDMENT TO THIRD AMENDED COMPLAINT<br><br>Dept:      69<br>Judge:    Hon. Jeffrey B. Barton |

339594.1

[PROPOSED] ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION

EXHIBIT A
263

EXHIBIT 19

1    This matter comes before the Court on the request of Plaintiffs. The Court, after

2  consideration of the papers submitted by Plaintiffs without objection or opposition, as well as the

3  factors set forth in Code of Civil Procedure § 473, California Rule of Court 379, and San Diego

4  Superior Court Local Rules 512, *et seq.*, hereby grants Plaintiffs' application and grants Plaintiffs

5  leave to file an amendment to 4th Amended Complaint. The amendment attached as Exhibit A to

6  Plaintiffs' *Ex Parte* Application for Order Granting Leave to File an Amendment to the Third

7  Amended Complaint shall be immediately filed by the Clerk.

8    FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.

9

10  Dated: August 6, 2004                    By: _____

11                                          The Honorable Jeffrey B. Barton
                                            Judge of the Superior Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

339504.1                           - 1 -

[PROPOSED] ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION

1

2

3                                          F I L E D
                                           Clerk of the Superior Court

4                                          SEP 1 7 2004

5                                          By: D. JELLISON, Deputy

6

7

8

9                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                              COUNTY OF SAN DIEGO

RICHARD P. ALLOCCO, et al.,          |  CASE NO. GIC 806450

11                Plaintiffs,          |  [Complaint Filed March 3, 2003; Assigned to the
                                       |  Honorable Jeffrey B. Barton Dept. 69]
12   vs.                               |
                                       |  [PROPOSED] CASE MANAGEMENT
13   STEPHEN P. GARDNER, et al.,       |  ORDER NO. 2
                                       |
14                Defendants.          |  Date:  August 6, 2004
15                                     |  Time:  3:00 p.m.
                                       |  Dept:  69
16

17

18          Following a Case Management Conference herein on August 6, 2004, at

19   3:00 p.m., at which all parties were represented by counsel in person or by telephone, and

20   good cause appearing, the Court enters the following Case Management Order No. 2 in

21   this matter:

22          1.      Appointment of Mediator.  Pursuant to agreement among the parties,

23   the Court confirms the appointment of Honorable Edward Infante as Mediator in this

24   action.

25          2.      Deposition Exhibits.  Deposition exhibits in this action and in Bains

26   et al. v. Moores et al., San Diego Superior Court Case No. GIC 80612 (the "Bains

27   Action") and Peregrine Systems, Inc. v. Arthur Andersen, San Diego Superior Court

28   No. GIC 796594 (the Peregrine Action") shall be marked with consecutive exhibit

ALSCHULER
GROSSMAN       797371_1.DOC
STEIN &
KAHAN LLP                    [PROPOSED] CASE MANAGEMENT ORDER No. 2          265
                                                                         EXHIBIT 20

numbers in the order that they are used in depositions in any of the three actions. The parties and court reporters shall use their best efforts to assign only one deposition exhibit number to any particular document.

3.   <u>Amendment of Protective Order</u>. The parties shall meet and confer to amend the Protective Order in this action in order to allow documents subject to the Protective Order in this action to be shared with parties to the <u>Bains</u> Action and the <u>Peregrine</u> Action. To this end, Plaintiff's counsel shall circulate a proposed amendment to the Protective Order to all parties.

4.   <u>Demurrers to Third Amended Complaint</u>. Demurrers to the Third Amended Complaint shall be filed and served in accordance with previous stipulations and agreements among the parties or per the Code of Civil Procedure. Opposition to all such demurrers shall be filed and served by October 8, 2004. Reply papers in support of such demurrers shall be filed and served by October 29, 2004. All demurrers shall be heard in Department 69 on November 12, 2004, at 1:30 p.m.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

797371_1.DOC

2

[PROPOSED] CASE MANAGEMENT ORDER No. 2

266
**EXHIBIT 20**

1          5.    *Further Case Management Conference.*  A further Case Management

2    Conference shall be held in this matter in Department 69 on November 12, 2004,

3    following the hearing on demurrers to the Third Amended Complaint at 3:00 p.m.

4               IT IS SO ORDERED.

5    DATED:  September SEP 1 6 2004 , 2004

6

7

8                                        **JEFFREY B. BARTON**
                                          Judge Jeffrey B. Barton

9

10   Presented By:

11   ALSCHULER GROSSMAN STEIN & KAHAN LLP

12   BUTZ DUNN DESANTIS & BINGHAM
     101 W. Broadway #1700
13   San Diego, CA 92101-3881
     Telephone:  619-233-4777
14   Facsimile:  619-231-0341

15

16   By _Douglas M. Butz /sw/_
17      Douglas M. Butz
        Attorneys for Defendant ARTHUR ANDERSEN LLP
18

19

20

21

22

23

24

25

26

27

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

797371_1.DOC

3

267

**EXHIBIT 20**

*RICHARD ALLOCCO, et al. v. ARTHUR ANDERSEN, LLP, et al.*
SDSC Case No. GIC 806450



F I L E D
~~Clerk of the Superior~~

SEP 1 7 200

By: D. JELLISON, Deputy

### PROOF OF SERVICE BY MAIL
(Code Civ. Proc., §§ 1013A(1) & (3))

I, Mary Carpinelli, declare that: I am over 18 years of age, and not a party to this action; I am employed in the County of San Diego, California, wherein the mailing occurs; and my business address is 101 West Broadway, Suite 1700, San Diego, California 92101.

I further declare that I am readily familiar with the business practice for collection and processing of correspondence and/or document(s) for mailing with the United States Postal Service; and that the correspondence and/or document(s) shall be deposited with the United States Postal Service this same day in the ordinary course of business.

I caused to be served the following document(s): **[PROPOSED] CASE MANAGEMENT ORDER NO. 2** by placing a true copy of said document(s) in a separate envelope addressed to each addressee, respectively, as follows:

### SEE ATTACHED SERVICE LIST

I then sealed each envelope and, with the postage thereon fully prepaid, I placed each for deposit in the United States Postal Service, this same day, at my business address shown above, following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: September 16, 2004

*Mary Carpinelli*
Mary Carpinelli

BUTZ DUNN DESANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

Proof of Service by Mail                    1

**268**
**EXHIBIT 20**

*RICHARD ALLOCCO, et al. v. ARTHUR ANDERSEN, LLP, et al.*
SDSC Case No. GIC 806450

**PROOF OF SERVICE BY MAIL**
*(Code Civ. Proc., §§ 1013A(1) & (3))*

I, Mary Carpinelli, declare that: I am over 18 years of age, and not a party to this action; I am employed in the County of San Diego, California, wherein the mailing occurs; and my business address is 101 West Broadway, Suite 1700, San Diego, California 92101.

I further declare that I am readily familiar with the business practice for collection and processing of correspondence and/or document(s) for mailing with the United States Postal Service; and that the correspondence and/or document(s) shall be deposited with the United States Postal Service this same day in the ordinary course of business.

I caused to be served the following document(s): **CONFORMED/SIGNED SEPTEMBER 16, 2004 BY JUDGE BARTON [PROPOSED] CASE MANAGEMENT ORDER NO. 2** by placing a true copy of said document(s) in a separate envelope addressed to each addressee, respectively, as follows:

**SEE ATTACHED SERVICE LIST**

I then sealed each envelope and, with the postage thereon fully prepaid, I placed each for deposit in the United States Postal Service, this same day, at my business address shown above, following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: September 22, 2004

Mary Carpinelli

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|---|---|---|
| PLAINTIFFS | | |
| Counsel for Plaintiffs | Richard A. Heimann, Esq.<br>James M. Finberg, Esq.<br>Joy A. Kruse, Esq.<br>Daniel E. Barenbaum, Esq.<br>Christopher Leung, Esq.<br>**Lieff, Cabraser, Heimann & Bernstein, LLP**<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3330 | Tel: (415) 956-1000<br>Fax: (415) 956-1008 |
| DEFENDANTS | | |
| Counsel for John J. Moores | John B. Quinn, Esq.<br>Harry A. Olivar, Jr., Esq.<br>**Quinn Emanuel Urquhart Oliver & Hedges, LLP**<br>865 South Figueroa Street,<br>10th Floor<br>Los Angeles, CA 90017-2543 | Tel: (213) 624-7707<br>Fax: (213) 624-0643 |
| Counsel for Stephen Gardner | Daniel J. Bergeson, Esq.<br>Caroline McIntyre, Esq.<br>Stephen D. Rockwell, Esq.<br>**Bergeson, LLP**<br>303 Almaden Blvd., Suite 500<br>San Jose, CA 95113-1611 | Tel: (408) 291-6200<br>Fax: (408) 297-6000 |
| Counsel for Charles E. Noell | Brian Pastuszenski, Esq.<br>Kenneth Weissman, Esq.<br>**Testa, Hurwitz & Thibeault**<br>125 High Street<br>Boston, Massachusetts 02110<br><br>Jane Hahn, Esq.<br>Alison Adema, Esq.<br>**Hahn & Adema**<br>501 West Broadway, Suite 1730<br>San Diego, California 92101 | Tel: (617) 248-7000<br>Fax: (617) 248-7100<br><br><br>Tel: (619) 235-2100<br>Fax: (619) 235-2101 |

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806410

| Role | Address | Phone / Fax |
|------|---------|-------------|
| Counsel for William Savoy | Cyrus Vance, Jr. Esq.<br>Robert D. Stewart, Esq.<br>*McNaul Ebel Nawrot Helgren & Vance P.L.L.C*<br>600 University Street, Suite 2700<br>Seattle, WA 98101-3143<br><br>Kathryn D. Horning, Esq.<br>*Allen Matkins Leck Gamble & Mallory I LP*<br>*501 West Broadway, Suite 900*<br>San Diego, CA 92101 | Tel: (206) 467-1816<br>Fax: (206) 467-0873<br><br><br><br><br>Tel: (619) 233-1155<br>Fax: (619) 233-1158 |
| Counsel for Thomas Watrous | Wayne Lamprey, Esq.<br>Anne Hartman, Esq.<br>**Goodin, MacBride, Squeri, Ritchie & Day, LLP**<br>505 Sansome Street, Suite 900<br>San Francisco, CA 94111 | Tel: (415) 392-7900<br>Fax: (415) 398-4321 |
| Counsel for Matthew Gless | Thomas Vance, Esq.<br>**Vance, Blair & Grady**<br>1201 Camino Del Mar, Suite 205<br>Del Mar, CA 92014 | Tel: (858) 793-0040<br>Fax: (858) 793-1655 |
| Counsel for Daniel Stulac | Michael A. Attanasio, Esq.<br>Aaron P. Arzen, Esq.<br>**Cooley Godward LLP**<br>4401 Eastgate Mall<br>San Diego, CA 92121-1909 | Tel: (858) 550-6020<br>Fax: (858) 550-6420 |
| Counsel for KPMG LLP | Michael C. Kelley, Esq.<br>Bradley H. Ellis, Esq.<br>*Garrett Craig, Esq.*<br>**Sidley Austin Brown & Wood LLP**<br>555 W. Fifth Street, 40th Floor<br>Los Angeles, California 90013 | Tel: (213) 896-6632<br>Fax: (213) 896-6600 |

271
**EXHIBIT 20**

SERVICE LIST
Allocco, et al. v. Gardner, et al.
San Diego Superior Court - Case No. GIC 806450

| Role | Address | Phone / Fax |
|------|---------|-------------|
| Counsel for Bearingpoint, Inc. and KPMG Consulting, Inc. | Gary DiBianco, Esq. Jennifer L. Spaziano, Esq. Skadden, Arps, Slate, Meagher & Flom LLP 1440 New York Avenue, N.W. Washington, D.C. 20005 | Tel: (202) 371-7000 Fax: (202) 393-5760 |
|  | James E. Lyons, Esq. Skadden, Arps, Slate, Meagher & Flom LLP Four Embarcadero Center San Francisco, California 94111 | Tel: (415) 984-6400 Fax: (415) 984-2698 |
| Counsel for Critical Path, Inc. | Thomas V. Loran III, Esq. Margaret M. Niver, Esq. Andrew D. Lanphere, Esq. Pillsbury Winthrop LLP 50 Freemont Street Post Office Box 7880 San Francisco, CA 94120-7880 | Tel: (415) 983-1000 Fax: (415) 983-1200 |
| Counsel for AWSC Société Coopérative, en liquidation | Robert S. Gerber, Esq. Betty Santohigashi, Esq. Martha Sottosanti, Esq. Sheppard, Mullin, Richter & Hampton LLP 12544 High Bluff Drive Suite 300 San Diego, CA 92101-3505 | Tel: (858) 720-8907 Fax: (858) 509-3691 |

272
EXHIBIT 20

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

330 W. Broadway, Dept. 69
San Diego, CA 92101
619-685-6137

TO:

JENNIFER SPAZIANO     #180225
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 NEW YORK AVE., NW
WASHINGTON, DC 20005

| | |
|---|---|
| RICHARD P ALLOCCO, et al.<br>**Plaintiff(s)**<br><br>vs.<br><br>STEPHEN P GARDNER, et al.<br>**Defendant(s)** | Case No.: GIC806450<br><br>## NOTICE OF<br>## CASE MANAGEMENT CONFERENCE<br><br>Sanctions pursuant to CCP 177.5, 575.2 and CRC 227(b)<br>may be imposed for failure to serve this notice. |

**COUNSEL: CHECK SERVICE LIST. IF YOU HAVE BROUGHT A PARTY INTO THIS CASE WHO IS NOT INCLUDED IN THE SERVICE LIST, Superior Court Rules, Division II, Rule 2.9 REQUIRES YOU TO SERVE THEM WITH A COPY OF THIS NOTICE.**

Notice is given that the above-entitled case has been set for the reason listed below and at the location shown above.
All inquiries regarding this notice should be referred to the court and phone number listed above.

| TYPE OF HEARING | DATE | TIME | REPORT TO JUDGE |
|---|---|---|---|
| Case Management Conference | 11/10/04 | 03:00PM | JEFFREY B. BARTON |

RESCHEDULED *from 11/12/04 03:00PM Judge JEFFREY B. BARTON*

A Case Management Statement must be completed by counsel for all parties or parties in pro per and timely
filed with the court at least 15 days prior to the initial Case Management Conference. (Rule 2.9, CRC Rule 212).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and
be fully prepared to participate effectively in the hearing, including discussions of ADR options.

## CERTIFICATE OF SERVICE

I certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the
parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and,
with postage thereon fully prepaid, deposited in the United States Postal Service at San Diego
California.
DATED: 09/28/04                                        BY: CLERK OF THE SUPERIOR COURT

| | |
|---|---|
| ALISON P. ADEMA (D) | WAYNE T. LAMPREY (D) |
| MICHAEL ATTANASIO (D) | THOMAS V III LORAN (D) |
| ROBERT S BREWER (D) | JAMES E. LYONS (D) |
| DOUGLAS M. BUTZ (D) | DOUGLAS W. LYTLE (D) |
| GREGORY E. COPELAND (D) | HARRY A. OLIVAR JR. (D) |
| GARY DIBIANCO (D) | BRIAN E. PASTUSZENSKI (D) |
| BRADLEY H ELLIS (D) | STEPHEN D. ROCKWELL (D) |
| JAMES M FINBERG (P) | JENNIFER SPAZIANO (D) |
| NORMAN FINCH, JR. (D) | THOMAS L. VANCE (D) |
| MEGHAN M HART (D) | KENNETH I. WEISSMAN (D) |
| KATHRYN D HORNING (D) | |

SDSC CIV-712(Rev. 7-03)                CMC-CASE MANAGEMENT CONFERENCE

**273**
**EXHIBIT 21**



# Superior Court of California
## County of San Diego

**HALL OF JUSTICE**
**330 WEST BROADWAY**
**P.O. BOX 12028**
**SAN DIEGO, CALIFORNIA 92101-3827**

## NOTICE OF NEW HEARING

October 6, 2004

Case Number:  GIC 806450
          Allocco, et al.,  vs Gardner, et al.,

To all Counsel on the above referenced case:

All Demurrer hearings calendared for Friday, 11/12/04 at 1:30 p.m., are moved to Wednesday, 11/10/04 at 1:30p.m. in Department 69.  If you have any questions, please call me at (619) 685 6137.

Thank You,

Cynthia Rein,
Independent Calendar Clerk for Department 69
(619) 685 6137

274
**EXHIBIT 22**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| ☐ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814<br>XX☐ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827<br>☐ FAMILY COURT, 1555 6TH AVE, SAN DIEGO, CA 92101-3294<br>☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105<br>☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187<br>☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941<br>☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649<br>☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792<br>☐ JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92083-6634 | **F I L E D**<br>Clerk of the Superior Court<br><br>OCT - 6 2004<br><br>By: S. ALYEA, Deputy |
| PLAINTIFF(S)/PETITIONER(S)<br><br>ALLOCCO, et al., | |
| GARDNER, et al., | JUDGE:   JEFFREY B. BARTON<br><br>DEPT:   69 |
| CLERK'S CERTIFICATE OF SERVICE BY MAIL/ FAX<br>(CCP 1013a(4)) | CASE NUMBER<br>GIC 806450 |

I, **Sheryl Alyea**, certify that:  I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):  MINUTE ORDER RE NOTICE OF NEW HEARING

on the parties shown below by **fax** and placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and with postage thereon fully prepaid, deposited in the United States Postal Service at:   XX☐  San Diego   ☐  Vista   ☐  El Cajon  ☐   Chula Vista   ☐   Ramona, California.

| <u>NAME & ADDRESS</u> | <u>NAME & ADDRESS</u> |
|---|---|
| *** SEE ATTACHED LIST*** | |

STEPHEN LOVE
CLERK OF THE SUPERIOR COURT

Date: October 6, 2004
by Sheryl Alyea, Deputy

**275**
**EXHIBIT 22**

# SERVICE LIST FOR:
# ALLOCCO vs. GARDNER
# GIC 806450

## PLAINTIFFS:

RICHARD HEIMANN
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 BATTERY STREET, 30TH FLOOR
SAN FRANCISCO, CA 94111-3330
(415) 956-1000
COUNSEL FOR PLAINTIFFS

## DEFENDANTS:

1   STEPHEN P. GARDNER
    DANIEL J. BERGESON and STEPHEN ROCKWELL
    BERGESON, LLP
    303 ALMADEN BLVD., SUITE 500
    SAN JOSE, CA 95110-2712
    (408) 291-6200
    COUNSEL FOR DEFENDANT STEPHEN P. GARDNER

2   MATTHEW C. GLESS
    THOMAS VANCE
    VANCE, BLAIR AND GRADY
    1201 CAMINO DEL MAR
    DEL MAR, CA 92014
    (858) 793-0040
    COUNSEL FOR DEFENDANT MATTHEW C. GLESS

3   JOHN J. MOORES
    JOHN B QUINN and HARRY A. OLIVAR, JR.
    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    865 SOUTH FIGUEROA STREET 10TH FLOOR
    LOS ANGELES, CA 90017
    (213) 624-7707
    COUNSEL FOR DEFENDANT JOHN J. MOORES

4   THOMAS G. WATROUS
    WAYNE LAMPREY and ANNE HARTMAN
    GOODIN, MACBRIDE, SQUERI, RITCHIE & DAY LLP
    505 SANSOME STREET, SUITE 900
    SAN FRANCISCO, CA 94111
    (415) 392-7900
    COUNSEL FOR DEFENDANT THOMAS G. WATROUS

**276**
**EXHIBIT 22**

5     **CHARLES E. NOELL**
ALISON P. ADEMA,
HAHN & ADEMA
501 W. BROADWAY, SUITE 1730
SAN DIEGO, CA  92101
(619) 235-2100
COUNSEL FOR DEFENDANT CHARLES E. NOELL, III

          **AND**

BRIAN PASTUSZENSKI and
KENNETH WEISSMAN
TESTA HURWITZ & THIBEAULT
124 HIGH STREET
BOSTON, MA  02110
(617) 248-7000
COUNSEL FOR CHARLES E. NOELL, III

          **AND**

MEGHAN M. HART
TESTA HURWITZ & THIBEAULT
124 HIGH STREET
BOSTON, MA 02110
(617) 248-7000
COUNSEL PRO HAC VICE FOR DEFENDANT CHARLES E. NOELL, III

6     **WILLIAM D. SAVOY**
KATHRYN HORNIG
ALLEN MATHINS LECK GAMBLE & MALLORY, LLP
501 W. BROADWAY, 9TH FLOOR
SAN DIEGO, CA  92101
(619) 233-1155
COUNSEL FOR DEFENDANT WILLIAM D. SAVOY

          **AND**

ROBERT STEWART
MCNAUL EBEL NAWROT HELGREN & VANCE PLLC
600 UNIVERSITY STREET, SUITE 2700
SEATTLE, WA 98101-3143
(206) 467-1816
COUNSEL FOR DEFENDANT WILLIAM D. SAVOY

7     **ARTHUR ANDERSEN LLP**
DOUGLAS M. BUTZ
BUTZ DUNN DESANTIS & BINGHAM, APC
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CA  92101
(619) 233-4777
COUNSEL FOR DEFENDANT ARTHUR ANDERSEN LLP

**277**
**EXHIBIT 22**

**AND**
C. STEPHEN HOWARD and SCOTT VICK and DANIEL FIORE
ALSCHULER, GROSSMAN, STEIN & KAHAN, LLP
1620 26TH STREET
SANTA MONICA, CA  90404-4060
(310) 907-1000
COUNSEL FOR DEFENDANT ARTHUR ANDERSEN LLP


8      ARTHUR STEUOREERATUNGSGESELLSCHAFT /
       ARTHUR ANDERSEN GERMANY

       NO ANSWER ON FILE

9      ARTHUR ANDERSEN WORLDWIDE SC

       NO ANSWER ON FILE

10     ERNST AND YOUNG

       NO ANSWER ON FILE


11     DANIEL STULAC
       MICHAEL A. ATTANASIO
       COOLEY GODWARD, LLP
       4401 EASTGATE MALL
       SAN DIEGO, CA  92121
       (858) 550-6000
       COUNSEL FOR DEFENDANT DANIEL STULAC

12     ERNST AND YOUNG REVISIONS – UND TREUH /
       ARTHUR ANDERSEN WIRTSCHAFTSPRUFUNGS
       *SPECIAL APPEARING DEFENDANTS -*
       DOUGLAS W. LYTLE
       HIGGS FLETCHER & MACK LLP
       401 W A STREET, SUITE 2600
       SAN DIEGO, CA  92101
       (619) 236-1551
       COUNSEL FOR SPECIALLY APPEARING DEFENDANTS ERNST AND YOUNG
       REVISIONS-UND TREUH / ARTHUR ANDERSEN WIRTSCHAFTSPRUFUNGS


3

AND

PAUL E. SUMMIT
SULLIVAN & WORCESTER, LLP
ONE POST OFFICE SQUARE
23RD FLOOR
BOSTON, MA  02109
(617) 338-2800
COUNSEL PRO HAC VICE FOR SPECIALLY APPEARING DEFENDANTS
EARNST AND YOUNG REVISIONS-UND TREUH / ARTHUR ANDERSEN
WIRTSCHAFTSPRUFUNGS

AND

UTZ P. TOEPKE
LAW OFFICES OF UTZ P. TOEPKE
70 WEST RED OAK LANE
WHITE PLAINS, NY  10604-3602
(914) 697-4791
COUNSEL PRO HAC VICE FOR SPECIALLY APPEARING DEFENDANTS
EARNST AND YOUNG REVISIONS-UND TREAH / ARTHUR ANDERSEN
WIRTSCHAFTSPRUFUNGS

13    CRITICAL PATH, INC.
      THOMAS V. LORAN, III
      PILLSBURY WINTHROP, LLP
      50 FREMONT STREET, 5TH FLOOR
      SAN FRANCISCO, CA  94105
      (415) 983-1000
      COUNSEL FOR DEFENDANT CRITICAL PATH, INC.

14    BEARINGPOINT INC. / KPMG CONSULTING, INC.
      JAMES E. LYONS and GARY DIBIANCO
      SKADDEN ARPS SLATE MEAGER & FLOM LLP
      4 EMBARCADERO CENTER, SUITE 3800
      SAN FRANCISCO, CA  94111
      (415) 984-6400
      COUNSEL FOR DEFENDANTS BEARINGPOINT / KPMG CONSULTING, INC.
                AND

      JENNIFER SPAZIANO
      SKADDEN ARPS SLATE MEAGHER & FLOM LLP
      1440 NEW YORK AVENUE NW
      WASHINGTON, D.C. 20005
      (202) 37107872
      COUNSEL FOR DEFENDANTS BEARINGPOINT / KPMG CONSULTING, INC.

15    KPMG, LLP
      BRADLEY H. ELLIS
      SIDLEY AUSTIN BROWN & WOOD, LLP
      555 WEST FIFTH STREET, SUITE 4000
      LOS ANGELES, CA  90013
      (213) 896-6000

4

279
**EXHIBIT 22**

COUNSEL FOR DEFENDANT KPMG, LLP

16   INSIGHT ENTERPRISES, INC.

NO ANSWER ON FILE

17   BT GROUP PLC

NO ANSWER ON FILE

**280**
**EXHIBIT 22**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

330 W. Broadway, Dept. 69
San Diego, CA 92101
619-685-6137

TO:

JENNIFER SPAZIANO      #180225
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 NEW YORK AVE., NW
WASHINGTON, DC 20005

---

| | |
|---|---|
| RICHARD P ALLOCCO, et al. **Plaintiff(s)** | Case No.:  GIC806450 |
| vs. | **NOTICE OF HEARING** |
| STEPHEN P GARDNER, et al. **Defendant(s)** | |

Notice is given that the above-entitled case has been set for the reason listed below and at the location shown above.
All inquiries regarding this notice should be referred to the court and phone number listed above.

| TYPE OF HEARING | DATE | TIME | REPORT TO JUDGE |
|---|---|---|---|
| Follow-up Conference | 01/13/05 | 03:00PM | JEFFREY B. BARTON |

RESCHEDULED *from 10/08/04 03:00PM Judge JEFFREY B. BARTON*

Appearances at all hearings are mandatory unless specifically excused by the court for good cause shown.  Refer to local rules.

CERTIFICATE OF SERVICE

I certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at San Diego California.

DATED: 10/13/04                           BY:  CLERK OF THE SUPERIOR COURT

ALISON P. ADEMA (D)                        WAYNE T. LAMPREY (D)
MICHAEL ATTANASIO (D)                      THOMAS V III LORAN (D)
ROBERT S BREWER (D)                        JAMES E. LYONS (D)
DOUGLAS M. BUTZ (D)                        DOUGLAS W. LYTLE (D)
GREGORY E. COPELAND (D)                    HARRY A. OLIVAR JR. (D)
GARY DIBIANCO (D)                          BRIAN E. PASTUSZENSKI (D)
BRADLEY H ELLIS (D)                        STEPHEN D. ROCKWELL (D)
JAMES M FINBERG (P)                        JENNIFER SPAZIANO (D)
NORMAN FINCH, JR. (D)                      THOMAS L. VANCE (D)
MEGHAN M HART (D)                          KENNETH I. WEISSMAN (D)
KATHRYN D HORNING (D)

**281**
**EXHIBIT 22**

F I L E D
Clerk of the Superior Court

NOV 2 4 2004

By: Y. BRENNAN, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| RICHARD P. ALLOCCO, et al.<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN P. GARDNER, et al.; and DOES 1-100,<br><br>Defendants. | CASE NO. GIC 806450<br><br>**ORDER AFTER HEARING**<br><br>Judge: Jeffrey B. Barton<br>Dept: 69<br>Oral argument: March 19, 2004 at 3:00 p.m. |

The defendants' demurrers were argued on November 12, 2004 and November 18, 2004, before Jeffrey B. Barton, Judge Presiding. After reviewing the moving and opposing papers, the Court rules as follows:

On defendants' demurrers to plaintiffs' Third Amended Complaint ("TAC"), the Court confirms the tentative rulings of November 11 and November 16, 2004, with minor changes. The following is the final order of the court:

Defendant KPMG LLP's demurrer to third amended complaint based upon Securities Litigation Uniform Standards Act ("SLUSA") is overruled.

-1-

Order after hearing

1   The initial demurrer, if deemed a motion for removal, was not timely and the motion should

2   have been brought in federal court. Defendants demurred to the original complaint so this "request"

3   for removal was not made in 30 days. Title 15 United States Code section 78bb is silent on whether it

4   must be brought in federal district court or state court. However, Title 28 United States Code section

5   1446(b), states, in part:

6

7   (a)   A defendant or defendants desiring to remove any civil action or criminal prosecution

8   from a State court shall file in the district court ...

9   (b)   The notice of removal of a civil action or proceeding shall be filed within thirty days

10   after the receipt by the defendant, through service or otherwise, of a copy of the initial

11   pleading...

12   Defendant argues that since subject matter jurisdiction may be challenged at any time, and the facts

13   have evolved sufficiently that *Bains* and *Allocco* cases have "proceeded" as a single action, it is still

14   appropriate to raise the issue by demurrer. A basic problem with that argument is that Judge Jones

15   has reviewed similar proceedings and has remanded the action. While this is not binding, Judge Jones

16   states, as an example, "Having given thorough consideration to the parties' arguments, it is clear that

17   SLUSA is not a basis for jurisdiction or removal in this Court. The single lawsuit does not contain 50

18   or more plaintiffs, nor has it been consolidated with *Bains*. ...Defendants cannot rely on their

19   assertion that *Bains* and *Allocco* will 'inevitably be consolidated in state court, removed again, and

20   dismissed under SLUSA.' Defendants had not met their burden for removal."

21

22   In this case, there has been no consolidation, and the grounds for consolidation are not

23   present. The only way defendant can remove this case is by finding the cases have "proceeded" as a

24   single action. SLUSA defines a "covered class action" as:

25   (ii) any group of lawsuits filed in or pending in the same court and involving common

26   questions of law or fact, in which --

27   (I) damages are sought on behalf of more than 50 persons; and

28

-2-

Order after hearing

, (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose. (15 U.S.C. § 78bb(f)(5)(b) (emphasis supplied). )

Defendants have the burden to show that there is no subject matter jurisdiction, and have not cited any case that the scheduling of the case management conference on the same day, the utilization of the same mediator and aids in facilitating discovery, made at the request of defendants, as involved here, amounts to proceeding as a single action.

The facts in this case are distinguishable from *In re WorldCom, Inc. Sec. Litig.* (S.D.N.Y. 2003) 294 F.Supp.2d 392, *and Feitelberg v. Merrill Lynch & Co.* (2003) 353 F.3d 765. In *WorldCom*, the parties were represented by the same attorneys and the complaints were identical, down to the typographical errors. Here, there are different attorneys, different defendants, some differences in the causes of action, and the plaintiffs in *Bains* and here have different standing issues, especially in regard to privity with the sale of securities-one's acquired through merger, one by direct sale. In *Feitelberg*, plaintiffs had brought a suit under Business and Professions Code section 17200 omitting damages, but sought "restitution" and class action language to avoid SLUSA. The court was concerned that the plaintiffs would conduct through discovery, and then amend their complaint for damages afterward to avoid SLUSA. The court found the higher pleading standards applied. (*Id.* at 1049.)

There are no other cases cited under the statute that provide further guidance. Based upon the procedural delays in filing the motion for removal, and the substantive problems in showing these two cases are proceeding as a single case, defendant's demurrer is overruled, especially in light of the fact that plaintiffs' cases are different.

For all demurrers and motions to strike, judicial notice is granted as requested, notwithstanding any objections raised by plaintiffs. Joinder is granted as requested.

-3-

Order after hearing

*284*
EXHIBIT 23

## DEMURRERS OF DIRECTOR AND OFFICER DEFENDANTS

The demurrers to the sixth cause of action for all defendants are sustained for adding a cause of action without leave to amend. John J. Moore's ("Moores") objection to the addition of the sixth cause of action for the addition of a cause of action under Corporations Code section 25500, because there was no leave to amend, is sustained, without prejudice. Though some of the remaining defendants failed to raise the objection, the court's ruling applies to all applicable defendants.

**Director defendants:**

The general and special demurrers of defendants Moores, Thomas G. Watrous ("Watrous"), joining in Moores' demurrer, Charles E. Noell, III ("Noell"), and William D. Savoy ("Savoy") (collectively "director defendants") are overruled to plaintiffs' third amended complaint ("TAC"). The general demurrers of Moores and Noell, to the first through third, and fifth, and seventh through eighth causes of action for failure to state a cause of action are overruled. The general demurrer of Watrous and Savoy to the first through fifth, seventh, eighth and ninth and tenth causes of action are overruled for failure to state a cause of action.

The demurrer to first cause of action for violation of Corporation Code 25504 (control person liability for Peregrine's violations of section 25401) is overruled. In the second amended complaint ("SAC"), plaintiffs failed to allege specific facts showing defendants had day-to-day control over Peregrine. The SAC merely alleged a conclusory statement that the defendants are director board members, and as such, in their position, they had control over the day-to-day activities of the corporation. (SAC, ¶62.) In the TAC, plaintiffs have sufficiently alleged as to these defendants control of the day-to-day activities of the corporation.

Plaintiffs argue that the application of the federal standard is incorrect, and that in California, status as a corporate officer or director is sufficient for a demurrer. The court has already rejected this position in *Kamen v. Lindly* (2001) 94 Cal.App.4th 197, to require more than just alleging status, but to show control. The issue then is whether plaintiffs have plead that the outside directors

-4-

Order after hearing

participated in the day-to-day management of the part of the company involved in the alleged fraud or if they had a special relationship with the company.

The TAC alleges Moore had control of the company. While defendant Moores argues that he had resigned prior to the merger, and that only his sale of stock prior to the merger is relevant, the court is unwilling to disregard the allegations of continued control over day-to-day operation as well as what occurred after the merger, and upon that basis the motion to strike is denied. The allegations are relevant to show the continuing relationship with the company, and the ability to quickly step in, even with only 5% of the stock, as Moores contends. (TAC, ¶117.) Throughout Peregrine's history, the complaint alleges that Moores chose key personnel, he was on the board for years, he kept his position on the Company's Compensation Committee, and he was continuously kept abreast of matters by executive email. (TAC, ¶¶116-117,211.) The complaint further alleges that to keep his hand in the daily affairs, he maintained an on-site presence through JMI's sublease, arranged to have Nelson to be given a bigger role, and in addition to the prior allegations that he signed the group publications, reviewed and approved quarterly financial results. Though Moores has presented cases to support that none of his conduct is wrongful, when taken collectively, the allegations are sufficient to withstand a demurrer.

The TAC alleges Noell was strategically placed, on various boards, on the Audit Committee, on the Peregrine site, was instrumental in installing his nephew as Gardner's special assistant, participated in the selection of financial officers, and his day to day control is alleged. (TAC, ¶¶129-136.)

Savoy contends there is no involvement in the day-to-day affairs. Unlike the other defendants, there are no allegations that Savoy was a director, or had profited from the sale of the stock. Savoy asserts that he never sold any stock and actually doubled his interests just months before. However, the TAC alleges Savoy had control of the corporation "by virtue of his Board membership on the important Audit Committee." (TAC, ¶138.) He was consulted by the CEO regarding a strategy for

-5-

Order after hearing

acquiring Remedy, signed financial reports, and owned substantial shares in Peregrine. The TAC alleges sufficient facts to show Savoy controlled the day-to-day activities of Peregrine. As set forth in *Lernout v. Hauspie Sec. Litig.* (2002) 286 B.R. 33, 43, those allegations do not go beyond the run-of-the mill duties of a director of a large corporation if he was just an outside director receiving information from the audit committee. (*Ibid.*) However, membership on the Audit Committee was treated differently than the outside directors, especially with equity interests, and knowledge of the day-to-day activities. (*Id.* at 38.) The TAC alleges sufficient facts to establish control.

For the same reasons as applied to Savoy, the demurrer of Thomas G. Watrous, who was on the Audit Committee, is overruled. The TAC alleges he was a senior partner at Andersen Consulting, was a member of the board at the time of Peregrine pursued Remedy, and became a member of the Audit Committee . (TAC, ¶¶120,125.) He signed false financial statements. He sold $800,000 of stock.

The demurrers to the second cause of action for fraud and deceit are overruled. Defendants assert that the TAC fails to state a claim because the elements of fraud were not set forth with particularity. They claim there are no statements made by them and that an outside director does not become liable for the contents of a group published document merely by signing it, relying on *Kamen, supra* at 94 Cal.App.4th at 206. However, plaintiffs have alleged facts to remove it from merely the status of outside director. As noted by *Kamen* court:

The Ninth Circuit has developed the group published information doctrine which it has described as follows: 'In cases of corporate fraud where false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases or other "group-published information," it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.' [Citation.] Subsequent decisions have

-6-

Order after hearing

extended the doctrine to cover not only officers but directors as well. [Citation.] 'The rationale for group pleading is that facts about fraud flowing from the internal operation of a corporation are peculiarly, and often exclusively, within the control of the corporate insiders who manage the parts of the corporation involved in the fraud.' (Ibid.)

Plaintiffs have alleged Moores made direct false statements when he signed 10-Ks and registration statements, knowing they contained false revenue numbers. (TAC, ¶117). It may be inferred that these statements were material. Intent was adequately alleged under ¶118, and plaintiffs have alleged reliance, and damages. The TAC shows when plaintiffs shares were sold, and the number of shares sold. Questions of earlier misconduct in 1999, though distant, might still have an impact on whether, if all information had been adequately disclosed, plaintiffs would have entered into the merger, and held onto their stocks.

The complaint also states a cause of action for fraud against the remaining director defendants. (TAC, ¶¶72-74,133-134, 120-127, 169.)

Since director defendants have argued throughout their pleadings that the remaining causes of action are all fraud based, and fail because plaintiffs have failed to meet their pleading burden, the demurrer to the remaining causes of action are overruled.

**Officer Directors:**

Defendant Richard T. Nelson (collectively "officer defendants") Vice President and general counsel, raised the statute of limitations in his defense, and then in his reply, he specifically challenges the for failure to comply with *Code of Civil Procedure section 474*. Plaintiffs merely responded that Nelson was added as a doe defendant. However, there was no discussion as whether the cause of action would relate back. Nelson's objections have merit, and plaintiffs should have brought a separate motion. Nelson's demurrer is sustained, without prejudice to plaintiff to bring a motion to amend. The parties are encouraged to resolve this issue informally.

-7-

Order after hearing

1   The general and special demurrers of defendants Stephen P. Gardner, with joinder by

2   Matthew C. Gless to Moores' motion, and Douglas Powanda, the executive Vice President,

3   Worldwide Sale are overruled.  The general demurrers of Gardner and Gless to the first through third,

4   and fifth, and seventh through eighth causes of action for failure to state a cause of action are

5   overruled.   Powanda's demurrer to the second, third, seventh and eighth causes of action are

6   overruled. Plaintiffs have alleged sufficient facts to establish that they were control persons.

7

8   Gardner has objected to the addition of the sixth cause of action as did Moores, because there

9   was no leave to amend, and the term "market manipulation" is a term of art, and plaintiffs have not

10  plead sufficient facts.   As set forth above, leave to amend was required, and the objection is

11  sustained, without prejudice to bring a motion. The complaint alleges Gardner was the CEO, was the

12  first to resign, had daily control and influence, helped to formulate and present to the board, and

13  continually authorized fraudulent accounting practices. Though sell-in may be an acceptable

14  accounting principal, it may be inferred that how it was applied was defective, and that Gardner was

15  involved and participated in the creation of key false documents.  (TAC, ¶¶35, 86.)

16

17  The TAC alleges that Douglas Powanda joined Peregrine in February 1992 as a sales

18  manager, became a consultant to the company, and was part of the Office of Chairman until he left

19  Peregrine in Spring 2002. (TAC, ¶98.) Powanda does not argue that he was not a control person, but

20  contends the only false statements are the pre-merger financial statements by Peregrine of the SEC

21  filings, press releases, and analyst conference calls.

22  Defendant Matthew C. Gless ("Gless") was Peregrine's CFO and director.   He joins in

23  Moores' demurrer, but has already pleaded guilty to security violations. As Judge Jones quoting In re

24  *Homestore.com Sec. Litig* (C.D. Cal. 2003) 252 F.Supp. 2d 1018,1020 stated, "Where individuals in a

25  company have pled guilty to securities fraud, such a case 'does not present the question of whether

26  the fraud actually happed, but rather who knew about it, who participated in it, and who can be held

27

28

-8-

Order after hearing

1  liable for it.'"

2  **Motions to strike:**

3
4      Defendants Moores and Noell's motions to strike are denied, in part. Nelson's motion to

   strike is granted, without prejudice, for the reasons stated in the demurrer ruling. Moores' motion to

5
6  strike attorney's fees is granted to all causes of action. The right to statutory costs will remain.

7      The court denies defendants requests to strike paragraphs 74-77, 113, 221-222.

8  **Defendants Arthur Andersen LLP and Daniel Stulac's demurrers ("Auditor defendants"):**

9      Defendant Arthur Andersen LLP's ("Andersen") demurrer to the fourth cause of action for

10 negligent misrepresentation is overruled. Defendant Daniel Stulac's demurrer to the second, fourth,

11 fifth, seventh and eighth causes of action is overruled.

12      The demurrers by Stulac to the SAC were sustained, because there were no allegations what

13 representations Stulac allegedly made, or that the opinion of the auditors was known to be false.

14 There was no allegation Stulac knew of the Peregrines' fraud.  There is no allegation that Stulac

15 signed or consented to be named as a preparer or certifier of the registration statements.  The TAC

16 corrects most of these problems.

17
18      If only the false statement section of the TAC is reviewed, Stulac is correct that he is not

19 listed as the one who made the false statements.  However, when read as a whole, there are sufficient

20 facts alleged to withstand a demurrer.  If Stulac improperly structured transactions working with

21 Gless, and did not comport to accounting standards, then the statement that the audit was done in

22 compliance with the GAAS or GAAP is a misrepresentation. (TAC, ¶¶252-253.) The allegations

23 under ¶170 give time and place of when Stulac acquired information and/or advised of problems. He

24 was alleged to be indispensable to the Company's ability to cook its books and to issue its false

25 statements. (TAC, ¶171.) The complaint alleges how each plaintiff relied on the representations by

26 entering into the merger and keeping the stock. (TAC, ¶237.)

27
28

-9-

Order after hearing

290
EXHIBIT 23

1    Stulac's reliance on *In re Worlds of Wonder Sec. Litig.* (9th 1994) 35 F.3d 1407,1426, fn.7 is

2  misplaced. That case was based upon inadequate declarations from experts on a motion for summary

3  judgment. Though the court did state in a footnote that it is highly improbably that an accountant

4  would participate in a fraud merely to obtain increased fees, that was dicta, and certainly is not

5  binding under these circumstances.

6

7    Since the conspiracy and aiding and abetting causes of action are based upon the prior

8  allegations of fraud and securities violations, defendant Stulac's demurrer is overruled.

9    As for Andersen's argument that *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, prevents

10  liability to the fourth cause of action for negligent misrepresentation, the holding is contrary. The

11  court held that although an auditor may not be held liable to third parties for general negligence, an

12  auditor may be held liable for negligent misrepresentation to third parties who are known to the

13  auditor and for whose benefit the auditor has rendered the audit report. The court further held that an

14  auditor may also be held liable to third parties for intentional fraud in the preparation of an audit

15  report, if the auditor had no belief in the truth of the false statements made in the audit report and

16  made them recklessly, even though the auditor may not have had actual knowledge of the false or

17  baseless character of its opinion. Frequently, the question of intent to benefit a third party will be a

18  question of fact. (*Id.* at 414.)

19

20  **Demurrers by defendants Critical Path, BearingPoint, Inc., Bindview and KPMG ("Customer**

21  **Defendants")**

22    The demurrers by defendants Critical Path, BearingPoint, Inc., Bindview and KPMG (on

23  grounds other than SLUSA) (collectively "customer defendants") are sustained, with leave to amend.

24  While the court was inclined to reconsider the tentative ruling on KPMG, based upon the

25  representations that plaintiff's amended complaint would clarify the allegations with KPMG and the

26  customer defendants' allegations, the court sustains this demurrer also.

27

28

-10-

Order after hearing

291
**EXHIBIT 23**

Plaintiffs have failed to state a claim for common law fraud. There are no allegations that the customer defendants made any specific representations, let alone representations to plaintiffs. Plaintiffs must allege that the customer defendants entered into the software swap or transactions with knowledge of the merger and that plaintiffs relied on the merger, i.e, that if they had known about the swap or other transactions, they would not have entered into the merger.

Plaintiffs have failed to state a common law aiding and abetting claim. Both specific knowledge and actual assistance of the tort are required to state a claim. (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318,1325-26.) For the same reasons, the remaining causes of action are sustained, with leave to amend.

Plaintiffs have not stated a claim for conspiracy, since there are no facts from which the formation and operation of the conspiracy involving customer defendants may be inferred. There are few facts showing the customer defendants were aware of the conspiracy to defraud plaintiffs.

Plaintiffs shall have until December 20, 2004, to file and serve a fourth amended complaint. If plaintiffs file a motion for leave to amend prior to December 3, 2004, the court will extend the time for service of the fourth amended complaint.

This is the final order of the court, and no further order is required.

**IT IS SO ORDERED.**

Dated: _11/24/04_

JEFFREY B. BARTON
Judge of the Superior Court

-11-

Order after hearing

292
EXHIBIT 23

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>☐ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814<br>☒ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827<br>☐ FAMILY COURT, 1555 6TH AVE., SAN DIEGO, CA 92101-3294<br>☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105<br>☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187<br>☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941<br>☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649<br>☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792<br>☐ JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92083-6634 | FOR COURT USE ONLY<br><br>F I L E D<br>Clerk of the Superior Court<br><br>NOV 2 4 2004<br><br>By: Y. BRENNAN, Deputy |
| PLAINTIFF(S)/PETITIONER(S)<br><br>RICHARD P. ALLOCCO, et al | |
| DEFENDANT(S)/RESPONDENT(S)<br><br>STEPHEN P. GARDNER, et al | JUDGE:    JEFFREY B. BARTON<br><br>DEPT:    69 |
| CLERK'S CERTIFICATE OF SERVICE BY MAIL<br>(CCP 1013a(4)) | CASE NUMBER<br>GIC 806450 |

I, certify that: I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):
ORDER AFTER HEARING dated 11-24-04

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:   ☒ San Diego   ☐ Vista   ☐ El Cajon   ☐ Chula Vista   ☐ Ramona, California.

| NAME & ADDRESS | NAME & ADDRESS |
|---|---|
| RICHARD HEIMANN<br>LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP<br>275 BATTERY STREET, 30TH FLOOR<br>SAN FRANCISCO, CA 94111-3330<br>(415) 956-1000<br>COUNSEL FOR PLAINTIFF | MICHAEL A. ATTANASIO<br>COOLEY GOODWARD, LLP<br>4401 EASTGATE MALL<br>SAN DIEGO, CA 92121<br>(858) 550-6000<br>COUNSEL FOR DANIEL STULAC |
| C. STEPHEN HOWARD<br>ALSCHULER, GROSSMAN, STEIN & KAHAN, LLP<br>1620 26TH STREET<br>SANTA MONICA, CA 90404-4060<br>(310) 907-1000<br>COUNSEL FOR ARTHUR ANDERSEN | DANIEL J. BERGESON and STEPHEN ROCKWELL<br>BERGESON, LLP<br>303 ALMADEN BLVD., SUITE 500<br>SAN JOSE, CA 95110-2712<br>(408) 291-6200<br>COUNSEL FOR STEPHEN GARDNER |
| DOUGLAS M. BUTZ<br>BUTZ DUNN DESANTIS & BINGHAM<br>101 WEST BROADWAY, SUITE 1700<br>SAN DIEGO, CA 92101<br>(619) 233-4777<br>COUNSEL FOR ARTHUR ANDERSEN | THOMAS VANCE<br>VANCE, BLAIR AND GRADY<br>1201 CAMINO DEL MAR<br>DEL MAR, CA 92014<br>(858) 793-0040<br>COUNSEL FOR MATTHEW GLESS |

CLERK OF THE SUPERIOR COURT

Date: November 24, 2004      by _Y Brennan_____, Deputy
                                    Yolanda Brennan

CLERK'S CERTIFICATE OF SERVICE BY MAIL

293
EXHIBIT 23

| CASE NAME | CASE NUMBER |
|---|---|
| RICHARD P. ALLOCCO, et al vs. STEPHEN P. GARDNER, et al | GIC 806450 |

| NAME & ADDRESS | NAME & ADDRESS |
|---|---|
| ROBERT STEWART and KATHRYN HORNIG<br>MCNAUL EBEL NAWROT HELGREN & VANCE PLLC<br>600 UNIVERSITY STREET, SUITE 2700<br>SEATTLE, WA 98101-3143<br>(206) 467-1816<br>COUNSEL FOR WILLIAM SAVOY | WAYNE LAMPREY and ANNE HARTMAN<br>GOODIN, MACBRIDE, SQUERI, RITCHIE & DAY LLP<br>505 SANSOME STREET, SUITE 900<br>SAN FRANCISCO, CA 94111<br>(415) 392-7900<br>COUNSEL FOR THOMAS WATROUS |
| JOHN B QUINN and HARRY A. OLIVER, JR.<br>QUINN EMANUEL URQUHART OLIVER & HEDGES<br>865 SOUTH FIGUEROA STREET 10TH FLOOR<br>LOS ANGELES, CA 90017<br>(213) 624-7707<br>COUNSEL FOR JOHN MOORES | BRIAN PASTUSZENSKI and KENNETH WEISSMAN<br>TESTA HURWITZ & THIBEAULT<br>124 HIGH STREET<br>BOSTON, MA 02110<br>(617) 248-7000<br>COUNSEL FOR CHARLES E. NOELL, III |
| DOUGLAS W. LYTLE<br>HIGGS FLETCHER & MACK LLP<br>401 W A STREET, SUITE 2600<br>SAN DIEGO, CA 92101<br>(619) 236-1551<br>COUNSEL FOR ERNEST & YOUND REVISIONS-UND | JAMES E. LYONS and GARY DIBIANCO<br>SKADDEN ARPS SLATE MEAGHER & FLOM LLP<br>FOUR EMBARCADERO CENTER, SUITE 3800<br>SAN FRANCISCO, CA 94111<br>(415) 984-6400<br>COUNSEL FOR BEARINGPOINT |

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

294
EXHIBIT 23

1    Richard M. Heimann (State Bar No. 063607)
     James M. Finberg (State Bar No. 114850)
2    Joy A. Kruse (State Bar No. 142799)
     Karin A. Kramer (State Bar No. 87346)
3    Scott P. Nealey (State Bar No. 193062)
     Daniel E. Barenbaum (State Bar No. 209261)
4    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     Embarcadero Center West
5    275 Battery Street, 30th Floor
     San Francisco, CA  94111-3339
6    Telephone:  (415) 956-1000
     Facsimile:  (415) 956-1008

7

8    Attorneys for Plaintiffs

              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN DIEGO

10                      UNLIMITED JURISDICTION

11

| | |
|---|---|
| 12   RICHARD P. ALLOCCO, LORI BARKER, <br> KENNETH BOYD, JR., RONALD COOTES, <br> 13   RONALD J. FIOR, PHYLLIS E. FRIEDMAN, <br> LAWRENCE L. GARLICK, HAROLD I. <br> 14   GOLDBERG, VICTOR GUERRIERI, <br> HARVEY C. JONES, JR., KLAWANS <br> 15   FAMILY TRUST, ARTHUR KULAKOW, <br> MICHAEL F. LITTLE, DAVID MAHLER, <br> 16   CHARLES MOUSSEAU, DOUGLAS <br> MUELLER, JUDITH ORAH MUELLER, <br> 17   JAMES G. PETERSON, ANDREA POTTS, <br> GLENDA GOULETTE SCHWEM, JOHN F. <br> 18   SHOCH, RICHARD THOMAS, GEORGE A. <br> de URIOSTE, DARIUS WALLACE, and <br> 19   DANIEL WELLER, <br><br> 20              Plaintiffs, <br><br> 21   v. <br><br> STEPHEN P. GARDNER, MATTHEW C. <br> 22   GLESS, JOHN J. MOORES, THOMAS G. <br> WATROUS, CHARLES E. NOELL, <br> 23   WILLIAM D. SAVOY, DOUGLAS <br> POWANDA, RICHARD NELSON, ARTHUR <br> 24   ANDERSEN LLP, ERNST & YOUNG <br> REVISIONS—UND <br> 25   TREUHANDGESELLSCHAFT MBH, <br> WIRSCHAFTSPRÜFUNGSGESELLSCHAFT <br> 26   STEUERBERATUNGSGESELLSCHAFT <br> (HRB 10482), AWSC SOCIÉTÉ <br> 27   COOPÉRATIVE, en liquidation, DANIEL <br> STULAC, KPMG, L.L.P., <br> 28   BEARINGPOINT, INC., CRITICAL PATH, <br> INC., <br> (continued on next page) | Case No.  GIC 806450 <br><br> **FOURTH AMENDED COMPLAINT** <br> **FOR VIOLATIONS OF:** <br><br> **(1)  CAL. CORP. SECURITIES LAW** <br>       **OF 1968;** <br><br> **(2)  FRAUD AND DECEIT AND** <br>       **NEGLIGENT** <br>       **MISREPRESENTATION** <br><br> **(3)  THE COMMON LAW OF** <br>       **CONSPIRACY AND AIDING** <br>       <u>**AND ABETTING**</u> <br><br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

(continued on next page)

324631.4

                                **295**
                            **EXHIBIT 24**

1   BT GROUP, plc, BRITISH
TELECOMMUNICATIONS, plc, BULL, S.A.,
2   INSIGHT ENTERPRISES, INC., BINDVIEW
DEVELOPMENT CORPORATION,
3   FUJITSU TRANSACTIONS SOLUTIONS,
Inc., and DOES 12-100,
4         Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**296**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

<u>**TABLE OF CONTENTS**</u>

|  |  |  |  | Page |
|---|---|---|---|---|

I. INTRODUCTION ........................................................... 1

II. THE PARTIES ............................................................ 5
   A. PLAINTIFFS .......................................................... 5
   B. DEFENDANTS ......................................................... 9
      1. Officer Defendants (Gardner, Gless, Powanda, Nelson) ........ 9
      2. Director Defendants (Moores, Watrous, Noell, Savoy) ........ 10
      3. Auditor Defendants (Andersen, AWSC, Andersen Germany, Stulac) ... 10
      4. Customer Defendants (KPMG, BearingPoint, Critical Path, Insight, BT and BT Group, Bull, Bindview, Fujitsu/ICL) ........ 11
      5. Doe Defendants ............................................ 13

III. JURISDICTION AND VENUE .............................................. 13
IV. FACTS RELATED TO THE REMEDY MERGER .................................. 14
V. FACTS RELATED TO THE FRAUD .......................................... 15
VI. THE FALSE STATEMENTS ................................................ 18
VII. ROLE OF THE AUDIT COMMITTEE ........................................ 26
VIII. OFFICER DEFENDANTS' PARTICIPATION IN THE FRAUD ................... 28
   A. Gardner ............................................................ 28
   B. Gless .............................................................. 30
   C. Powanda ............................................................ 33
   D. Nelson ............................................................. 37
IX. DIRECTOR DEFENDANTS' PARTICIPATION IN THE FRAUD .................... 41
   A. Moores ............................................................. 41
   B. Watrous ............................................................ 44
   C. Noell .............................................................. 47
   D. Savoy .............................................................. 50
X. AUDITOR DEFENDANTS' PARTICIPATION IN THE FRAUD ..................... 52
   A. Arthur Andersen .................................................... 52
   B. AWSC and Andersen Germany .......................................... 62
   C. Stulac ............................................................. 65
XI. CUSTOMER DEFENDANTS' PARTICIPATION IN THE FRAUD ................... 68
   A. The KPMG Defendants (KPMG and BearingPoint) ....................... 68
   B. Critical Path ..................................................... 74
   C. BT and BT GROUP .................................................... 76
   D. Bull .............................................................. 79

1

## TABLE OF CONTENTS
(continued)

2                                                                                              **Page**

3    E.     Insight .................................................................................................. 81

4    F.     Bindview ........................................................................................... 83

     G.     Fujitsu ............................................................................................... 85
5
XII. OFFICER AND DIRECTOR DEFENDANTS' UNLAWFUL MARKET
6        ACTIVITY ............................................................................................. 87

7  FIRST CAUSE OF ACTION  (AGAINST OFFICER AND DIRECTOR DEFENDANTS
        FOR VIOLATION OF CAL. CORP. CODE § 25504) ..................................... 93
8
   SECOND CAUSE OF ACTION  (AGAINST ALL DEFENDANTS FOR FRAUD AND
9        DECEIT) ............................................................................................... 94

10 THIRD CAUSE OF ACTION  (AGAINST THE OFFICER AND DIRECTOR
        DEFENDANTS FOR NEGLIGENT MISREPRESENTATION) .................................. 114
11
   FOURTH CAUSE OF ACTION  (AGAINST THE AUDITOR DEFENDANTS FOR
12       NEGLIGENT MISREPRESENTATION) ......................................................... 115

   FIFTH CAUSE OF ACTION  (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF
13       CAL. CORP. CODE § 25504.1) ............................................................... 117

14 SIXTH CAUSE OF ACTION  (AGAINST ALL DEFENDANTS FOR COMMON LAW
        CONSPIRACY) ..................................................................................... 118
15
   SEVENTH CAUSE OF ACTION  (AGAINST ALL DEFENDANTS FOR COMMON
16       LAW AIDING AND ABETTING) ............................................................... 120

   PRAYER FOR RELIEF ................................................................................. 121

   PLAINTIFFS DEMAND A TRIAL BY JURY ...................................................... 123

17

18

19

20

21

22

23

24

25

26

27

28

**298**
**EXHIBIT 24**

1            Plaintiffs Richard P. Allocco, Lori Barker, Kenneth Boyd, Jr., Ronald Cootes,

2  Ronald J. Fior, Phyllis E. Friedman, Lawrence L. Garlick, Harold I. Goldberg, Victor Guerrieri,

3  Harvey C. Jones, Jr., Klawans Family Trust, Arthur Kulakow, Michael F. Little, David Mahler,

4  Charles Mousseau, Douglas Mueller, Judith Orah Mueller, James G. Peterson, Andrea Potts,

5  Glenda Goulette Schwem, John F. Shoch, Richard Thomas, George A. de Urioste, Darius

6  Wallace, and Daniel Weller ("Plaintiffs"), by their undersigned counsel, allege as follows:

7  **I.    INTRODUCTION**

8         1.      Peregrine Systems, Inc. ("Peregrine" or the "Company") is a provider of

9  business software and services. First incorporated in 1981, Peregrine has been publicly traded

10  since 1997. Plaintiffs are a group of former shareholders of Remedy Corporation who exchanged

11  their Remedy stock and options for cash and Peregrine securities when Peregrine acquired

12  Remedy. Within months of the Remedy acquisition, Peregrine began to reveal to the public that

13  it had grossly overstated its revenue during the years 2000, 2001, and 2002. The announcement

14  led to a drastic and sudden devaluation of Peregrine stock. While the stock was artificially

15  inflated, certain Peregrine officers and directors, including defendants Stephen P. Gardner,

16  Matthew C. Gless, John J. Moores, Thomas G. Watrous, Charles E. Noell, Douglas Powanda and

17  Richard Nelson, sold off much of their stock at enormous profits. Meanwhile, plaintiffs, who just

18  months before had been shareholders and employees of a successful and valuable company, were

19  left holding worthless Peregrine stock.

20         2.      On May 23, 2002, Peregrine announced a massive restatement of revenues.

21  Although Peregrine initially announced that as much as $100 million of revenue would be erased,

22  that prediction proved optimistic; as the investigation continued, the restatement figure quintupled

23  to over $500 million. Peregrine further disclosed that the SEC was investigating the Company's

24  accounting practices and that Gardner, its Chairman and Chief Executive Officer, and Gless, its

25  Chief Financial Officer and Executive Vice President, were resigning. In the ensuing months,

26  Gless, Peregrine's Assistant Treasurer Ilse Cappel, and Vice President for Sales Steven Spitzer

27  pled guilty to various criminal offenses, including conspiracy to commit securities fraud, bank

28  fraud, falsifying books and records, making false statements to auditors, and more. Both the SEC

1    and the Department of Justice are still investigating illegal activities by Peregrine and the

2    individual defendants.

3              3.     The facts that have emerged reveal that there were two Peregrines. The

4    Peregrine known to the public falsely announced record revenues and outstanding performance

5    quarter after quarter – reports that caused the price of Peregrine stock to soar. The other

6    Peregrine, known only to Peregrine insiders, including executives, certain members of its Board

7    of Directors, its auditors, and other defendants participating in the fraud, was actively engaged in

8    fraudulent accounting practices designed to pump up the price of Peregrine stock by, among other

9    things, booking revenue for transactions that had no economic value. Relying on the first

10   Peregrine, plaintiffs bought Peregrine stock. Knowing the true Peregrine, insiders unloaded their

11   Peregrine stock before the truth about Peregrine was revealed.

12             4.     The practices that defendants engaged in to inflate Peregrine's revenues

13   violate the standards by which public corporations must operate, known as Generally Accepted

14   Accounting Practices ("GAAP"). At the heart of Peregrine's violation of GAAP was its decision

15   to recognize revenue where it had not received revenue and did not have a sufficient basis to

16   believe it ever would receive the revenue it recorded. Peregrine's deceptive practices, which

17   created an illusion of growth, included such improprieties as using "side agreements" to excuse

18   customers from paying for products; "parking" product with cooperating resellers at the end of a

19   quarter so the Company could show it as sold, when in fact the purported customer had no

20   intention of paying for it; treating product transferred to resellers (known as channel partners) as

21   "sold" for accounting purposes, even though the reseller had no end-user and was permitted to

22   return the product; booking bank loans as sales; and booking revenue from "barter" transactions

23   or "swaps" in which Peregrine and another company would appear to sell product to each other so

24   that each could recognize revenue from the transaction when in fact no money changed hands and

25   the swaps were, economically, a wash. These practices allowed Peregrine to perpetrate the

26   illusion that it was meeting and often exceeding its quarterly financial targets, which in turn kept

27   its stock price high.

28

**300**
**EXHIBIT 24**

1         5.     Peregrine's officers and directors did not perpetrate this fraud alone.

2    Without the assistance of certain entities that entered into fraudulent transactions with Peregrine,

3    as well as auditors who looked the other way, helped Peregrine structure improper transactions,

4    and certified Peregrine's false financial statements, Peregrine could not have effected this massive

5    fraud.  Among the acts of substantial assistance that such defendants provided to Peregrine were

6    the following:

7         a.     Defendants, the Arthur Andersen entities and Daniel Stulac, the

8    audit engagement partner for the Peregrine account, repeatedly issued unqualified audit opinions

9    knowing that Peregrine's statements of revenue were false and that huge losses were hidden in

10   acquisition costs;

11        b.     Defendants KPMG, L.L.P. ("KPMG") and BearingPoint, Inc.

12   ("BearingPoint") entered into at least nine phony transactions with Peregrine for the purpose of

13   allowing Peregrine to recognize revenue;

14        c.     Defendant Critical Path, Inc. ("Critical Path") entered into an illegal

15   "swap" transaction, exchanging documents with Peregrine to make it appear that the parties

16   entered into two separate transactions for value when in fact they merely traded software;

17        d.     Defendant Bindview Development Corporation ("Bindview")

18   agreed to a swap with Peregrine in which the parties "sold" matching amounts of software to each

19   other so that each could recognize revenue;

20        e.     Defendant Bull, S.A., tradestyle "Groupe Bull" ("Bull"), at

21   Peregrine's behest, backdated documents, to allow Peregrine to recognize revenue in the previous

22   quarter, and only after Peregrine entered into 2 secret side letters in which Peregrine agreed to pay

23   money and transfer business to Bull that equaled or exceeded the purported obligation from Bull

24   to Peregrine.

25        f.     Defendants BT Group, plc ("BT Group") and British

26   Telecommunications, plc ("BT") backdated documents to permit Peregrine to recognize revenue

27   in a previous quarter, entered into a separate agreement on the side which excused it from paying

28

**301**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1  Peregrine any money at all, then falsely confirmed to Peregrine's auditors in San Diego that

2  Peregrine had recognized revenue;

3        g.     Defendant Insight Enterprises, Inc. ("Insight") entered into a phony

4  transaction with Peregrine with a hidden side agreement that obviated any need for payment,

5  knowing that Peregrine needed and would record revenue from the deal.

6        h.     Defendant Fujitsu Transactions Solutions, Inc. ("Fujitsu")

7  backdated documents and entered into a sham transaction to permit Peregrine to falsely recognize

8  revenue.

9        6.     The aim of this aggressive program of fraudulent transactions was to drive

10  up Peregrine's stock price, in part because it created wealth for the insiders, but also because it

11  allowed Peregrine to acquire other companies using its stock as currency. The Remedy merger

12  was one such acquisition. Peregrine acquired at least 12 other companies between 1997 and 2001

13  before acquiring Remedy and its strategy and merger activities were thus well-known among

14  those with whom it did business. Remedy, a publicly held company with approximately 1300

15  employees worldwide, was a leading supplier of information technology service management and

16  customer relationship management solutions. Following some two years of discussion and

17  negotiation, Peregrine finally convinced Remedy to agree to a merger and paid Remedy

18  shareholders $9.00 plus 0.9065 shares of Peregrine stock per share of Remedy stock. On the day

19  of the merger, August 27, 2001, Peregrine stock closed at $23.01, and Remedy stock closed at

20  $29.40. But for the false statements, false records, and unlawful acts of defendants, plaintiffs

21  would not have sold their company to Peregrine in exchange for Peregrine stock.

22        7.     On February 28, 2003, Peregrine filed restated consolidated financial

23  statements for the years ended March 31, 2000 and 2001. Peregrine had previously reported its

24  results for the first three fiscal quarters of the March 31, 2002 fiscal year. The restated financials

25  show that Peregrine inflated revenue by $509 million from April 1999 through December 2001.

26  Approximately half of the $509 million, or $259 million, represented "non-substantiated

27  transactions." Peregrine had previously told investors and government regulators that its losses

28

**302**

**EXHIBIT 24**

1    during that time period amounted to $1.54 billion, but the restatement showed those losses to be

2    $4.09 billion.

3          8.    Peregrine's common stock, which once sold for over $80 per share, now

4    hovers at around a dime.

5    **II.    THE PARTIES**

6          **A.    PLAINTIFFS**

7          9.    Plaintiff Richard P. Allocco was the Executive Vice President of Global

8    Sales and Services at Remedy. At the time of the merger, Allocco had 244,900 Remedy options

9    for which he received Peregrine options. Allocco resides in Pleasanton, California.

10          10.    Plaintiff Lori Barker was employed by Remedy from February 1998

11    through the merger, most recently as Remedy's Director of Finance and Investor Relations. At

12    the time of the merger, Barker received approximately 2,511 shares of Peregrine stock. She also

13    owned 49,210 Remedy options which were exchanged for Peregrine options. She then acquired

14    700 Peregrine shares on the open market on January 28, 2002. Barker resides in Redwood City,

15    California.

16          11.    Plaintiff Kenneth Boyd, Jr. was Chief Information Officer of Remedy from

17    December 1998 through the merger. After the merger, Boyd was Vice President of Business

18    Development, Office of the Chairman. At the time of the merger, Boyd received approximately

19    1,098 shares of Peregrine stock. He also owned 125,000 Remedy options which were exchanged

20    for Peregrine options. He acquired additional options after the merger and prior to May 23, 2002.

21    Boyd resides in Sunnyvale, California.

22          12.    Plaintiff Ronald R. Cootes was a Distinguished Engineer at the time of the

23    merger with Peregrine and is currently employed by Remedy. At the time of the merger, Cootes

24    received Peregrine stock. He also owned 67,500 Remedy options, which were exchanged for

25    Peregrine options. Cootes resides in Los Gatos, California.

26          13.    Plaintiff Ronald J. Fior was the Vice President for Finance and Operations,

27    and CFO of Remedy from September 1998 through the merger. At the time of the merger, Fior

28    received approximately 4,275 shares of Peregrine stock. He also owned 205,000 Remedy options

**303**

324631.4                                    - 5 -                              **EXHIBIT 24**

1   which were exchanged for Peregrine options. Fior also made sales and option exchanges

2   subsequent to that. Fior resides in Redwood City, California.

3              14.   Plaintiff Phyllis E. Friedman was the Office Manager and then Manager of

4   Employee Programs of Remedy from January 3, 1993 through the merger. At the time of the

5   merger, Friedman received approximately 23,976 shares of Peregrine stock. She also owned

6   7,850 Remedy options which were exchanged for Peregrine options  Friedman resides in

7   Redwood City, California.

8              15.   Plaintiff Lawrence L. Garlick was the co-founder, chairman, and Chief

9   Executive Officer of Remedy from its inception on November 20, 1990 until its acquisition by

10  Peregrine. At the time of the merger, Garlick received approximately 2,176,433 shares of

11  Peregrine stock. He also owned 565,500 Remedy options which were exchanged for Peregrine

12  options. Garlick resides in Palo Alto, California.

13             16.   Plaintiff Harold I. Goldberg was a Vice President and General Manager at

14  Remedy. At the time of the merger, Goldberg received approximately 1,570 shares of Peregrine

15  stock. He also owned 129,460 Remedy options which were exchanged for Peregrine options.

16  Goldberg resides in San Jose, California.

17             17.   Plaintiff Victor Guerrieri was the Vice President of Sales Americas at

18  Remedy. At the time of the merger, Guerrieri owned approximately 1,326 shares of Peregrine

19  stock. He also owned 73,000 Remedy options which were exchanged for Peregrine options.

20  Guerrieri resides in Pleasanton, California.

21             18.   Plaintiff Harvey C. Jones, Jr. was a Remedy director from November 1994

22  through the merger. At the time of the merger, Jones received approximately 27,195 shares of

23  Peregrine stock. He also owned 170,000 Remedy options which were exchanged for Peregrine

24  options. Jones resides in Palo Alto, California.

25             19.   Plaintiff Barry Klawans was a Software Engineer and Engineering

26  Manager at Remedy from 1991 through February 20, 1997. At the time of the merger, Klawans

27  received approximately 32,340 shares of Peregrine stock. Klawans resides in San Francisco,

28  California.

**304**

FOURTH AMENDED COMPLAINT

20. Plaintiff Arthur Kulakow was a Senior Software Engineer at Remedy from September 1991 to January 1996. At the time of the merger, Kulakow received approximately 13,597 shares of Peregrine stock. Kulakow resides in Saratoga, California.

21. Plaintiff Michael F. Little was Vice President of Worldwide Support at Remedy. At the time of the merger, Little received approximately 467 shares of Peregrine stock. He also owned 65,500 Remedy options, which were exchanged for Peregrine options. Little resides in Fremont, California.

22. Plaintiff David Mahler was a co-founder and director of Remedy from 1990 through the merger. At the time of the merger, Mahler received approximately 562,750 shares of Peregrine stock. He also owned 35,000 Remedy options which were exchanged for Peregrine options. Mahler resides in Los Altos Hills, California.

23. Plaintiff Charles Mousseau was a Senior Staff Engineer at the time of the merger with Peregrine and is currently employed by Remedy. At the time of the merger, Mousseau received approximately 11,137 shares of Peregrine stock. He also owned 48,870 Remedy options which were exchanged for Peregrine options. Mousseau resides in Palo Alto, California.

24. Plaintiff Douglas Mueller was a co-founder and Software Engineer at Remedy from December 1990 through the Merger. At the time of the merger, Mueller received approximately 763,491 shares of Peregrine stock. He also owned 224,498 Remedy options which were exchanged for Peregrine options. Mueller purchased 13,100 shares on the open market in January 2002. Mueller resides in Palo Alto, California.

25. Plaintiff Judith Orah Mueller is the wife of Douglas Mueller. At the time of the merger, Mueller received approximately 26,353 shares of Peregrine stock. Mueller resides in Palo Alto, California.

26. Plaintiff James G. Peterson was the Vice President of the Action Request System Business Unit for Remedy. At the time of the merger, Peterson received approximately 990 shares of Peregrine stock. He also owned 120,000 Remedy options which were exchanged

1    for Peregrine options.  Peterson purchased 5,000 Peregrine shares on May 8, 2002.  Peterson

2    resides in San Jose, California.

3         27.    Plaintiff Andrea Potts was the Worldwide Vice President of Human

4    Resources of Remedy from August 17, 1999 through November 31, 2001.  At the time of the

5    merger, Potts received approximately 1,860 shares of Peregrine stock.  She also owned 110,000

6    Remedy options which were exchanged for Peregrine options.  Potts resides in Los Gatos,

7    California.

8         28.    Plaintiff Glenda Goulette Schwem was a Director of Contracts and

9    Intellectual Property at Remedy from April 1998 through October 2001.  At the time of the

10   merger, Schwem received approximately 245 shares of Peregrine stock.  She also owned 95,100

11   Remedy options which were exchanged for Peregrine options.  Schwem resides in Pleasanton,

12   California.

13        29.    Plaintiff John F. Shoch was a Remedy director from January 1991 through

14   the merger.  At the time of the merger, Schoch received approximately 77,052 shares of Peregrine

15   stock.  He also owned 120,000 Remedy options which were exchanged for Peregrine options.

16   Shock also engaged in sales and option exchanges subsequent to that.  Shoch resides in

17   Woodside, California.

18        30.    Plaintiff Richard Thomas was a Quality Assurance Manager at Remedy

19   from April 1993 through August 1996.  At the time of the merger, Thomas received

20   approximately 28,682 shares of Peregrine stock.  Thomas resides in Sunnyvale, California.

21        31.    Plaintiff George A. de Urioste was the Vice President, Finance and

22   Operations, and Chief Financial Officer of Remedy from March 1993 until July 1998.  At the

23   time of the merger, de Urioste received approximately 178,707 shares of Peregrine stock.  He also

24   purchased 1,000 shares on April 6, 2000.  De Urioste resides in Atherton, California.

25        32.    Plaintiff Darius Wallace was Services Technical Director at Remedy.  At

26   the time of the merger, Wallace owned 118,750 Remedy options which were exchanged for

27   Peregrine options.  Wallace resides in San Jose, California.

28

33.     Plaintiff Daniel Weller was a Software Engineer and Engineering Manager of Remedy from 1991 through approximately April 1997.  At the time of the merger, Weller received approximately 136,349 shares of Peregrine stock.  Weller also purchased 30,000 shares of Peregrine common stock on May 2, 2002.  Weller resides in Palo Alto, California.

34.     The value of the Peregrine stock and options obtained by Plaintiffs in exchange for their Remedy shares and options was approximately $150,000,000.

## B.     DEFENDANTS

### 1.     Officer Defendants (Gardner, Gless, Powanda, Nelson)

35.     Defendant Stephen P. Gardner ("Gardner") served as Peregrine's Chairman of the Board and Chief Executive Officer.  Gardner first joined Peregrine in May 1997 as Vice President of Strategic Operations.  In January 1998, he became Executive Vice President and Principal Executive Officer of the Company.  He became CEO in April 1998.  Gardner was forced to resign from the Company on or about May 3, 2002.  Gardner resides in San Diego, California.

36.     Defendant Matthew C. Gless ("Gless") served as Peregrine's Chief Financial Officer and director.  He first joined Peregrine as Corporate Controller in April 1996.  In October 1998, he became Vice President of Finance and Chief Accounting Officer ("CAO").  From October 2000 until his forced resignation on or about May 23, 2002, Gless served as CFO and director.  Gless resides in San Diego, California.  He has pled guilty to securities fraud and is awaiting sentencing.

37.     Defendant Douglas Powanda ("Powanda") is substituted herein as Doe Defendant No. 5.  Powanda joined Peregrine in February 1992 as Sales Manager.  In 1998, he became Executive Vice President, Worldwide Sales.  In February 2001, he became a "consultant" to the Company but continued to work on major accounts with a compensation plan providing him with substantial incentives for generating revenue.  He also constituted part of the Office of the Chairman until he left the Company in the Spring of 2002.

38.     Richard Nelson ("Nelson") was substituted herein as Doe Defendant No. 6 as soon as possible after learning of the facts establishing his connection with the claims alleged

1   herein. Nelson became Vice President and General Counsel of Peregrine in 1995. In 1997, he

2   became Secretary of the Corporation, and in 2000 became Vice President of Corporate

3   Development, reporting directly to Gardner. Thereafter, he became a Senior Vice President and

4   assumed the role of interim CEO when the fraud was first announced. Plaintiffs substituted

5   Mr. Nelson in as a Doe Defendant as soon as possible after learning of the facts establishing his

6   connection with his claims alleged herein.

7           2.      **Director Defendants** (Moores, Watrous, Noell, Savoy)

8           39.     Defendant John J. Moores ("Moores") was Peregrine's Chairman of the

9   Board. He first became a director in March 1989. He served as Chairman from March 1990 until

10  July 2000. Moores served on the Board's Compensation Committee, which determines salaries,

11  incentives, and other forms of compensation for directors, officers, and other employees of

12  Peregrine. Moores resides in Del Mar, California.

13          40.     Defendant Thomas G. Watrous, Sr. ("Watrous") was a Peregrine director

14  who served on the Audit Committee during the relevant period. Watrous resides in Atwood,

15  California.

16          41.     Defendant Charles E. Noell ("Noell") was a Peregrine director who served

17  on the Audit Committee during the relevant period. Noell resides in San Diego, California.

18          42.     Defendant William D. Savoy ("Savoy") was a Peregrine director who

19  served on the Audit Committee during the relevant period. Savoy resides in Bellevue,

20  Washington.

21          3.      **Auditor Defendants** (Andersen, AWSC, Andersen Germany, Stulac)

22          43.     In a related case filed in this Court, Peregrine Systems, Inc. v. Arthur

23  Andersen, LLP, et al., Case No. GIC 796594, Peregrine has identified Defendant Arthur

24  Andersen LLP ("Andersen"), AWSC Société Coopérative, en liquidation ("AWSC"), and Arthur

25  Andersen Germany ("Andersen Germany") as Peregrine's accountants from 1997 until April

26  2002. Andersen is headquartered in Chicago, Illinois. Upon information and belief, AWSC is

27  also headquartered in Chicago, Illinois. Andersen Germany is currently owned by Ernst and

28  Young and was previously headquartered in Eschborn, Germany. The formal name of Andersen

**308**

1    Germany is Ernst & Young Revisions–und Treuhandgesellschaft mbH,

2    Wirtschaftsprüfungsgesellschaft Steuerberatungsgesellschaft (HRB 10482).

3         44.    Defendant Daniel Stulac ("Stulac") was the Andersen audit engagement

4    partner in charge of Peregrine's account during the relevant time. Stulac was responsible for

5    Andersen's audit of Peregrine's financial statements for Fiscal Year 2001. (Peregrine's year

6    began on April 1 and ended March 31. Thus, FY 2001 began April 1, 2000 and ended March 31,

7    2001.)

8         4.    **Customer Defendants (KPMG, BearingPoint, Critical Path, Insight,**
              **BT and BT Group, Bull, Bindview, Fujitsu/ICL)**
9

10        45.    Defendant KPMG LLP has been substituted herein as Doe Defendant

11   No. 1. KPMG colluded with the Peregrine Officer and Director Defendants ("Peregrine

12   Defendants") to fraudulently omit and misrepresent information concerning Peregrine's true

13   financial condition. KPMG is headquartered at Three Chestnut Ridge Road, Montvale, NJ 07645,

14   and is incorporated in the State of Delaware. KPMG maintains at least twelve offices in

15   California, including one office in San Diego, does extensive business in California, has sufficient

16   minimum contacts with California, and otherwise intentionally avails itself of the markets in

17   California through the promotion, marketing, sale, and distribution of services in California to

18   render the exercise of jurisdiction by the California courts permissible under traditional notions of

19   fair play and substantial justice.

20        46.    Defendant BearingPoint, formerly known as KPMG Consulting, has been

21   substituted herein as Doe Defendant No. 2. BearingPoint colluded with the Peregrine Defendants

22   to fraudulently misrepresent Peregrine's true financial condition. BearingPoint is headquartered

23   at 1676 International Drive, McLean, VA 22102, and is incorporated in the State of Delaware.

24   BearingPoint maintains at least six offices in California, including two offices in San Diego, does

25   extensive business in California, has sufficient minimum contacts with California, and otherwise

26   intentionally avails itself of the markets in California through the promotion, marketing, sale, and

27   distribution of services in California to render the exercise of jurisdiction by the California courts

28   permissible under traditional notions of fair play and substantial justice.

1        47.    Defendant Critical Path has been substituted herein as Doe Defendant

2    No. 3. Critical Path colluded with the Peregrine Defendants to fraudulently misrepresent

3    Peregrine's true financial condition. Critical Path is headquartered at 320 First Street, San

4    Francisco, CA 94105, and is incorporated in the State of California.

5        48.    Defendant BT Group, plc ("BT Group") has been substituted herein as Doe

6    Defendant No. 4 as soon as possible after learning of the facts establishing its connection with the

7    claims alleged herein. Defendant British Telecommunication, plc ("BT") has been substituted

8    herein as Doe Defendant No. 10 as soon as possible after learning of the facts establishing its

9    connection with the claims alleged herein.

10       a. BT Group colluded with the Peregrine Defendants to fraudulently misrepresent

11   Peregrine's true financial condition. BT Group is an English corporation headquartered in

12   London, England, and is listed on the New York and London stock exchanges. BT Group, and its

13   alter egos and agents, including but not limited to BT Consulting, and BT Global Services

14   (formerly known as BT Ignite) and British Telecommunications, Plc ('BT") purposefully engaged

15   in activities directed at this State related to the transactions described below, and do business

16   continually in this State directly and through their alter ego and/or agent BT Americas, Inc., a

17   Delaware corporation with headquarters in New York.

18       b. BT is an English company headquartered in London, England, which holds virtually all

19   businesses and assets of the BT Group. BT is the alter ego and agent of BT Group. BT, and its

20   employees and agents, purposefully engaged in activities directed at this State related to the

21   transactions described below, and do business continually in this State through their alter ego and

22   agent BT Group, and its alter egos and agents.

23       49.    Defendant Bull has been substituted herein as Doe No. 7, as soon as

24   possible after learning of the facts establishing its connection with the claims alleged herein.

25   Headquartered in Louneciennes (Paris), France, Bull does business in California through its agent

26   and alter ego Bull Data Systems, Inc., a Delaware corporation. Bull participated directly in a

27   fraudulent transaction with Peregrine knowing that it would have effects within this State.

28

**310**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

50.     Defendant Insight has been substituted herein as Doe No. 8, as soon as possible after learning of the facts establishing its connection with the claims alleged herein. Formerly known as Action Computer Supplies Holding, plc (UK), the company was acquired in December 2001 by Insight. Insight is a Delaware corporation headquartered in Tempe, Arizona. It does business in the State of California through its operations segments, Insight North America and Insight U.K.

51.     Defendant Bindview has been substituted herein as Doe No. 9, as soon as possible after learning of the facts establishing its connection with the claims alleged herein. Bindview is a Texas corporation headquartered in Houston, Texas. Bindview took part in the transaction referred to in this Complaint knowing and intending it would have effects in California.

52.     Defendant Fujitsu has been substituted herein as Doe No. 11, as soon as possible after learning of the facts establishing its connection with the claims alleged herein. Formerly known as Fujitsu/ICL Systems, Inc., it was renamed as Fujitsu Transaction Solutions, Inc. in 2001. Fujitsu Transaction Solutions, Inc. is incorporated in Delaware and headquartered in New Jersey. Fujitsu participated directly in a fraudulent transaction with Peregrine knowing that it would have effects within this State.

### 5.     Doe Defendants

53.     Plaintiffs do not know the true names and capacities of Does 13 through 100, inclusive, whether individual, corporate, association, or otherwise, and, therefore, sues said defendants, and each of them, by such fictitious names. Plaintiffs will amend this Complaint to show their true names and capacities when they have been ascertained. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each of these defendants was in some manner legally responsible for the events, happenings, injuries, and damages alleged in this Complaint.

## III.     JURISDICTION AND VENUE

54.     This Court has jurisdiction over all causes of action asserted in Plaintiffs' original Complaint and this Fourth Amended Complaint pursuant to the California Constitution,

1   Article VI, § 10. The claims asserted herein arise under Cal. Corp. Code §§ 25400 et seq. and

2   25500 et seq.; and common law.

3        55.   Venue is proper in the Superior Court for the County of San Diego because

4   one or more defendants reside in San Diego County.

5        56.   The amount in controversy exceeds the jurisdictional minimum of the

6   Superior Court.

7        57.   This action is not preempted by the Federal Securities Litigation Uniform

8   Standards Act of 1998, 15 U.S.C. § 78bb(f) ("SLUSA"), because this Complaint asserts state law

9   claims and is not a class action, an action brought by a representative party, or an action that

10   seeks damages on behalf of more than fifty persons.

11   IV.   **FACTS RELATED TO THE REMEDY MERGER**

12        58.   Peregrine aggressively pursued Remedy for almost two years, beginning its

13   overtures in late 1999. Nothing came of these early discussions. In February 2001, Peregrine

14   representatives made new overtures to Remedy and made a specific offer to acquire all

15   outstanding Remedy shares, which Remedy rejected.

16        59.   Shortly after Remedy rejected Peregrine's offer, Peregrine purchased

17   295,000 shares of Remedy on the open market without consulting Remedy. Peregrine then made

18   another offer to Remedy, which Remedy again rejected.

19        60.   On May 24, 2001, Peregrine made its final offer. After a meeting of

20   Remedy's Board of Directors on May 30, 2001, that offer, set forth in paragraph 6, was accepted.

21   Each company commenced due diligence soon thereafter.

22        61.   The merger agreement required Remedy to prepare and file with the SEC a

23   Proxy Statement/Prospectus for solicitation of proxies from its shareholders for consent to the

24   merger and their acquisition of approximately 28.3 million shares of Peregrine common stock and

25   approximately $278 million in cash in exchange for approximately 30.9 million shares of

26   Remedy's common stock. The merger agreement also required Peregrine to prepare and file with

27   the SEC an S-4 Registration Statement for the Offer and Sale of Peregrine common stock

28   ("Registration Statement"). The merger agreement further required that the Registration

312

1   Statement contain the Proxy Statement/Prospectus. The merger agreement warranted prior SEC

2   filings and all statements contained in the Registration Statement.

3        62.    The Registration Statement was filed and distributed on July 23, 2001. It

4   urged shareholders to vote in favor of the Peregrine/Remedy merger. The Proxy

5   Statement/Prospectus expressly incorporated Peregrine's FY01 10-K by reference.

6        63.    In approving the merger, Remedy's Board of Directors considered factors

7   such as "historical information concerning Peregrine's and Remedy's respective businesses,

8   prospects, financial performance and condition[;] the market value of Peregrine common stock

9   and various factors that might affect that value in the future[; and] detailed financial analysis and

10   pro forma and other information presented to the board." As Remedy, its Directors, and

11   shareholders later learned, the historical and financial information was rife with false and

12   misleading statements that vastly inflated Peregrine's revenue and the value of its stock.

13   **V.    <u>FACTS RELATED TO THE FRAUD</u>**

14        64.    For the 17 quarters prior to the Remedy merger, from April 1997 through

15   the quarter ended June 2001, Peregrine reported continuous growth, always meeting or exceeding

16   the expectations of securities analysts. Quarter after quarter, defendants engaged in persistent

17   efforts to create the appearance that Peregrine was meeting its announced revenue goals and

18   analysts' expectations, information material to the stock's performance on the efficient NASDAQ

19   exchange.

20        65.    An important feature of the Company's business plan was to achieve

21   growth through acquisitions and strategic alliances, a fact known to all defendants in this action.

22   The rise in the price of Peregrine stock that accompanied its assertedly "record" performance

23   each quarter allowed the Company to pursue acquisitions using its stock as consideration in the

24   transactions. Meeting its revenue projections — or, at least announcing that it had done so —

25   was thus a key building block in Peregrine's growth strategy.

26        66.    Software license fees accounted for the bulk of Peregrine's revenue.

27   Software sales are known to provide opportunities to inflate revenues through improper revenue

28   recognition and to thereby perpetrate financial statement fraud. Fully aware of this fact,

313

1  Peregrine executives and the Company's Board made a decision in April 1999 that materially
2  affected the truth of its public statements regarding its performance from at least that point
3  forward. At that meeting, the Board authorized the Company to recognize revenue based on
4  "sell-in" rather than "sell-through." Both terms refer to transactions with "resellers" or "channel
5  partners" as distinct from direct sales by Peregrine's own sales force. "Sell-in" refers to sales to
6  the channel partner with no confirmed end user. "Sell-through" refers to sales by channel
7  partners to end-users.

8      67.    Because of the opportunities for improper and fraudulent accounting,
9  Peregrine's Board was advised at the April 1999 meeting that revenue recognition based on "sell-
10  in" is not preferred and made the auditors uncomfortable. The weakness of recognizing revenue
11  on sell-in is that payment to Peregrine was contingent upon the reseller perfecting a sale to an end
12  user; no sale to an end user, no revenue. Thus, by recognizing revenue upon sell-in, Peregrine
13  was counting as certain revenue that was merely contingent. The Board nevertheless authorized
14  the Company to recognize revenue based on sell-in because that was the only way Peregrine
15  could meet its revenue projections for the previous quarter.

16      68.    A limited amount of revenue recognition on sell-in is permitted under
17  GAAP, but certain rules must be followed to ensure that the revenue is substantially certain to
18  follow. Peregrine permitted excessive amounts of revenue to be recognized on sell-in, and did so
19  without following the rules. Most of the sell-in revenue Peregrine recognized never materialized
20  and much of the revenue that did eventually materialize should have been recorded in quarters
21  other than those for which it was reported.

22      69.    In the 10-K and 10-Q statements Peregrine filed with the SEC for the
23  "Affected Period" (Fiscal Years 2000, 2001, and the first three quarters of 2002), Peregrine
24  represented that it recognized revenue in accordance with GAAP. Those representations were
25  false. The true facts were that Peregrine recognized revenue immediately upon sell-in, even
26  though one or more of the requirements of GAAP were not met, including the following: (1) the
27  fee owed to Peregrine was not fixed and determinable; (2) collectability of the fee was not
28  probable; or (3) the resellers' obligation to pay for the product was contingent upon subsequent

314

1   sale of the product to an end user. Moreover, Peregrine entered into side agreements with

2   resellers releasing them from their obligation to pay as well as offering discounts, kickbacks, and

3   other forms of inducement to entice resellers to "purchase" license agreements, even though no

4   actual purchase occurred. The sole purpose of these deceptive actions was to allow Peregrine to

5   off-load product, even if only temporarily, so it could report revenue consistent with what it had

6   told analysts to expect.

7               70.     Peregrine used several instruments of deception to inflate its revenues,

8   including, but not limited to:

9               a.     Side agreements: Peregrine and a complicit customer would

10   document a transaction showing a non-contingent sale to the customer. Peregrine and the

11   customer would then enter into an additional oral or written agreement releasing the customer

12   from its obligation to pay Peregrine unless and until it sold through to an end-user, thus rendering

13   the transaction contingent;

14              b.     Swaps: A swap occurred when a complicit customer would agree

15   to exchange some of its product or services for Peregrine product. Each party would document

16   the transaction as if it were a legitimate sale, disguising the fact that there was a reciprocal

17   transaction that cancelled out any gain. The swaps were engaged in purely for the purpose of

18   allowing the participating parties to book revenue. Among defendants, these phony transactions

19   were referred to as "Barney deals" – a reference to the refrain sung by the popular purple

20   dinosaur, "I love you, you love me, we're a happy family . . ."

21              c.     Parking: Parking occurred when Peregrine staged a fake "sale" to

22   a third party, with the understanding that the transaction would be undone after the quarter ended

23   and the revenue had been recorded;

24              d.     Calendar manipulation: Peregrine would hold the quarters open,

25   sometimes as much as seven days longer than the true close of the quarter, to allow the Company

26   to count revenue generated during the extended period in the previous quarter; and

27              e.     Manipulation of accounts receivable: Among the forms this took

28   was counting as income loans received from banks in anticipation of payment of receivables. At

315

FOURTH AMENDED COMPLAINT

1  the same time, the Company would remove the receivables from its balance sheet, giving the

2  impression that customers were paying on time, or sooner than was true.  Peregrine even prepared

3  false invoices and obtained funds from banks for transactions that had not closed.  Another

4  purpose of this manipulation of receivables was to manufacture a false number for the Company's

5  Days Sales Outstanding ("DSO").  DSO measures the time between sale and payment and is

6  considered a key indicator of a company's health.

7  **VI.    THE FALSE STATEMENTS**

8          71.    Following the Board's decision blessing sell-in as a basis for calculating

9  revenue, the Company issued a long series of false public statements including press releases,

10  financial statements, quarterly reports, earnings releases, and SEC filings.  These false statements

11  were material in that they were calculated to improve, and did improve, Peregrine's stock price by

12  causing investors to buy Peregrine stock.

13          72.    Each of the statements which are set forth in paragraphs 73-75 contained

14  misrepresentations and/or omissions of at least the following adverse facts:

15                 a.    Peregrine had improperly booked revenues from resellers that did

16  not comply with GAAP, thereby inflating the Company's revenues;

17                 b.    Peregrine failed to disclose that it was forced to write off revenues

18  it had booked on transactions with resellers in previous quarters;

19                 c.    Peregrine failed to disclose that it was engaging in swaps and that it

20  was parking product with complicit third parties, booking revenue that it knew it never would

21  receive;

22                 d.    Peregrine failed to accurately record revenues and/or write down

23  impaired or adjusted asset values on a timely basis in accordance with GAAP; and

24                 e.    Peregrine failed to disclose that it had prematurely recognized a

25  portion of $100 million in revenues from the sale of software to MSPs (Managed Service

26  Providers).

27          73.    These misrepresentations and omissions rendered at least the following

28  public statements and filings false and misleading.  In every case, the true facts were that the

**316**

FOURTH AMENDED COMPLAINT

1   revenues were substantially less than reported and the statements about the level of increased

2   growth were known by defendants to be blatantly false:

3                   a.      On April 26, 1999 the Company announced its revenues for the

4   quarter ended March 31, 1999.  The Company falsely reported that it had met expectations with

5   revenues of $46.1 Million, which it reported as an increase of 129% over the previous year's

6   comparable quarter.

7                   b.      On July 21, 1999, Peregrine issued a release that falsely announced

8   "record" financial results for the first quarter ("Q1") of FY00 (the period ending June 30, 1999),

9   including a 137% increase in revenue for the quarter to $51.6 million.

10                  c.      On August 13, 1999, Peregrine filed its Q1 FY00 10-Q with the

11  SEC, which incorporated the false financial statements contained in the July 21, 1999 press

12  release.

13                  d.      On October 20, 1999, Peregrine issued a release that falsely

14  announced "record" financial results for Q2 and first half of FY00 (the period ending

15  September 30, 1999), with a 95% increase in revenues over the comparable quarter from the

16  previous year and a purported 113% increase over the comparable prior year total revenues.  The

17  release followed Gardner's report to the Board that the level of channel activity was a problem

18  and that direct sales were declining, neither of which were mentioned in the release.  Instead,

19  Peregrine added to the release glowing statements regarding the "rapid growth" and future

20  potential of the Company.

21                  e.      On November 15, 1999, Peregrine filed its second quarter ("Q2")

22  FY00 10-Q with the SEC, which incorporated the financial statements contained in the

23  October 20, 1999 press release.

24                  f.      On January 20, 2000, Peregrine issued a release that announced, yet

25  again, purported "record" financial results for Q3 and the first three quarters of FY00 (the period

26  ending December 31, 1999), including a 67% increase in revenues for the quarter and a 92%

27  increase for the nine-month period over the previous year's comparable period.  Peregrine capped

28  the release with more glowing comments about the "future prospects" for Peregrine.  These

EXHIBIT 24

1    statements were issued to the public notwithstanding that Gardner had told the Board just days

2    before that the Company's "bread and butter business" had gone "to hell," the productivity of the

3    direct sales force was at a "ridiculously low level," and the level of channel stuffing was a cause

4    for concern.

5                    g.      On February 11, 2000, Peregrine filed its third quarter ("Q3") FY00

6    10-Q with the SEC, which incorporated the false financial statements contained in the January 20,

7    2000 press release.

8                    h.      On April 26, 2000, Peregrine issued a release that announced more

9    purported "record" financial results for the fourth quarter ("Q4") of FY00 (the period ending

10   March 31, 2000), as well as for FY00.  This time, Peregrine claimed a 66% increase and an 83%

11   increase in revenues over the comparable prior year periods.

12                   i.      On May 10, 2000, Peregrine filed its FY00 10-K with the SEC,

13   which incorporated the financial statements contained in the April 26, 2000 press release.

14                   j.      On July 19, 2000, Peregrine issued a press release that falsely

15   announced more "record" financial results for Q1 of FY01 (the period ending June 30, 2000),

16   which stated, in part, that revenue had increased 83% over the prior year's first quarter.  Peregrine

17   projected a rosy future, notwithstanding that the Board had just been told that: the Company's

18   bread and butter deals had plummeted and were "off the radar screen," it would be difficult to

19   reach the goals set for the second quarter, the Company was short on cash, and that the state of

20   the Company was such that it could not do a public offering as it had hoped.

21                   k.      On August 14, 2000, the Company filed its Q1 FY01 10-Q with the

22   SEC for the period ended June 30, 2000, reporting the same false results as reported in the

23   July 19, 2000 press release.

24                   l.      On October 3, 2000, Defendants issued a press release that falsely

25   informed investors and analysts that Peregrine purportedly was on track to meet "or exceed"

26   previous Company-sponsored guidance for Q2 of FY01 (the period ending September 30, 2000).

27                   m.      On October 24, 2000, Defendants issued a press release confirming

28   the October 3, 2000 release and falsely announcing "record" results for Q2 FY01, with revenues

318

FOURTH AMENDED COMPLAINT

1   of $142.7 million and net income of $0.12 per share. The release touted a 147% increase in

2   revenues over the prior year's comparable quarter. The Company issued this release

3   notwithstanding that Gardner had advised the Board that the numbers were camouflage, stating

4   that the Company had to "borrow from the future to make the present," that the quarter had been

5   "saved" by the huge but substanceless deals to resellers, that the productivity of the Company's

6   direct sales force was low, and that the Company lacked the cash that it needed.

7           n.      On November 14, 2000, the Company filed its Q2 FY01 10-Q with

8   the SEC for the period ended September 30, 2000, reporting essentially the same false results as

9   reported in the October 3 and 24, 2000 press releases.

10          o.      On January 24, 2001, Defendants issued a release that again

11   announced "record" results for Q3 FY01 (the period ending December 31, 2000), with revenues

12   of $156.6 million and net income of $0.15 per share. This time the Company claimed an increase

13   in revenues of 132%. Calling it a "very important quarter" for Peregrine, Gardener falsely told

14   the public that Peregrine again had exceeded its objectives, causing the price of Peregrine

15   common stock to jump. Prior to releasing the report, Gardner had told the Board that the

16   Company's direct sales in North America were "a disaster," that they were placing heavy reliance

17   on the channel, and that the company's sales force was not performing.

18          p.      On February 14, 2001, the Company filed its Q3 FY01 10-Q,

19   reporting the same false results as the January 24, 2001 earnings release.

20          q.      On April 4, 2001, after Gardner made a grim report to the Board

21   about the Company's status, Defendants issued a press release that falsely informed investors and

22   analysts that the Company was on track to meet previous Company-sponsored guidance for Q4

23   FY01 and FY01 (the period ending March 31, 2001). Commenting on these purported continued

24   "record" financial results, Gardner was quoted in the release with respect to Peregrine's "strong

25   profitable results" over sixteen "consecutive quarter[s]." The report caused Peregrine's shares to

26   rally.

27          r.      On April 26, 2001, Defendants issued a press release that confirmed

28   the April 4, 2001 release, purporting to announce "record" results for Q4 FY01 and FY01 (the

324631.4                        - 21 -                          **EXHIBIT 24**

1    period ending March 31, 2001).  The Company reported the increase for the quarter at 124% and

2    for the fiscal year at 123%.  Gardner's accompanying statement attributed the strong performance

3    to the value of their product, rather than to channel stuffing and accounting manipulation, which

4    were the true causes of the purported revenue increase.  As a result, the price of Peregrine shares

5    continued to climb.

6                    s.       On June 29, 2001, Peregrine filed its FY01 10-K with the SEC,

7    which incorporated the financial statements contained in the May 25, 2001 press release as well

8    as the press releases and 10-Qs for the preceding three quarters.  Once again, Peregrine

9    proclaimed impressive revenue increases.  But the restatement, which shows the true facts,

10   showed that Peregrine's revenues had decreased, not increased, and were less than half of what

11   was reported.

12                   t.       On July 24, 2001, Peregrine issued a press release announcing its

13   financial results for Q1 of FY02.  As usual, Peregrine reported impressive increases in revenue

14   for the quarter (82%) despite its knowledge that much of the purported revenue resulted from

15   manipulation and improprieties.  That knowledge did not stop Gardner from telling the public that

16   the Company's continued growth resulted from their "ability to deliver on [our] objectives."

17                   u.       On August 14, 2001, Peregrine filed its Q1 FY02 10-Q with the

18   SEC, incorporating the false financial statements that were included with the July 24, 2001 press

19   release.

20           74.      The false information contained in the above filings, reports, and releases

21   was provided in connection with the Remedy merger discussions.  In addition, the Registration

22   Statement filed on July 2, 2001 regarding the Peregrine and Remedy merger represented that none

23   of the reports filed by the Company with the SEC since 1997 contained any false statements or

24   omissions, that the financial statements incorporated in those reports complied with GAAP, and

25   that the information provided "fairly present[ed] in all material respects the consolidated financial

26   condition" of Peregrine.  Each of these representations was false.

27

28

**320**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1       75.     After the Remedy merger, Peregrine continued to issue false statements

2  that masked the true state of the Company, causing plaintiffs to hold on to their Peregrine stock,

3  and, in some cases, to purchase additional stock:

4       a.     On October 3, the Company issued a press release proclaiming its

5  "strength" notwithstanding the events of September 11, 2001. On October 24, Peregrine issued

6  another press release proclaiming, once again, "record results," including a 23% increase in

7  revenue over the comparable quarter of FY 2001. These results were even more remarkable

8  given the depressed global economy in reaction to the recent historical events. This public

9  statement contrasted sharply with Gardner's report to the Board just days earlier, on October 15,

10  2001, wherein he advised that Peregrine was already in jeopardy of not meeting the targets it had

11  announced to analysts less than two weeks before. Gardner recommended, for the first time ever,

12  that employees be required to contribute to benefit plans in order to assist the Company in

13  meeting its earnings per share target for the quarter. He reported again that the Company's cash

14  situation was tight and suggested that the Company might need to raise additional capital, thus

15  creating even more motivation to artificially inflate the stock price. None of this was disclosed to

16  the public.

17       b.     Also, on October 24, Gardner held a conference call with investors

18  and analysts. In that call, Peregrine falsely reported that Peregrine was on track to meet

19  expectations and that its key economic indicators were sound. Based on those representations,

20  the analysts issued "buy" recommendations for Peregrine stock.

21       c.     On November 21, 2001, Peregrine filed its 10-Q for Q2 02. The

22  10-Q falsely stated that Peregrine complied with GAAP with respect to recording revenue on

23  license agreements. It failed to mention any of the other material adverse facts, such as the

24  change in its accounting policy to revenue recognition on sell-in, the understatement of its

25  accounts receivables, the overstatement of its cash balances, and the understatement of its

26  liabilities and DSO.

27       d.     On January 2, 2002, Peregrine issued a press release regarding

28  preliminary results for Q3 02. On January 3, 2002, Peregrine management held its call with

1   investors and analysts.  These public statements caused analysts to again issue a "buy" rating for

2   Peregrine stock, notwithstanding that Gardner had reported to the Board on December 31, 2001

3   that the Company would miss its targets "by a wide margin."  Alluding to improper revenue

4   recognition, Gardner referred to $50 million in expected revenue on license sales that was not

5   "qualified or forecastable," identifying the EMEA division (Europe, Middle East, and Asia) as a

6   major source of problems.  None of this information was made known to investors or analysts.

7              e.      Gardner reiterated these problems in his report to the Board in the

8   first half of January 2002.  The situation was so dire that Gardner previewed in his report a

9   discussion he intended to have with the Board about a "poison pill" for the Company, now that it

10  had become weak enough to be a takeover target.  He also suggested the need for significant

11  structural changes.  In the press release and analyst/investor call that followed on January 24,

12  Gardner admitted to "disappointment" but attributed it to "global economic weakness."  Omitted

13  from the public statements were all the internal problems that Gardner had been reporting to the

14  Board, including problems with revenue recognition and the accompanying widespread violations

15  of GAAP.

16             f.      On February 14, 2002, Peregrine filed its 10-Q for Q3 2002.  It

17  incorporated the false financial statements that characterized the January 24 press release.  The

18  statements were materially false and misleading because Peregrine's reported revenue was

19  significantly overstated, there was no disclosure of its sell-in revenue recognition policy, it had

20  understated its receivables, liabilities, and DSO, and had overstated its cash position.

21       76.    On February 23, 2002, Gardner reported to the Board that Peregrine had

22  been engaged in implementing a workforce reduction to help cut costs.  He also updated the

23  Board on merger discussions with BMC Software, thus necessitating that adverse facts continue

24  to be kept quiet so as not to undermine the possibility of a successful merger.

25       77.    On March 23, 2002, Gardner again raised the spectre of a merger with

26  BMC Software as the mechanism to rescue Peregrine from its dire straits.

27

28

78.   On April 4, 2002, Gardner reported on the status of negotiations with BMC Software. He offered his strong support for the merger which he indicated might be necessary for the Company "even to survive."

79.   The truth regarding Peregrine's financial status first began to emerge in April, 2002, when Peregrine issued a press release advising that it was replacing Andersen with KPMG, although attributing the decision to Andersen's Enron troubles. On April 30, Peregrine announced that its financial results for the fourth quarter and year-end for 2002 would be delayed pending further analysis by KPMG. On May 6, Peregrine announced the "discovery" of "accounting irregularities," an internal accounting investigation, and the resignations of Gardner and Gless. It was not long before KPMG began to identify Peregrine's fraudulent activities that form the basis of this lawsuit.

80.   On August 30, 2002 NASDAQ delisted Peregrine.

81.   On September 22, 2002, Peregrine filed for bankruptcy protection.

82.   On February 28, 2003, Peregrine filed with the SEC its restatement of its financial statements for fiscal years 2000, 2001, and the first three quarters of fiscal year 2002. For the two complete fiscal years prior to the Remedy merger the restatement revealed, *inter alia,* the following material false representations related to Peregrine:

|  | Reported Revenue | Truth | Difference |
|---|---|---|---|
| FY 2000 | $253,300,000 | $131,632,000 | ($121,668,000) |
| FY 2001 | $564,683,000 | $213,353,000 | ($351,330,000) |

|  | Reported Net Loss | Truth | Difference |
|---|---|---|---|
| FY 2000 | ($25,070,000) | ($217,418,000) | ($192,348,000) |
| FY 2001 | ($852,241,000) | ($1,844,517,000) | ($992,276,000) |

|  | Reported Net Loss Per Share | Truth | Difference |
|---|---|---|---|
| FY 2000 | ($0.24) | ($2.12) | ($1.88) |

**323**
**EXHIBIT 24**

| | | | |
|---|---|---|---|
| FY 2001 | ($6.16) | ($13.32) | ($7.16) |

## VII.   ROLE OF THE AUDIT COMMITTEE

83.    The Audit Committee for Peregrine was meant to be a robust committee with significant responsibility for financial controls and accounting oversight. During the time in question, members of the Audit Committee had access and exposure to significant troubling information regarding Peregrine's practices and true financial status. Defendants Watrous, Noell, and Savoy served on Peregrine's Audit Committee during the relevant time. In addition, Defendants Moores and Nelson, although not members of the Committee, attended Audit Committee meetings and implicated themselves in Audit Committee functions.

84.    The Audit Committee had responsibility for oversight of the accounting and reporting activities of Peregrine. By April 2000, Peregrine's Board of Directors had adopted a written Charter to govern its Audit Committee. The Charter required the Audit Committee to be closely involved in the Company's financial reporting and controls. Its list of duties was extensive, including, but not limited to, the following:

    (1)    Reviewing on a continuing basis the Company's system of internal controls;

    (2)    Reviewing the independent auditors' proposed audit scope and approach;

    (3)    Reviewing and providing guidance with respect to the external audit and the Company's relationship with its external auditors by (i) selecting, and evaluating the performance of the independent auditors; (ii) reviewing the independent auditors' fee arrangements, proposed audit scope and approach; (iii) obtaining a statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the board, and to the extent there are relationships, monitoring and investigating them; (iv) reviewing the independent auditors' peer review conducted every three years; and (v) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, and significant new accounting policies;

    (4)    Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

**324**
**EXHIBIT 24**

1

(5)    Reviewing before release, and recommending to the Board of Directors for inclusion in the Company's annual report on Form 10-K, the audited financial statements and management's Discussion and Analysis of Financial Condition and Results of Operations;

2

3

4

(6)    Ensuring that the Company's independent auditors review the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

5

6

7

(7)    Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release;

8

(8)    Overseeing compliance with the requirements of the Securities and Exchange Commission for disclosure of auditor's services and audit committee members and activities;

9

10

(9)    Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act;

11

12

(10)   Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

13

14

(11)   Providing oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and short-term investments;

15

16

(12)   Reviewing the Company's compliance with employee benefit plans;

17

18

(13)   Overseeing and reviewing the Company's policies regarding information technology and management information systems;

19

(14)   If necessary, instituting special investigations and, if appropriate, hiring special counsel or experts to assist;

20

21

(15)   Reviewing related party transactions for potential conflicts of interest;

22

(16)   Reviewing its own structure, processes and membership requirements;

23

24

(17)   Providing a report in the Company's proxy statement in accordance with the requirements of Item 306 of Regulation S-K and Item 7(e) (3) of Schedule 14A; and

25

26

(18)   Performing other oversight functions as requested by the full Board of Directors.

27

28

**325**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

85.    The Charter also provided that the Audit Committee was required to meet at least three (3) times a year and maintain written minutes of its meetings.  Notwithstanding the oversight duties imposed upon it, the Audit Committee permitted Peregrine to operate without adequate internal accounting controls.

## VIII.    OFFICER DEFENDANTS' PARTICIPATION IN THE FRAUD

### A.    Gardner

*Gardner's sales of Peregrine stock while in possession of material undisclosed adverse information:  approx. 500,000 shares; gross proceeds:  over $16.5M.*

86.    As the CEO of the Company during the time in question, Gardner is liable for its false statements, according to California Corporations Code § 25504 (". . . every principal executive officer . . . [is] also jointly and severally liable . . .") unless he can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the fraud.

87.    By virtue of his position and stock holdings, Gardner was a control person who exercised day-to-day control over the Company.  Gardner had the power to influence and control, and did influence and control the Company's day-to-day decision making and management, including the content and dissemination of false statements.  Among the activities that Gardner engaged in during the Affected Period that demonstrated his control, knowledge of, and participation in the fraud are:

a.    Helping to formulate, present to the Board of Directors, and continually authorize fraudulent accounting practices, such as the policy of recognizing revenue on sell-in.  Gardner knew throughout at least the Affected Period that Peregrine was recognizing revenue on scores of transactions upon sell-in, under circumstances that did not comply with GAAP;

b.    Creating and communicating to analysts, investors, and the SEC, the false reports, releases, and statements set forth above in Paragraphs 72-75;

c.    Participating in the creation and preparation of Registration Statements, including the Registration Statement for the Remedy merger, which contained false

**326**

**EXHIBIT 24**

1   statements about the Company's financial health and accounting practices, as set forth in

2   Paragraphs 72-75;

3                   d.      Directing and participating actively in the Company's sales efforts,

4   including setting targets, pressuring sales agents to close deals at quarter end with side

5   agreements and other contingent deals, working on negotiating and closing large deals, presiding

6   over sales meetings, and monitoring the progress of sales in the channel;

7                   e.      Negotiating an unlawful barter with Critical Path in 2000 in which

8   both parties exchanged offsetting amounts of product in a deal documented by separate contracts,

9   neither of which mentioned the other, and authorizing the recognition of revenue from that deal,

10  even though neither side obtained any revenue;

11                  f.      Authorizing other executives to obtain bank loans for receivables

12  and to treat the loan proceeds as revenue;

13                  g.      Signing management representation letters during the course of

14  Andersen audits and reviews of financial statements representing there had been no fraud

15  affecting the accuracy of the Company's financial statements, on at least the following dates:

16  April 25, August 11, October 24, November 2, and December 13, 2000; January 23, April 26, and

17  October 23, 2001; and January 22 and April 10, 2002;

18                  h.      Participating in discussions about numerous side letters affecting

19  very large transactions with other executives of the Company, including Gless and Nelson.

20                  i.      Gardner attended two meetings of senior executives of the

21  Company, one in 2000 and one in early 2001 where the issue of improper revenue recognition

22  was discussed and a suggestion was made to get rid of all the receivables and "take the hit."

23  Gardner refused.

24          88.     Gardner knew in each instance that these statements were false, or acted

25  with reckless disregard of their falsity, as demonstrated by his participation in the sales and

26  accounting activities that led to the false financial reports, as well as his presentations to the

27  Board preceding their quarterly release, some of which are set forth above in Paragraphs 72-75.

28

**327**
**EXHIBIT 24**

89.     At all times, Gardner intended to deceive plaintiffs into buying and holding Peregrine stock as he benefited personally by his ability to sell stock at inflated prices, to acquire Remedy using consideration worth substantially less than was represented, and by obtaining ever-increasing performance-based bonuses. The cash bonuses paid to Gardner as Peregrine falsely reported "record" revenues increased almost ten-fold from $43,750 in 1999 to $400,000 in 2001.

90.     Gardner resigned from the Company after he was advised that he would be terminated unless he agreed to an unprivileged interview as part of an investigation of the Company's practices. Gardner has since filed a motion to stay discovery against him, in this case, asserting that his Fifth Amendment rights otherwise may be implicated "in light of the pending criminal investigation."

91.     Other paragraphs referring specifically to Gardner by name include the following: 1, 2, 35, 73, 75-79, 94, 103, 106, 110, 111, 117, 118, 124, 125, 134, 140, 142, 198, 203, 204, 208, 216, 218, 219, 225, 226, 227, 229, 250, 252, 273.

**B.     Gless**

*Gless' sales of Peregrine stock while in possession of material undisclosed adverse information; 93,625; gross proceeds: $3.9 million.*

92.     In his plea agreement (referenced in Paragraph 36), Gless admits, among other things, the following regarding his misstatements, knowledge, and intent:

a.     He conspired with others to use a variety of schemes, devices, and artifices, to make false and misleading statements and omit material facts in their statements, and to engage in acts, practices and courses of business which would operate as a fraud or deceit upon a purchaser or seller of Peregrine's stock;

b.     He made and caused others to make materially false statements to auditors, the SEC, and the investing public, and omitted and caused others to omit material facts from statements to auditors, the SEC, and the investing public, intending to deceive these groups regarding Peregrine's policies, transactions and financial condition;

c.     He knowingly, willfully, and with an intent to defraud, created the false impression that Peregrine was financially sound, to artificially increase the value of

1    Peregrine's stock, to induce the public to purchase and hold Peregrine's stock, to defraud

2    securities analysts and the public, and to enhance his reputation and enrich himself through

3    compensation, stock options, and other means.

4           93.    As the Executive Vice President, Chief Financial Officer, Chief

5    Accounting Officer, and member of the Board of Directors during the time in question, Gless is

6    liable for Peregrine's false statements by virtue of Corporations Code section 25504 (extending

7    joint and several liability to "every principal executive officer or director of a corporation so

8    liable") unless he can prove he had no knowledge of or reasonable grounds to believe in the facts

9    constituting the fraud.

10          94.    By virtue of his position and stock holdings, Gless was a control person

11   who exercised day-to-day control over the Company.  Gless had the power to influence and

12   control, and did influence and control the Company's decision making, including the content and

13   dissemination of false statements.  Among the activities that Gless engaged in that demonstrated

14   his control, knowledge of, and participation in the fraud include but are not limited to the

15   following, all of which occurred during the Affected Period:

16          a.    Gless participated in the day-to-day management of the Company,

17   actively consulting with and assisting CEO Gardner among others with decisions regarding the

18   Company's day-to-day operations, particularly with respect to sales, accounting, and preparation

19   and dissemination of the company's public financial information.  By reason of his key positions

20   in the Company, including as Chief Financial Officer, Chief Accounting Officer, and a member

21   of the Board of Directors, Gless used his power and influence to cause Peregrine to engage in the

22   unlawful conduct alleged herein.

23          b.    Gless was responsible for ensuring that the Company's financial

24   statements were accurate and complied with GAAP.  Instead, Gless actively participated in the

25   preparation and dissemination of the false financial information referred to in paragraphs 72-75,

26   above.  As a prominent member of the Company's accounting office, and its Chief Financial

27   Officer, as well as its Chief Accounting Officer, his signature on 10-Q and 10-K statements as

28   well as Registration Statements carried weight.  Among the official company documents that bear

329

1    his signed imprimatur are:  10-K statements for the years ended March 31, 1999; 2000, 2001;

2    10-Q's for the quarters ended:  June 30 and November 15, 1999; February 11, June 30, and

3    November 11, 2000; February 14, June 30, September 30, and December 31, 2001 and the

4    amendment to the 10-Q for December 31, 2001;

5             c.     Gless was a principal architect of the scheme to inflate reported

6    revenues. He authorized sales personnel to engage in contingent transactions that did not comply

7    with GAAP and authorized the booking of revenue on those non-compliant transactions. Some of

8    the improper transactions in which he was involved included booking revenue on potential deals

9    with KPN and Aranico, approving a transaction with Defendant BT, plc with an "out clause," to

10    allow Peregrine to book revenue at quarter's end, and booking revenue on quarter-end

11    transactions with extended payment terms to the KPMG Defendants (KPMG and BearingPoint),

12    even though the KPMG Defendants had a history of non-payment;

13             d.     He actively participated in sales meetings and monitored the

14    Company's exposure on contingent transactions, keeping Gardner informed of total exposure;

15             e.     He was responsible on an ongoing basis for reviewing and

16    approving software license agreements that departed from the norm, as well as those for large

17    transactions;

18             f.     He authorized the use of improper side agreements with resellers

19    allowing resellers to return product and releasing them from an obligation to pay;

20             g.     He instructed other company personnel to hide returned product and

21    bad debts in the accounting for acquisitions, rather than charging them against revenues. In 2001

22    alone, he authorized concealment of $91.6 million of bad debts as acquisition costs, including

23    hiding $16.9 million in the Remedy acquisition;

24             h.     He actively participated in the unlawful swap transaction with

25    Critical Path, which led to a criminal conviction of Critical Path's CEO;

26             i.     He instructed company employees to refrain from giving

27    confidential information to the head of investor relations so that she would not be in a position to

28

**330**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1  communicate the truth of Peregrine's financial condition and accounting practices to the investing

2  public;

3                  j.     He participated in decisions to falsify the Company's DSO number;

4                  k.     He directed other company personnel to recognize as revenue loan

5  funds received from banks based on receivables, at the same time removing those receivables

6  from the Company's balance sheet.  In instances when some of those receivables were in fact paid

7  by the customer, Gless then directed company personnel to count the payment as income again,

8  and again deducted the receivable from the balance sheet, engaging in a practice known as

9  "double dipping;"

10                  l.     He authorized another Peregrine employee, Ilse Cappel, to create

11  false invoices for non-existent receivables to present to banks in exchange for loan funds, which

12  he then added to Company revenue; Ms. Cappell has since pled guilty to crimes based on this

13  conduct.

14         95.    Gless knew in each instance that the statements referenced in paragraphs

15  72-75 were false, or acted with reckless disregard of their falsity, as demonstrated by his

16  participation in the sales and accounting activities that led to the false financial reports.

17         96.    At all times, Gless intended to deceive plaintiffs into buying and holding

18  Peregrine stock as he benefited personally from them by his ability to sell stock at inflated prices.

19         97.    Other paragraphs that mention Gless specifically by name include: 1, 2, 36,

20  79, 87, 102, 110, 111, 117, 134, 140, 150, 171, 172, 208, 216, 218, 219, 225, 226, 227, 229, 238,

21  250, 253, 273.

22  **C.**   **Powanda**

23  *Powanda's sales of Peregrine stock while in possession of material undisclosed*
   *adverse information: 736,196 shares; gross proceeds: over $24 million.*

24  

25         98.    Powanda had extensive experience in the software business and knew that

26  revenue recognition practices were a key to perpetrating fraud.  He thus knew or recklessly

27  disregarded that the practices and transactions referred to herein were false and misleading.

28  

**331**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

99.    Powanda was hired by Peregrine on February 18, 1992 as Sales Manager with fifteen years of experience in the software business. Powanda's authority over Peregrine's sales continually increased in scope and by January 1998 he had been elevated to Executive Vice President, Worldwide Sales. In February 2001, he became a consultant to the company but continued to work on major accounts with a compensation plan providing him with substantial revenue. He also worked in the office of the Chairman until he left the Company in the Spring of 2002.

100.    During material times, Powanda was a senior executive of Peregrine and is thus liable for the fraud pursuant to California Corporations Code § 25504 ("Every . . . principal executive officer . . . every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, . . . [is] also liable jointly and severally . . .) unless he can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the fraud.

101.    By virtue of his executive status, direct participation and control over the improper transactions at the heart of the fraud, and his stock ownership, Powanda had the power to influence and control, and did influence and control the day-to-day decision-making and management of the Company, including the content of the various statements which plaintiffs contend are materially false and misleading. Powanda was provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements or cause the false statements to be corrected. Notwithstanding, he took no action whatsoever, but created the opportunities for false statements to be made and took no action to correct them.

102.    In addition, Powanda's status as a controlling person and as a person who materially aided in the fraud, is evident from at least the following facts:

a.    As early as 1998, Powanda was reporting directly to CEO Gardner. As the Company's leading salesman, Powanda participated in high level meetings with other top management to discuss strategy, operation, and management of the Company's campaign to meet

**332**

FOURTH AMENDED COMPLAINT

1   revenue targets. On January 22, 2001, Powanda was appointed to the Operating Committee to

2   help manage the company;

3           b.      Powanda had the power to pressure and did pressure the Peregrine

4   sales force to enter into improper transactions at the end of the quarters in order to meet the

5   earnings expectations. Powanda attended meetings in at least late 1998 and early 1999 with other

6   company management to discuss and agree on the improper practice of revenue recognition at

7   sell-in.

8           c.      Powanda exported the improper sell-in practices to Europe, which

9   became heavily involved in booking fraudulent transactions;

10          d.      In June 1999, Powanda held a sales staff meeting where he

11  discussed the concept of "Magic Quadrant Partners," that is, channel partners who would engage

12  in fraudulent transactions for the purpose of revenue recognition, at quarter's end;

13          e.      When necessary, Powanda directed accounting staff to keep the

14  quarter open for the purpose of meeting quarterly targets, booking revenue earned after the

15  quarter as if it had been earned in the just previous quarter. For example, on October 2, 2001,

16  Powanda engaged in an e-mail exchange with the Area Vice President for EMEA (Europe,

17  Middle East, and Asia) regarding Powanda's help in closing deals so they could be counted in the

18  quarter that already had ended on September 30;

19          f.      Powanda was a direct participant in and/or the primary participant

20  on behalf of Peregrine in at least the following improper transactions which were entered into for

21  the purpose of recognizing revenue and meeting revenue targets: CI Software Solutions (Q4 00,

22  Q1-Q3 01), Corporate Software and Technology (Q4 00, Q2 01), BT (Q3 01), Action (Q3 01),

23  Systematics AG (Q4 01), Barnhill, IBM/Tivoli (Q3 01, Q4 01), and several transactions with the

24  KPMG Defendants (throughout 2000-2002).

25          g.      Powanda authorized his sales personnel to enter into improper side

26  agreements, knowing, through discussions with Gardner, Gless, and others, that revenue would be

27  recognized despite the side agreements;

28

**333**
**EXHIBIT 24**

324631.4                        - 35 -

1          h.     Powanda would travel to Europe at the end of quarters to "close"

2    deals so that revenue could be recognized even though the deals remained contingent;

3          i.     Powanda kept a drawer in his office, known as the "magic drawer,"

4    filled with phony contracts he used at quarter's end to book revenue. An Area Vice President

5    who reported to Powanda said that Powanda had a secret fax machine in his office that was

6    backdated three days, to allow for deals closed after the quarter to be included in the just-closed

7    quarter.

8          103.   In addition to the allegations in the preceding paragraph showing

9    Powanda's control and material assistance in the fraud, the following facts show that he knew or

10   recklessly disregarded that Peregrine was engaged in cooking its books through channel stuffing

11   and contingent transactions:

12         a.     Powanda regularly reviewed reports tracking the Company's

13   "burn," that is, the rate at which inventory in the channel was actually sold to an end-user. He

14   also closely monitored the progress of deals and the Company's progress toward meeting its

15   quarterly and annual revenue targets;

16         b.     Powanda attended a meeting in early 2001 with senior management

17   of the Company to discuss the issue of revenue recognition in the absence of bona fide deals. At

18   that meeting, Vice President Joe Reichner proposed that the Company "clean up" its books and

19   start afresh. Powanda was one of the most vocal opponents of Reichner's proposal;

20         c.     Powanda was present, along with Gardner, when defendant BT,

21   who had knowingly entered into a transaction with Peregrine to allow Peregrine to recognize

22   revenue, purported to eliminate the contingency (a cancellation right) in the contract in response

23   to an audit confirmation request from Arthur Andersen; BT then confirmed to Arthur Andersen

24   that the deal was not contingent, even though it had been when the revenue was recognized.

25   These events are discussed in more detail in paragraphs 195-201.

26         104.   Powanda undertook these actions, perpetrated false statements, and failed

27   to disclose true facts with the specific intent to cause investors to buy and hold Peregrine stock,

28

1   motivated at least in part by his desire to sell his own stock at inflated prices and his pursuit of

2   compensation tied to revenue.

3          105.   Other paragraphs that mention Powanda specifically by name include the

4   following: 1, 37, 110, 208, 218, 225, 226, 227, 242, 250, 255, 256.

5   **D.   Nelson**

6   *Nelson's sales of Peregrine stock while in possession of material undisclosed*
   *adverse information: 287,000 shares; gross proceeds: $8.8 million.*

7

8          106.   Nelson was a licensed CPA and an active member of the State Bar of

9   California. He had been employed by KPMG as an auditor. Nelson became Vice President and

10   General Counsel of Peregrine, through Moores, in 1995. Over the years, his authority,

11   responsibilities, and control continually increased. He became Secretary of the Corporation in

12   1997 and Vice President of Corporate Development in March, 2000, reporting directly to

13   Gardner. Thereafter, he became a Senior Vice President of the Company. When the accounting

14   fraud was first announced, it was Nelson who was installed as interim CEO.

15          107.   Despite his training, knowledge, and experience in the fields of both law

16   and accounting, Nelson not only did nothing to stop the fraud, he actively participated in it. He

17   was keenly aware of the improper transactions and revenue recognition therefrom as well as the

18   insider trading. During one particularly aggressive spate of insider trading in connection with the

19   acquisition of Harbinger, Nelson engaged in an e-mail exchange describing the insider trading

20   activity by Peregrine insiders as "hogs at the trough," but made no effort to stop the hogs or

21   expose their feeding frenzy.

22          108.   By virtue of his executive status, direct participation and control over the

23   improper transactions at the heart of the fraud, and his stock ownership, Nelson had the power to

24   influence and control and did influence and control the day-to-day decision-making and

25   management of the Company, including the content of the various statements which plaintiffs

26   contend are materially false and misleading. Nelson was provided with or had unlimited access

27   to the Company's internal reports, press releases, public filings and other statements alleged by

28   plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

FOURTH AMENDED COMPLAINT

1   ability to prevent the issuance of the false statements or cause the false statements to be corrected.

2   Notwithstanding, he took no action whatsoever, but created the opportunities for false statements

3   to be made and took no action to correct them.

4          109.   By virtue of his various executive roles and as a member of senior

5   management of the Company, Nelson is liable under California Corporations Code § 25504

6   ("... every principal executive officer ..., every person occupying a similar status or performing

7   similar functions, ... [is] also liable jointly and severally with and to the same extent as such

8   person, ...") unless he can prove that he had no knowledge of or reasonable grounds to believe

9   in the fraud.

10          110.   Other facts demonstrating Nelson's control over the Company during the

11   relevant time include at least the following:

12          a.   Nelson was responsible for corporate reporting and deal making,

13   including due diligence for Peregrine's many acquisitions, a key aspect of its growth strategy;

14          b.   In July, 2000, Nelson implemented the document and e-mail

15   destruction and shredding policy which mandated that Board materials could not be maintained

16   for more than one month. Along with other key executives in the Company, including Gardner,

17   Gless, Powanda and virtual executive Moores, Nelson used the Company's state of the art

18   $100,000 e-mail shredding system, which allowed those individuals to e-mail each other without

19   concern that the content of their communications could be reviewed by others or reconstructed at

20   a later date;

21          c.   Nelson was responsible for keeping the Board minutes and

22   cleansing them of damaging information. As a result, the minutes of Peregrine's Board meetings

23   exist largely in barebones form;

24          d.   Nelson participated in the executive effort at quarter's end to

25   pressure sales personnel to close deals to meet the Company's announced revenue targets;

26          e.   Nelson participated in the decision, made in late 1998, to start

27   booking revenue at sell-in regardless of contingencies;

28

**FOURTH AMENDED COMPLAINT**

1    f.    Nelson authorized Peregrine's sales personnel to enter into

2    transactions that did not obligate the reseller to pay until sell-through while recording revenue in

3    full to meet publicly announced revenue targets;

4    g.    Nelson regularly attended Audit Committee meetings as a

5    Company "representative," even though he was not a member of the Audit Committee. He

6    attended meetings on at least the following dates: July 1999; April, June, July, and October,

7    2001; and April 2002;

8    h.    As Corporate Secretary, Nelson prepared sanitized Board minutes

9    that did not accurately reflect the content of the meetings. For example, although the improper

10   barter transaction with Critical Path was discussed at the July 18, 2001 meeting, the minutes

11   contain no mention of it;

12   i.    Nelson drafted and filed the Company's 10-K and 10-Q statements

13   and until October 2000 was also the principal drafter of the Company's false press releases

14   regarding quarterly results;

15   j.    Nelson was the compliance officer for the Company's insider

16   trading policy until March 2000;

17   k.    Nelson helped formulate the option pricing policy for the Company.

18   111.   Additional facts demonstrating Nelson's knowledge, or reckless disregard

19   of the fraud, include at least the following:

20   a.    Nelson knew of the SEC investigation and deposition of Gardner

21   and other Company employees related to the Critical Path transaction;

22   b.    In the fall of 2001, senior management of Peregrine, including

23   Nelson, were informed of numerous improper side letters and uncollectible accounts receivables

24   from channel deals by Vice Presidents in Europe and EMEA;

25   c.    Nelson received the reports to the Board chronicling the Company's

26   bleak financial picture, including at least the following: April and October 1999; January, July,

27   October, and December 2000; April, July, October, and December, 2001; and February and

28   March 2002. The content of these reports is set out in brief in paragraphs 72 and 75. In

337

324631.4                          - 39 -                          **EXHIBIT 24**

1   conjunction with Nelson's other knowledge, these reports alone should have alerted Nelson to the

2   fact that the 10-K and 10-Q statements and press releases he prepared were false and misleading;

3              d.     Nelson received the Q2 02 Quarterly Review prepared for the Audit

4   Committee which identified six or seven transactions in which revenue was improperly

5   recognized;

6              e.     Nelson received a September 2001 e-mail from Gardner discussing

7   hiding unwarranted charges and expenses in the acquisition costs of the Remedy merger;

8              f.     Nelson, one of the architects of the Company's option pricing

9   policy, knew that Gardner dated option grants retroactively for the purpose of artificially

10   boosting reported earnings;

11              g.     Nelson was copied on a memo from Gless addressing the improper

12   revenue recognition related to a barter deal with CI Software Solutions. Nelson received an e-

13   mail in September 2001 from Gardner regarding improper revenue recognition in other improper

14   deals, including IDOM and MGX;

15              h.     In the spring of 2001, the Company Treasurer prepared and gave

16   Nelson a report regarding the Company's "sale" of receivables to banks to mask the problem the

17   Company was having with meeting its DSO expectations. The memo also addressed channel

18   stuffing and the existence of a massive amount of unpaid invoices;

19              i.     In the fall of 2001, Nelson received a copy of an e-mail from a

20   salesman based in Australia regarding sham transactions with resellers;

21              j.     In October 2001, Nelson met with Executive Vice President Andy

22   Cahill to discuss improper side letter transactions;

23              k.     In November 2001, an Assistant VP for the EMEA region,

24   forwarded Nelson a spreadsheet showing seven transactions for which revenue should not have

25   been recorded;

26              l.     In December of 2001, Nelson learned of an improper side letter

27   deal with Prokom Software, S.A.;

28

m.      In April 2002, Nelson learned of the improper deal with defendant BT, plc that included a cancellation clause that made the deal illusory, which is discussed more fully in paragraphs 195 - 201;

112.    Every action and inaction that Nelson took with respect to the fraud was intended to defraud investors and cause them to buy and hold Peregrine stock.

113.    Other paragraphs in which Nelson is specifically mentioned by name include the following: 1, 38, 83, 87, 118, 140, 150, 171, 150, 254.

## IX.    DIRECTOR DEFENDANTS' PARTICIPATION IN THE FRAUD

### A.    Moores

*Moore's personal sales of Peregrine stock while in possession of material undisclosed adverse information: 10,930,051 shares; gross proceeds: $401,640,096.08.*

114.    Moores played the single most influential role in the Company's development, holding various roles as an executive, funder, director, and promoter of the Company, maintaining at all times through its history since 1989 a special relationship with the Company characterized by his close and constant involvement with and direction of the Company's affairs. The Company's executive profile was to a large extent the result of Moores' hand-picked choices consisting of his own close business associates, placed within the Company to keep him apprised of its day-to-day operations so he could control them. Moores and his affiliated entities sold more than $554 Million of Peregrine stock at prices he knew to be inflated, thus rendering Moores the largest beneficiary of Peregrine's fraudulent practices. Because of his important relationship to and positions with the Company during the time in question, Moores is liable for its false statements as provided for by California Corporations Code § 25504 ("Every person who directly or indirectly controls a person liable, . . . every principal executive officer or director . . . every person occupying a similar status or performing similar functions, . . .[is] also jointly and severally liable . . .") unless he can prove he had no knowledge or reasonable grounds to believe in the facts constituting the fraud.

339
**EXHIBIT 24**

115.   As late as February 2001, just months before the Remedy merger, Moores still owned 16.6% of Peregrine's stock, a higher percentage than was owned by all of the Plaintiffs combined after the merger.

116.   Moores' influence over the Company began in 1989 when it was a struggling young Company working on its first product. Moores had extensive experience with the development and sale of software products and thus was familiar both with the Company's business and with the risk of fraud associated with improper or overly aggressive revenue recognition policies. He helped raise financing for the Company during its developmental stage and by 1990 had become Chairman of the Board, a position which he held until July 2000, during which time the Board approved the deceptive revenue recognition policy. He stayed on the Board through February 2003.

117.   During the relevant period, Moores carried on discussions with Noell regarding strategies for inflating financial statements, which strategies would then be implemented by Gardner, the former and now-deceased CFO David Farley, Gless, and Noell. Noell spoke regularly to Moores regarding how Peregrine could make its target number and both were deeply entrenched in the day-to-day decision making regarding this issue.

118.   Moores had the power to influence and control, and did influence and control the Company's day-to-day decision making and management, including the content and dissemination of false statements. Among the activities that Moores engaged in that demonstrated his control, knowledge of, and participation in the fraud are:

a.   Moores arranged for the Company to go public in 1997, at a time when he and his business partners owned or had an interest in over 83% of the issued and outstanding shares. The prospectus identified Moores as a controlling person  At the time of the IPO, business acquaintances, colleagues, and friends of Moores occupied most of the Board seats as well as key executive and technical positions;

b.   Moores handpicked Gardner as the new CEO in 1998, a decision that was ratified by the Board. At the same time, an "Office of the Chairman" to assist Gardner was established, and Moores was one of three members;

**340**
**EXHIBIT 24**

1         c.     A Peregrine PowerPoint presentation used to solicit business and

2  investors in 1999 showed Moores as a member of the senior management team of Peregrine;

3         d.     Moores was actively involved in securing financing for the

4  Company. In 1996, Moores personally guaranteed a line of credit and term loan for the Company

5  totaling $6 million. His company, JMI Equity Fund, L.P., of which he was Chair of the Board and

6  a limited partner, made working capital loans to the Company on an as needed basis;

7         e.     To help keep his hand in the Company's daily affairs, Moores

8  maintained an on-site presence through JMI's sublease of space from Peregrine at its facility

9  beginning in 1996 and through at least the summer of 2000, meeting on a regular basis with

10  Peregrine's top executives;

11         f.     He had a presence on key Board committees, including a

12  membership on the Compensation Committee (1999-2002) and representation through business

13  partners on the Audit Committee;

14         g.     Throughout the Company's history, Moores installed key operating

15  and executive personnel, including in accounting, finance, legal, corporate, technology, business

16  development, mergers & acquisitions, and customer service. These individuals kept Moores

17  advised on operating and financial issues, allowing him to engage in hands-on management of the

18  Company. Moores' influence was so pervasive that when the General Counsel, Nelson, decided

19  to leave the Company in 2001, Moores arranged for him instead to have a bigger role in the

20  Company, thus causing Nelson to stay. Similarly, Moores arranged for his key confidant on the

21  Board (Taylor Barada) to be hired as Gardner's "Special Assistant," a position he held until

22  Gardner resigned;

23         h.     Moores had continuous contact with Gardner who was a frequent

24  passenger on Moore's private jet;

25         i.     Moores was so much an insider that when Gardner received a

26  lengthy e-mail in October 2001 detailing improper transactions and revenue recognition from an

27  Australian sales employee, advising that the Company was engaged in illegal "channel stuffing,"

28  Gardner forwarded it to Moores;

**341**

**EXHIBIT 24**

1              j.    Both CFOs, Farley and Gless, were close and long-time business

2  associates of Moores, holding positions in his other companies;

3              k.    Moores directed Gardner in the integration of Remedy after its

4  acquisition in 2001;

5              l.    It was Moores who stepped in and appointed General Counsel

6  Nelson as interim CEO in May 2002;

7              m.    In May 2002, after the announcement of the Critical Path

8  investigation, Moores convened and attended a special meeting of the Audit Committee of

9  Peregrine, even though he was not a member of the Committee;

10            n.    Moores signed group publications of the Company, including

11  10-K's (March 31, 2000, March 31, 2001) and Registration Statements and reviewed and

12  approved quarterly financial results for Fiscal Years 2000, 2001, and the first three quarters of

13  2002, which contained false statements regarding the Company's sales and accounting and

14  compliance with GAAP. Moores knew these published materials contained false statements or

15  was reckless in not knowing. He participated in making the Company's false statements and

16  failed to disclose true facts intending to cause others to buy and hold Peregrine stock;

17       119.   At all times, Moores intended to deceive Plaintiffs with false statements

18  regarding the financial status of the Company as he and his related partners had enormous

19  stockholdings in the Company and benefited from being able to sell their stock at inflated prices.

20       120.   Other paragraphs in which Moores is specifically mentioned by name

21  include the following: 1, 39, 83, 110, 130, 134, 140, 160, 231, 238, 240, 250, 257, 258.

22  **B.**   **Watrous**

23  *Watrous's sales of Peregrine stock while in possession of material undisclosed*
*adverse information: 15,000 shares; gross proceeds: approx. $800,000.*

24

25       121.   Watrous was a Senior Partner of Andersen Consulting, a related company

26  to Arthur Andersen. He served on the Board of Directors of Peregrine beginning in 1999 and on

27  its Audit Committee beginning in April 2001. As such, he is liable for the false statements made

28  by the Company pursuant to Corp. Code § 25504 ("Every . . . director of a corporation so liable"

1    is jointly and severally liable for its fraud) unless he can prove he had no knowledge or

2    reasonable grounds to believe in the existence of the facts constituting the fraud.

3            122.    By virtue of his Board membership and stock ownership, Watrous had the

4    power to influence and control and did influence and control the day-to-day decision-making and

5    management of the Company, including the content and dissemination of the various statements

6    which plaintiffs contend are materially false and misleading.  Watrous was provided with or had

7    unlimited access to the Company's internal reports, press releases, public filings and other

8    statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements

9    were issued and had the ability to prevent the issuance of the false statements or cause the false

10   statements to be corrected.  Notwithstanding, he took no action whatsoever, but permitted these

11   false statements to be disseminated and took no action to correct them.

12           123.    Watrous approved the sell-in method of accounting and revenue

13   recognition at the April 1999 Board meeting.

14           124.    Watrous received and reviewed at least the following reports to the Board

15   by Gardner: October 1998; April and October 15, 1999; January 8, July, and October 16, 2000;

16   January, April 16, July, July 18, 2001; February 23, March 2, and March 22, 2002.  As set forth in

17   paragraphs 72-75, Watrous, along with other members of the Board, was advised through each of

18   these reports of financial and/or accounting problems that the Company was experiencing.

19   Despite being so advised, the Board, including Watrous, authorized and permitted the

20   dissemination of false financial information about the Company in the quarterly and annual

21   reports and Registration statements that followed these grim reports to the Board.  Watrous and

22   his fellow Board members were thus advised of the true facts regarding the Company, but

23   authorized and did nothing to stop the dissemination of false information.

24           125.    Watrous was present at Board meetings when Gardner reported problems

25   to the Board on at least the following dates: October 1999;  January, July, and October 2000;

26   January, April, July, October, and December 2001; and February, March, and April, 2002.

27   Notwithstanding the grim reports to the Board at these meetings regarding Peregrine's financial

28   condition, and notwithstanding his knowledge that Peregrine was improperly recognizing

343

1    revenue, Watrous approved and/or permitted dissemination of the false financial statements to the

2    public following the listed reports, the false contents of which are set forth more fully in

3    paragraphs 72-75. Watrous signed some of these false financial statements, including at least the

4    2000 and 2001 10-K's as well as the Registration Statements for the Remedy merger as well as

5    for Peregrine's acquisition of a company known as Harbinger, either knowing, or recklessly

6    disregarding, that these group publications contained serious misstatements.

7          126.    Watrous also attended Audit Committee meetings at which he was advised

8    of the Company's dire financial situation and improper accounting practices, including at least on

9    the following dates: April 25, June 29, July 23, and October 24, 2001; and February 12, April 2,

10    and April 29, 2002. At these meetings, Watrous was advised of at least the following facts:

11          a.     that the Company was improperly recognizing revenue in its EMEA

12    division (Europe, Middle East, Asia);

13          b.     that the Company was improperly recognizing full revenue upon

14    sell-in and that this was not truthfully disclosed in SEC filings;

15          c.     that the Company had become involved in the SEC's investigation

16    of Critical Path and that the testimony of Gardner and his Special Assistant had been required;

17          d.     that channel sales in general were a problem and that Peregrine was

18    not implementing best practices;

19          e.     that numerous specific transactions involving such customers as the

20    KPMG Defendants were improper;

21          f.     that the Company was engaging in intentional and repeated

22    violations of GAAP and accounting fraud;

23          g.     that the SEC had opened an inquiry on Peregrine;

24          h.     that the Company had been embedding unpaid accounts receivables

25    in financial statements for acquisitions, showing them as "acquisition costs and other" rather than

26    the unpaid revenue that they actually represented;

27          i.     that the Company was engaging in transactions using improper

28    "side letters" excusing customers from payment obligations

**344**

**EXHIBIT 24**

1    127.    As an Audit Committee member, Watrous had control over Peregrine with

2    respect to the accounting and disclosure policies and practices of the Company but did nothing to

3    stop the fraud or advise the public of it.

4    128.    Watrous participated in the Company's false statements and failed to

5    disclose the true facts intending to cause investors to buy and hold Peregrine stock, motivated at

6    least in part by his desire to benefit from the sale of his own stock at inflated prices.

7    129.    Other paragraphs referring to Watrous by name include the following: 1,

8    40, 83, 121, 250, 260.

9    **C.    Noell**

10   *Noell's sales of Peregrine stock while in possession of material undisclosed*
     *adverse information: approximately 226,000 shares; gross proceeds: $8.6*
11   *million.*

12   130.    Noell was a close confidant and business partner of defendant Moores,

13   serving in various capacities in companies owned and controlled by Moores.  Although Noell's

14   close connection to Moores goes back to at least 1988, since at least 1992 he has been employed

15   by and reports to Moores.  At Moore's behest, Noell serves on numerous Boards of Directors of

16   companies in which Moores has an interest.  As president and CEO of JMI Services and a general

17   partner of JMI Equity (companies that bear Moores' initials and which he controls), Noell's

18   duties have included becoming familiar with the financial condition and details of companies in

19   which Moores has an ownership interest.  One such company was Peregrine.  Noell functioned, in

20   essence, as an additional set of eyes and ears for Moores at Peregrine, and functioned as a conduit

21   through which Moores exercised control.

22   131.    Noell served as a member of Peregrine's Board of Directors from January

23   1992 through February 2003.  He was also a member of the Audit Committee and the

24   Compensation Committee in the years preceding the Remedy merger: 2000 and 2001.

25   132.    As a member of the Board of Directors of Peregrine, Noell is liable for the

26   fraud pursuant to California Corporations Code § 25504 ("Every . . . director of a corporation so

27   liable . . .[is] also liable jointly and severally . . .) unless he can prove he had no knowledge of or

28   reasonable grounds to believe in the facts constituting the fraud.

**345**
**EXHIBIT 24**

324631.4

- 47 -

133.     By virtue of his Board membership, stock ownership, and membership on the Audit and Compensation Committees, Noell had the power to influence and control and did influence and control the day-to-day decision-making and management of the Company, including the content and dissemination of the various statements which plaintiffs contend are materially false and misleading. Noell was provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements or cause the false statements to be corrected. Notwithstanding, he took no action whatsoever, but permitted these false statements to be disseminated and took no action to correct them.

134.     Other facts that demonstrate Noell's control over Peregrine during the Affected Period include the following:

      a.     By virtue of Moores' sublease of space from Peregrine, which sublease ran from June 1996 through October 2003, Noell maintained an office on the premises of Peregrine through which he was able to and did maintain close contact with the Company's executive and financial staff. In 2000, when Noell's office was moved out of the building, he and Moores installed Noell's nephew, Taylor Barada, as Gardner's "Special Assistant" in order to maintain access to information and assert control.

      b.     Along with Moores, Noell was instrumental in causing Allan Hunt to be selected as the Company's CEO prior to the IPO and in installing Gardner as CEO in 1998;

      c.     Noell participated in the selection and installation of the Company's financial officers, who were imported from Moores' company, BMC, including the Company's two CFOs during the time in question, Farley and Gless. Farley, who became CFO in 1995, kept Noell current on key operating and financial issues at Peregrine; after Farley died and Gless took over as CFO, he continued Farley's practice of keeping Noell informed about the Company's financial affairs so that Noell in turn could keep Moores informed;

      d.     Noell discussed with Moores strategies to inflate Peregrine's revenues and then would implement these strategies through discussions with Gardner and Gless;

346
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1         e.      Noell was closely involved in Peregrine's preparation for its IPO.

2 At the time of the IPO, Noell had substantial related party transactions with Peregrine including:

3 that JMI (in which Noell was a general partner and which held more than 10% of Peregrine's

4 common stock) made working capital loans to Peregrine; JMI subleased space from Peregrine;

5 Peregrine sold a subsidiary to Skunkware, a Moores' company of which Noell had been

6 president;

7         f.      Noell met regularly with Gardener, Gless, and Moores to discuss

8 the fraudulent scheme;

9         g.      Noell signed the Company's 10-K's for 1999, 2000, and 2001, and

10 signed the Remedy Registration Statement, even though he knew that they contained false

11 statements about the Company's financial health and its compliance with GAAP;

12         h.      Noell remained actively involved in the day to day operations of the

13 Company until he was forced to resign in February 2003 as part of Peregrine's bankruptcy

14 proceedings;

15         i.      He actively directed the operations of Peregrine and set aggressive

16 financial goals for the Company and encouraged false and misleading revenue recognition.  He

17 attended at least 38 board and operational meetings of the Company between 1999 and 2002 at

18 which false and misleading revenue recognition was discussed.

19         135.     In addition to the facts set forth in the preceding paragraphs, Noell's

20 knowledge of the fraud, or reckless disregard of it is evident from the following:

21         a.      Noell had extensive experience in the software industry and knew

22 of the risk of fraud associated with revenue recognition policies;

23         b.      He approved the issuance of quarterly financial results during Fiscal

24 Years 2000 and 2001 and the first three quarters of 2002 (i.e., all material times) notwithstanding

25 his attendance at Board and Audit Committee meetings where the Company's true financial status

26 was discussed along with the Company's improper revenue recognition, side letters, channel

27 stuffing, and non-compliance with GAAP, as alleged in paragraphs 72-75 and 126;

28

1             c.      In October 2001, Peregrine's General Counsel advised Noell about

2   e-mails from a Peregrine salesman based in Australia who informed the Company of specific acts

3   of improper sales transactions and channel stuffing;

4              d.      In January 2002, Noell became aware of a highly unusual

5   representation letter to Andersen from the Company which would have raised a red flag for

6   someone with Noell's experience and knowledge about Peregrine. The Company was asked to

7   represent that it was not entering into improper side letter agreements in sales transactions – a

8   representation the Company had not been asked to make in prior years.

9         136.    Noell's authorization and participation in the Company's false statements,

10  as well as his failure to take any action to correct them were intended to cause investors to buy

11  and hold Peregrine stock, motivated in part by his ownership of stock and his desire to sell his

12  stock at inflated prices.

13        137.    Other paragraphs that refer specifically to Noell by name include the

14  following: 1, 41, 83, 117, 140, 250, 259.

15      **D.**    <u>Savoy</u>

16         138.    Savoy was a Director of the Company during the time leading up to and

17  just following the Remedy acquisition. Consequently, pursuant to California Corporations Code

18  § 25504, Savory is liable for Peregrine's fraud ("Every . . . director of a corporation so liable; . . .

19  [is] also liable jointly and severally with and to the same extent as such person, . . .") unless he

20  can prove he had no knowledge of or reasonable grounds to believe in the facts constituting the

21  fraud.

22        139.    In addition to being a director during the critical period, Savoy exerted

23  influence and control over the Company by virtue of his position on the Audit Committee. As set

24  forth above in paragraphs 83-85, the Audit Committee had responsibility for assuring the integrity

25  of the financial controls and reporting of the Company. As set forth in paragraph 126, the Audit

26  Committee members received specific negative information about the Company and its practices.

27        140.    By virtue of his Board membership and membership on the important

28  Audit Committee, Savoy had the power to influence and control and did influence and control the

1   day-to-day decision-making and management of the Company, including the content and

2   dissemination of the various statements which plaintiffs contend are materially false and

3   misleading and which were issued and in many cases signed off on by Savoy during the time he

4   served the Company.  In that capacity, Savoy was provided with or had unlimited access to the

5   Company's internal reports, press releases, public filings and other statements alleged by

6   plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

7   ability to prevent the issuance of the false statements or cause the false statements to be corrected.

8   Notwithstanding, he took no action whatsoever, but permitted these false statements to be

9   disseminated and took no action to correct them.  Savoy was consulted by Gardner, along with

10  executives and other favored directors, including Noell, Nelson, Gless and Moores regarding a

11  strategy for acquiring Remedy.

12          141.   Savoy signed the Company's 10-K for June 2001, which included 10-Q's

13  from the previous three quarters.  He also signed the Remedy Registration statement on behalf of

14  the Company, which falsely asserted, among other things, that the Company was complying with

15  GAAP and that its financial statements contained no false statements.

16          142.   Savoy knew, or was reckless in not knowing, that the Company was

17  issuing false financial statements for at least the following reasons:

18          a.      Savoy had extensive experience in the software industry.  Based on

19  that experience, he knew about the issues related to the propriety of revenue recognition and the

20  risk of fraud in sales of software;

21          b.      During the time he was a director, Savoy received and reviewed

22  Gardner's reports to the Board that laid out the Company's grim financial situation.  These

23  reports are described in paragraph 72-75, above.  Savoy thus knew that when the Company issued

24  10-Q's and press releases proclaiming record financial results that the Company was misleading

25  the investing public.  For example, Savoy received the report to the Board before the July 18,

26  2000 Board meeting which advised the directors that the Company had had a tough quarter and

27  that its "bread and butter deals" were "off the radar screen."  Three months later, Savoy received

28  the October report to the Board that indicated the Company had to grant "extraordinary terms" on

349

1   some deals in the closing hours of the quarter to make its numbers.  In December of that year,

2   Savoy was advised by Gardner of the Company's heavy reliance on channel partners, as opposed

3   to end users.  Gardner's reports to the Board of a foundering Company continued throughout

4   Savoy's tenure at the Company.

5                  c.      Savoy also learned through reports to the Board of at least one

6   suspect transaction in which Peregrine was involved, when he was advised of the SEC

7   investigation into the Critical Path barter transaction, which shortly thereafter resulted in a guilty

8   plea by Critical Path's CEO.

9               143.    Despite his knowledge, Savoy made no effort to correct the misstatements

10  he had authorized and issued as a member of the Company's Board and Audit Committees.  Nor

11  did he take any steps to stop the improper revenue recognition practices at the heart of the fraud,

12  despite his control over the Company's control and disclosure policies and practices.  Savoy

13  engaged in these misstatements and omissions intending to cause investors to buy and hold

14  Peregrine stock.

15              144.    Other paragraphs that mention Savoy by name  include: 42 and 83

16  **X.      AUDITOR DEFENDANTS' PARTICIPATION IN THE FRAUD**

17       **A.      Arthur Andersen**

18              145.    Andersen acted as Peregrine's independent auditors from 1997 until

19  April 5, 2002, when Peregrine announced it was replacing Andersen with KPMG.  As such,

20  Andersen was engaged to perform audits and reviews of Peregrine's financial statements included

21  in its public filings with the SEC.  Andersen thus had access to and knowledge of Peregrine's

22  internal documents and knew of material misstatements in its public statements.  During that

23  time, Andersen not only ignored the improper accounting and financial statement activities that it

24  knew Peregrine was engaging in, it actively participated in helping Peregrine structure

25  transactions for the purpose of inflating revenue and perpetrating the fraud.  In fact, without the

26  active assistance and complicity of Andersen, Peregrine likely could not have perpetrated this

27  fraud.

28
                                                                    **350**
                                          - 52 -              **EXHIBIT 24**
    324631.4

146.   Andersen knew its work would be relied on by third parties, in particular the Remedy shareholders. It gave its consent "to the incorporation by reference in [the Remedy] registration statement of our report dated April 26, 2001 included in Peregrine Systems, Inc. Form 10-K for the year ended March 31, 2001 and to all references to our Firm included in this registration statement."

147.   Andersen and the other Auditor Defendants (AWSC, Andersen Germany, and Stulac), by reason of their status as independent auditors of Peregrine's finances, had access to extensive non-public information about Peregrine. They had the ability and duty to perform their work in accordance with the prevailing professional standards. The Auditor Defendants were in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the public dissemination of the misrepresentations.

148.   On May 24, 2002, Andersen admitted that Peregrine's audited financials for 2000 and 2001 plus its interim financials for 1999-2001 and the first three quarters of 2002 could not be relied upon. Andersen's failure to prevent false financials from being disseminated and the admission which followed the discovery of the accounting fraud in which Andersen played a heavy role led to the drop in the value of Peregrine stock that precipitated the losses suffered by plaintiffs in this lawsuit.

149.   According to the accounting standards governing the Auditor Defendants, known as Generally Accepted Auditing Standards ("GAAS"), when a financial statement contains a material departure from GAAP, as Andersen knew Peregrine's did, audit opinions should, at a minimum, be qualified. Andersen's unqualified confirmations of Peregrine's financial for FY00 and FY01 were false and misleading in that: (1) Andersen's auditing was not conducted in accordance with GAAS; (2) the financial statements did not fairly present Peregrine's financial position; and (3) the financial statements were not prepared in accordance with GAAP.

150.   Facts demonstrating Andersen's knowledge of and participation in the fraud include, but are not limited to, the following:

1      a.      Andersen was experienced, and touted itself as experienced, in the

2  software industry, where revenue recognition was known to be a problem.  In making the pitch to

3  be Peregrine's auditors, Andersen promised that it would monitor and oversee not just the

4  accounting and financing aspects of Peregrine's business, but also sales;

5      b.      Andersen provided financial services for Peregrine's 10-Q's from

6  1999 and through the first three quarters of 2002, which contained statements which Andersen

7  knew to be false and misleading.  It then issued false certifications for the financial statements

8  contained in Peregrine's 10 K's for at least 1999, 2000, and 2001.  These statements were

9  disseminated to the public and were responsible for inflating Peregrine's revenue and stock price;

10     c.      Andersen issued audit opinions that represented that Peregrine's

11  financials complied with GAAP, when it knew that was not the case.  Andersen knew, or was

12  reckless in not knowing, that Peregrine's financial statements were not in compliance with GAAP

13  because it had specific knowledge that Peregrine had improperly recorded revenue, had

14  understated its liabilities, had understated option compensation, had understated the size of its

15  account receivables, and had overstated its cash position.  Additional allegations regarding

16  Andersen's knowledge are found in the section of this Complaint regarding AWSC, Andersen

17  Germany, and Stulac;

18     d.      Andersen knew of and approved Peregrine's revenue recognition

19  practices, even though it knew them to be improper.  In fact, Gless routinely consulted with

20  Andersen, and particularly audit engagement partner Stulac, regarding how to structure

21  transactions to allow for revenue recognition where no revenue had been received or reasonably

22  was expected;

23     e.      Andersen knew and approved of Peregrine's practice of treating

24  loans on accounts receivables as sales.  In the first quarter of Fiscal Year 2002, Stulac specifically

25  approved Peregrine's practice of keeping these accounts receivables "sales" off of the balance

26  sheet even though Peregrine's Vice President of Finance, Berj Rassam, wanted to disclose them

27  on the balance sheet;

28

1          f.       Andersen routinely and falsely certified that its own conduct as

2    Peregrine's auditors complied with GAAS knowing that its reports would be relied upon by

3    current and potential investors in Peregrine;

4          g.       Andersen knew of inadequate internal accounting controls at

5    Peregrine, including but not limited to the following:  (a) weak or non-existent internal controls;

6    (b) there were no minutes kept by the Audit Committee; (c) there were many manual adjustments

7    made to software revenue; (d) Peregrine was unable to quantify the amount of sales to resellers

8    during particular periods; (e) there routinely was a delay or a complete inability to provide

9    information that should have been readily available such as trial balances and general ledgers;

10          h.       In November 1998 the AICPA (American Institute of Certified

11    Public Accountants) issued a Practice Alert regarding revenue recognition issues that advised

12    accounting professional like Andersen that the following were red flags:  (1) significant sales or

13    sales volume at the end of a reporting period; (2) an unusually high volume of sales to resellers;

14    (3) barter transactions; and (4) side agreements.  Andersen knew that all of these red-flag

15    conditions existed at Peregrine yet it failed to take steps to reverse the practices or disclose them

16    to the investing public and continued to issue unqualified audit opinions;

17          i.       At the April 22, 1999 Board meeting, the Board was advised that

18    Andersen was not comfortable with channel sales that represented more than 25% of revenue

19    (itself an unusually high number in the industry).  By that point, Peregrine's channel sales were at

20    22% and were on the increase.  In January 2000, Andersen told Peregrine that it was

21    uncomfortable with the amount of inventory in the channel;

22          j.       During Fiscal Year 2000, channel sales represented 38% of all

23    license revenues, nearly triple the percentage of channel sales a year earlier and well past the

24    auditor's maximum of 25%;

25          k.       In the summer of 2000, Andersen designed the stock option

26    compensation plan for Peregrine that was an intentional violation of GAAP allowing for exercise

27    prices on options that were below the common stock market value on  the date the options were

28    granted and allowed for improper acceleration of vesting.  In conjunction with the improper plan,

353

FOURTH AMENDED COMPLAINT

1   Andersen knew and approved of Peregrine's massive understatement of stock option

2   compensation expense;

3                  l.       No later than January 24, 2001, Andersen knew that revenue had

4   been improperly recognized on transactions with New Era of Networks and Extricity, both of

5   which were barter transactions in which no revenue was received;

6                 m.      At the Audit Committee meeting of April 25, 2001, Andersen audit

7   engagement partner Stulac participated in a discussion of revenue recognition problems in

8   Peregrine's EMEA division. Stulac, knowing that the Company was improperly recognizing

9   revenue on sell-in, recommended that the Company move to sell-through accounting. The

10  Company did not take up his recommendation;

11                n.       At the Audit Committee meeting of July 23, 2001 at which Stulac

12  was present, there was a discussion of problems with accounting and collections for channel sales

13  as well as a discussion that the Company's revenue recognition policy needed to be replaced.

14  Andersen was directed to review the Critical Path transaction, even though the revenue for that

15  transaction already had been recognized;

16                o.       In the fall of 2001, Andersen repeatedly was advised of the

17  existence of side letters and large accounts receivables by at least Peregrine's in-house accounting

18  staff;

19                p.       In October, 2001, Andersen told the Audit Committee of specific

20  instances of questionable revenue recognition on channel sales;

21                q.       At the Audit Committee meeting on October 24, 2001, Andersen

22  employee Ross Baldwin and the National Practice Director for the western region were in

23  attendance to signify Andersen's concerns with the accounting issues at Peregrine. The Andersen

24  personnel handed out a report which referred to a breakdown in internal controls regarding

25  revenue recognition for the quarter ended September 30, 2001, including transactions that they

26  believed were improperly reported as full revenue. The report also advised that Andersen was

27  aware of side letters and other contingencies with deals, thus acknowledging Andersen's

28  knowledge that Peregrine was intentionally and repeatedly violating GAAP;

**354**

1                 r.      In the fall of 2001, Andersen specifically rewrote the form of its

2    management representation letters for Peregrine, asking Peregrine to certify that it had not entered

3    into side letter agreements. Instead of complying, Peregrine, through Nelson, told Andersen

4    employee Ross Baldwin to back off from this request, another obvious red flag;

5                 s.      Andersen's audit opinions for April 2000 and April 2001 were

6    materially false and misleading. Among other things, they failed to mention that the Company

7    had changed its accounting policy to recognize revenue on sell-in and failed to report specific

8    instances that it knew of involving improper revenue recognition. The reports failed to mention

9    Andersen's concerns about the amount of inventory in the channel, and falsely stated that

10   Peregrine's consolidated financial statements complied with GAAP;

11                t.      In April 2001, Andersen learned that Peregrine had written off $15

12   million as part of "acquisition costs and other expense" rather than properly disclosing it as bad,

13   debt. Andersen learned of similar instances of burying bad debts in quarterly reports for June 30,

14   September 30 and December 31, 2000. Andersen did nothing in response;

15                u.      In April, 2001, Stulac received an e-mail from Andersen Germany

16   and, on information and belief, AWSC warning of serious problems with revenue recognition

17   issues in EMEA and detailing specific contracts involved. The e-mail spoke of reseller

18   transactions worth EURO 14.6 in which there had been no sell-in, and warned that more could be

19   discovered. This was followed by another e-mail some two weeks later saying there were even

20   more serious problems involving "bad revenue" and insufficient bad debt reserves. Other e-mails

21   to Andersen from Andersen Germany and, on information and belief, AWSC followed in the

22   ensuing months (including but not limited to on May 30 and August 1, 2001) regarding revenue

23   recognition improprieties. This e-mail traffic reflects Andersen's actual knowledge of numerous

24   material deficiencies in Peregrine's accounting;

25                v.      In yet another instance of Andersen working together with Gless to

26   cook the Company's books, Stulac assisted Gless in structuring a swap transaction with

27   IBM/Tivoli so that it appeared as two separate transactions on Peregrine's books, even though

28

1   this treatment was patently improper and concocted for the purpose of hiding the fact that the

2   transaction was devoid of substance or revenue;

3              w.      Despite repeated complaints about the issue by Peregrine officers,

4   lower level Peregrine accounting employees, and even concerns expressed by Andersen's own

5   personnel, Andersen did not require an accounts receivable subledger tied to the balance sheet, a

6   basic and indispensable accounting requirement the absence of which made it difficult to verify

7   the accuracy of the amount reported receivables;

8              x.      On July 23, 2001, Rassam sent an e-mail to, among others,

9   defendants Gless, Nelson, and Stulac regarding "Disclosure of Impairment and Related Charges."

10  Referencing the fact that Peregrine had written off $600 million in Q4 01 without proper

11  disclosure, he warned that such practices could ignite SEC interest. Rassam's plea to defendants

12  Gless, Nelson, and Stulac, for full and truthful disclosure of the write offs which Peregrine buried

13  in the "acquisition and other" line item, were ignored;

14             y.      In July 2001, Rassam told Stulac of accounts receivables of $80 –

15  $100 million that had not been reflected in the published financial reports;

16             z.      In the quarter ended September 30, 2001, Andersen put Peregrine

17  on its list of its most risky clients, along with Enron. It replaced Stulac with Ross Baldwin,

18  noting, among other things, that the absence of an accounts receivable subledger was inexcusable.

19             aa.     In connection with its 2001 year end audit review, Andersen

20  received a very low rate of return on its audit confirmation letters, another red flag regarding the

21  validity of Peregrine's transactions;

22             bb.     In connection with its December 2001 review of financial results,

23  Andersen continued to note material deficiencies in Peregrine's accounting practices, including

24  problems with revenue recognition in specific transactions. For example, Andersen notes that

25  Peregrine had accumulated receivables of $87 million for the third quarter of Fiscal Year 2002,

26  but took a bad debt reserve of only $14 million;

27

28

1        cc.    On March 11, 2002 Andersen told Gardner and Gless that the

2    Critical Path transaction violated SOP ("Statement of Position") 97-2, which sets forth the

3    requirements for GAAP with respect to revenue recognition in software transactions;

4        dd.    On March 29, 2002, Andersen, through Baldwin, suggested to

5    Peregrine that it issue a Restatement of its prior year financials based on its hiding of write-offs in

6    the "acquisition and other" category.  Peregrine chose not to do so, Andersen did not insist upon

7    it, nor did it disclose the matter to the investing public; and

8        ee.    As detailed above, Andersen knowingly or with deliberate

9    recklessness caused Peregrine to recognize revenue from sales to both resellers and end users

10   where one or more conditions for proper recognition of revenue under GAAP were not met,

11   including the following:  (i) the product was never delivered to the purchaser; (ii) the purchaser's

12   obligation to pay for the product was not fixed and determinable; (iii) collectability of the fee was

13   not probable; or (iv) the reseller's obligation to pay for the product was contingent upon

14   subsequent sale of the product to the end user.

15       151.    Andersen was heavily involved in the day-to-day accounting practices of

16   the Company, it had actual knowledge of specific improper transactions and accounting for such

17   transactions, it acquiesced in accounting judgments of its client which it knew to be wrong, and

18   nonetheless issued unqualified audit opinions certifying that Peregrine's publicly filed financial

19   statements complied with GAAP and that its auditing complied with GAAS, as well as allowing

20   publication of, and failing to correct, interim financial statements it knew were materially

21   inaccurate.

22       152.    Based on Andersen's false audit opinions and the failure to qualify and/or

23   modify its reports to identify Peregrine's false financial reporting, Andersen violated the

24   following GAAS standards, among others:

25       a.    The auditors should maintain an independence in mental attitude in

26   all matters relating to the engagement;

27       b.    Due professional care is to be exercised in the performance of the

28   audit and preparation of the report;

**357**

FOURTH AMENDED COMPLAINT

1     c.  The auditor should obtain a sufficient understanding of internal

2 controls so as to plan the audit and determine the nature, timing and extent of tests to be

3 performed; and

4     d.  Sufficient competent evidential matter is to be obtained to afford a

5 reasonable basis for an opinion on the financial statements under audit.

6    153. Andersen also was required to implement procedures to identify deviations

7 by the Company from GAAP, which it failed to do.  17 C.F.R. 210.4-01(a)(l), provides that

8 financial statements filed with the SEC which are not prepared in compliance with GAAP, are

9 presumed to be misleading and inaccurate.

10    154. Moreover, Andersen was required to report if the Company was not in

11 compliance with fair accounting principles, but failed to do so.  Among the principles of fair

12 accounting with which Peregrine did not comply, and Andersen did not report, are the following:

13     a.  That financial reporting should provide information that is useful to

14 present and potential investors and creditors and other users in making rational investment, credit

15 and similar decisions (FASB Statement of Concepts No. 1);

16     b.  That financial reporting should provide information about an

17 enterprise's financial performance during a period (FASB Statement of Concepts No. 1);

18     c.  That financial reporting should be reliable in that it represents what

19 it purports to represent (FASB Statement of Concepts No. 2);

20     d.  The principle of completeness, which means that nothing material

21 is left out of the information that may be necessary to ensure that it validly represents underlying

22 events and conditions (FASB Statement of Concepts No. 2);

23     e.  That conservatism be used as a prudent reaction to uncertainty to

24 try to ensure that uncertainties and risks inherent in business situations are adequately considered

25 (FASB Statement of Concepts No. 2);

26     f.  That disclosure of accounting policies should identify and describe

27 the accounting principles followed by the reporting entity and the methods of applying those

28 principles that materially affect the financial statements (APB Opinion No. 22);

**358**

**EXHIBIT 24**

1      g.     That losses be accrued for when a loss contingency exists

2  (Statement of Financial Accounting Standards No. 5);

3      h.     That if no accrual is made for a loss contingency, then disclosure of

4  the contingency shall be made when there is at least a reasonable possibility that a loss or an

5  additional loss may have been incurred (Statement of Financial Accounting Standards No. 5);

6      i.     That contingencies and other uncertainties that affect the fairness of

7  presentation of financial data at an interim date shall be disclosed in interim reports in the same

8  manner required for annual reports (APB Opinion No. 28);

9      j.     That disclosures of contingencies shall be repeated in interim and

10  annual reports until the contingencies and have been removed, resolved, or have become

11  immaterial (APB Opinion No. 28); and

12      k.     That management should provide commentary relating to the

13  effects of significant events upon the interim financial results (APB Opinion No. 28);

14      155.   In addition, during the Affected Period, Peregrine Defendants violated, and

15  Andersen failed to report, violations of SEC disclosure rules. For example, defendants failed to

16  disclose the existence of known trends, events or uncertainties that they reasonably expected

17  would have a material, unfavorable impact on net revenues or income or that were reasonably

18  likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303

19  of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to

20  disclose the information rendered the statements that were made materially false and misleading.

21      156.   Andersen read and approved all of the press releases set forth in

22  paragraphs 72-75, prior to their publication. For at least the reasons set forth in paragraphs 150-

23  151, Andersen either knew, or was reckless in not knowing, that each and every one of these

24  press releases was false and misleading and that the rosy picture of the Company's financial

25  health painted by the press releases was contravened by the true state of facts. Nevertheless,

26  Andersen did nothing.

27      157.   Andersen audited Peregrine's financial statements for FY00, FY01, and the

28  first three quarters of FY02, and issued an unqualified audit report on those statements, which

359

1   was included in the respective 10-Ks and 10-Qs.  In each of these reports, Andersen certified:

2   (i) that it had audited Peregrine's financial statements in accordance with GAAS; (ii) that it had

3   planned and performed its audits "to obtain reasonable assurance about whether the financial

4   statements are free of material misstatement;" (iii) and that, in its opinion, Peregrine's financial

5   statements "present fairly, in all material respects, the financial position" of Peregrine "in

6   conformity with accounting principles generally accepted in the United States."

7           158.   Based on the information set forth in paragraphs 150-157, Andersen knew

8   or was reckless in not knowing that the financial information contained in the 10-K and 10-Q

9   statements was false and misleading and that the true facts were that Peregrine was improperly

10  recognizing revenue on contingent transactions, was misstating information regarding the

11  expenses and value of options, was counting as revenue loan funds on receivables, and was

12  burying write-offs as acquisition costs.  Nevertheless, Andersen did nothing.

13          159.   On July 23, 2001, Peregrine filed its Registration Statement with the SEC

14  for the Remedy merger.  The Registration Statement contained a Joint Proxy Statement and

15  Prospectus to solicit proxies from Remedy shareholders to approve the transaction.  The Joint

16  *Proxy Statement advised Remedy shareholders that Andersen had audited Peregrine's financial*

17  *statements.*

18          160.   Andersen's false statements and omissions were made with intent to

19  defraud investors and members of the public, including Plaintiffs herein, as Andersen desired to

20  retain Peregrine as a client, both because Peregrine itself generated substantial fees in the millions

21  of dollars, and because its relationship with Peregrine could be used as leverage to obtain work

22  from Moores and Moores' company, JMI.

23      **B.    AWSC and Andersen Germany**

24          161.   AWSC is a Swiss entity composed of AWSC member firms and their

25  partners, including Andersen and Andersen Germany, which member firms engage in fee sharing

26  as a regular part oft their organizational structure.  AWSC is the coordinating entity for the

27  international network of Andersen firms and sets policies and procedures for its members, which

28  together, operate as a single global partnership or joint venture.

**360**
**EXHIBIT 24**

324631.4                    - 62 -

FOURTH AMENDED COMPLAINT

1       162.    The model adopted by AWSC Partners was meant to preserve "The Heart

2    of Partnership Culture," including income sharing among the member firms of the two business

3    units and common governance model.  The structure was and is designed to maintain the "one

4    firm" concept, and was intended to foster the belief that the firm operated as a single entity.  In its

5    promotional literature, including its web site, the firm marketed itself as "one firm" "a single

6    worldwide operating structure" that "think[s] and act[s] as one."  AWSC is akin to the parent

7    company of its member firms.  Therefore and because AWSC is the alter ego of the other Auditor

8    Defendants, plaintiffs incorporate herein by reference all of the allegations pertaining to

9    Andersen, Stulac, and Andersen Germany.

10      163.  ˙ Andersen Germany assisted in the year end audits for Peregrine Fiscal

11   Years 2000 and 2001 and all quarterly reports implicated in this lawsuit.

12      164.    Andersen Germany and, on information and belief, AWSC, knew that

13   Peregrine was experiencing pervasive deficiencies in its internal accounting controls, that

14   Peregrine was improperly recognizing revenue on transactions, that Peregrine was violating

15   GAAP, and that Andersen was itself violating GAAS.  Nevertheless, Andersen Germany and

16   AWSC permitted Peregrine to improperly recognize revenue and neither disclosed these

17   violations to the investing public nor insisted upon the issuance of qualified audit reports or the

18   withdrawal of the Andersen entities as Peregrine's auditors.

19      165.    A series of e-mails that emanated from Andersen Germany and, on

20   information and belief, AWSC, to Andersen shows that Andersen Germany and, on information

21   and belief, AWSC, were fully cognizant of Peregrine's improper accounting and financial

22   activities.  Among these e-mails are the following:

23          a.    April 14, 2000:  an e-mail to the audit manager on the Peregrine

24   account noting material problems with the EMEA division.  Among other things, the e-mail

25   stated that  Peregrine had difficulty meeting budget and was advised to minimize its recording of

26   expenses.  It also warned of "bad revenue" arising from contingent sales, excessively long due

27   dates, and dependency on resellers, as well as the failure to maintain an adequate bad debt

28   reserve;

**361**
**EXHIBIT 24**

1                  b.     April 12, 2001: an e-mail regarding "serious problems" in the

2   EMEA division. Again it mentioned revenue recognition issues regarding specific transactions

3   and opined that revenue from these transactions should not be recognized in the previous quarters

4   financials. It further warned that it was expecting more bad news of the same kind;

5                  c.     April 25, 2001: an e-mail regarding continued serious problems

6   with EMEA, repeating its concerns about bad revenue and the failure to set up bad debt reserves;

7                  d.     May 30, 2001: an e-mail regarding Peregrine's improper

8   accounting practices noting in particular the absence of subledgers for accounts receivables and

9   accounts payables thus making it impossible to assess the accuracy of account balances.

10  Mentioning again the problems with improper revenue recognition, the e-mail stated that

11  Peregrine's accounting and financial reporting required significant improvement and immediate

12  attention;

13                 e.     August 1, 2001: an e-mail repeating the serious issues and

14  concerns raised in previous e-mails regarding specific transactions for which revenue had been

15  misstated because there were no end-user agreements.

16         166.    Andersen Germany and, on information and belief, AWSC, knew of

17  Peregrine's accounting fraud through its accounting work on Peregrine's EMEA division, in

18  particular, Peregrine Germany. As a result of its work, these auditors learned (i) that a major

19  division of Peregrine was engaged in revenue recognition fraud, (ii) that many of the contracts

20  pursuant to which it reported revenue were undated and/or outside of the relevant period, (iii) that

21  there were materially deficient internal accounting controls such that it was not possible for the

22  auditors to completely understand EMEA's accounting transactions; and (iv) there were

23  materially deficient bad debt reserves and that Company personnel actively resisted establishing

24  appropriate reserves.

25         167.    Andersen Germany and, on information and belief AWSC, failed to require

26  Peregrine to properly state its financial information or to revise its financial reports even though

27  the defendants knew that these reports would be relied upon by investors. These defendants knew

28  that all of the red-flag conditions mentioned in the November 1998 AICPA Practice Alert

1    (referenced in paragraph 149) existed at Peregrine yet it failed to take steps to reverse the

2    practices or disclose them to the investing public and continued to issue unqualified audit

3    opinions.

4          168.   Andersen Germany reviewed and approved each 10-K and 10-Q before

5    Peregrine released it.

6          169.   AWSC's and Andersen Germany's participation in Peregrine's

7    misrepresentations and its failures to disclose material facts were intended to defraud investors

8    and the public and to cause them to buy and hold Peregrine stock. AWSC and Andersen

9    Germany were motivated to do this because their relationship with Peregrine was lucrative and

10   generated substantial fee income for the Andersen entities and they did not wish to lose Peregrine

11   as a client.

12          C.   **Stulac**

13          170.   Stulac was hand-in-glove with Peregrine insiders. For most of the time in

14   question, Stulac was the audit engagement partner for Andersen's audit of Peregrine's financial

15   statements. In particular, he was the audit engagement partner for the Fiscal Year 2001 financials

16   which falsely stated that Peregrine complied with GAAP and that Andersen had complied with

17   GAAS in auditing them. When Andersen replaced Stulac as the audit engagement partner in the

18   latter half of 2001 because they found the practices he had permitted "unforgivable," it was over

19   the objection of the Peregrine insiders who depended on him to help them perpetrate their fraud.

20          171.   Facts showing Stulac's knowledge of and participation in the fraud include

21   all of the facts alleged with respect to the Andersen entities and at least the following additional

22   facts:

23          a.   Stulac worked closely with Gless to structure transactions to allow

24   Peregrine to recognize revenue. For example, in December 2000 Stulac structured a swap deal

25   with IBM/Tivoli as two separate and unrelated deals to mask the fact that there was no revenue

26   realized from the transaction;

27

28

1                b.      From the beginning, Stulac knew that Peregrine's sell-in method of

2    accounting was improper.  In January 2000, even before the Board adopted it, Stulac raised with

3    Peregrine the issue of the level of inventory in the channel;

4                c.      In January 2001, Stulac advised Nelson of barter transactions with

5    New Era of Networks and Extricity in which revenue was recognized on transactions with no

6    commercial substance;

7                d.      Between January and March 2001, Stulac had discussions with

8    Rassam about the Company's accounting for accounts receivable.  Despite Stulac's actual

9    knowledge of questionable practices and outright misstatements regarding its revenue, Stulac

10   advised Rassam that Andersen had not asked for a management representation letter from

11   Peregrine in years.  In response to Rassam's expression of disbelief, Stulac reportedly told

12   Rassam that "[a]t Peregrine, you've got to go along to get along;"

13               e.      In April 2001, Rassam and the Andersen audit manager (Nevanna

14   Sacks) both challenged Stulac about the lack of an accounts receivable subledger.  Sacks also

15   complained to Stulac that the Peregrine personnel who should have been assisting with the

16   accounting were in fact either not helping and/or intimidating her.  Stulac took no action to rectify

17   either situation;

18               f.      At an Audit Committee meeting on April 25, 2001 at which Stulac

19   was present, there was discussion of significant issues with revenue recognition in the Company's

20   EMEA division.  Stulac knew that the Company's revenue recognition policy was not truthfully

21   disclosed in SEC filings;

22               g.      In April 2001, the Company took another large write off ($15

23   million) against the reserve for "acquisition and other" rather than properly disclosing it as a bad

24   debt.  Stulac approved it.  He approved other similar write-offs in June, September, and

25   December of 2000;

26               h.      At the June 29, 2001 Audit Committee meeting which Stulac

27   attended, there was a discussion of the Critical Path transaction, the SEC investigation, and the

28

324631.4                    - 66 -               **364**
                                                  **EXHIBIT 24**
                       FOURTH AMENDED COMPLAINT

1   fact that the SEC had taken testimony from Gardner and his special assistant, Taylor Barada.

2   This discussion of Peregrine's participation in the unlawful scheme was another red flag;

3           i.    In or about June 2001, Rassam and Stulac discussed Peregrine's

4   failure to disclose that its "sales" of accounts receivables were in fact loans. Stulac reportedly

5   told Rassam that Gless wanted the matter to stay off balance sheet and not to be disclosed in

6   public filings;

7           j.    At the July 23, 2001 Audit Committee meeting at which Stulac

8   attended, there was discussion of the serious problem presented by the non-collection of revenue

9   for channel sales and that the sell-in accounting practice needed to be replaced;

10           k.    In a July 23, 2001 e-mail, Rassam complained about the failure to

11   disclose very large write-offs, questioning the propriety of burying them in acquisition costs.

12   During that same time period, at a dinner, Rassam advised Stulac of $80-100 million in

13   receivables. This had not been disclosed in the relevant period financials nor were they corrected

14   to reflect it;

15           l.    In July 2001, Rassam sent an e-mail to Stulac complaining that he

16   still had not seen an accounts receivable detailed subledger tying to the general ledger.

17       172.    Because of his position as audit engagement partner, and his close

18   relationship with Company insiders, including Gless, Stulac had both the duty and the

19   opportunity to prevent, correct, and disclose Peregrine's fraud. Instead, he assisted Peregrine

20   with it. Stulac reviewed and approved press releases, 10-K and 10-Q statements during the

21   Affected Period. He was indispensable to the Company's ability to cook its books and to issue its

22   false statements. He was complicit in the fraud in assisting in structuring phony transactions,

23   excusing procedures necessary to keeping clean books, permitting revenue recognition in the

24   absence of revenue, and helping Peregrine disguise bad debts. His inattention to sound and

25   honest accounting practices and his attention to helping further the fraud caused Peregrine to

26   request that he be restored as audit engagement partner after Andersen replaced him.

27       173.    Stulac's participation in the fraudulent statements and his failure to

28   disclose the true facts were intended to defraud the public and investors and to cause them to buy

1   and hold Peregrine stock.  As the audit engagement partner, he stood to gain financially from

2   generating fees from the Peregrine account, which he could only do by looking the other way,

3   staying in the good graces of the Peregrine insiders by assisting them in structuring unlawful

4   transactions.

5            174.   Other paragraphs which refer specifically to Stulac by name include the

6   following: 5, 44, 147, 150, 162.

7   **XI.   CUSTOMER DEFENDANTS' PARTICIPATION IN THE FRAUD**

8        **A.   The KPMG Defendants (KPMG and BearingPoint)**

9            175.   Defendant KPMG LLP (KPMG) is a firm of certified public accountants

10  which, at relevant times, was a provider of accounting, auditing, and consulting services.  During

11  the Affected Period, KPMG entered into agreements with Peregrine for the delivery of software

12  which it knew were nothing more than "parking" arrangements for which KPMG was not

13  obligated to pay.  KPMG knew that these arrangements were made for the purpose of permitting

14  Peregrine to improperly recognize revenue and to falsely publicly report revenue which KPMG

15  knew Peregrine had not obtained and would not obtain.  KPMG made and signed off on false

16  statements on the documents for these transactions regarding Peregrine's entitlement to payment.

17  KPMG, by virtue of its professional expertise, knew that these falsely reported revenues would be

18  relied on by investors and potential merger partners.

19           176.   On or about January 31, 2000, KPMG transferred its consulting business to

20  KPMG Consulting, which thereafter changed its name to BearingPoint, Inc.  BearingPoint was

21  one of Peregrine's principal customers during the Affected Period, entering into arrangements for

22  the delivery of software which it knew were merely parking arrangements.  BearingPoint knew

23  that these arrangements were for the sole purpose of permitting Peregrine to falsely report

24  revenues in order to meet published earnings estimates for Peregrine.  BearingPoint knew that

25  these false published reports would be relied upon by investors and others, such as merger

26  partners.

27           177.   During the time in question, KPMG and its former consulting division,

28  BearingPoint, maintained close business and economic ties.  This was particularly true in their

324631.4                          - 68 -                        **366**
**EXHIBIT 24**
FOURTH AMENDED COMPLAINT

1  dealings with Peregrine in which the supposedly separate entities would enter into supposedly

2  separate transactions with Peregrine on the same day, with the agreements signed by the same

3  person as "Managing Director" of both KPMG and BearingPoint, with the same address.  KPMG

4  and BearingPoint are therefore sometimes referred to hereafter as "the KPMG Defendants."

5          178.    Within weeks after Peregrine announced it was replacing Andersen with

6  KPMG as its independent auditor, KPMG resigned.  The reason KPMG resigned was that the new

7  KPMG auditors discovered that the KPMG Defendants had entered into improper transactions

8  with Peregrine totaling $35 million.

9          179.    During the Affected Period, Peregrine reported revenue of approximately

10  $34.8 million based on nine software licensing agreements between the KPMG Defendants and

11  Peregrine.  The KPMG Defendants, however, only paid approximately $4.3 million for the

12  licenses it ostensibly purchased from Peregrine.  Eventually, Peregrine improperly wrote off

13  approximately $30.8 million in purported receivables from the KPMG Defendants.  A Peregrine

14  executive who participated in these transactions, Steven Spitzer, has since pled guilty to

15  conspiracy to commit securities fraud, admitting to falsifying books and records, among other

16  things.

17          180.    The KPMG Defendants' relationship with Peregrine began after Peregrine

18  entered into an "alliance agreement" with KPMG in which KPMG agreed to become a Peregrine

19  reseller.  After the alliance agreement was in place, on repeated occasions Peregrine contacted

20  KPMG Defendants at the end of financial reporting quarters to request the KPMG Defendants to

21  park software to enable Peregrine to meet its publicly projected revenue targets.  The KPMG

22  Defendants knew that Peregrine was doing this to improperly book revenue.  In each instance

23  Peregrine assured the KPMG Defendants that it would not enforce payment terms for the

24  software.  In some cases no potential end-users were identified.  In other cases, a potential end-

25  user was identified but the deal had not closed and would not close by quarter's end.  In return for

26  assisting Peregrine, the KPMG Defendants were provided or promised the service portion of

27  certain contracts which were worth hundreds of thousands of dollars.

28

181.   The first of the many sham transactions between the KPMG Defendants and Peregrine occurred at or about March 31, 1999 and had no identified end-user. Others included: *December 31, 1999 (Sodhexo Marriott – partial payment); March 30, 2000 (HHS); June 30, 2000 (Citigroup – no payment); June 30, 2000 (Avnet – no payment); September 29, 2000 (Morgan Stanley – no payment); December 20, 2000 (Honeywell – no payment); December 22, 2000 (Boeing – no payment); December 27, 2000 (Honeywell – no payment); and June 29, 2001 (JP Morgan – no payment).* Each of the sham transactions included affirmatively false representations by the KPMG Defendants regarding the revenue to be recognized by Peregrine. The KPMG Defendants knew that these false statements would be incorporated into Peregrine's financial statements. The KPMG Defendants made these false statements knowing that potential investors would rely on them in evaluating Peregrine.

182.   In his plea agreement, Spitzer admitted that he entered into these fraudulent deals with a "consulting firm," that in doing so he was acting at the direction and behest of Peregrine senior management and that he met with senior management at the end of financial reporting quarters to determine how much revenue needed to be generated and how to go about structuring transactions to get it. As is evident from the dates of these transactions, the KPMG Defendants became Peregrine's "go to" resellers when revenue was needed to make quarterly forecasts.

183.   KPMG, one of the world's largest auditing and accounting firms, and BearingPoint, a sophisticated financial consulting firm with great expertise in accounting matters, knew that Peregrine's recognition of revenue based on these transactions violated GAAP and was fraudulent.

184.   The principal representative of both KPMG Defendants for these deals was Larry Rodda. Rodda was a principal and later managing director of KPMG's consulting division, later known as KPMG Consulting LLC, in the Sacramento, California office. Rodda managed a team of KPMG personnel which provided consulting and software integrating services to other businesses and entities.

185.    On November 16, 2004, Rodda entered a guilty plea to one count of conspiracy to commit securities fraud, wire fraud, falsification of the books, records, and accounts of a public corporation, and bank fraud. Under penalty of perjury, Rodda swore that the facts in the "Factual Basis" portion of the written plea agreement he signed were true. Paragraphs 4-10 of the "Factual Basis" are recited verbatim in paragraphs 186 to 192 below.

186.    "In early 1999, KPMG and Peregrine Systems, Inc. (hereinafter "Peregrine") formed an alliance relationship under which, on a project by project basis, Peregrine would supply software products and KPMG would provide integrator services to end users. From March 1999 through October 2000, Rodda signed Peregrine license agreements with a face value of over $27 million.

187.    In or about December 1999, Rodda received a request from Steve Spitzer (charged elsewhere), an employee of Peregrine, to sign a software license agreement that, on its face, purported to obligate KPMG to purchase approximately $4 million in Peregrine software that was to be sent to and used by a certain end user identified by Mr. Spitzer. Spitzer told Rodda that Peregrine was close to consummating a software transaction with this end user, and asked Rodda to sign the agreement before the end of Peregrine's financial quarter so that Peregrine personnel could treat the transaction as a sale immediately rather than waiting for the anticipated transaction with the end user. Contrary to the written terms of the agreement, Spitzer orally told Rodda that, Peregrine would actually not expect KPMG to pay for the software under the agreement. Instead, Spitzer advised Rodda that Peregrine would either credit KPMG with the sale Peregrine was negotiating with the end user, or would otherwise not expect payment from KPMG until the end user had paid. Rodda agreed to these terms, signed the agreement and returned it to Peregrine.

188.    In or about February 2000, Rodda signed and returned a letter to Peregrine's auditors in connection with the license agreement that he signed in or about December 1999. The letter, among other things, asked whether there were any unfulfilled obligations or contingencies in connection with the December 1999 agreement. Rodda returned the letter indicating "no exceptions," which was a misleading response.

**369**

189.   On or about June 30, 2000, Defendant Rodda, again at the request of Spitzer, signed another license agreement with Peregrine that, on its face, purported to obligate KPMG to pay Peregrine approximately $7.1 million for software in connection with another anticipated software transaction with another end user.  As with the first license agreement signed by Rodda, Spitzer orally told Rodda that Peregrine would not expect KPMG to pay for the software under the agreement until the end user paid.

190.   On or about July 7, 2000, Defendant Rodda, again at the request of Spitzer, signed another license agreement with Peregrine that, on its face, purported to obligate KPMG to pay Peregrine approximately $2.3 million for software in connection with another anticipated software transaction with another end user.  Spitzer again told Rodda that Peregrine would not expect KPMG to pay for the software under the agreement until the end user paid.  This license agreement, when received by Rodda, had the date of June 30, 2000 already typed in below the line for his signature.  Rodda signed the document on or about July 7, 2000 and returned it to Peregrine on about that same day without changing the date on the document.

191.   On or about October 3, 2000, Defendant Rodda, at the request of Spitzer and Defendant Douglas Powanda, signed another license agreement with Peregrine that, on its face, purported to obligate KPMG to purchase from Peregrine approximately $11.5 million in software in connection with another anticipated software transaction with another end user. Rodda received the agreement by fax from Douglas Powanda on or about October 3, 2000.  In his fax cover sheet to Rodda, Powanda also confirmed that he would follow up and have confirmed a wire transfer of funds in connection with the June 30, 2000 agreement, as Rodda had previously requested.  Later the same day, Powanda communicated directly with Rodda.  On the same day, Rodda returned the signed agreement to Powanda at the fax number indicated by Powanda in his earlier fax cover sheet.  This license agreement, when received by Rodda from Powanda, had the date of September 29, 2000 already typed in below the line for his signature.  Rodda signed the document on or about October 3, 2000 and returned it to Powanda on about that same day without changing the date on the document.

**370**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1    192.    Peregrine fraudulently reported the December 1999, June and July 2000,

2    and October 2000 license agreements Rodda signed as sales in the December 1999, June 2000

3    and September 2000 quarters. The fact that those license agreements were not binding

4    commitments was a material fact not recorded in Peregrine's books, records, and accounts, and

5    not disclosed to the investing public. Rodda understood that Peregrine was a publicly traded

6    company that declared its financial results and conditions in public statements. These public

7    financial statements included press releases, conference calls with professional securities analysts,

8    and Form 10-Q and 10-K filings with the United States Securities and Exchange Commission

9    ("SEC"), all of which were distributed by Peregrine to the investing public throughout the United

10    States and the world using the means and instrumentalities of interstate commerce and the mails."

11    193.    KPMG had knowledge of Peregrine's merger activities. KPMG was the

12    accountant for Harbinger which merged with Peregrine in June 2000, prior to the Peregrine-

13    Remedy merger in 2001. KPMG gave its consent to include its audited financial statements of

14    Harbinger in the S-4 filed in May 2000 by Peregrine regarding its merger with Harbinger.

15    194.    Peregrine's S-4 dated May 22, 2000 states:

16    ". . . The selected financial data of Harbinger set forth below as of
December 31, 1995, 1996, 1997, 1998 and 1999 are derived from
17    financial statements of Harbinger audited by KPMG LLP,
independent public accountants, which are included elsewhere in
18    this prospectus ...."

19    Exhibit 23.2A to the S-4 is the Consent of KPMG, Independent Accountants (relating to financial

20    statements for Harbinger Corporation). In addition, KPMG was also appointed as the

21    independent public accountants to audit the accounts of Harbinger for the year ended 12/31/2000

22    (Harbinger 10Q, filed 5/4/2000).

23    195.    In addition to KPMG's corporate knowledge of Peregrine's mergers gained

24    through its audit work for Harbinger, Peregrine's mergers with both Extricity and Harbinger were

25    publicly announced in April 2001, and June 2000, respectively.

26    196.    As a large, sophisticated business entity, KPMG understood that reported

27    revenue affected the value of a company's stock. As large, sophisticated business entities, both

28

1   KPMG and BearingPoint were familiar with Peregrine's practice of using its stock in merger

2   transactions.

3       197.   Other paragraphs in this Fourth Amended Complaint referring to the

4   KPMG defendants include: 5, 45, 46, 79, 94, 102, 106, 126 and 145.

5   **B.**   **Critical Path**

6       198.   On January 19, 2000, Peregrine and Critical Path publicly announced that

7   they had "formed a strategic relationship."

8       199.   Prior to the commencement of the "strategic relationship" between

9   Peregrine and Critical Path was announced, however, Gardner and others at Peregrine had

10   developed a significant working relationship with Critical Path President David A. Thatcher

11   ("Thatcher"), who had served as Peregrine's CFO from March 1993 through November 1995.

12       200.   In response to the pressures at both companies to produce profits in their

13   next quarters, Peregrine and Critical Path engaged in a series of transactions as part of a

14   fraudulent scheme to falsely inflate each of their respective earnings in Peregrine's quarter two

15   and Critical Path's quarter three.  These actions led to SEC enforcement actions against both

16   Thatcher and Critical Path, and the eventual criminal conviction of Thatcher for securities fraud.

17       201.   On February 2, 2002, the SEC filed a civil action charging Thatcher with

18   participating in a scheme to inflate Critical Path's revenues and earnings for fiscal 2000, in part

19   based on its business dealings with Peregrine.  The SEC Complaint alleges that during the year

20   2000, Thatcher and other Critical Path employees caused Critical Path to record revenue from

21   fictitious, contingent, or backdated transactions in its third quarter of the fiscal year 2000, one of

22   which involved the "software swap" transaction between Peregrine and Critical Path.

23       202.   The United States District Court for the Northern District of California

24   permanently enjoined Thatcher from violating sections of the Securities Exchange Act of 1934

25   (Exchange Act) and the Exchange Act Rules.  Included as a basis for these charges against

26   Thatcher was the "software swap" transaction between Peregrine and Critical Path.

27       203.   Thatcher admitted his participation in a conspiracy to commit securities

28   fraud in violation of Title 18, U.S.C., Section 371, and pled guilty to criminal securities fraud

372

1  charges before United States District Judge William H. Alsup in San Francisco, California.

2  Thatcher's criminal conviction was based in part on the "software swap" transaction between

3  Peregrine and Critical Path.

4        204.   At least one Peregrine officer – Gardner – participated directly in that

5  conspiracy in connection with the "software swap" between Peregrine and Critical Path.  In his

6  plea bargain agreement, Thatcher admitted he participated in negotiations with Peregrine's CEO

7  (Gardner) for a non-monetary exchange of software, the "software swap" between Peregrine and

8  Critical Path.  Under the terms of the "software swap" with Peregrine, Critical Path provided

9  Peregrine with software and cash in return for Peregrine software.  Critical Path then accounted

10  for the transaction as though it were a cash sale, without disclosing to investors that it had merely

11  exchanged software with Peregrine.  The intent and effect of this "software swap" was to

12  artificially inflate Critical Path's revenues for the third quarter and to artificially inflate

13  Peregrine's revenues for its second quarter (Peregrine's fiscal year ends on March 31).  Thatcher

14  also admitted that he realized that Critical Path's recognition of revenue for the software swap

15  was improper.

16        205.   To make the two transactions look like they were not contingent on one

17  another, defendant Gardner and Thatcher, along with others at Peregrine and Critical Path

18  arranged for the parties to prepare two separate contracts, exchange checks for the full amounts

19  owed, and make their payments to each other on different days.

20        206.   Peregrine falsely recorded the sale to Critical Path as revenue for the

21  second quarter.

22        207.   In documenting these improper transactions, Critical Path made false and

23  misleading statements regarding the revenue to be obtained by Peregrine as a result of them.

24  Critical Path knew these statements were false and that they would form part of the results for

25  Peregrine's financial statements and public reporting.  Critical Path made these false statements

26  intending to defraud investors and the public and to cause them to rely on the false financial

27  results of which they were a part.

28

373
EXHIBIT 24

FOURTH AMENDED COMPLAINT

1

C.    **BT and BT GROUP**

2        208.    In late 2000 employees of Peregrine, including but not limited to Gardner,

3   Gless, Powanda, Cahill, Andrew Highland, and Jerry Crook entered into negotiations with

4   employees of BT who worked in BT's British Telecom Consulting unit, a/k/a BT Ignite, Ignite

5   Solutions, BT Consulting (collectively "BTC"). (Gardner, Powanda, Cahill, and Crook were

6   among those indicted on October 5, 2004 for, among other things, conspiracy to commit

7   securities fraud, falsification of books and records, securities fraud, and wire fraud.) The

8   negotiations concerned a re-seller order to be placed with BTC's clients. Julian Garrett,

9   managing director of BTC, and an employee of BT, told Peregrine that he would not commit to

10  the deal until his customers (the end users) had placed an order with BT.

11       209.    To entice Garrett to change his mind, Peregrine offered BT both a

12  substantial discount and a 30 day cancellation ("get out") clause provided that BT agree to enter

13  into the contract in the December quarter of 2000. In response, Garrett asked Peregrine's

14  Highland if Peregrine needed BT to sign the deal so Peregrine could make its quarterly numbers.

15  Highland told Garrett yes, and Garrett then agreed to authorize a fully contingent £10,000,000

16  ($14 million) deal so Peregrine could meet its quarterly numbers. Garrett thus knew that

17  Peregrine would improperly report the £10,000,000 deal as current revenue, and that this revenue

18  would be falsely included in Peregrine's financial statements.

19       210.    In the contract dated December 29, 2000, "BT, plc," agreed to license

20  £10,000,000 of Peregrine software for resale to end users. The contract was signed by David H.

21  Hill, a senior buyer for BT on orders from Garrett. Peregrine improperly recognized revenue of

22  $12,545,810 in December 2000 from this transaction, as well as deferred revenue of $1,254,646

23  and royalties of $547. (When Peregrine restated its earnings on May 23, 2002, all of this

24  purported revenue was reversed.)

25       211.    In fact, the contracts between BT and Peregrine were not signed on

26  December 29, 2000. Instead they were signed during the following quarter, on or about

27  January 8, 2001. Garrett, Hill and other employees and agents of BT knew of Peregrine's need to

28  falsely report that the deal had closed in the December 2000 quarter for purposes of revenue

374

**EXHIBIT 24**

1  recognition and agreed and intended to aid and abet Peregrine's fraudulent recognition of revenue

2  by back dating the contract documents so that the deal would appear to have been entered into the

3  December 2000 quarter. In doing so, BT intentionally made false statements regarding both the

4  fact of the revenue that Peregrine would recognize from the transaction and when the contract

5  occurred, knowing and intending that this fraudulently recognized revenue would be included in

6  Peregrine's financial reports, and would be relied upon by others, including potential investors

7  and merger partners.

8         212.   Because BT had secured no end user for the software at the time of

9  contracting, it only agreed to the deal because it included a 30-day cancellation clause. The

10  cancellation option also was confirmed in a side letter agreement between the parties, dated

11  January 8, 2001.

12         213.   In late January 2001, BT contacted Peregrine to cancel the deal. However,

13  because Peregrine needed the BT deal to remain on its books, Peregrine offered BT an extension

14  of the 30-day cancellation clause. BT agreed. After several extensions of the 30-day clause by

15  Peregrine, on April 5, 2001, via a letter sent by Hill, BT cancelled the December 29, 2000

16  agreement. As of this time, no money had been paid by, or product shipped to BT.

17         214.   In conjunction with Andersen's 2001 audit of Peregrine, Jane Balcombe,

18  Peregrine's UK financial controller, received several requests to confirm the details of the BT

19  deal from Peregrine's auditor Andersen. Balcombe, who knew the deal was phony, resigned

20  rather than falsely tell Andersen that the BT deal was a real transaction that could be counted as

21  revenue to Peregrine.

22         215.   In conjunction with the 2001 audit, which was in process at the time of the

23  Remedy merger negotiations, Peregrine required a confirmation from BT that the deal was a firm

24  commitment in order to support the reported revenue. Moreover, had the fraudulent nature and

25  back dating of the deal been revealed at that time, it would have alerted potential merger partners

26  such as Remedy stock owners and management to Peregrine's fraudulent revenue recognition

27  practices and fake deals.

28

216.    As a result of the need to keep the fake BT deal on Peregrine's books, Gless and Gardner immediately opened discussions with BT about "reinstituting" the fake deal so that BT would execute the needed audit confirmation letter. Gless and Gardner had extensive discussions with BT including with Tony Chanmugam, CFO of BTC and a BT employee and agent.

217.    In early June, Anderson sent BT an audit confirmation letter regarding the BT deal. Chanmugam initially refused to allow BT to complete the form because it required BT to falsely attest to the existence of a nonexistent order and a nonexistent payment obligation. Chanmugam was well aware that BT's execution of an audit confirmation and the representations therein would be relied upon by Peregrine's U.S. auditors and in turn by buyers of Peregrine stock and potential merger partners such as Plaintiffs. However, because failing to execute the audit confirmation would expose Peregrine's and BT's involvement in the phony transaction, Chanmugam, Hill, Garrett, and others at BT eventually agreed that they would work together to "reinstitute" the sham order at a later time. On information and belief, this agreement to later reach a later agreement was reached in consultation with BT Group's legal department. Chanmugam and Garrett then authorized Hill to sign and return the false audit confirmation. With full knowledge of its falsity, BT transmitted the false confirmation letter to Andersen in San Diego. BT's statements confirming the deal were materially false when made, and were made to assist Peregrine in its fraudulent recognition of revenue while covering BT's part in the fraudulent transaction. BT made these statement knowing, and intending that they would lead to nonexistent revenue being reported in Peregrine's audited financial statements, which would in turn be relied upon by investors and potential merger partners such as Remedy.

218.    In August 2001, Hill, Garrett, Chanmugam, and individuals in BT Group's legal office followed through on their earlier agreement to "reinstitute" the deal and agreed with Peregrine to an "amendment" to the then cancelled contract which would convert the then cancelled BT deal into a contingent "barter" transaction — a deal that a Peregrine lawyer stated in an email: "make[s] no sense whatsoever [sic], commercially or legally — but fully appreciative of the spot we're in." Gardner, Gless, and Powanda were among those from Peregrine who

376

1   participated in the decision to repaper the fraudulent deal with BT. This new deal allowed

2   Peregrine to continue to keep the BT deal on its books as revenue. By entering into this

3   "amendment," BT knowingly and intentionally assisted Peregrine in concealing the cancellation

4   of the BT deal, and in continuing to fraudulently recognize revenue from that deal. The

5   discussions and effectuation of the "no sense" barter transaction occurred during the time that

6   Peregrine was actively working on the Remedy merger. BT knew that Peregrine would use this

7   sham transaction to continue to misstate its financial condition, and that third parties and merger

8   partners such as Plaintiffs would rely upon these false financial statements to their detriment.

9        **D.**    **Bull**

10           219.   Bull is a major designer and developer of servers and software. From

11  1988-1992, Gardner was employed by Bull. Bull is a highly sophisticated business enterprise

12  with a global presence and a worldwide customer base. Its business is varied but a large portion

13  is devoted to the banking, finance, and telecommunications industries. In its marketing materials,

14  it touts itself as having a "thorough understanding of the business" of these sectors.

15           220.   In the summer of 2000, Bull and Peregrine entered into a business

16  arrangement that was part of Bull's overall business strategy to determine with whom they would

17  partner. Bull had a team in place to evaluate potential partnering arrangements based on

18  "functional fit" and "business value." The parties prepared a Business Proposal Final Document

19  that addressed whether Peregrine would be able to help Bull achieve its business objectives. As

20  this arrangement and the document itself make clear, Peregrine's strategy of acquiring and

21  merging with other companies was something Bull considered in deciding whether to partner with

22  Peregrine; in evaluating Peregrine's "strategic value," the parties' business proposal referred in

23  particular to the recently completed acquisition of Harbinger. Bull thus knew of and considered

24  important Peregrine's strategy of acquiring other companies. Plaintiffs are informed and believe

25  and thereupon allege that Bull knew in particular of Peregrine's plan to try to acquire Remedy.

26  The documents regarding the transaction also reveal that Bull would have been aware that

27  Peregrine had an interest in Remedy; when the transaction between Bull and Peregrine was

28

324631.4                    - 79 -          **377**
                                       **EXHIBIT 24**
FOURTH AMENDED COMPLAINT

1    completed, the Peregrine official who directed the transaction touted the fact that Peregrine had

2    "scored a major victory in a Remedy stronghold."

3           221.    In July, 2000, Bull and Peregrine entered into a transaction pursuant to

4    which Bull agreed to resell $5,000,000 worth of Peregrine product. Although the agreement was

5    not signed until July 5, 2000, Peregrine recognized the revenue for the transaction for the quarter

6    ended June 30, 2000. But as of June 30, Bull had not agreed to the arrangement because it was

7    still trying to finalize end-user agreements. The President of the Bull division responsible for the

8    agreement, Noel Saille, backdated the contract to June 30 to allow Peregrine to improperly

9    recognize the revenue the previous quarter. A June 29, 2000 internal Peregrine e-mail states that

10.   Peregrine was "very desperate" for revenue for that quarter. Officials from Peregrine's EMEA

11    division confirm that Mr. Saille knew this and that he backdated the contract to assist Peregrine in

12.   its quest to fill out its financial statement for that quarter. Peregrine's counsel in France later

13    pointed out that June 30, 2000 had not thirty days "but around thirty-seven."

14           222.    Besides backdating the agreement, Mr. Saille entered into two

15    contemporaneous side letter agreements with Peregrine that made the original deal illusory for

16    revenue interpretation purposes. In the first agreement, Peregrine and Bull agreed that Bull could

17.   invoice Peregrine for $2.5 Million, or half of the contract amount, if Bull could not find end-

18    users. Under the terms of the side-letter, Peregrine was required to pay the invoice upon

19    presentation by Bull. In the second side-letter, Peregrine promised to deliver $5 Million worth of

20    business to Bull, thereby eliminating any obligation for Bull in the agreement. Thus, not only

21    was the agreement backdated, it was fully contingent and thus not recognizable as revenue under

22    GAAP. Notwithstanding, and as Peregrine told Bull it would do, Peregrine improperly

23    recognized all but approximately $700,000 of the phantom revenue from the alleged agreement in

24    the June 30 quarter. Gless, Gardner, and others at Peregrine knew of the contingent nature of the

25    Bull transaction.

26           223.    Bull falsely represented the amount and nature of the revenue deal knowing

27    that Peregrine intended to fraudulently recognize revenue from the deal, with no intention to fully

28    perform under the deal, and with the intention to aid and abet Peregrine in its fraudulent

378

FOURTH AMENDED COMPLAINT

1   recognition of revenue. Based on its sophistication and knowledge of this kind of business as

2   well as its specific knowledge of Peregrine's business derived in part from its research into

3   Peregrine in connection with considering whether to partner with Peregrine, Bull knew and

4   intended that investors and potential merger partners would rely upon Peregrine's fraudulent

5   financial numbers containing revenue recognized from this transaction.

6        **E.    Insight**

7            224.    In a contract dated December 28, 2000, Insight, then known as Action,

8   agreed to a £10,000,000 deal with Peregrine under which it would purchase £4.5 million in

9   software for its own use, and £5.5 million in software for resale. Peregrine immediately

10  recognized $12,580,445 in license revenue and $1,492,000 in deferred revenue in the 3rd Quarter

11  ending December 31, 2000, from its transaction with Action.

12           225.    The Action deal arose out of the friendships of Action's CEO David Palk

13  with people at Peregrine, including Powanda. The deal as known to, and discussed by, among

14  others, Gardner, Powanda, and Gless and Action's CEO Palk, was intended from the beginning as

15  a swap to allow both parties to improperly book significant revenue in the December 2000

16  quarter. Palk had extensive experience in the software industry and knew from his experience

17  and discussions with Peregrine of Peregrine's (and Action's) need to show good revenue numbers

18  on a quarterly basis. Palk in fact had lost an opportunity to sell Action to Insight in 1999 because

19  Action's revenue numbers had been too weak. Palk therefore knew that the deal was structured to

20  allow both parties to record fake revenue and would aid Peregrine in meeting its numbers and

21  maintaining its stock price. Palk and Action further knew that third parties such as Remedy

22  would rely upon the fake revenue figures.

23           226.    The deal itself lacked any economic substance. Peregrine funded the deal

24  by agreeing to purchase a license for Action products. Peregrine "paid" Action £2,7000,000,

25  which sum was then repaid to Peregrine and recorded by Peregrine as income. A further

26  £5.5 million of the deal was contingent due to a hidden side agreement, under which Peregrine

27  agreed to cover Action's supposed obligations by transferring other third-party sales to Action to

28  run through Action's books to burn off the obligation. It was further understood by Action's

1   CEO Palk, Powanda, Gardner and Gless that the deal was an accommodation to Peregrine to

2   allow Peregrine to meet its quarterly numbers and that Action could choose not to perform, absent

3   further accommodations from Peregrine.

4          227.   Action, through Palk and others, expressly agreed with, among others,

5   Gardner, Gless, and Powanda, that Peregrine would improperly recognize revenue from the

6   Action deal, and agreed to structure the deal, and to undertake all necessary actions, including

7   falsely responding to audit confirmations, to allow Peregrine to improperly recognize revenue.

8   As agreed by the parties in advance, Action later advised Peregrine that it would not perform, as

9   was expected.

10         228.   In March of 2001, Action agreed to a second £2,750,000 deal.  This second

11   deal was arranged between Powanda and Palk to "cover" for a Peregrine deal with Computer

12   Sciences Corporation which fell through.  Peregrine recorded revenue of $3,128,340 on

13   March 31, 2001 from this further deal.  At the time this revenue was recorded, Action did not

14   intend to pay, and Peregrine had agreed Action would not have to pay, any moneys under the

15   contract. The second deal was arranged with the understanding and knowledge by Action that

16   Peregrine would improperly record the fake revenue in order to meet its quarterly numbers,

17   allowing it to continue to misrepresent its true financial condition to shareholders and potential

18   merger partners, including but not limited to Remedy.  In an August 14, 2001 side letter pursuant

19   to Action's and Peregrine's agreement and conspiracy to misrepresent revenue, Peregrine

20   absolved Action of any need to perform under the agreement.

21         229.   Gardner and Gless further agreed with Action to hide the fraudulent nature

22   of the deals by shifting other revenue through Action, thereby allowing Peregrine to keep both

23   deals on its books.  In the meantime, on June 1, 2001, Action's Financial Controller, Sunil

24   Madhen, responding to an audit confirmation request from Andersen falsely represented that the

25   Action deal was real, free from contingencies, and the sums claimed under it owed to Peregrine

26   were in fact owed.

27         230.   These transactions were documented by written agreements containing

28   false statements about the revenue Peregrine would receive.  Action entered into these fraudulent

380

**EXHIBIT 24**

1  transactions knowing that Peregrine would falsely inflate its financial statements in part by using

2  the revenue attributed to these transactions.

3      F.    **Bindview**

4          231.  Moores was on the Board of Directors of Bindview, and played a

5  prominent role in leading that company.

6          a.  Bindview's Board of Directors had only five members.  Moores had

7  been a director since 1997.

8          b.  The Board had two committees – the Compensation Committee and

9  the Audit Committee.  Each committee was comprised of just two directors.  Moores was on both

10  committees.

11          c.  From May 1994 through December 1999, Bindview's president and

12  Chief Executive Officer, Richard P. Gardner, was a senior vice president at BMC Software, Inc.,

13  a company founded and run by Moores prior to Peregrine.

14          d.  Moores owned 10,000 shares of Bindview stock; his company JMI

15  Equity Fund III, LP owned an addition 1.42 million shares (or 6.3% of all equity).

16          232.  In early Spring of 2000, Bindview agreed to a concurrent swap transaction

17  with Peregrine under which Bindview and Peregrine would purchase equally valued software

18  from one another.  However, instead of swapping the products and recording the transaction as a

19  barter, Peregrine and Bindview disguised the true nature of the transaction by preparing separate

20  contracts for each part of the swap that falsely showed the other party paying consideration to and

21  receiving consideration from the other, thereby fraudulently enabling each selling party to record

22  the "consideration" received from the purchaser as revenue.

23          233.  As the first part of the swap, on April 20, 2000, an agreement between

24  Bindview and Peregrine became effective under which Peregrine licensed software from

25  Bindview in the amount of $1,453,563.58 ("Bindview License").  On June 1, 2000, Peregrine

26  issued a check to Bindview in the amount of $1,260,187.70.  On July 3, 2000, Peregrine issued a

27  check to Bindview in the amount of $306,077.35.  The total paid by Peregrine to Bindview for

28

1    this license agreement was $1,576,265.05, just slightly more than the amount Bindview had

2    purported to "pay" Peregrine on the transaction described in the following paragraph.

3         234.    As the second part of the swap, on April 30, 2000, Peregrine improperly

4    recognized $1,453,520 in revenue from a transaction where it licensed software to Bindview

5    ("Peregrine License").  That revenue consisted of $1,086,355 of license revenue and $367,165 of

6    deferred revenue.  The agreement was in fact not signed by Bindview with until May 17, 2000,

7    well into the next quarter after the revenue was recognized.  Moreover, the effective date of the

8    agreement was not until May 30, 2000.  On June 1, 2000, Bindview issued a check to Peregrine in

9    the amount of $1,563,413.83.

10        235.    By signing the Peregrine License, Bindview agreed that it "shall pay to

11   Peregrine…the charges designated in any Product Schedule or business partner invoice…."  That

12   was a false statement by Bindview, because it was representing that money was due (and

13   impliedly that revenue could be recognized), when in fact it knew that the transaction was a swap

14   of products and services.

15        236.    By signing the Bindview License, Bindview agreed that "The Licensed

16   Software and the license fee and subscription fee to be paid by Peregrine are as follows.

17   Peregrine will pay Bindview's invoices for the license fee and subscription fee below…."  By

18   signing Exhibit A to the License Agreement, Bindview agreed that "The Licensed Software and

19   the license fee and subscription fee to be paid by Peregrine are as follows.  Peregrine will pay

20   Bindview's invoices for the license fee and subscription fee below…."  Those were false

21   statements by Bindview, because it was representing each time that money was due (and

22   impliedly that revenue could be recognized), when in fact it knew that the transaction was a swap

23   of products and services.

24        237.    In its books and records, Peregrine recognized revenue from the Peregrine

25   License even though it had obtained no revenue.  Peregrine incorporated that revenue into its

26   financial statements and into the documents submitted to Plaintiffs during merger negotiations

27   and to the SEC as required merger filings.

28

**382**
**EXHIBIT 24**

238.    In reporting on the Peregrine/Bindview deal, Peregrine and Moores concealed and did not disclose that Moores had a significant role as a director of Bindview. An internal Peregrine email dated December 6, 2000 from Defendant Gless to Eric Deller and Berdj Rassam states: "[R]elated to the Bindview transaction where [Moores] was a participant on both boards (related management). You found an out in the [Securities and Exchange] rules that allowed us to skate around the related disclosure rules."

239.    As a large, sophisticated business entity, Bindview understood that reported revenue affected the value of a company's stock. As a large, sophisticated business entity, Bindview was familiar with the practice of using stock in merger transactions.

240.    Through publicly reported documents, and through Moores, Bindview knew that part of Peregrine's business strategy was to enter into mergers with other companies by utilizing an exchange of stock. Bindview knew that Peregrine would improperly recognize revenue to inflate its financial statements and Bindview further knew and intended that these false financial statements would be relied upon by investors and potential merger partners who would invest in Peregrine based upon them.

G.    **Fujitsu**

241.    In a contract falsely dated September 29, 2000 Fujitsu/ICL Systems, Inc., (Fujitsu/ICL) ("Fujitsu/ICL") agreed to license $3,600,000 of Peregrine software. In September 2000, Peregrine improperly recognized license revenue in the amount of $3,000,000 and $600,000 in deferred maintenance revenue on this transaction.

242.    In fact the contract was not signed at the end of the quarter on September 29, 2000. Instead the contract was signed after the end of the quarter on or about October 2, 2000 by Powanda for Peregrine, and by Dean Whitlock, EVP and COO for Fujitsu/ICL and backdated to September 29, 2000.

243.    As incentives to backdate the contract, Peregrine provided Fujitsu/ICL with a 30 day written money back guarantee embedded on the face of the contract; discounted prices that would expire on September 30, 2000; and an agreement by Peregrine to purchase

383
**EXHIBIT 24**

1   professional services from Fujitsu/ICL in the exact amount of the contract, thus rendering the

2   agreement fully contingent, illusory, and devoid of any value as to Peregrine.

3        244.   Simultaneous with the placing of the bogus $3.6 million order, Peregrine

4   and Fujitsu/ICL signed a Statement of Work (SOW).  The SOW was signed and dated

5   September 29, 2000.  In the SOW, Peregrine purported to hire Fujitsu/ICL to provide general

6   consulting services in connection with Peregrine's business operations.  The dollar amount of the

7   consulting work agreed upon was exactly the amount of the original agreement, $3,600,000.

8        245.   The original contract stated that the $3,000,000 in license fees and

9   $600,000 in maintenance were payable within a 12 month period.  Fujitsu/ICL did not pay on the

10   contract because they knew there was no obligation to pay.  Fujitsu/ICL placed the order

11   knowingly as an accommodation to Peregrine so that Peregrine could improperly recognize the

12   revenue in the September 2000 quarter.

13        246.   In January 2002, over 15 months after the original contract was signed,

14   Fujitsu/ICL had not paid on the contract.  Instead of paying, the deal partners worked out an

15   Addendum to the original agreement wherein Fujitsu/ICL would only need to pay Peregrine

16   $234,000 or only 6.5% of the money owned.

17        247.   By backdating the original contract and other actions, Fujitsu/ICL falsely

18   represented the amount and nature of the revenue deal knowing that Peregrine intended to

19   fraudulently recognize revenue at the end of the September 2000 quarter.  By their actions and

20   lack of payments to Peregrine, Fujitsu/ICL showed it had no intention of fully performing under

21   the bogus terms of the deal and thus had the intention to aid and abet Peregrine in its fraudulent

22   revenue recognition scheme.

23        248.   Fujitsu ICL Systems is wholly owned by Fujitsu Ltd., a $40 billion a year

24   conglomerate.  In November 1990, Fujitsu Limited acquired an 80 percent shareholding in ICL.

25   By virtue of two rights issues in 1993-94 and 1996, Fujitsu increased its stake to 90.1 percent.  In

26   September 1998, Fujitsu acquired the 9.9 percent balance from Nortel Networks.  Fujitsu ICL

27   Systems was renamed Fujitsu Transaction Solutions, Inc. in June 2001 and is based in Dallas.

28   Fujitsu Transaction Solutions currently has 1,000 employees worldwide.  In 2000, when the

384

FOURTH AMENDED COMPLAINT

1    transactions with Peregrine occurred, Fujitsu ICL was in the business of selling software to

2    businesses, including handheld computers and ATM machines. Fujitsu/ICL, as a large and

3    sophisticated global business enterprise, knew investors would rely upon the revenue reported in

4    publicly filed documents including Peregrine's fraudulent financial numbers containing revenue

5    recognized under the September 29, 2000 transaction, in making investments in and agreeing to

6    mergers with Peregrine.

7         249.    At the close of the September 2000 quarter, Peregrine was desperate for

8    revenue so it could meet Wall Street's revenue expectations. Analysts' consensus of estimated

9    revenue for Peregrine for the quarter was $142 million. Peregrine reported revenue of

10    $142.5 million. Without the bogus Fujitsu order, Peregrine would have missed its estimated

11    quarterly revenue numbers resulting in potential severe negative impact to its share value, and

12    overall industry perception as an industry leader.

13    **XII. OFFICER AND DIRECTOR DEFENDANTS' UNLAWFUL MARKET ACTIVITY**

14         250.    Defendants Moores, Gardner, Gless, Watrous, Noell, Powanda, and Nelson

15    engaged in unlawful market activity. They regularly traded on inside information, selling off

16    huge quantities of stock after the Company released glowing public statements, knowing full well

17    that those statements were untrue and that sale of their stock was advisable while they could

18    profit from it. Moreover, they also sold stock prior to public disclosure of the Company's

19    acquisition of Harbinger because they knew that the purchase of Harbinger would depress the

20    stock price for some time. To avoid losing value, they sold off stock in massive amounts.

21         251.    Many of the sales came on the heels of Peregrine's various press releases

22    falsely announcing positive and often "record" results, which these defendants knew or were

23    reckless in not knowing, were materially false and misleading. Defendants also sold stock during

24    black-out periods.

25         252.    Gardner engaged in the following sales of Peregrine stock during the

26    Affected Period while knowing of material adverse nonpublic information concerning the

27    Company:

28

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|

**385**

FOURTH AMENDED COMPLAINT

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 08/04/99 | 12,500 | $ 357,875.00 |
| 08/04/99 | 7,500 | $ 214,725.00 |
| 08/05/99 | 7,500 | $ 215,325.00 |
| 08/06/99 | 5,000 | $ 142,500.00 |
| 08/09/99 | 5,000 | $ 143,600.00 |
| 08/09/99 | 42,500 | $ 1,220,600.00 |
| 08/13/99 | 12,500 | $ 399,125.00 |
| 08/13/99 | 7,500 | $ 239,475.00 |
| 02/22/00 | 35,000 | $ 1,515,850.00 |
| 02/23/00 | 15,000 | $ 658,500.00 |
| 02/23/00 | 25,000 | $ 1,097,500.00 |
| 02/23/00 | 117,762 | $ 5,169,751.80 |
| 02/24/00 | 37,238 | $ 1,679,806.18 |
| 02/24/00 | 20,262 | $ 914,018.82 |
| 09/04/01 | 2,250 | $ 61,875.00 |
| **Total Sold:** | **352,512[1]** | **$14,030,526.80** |

253.    Gless engaged in the following sales of Peregrine stock during the Affected Period while knowing of material adverse nonpublic information concerning the Company.

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 07/26/99 | 3,125 | $ 93,781.25 |
| 07/26/99 | 11,250 | $ 337,612.50 |
| 08/17/99 | 1,250 | $ 41,250.00 |
| 08/26/99 | 5,000 | $ 172,500.00 |

---

[1] This amount and others throughout the Complaint reflect the total number of shares unadjusted for stock splits.

| Date | Number of Shares | Proceeds Received |
|------|------|------|
| 08/26/99 | 5,000 | $ 175,000.00 |
| 02/15/00 | 9,000 | $ 408,960.00 |
| 02/15/00 | 4,000 | $ 182,520.00 |
| 02/15/00 | 5,000 | $ 222,500.00 |
| 02/15/00 | 5,000 | $ 225,000.00 |
| 02/15/00 | 2,500 | $ 113,750.00 |
| 02/15/00 | 500 | $ 22,750.00 |
| 02/15/00 | 6,250 | $ 287,500.00 |
| 02/15/00 | 7,750 | $ 356,500.00 |
| 02/15/00 | 10,000 | $ 451,900.00 |
| 02/23/00 | 5,000 | $ 230,000.00 |
| 02/25/00 | 8,000 | $ 400,000.00 |
| 02/25/00 | 500 | $ 27,000.00 |
| 02/25/00 | 2,000 | $ 109,000.00 |
| 02/25/00 | 1,000 | $ 54,380.00 |
| 02/25/00 | 1,500 | $  81,285.00 |
| **Total Sold:** | **93,625** | **$3,993,188.75** |

254.    Nelson made the following sales of Peregrine common stock during the

Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|------|------|------|
| 08/16/99 | 12,500 | $ 415,625.00 |
| 08/16/99 | 37,500 | $1,237,500.00 |
| 08/23/99 | 25,000 | $ 837,500.00 |
| 08/26/99 | 1,000 | $ 35,250.00 |
| 08/31/99 | 11,500 | $ 375,245.00 |

387
EXHIBIT 24

FOURTH AMENDED COMPLAINT

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/15/01 | 200,000 | $5,926,000.00 |
| **Total Sold:** | **287,500** | **$8,827,120.00** |

255.   Powanda made the following sales of Peregrine common stock during the Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 08/16/99 | 10,000 | $ 330,000.00 |
| 08/16/99 | 6,250 | $ 206,250.00 |
| 02/17/00 | 30,000 | $ 1,379,400.00 |
| 02/17/00 | 20,000 | $ 923,800.00 |
| 02/17/00 | 10,000 | $ 459,400.00 |
| 02/17/00 | 20,000 | $ 922,600.00 |
| 02/17/00 | 20,000 | $ 924,400.00 |
| 02/17/00 | 10,000 | $ 464,400.00 |
| 02/23/00 | 2,500 | $ 112,350.00 |
| 02/23/00 | 5,000 | $ 225,950.00 |
| 02/24/00 | 22,500 | $ 1,012,500.00 |
| 02/24/00 | 10,000 | $ 451,300.00 |
| 02/24/00 | 10,000 | $ 460,000.00 |
| 02/24/00 | 2,500 | $ 113,900.00 |
| 02/24/00 | 10,000 | $ 463,800.00 |
| 02/24/00 | 7,500 | $ 341,250.00 |
| 02/25/00 | 5,000 | $ 238,750.00 |
| 02/25/00 | 10,000 | $ 481,300.00 |
| 02/25/00 | 5,000 | $ 235,000.00 |
| 02/08/01 | 400,000 | $11,232,000.00 |
| 05/10/01 | 10,000 | $282,000.00 |
| 05/16/01 | 8,750 | $231,875.00 |
| 05/16/01 | 30,000 | $795,000.00 |

**388**
**EXHIBIT 24**

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 05/16/01 | 1,250 | $33,125.00 |
| 05/21/01 | 20,946 | $586,488.00 |
| 05/21/01 | 14,000 | $392,700.00 |
| 05/21/01 | 10,000 | $281,000.00 |
| 05/21/01 | 10,000 | $281,500.00 |
| 05/21/01 | 1,900 | $53,675.00 |
| 05/21/01 | 600 | $16,950.00 |
| 05/21/01 | 2,500 | $70,625.00 |
| 05/21/01 | 10,000 | $ 283,000.00 |
| **Total Sold:** | **736,196** | **$24,286,288.00** |

256.    Powanda was constantly requesting that he be removed from the list of Company insiders subject to black-out periods. In an e-mail to Eric Deller on July 20, 2000, Powanda pleaded, "get me off the 16B list!!!" Notwithstanding, Powanda sold 200,000 shares during Company imposed black-out periods.

257.    Moores made the following sales of Peregrine common stock during the Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|---|---|---|
| 07/26/99 | 1,522,719 | $ 43,397,491.50 |
| 07/26/99 | 970,923 | $ 27,671,305.50 |
| 02/17/00 | 1,143,016 | $ 52,647,316.96 |
| 02/17/00 | 251,436 | $ 11,581,142.16 |
| 02/18/00 | 2,122,736 | $ 92,721,108.48 |
| 02/18/00 | 466,960 | $ 20,396,812.80 |
| 02/28/00 | 408,220 | $ 20,962,097.00 |
| 02/28/00 | 89,799 | $ 4,611,178.65 |

**389**
**EXHIBIT 24**

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/29/00 | 89,799 | $ 4,727,917.35 |
| 02/29/00 | 408,220 | $ 21,492,783.00 |
| 02/08/01 | 77,000 | $ 2,324,630.00 |
| 02/12/01 | 175,000 | $ 4,900,000.00 |
| 02/13/01 | 385,000 | $ 10,987,900.00 |
| 02/15/01 | 1,104,022 | $ 32,756,332.74 |
| 02/16/01 | 280,000 | $ 8,332,800.00 |
| 02/16/01 | 218,978 | $ 6,330,653.98 |
| 02/20/01 | 210,000 | $ 6,308,400.00 |
| 02/23/01 | 506,223 | $ 15,449,925.96 |
| 02/26/01 | 360,000 | $ 10,429,200.00 |
| 02/27/01 | 50,000 | $ 1,335,000.00 |
| 02/28/01 | 90,000 | $ 2,276,100.00 |
| **Total Sold:** | **10,930,051** | **$401,640,096.08** |

258.   In addition, Moores' personal investment company (JMI Equity) sold the stock it owned as well, prior to Peregrine's May 6, 2002, announcement of its discovery of purported accounting irregularities. In total, Moores obtained more than $554 million of proceeds from his sale of Peregrine stock, making him by far the largest beneficiary of the fraud.

259.   Noell made the following sales of Peregrine common stock during the Affected Period, while knowing of material adverse nonpublic information:

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/23/00 | 90,000 | $3,897,900.00 |
| 02/15/01 | 68,978 | $2,052,785.28 |
| 02/16/01 | 15,397 | $ 445,127.27 |
| **Total Sold:** | **174,375** | **$6,395,812.55** |

**390**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1    260.    Watrous engaged in the following insider selling of Peregrine shares during

2  the Affected Period while knowing material adverse nonpublic information about the Company.

| Date | Number of Shares | Proceeds Received |
|------|------------------|-------------------|
| 02/25/00 | 15,000 | $811,200.00 |
| **Total Sold:** | **15,000** | **$811,200.00** |

## FIRST CAUSE OF ACTION

(Against Officer and Director Defendants
for Violation of Cal. Corp. Code § 25504)

11    261.    Plaintiffs incorporate here by reference the allegations contained in

12  paragraphs 1 - 260, as though fully set forth herein.

13    262.    Under California Corporations Code § 25401: "It is unlawful for any

14  person to offer or sell a security in this state or buy or offer to buy a security in this state by

15  means of any written or oral communication which includes an untrue statement of a material fact

16  or omits to state a material fact necessary in order to make the statements made, in the light of the

17  circumstances under which they were made, not misleading."

18    263.    As set forth extensively throughout this Complaint, including but not

19  limited to paragraphs 71 - 75, Peregrine published numerous false and misleading statements of

20  material fact regarding its financial condition and prognosis and also failed to disclose material

21  facts.  These false and misleading statements were made in, among other things, press releases,

22  10-Q and 10-K statements, the Registration Statement for the Remedy transaction, the Proxy

23  Statement and Prospectus, as well as in other written and oral communications.

24    264.    Peregrine made these false statements and omissions in connection with the

25  purchase and sale of securities, including its purchase of Remedy stock from and its sale of

26  Peregrine stock to plaintiffs in the State of California.

27    265.    Under California Corporations Code § 25504, the following persons are

28  jointly and severally liable for violations of § 25401: "Every person who directly or indirectly

391

324631.4                              - 93 -                    **EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1  controls a person liable; . . . every principal officer or director of a corporation so liable, every

2  person occupying a similar status or performing similar functions, every employee of a person so

3  liable who materially aids in the act or transaction constituting the violation, . . ." unless such

4  person can show he had no knowledge or reasonable grounds to believe in the facts underlying

5  the allegations of liability.

6        266.   Each Officer Defendant and Director Defendant is presumptively liable by

7  virtue of his status as an officer or director of Peregrine. Each Director Defendant had interests in

8  Peregrine and duties to the Company that went beyond merely serving on the Board of Directors.

9  These interests and duties are set forth more fully in those sections of the Complaint pertaining to

10  each such defendant.

11       267.   Moreover, each Officer Defendant and Director Defendant is also liable by

12  virtue of his status as a control person of Peregrine. The facts demonstrating each defendant's

13  exercise of control over the Company are set forth in those sections of the Complaint pertaining

14  to each defendant.

15       268.   As a direct, foreseeable, and proximate result of this wrongful conduct

16  alleged herein, Plaintiffs suffered economic injury. The amount of such damages and

17  prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

18  time of trial.

19              **SECOND CAUSE OF ACTION**

20            (Against All Defendants for Fraud and Deceit)

21       269.   Plaintiffs incorporate herein by reference the allegations contained in

22  paragraphs 1 - 268 as though fully set forth herein.

23       270.   As set forth more fully throughout the Complaint, defendants, directly and

24  indirectly, made numerous false statements regarding the financial status of Peregrine, as well as

25  its financial health and future. The nature of these misrepresentations and omissions related to,

26  without limitation: (a) the financial condition of Peregrine; (b) revenue to be recognized by

27  Peregrine on certain transactions; (c) the financial statements of Peregrine including falsely

28  asserting that those statements complied with GAAP; (d) the value of Peregrine common stock to

**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1   be exchanged in the merger with Remedy; and, (e) in the case of the Auditor Defendants, whether

2   their audit opinions complied with GAAS.  As set forth more fully in the paragraphs of the

3   Complaint related to each particular defendant, as well as the paragraphs describing the false

4   statements, each and every defendant in this action made material false statements or failed to

5   disclose information.  Each defendant had a duty to disclose the true facts, either by virtue of their

6   status as an officer or director of defendant, by virtue of the fact that they had superior knowledge

7   and made statements that required further disclosure to avoid their misleading nature, and by

8   virtue of the fact that they made statements knowing that third parties, such as investors and

9   Peregrine's merger partners, would rely on them.

10          271.    In each case, defendants acted with the requisite scienter, knowing that

11   their misstatements and failures to disclose were material, or recklessly disregarding their truth or

12   falsity.

13          272.    Defendants made those misrepresentations with the intent to deceive

14   Plaintiffs and to induce Plaintiffs and/or their agents to rely on them by purchasing or otherwise

15   acquiring Peregrine securities and/or selling Remedy securities.

16          273.    Plaintiffs and/or their agents read and/or were aware of the

17   misrepresentations and actually and justifiably relied on them in making their substantial

18   investments and decisions to enter into the merger on the agreed terms in exchange for Peregrine

19   securities and other consideration.  Such misrepresentations include, but are not limited to, those

20   made in the Registration Statement, Proxy Statement/Prospectus, SEC filings, and press releases.

21   Had Plaintiffs and/or their agents known the truth, they would have understood the true value of

22   Peregrine securities and would not have entered into the merger on such unfavorable terms, with

23   Peregrine securities valued at the substantially inflated market prices, or would not have entered

24   into the merger at all.  The reliance by each individual plaintiff is set forth as follows:

25          a.      Allocco:  Prior to the merger Allocco reviewed numerous

26   documents containing Peregrine's audited sales figures.  Allocco was aware of the contents of

27   Peregrine's audited financial numbers, specifically the revenue numbers.  Allocco specifically

28   was aware of, and relied upon, the audited financial information and revenue numbers contained

393

FOURTH AMENDED COMPLAINT

1 | therein and believed based upon them that Peregrine was a financially healthy company and that
2 | the merger was beneficial. Allocco expected, and relied upon, Peregrine's officers, directors, and
3 | auditor to ensure that Peregrine's financial information was accurate, and expected and relied
4 | upon third parties, including Peregrine's customers, confirming Peregrine's revenue to do so
5 | honestly and accurately. Had Allocco known of Peregrine's true financial condition, and that it
6 | was booking revenue from contingent and swap deals, he would have voted against the merger,
7 | and if the merger had still occurred, would have sold all of his stock as soon as possible after the
8 | merger. Allocco would not have agreed to exchange his Remedy stock if he had known that
9 | Peregrine was engaging in unlawful transactions, such as those described with the KPMG
10 | Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Allocco
11 | further relied upon this information in holding his stock after the merger. Had Allocco known of
12 | Peregrine's true financial condition, or that it was booking revenue from contingent and swap
13 | deals, he would immediately have sold all of his shares.

14 |                     b.        Barker:  Prior to the merger, Barker reviewed and relied upon,
15 | among other documents, Peregrine's 10-K and 10-Q filings, quarterly reports, the July 23, 2001
16 | SEC registration statement, the proxy statement/prospectus, Peregrine's press releases containing
17 | information on Peregrine's financial numbers, and analysis and press reports containing
18 | Peregrine's financial information. Barker specifically reviewed and relied upon the audited
19 | financial information and revenue numbers contained therein, and believed based upon them that
20 | Peregrine was a financially healthy company, and that the merger was beneficial. As Remedy's
21 | Investor Relations employee, Barker was also aware of the due diligence review of Peregrine's
22 | financial information and believed based upon that review, that Peregrine's financial numbers
23 | reflected the company's finances. Barker expected, and relied upon, Peregrine's officers,
24 | directors, and auditors to ensure that Peregrine's financial information was accurate, and expected
25 | and relied upon third parties, including Peregrine's customers, confirming Peregrine's revenue to
26 | do so honestly and accurately. Had Barker known of Peregrine's true financial condition, or that
27 | it was booking revenue from contingent and swap deals, she would have voted against the
28 | merger, and would have immediately reported any information she had obtained as to Peregrine's

394

1    fraudulent financial numbers. Barker would not have agreed to exchange his Remedy stock if he

2    had known that Peregrine was engaging in unlawful transactions, such as those described with the

3    KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Barker

4    further relied upon this information in purchasing Peregrine shares after the merger. Had Barker

5    known of Peregrine's true financial condition or that it was booking revenue from contingent and

6    swap deals, she would have immediately reported this information.

7              c.       Boyd:  Prior to the merger, Boyd reviewed and relied upon, among

8    other documents, Peregrine's 10-K and 10-Q SEC filings, annual and quarterly reports, the

9    July 23, 2001 SEC registration statement, the proxy statement/prospectus, and financial

10   information contained in Peregrine's press release. Boyd specifically reviewed and relied upon

11   the audited financial information and revenue numbers contained therein, and believed based

12   upon them that Peregrine was a financially healthy company, and that the merger was beneficial.

13   Boyd further relied upon Peregrine's history of quarter after quarter exceeding revenue

14   expectations. Boyd expected, and relied upon, Peregrine's officers, directors, and auditors to

15   ensure that Peregrine's financial information was accurate, and expected and relied upon third

16   parties, including Peregrine's customers confirming Peregrine's revenue to do so honestly and

17   accurately. Had Boyd known of Peregrine's true financial condition, or that it was booking

18   revenue from contingent and swap deals, he would have voted against the merger, and if the

19   merger had still occurred, would have sold all of his stock as soon as possible after the merger.

20   Boyd would not have agreed to exchange his Remedy stock if he had known that Peregrine was

21   engaging in unlawful transactions, such as those described with the KPMG Defendants, Critical

22   Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Boyd further relied upon this

23   information in holding his stock after the merger, and in working for Peregrine with

24   compensation that was partially provided through new option grants of Peregrine's stock. Had

25   Boyd known of Peregrine's true financial condition, or that it was booking revenue from

26   contingent and swap deals, he would have immediately sold all of his shares as soon as legally

27   possible.

28

1          d.       Cootes:  Prior to the merger, Cootes reviewed and relied upon,

2    among other documents, Peregrine's annual reports from the two years preceding the merger, the

3    July 23, 2001 SEC registration statement, the proxy statement/prospectus, and Peregrine press

4    releases containing information from Peregrine's financial reports.  Cootes further reviewed

5    analysis briefings which contained information on Peregrine's revenue numbers taken from

6    Peregrine's audited financial reports.  Cootes specifically reviewed and relied upon the audited

7    financial information and revenue numbers contained therein, and believed based upon them that

8    Peregrine was a financially healthy company, and that the merger was beneficial.  Cootes further

9    relied upon Peregrine's history of revenue growth and what appeared to be well-developed and

10   profitable resale channels, as reflected in Peregrine's financial reports.  Cootes expected, and

11   relied upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial

12   information was accurate, and expected and relied upon third parties, including Peregrine's

13   customers, confirming Peregrine's revenue to do so honestly and accurately.  Had Cootes known

14   of Peregrine's true financial condition or that it was booking revenue from contingent and swap

15   deals, he would have voted against the merger, and if the merger had still occurred, would have

16   sold all of his stock as soon as possible after the merger.  Cootes would not have agreed to

17   exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

18   transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

19   Group, Bull, Insight, Bindview and Fujitsu.  Cootes further relied upon this information in

20   purchasing Peregrine's shares after the merger, as well as in holding his stock after the merger.

21   Had Cootes known of Peregrine's true financial condition, or that it was booking revenue from

22   contingent and swap deals, he would not have purchased Peregrine shares after the merger, and

23   would have immediately sold all of his shares as soon as legally possible.

24          e.       Fior:  Prior to the merger, Fior reviewed and relied upon, among

25   other documents, Peregrine's 10-K and 10-Q filings, Peregrine's annual and quarter reports,

26   Peregrine's financial information contained within the registration agreement and the plan of

27   merger and reorganization, the July 23, 2001 SEC registration statement, the proxy

28   statement/prospectus, and press releases and analyst reports containing information on

**396**

FOURTH AMENDED COMPLAINT

1   Peregrine's financial condition. Fior specifically reviewed and relied upon the audited financial

2   information and revenue numbers contained therein, and believed based upon them that Peregrine

3   was a financially healthy company and that the merger was beneficial. Fior expected, and relied

4   upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information

5   was accurate, and expected and relied upon third parties, including Peregrine's customers,

6   confirming Peregrine's revenue to do so honestly and accurately. Fior further relied upon

7   presentations made by defendant Gardner and Gless to him regarding Peregrine's financial

8   condition. Had Fior known of Peregrine's true financial condition, or that it had booked revenue

9   from contingent and swap deals, he would have voted against the merger, and if the merger still

10  occurred, would have sold all of his stock as soon as possible after the merger. Fior would not

11  have agreed to exchange his Remedy stock if he had known that Peregrine was engaging in

12  unlawful transactions, such as those described with the KPMG Defendants, Critical Path, BT and

13  BT Group, Bull, Insight, Bindview and Fujitsu. Fior further relied upon this information, in

14  holding his stock after the merger. Had Fior known of Peregrine's true financial condition and

15  that it was booking revenue from contingent and swap deals, he would have immediately sold all

16  of his shares.

17              f.       Friedman: Prior to the merger, Friedman reviewed and relied upon,

18  among other documents, the proxy statement/prospectus as well as press reports and analysts

19  reports containing information taken from Peregrine's audited financial statements, and including

20  information on Peregrine's revenue numbers taken from those financial statements. Friedman

21  specifically reviewed, was aware of, and relied upon Peregrine's audited financial information

22  and the revenue numbers contained therein, and believed based upon them that Peregrine was a

23  financially healthy company and that the merger was beneficial. Friedman expected, and relied

24  upon Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information

25  was accurate, and expected and relied upon third parties, including Peregrine's customers,

26  confirming Peregrine's revenue to do so honestly and accurately. Had Friedman known of

27  Peregrine's true financial condition, or that it was booking revenue from contingent and swap

28  deals, she would have voted against the merger, and if the merger had still occurred, would have

397

FOURTH AMENDED COMPLAINT

1  sold all of her stock as soon as possible after the merger. Friedman would not have agreed to

2  exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

3  transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

4  Group, Bull, Insight, Bindview and Fujitsu. Friedman further relied upon this information, in

5  holding her stock after the merger. Had Friedman known of Peregrine's true financial condition

6  or that it was booking revenue from contingent and swap deals, she would have immediately sold

7  all of her shares as soon as legally possible.

8        g.    Garlick: Prior to the merger, Garlick reviewed and relied upon,

9  among other documents, Peregrine's 10-K's and 10-Q's from 1999 to 2001 as well as Peregrine's

10  press releases and analysts' reports containing information from Peregrine's financials from that

11  period and throughout his time at Remedy. This review included careful consideration of

12  Peregrine's revenue numbers taken from these financial statements, and Peregrine's consistent

13  history of revenue growth. Garlick specifically reviewed, was aware of, and relied upon

14  Peregrine's audited financial information and the revenue numbers contained therein, and based

15  upon them that Peregrine was a financially healthy company and that the merger was beneficial.

16  As part of his due diligence, Garlick specifically looked at the DSO number for Peregrine, which

17  he considered a key indicator of Peregrine's financial health, and specifically looked for the

18  "three standard paragraphs" and the lack of any exceptions to Arthur Andersen's unqualified

19  audit reports on Peregrine's financial statement. Garlick expected, and relied upon Peregrine's

20  officers, directors, and auditors to ensure that Peregrine's financial information was accurate and

21  expected and relied upon third parties, including Peregrine's customers, confirming Peregrine's

22  revenue to do so honestly and accurately. Garlick would not have agreed to exchange his

23  Remedy stock if he had known that Peregrine was engaging in unlawful transactions, such as

24  those described with the KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight,

25  Bindview and Fujitsu. Had Garlick known of Peregrine's true financial condition, or that it was

26  booking revenue from contingent and swap deals, he would not have gone through the merger

27  and if he had learned the truth after the merger he would have made an effort to rescind the

28  transaction for the benefit of all of Remedy's shareholders.

398
EXHIBIT 24

FOURTH AMENDED COMPLAINT

1    h.    Goldberg: Prior to the merger, Goldberg reviewed and relied upon,

2  among other documents, Peregrine's quarterly reports, the Registration Agreement and Plan of

3  Merger in the Organization, the July 23, 2001 SEC Registration Statement, and the entirety of the

4  Proxy Statement/Prospectus. Goldberg specifically reviewed, was aware of, and relied upon

5  Peregrine's audited financial information and the revenue numbers contained therein, and

6  believed based upon them that Peregrine was a financially healthy company and that the merger

7  was beneficial. Goldberg expected, and relied upon Peregrine's officers, directors, and auditors

8  to ensure that Peregrine's financial information was accurate, and expected and relied upon third

9  parties, including Peregrine's customers, confirming Peregrine's revenue to do so honestly and

10  accurately. Had Goldberg known of Peregrine's true financial condition, or that it was booking

11  revenue from contingent and swap deals, he would have voted against the merger, and if the

12  merger had still occurred, would have sold all of his stock as soon as possible after the merger.

13  Goldberg would not have agreed to exchange his Remedy stock if he had known that Peregrine

14  was engaging in unlawful transactions, such as those described with the KPMG Defendants,

15  Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Goldberg further relied

16  upon this information in holding his stock after the merger. Had Goldberg known of Peregrine's

17  true financial condition, or that it was booking revenue from contingent and swap deals, he would

18  have immediately sold all of his shares as soon as legally possible.

19    i.    Guerrieri: Prior to the merger, Guerrieri reviewed and relied upon,

20  among other documents, the July 23, 2001 SEC registration statement and the proxy

21  statement/prospectus, as well as Peregrine's press releases, and analyst reports repeating

22  information from Peregrine on Peregrine's financial condition. Guerrieri specifically reviewed

23  and relied upon the audited financial information and revenue numbers contained therein, and

24  believed based upon them that Peregrine was a financially healthy company and that the merger

25  was beneficial. Guerrieri expected, and relied upon, Peregrine's officers, directors, and auditors

26  to ensure that Peregrine's financial information was accurate, and expected and relied upon third

27  parties, including Peregrine's customers, confirming Peregrine's revenue to do so honestly and

28  accurately. Had Guerrieri known of Peregrine's true financial condition, or that they had booked

399

**EXHIBIT 24**

1   revenue from contingent and swap deals, he would have voted against the merger, and if the

2   merger had still occurred, would have sold all of his stock as soon as possible after the merger.

3   Guerrieri would not have agreed to exchange his Remedy stock if he had known that Peregrine

4   was engaging in unlawful transactions, such as those described with the KPMG Defendants,

5   Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Guerrieri further relied

6   upon this information in holding his stock after the merger. Had Guerrieri known of Peregrine's

7   true financial condition, that it was booking revenue from contingent and swap deals, he would

8   have immediately sold all of his shares.

9            j.      Jones: Prior to the merger, Jones reviewed and relied upon, among

10  other documents, Peregrine's 10-K and 10-Q filings, Peregrine's annual quarterly reports, the

11  July 23, 2001 SEC registration statement, the proxy statement/prospectus, and financial

12  information contained in Peregrine's press releases, and in analyst reports. Jones specifically

13  reviewed and relied upon the audited financial information, revenue numbers contained therein,

14  and believed based upon them that Peregrine was a financially healthy company and that the

15  merger was beneficial. Jones expected, and relied upon, Peregrine's officers, directors, and

16  auditors to ensure that Peregrine's financial information was accurate, and expected and relied

17  upon third parties, including Peregrine's customers, confirming Peregrine's revenue to do so

18  honestly and accurately. Had Jones known of Peregrine's true financial condition, or that it had

19  booked revenue from contingent and swap deals, he would have voted against the merger, and if

20  the merger had still occurred, would have sold all of his stock as soon as possible after the

21  merger. Jones would not have agreed to exchange his Remedy stock if he had known that

22  Peregrine was engaging in unlawful transactions, such as those described with the KPMG

23  Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Jones further

24  relied upon this information in holding his stock after the merger. Had Jones known of

25  Peregrine's true financial condition and that it was booking revenue from contingent and swap

26  deals, he would have immediately sold all of his shares.

27           k.      Klawans Family Trust: Prior to the merger, Klawans, on behalf of

28  the Trust, reviewed and relied upon, among other documents, Peregrine's 10-Q's, Peregrine's

**400**

FOURTH AMENDED COMPLAINT

1   then-current annual report, the July 23, 2001 SEC registration statement, the proxy

2   statement/prospectus, Peregrine's press releases from the time of the merger, and analyst and

3   press reports which contained information on Peregrine's financial condition taken from

4   Peregrine's audited financial reports.  Klawans specifically reviewed, was aware of, and relied

5   upon the audited financial information and revenue numbers contained therein, and believed

6   based upon them that Peregrine was a financially healthy company and that the merger was

7   beneficial.  Klawans expected, and relied upon, Peregrine's officers, directors, and auditors to

8   ensure that Peregrine's financial information was accurate, and expected and relied upon third

9   parties, including Peregrine's customers, confirming Peregrine's revenue to do so honestly and

10   accurately.  Had Klawans known of Peregrine's true financial condition, or that it was booking

11   revenue from contingent and swap deals, he would have voted the Trust's shares against the

12   merger, and if the merger had still occurred, would have sold all of the Trust's shares as soon as

13   possible after the merger.  Klawans would not have agreed to exchange his Remedy stock if he

14   had known that Peregrine was engaging in unlawful transactions, such as those described with the

15   KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu.

16   Klawans further relied upon this information in holding the Trust's shares after the merger.  Had

17   Klawans known of Peregrine's true financial condition or that it was booking revenue from

18   contingent and swap deals, he would have immediately sold all of the Trust's shares as soon as

19   legally possible.

20            l.       Kulakow:  Prior to the merger, Kulakow reviewed and relied upon,

21   among other documents, Peregrine's 10-K's and 10-Q's, annual and quarterly reports, July 23,

22   2001 SEC registration statement, and proxy statement/prospectus.  Kulakow specifically

23   reviewed, was aware of, and relied upon the audited financial information and revenue numbers

24   contained therein, and believed based upon them that Peregrine was a financially healthy

25   company and that the merger was beneficial.  Kulakow expected, and relied upon, Peregrine's

26   officers, directors, and auditors to insure that Peregrine's financial information was accurate, and

27   expected and relied upon third parties, including Peregrine's customers, confirming Peregrine's

28   revenue to do so honestly and accurately.  Had Kulakow known of Peregrine's true financial

**401**

FOURTH AMENDED COMPLAINT

1   condition, or that it was booking revenue from contingent and swap deals, he would have voted

2   against the merger, and if the merger had still occurred, would have sold all his shares as soon as

3   possible after the merger. Kulakow would not have agreed to exchange his Remedy stock if he

4   had known that Peregrine was engaging in unlawful transactions, such as those described with the

5   KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu.

6   Kulakow further relied upon this information, in holding his stock after the merger. Had

7   Kulakow known of Peregrine's true financial condition or that it was booking revenue from

8   contingent and swap deals, he would have immediately sold all of his shares as soon as legally

9   possible.

10          m.     Little: Prior to the merger, Little reviewed and relied upon, among

11   other documents, Peregrine's July 23, 2001 SEC registration statement, Peregrine's SEC filings

12   10-K and 10-Q, the proxy statement and prospectus, and press releases and analysts reports which

13   contained information taken from Peregrine's audited financial statements. Little specifically

14   reviewed, was aware of, and relied upon the audited financial information and revenue numbers

15   contained therein, and believed based upon them that Peregrine was a financially healthy

16   company and that the merger was beneficial. Little expected, and relied upon, Peregrine's

17   officers, directors, and auditors to insure that Peregrine's financial information was accurate, and

18   expected and relied upon third parties, including Peregrine's customers, confirming Peregrine's

19   revenue to do so honestly and accurately. Had Little known of Peregrine's true financial

20   condition, or that it was booking revenue from contingent and swap deals, he would have voted

21   against the merger, and if the merger had still occurred, would have sold all of his stock as soon

22   as possible after or before the merger. Little would not have agreed to exchange his Remedy

23   stock if he had known that Peregrine was engaging in unlawful transactions, such as those

24   described with the KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview

25   and Fujitsu. Little further relied upon this information in holding his stock after the merger. Had

26   Little known of Peregrine's true financial condition or that it was booking revenue from

27   contingent and swap deals, he would have immediately sold all of his shares as soon as legally

28   possible.

**402**
**EXHIBIT 24**

1          n.        Mahler:  Prior to the merger, Mahler reviewed and relied upon,

2    among other documents, the registration agreement and plan of merger and reorganization, the

3    July 23, 2001 SEC registration statement and remedy press release.  Mahler specifically

4    reviewed, was aware of the contents of, and relied upon the audited financial information and

5    revenues numbers contained therein, and believed, based upon them, that Peregrine was a

6    financially healthy company and that the merger was beneficial.  Based upon this financial

7    information, in its further review by the remedy due diligence team in Morgan Stanley, Mahler

8    believed that Peregrine was financially healthy, and had multiple quarters of increased revenue,

9    and it consistently met its financial targets.  Mahler expected, and relied upon, Peregrine's

10   officers, directors, and auditors to insure that Peregrine's financial information was accurate, and

11   expected and relied upon third parties, including Peregrine's customers, confirming Peregrine's

12   revenue to do so honestly and accurately.  Had Mahler known of Peregrine's true financial

13   condition, or that it was booking revenue from contingent and swap deals, he would have done

14   everything he could to persuade the board not to vote in favor of the merger, would have voted

15   against the merger, and if the merger had still occurred, would have sold all of his stock as soon a

16   legally possible.  Mahler would not have agreed to exchange his Remedy stock if he had known

17   that Peregrine was engaging in unlawful transactions, such as those described with the KPMG

18   Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu.  Mahler further

19   relied upon this information in holding his stock after the merger.  Had Mahler known of

20   Peregrine's true financial condition or that it was booking revenue from contingent and swap

21   deals, he would have immediately sold all of his shares as soon as legally possible.

22          o.        Mousseau:  Prior to the merger, Mousseau reviewed and relied

23   upon, among other documents, Peregrine's 10-K and 10-Q and annual and quarterly reports, and

24   Peregrine's press releases and analyst reports containing information on Peregrine's financial

25   condition.  Mousseau specifically reviewed, was aware of, and relied upon the audited financial

26   information and revenue numbers contained therein, and believed based upon them that Peregrine

27   was a financially healthy company and that the merger was beneficial.  Mousseau relied upon

28   Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information was

1   accurate, and expected and relied upon third parties, including Peregrine's customers, confirming

2   Peregrine's revenue to do so honestly and accurately. Had Mousseau known of Peregrine's true

3   financial condition or that it booked revenue from contingent and swap deals, he would have

4   voted against the merger, and if the merger had still occurred, would have sold all of his stock as

5   soon as possible after the merger. Mousseau would not have agreed to exchange his Remedy

6   stock if he had known that Peregrine was engaging in unlawful transactions, such as those

7   described with the KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight, Bindview

8   and Fujitsu. Mousseau further relied upon this information, in holding his stock after the merger.

9   Had Mousseau known of Peregrine's true financial condition or that it was booking revenue from

10  contingent and swap deals, he would have immediately sold all of his shares as soon as legally

11  possible.

12          p.      Douglas Mueller: Prior to the merger, Mueller reviewed and relied

13  upon, among other documents, Peregrine's 10-K, 4 annual reports preceding merger, registration

14  agreement and plan of merger, the July 23, 2001 SEC Registration Statement, and the July 23,

15  2001 Proxy Statement/Prospectus, as well as press releases and analyst reports containing

16  information on Peregrine's financial condition taken from Peregrine's financial reports. Mueller

17  specifically reviewed and relied upon the audited financial information revenue numbers

18  contained therein and believed based upon them that Peregrine was a financially healthy

19  company. Mueller relied upon, Peregrine's officers, directors, and auditors to ensure that

20  Peregrine's financial information was accurate, and expected and relied upon third parties,

21  including Peregrine's customers, confirming Peregrine's revenue to do so honestly and

22  accurately. Mueller relied upon Peregrine's revenue numbers, their revenue trends on a quarterly

23  basis, and their history of meeting Wall Street's expectations and history of revenue growth in the

24  belief it provided in him that Peregrine was a financially health company in not attempting to

25  prevent a vote in favor of the merger. Had Mueller known of Peregrine's true financial condition

26  or that it booked revenue from contingent and swap deals, he would have actively opposed and

27  attempted to prevent the merger, and if the merger had still occurred, would have sold all of his

28  stock as soon as possible after the merger. Mueller would not have agreed to exchange his

1    Remedy stock if he had known that Peregrine was engaging in unlawful transactions, such as

2    those described with the KPMG Defendants, Critical Path, BT and BT Group, Bull, Insight,

3    Bindview and Fujitsu. Had Mueller known of Peregrine's true financial condition, or that it was

4    booking revenue from contingent and swap deals, he would have immediately sold all of his

5    shares, and would not have purchased additional shares in January of 2002.

6              q.      Judith Orah Mueller: Through discussions with her husband,

7    Douglas Mueller, Mueller relied upon the same materials upon which he relied. Among other

8    documents, these include Peregrine's 10-K, 4 annual reports preceding merger, registration

9    agreement and plan of merger, the July 23, 2001 SEC Registration Statement, and the July 23,

10    2001 Proxy Statement/Prospectus, as well as press releases and analyst reports containing

11    information on Peregrine's financial condition taken from Peregrine's financial reports. Mueller

12    specifically relied upon the audited financial information revenue numbers contained therein and

13    believed based upon them that Peregrine was a financially healthy company. Mueller relied

14    upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial information

15    was accurate, and expected and relied upon third parties, including Peregrine's customers,

16    confirming Peregrine's revenue to do so honestly and accurately. Mueller relied upon Peregrine's

17    revenue numbers, their revenue trends on a quarterly basis, and their history of meeting Wall

18    Street's expectations and history of revenue growth in the belief it provided that Peregrine was a

19    financially health company in not attempting to prevent a vote in favor of the merger. Had

20    Mueller known of Peregrine's true financial condition or that it booked revenue from contingent

21    and swap deals, she would have actively opposed and attempted to prevent the merger, and if the

22    merger had still occurred, would have sold all of her stock as soon as possible after the merger.

23    Mueller would not have agreed to exchange her Remedy stock if she had known that Peregrine

24    was engaging in unlawful transactions, such as those described with the KPMG Defendants,

25    Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Had Mueller known of

26    Peregrine's true financial condition, or that it was booking revenue from contingent and swap

27    deals, she would have immediately sold all of her shares.

28

1                r.      Peterson: Prior to the merger, Peterson reviewed, was aware of the

2  contents of, and relied upon, among other documents, Peregrine's 10-K and 10-Q filings, annual

3  reports, the July 23, 2001 NCC registration statement, and the proxy statement/prospectus.

4  Peterson specifically reviewed and relied upon the audited financial information and revenue

5  numbers contained therein, and believed, based upon them, that Peregrine was a financially

6  healthy company. Peterson expected, and relied upon, Peregrine's officers, directors, and their

7  auditors to ensure that Peregrine's financial information was accurate, and expected and relied

8  upon third parties, including Peregrine's customers, confirming Peregrine's revenue to do so

9  honestly and accurately. Peterson relied upon Peregrine's revenue numbers, the revenue trends

10  on a quarterly basis, and his belief that Peregrine was a financially healthy company and not

11  attempting to prevent a vote in favor of the merger. Had Peterson known of Peregrine's true

12  financial condition, or that it had booked revenue from contingent and swap deals, he would have

13  actively opposed and attempted to prevent the merger, and if the merger had still occurred, would

14  have sold all of his stock as soon as possible after the merger. Peterson would not have agreed to

15  exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

16  transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

17  Group, Bull, Insight, Bindview and Fujitsu. Had Peterson known of Peregrine's true financial

18  condition, or that it was booking revenue from contingent and swap deals, he would have

19  immediately sold all his shares as soon as possible.

20                s.      Potts: Prior to the merger, Potts reviewed and relied upon, among

21  other documents the July 23, 2001 Proxy Statement/Prospectus and the July 23, 2001 SEC

22  Registration Statement, as well as Peregrine's financial information. Potts specifically knew the

23  contents of, and relied upon, the audited financial numbers contained therein, and believed based

24  upon them and her discussions with members of Remedy's executive team who had carefully

25  reviewed them, that Peregrine was a financially healthy company and that the merger was

26  beneficial. Potts relied upon Peregrine's officers, directors, and auditors to ensure that

27  Peregrine's financial information was accurate, and expected and relied upon third parties,

28  including Peregrine's customers, confirming Peregrine's revenues to do so honestly and

406

FOURTH AMENDED COMPLAINT

1   accurately. Had Potts known of Peregrine's true financial condition or that it had booked from

2   revenue from contingent and swap deals, she would have voted against the merger, and if the

3   merger had still occurred, would have sold all of her shares as soon as possible after the merger.

4   Potts would not have agreed to exchange his Remedy stock if he had known that Peregrine was

5   engaging in unlawful transactions, such as those described with the KPMG Defendants, Critical

6   Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Potts further relied upon this

7   information in holding her stock after the merger. Had Potts known of Peregrine's true financial

8   condition or that it was booking revenue from contingent and swap deals, she would have

9   immediately sold all of her shares.

10           t.      Schwem: Prior to the merger, Schwem reviewed, was aware of the

11  contents of, and relied upon, among other documents, Peregrine's 10-K and 10-Q filings, annual

12  reports, quarterly reports, the registration agreement and plan of merger and reorganization, the

13  July 23, 2001 SEC registration statement, and the proxy statement/prospectus. Schwem

14  specifically knew the contents of, and relied upon, the audited financial numbers contained

15  therein, and believed, based upon them, and her discussions with employees of Peregrine during

16  the due diligence period, that Peregrine was a financially healthy company and that the merger

17  was beneficial. Schwem expected, and relied upon, Peregrine's officers, directors, and auditors to

18  ensure that Peregrine's financial information was accurate, and expected and relied upon third

19  parties, including Peregrine's customers, confirming Peregrine's revenue to do so honestly and

20  accurately. Had Schwem known of Peregrine's true financial condition, or that it booked revenue

21  from contingent and swap deals, she would have opposed the merger as part of her due diligence

22  responsibilities, and would have voted against the merger. Had this information been known, the

23  merger would not have occurred and if, hypothetically, the merger had still occurred, she would

24  have sold all of her shares as soon as legally possible after the merger. Schwem would not have

25  agreed to exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

26  transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

27  Group, Bull, Insight, Bindview and Fujitsu. Schwem further relied upon this information in

28  holding her stock after the merger, and in holding off exercising her options until the following

                                                                                          407

1    year. Had Schwem known of Peregrine's true financial condition, or that it was booking revenue

2    from contingent and swap deals, she would have immediately sold all her shares as soon as

3    legally possible, and would have exercised her options as soon as possible, then selling any stock

4    as soon as legally possible.

5                    u.          Shoch:  Prior to the merger, Shoch reviewed, and relied upon,

6    among other documents, Peregrine's quarterly reports, the registration agreement and plan of

7    reorganization, the July 23, 2001 SEC registration statement, the proxy statement/prospectus,

8    Peregrine press releases, and analysis of press reports containing information on Peregrine's

9    finances taken from Peregrine's financial statements.  Shoch specifically knew the contents of,

10   and relied upon, the audited financial numbers contained therein, believed based upon them and

11   presentations by Peregrine to Remedy's board of directors, attorneys, bankers, accountants, that

12   Peregrine was a financially healthy company and that the merger was beneficial.  Shoch expected,

13   and relied upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's financial

14   information was accurate, and expected and relied upon third parties, including Peregrine's

15   customers, confirming Peregrine's revenue to do so honestly and accurately.  Shoch specifically

16   relied upon, among other materials, Peregrine's revenue numbers, revenue trends regarding

17   Peregrine's quarterly numbers, and history of meeting Wall Street's expectations and history of

18   revenue growth.  Had Shoch known of Peregrine's true financial condition or that it had booked

19   revenue from contingent and swap deals, he would have voted against the merger, both as a

20   shareholder and member of the board of Remedy, and if the merger had still occurred would have

21   sold all of his shares as soon as possible after the merger.  Shoch would not have agreed to

22   exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

23   transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

24   Group, Bull, Insight, Bindview and Fujitsu.  Shoch further relied upon this information in holding

25   his stock after the merger.  Had Shoch known of Peregrine's true financial condition or that it was

26   booking revenue from contingent swap deals, he would have immediately sold all of his shares as

27   soon as legally possible.

28

**408**
**EXHIBIT 24**

1    v.    Thomas:  Prior to the merger, Thomas reviewed and relied upon,

2  among other documents, Peregrine's SEC filings 10-K and 10-Q and Peregrine's press releases

3  and analyst reports containing information on Peregrine's finances.  Thomas was aware of these

4  materials showing Peregrine's financial condition and relied upon his discussions with co-

5  workers who had reviewed Peregrine's audited financial information and revenue numbers, and

6  believed based upon them that Peregrine was a financially healthy company and that the merger

7  was beneficial.  Thomas relied upon Peregrine's officers, directors and auditors to ensure that

8  Peregrine's financial information was accurate, and expected and relied upon third parties,

9  including Peregrine's customers, confirming Peregrine's revenue to do so honestly and

10  accurately.  Had Thomas known of Peregrine's true financial condition or that it had booked

11  revenue from contingent and swap deals, he would have voted against the merger, and if the

12  merger had still occurred would have sold all of his stock as soon as possible after the merger.

13  Thomas would not have agreed to exchange his Remedy stock if he had known that Peregrine

14  was engaging in unlawful transactions, such as those described with the KPMG Defendants,

15  Critical Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu.  Thomas further relied upon

16  this information to hold his stock after the merger.  Had Thomas known of Peregrine's true

17  financial condition or that it was booking revenue from contingent and swap deals, he would have

18  immediately sold all of his shares.

19    w.    de Urioste:  Prior to the merger De Urioste reviewed and relied

20  upon, among other documents, the July 23, 2001 Proxy Statement/Prospectus and the July 23,

21  2001 SEC Registration Statement.  De Urioste specifically reviewed and relied upon the audited

22  financial information and revenue numbers contained therein, and believed based upon them that

23  Peregrine was a financially healthy company and that the merger was beneficial.  De Urioste

24  relied upon Peregrine's officers, directors, and auditors to insure that Peregrine's financial

25  information was accurate, and expected and relied upon third parties, including Peregrine's

26  customers, confirming Peregrine's revenue to do so honestly and accurately.  Had De Urioste

27  known of Peregrine's true financial condition or that it had booked revenue from contingent and

28  swap deals, he would have voted against the merger, and if the merger had still occurred would

409

1   have sold all of his stock as soon as possible after the merger. De Urioste would not have agreed

2   to exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

3   transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

4   Group, Bull, Insight, Bindview and Fujitsu. De Urioste further relied upon this information, and

5   representations by Gardner in an August 2001 call with former Remedy shareholders in holding

6   his stock after the merger. Had De Urioste known of Peregrine's true financial condition or that it

7   was booking revenue from contingent and swap deals he would have immediately sold all of his

8   shares.

9               x.     Wallace:  Prior to the merger, Mr. Wallace reviewed and relied

10   upon, among other documents, Peregrine's annual and quarterly reports, the July 23, 2001 SEC

11   registration statement, the proxy statement/prospectus, Peregrine's press releases, and analyst and

12   press reports containing Peregrine's financial information taken from Peregrine's financial

13   reports. Mr. Wallace specifically reviewed and relied upon the audited financial information and

14   revenue numbers contained therein, and believed based upon his review of these materials in his

15   discussion with Remedy people who had also reviewed Peregrine's financial numbers, that

16   Peregrine was a financially healthy company and that the merger was beneficial. Mr. Wallace

17   expected, and relied upon, Peregrine's officers, directors, and auditors to ensure that Peregrine's

18   financial information was accurate, and expected and relied upon third parties, including

19   Peregrine's customers, confirming Peregrine's revenue to do so honestly and accurately. Had

20   Mr. Wallace known of Peregrine's true financial condition or that it had booked revenue from

21   contingent and swap deals, he would have voted against the merger, and if the merger had still

22   occurred, would have sold all of his stock as soon as possible after the merger. Mr. Wallace

23   would not have agreed to exchange his Remedy stock if he had known that Peregrine was

24   engaging in unlawful transactions, such as those described with the KPMG Defendants, Critical

25   Path, BT and BT Group, Bull, Insight, Bindview and Fujitsu. Mr. Wallace further relied upon

26   this information, and representations by Gardner as to Peregrine's financial condition and

27   continued revenue growth in holding his stock after the merger. Had Mr. Wallace known of

28

**410**
**EXHIBIT 24**

1    Peregrine's true financial condition or that it was booking revenue from contingent and swap

2    deals, he would have immediately sold all of his shares as soon as legally possible.

3             y.    Weller: Prior to the merger, Weller and/or his agents whom he

4    entrusted to perform due diligence with respect to the merger, reviewed and relied upon the

5    Registration Statement and joint proxy/prospectus as well as the 10-K and 10-Q statements for

6    the periods preceding the merger which contained the audited financial statements.  Weller

7    expected and relied upon Peregrine's financial history as it had been reported, as well as

8    Peregrine's officers, directors, and auditors to ensure that Peregrine's financial statements were

9    accurate and he expected and relied upon third parties, including Peregrine's customers,

10   confirming Peregrine's revenue to do so honestly and accurately.  Weller would not have agreed

11   to exchange his Remedy stock if he had known that Peregrine was engaging in unlawful

12   transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT

13   Group, Bull, Insight, Bindview and Fujitsu.  Had Weller known of Peregrine's true financial

14   condition or that it had booked revenue from contingent and swap deals, he would have voted

15   against the merger, and if the merger had still occurred, would have sold all of his stock as soon

16   as possible after the merger. Moreover, he would not have purchased or held additional stock but

17   would have sold all of it at the first available legal opportunity.

18           274.   At the time of the misrepresentations and of Plaintiffs' reliance thereon,

19   Plaintiffs were unaware of the falsity of Defendants' misrepresentations and could not reasonably

20   have known the truth.  Defendants were the sole possessors of the true, accurate, and complete

21   information about Peregrine, to which Plaintiffs had no access.  Plaintiffs did not and could not

22   have, in the exercise of reasonable diligence, discovered the fraudulent acts constituting this cause

23   of action until after Peregrine announced its restatement of revenues in May 2002 when the true

24   information first became publicly available and still do not know all of the facts concerning

25   defendants' participation.

26           275.   As a direct, foreseeable, and proximate result of this wrongful conduct

27   alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

28

**411**
**EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1   prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

2   time of trial.

3          276.   Defendants acted with oppression, fraud, and/or malice, thereby entitling

4   Plaintiffs to punitive damages.

5   ## THIRD CAUSE OF ACTION

6   (Against the Officer and Director Defendants for Negligent Misrepresentation)

7          277.   Plaintiffs incorporate herein by reference the allegations contained in

8   paragraphs 1 - 276 as though fully set forth herein.

9          278.   The Officer and Director Defendants made misrepresentations of fact and

10   failed to disclose material facts, notwithstanding their duty to make full and complete disclosures.

11   As set forth throughout this Complaint, Defendants made numerous representations without

12   disclosure of additional facts necessary to make the disclosed matters not misleading.  Moreover,

13   Defendants had superior knowledge and Plaintiffs could not reasonably have discovered the true

14   facts. The nature of these misrepresentations and omissions related to, without limitation:  (a) the

15   financial condition of Peregrine; (b) the financial statements of Peregrine including falsely

16   asserting that those statements complied with GAAP; and (3) the value of Peregrine common

17   stock to be exchanged in the merger with Remedy.

18          279.   Defendants also knew or should have known that material representations

19   would be relied upon by the Remedy negotiating and due diligence teams in conveying their

20   recommendations about the proposed merger to plaintiffs.

21          280.   These communications included misrepresentations, i.e., untrue statements

22   of material facts and/or omissions of material facts necessary to make the statements not

23   misleading in the light of the circumstances under which they were made.

24          281.   Defendants had no reasonable ground for believing these communications

25   to be true.

26          282.   Defendants made these representations and omissions of fact with the

27   intent to induce Plaintiffs and/or their agents to act in reliance upon such by purchasing or

28   otherwise acquiring Peregrine securities and/or selling Remedy securities.

**412**

1      283.   At the time of the communications, and at the time Plaintiffs acted in

2   reliance thereon, Plaintiffs did not know of their false and/or misleading nature and could not

3   reasonably believe them to be untrue.

4      284.   Plaintiffs and/or their agents read and/or were aware of the false and

5   misleading representations and actually and justifiably relied on such in making their substantial

6   investments and decisions to enter into the merger on the agreed terms in exchange for Peregrine

7   securities and other consideration, in purchasing Peregrine shares on the open market, and in

8   holding on to their Peregrine stock until it became worthless.  Such representations include, but

9   are not limited to, those made in the Registration Statement, Proxy Statement/Prospectus, SEC

10  filings, and press releases.  Plaintiffs further did not know of the facts that Defendants suppressed

11  and failed to disclose at the time of the failures to disclose and suppressions of fact, and at the

12  time Plaintiffs acted in reliance thereon.  Had Plaintiffs and/or their agents known the truth, they

13  would have understood the true value of Peregrine securities and would not have entered into the

14  merger on such unfavorable terms, or at all.

15     285.   As a direct, foreseeable, and proximate result of this wrongful conduct

16  alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

17  prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

18  time of trial.

19                      **FOURTH CAUSE OF ACTION**

20          (Against the Auditor Defendants for Negligent Misrepresentation)

21     286.   Plaintiffs incorporate herein by reference the allegations contained in

22  paragraphs 1 - 285 as though fully set forth herein.

23     287.   The Auditor Defendants held themselves out as possessing superior

24  knowledge and expertise in the field of accounting and the preparation of audit reports.  The audit

25  reports that they issue are positive assertions of fact, intended to be regarded as affirmations of

26  the matters contained in them.

27     288.   The Auditor Defendants each contributed to the preparation of Andersen's

28  audit opinions with respect to each of Peregrine's annual financial statements and performed

324631.4                    - 115 -                    **EXHIBIT 24**

1   quarterly review work with respect to Peregrine's interim quarterly statements.  In addition,

2   Stulac worked closely with Peregrine to structure transactions for the purpose of revenue

3   recognition, even though such transactions did not result in revenue as it was then reported on the

4   financial statements.

5          289.   The Auditor Defendants issued unqualified audit opinions for Peregrine's

6   financial statements for both Fiscal Year 2000 and 2001, the years just preceding the Remedy

7   merger.  In both cases, the Auditor Defendants falsely reported that Peregrine financial statements

8   fairly presented Peregrine's financial position, that Peregrine's financial statements were prepared

9   in conformity with GAAP, and that Andersen had conducted its audits in conformity with GAAS.

10         290.   The Auditor Defendants were fully aware of Peregrine's business strategy

11   of acquiring other companies and its strategy to attract investors with false financial reports.  The

12   Auditor Defendants knew that a key part of Peregrine's business strategy was to use its stock as

13   currency to fund acquisitions.  The Auditor Defendants understood that the companies to be

14   acquired, including their executives, directors, shareholders, and representatives in the merger

15   discussions would review and rely upon the audit opinions and reports, and that the Auditor

16   Defendants' statements that the financial reporting complied with GAAP and GAAS would be

17   material to their evaluation of Peregrine's financial condition.  The Auditor Defendants knew that

18   Remedy, on behalf of itself and its shareholders, would retain a firm to analyze the fairness of a

19   merger and that that firm would rely upon Peregrine's financial statements and the audit reports

20   of them.

21         291.   In representing that Peregrine's financial statements were prepared in

22   accordance with GAAP, that those financial statements presented fairly the financial position of

23   the Company, and that Arthur Andersen had conducted its audit in accordance with GAAS, the

24   Auditor Defendants made material false statements without reasonable grounds for believing

25   them to be true.

26         292.   As set forth in paragraphs 237 - 238, plaintiffs justifiably relied upon these

27   false statements in exchanging their Remedy shares for shares of Peregrine, in some cases in

28   purchasing additional Peregrine stock after the merger, and in holding on to their Peregrine stock

414

FOURTH AMENDED COMPLAINT

1  until it became worthless. But for these false and misleading statements, plaintiffs would not

2  have taken these actions.

3        293.   As a direct, proximate and foreseeable result of the inaccurate

4  misrepresentations of the Auditor Defendants, plaintiffs have been damaged in an amount to be

5  proven at trial.

6              **FIFTH CAUSE OF ACTION**

7       (Against All Defendants For Violations of Cal. Corp. Code § 25504.1)

8        294.   Plaintiffs incorporate herein by reference the allegations contained in

9  paragraphs 1 - 293 as though fully set forth herein.

10        295.   California Corporations Code § 25504.1 imposes joint and several liability

11  for false or misleading statements (Cal. Corps. Code § 25401) on: "Any person who materially

12  assists . . . with intent to deceive or defraud . . ."

13        296.   For the reasons sets forth more specifically in the sections of the Complaint

14  regarding each individual defendant, all defendants in this action materially assisted in the

15  violations of Cal. Corps. Code § 25401 in numerous ways, including but not limited to:

16  conceiving of, implementing, and approving revenue recognition upon sell-in; publishing and

17  failing to correct the Company's financial statements knowing that the financial statements were

18  false and misleading; structuring and participating in bogus transactions for the purpose of

19  revenue recognition; participating in and permitting fraudulent accounting practices such as

20  treating loan funds as revenue; making and failing to correct press releases proclaiming record

21  and otherwise positive results for the Company knowing that the Company was in desperate

22  financial circumstances; failing to implement sound audit practices and procedures and internal

23  controls; and publishing and failing to correct false and misleading materials including the

24  Registration Statement and Prospectus for the Remedy merger.

25        297.   Defendants had actual knowledge at all times of the false and misleading

26  nature of the statements as set forth more fully in the sections of the Complaint referring to each

27  individual defendant. Moreover, as also set forth in those sections of the Complaint, each Officer

28  and Director Defendant intended to deceive and defraud potential investors and merger prospects,

415

FOURTH AMENDED COMPLAINT

1   including Remedy and its shareholders, for their own financial gain.  These individuals sought to

2   increase the value of their Peregrine shares or the value of the shares and/or the value of the

3   shares of those whose interests they represented.  In the case of the Auditor Defendants, they

4   sought lucrative professional relationships and engagements and the fees they generated.  In the

5   case of the Customer Defendants, they sought various benefits from assisting in Peregrine's fraud,

6   including an opportunity to perpetrate their own fraud, or the deep discounts and other

7   commercial favors they could gain by participating in phony and otherwise fraudulent

8   transactions.

9        298.    As a direct, foreseeable, and proximate result of this wrongful conduct

10   alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

11   prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

12   time of trial.

13                          **SIXTH CAUSE OF ACTION**

14                      (Against All Defendants For Common Law Conspiracy)

15        299.    Plaintiffs incorporate herein by reference the allegations contained in

16   paragraphs 1 - 298 as though fully set forth herein.

17        300.    Beginning in or about 1999, and continuing through in or about May 2002,

18   defendants knowingly and willfully conspired among themselves to commit financial statement

19   fraud by engaging in numerous acts to overstate Peregrine's revenue.  The facts setting forth the

20   fraud are detailed throughout the previous paragraphs of this Complaint.  The members of the

21   conspiracy developed, maintained, promoted, and executed a common plan, scheme, or design to

22   effect this conspiracy.  The purpose and effect of the conspiracy was, among other things, to

23   create and disseminate false statements about Peregrine's business and financial results,

24   condition, and prospects; to artificially inflate the price of Peregrine securities; to relatively

25   devalue the price of Remedy securities in the context of the merger; to make the terms of the

26   merger seem more attractive than it otherwise would have seemed; to deceive Plaintiffs and/or

27   their agents by means of such false statements; and to induce Plaintiffs to purchase or otherwise

28   acquire Peregrine securities at artificially inflated prices.

**416**

1    301.    As more specifically alleged above, defendants and each defendant

2    committed numerous and continuing wrongful acts in furtherance of the conspiracy, including but

3    not limited to secretly adding material contingencies, by oral and written side agreement, to what

4    appeared on their face to be binding contracts, removing receivables from Peregrine's balance

5    sheets by selling them to banks at the quarter's end to reduce its DSO figure and to make it appear

6    Peregrine's customers were promptly paying Peregrine, preparing and or certifying Peregrine's

7    false and fraudulent financial statements declaring that Peregrine had complied with GAAP

8    engaging in mutually beneficial but commercially empty sales agreements for the purpose of

9    revenue recognition; the specific acts of the specific defendants are set forth in detail in the

10   Section of the Complaint related to each of them.

11   302.    As more specifically alleged above, defendants also furthered the

12   conspiracy by cooperation with each other, and/or ratified the acts of each other by, among other

13   things, allowing the false statements  set forth in paragraphs 71 - 74 to stand, knowing that they

14   were false and knowing that they were being disseminated for the purpose of inflating Peregrine's

15   stock price.

16   303.    Plaintiffs suffered injury by negotiating and completing the merger, which

17   was effected by the purchase of Peregrine securities at artificially inflated prices and the sale of

18   Remedy securities at relatively depressed prices.

19   304.    Each defendant is liable for each act of every other member of the

20   conspiracy that is in furtherance of the object of the conspiracy.  Similarly, each Defendant is

21   bound by each declaration of every other member of the conspiracy that is in furtherance of the

22   object of the conspiracy.

23   305.    Each defendant is liable for the natural and probable consequences of each

24   wrongful act of every other member that furthered the object of the conspiracy, even though that

25   particular act was not intended as a part of the agreed upon objective and even though he was not

26   present at the time of the commission of that act.  The natural and probable consequences of the

27   conspiracy generally was the artificial inflation of the price of Peregrine securities, the relative

28

**417**
**EXHIBIT 24**

324631.4                           - 119 -

FOURTH AMENDED COMPLAINT

1   devaluation of Remedy securities, and the completion of the Merger at terms that did not reflect

2   the true value of Peregrine securities.

3            306.    Each Defendant was a direct, necessary, and substantial participant in the

4   conspiracy and common course of conduct complained of herein.

5            307.    As a direct, foreseeable, and proximate result of this wrongful conduct

6   alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

7   prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

8   time of trial.

9            308.    Defendants acted with oppression, fraud and/or malice, thereby entitling

10  Plaintiffs to punitive damages.

11                          **SEVENTH CAUSE OF ACTION**

12              (Against all Defendants for Common Law Aiding and Abetting)

13            309.    Plaintiffs incorporate herein by reference the allegations made in

14  paragraphs 1 - 308 as though fully set forth herein.

15            310.    Each defendant knew that Peregrine had a duty to issue and publish written

16  and oral statements regarding its financial status that were true and, with respect to the financial

17  statements, were prepared in accordance with GAAP.  Each of these defendant also knew that

18  Peregrine's press releases and financial statements would be communicated to potential investors

19  and acquisition prospects, such as Remedy and its shareholders, so that they could rely upon them

20  in evaluating the fairness of a merger transaction and the value of Peregrine stock and options.

21            311. .  Each defendant aided and abetted the commission of all preceding counts

22  by engaging in the acts which are described more particularly in the sections of the Complaint

23  relating to each individual defendant.  In brief, the Officer Defendants were involved in the

24  fraudulent transactions at the heart of the scheme, concocted, proposed, and carried out the

25  fraudulent revenue recognition scheme and prepared the false financial statements.  The Director

26  Defendants approved the revenue recognition scheme knowing it was improper and permitted

27  Peregrine to issue one false statement after another regarding its financial status without challenge

28  and without requiring correction, even though they were cognizant of the false statements those

418
EXHIBIT 24

1    public reports contained.  Further, they participated in issuing group publications on behalf of the

2    Company, and in many cases lent their imprimatur to them by signing them.  The Auditor

3    Defendants helped structure improper transactions, allowed financial statements to be issued

4    falsely proclaiming that they complied with GAAP, and issued unqualified audit opinions that

5    purportedly complied with GAAS, knowing that the books had been seriously cooked.  The

6    Customer Defendants engaged in phony transactions with Peregrine, knowing that Peregrine was

7    entering into the deals for the purpose of improper revenue recognition.  All of this conduct, as

8    well as the conduct alleged throughout this Complaint which chronicles the web of improper

9    activities, aided and abetted the fraud and allowed plaintiffs to be tricked into believing they were

10   giving up their stock in Remedy for valuable Peregrine stock, and in some cases purchasing

11   valuable Peregrine stock, when in fact it was all but worthless.  All Defendants knew Peregrine's

12   conduct constituted a breach of duty to Plaintiffs yet gave substantial assistance and/or

13   encouragement so to act.

14         312.    As a direct, foreseeable, and proximate result of this wrongful conduct

15   alleged herein, Plaintiffs suffered economic injury.  The amount of such damages and

16   prejudgment interest to which Plaintiffs are entitled shall be determined according to proof at the

17   time of trial.

18         313.    Defendants acted with oppression, fraud and/or malice, thereby entitling

19   Plaintiffs to punitive damages.

## PRAYER FOR RELIEF

21         WHEREFORE, Plaintiffs pray for judgment as follows:

22         1.     Awarding Plaintiffs compensatory damages according to proof;

23         2.     Awarding Plaintiffs rescission to the extent that they still hold their

24   Peregrine securities or rescissionary damages to the extent that they do not;

25         3.     Awarding Plaintiffs exemplary/punitive damages;

26         4.     Awarding Plaintiffs pre-judgment and post-judgment interest

27         5.     Awarding Plaintiffs reasonable costs, including expert witness fees and

28   other fees.

**419**

FOURTH AMENDED COMPLAINT

1        6.      Awarding such other relief as this Court may deem just and proper.

2   Dated: December 17, 2004          Respectfully submitted,

3                                     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

4

5                                     By: *Richard M. Heimann* jak

6                                          Richard M. Heimann

7                                     Richard M. Heimann
                                      James M. Finberg
8                                     Joy A. Kruse
                                      Karin A. Kramer
9                                     Scott P. Nealey
                                      Daniel E. Barenbaum

10                                    Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

324631.4                              - 122 -                          **420
                                                                       EXHIBIT 24**

FOURTH AMENDED COMPLAINT

1

## PLAINTIFFS DEMAND A TRIAL BY JURY

2

Plaintiffs hereby demand a trial by jury.

3

Dated: December *17*, 2004          Respectfully submitted,

4

5          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

6

By: *Richard M. Heimann* jak

7          Richard M. Heimann

8          Richard M. Heimann
          James M. Finberg
9          Joy A. Kruse
          Karin A. Kramer
10          Scott P. Nealey
          Daniel E. Barenbaum
11
          Attorneys for Plaintiffs
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**421**
**EXHIBIT 24**

324631.4                          - 123 -

JAN-21-05   10:07AM   FROM-Bergeson, LLP                   408-297-6000          T-236  P.002/013  F-318

1   DANIEL J. BERGESON, Bar No. 105439
    CAROLINE McINTYRE, Bar No. 159005
2   STEPHEN D. ROCKWELL, Bar No. 196976
    BERGESON, LLP
3   303 Almaden Boulevard, Suite 500
    San Jose, CA 95110-2712
4   Telephone: (408) 291-6200
    Facsimile: (408) 297-6000

5

6   Attorneys for Defendant
    STEPHEN P. GARDNER

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN DIEGO

10

11   RICHARD P. ALLOCCO, et al.,          Case No.  GIC 806450

12               Plaintiffs,          ANSWER OF DEFENDANT
                                       STEPHEN P. GARDNER TO PLAINTIFFS'
13   v,                                FOURTH AMENDED COMPLAINT

14
                                       Judge:      Honorable Jeffrey B. Barton
15   STEPHEN P. GARDNER, et al.

16               Defendants.          Action Filed:  March 3, 2003
                                      Trial Date:    May 5, 2006
17

18

19

20

21

22

23

24

25

26

27

28

---

1    Defendant Stephen P. Gardner ("Gardner") answers Plaintiffs Richard P. Allocco et al.'s

2    ("Plaintiffs") Fourth Amended Complaint ("FAC") as follows:

### GENERAL DENIAL

4    Pursuant to California Code of Civil Procedure § 431.30(d), Gardner generally denies each and

5    every allegation contained in Plaintiffs' FAC, and each and every purported cause of action alleged

6    therein, and further denies that Plaintiffs have suffered any damages by reason of any act, omission, or

7    conduct on the part of Gardner, and further denies that Plaintiffs have been damaged whatsoever, and

8    denies that Plaintiffs are entitled to the relief sought in the FAC, or to any relief at all.

9    By submitting this general denial and the following affirmative defenses, Gardner is not waiving

10   his privilege against self-incrimination granted by the Fifth Amendment to the U.S. Constitution, Article I,

11   Section 15 of the California Constitution, and/or California Evidence Code Section 940.  Gardner's

12   privilege against self-incrimination is implicated by the fact that this civil action parallels an ongoing

13   federal criminal investigation into matters related to the restatement of Peregrine Systems, Inc.'s financial

14   statements.

15   Gardner also reserves his right to seek a stay of this civil action, a stay of any discovery in this

16   civil action, and/or refuse to provide documents and/or written or oral testimony in this civil action

17   (including, but not limited to, document requests, interrogatories, deposition and trial testimony, or

18   requests for admission), on the grounds that such might be incriminating or lead to incriminating

19   evidence.

### GARDNER'S AFFIRMATIVE DEFENSES

21   As separate and affirmative defenses to the FAC, Gardner also asserts the following affirmative

22   defenses, without assuming the burden of proof for such where the burden is not, by law, upon him, and

23   also without waiving or intending to waive his privilege against self-incrimination.

### FIRST AFFIRMATIVE DEFENSE
(Failure to State Cause of Action)

1.    The FAC, and each and every alleged cause of action in the FAC, fails to allege facts

sufficient to state a cause of action against Gardner.

423
**EXHIBIT 25**

## SECOND AFFIRMATIVE DEFENSE
### (Waiver)

2.      The FAC, and each and every alleged cause of action in the FAC, is barred by Plaintiffs' own conduct, actions and inactions, which constitute a waiver of any right Plaintiffs may have had with regard to the matters alleged in the FAC.

## THIRD AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

3.      If Plaintiffs have sustained, or will sustain, any of the injuries, losses or damages described in their FAC, which Gardner denies, then such injuries, losses or damages were caused solely or in part by the failure of Plaintiffs to take reasonable steps available to them to mitigate, alter, or lessen such losses, and to the extent that any such losses proven by Plaintiffs were caused by Plaintiffs' own failure to take reasonable steps available to them to mitigate such losses, they shall not be recoverable against Gardner.

## FOURTH AFFIRMATIVE DEFENSE
### (Estoppel)

4.      The FAC, and each and every alleged cause of action in the FAC, is barred by the doctrine of estoppel, by reason of Plaintiffs' own acts, omissions, representations, course of action, or those of their agents, employees or representatives, upon which Gardner relied to his detriment.

## FIFTH AFFIRMATIVE DEFENSE
### (Laches)

5.      The FAC, and each and every alleged cause of action in the FAC, is barred by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

6.      The FAC, and each and every alleged cause of action in the FAC, is barred by the doctrine of unclean hands, in that Plaintiffs have been guilty of inequitable conduct with respect to the matters alleged in the FAC, and such inequitable conduct shall absolutely bar Plaintiffs' recovery herein.

ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

424

**EXHIBIT 25**

**SEVENTH AFFIRMATIVE DEFENSE**
(No Duty)

7.    The FAC, and each and every alleged cause of action in the FAC, is barred because Gardner owed no legal duty, imposed by statute, contract, or otherwise, to Plaintiffs.

**EIGHTH AFFIRMATIVE DEFENSE**
(Corporations Code Section 25504)

8.    Gardner is not liable to Plaintiffs because he had no knowledge of or reasonable grounds to believe in the existence of facts by reason of which his liability to Plaintiffs is alleged to exist.

**NINTH AFFIRMATIVE DEFENSE**
(Consent)

9.    The FAC, and each and every alleged cause of action in the FAC, is barred because Plaintiffs authorized, consented to, ratified and/or had knowledge of the acts of Gardner as alleged in the FAC, and, therefore, Plaintiffs may not complain thereof.

**TENTH AFFIRMATIVE DEFENSE**
(Comparative Fault)

10.    Plaintiffs were careless and negligent in and about the matters alleged in the FAC, said carelessness and said negligence on Plaintiffs' own part proximately contributed to the happening of the incidents, injuries, losses and damages complained of, if there were any, and said negligence on the part of Plaintiffs shall diminish their recovery herein, if any, in direct proportion to the extent of such negligence.

**ELEVENTH AFFIRMATIVE DEFENSE**
(No Reliance)

11.    The FAC, and each and every alleged cause of action in the FAC, is barred because Plaintiffs did not actually or justifiably rely on any of Gardner's alleged conduct or statements.

**TWELFTH AFFIRMATIVE DEFENSE**
(Justification)

12.    The FAC, and each and every alleged cause of action in the FAC, is barred because Gardner was justified in doing any and/or all of the acts alleged in the FAC. .

- 3 -
ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

13.    Each and every cause of action in the FAC is barred by applicable statutes of limitation, including, without limitation, Code of Civil Procedure Sections 337 and 338.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Privilege)

14.    Each and every cause of action in the FAC is barred because Gardner was privileged in doing all of the acts alleged in the FAC.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Lack of Knowledge)

15.    Plaintiffs are not entitled to any relief as against Gardner because Gardner had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which Gardner's liability is alleged to exist in the FAC.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

16.    Each and every cause of action in the FAC is barred because Plaintiffs would be unjustly enriched if they were granted any damages as against Gardner.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Prevention or Excuse)

17.    The FAC, and each and every cause of action in the FAC, is barred, in whole or in part, because the performance of Gardner's duties, if any, were excused or prevented.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Setoff)

18.    The FAC, and each and every alleged cause of action in the FAC, is barred, in whole or in part, because Plaintiffs' damages, if any, are subject to setoff.

//

//

//

- 4 -

426
EXHIBIT 25

### NINETEENTH AFFIRMATIVE DEFENSE
#### (Superseding Act)

19.    To the extent Plaintiffs have incurred, suffered, or sustained any damages, which Gardner denies, any act, conduct, or omission, if any, on the part of Gardner, was neither a substantial factor in bringing about, nor a contributing cause, in law or in fact, of such damages.  Instead, any act, conduct, or omission, if any, on the part of Gardner was superseded by the acts, conduct, or omissions of Plaintiffs or persons or entities other than Gardner, which were the independent, intervening, and proximate cause of any damages incurred, suffered, or sustained by Plaintiffs, if any.

### TWENTIETH AFFIRMATIVE DEFENSE
#### (No Punitive or Exemplary Damages)

20.    The FAC fails to set forth facts sufficient to state a claim for punitive or exemplary damages as against Gardner.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
#### (Good Faith)

21.    Gardner acted reasonably and in good faith at all times material herein, based on all relevant facts and circumstances known by Gardner at the time he so acted.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
#### (No Attorneys' Fees)

22.    To the extent, if any, that Plaintiffs seek attorneys' fees in their FAC, the FAC fails to allege facts sufficient to allow recovery of attorneys' fees against Gardner.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
#### (No Damages)

23.    Plaintiffs have not suffered any damages as a result of any actions taken by Gardner, and Plaintiffs are, therefore, barred from asserting any cause of action against Gardner, or, if any damages were suffered, they were not as extensive as alleged by Plaintiffs.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
#### (Not Responsible for Others' Actions)

24.    Gardner is not legally responsible for the actions or inactions of Peregrine Systems, Inc, or any of the other alleged defendants in this action, including DOES 4-100.

- 5 -

ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

### TWENTY-FIFTH AFFIRMATIVE DEFENSE
#### (Assumption of Risk)

25.    Plaintiffs assumed the risk that the price of Peregrine stock could decline, and, therefore, they are barred from recovery against Gardner.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE
#### (Pleading Uncertain)

26.    The FAC, and each and every purported cause of action therein, is uncertain in that it, *inter alia*, fails to state with reasonable particularity:  (1) the alleged wrongful acts or omissions on the part of Gardner; or (2) facts sufficient to allege damage or injury to Plaintiffs.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE
#### (Authorization)

27.    The FAC, and each and every purported cause of action therein, is barred because the conduct complained of was authorized by, among other things, Peregrine Systems, Inc.'s Certificate of Incorporation, its Bylaws and/or applicable law.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE
#### (Business Judgment Rule)

28.    The FAC, and each and every purported cause of action therein, is barred, in whole or in part, under the business judgment rule.

### TWENTY-NINTH AFFIRMATIVE DEFENSE
#### (Officer/Director Liability Limitations)

29.    The FAC, and each and every purported cause of action therein, is barred or limited by Delaware Corporations Code § 102(b)(7) (inclusion of exculpatory language of statute in certificate of incorporation sufficient to shield directors from monetary liability arising out of all "duty of care" claims) and its proper invocation in Peregrine's certificate of incorporation.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE
#### (Discovery and Investigation Are Incomplete)

30.    Gardner has not yet completed his investigation and discovery of all the facts and circumstances regarding the subject matter of Plaintiffs' FAC, and, accordingly, reserves his right to

- 6 -

428
**EXHIBIT 25**

JAN-21-05   10:09AM   FROM-Bergeson, LLP                    408-297-6000          T-236  P.009/013  F-318

1   amend, modify and plead such further defenses, and take such other actions as necessary and proper for

2   his defense, upon completion of his investigation and study.

3       WHEREFORE, Gardner prays for judgment against Plaintiffs as follows:

4       A.    That Plaintiffs take nothing by their FAC herein, and that the same be dismissed with

5   prejudice;

6       B.    That Gardner recover his costs of suit incurred herein, together with his reasonable

7   attorneys' fees and expenses; and

8       C.    That Gardner be awarded such other and further relief as the Court deems just and proper.

9   Dated: January 21, 2005        BERGESON, LLP

10

11                       By: _Caroline McIntyre_

12                             Caroline McIntyre

13                       Attorneys for Defendant
                         STEPHEN P. GARDNER

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -

ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

429
EXHIBIT 25

JAN-21-05   10:13AM   FROM-Bergeson, LLP                    408-297-6000        T-237  P.010/013  F-318

<div align="center">

## PROOF OF SERVICE

</div>

1

2      I, Sheila Yarbro, declare as follows:

3      I am an employee in Santa Clara County, the county in which the service described below occurs.

4 My business address is 303 Almaden Boulevard, Suite 500, San Jose, California 95110. I am over the age

5 of eighteen (18) years and am not a party to the cause for which I am serving the document named below.

6      On January 21, 2005, I served the within: **ANSWER OF DEFENDANT STEPHEN P.**

7 **GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT** on the parties below by placing

8 a true copy thereof in a sealed envelope and served same as follows:

9 <u>X</u>     BY MAIL: I caused such envelope to be deposited in the mail at San Jose,
California. I am readily familiar with Bergeson, LLP's practice for collection and

10         processing of correspondence for mailing with the United States Postal Service. In
the ordinary course of business, correspondence would be deposited with the United

11         States Postal Service on this day. C.C.P. Section 1013(a).

12 <u>X</u>     BY FACSIMILE: I caused said documents to be sent via facsimile to the interested
party at the following facsimile listed below. C.C.P. Section 1013.

13

14 <div align="center">**SEE ATTACHED SERVICE LIST**</div>

15      I declare under penalty of perjury that the foregoing is true and correct, and that this declaration

16 was executed on January 21, 2005, at San Jose, California.

17

18                _Sheila Yarbro_
               Sheila Yarbro

19

20

21

22

23

24

25

26

27

28

<div align="center">

- 8 -

ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

</div>

<div align="right">

430
**EXHIBIT 25**

</div>

*Allocco et al. v. Stephen P. Gardner, et al.,*

San Diego Superior Court – Case No. GIC 806450

**Attorney for Plaintiffs**

James M. Finberg, Esq.
**Lieff, Cabraser, Heimann & Bernstein, LLP**
275 Battery Street, 30th Floor
Embarcadero Center West
San Francisco, CA 94111-3339
Telephone:   415.956.1000
Facsimile:   415.956.1008

**Counsel for Arthur Andersen**

Marshall B. Grossman, Esq.
C. Stephen Howard, Esq.
Gwyn Quillen, Esq.
Timothy Scott Vick, Esq.
**Alschuler, Grossman, Stein & Kahan LLP**
The Water Garden
1620 26th Street, Fourth Floor
North Tower
Santa Monica, CA 90404-4060
Telephone: 310.907-1000
Facsimile: 310.907-2000

Douglas M. Butz, Esq.
Kevin DeSantis, Esq.
**Butz, Dunn, Desantis & Bingham**
101 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: 619.233.4777
Facsimile: 619.231.0341

**Counsel for Daniel Stulac**

Michael A. Attanasio, Esq.
Chaise Bivin, Esq.
Aaron P. Arnzen, Esq.
**Cooley Godward, LLP**
4401 Eastgate Mall
San Diego, CA 92121
Telephone: 858.550.6000
Facsimile: 858.550.6420

**Counsel for Matthew Gless**

Thomas L. Vance, Esq.
**Vance, Blair and Grady**
1202 Camino del Mar
Del Mar, CA 92014
Telephone:   858.793.0040
Facsimile:    858.793.1655

**Counsel for William Savoy**

Cyrus R. Vance, Jr., Esq.
**Morvillo Abramowitz Grand Iason & Silberberg, PC**
565 Fifth Avenue
New York, New York 10017
Telephone:   212.856.9600
Facsimile:    212.856.9494

Robert D. Stewart, Esq.
**McNaul Ebel Nawrot & Helgren PLLC**
600 University Street, Suite 2700
Seattle, Washington 98101-3143
Telephone:   206.467.1816
Facsimile:    206.624.5128

George J. Berger, Esq.
Kathryn D. Horning, Esq.
**Allen Matkins Leck Gamble & Mallory LLP**
501 West Broadway, Suite 900
San Diego, CA 92101
Telephone:   619.233.1155
Facsimile:   619.233.1158

**Counsel for Thomas Watrous**

Wayne T. Lamprey, Esq.
Anne Hartman, Esq.
**Goodin, MacBride, Squeri, Ritchie & Day, LLP**
505 Sansome Street, Suite 900
San Francisco, CA 94111
Telephone: 415.392.7900
Facsimile:   415.398.4321

- 9 -

431
EXHIBIT 25

1

2    *Counsel for John J. Moores*                          *Counsel for Charles E. Noell, III*

3    Harry A. Olivar, Jr., Esq.                            Jane Hahn, Esq.
     John B. Quinn, Esq.                                   **Hahn & Adema**
4    Sarah J. Cole, Esq.                                   501 West Broadway, Suite 1730
     **Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP**    San Diego, CA 92101
5    865 Figueroa Street, 10th Floor                       Telephone: 619.255.2100
     Los Angeles, CA 90017-2543                            Facsimile:  619.255.2101
6    Telephone: 213.624.7707
     Facsimile:  213.624.0643
7                                                          Brian Pastuszenski, Esq.
                                                           Christine Chung, Esq.
8                                                          Meghan M. Hart, Esq.
                                                           **Testa, Hurwitz & Thibeault**
9                                                          125 High Street
                                                           Boston, Massachusetts 02110
10                                                         Telephone: 617.248.7000
                                                           Facsimile:  617.248.7100
11
     *Counsel for BearingPoint, Inc.*                      *Counsel for KPMG LLP*
12   *(formerly known as KPMG Consulting, Inc.)*

13   Jennifer L. Spaziano, Esq.                            Michael C. Kelley, Esq.
     **Skadden, Arps, Slate, Meagher & Flom LLP**          Bradley H. Ellis, Esq.
14   1440 New York Avenue, N.W.                            Garrett K. Craig, Esq.
     Washington, D. C. 20005                               **Sidley Austin Brown & Wood LLP**
15   Telephone: 202.371.7000                               555 West Fifth Street, Suite 4000
     Facsimile:  202.393.5760                              Los Angeles, CA 90013-1010
16                                                         Telephone: 213.896.6000
                                                           Facsimile:  213.896.6600
17   James E. Lyons, Esq.
     **Skadden, Arps, Slate, Meagher & Flom LLP**
18   Four Embarcadero Center
     San Francisco, CA 94111
19   Telephone:  415.984.6400
     Facsimile:   415.984.2698
20

21   *Counsel for Ernest & Young Revisions*                *Counsel for Critical Path*
     *(counsel specially appearing)*                       Thomas V. Loran, III Esq.
22                                                         **Pillsbury Winthrop LLP**
     A. Michael Nalu, Esq.                                 50 Fremont Street
23   **Higgs Fletcher & Mack LLP**                         Mailing Address:  P. O. Box 7880
     401 W A Street, Suite 2600                            San Francisco, CA 94105-2228
24   San Diego, CA 92101                                   Telephone:    415.983.2000
     Telephone: 619.236.1551                               Facsimile:     415.983.1200
25   Facsimile:  619.696.1410

26

27

28

<div align="center">

- 10 -

ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

432

**EXHIBIT 25**

</div>

JAN-21-05   10:14AM   FROM-Bergeson, LLP                  408-297-6000        T-237   P.013/013   F-318

1  *Counsel for BindView Development Corporation*

2  Robert E. Darby, Esq.
   Norman D. Finch, Jr., Esq.
3  Gerard G. Pecht, Esq. *pro hac vice*
   **Fulbright & Jaworski L.L.P.**
4  865 S. Figueroa Street, 29th Street
   Los Angeles, CA 90017
5  Telephone:   213.892.9200
   Facsimile:   213.670.4518
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Counsel for Richard T. Nelson*

Christian D. Humphreys, Esq.
Robert S. Brewer, Jr., Esq.
Jim McNeill, Esq.
**McKenna Long & Aldridge, LLP**
750 B Street, Suite 3300
San Diego, CA 92101
Telephone:   619.595.5407
Facsimile:   619.595.5450

ANSWER OF DEFENDANT STEPHEN P. GARDNER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
Case No. GIC 806212

433

**EXHIBIT 25**

JAMES E. LYONS (Bar No. 112582)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 984-6400
Facsimile: (415) 984-2698

JENNIFER L. SPAZIANO (Bar No. 180225)
GARY DIBIANCO (admitted pro hac vice)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendant
BEARINGPOINT, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| RICHARD P. ALLOCCO, et al., | Case No. GIC 806450 |
| Plaintiffs, | NOTICE OF DEMURRER AND DEMURRER OF BEARINGPOINT, INC. TO PLAINTIFFS' FOURTH AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| v. | |
| STEPHEN P. GARDNER, et al., | |
| Defendants. | Date:  March 24, 2005 |
| | Time:  3:00 p.m. |
| | Dept:  69 |
| | |
| | Judge:  Hon. Jeffrey B. Barton |
| | |
| | Complaint Filed:  March 3, 2003 |
| | Trial Date:  None Set |

---

DEMURRER OF BEARINGPOINT, INC. TO PLAINTIFFS' FOURTH AMENDED COMPLAINT

434
**EXHIBIT 26**

1  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2  PLEASE TAKE NOTICE AND NOTICE IS HEREBY GIVEN that on March 24, 2005 at

3  3:00 p.m., or as soon thereafter as counsel may be heard, in Department 69 of the San Diego

4  County Superior Court located at 330 West Broadway, San Diego, California 92101, BearingPoint,

5  Inc. will and hereby does demur, pursuant to Civil Procedure Code §§ 430.10(a) and (e), to the

6  Second, Fifth, Seventh and Eighth causes of action asserted in Plaintiffs' Fourth Amended

7  Complaint. The Demurrer will be based on this Notice, the attached Demurrer, the accompanying

8  Memorandum of Points and Authorities, the pleadings and papers on file in this action, the

9  argument of counsel, and all other matters that may be presented on or before the hearing.

10  DATED: January 21, 2005          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

11

12                                  By: *Jennifer L. Spaziano*
13                                       Jennifer L. Spaziano
                                         Attorneys for BearingPoint, Inc.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

DEMURRER OF BEARINGPOINT, INC. TO PLAINTIFFS' FOURTH AMENDED COMPLAINT
ii

435
EXHIBIT 26

1   BearingPoint, Inc. ("BearingPoint") hereby generally and specially demurs to Plaintiffs'

2   Fourth Amended Complaint as follows:

3

4   **Demurrer to Plaintiffs' Second Cause of Action for Fraud**

5       1.      BearingPoint demurs generally to Plaintiffs' second cause of action on the ground

6   that it does not state facts sufficient to constitute a cause of action against BearingPoint.

7       2.      BearingPoint demurs generally and specially to Plaintiffs' second cause of action on

8   the ground that it is preempted by the Securities Litigation Uniform Standards Act ("SLUSA") and

9   this Court therefore lacks jurisdiction over the subject matter of Plaintiffs' claim.

10

11   **Demurrer to Plaintiffs' Fifth Cause of Action for Violation of the Cal. Corp. Code**

12      1.      BearingPoint demurs generally to Plaintiffs' fifth cause of action on the ground that

13   it does not state facts sufficient to constitute a cause of action against BearingPoint.

14      2.      BearingPoint demurs generally and specially to Plaintiffs' fifth cause of action on

15   the ground that it is preempted by SLUSA and this Court therefore lacks jurisdiction over the

16   subject matter of Plaintiffs' claim.

17

18   **Demurrer to Plaintiffs' Seventh Cause of Action for Conspiracy**

19      1.      BearingPoint demurs generally to Plaintiffs' seventh cause of action on the ground

20   that it does not state facts sufficient to constitute a cause of action against BearingPoint.

21      2.      BearingPoint demurs generally and specially to Plaintiffs' seventh cause of action on

22   the ground that it is preempted by SLUSA and this Court therefore lacks jurisdiction over the

23   subject matter of Plaintiffs' claim.

24

25

26

27

28

436
**EXHIBIT 26**

1   **Demurrer to Plaintiffs' Eighth Cause of Action for Aiding and Abetting**

2      1.      BearingPoint demurs generally to Plaintiffs' eighth cause of action on the ground

3   that it does not state facts sufficient to constitute a cause of action against BearingPoint.

4      2.      BearingPoint demurs generally and specially to Plaintiffs' eighth cause of action on

5   the ground that it is preempted by SLUSA and this Court therefore lacks jurisdiction over the

6   subject matter of Plaintiffs' claim.

7

8   DATED:  January 21, 2005            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

9

10                                      By: *Jennifer L. Spaziano*
11                                          Jennifer L. Spaziano
                                            Attorneys for BearingPoint, Inc.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... vi

INTRODUCTION ..........................................................................................................1

PERTINENT FACTS .....................................................................................................2

ARGUMENT .................................................................................................................5

I.    The Complaint Does Not Satisfy The Heightened Pleading Requirements Applicable To Plaintiffs' Fraud-Based Claims ....................................................5

II.   Plaintiffs Do Not Allege The Required Elements Of Their Causes of Action Against BearingPoint ..............................................................................................7

     A.    The Complaint Does Not State A Cause Of Action Against BearingPoint For Fraud..............................................................................................................7

          1.    The Complaint Does Not Allege That BearingPoint Made Any Statement To Plaintiffs ...........................................................................8

          2.    The Complaint Does Not Allege That Any Conduct Attributed To BearingPoint Was Material To Their Decision To Acquire Peregrine Stock .......................................................................................9

          3.    The Complaint Does Not Allege BearingPoint's Knowledge Of Falsity.........................................................................................................10

          4.    The Complaint Does Not Allege That BearingPoint Acted With An Intent To Deceive.........................................................................................11

          5.    The Complaint Does Not Allege That Plaintiffs Relied On Any Statements Made By BearingPoint Or That Plaintiffs Suffered Damages As A Result Of BearingPoint's Alleged Conduct .....................11

     B.    The Complaint Fails To Assert A Cause Of Action Against BearingPoint For Violation Of The California Corporations Code..............................................12

     C.    The Complaint Fails To State A Claim For Conspiracy Or Aiding And Abetting.........................................................................................................14

CONCLUSION..............................................................................................................15

---

1

## TABLE OF AUTHORITIES

2

### CASES

3   *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503 (1994) ...............................14

4   *Baldwin v. Marina City Properties, Inc.*, 79 Cal. App. 3d 393 (1978)...........................................5

5   *Chavers v. Gatke Corp.*, 107 Cal. App. 4th 606 (2003) ...............................................................15

6   *Committee On Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197 (1983).......5, 6

7   *Crystal Pier Amusement Co. v. Cannan*, 219 Cal. 184 (1933) ......................................................8

8   *Gentry v. Ebay*, 99 Cal. App. 4th 816 (2002) ............................................................................11

9   *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ................................................10

10  *Goodman v. Kennedy*, 18 Cal. 3d 335 (1976).............................................................................12

11  *Insurance Underwriters Clearing House, Inc. v. Natomas Co.*, 184 Cal. App. 3d 1520
        (1986).....................................................................................................................................10

12

13  *Kainos Labs., Inc. v. Beacon Diagnostics, Inc.*, Case No. C-97-4618, 1998 U.S. Dist.
        LEXIS 23473 (N.D. Cal. Sept. 14, 1998) .......................................................................5, 6

14  *LaVista Cemetery Association v. American Savings & Loan Association*, 12 Cal. App. 3d
        365 (1970)................................................................................................................................6

15

16  *Mirkin v. Wasserman*, 5 Cal. 4th 1082 (1993).....................................................................11, 12

17  *Parnes v. Gateway 2000*, 122 F.3d 539 (8th Cir. 1997) ...............................................................9

18  *Quan v. Truck Insurance Exch.*, 67 Cal. App. 4th 583 (1998) ......................................................2

19  *Saunders v. Superior Court*, 27 Cal. App. 4th 832 (1994) .........................................................15

20  *Schick v. Lerner*, 193 Cal. App. 3d 1321 (1987) ......................................................................14

21  *Service By Medallion v. Clorox Co.*, 44 Cal. App. 4th 1807 (1996) ..............................................9

22  *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167 (2003) ................................................................6, 11

23  *Tarmann v. State Farm Mutual Automobile Insurance Co.*, 2 Cal. App. 4th 153 (1991) ..............6

24  *In re U.S. Grant Hotel Associates, Ltd. Security Litigation*, 740 F. Supp. 1460 (S.D. Cal.
        1990) .......................................................................................................................................6

25  *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal. App. 3d 1324 (1986)....................... *passim*

26  *Wood v. Elling Corp.*, 20 Cal. 3d 353 (1977) ............................................................................11

27

28

1   *In re ZZZZ Best Security Litigation,* Case No. CV 87-3574-RSWL, 1989 U.S. Dist. LEXIS
2       8083 (C.D. Cal. May 25, 1989) ...................................................................................13

    *In re ZZZZ Best Security Litigation,* Case No. CV 87-3574 RSWL, 1990 U.S. Dist. LEXIS
3       11867 (C.D. Cal. July 23, 1990) ................................................................................14

4                                            **STATUTES**

5   Corp. Code § 25401 ...............................................................................................................12

6   Corp. Code § 25504.1 ......................................................................................................12, 13

7                                         **MISCELLANEOUS**

8   Restatement (Second) of Torts 533...........................................................................................8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

440
**EXHIBIT 26**

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On November 23, 2004, this Court sustained BearingPoint's demurrer to Plaintiffs' Third Amended Complaint, finding that Plaintiffs had failed to state a claim against any of the Peregrine customer defendants. Although Plaintiffs have added some additional detail to their complaint, including allegations regarding the guilty plea of former BearingPoint managing director Larry Rodda and an allegation that KPMG LLP knew of one Peregrine merger (but not of the Remedy merger), the defects that rendered Plaintiffs' Third Amended Complaint insufficient permeate Plaintiffs' Fourth Amended Complaint as well. Specifically, the Fourth Amended Complaint (the "Complaint"), like its predecessors, does not contain a single allegation that BearingPoint made any statement to Plaintiffs, that BearingPoint knew of Remedy's existence, that BearingPoint was involved with or had any knowledge of Peregrine's representations and dealings with Plaintiffs during its acquisition of Remedy, or that the Plaintiffs were aware of, much less relied upon, the alleged transactions between BearingPoint and Peregrine when they acquired Peregrine stock. Rather, all that the Complaint alleges – still – is that BearingPoint, among many others, entered into a handful of transactions with Peregrine, many of which occurred long before Plaintiffs acquired Peregrine stock, and that *Peregrine* mischaracterized those transactions to inflate its revenue (and its stock price) to induce Plaintiffs to sell Remedy and accept Peregrine stock.

As discussed in detail below, the claims asserted against BearingPoint cannot survive scrutiny under applicable pleading principles. All four causes of action asserted against BearingPoint fail because Plaintiffs do not plead with the required particularity facts to support their conclusory allegation that BearingPoint knowingly engaged in fraudulent conduct. Plaintiffs' claims fail for the additional reason that even the most basic elements of their causes of action (all of which must be satisfied) are not alleged: the Complaint does not allege (i) that BearingPoint made *any* representations to Plaintiffs much less specify, as it must, the time and place of these representations; (ii) that any conduct attributed to BearingPoint was material to Plaintiffs' decision to acquire Peregrine stock or that Plaintiffs relied on any such conduct in reaching that decision; (iii) BearingPoint's knowledge of Peregrine's purported scheme to defraud Plaintiffs; or (iv) facts to

---

1  support the assertion that BearingPoint materially or substantially assisted Peregrine's purported

2  fraud.

3      For all these reasons, BearingPoint's demurrer should be sustained.[1]

4  ## PERTINENT FACTS[2]

5      BearingPoint is a worldwide leader in business consulting and systems integration serving

6  over 2,100 clients in more than 20 countries.  It provides business and technology strategy, systems

7  design and architecture, network and systems integration, and related services that enable its clients

8  to leverage technology for stronger return on investments.  Formerly known as KPMG Consulting,

9  Inc., BearingPoint separated from KPMG LLP in 2000 and completed its initial public offering on

10  February 8, 2001.  (*See* Compl. ¶ 46.)

11      Plaintiffs are "a group of former shareholders of Remedy Corporation who exchanged their

12  Remedy stock and options for cash and Peregrine securities when Peregrine acquired Remedy."

13  (*Id.* ¶ 1.)  According to the Complaint, in approving the Peregrine/Remedy merger, Remedy's

14  Board of Directors considered factors such as historical information concerning Peregrine's and

15  Remedy's respective businesses, prospects, financial performance and condition; the market value

16  of Peregrine common stock and various factors that might affect that value in the future; and

17  detailed financial analysis and pro forma and other information presented to the board.  (*Id.* ¶ 63.)

18  Plaintiffs now contend that the "historical and financial information" provided by Peregrine "was

19  rife with false and misleading statements that vastly inflated Peregrine's revenue and the value of

20  its stock."  (*Id.*)  In reliance on these representations, in or about August 2001, Plaintiffs agreed to

21  exchange their Remedy securities for Peregrine securities.  (*See id.* ¶ 273.)

22

---

23  [1]   The demurrer should be sustained for the additional reason that Plaintiffs' state law causes
24  of action are preempted by the Securities Litigation Uniform Standards Act.  Since the Court
    addressed this issue in its ruling on KPMG LLP's demurrer to Plaintiffs' Third Amended
25  Complaint, BearingPoint will not repeat such argument here.

26  [2]   On demurrer, the Court is required to accept as true only the well-pleaded allegations of the
    Complaint.  The Court is not required to accept the truth of Plaintiffs' contentions, deductions, or
27  conclusions of fact or law.  *Quan v. Truck Ins. Exch.*, 67 Cal. App. 4th 583, 589 (1998).

28

1    Plaintiffs do not allege that BearingPoint had knowledge of Peregrine's negotiations with
2    Remedy or of the statements made by Peregrine to Remedy and its shareholders.  They do not
3    allege that BearingPoint participated in the review, drafting, preparation, or filing of Peregrine's
4    allegedly fraudulent financial statements or any other purportedly fraudulent statement made by
5    Peregrine to Remedy.  They do not even allege that Peregrine mentioned BearingPoint by name
6    either during its negotiations with Remedy or in the financial information that they reviewed.

7    The allegations relating to BearingPoint pertain to Peregrine's decision to recognize revenue
8    from contingent software sales that it entered into with BearingPoint. (Compl. ¶¶ 179-180.)  These
9    transactions are described generally in Paragraph 181 as follows:

| | |
|---|---|
| March 31, 1999 | No identified end-user |
| December 31, 1999 | Sodhexo Marriott – partial payment |
| March 30, 2000 | HHS |
| June 30, 2000 | Citigroup – no payment |
| December 20, 2000 | Honeywell – no payment |
| December 22, 2000 | Boeing – no payment |
| December 27, 2000 | Honeywell – no payment |
| June 29, 2001 | JP Morgan – no payment |

15    The Complaint itself alleges that one of the contracts resulted in a payment by BearingPoint to
16    Peregrine of $4.3 million. (*Id.* ¶ 179.)  It also alleges that BearingPoint agreed to these transactions
17    to "receive[] the service portion of certain contracts which were worth hundreds of thousands of
18    dollars." (*Id.* ¶ 180.)  In so alleging, the Complaint contradicts itself as these specific allegations
19    regarding BearingPoint's valid business purpose in entering into the purported transactions cannot
20    be reconciled with the Complaint's more generalized and unsubstantiated allegations that
21    BearingPoint entered into these transactions with an "intent to deceive" the Plaintiffs.  These
22    allegations are substantively identical to those set forth in Plaintiffs' Third Amended Complaint,
23    which this Court found insufficient to state a claim against BearingPoint.[3]

24

25    [3]    The only change to these allegations is Plaintiffs' amendment of the word "the" to "certain"
      when describing the contracts with respect to which BearingPoint purportedly expected to receive
26    the service portion. (*Compare* Third Amended Complaint ¶ 179 *with* Complaint ¶ 180.)  This
      change, however, does not defeat the import of the allegation:  Plaintiffs allege a motive unrelated
27    to an intent to deceive for BearingPoint entering into the contracts at issue.

28

1    The new allegations in the Complaint do not cure the deficiencies in Plaintiffs' claims.

2  First, Plaintiffs have added allegations regarding the guilty plea entered by former BearingPoint

3  managing director Larry Rodda.  (*See* Compl. ¶¶ 184-192.)  Quoting directly from Mr. Rodda's

4  guilty plea, Plaintiffs allege that Mr. Rodda (i) entered into contingent transactions with Peregrine

5  (*id.* ¶¶ 187, 189-191); (ii) signed an audit confirmation letter in which he advised Peregrine's

6  auditors that a December 1999 contract had "no exceptions" (*id.* ¶ 188); and (iii) knew that

7  Peregrine was a publicly traded company that declared its financial results in public statements (*id.*

8  ¶ 192).  These allegations are substantively identical to the allegations of Plaintiffs' Third Amended

9  Complaint.  (*See* Third Amended Complaint ¶¶ 180, 182, 183.)[4]  Because these allegations, when

10  *assumed* to be true, were insufficient to state a claim against BearingPoint, as this Court held when

11  it sustained BearingPoint's demurrer to the Third Amended Complaint, these same facts are

12  insufficient to state a cause of action notwithstanding Mr. Rodda's *admission* of their truth.

13    Second, Plaintiffs have added allegations presumably designed to address the Court's

14  concern that the Third Amended Complaint failed to allege the customer defendants' knowledge of

15  Peregrine's potential merger with Remedy.  (*See* 11/24/2004 Order at 11.)  However, all that the

16  Complaint alleges in this regard is that KPMG LLP (not BearingPoint) had knowledge of

17  Peregrine's merger with Harbinger (Compl. ¶¶ 193-194), and that Peregrine publicly disclosed its

18  mergers with Harbinger and Extricity (but not that BearingPoint or KPMG LLP were aware of

19  these public disclosures) (*id.* ¶ 195).  Despite Plaintiffs' attempts to cure the fundamental defect

20  identified by the Court, the Complaint does not – and cannot – allege that BearingPoint was aware

21  of Peregrine's merger activities, much less that it had knowledge of Peregrine's negotiations with

22  Remedy.

23

24  [4]    The Complaint also alleges that two of the purported transactions bore incorrect dates
(Compl. ¶¶ 189-191.)  Although the Third Amended Complaint did not contain such allegations,
25  the inclusion of these allegations does not strengthen Plaintiffs' claims.  In this regard, the fact that
the transactions were incorrectly dated has the same effect as the transactions having undisclosed
26  contingencies – *i.e.*, that Peregrine should not have recorded them in the quarter in which they were
recorded.  Because the Third Amended Complaint alleged that the transactions were improperly
27  recorded, and alleged a basis for that conclusion, the fact that the Complaint now alleges another
basis for that conclusion does not change the nature of the Complaint or its deficiencies.

28

444
**EXHIBIT 26**

1    Simply put, notwithstanding its new allegations, the Complaint still contains no factual

2  allegations as to how (or when or under what circumstances) BearingPoint gained knowledge of

3  Peregrine's alleged fraudulent conduct with regard to Plaintiffs. The Complaint, moreover, does

4  not allege that any statement made by Mr. Rodda or BearingPoint was made to Plaintiffs, that

5  Plaintiffs were even aware of BearingPoint's business relationship with Peregrine, or that the

6  conduct of Mr. Rodda or BearingPoint was material to Plaintiffs' decision to acquire Peregrine

7  stock.

8    As discussed below, the allegations regarding the handful of transactions between

9  BearingPoint and Peregrine and the role that Mr. Rodda played with regard to these transactions

10  fail to state a claim against BearingPoint.

11    **ARGUMENT**

12    BearingPoint's demurrer should be sustained because the Complaint fails to state facts

13  sufficient to constitute a cause of action against BearingPoint. *See Baldwin v. Marina City Props.,*

14  *Inc.,* 79 Cal. App. 3d 393, 409 (1978) (citations omitted) (a cause of action is subject to demurrer

15  where the pleading does not "contain a statement of facts which, without the aid of other

16  conjectured facts not stated, shows a complete cause of action").

17

18  I.    **The Complaint Does Not Satisfy The Heightened Pleading Requirements Applicable to Plaintiffs' Fraud-Based Claims.**

19    It is well established that "'[f]raud actions . . . are subject to strict requirements of

20  particularity in pleading.'" *Committee On Children's Television, Inc. v. General Foods Corp.,* 35

21  Cal. 3d 197, 216 (1983) (citation omitted). Because fraudulent intent is an element of a claim for

22  violation of Corp. Code § 25504.1, such a claim also is subject to heightened pleading requirements

23  applicable to fraud claims. *See Kainos Labs., Inc. v. Beacon Diagnostics, Inc.,* No. C-97-4618,

24  1998 U.S. Dist. LEXIS 23473 at *49 (N.D. Cal. Sept. 14, 1998) (dismissing claim under § 25504.1

25  where plaintiff "failed to provide with requisite particularity allegations of fraudulent intent").[5] As

26  _____

27  [5]    Although the *Kainos Labs.* court applied Fed. R. Civ. P. 9(b), which specifically requires
   that fraud be pled with particularity in federal complaints, California law imposes the same

28

1  one appellate court stated, "it is essential that the facts and circumstances which constitute actual

2  fraud should be set forth with particularity in order to enable the court to determine whether, on the

3  facts pleaded, there is any foundation for the charge." *LaVista Cemetery Ass'n v. American Sav. &*

4  *Loan Ass'n,* 12 Cal. App. 3d 365, 369 (1970).

5        To satisfy these pleading requirements, a plaintiff must plead "*facts* which show how,

6  when, where, to whom, and by what means the [purportedly fraudulent] representations were

7  tendered." *Small v. Fritz Cos., Inc.,* 30 Cal. 4th 167, 184 (2003) (quotations and citations omitted)

8  (emphasis added). The Complaint simply contains no such details with respect to the conduct

9  purportedly engaged in by BearingPoint. As discussed above, Paragraph 181 identifies generally

10  nine transactions purportedly entered into between KPMG LLP or BearingPoint and Peregrine for

11  which Peregrine purportedly recognized revenue in violation of GAAP. The Complaint then

12  alleges: "Each of the sham transactions included affirmatively false representations by [KPMG

13  LLP or BearingPoint] regarding the revenue to be recognized by Peregrine." (Compl. ¶ 181.) The

14  Complaint does not identify the purportedly false representations made by BearingPoint to

15  Plaintiffs in connection with these transactions, and certainly fails to show how, when, where, to

16  whom, and by what means any such representations were tendered to Plaintiffs. The allegations of

17  Paragraph 188 regarding Mr. Rodda's purported audit confirmation are likewise deficient:  the

18  Complaint does not allege Mr. Rodda's authority to make this representation on behalf of

19  BearingPoint. *See Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 157 (1991)

20  (where, as here, a plaintiff asserts a fraud claim against a corporation, he must "allege the names of

21  the persons who made the allegedly fraudulent representations, *their authority to speak*, to whom

22  they spoke, what they said or wrote, and when it was said or written") (emphasis added).

23        In addition, the Complaint does not allege with specificity BearingPoint's knowledge of

24  Peregrine's purported misrepresentations to Plaintiffs. Plaintiffs allege that Mr. Rodda knew that

25  Peregrine included the contingent software agreements with BearingPoint in its quarterly revenue

26

27  requirement. *See Committee On Children's Television, Inc.*, 35 Cal. 3d at 216 ("[T]he rule is
    everywhere followed that fraud must be specifically pleaded.").

28

---

1   statements (Compl. ¶¶ 187-191), that Mr. Rodda "understood that Peregrine was a publicly traded

2   company that declared its financial results and conditions in public statements" (*id.* ¶ 192), that

3   KPMG LLP had knowledge of one Peregrine merger (*id.* ¶¶ 193-194), that two Peregrine mergers

4   were publicly disclosed (*id.* ¶ 195), and that BearingPoint was "familiar with Peregrine's practice of

5   using its stock in merger transactions" (*id.* ¶ 196). Even if the purported knowledge of Mr. Rodda

6   and KPMG LLP were attributable to BearingPoint (it is not), these allegations are insufficient to

7   allege BearingPoint's knowledge of the falsity of *Peregrine's statements to Plaintiffs*. The absence

8   of any factual allegations supporting the conclusion that BearingPoint had knowledge of the

9   purportedly false statements made by Peregrine to Plaintiffs renders the four causes of action

10   asserted against BearingPoint deficient. *See Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.

11   App. 3d 1324, 1331 (1986) (sustaining demurrer where complaint failed "to plead with specificity a

12   factual basis for how [defendant] 'knew' the representations she communicated" were false).

13        In sum, Plaintiffs' failure to plead with specificity a factual basis for their claims renders

14   each of the four causes of action asserted against BearingPoint in the Complaint subject to

15   demurrer.

16
17   **II.     Plaintiffs Do Not Allege The Required Elements Of Their Causes Of Action Against
         BearingPoint.**

18        Even if Plaintiffs could plead with specificity the facts alleged in the Complaint, these facts

19   do not state a claim against BearingPoint upon which relief can be granted.

20
21        **A.     The Complaint Does Not State A Cause Of Action Against BearingPoint For
         Fraud.**

22        To assert a claim for fraud, a plaintiff must allege that (1) the defendant misrepresented a

23   material fact; (2) the defendant knew that his misrepresentation was false; (3) the defendant made

24   the misrepresentation with the intent to deceive the plaintiff; (4) the plaintiff justifiably relied on

25   the statement; and (5) plaintiff suffered damages as a result. *Wilhelm*, 186 Cal. App. 3d at 1331.

26

27

28

---

DEMURRER OF BEARINGPOINT, INC. TO PLAINTIFFS' FOURTH AMENDED COMPLAINT

447
**EXHIBIT 26**

### 1. The Complaint Does Not Allege That BearingPoint Made Any Statement To Plaintiffs.

Plaintiffs' fraud claim against BearingPoint fails for the simple reason that Plaintiffs do not allege that BearingPoint misrepresented any information to them. Indeed, Plaintiffs do not allege that BearingPoint made any statements to them, to Remedy or to the investing public, much less that it made any statements that were false. As noted above, Plaintiffs' conclusory assertion that the contingent software sales transactions "included affirmatively false representations by [BearingPoint and KPMG LLP] regarding the revenue to be recognized by Peregrine" (Compl. ¶ 181) cannot survive scrutiny under the heightened pleading standards applicable to Plaintiffs' fraud claim. Indeed, as BearingPoint established in the last round of briefing, BearingPoint's purported transactions with Peregrine could not have contained false representations regarding "the revenue to be recognized by Peregrine" because revenue is reported in company financial statements – not in software sales transactions. Nevertheless, this remains the only allegation regarding the purported false representations allegedly made by BearingPoint. In any event, there is no allegation that these purported "false representations" were made to anybody other than Peregrine. Nor is there any allegation that the statement attributed to Mr. Rodda in Paragraph 188 was made to Plaintiffs or known by Plaintiffs when they acquired Peregrine stock.[6]

---

[6]    During the last round of briefing, Plaintiffs cited the theory of "indirect communication" set forth in the Restatement (Second) of Torts § 533 as support for their contention that they have stated a claim against BearingPoint notwithstanding the complete absence of any allegation that BearingPoint made any statement to them or to the investing public generally. In our research, we have been unable to uncover any case applying this doctrine to a party as attenuated from the fraud as BearingPoint is in this case. Indeed, the doctrine typically is applied in the situation where the maker of the fraudulent representation intends to induce action by the person who ultimately relies on the statement by making the fraudulent misrepresentation to an intermediate party. *See Crystal Pier Amusement Co. v. Cannan*, 219 Cal. 184, 188 (1933) (defendant subject to fraud claim by company that constructed ballroom on pier based on representations it made regarding the quality of the pier to company that constructed the pier because, *inter alia*, the pier was built for the purpose of developing the ballroom). The intermediate party therefore serves as the conduit for the defendant's false statement and carries the statement to its intended recipient. As discussed below, the Complaint simply does not allege (and cannot allege) that BearingPoint intended to defraud Plaintiffs or any Peregrine investor. The indirect communication doctrine therefore has no application here.

1  The Complaint's failure to allege that BearingPoint made any misrepresentations to

2  Plaintiffs is borne out by its own Section VI, which purports to identify the "false statements" upon

3  which Plaintiffs' claims are based.  (Compl. ¶¶ 71-82.)  In this section, which comprises eight

4  pages   and   identifies   approximately   thirty-one   statements   that   purportedly   contained

5  misrepresentations and omissions, not a single statement is attributed to BearingPoint.  Rather,

6  each statement that forms the basis for Plaintiffs' action was made by Peregrine or by its officers

7  and directors.

8  Absent an allegation that BearingPoint made a misrepresentation to Plaintiffs, Plaintiffs

9  cannot allege any of the elements of a cause of action for fraud.  *See Service By Medallion v.*

10  *Clorox Co.*, 44 Cal. App. 4th 1807, 1816-17 (1996) (failure to allege misrepresentation fatal to

11  claim for fraud).  In this regard, if (as is the case), BearingPoint did not represent (or misrepresent)

12  anything to Plaintiffs, then BearingPoint could not have knowledge of falsity of its statement to

13  Plaintiffs (as there is no statement that could be deemed false), BearingPoint could not have made a

14  misrepresentation with the intent to deceive Plaintiffs (as no misrepresentations were made),

15  Plaintiffs could not have justifiably relied on such statements (as no statements were made), and

16  Plaintiffs could not have suffered resulting damage.

17       **2.**    **The Complaint Does Not Allege That Any Conduct Attributed To BearingPoint Was Material To Their Decision To Acquire Peregrine**

18              **Stock.**

19  Even if Plaintiffs could allege that BearingPoint made a statement to them or the investing

20  public regarding the contingent software sales described in the Complaint, the demurrer still should

21  be sustained because the Complaint does not allege, as it must, that any statements regarding these

22  sales would have been material to their decision to acquire Peregrine stock.  *Wilhelm*, 186 Cal.

23  App. 3d at 1331 (failure to plead any element of fraud claim renders claim subject to demurrer).  In

24  this regard, the Complaint must allege, with particularity, the materiality of each transaction.  *See,*

25  *e.g., Parnes v. Gateway 2000,* 122 F.3d 539, 545 (8th Cir. 1997) (affirming dismissal of securities

26  fraud case, among other reasons, because allegation that defendant overstated 2% of assets and

27  9.9% of earnings was immaterial as a matter of law); *Glassman v. Computervision Corp.,* 90 F.3d

28

449
**EXHIBIT 26**

1    617, 633 & n.26 (1st Cir. 1996) (same: 3% to 9% of total revenues immaterial). The Complaint,

2    however, does not allege the effect that Peregrine's recognition of revenue from each of the nine

3    transactions identified in Paragraph 181 had on its financial reporting for the quarters in which

4    such revenue was recognized and does not allege how Peregrine's recognition of this revenue

5    affected Plaintiffs' decision to acquire Peregrine stock. Nor does the Complaint allege how

6    transactions that occurred as early as March 1999 could be material to their ultimate decision to

7    acquire Peregrine stock seventeen months later.[7] Absent a specific factual allegation that

8    BearingPoint's purported statements were material to Plaintiffs' decision to acquire Peregrine stock,

9    the Complaint cannot survive scrutiny. *See Insurance Underwriters Clearing House, Inc. v.*

10    *Natomas Co.*, 184 Cal. App. 3d 1520 (1986) (affirming trial court's order sustaining demurrer to

11    complaint where omissions alleged were neither material nor misleading as a matter of law).

12         **3.**    **The Complaint Does Not Allege BearingPoint's Knowledge Of Falsity.**

13         The Complaint, moreover, cannot survive scrutiny because it does not allege that

14    BearingPoint had knowledge of the falsity at issue. *Wilhelm*, 186 Cal. App. 3d at 1331 (affirming

15    order sustaining demurrer where plaintiff failed to plead with specificity defendant's knowledge of

16    falsity). Because the Complaint does not allege that BearingPoint made a false statement to

17    Plaintiffs, it does not allege, as it must, that BearingPoint had knowledge of the falsity of such

18    statements. As discussed in Section I, moreover, the Complaint does not allege BearingPoint's

19    knowledge of the purported falsity of *Peregrine's* statements with the required particularity.

20    Plaintiffs' failure to plead BearingPoint's knowledge of the falsity of its purported statements *and* a

21    factual basis for such knowledge is fatal to their fraud claim. *Wilhelm*, 186 Cal. App. 3d at 1331.

22

23    ——————————————

[7]    Notably, the statement attributed to Mr. Rodda in Paragraph 188 of the Complaint
24    purportedly related to a December 31, 1999 transaction that would have been reflected in
Peregrine's third quarter FY00 10-Q and its FY00 10-K, which were filed on February 11 and May
25    10, 2000, respectively. (*See* Compl. ¶¶ 72(g) and (i).) The transaction thus was reflected in
financial statements that were issued fifteen and eighteen months *before* the Remedy merger.
26    Although BearingPoint demonstrated during oral argument on its demurrer to Plaintiffs' Third
Amended Complaint that Plaintiffs did not allege how such a remote statement was material to
27    their decision to acquire Peregrine stock, Plaintiffs did not even attempt to cure this deficiency in
the Complaint.

28

450
**EXHIBIT 26**

     **4.    The Complaint Does Not Allege That BearingPoint Acted With An Intent To Deceive.**

     The fraud claim also fails because the Complaint does not allege that BearingPoint entered into the contingent software sales with an intent to deceive or defraud Plaintiffs. *See Small*, 30 Cal. 4th at 173-74 (to state a claim for fraud, a plaintiff must allege "intent to defraud, i.e., to induce reliance"). Although Paragraph 272 purports to allege against all defendants an "intent to deceive," it is plain from the language of the Paragraph that it does not apply to BearingPoint. Paragraph 272 states: "Defendants made those misrepresentations with the intent to deceive Plaintiffs and to induce Plaintiffs and/or their agents to rely on them by purchasing or otherwise acquiring Peregrine securities and/or selling Remedy securities." Because Plaintiffs do not allege that BearingPoint had any knowledge of Peregrine's negotiations with Remedy or otherwise had knowledge that Plaintiffs were considering acquiring Peregrine stock, these allegations cannot apply to BearingPoint. To the extent that Paragraph 272 can be read to constitute an allegation against BearingPoint, Plaintiffs allege that BearingPoint entered into these transactions so that it would "receive[] the service portion of certain contracts which were worth hundreds of thousands of dollars" (Compl. ¶ 180), not that BearingPoint intended to defraud Plaintiffs. This specific allegation controls Paragraph 272's general allegation. *See Gentry v. Ebay*, 99 Cal. App. 4th 816, 827 (2002) ("specific allegations control the general pleadings"); *Wood v. Elling Corp.*, 20 Cal. 3d 353, 364 n.8 (1977) ("Where there is any inconsistency between the specific allegations upon which a conclusion [is] based and the conclusion, the specific allegations control.") (quotation omitted).

     **5.    The Complaint Does Not Allege That Plaintiffs Relied On Any Statements Made By BearingPoint Or That Plaintiffs Suffered Damages As A Result Of BearingPoint's Alleged Conduct.**

     Finally, Plaintiffs do not allege that they relied on *any* statement made by BearingPoint in deciding to acquire and hold Peregrine stock. *See Mirkin v. Wasserman,* 5 Cal. 4th 1082, 1088 (1993) ("It is settled that a plaintiff, to state a cause of action for deceit based on a misrepresentation, must plead that he or she actually relied on the misrepresentation."); *Goodman v. Kennedy,* 18 Cal. 3d 335, 347 (1976) (trial court properly sustained demurrer to complaint where

1  there were no "factual allegations showing that plaintiffs were reasonably induced to purchase the

2  stock by defendant's omission of these matters from his statements"). Indeed, in the 19 pages of

3  the Complaint in which Plaintiffs allege the statements upon which they purportedly relied in

4  deciding to acquire Peregrine stock, there is not a single reference to any of the nine transactions

5  identified in Paragraph 181, to the statement attributed to Mr. Rodda in Paragraph 188 or to any

6  other statement purportedly made by BearingPoint. (*See* Compl. ¶ 273.)[8] Because Plaintiffs do not

7  allege that they relied on any statement attributed to BearingPoint in deciding to acquire Peregrine

8  stock, they have not (and cannot) allege that they suffered damages as a result of BearingPoint's

9  conduct. *See Mirkin,* 5 Cal. 4th at 1092 (specific pleading of reliance is "necessary to establish a

10  complete causal relationship between the alleged misrepresentations and the harm claimed to have

11  resulted therefrom") (quotation omitted).

12
13
   **B.     The Complaint Fails To Assert A Cause Of Action Against BearingPoint For
           Violation Of The Corporations Code.**

14         In their fifth cause of action, Plaintiffs purport to assert against all defendants a cause of

15  action under Cal. Corp. Code § 25504.1, which provides that "any person who materially assists in

16  any violation of Section . . . 25401 . . . with intent to deceive or defraud, is jointly and severally

17  liable."[9] Plaintiffs have not alleged a cause of action against BearingPoint under § 25504.1. First,

18  to state a claim under § 25504.1, a plaintiff must allege that the defendant had actual knowledge of

19  the underlying fraud (*i.e.*, of the underlying statement and the fact that it was false when made).

20  *See In re U.S. Grant Hotel Assocs., Ltd. Sec. Litig.,* 740 F. Supp. 1460, 1465-66 (S.D. Cal. 1990)

21  ――――――――――――――――――――――――
22
   [8]     Although each Plaintiff now alleges that he or she "would not have agreed to exchange
   [his/her] Remedy stock if [he/she] had known that Peregrine was engaging in unlawful
   transactions, such as those described with the KPMG Defendants, Critical Path, BT and BT Group,
23  Bull, Insight, Bindview and Fujitsu," (Compl. ¶¶ 273(a)-(y)), such assertion does not constitute an
   allegation that any Plaintiff relied on the purported statements contained in the identified
24  transactions. Indeed, not a single Plaintiff alleges that he or she was aware of the existence of these
   transactions, much less that he or she read and relied on statements contained in them.

25
   [9]     Section 25401 provides: "It is unlawful for any person to offer or sell a security in this state
26  or buy or offer to buy a security in this state by means of any written or oral communication which
   includes an untrue statement of a material fact or omits to state a material fact necessary in order to
27  make the statements made, in the light of the circumstances under which they were made, not
   misleading."

28

1 (dismissing claims under § 25504.1 where plaintiff failed to plead facts showing that defendant

2 alleged to have materially assisted another's purported fraud knew of such fraud or of its role in

3 that fraud); *In re ZZZZ Best Sec. Litig.*, Case No. CV 87-3574-RSWL, 1989 U.S. Dist. LEXIS

4 8083, at *101-02 (C.D. Cal. May 25, 1989) (same). Here, while Plaintiffs allege generally that

5 BearingPoint acted with knowledge that Peregrine intended to record revenue from the contingent

6 software sales transactions (a fact that BearingPoint denies), they do not – and cannot – allege that

7 BearingPoint had knowledge of Peregrine's scheme to defraud the Plaintiffs.

8       The new allegations with respect to Mr. Rodda's purported conduct do not save Plaintiffs'

9 claim. Indeed, all that Plaintiffs allege with respect to Mr. Rodda is that he understood that

10 Peregrine intended to include its contingent agreements with BearingPoint in its quarterly revenue

11 statements. Even if Mr. Rodda's knowledge is attributable to BearingPoint (and it is not), the

12 Complaint does not allege Mr. Rodda's knowledge of the false statements made by Peregrine to

13 Plaintiffs. Absent allegations that BearingPoint knew of such statements and of their falsity,

14 Plaintiffs cannot allege the elements of a claim for violation of § 25504.1. Moreover, as discussed

15 in Section I, absent allegations establishing a factual basis for such knowledge, Plaintiffs cannot

16 satisfy their pleading obligations with respect to such a claim. *See Wilhelm,* 186 Cal. App. 3d at

17 1331.

18       Second, a plaintiff must plead facts demonstrating that the defendant materially assisted the

19 underlying fraud. *See In re U.S. Grant Hotel,* 740 F. Supp. at 1465, 1466 (dismissing claims for

20 violation of § 25504.1 where facts alleged in the complaint failed to show that defendant

21 substantially assisted in the underlying fraud). Here, Plaintiffs have not satisfied their burden of

22 alleging that BearingPoint materially assisted Peregrine's fraud. In this regard, Plaintiffs allege that

23 Peregrine engaged in a massive fraud designed to inflate its revenues and defraud its investors.

24 (*See, e.g.,* Compl. ¶ 70.) This purported fraud, which involved numerous Peregrine officers,

25 directors and employees and multiple "instruments of deception," resulted in a restatement by

26 Peregrine of over $500 million in revenues for a three-year period. (*Id.* ¶¶ 2, 70.) In the context of

27 Peregrine's pervasive fraud, BearingPoint's purported conduct – entering into nine contingent sales

28

1  contracts on which Peregrine improperly recorded revenue – is immaterial. Indeed, the revenue

2  that Peregrine purportedly improperly recorded from BearingPoint transactions represents just six

3  percent of Peregrine's total revenue overstatement. (*See* Compl. ¶¶ 2, 179.)

4        Finally, a plaintiff must allege that the defendant acted with the intent to deceive. Cal.

5  Corp. Code § 25504.1 ("any person who materially assists in any violation of Section . . . 25401 . .

6  . with intent to deceive or defraud, is jointly and severally liable"); *See also In re ZZZZ Best Sec.*

7  *Litig.*, Case No. CV 87-3574 RSWL, 1990 U.S. Dist. LEXIS 11867 at *50-52 (C.D. Cal. July 23,

8  1990) (dismissing claim for violation of § 25504.1 to the extent it was based on allegation that

9  defendant acted "recklessly"). As noted above, the Complaint does not allege that BearingPoint

10 acted with a specific intent to deceive the Plaintiffs.

11       **C.**    **The Complaint Fails To State A Claim For Conspiracy Or Aiding And**

12                **Abetting.**

13       It is well established in California jurisprudence that "[c]onspiracy is not a cause of action,

14 but a legal doctrine that imposes liability on persons who, although not actually committing a tort

15 themselves, share with the immediate tortfeasors a common plan or design in its perpetration."

16 *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). To state a

17 claim for conspiracy, a plaintiff must allege "(1) the formation and operation of the conspiracy; (2)

18 the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts."

19 *Schick v. Lerner*, 193 Cal. App. 3d 1321, 1327-28 (1987). "The *sine qua non* of a conspiratorial

20 agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and

21 their intent to aid in achieving that objective." *Id.* at 1328. Here, Plaintiffs' failure to allege

22 knowledge by BearingPoint of Peregrine's purported scheme to defraud them is fatal to their claim

23 for conspiracy: absent such knowledge, BearingPoint lacked knowledge of Peregrine's purported

24 unlawful objective, and BearingPoint cannot be held liable for Peregrine's purported conduct on a

25 conspiracy theory.

26       Plaintiffs' cause of action for aiding and abetting is similarly flawed. Again, although

27 aiding and abetting is not a cause of action itself, a party may be liable under an aiding and abetting

28

1   theory *if* he or she aids and abets the commission of an intentional tort *and* he or she "(a) knows the

2   other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to

3   the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result

4   and the person's own conduct, separately considered, constitutes a breach of duty to the third

5   person." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 846 (1994). Because Plaintiffs have

6   not alleged that BearingPoint had knowledge of Peregrine's scheme to defraud them (which it did

7   not), the Complaint fails to allege that BearingPoint had knowledge that Peregrine's conduct

8   constituted a breach of its duties to Plaintiffs. Because Plaintiffs have not alleged that

9   BearingPoint had *any* relationship with them (which it did not), the Complaint fails to allege that

10   BearingPoint owed them any duty whatsoever. Therefore, even if Plaintiffs had properly alleged

11   that BearingPoint gave "substantial assistance" to Peregrine in connection with its commission of

12   an intentional tort (which, as discussed in Section II.B, *supra*, Plaintiffs have not done), Plaintiffs

13   have not alleged facts that, if true, would support a finding of aiding and abetting liability. *See*

14   *Chavers v. Gatke Corp.*, 107 Cal. App. 4th 606, 617 (2003) (substantial assistance requires conduct

15   that is a substantial factor in causing the tortious conduct).

16

## CONCLUSION

17      For the foregoing reasons, BearingPoint's demurrer should be sustained.

18   DATED: January 21, 2005        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

19

20                 By:   *Jennifer L. Spaziano*

21                     Jennifer L. Spaziano
                    Attorneys for BearingPoint, Inc.

22

23

24

25

26

27

28

1            PROOF OF SERVICE

2    WASHINGTON, DISTRICT OF COLUMBIA

3            I am employed in Washington, D.C.  I am over the age of 18 and not a party to the
4    within action; my business address is 1440 New York Avenue, NW. Washington, DC 20005.

5            On January 21, 2005, I served the following documents described as:

6         **NOTICE OF DEMURRER AND DEMURRER OF BEARINGPOINT, INC. TO
     PLAINTIFFS' FOURTH AMENDED COMPLAINT; MEMORANDUM OF POINTS AND
7                    AUTHORITIES IN SUPPORT THEREOF**

8    on the interested parties in this action by placing true copies thereon enclosed in sealed envelopes
9    addressed as follows:

10                SEE ATTACHED LIST

11        ⊠   (BY MAIL) I am readily familiar with the firm's practice for the collection and
     processing of correspondence for mailing with the United States Postal Service and the fact that the
12    correspondence would be deposited with the United States Postal Service that same day in the
13    ordinary course of business; on this date, the above-referenced correspondence was placed for
     deposit at Washington, District of Columbia and placed for collection and mailing following
14    ordinary business practices.

15            I declare under penalty of perjury under the laws of the State of California that
16    above is true and correct.

17            Executed on January 21, 2005, at Washington, D.C.

18    Jennifer L. Spaziano
      _____            _____
           Type or print name                        Signature

19

20

21

22

23

24

25

26

27

28

    _____
         DEMURRER OF BEARINGPOINT, INC. TO PLAINTIFFS' FOURTH AMENDED COMPLAINT

JS44
(Rev. 07/89)

**CIVIL COVER SHEET**

**BY FAX**

FILED

05 JAN 25 PM 12: 04

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard P. Allocco, et al (See Attachment A) | Stephen P. Gardner, et al (See Attachment A) |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  San Diego (IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| See Attachment A | See Attachment **05 CV 0140    LAB (NLS)** |

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☐ I U.S. Government Plaintiff        ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant      ☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

Removal of action under 15 U.S.C. Section 78bb(f)(2) Securities Litigation Uniform Standards Act   28:1441

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury- Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☐ 1 Original Proceeding   ☒ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions): JUDGE Benitez (see Attachment B for additional related cases)   Docket Number 02-CV-0870J (see Attachment B)

DATE   January 25, 2005        SIGNATURE OF ATTORNEY OF RECORD   Jennifer L Sprague

Rd $150.00   1/25/05   #110542  VB

## ATTACHMENT A

**PLAINTIFFS' COUNSEL**

| | | |
|---|---|---|
| Counsel for<br>Plaintiffs | Richard M. Heimann, Esq.<br>James M. Finberg, Esq.<br>Joy A. Kruse, Esq.<br>Daniel E. Barenbaum, Esq.<br>Christopher K. Leung, Esq.<br>**Lieff, Cabraser, Heimann & Bernstein, LLP**<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339 | Tel: 415-956-1000<br>Fax: 415-956-1008 |

## DEFENDANTS' COUNSEL

| | | |
|---|---|---|
| Counsel for<br>Stephen Gardner | Daniel J. Bergeson, Esq.<br>Caroline McIntyre, Esq.<br>Stephen Rockwell, Esq.<br>**Bergeson LLP**<br>303 Almaden, Suite 500<br>San Jose, CA 95110-2712 | Tel: 408-291-6200<br>Fax: 408-297-6000 |
| Counsel for<br>Matthew Gless | Thomas L. Vance, Esq.<br>**Vance Blair & Grady**<br>1201 Camino Del Mar, Suite 205<br>Del Mar, CA 92014 | Tel: 858-793-0040<br>Fax: 858-793-1655 |
| Counsel for<br>Thomas Watrous | Wayne Lamprey, Esq.<br>Anne Hartman, Esq.<br>**Goodin, MacBride, Squeri, Ritchie & Day, LLP**<br>505 Sansome Street, Suite 900<br>San Francisco, CA 94111 | Tel: 415-392-7900<br>Fax: 415-793-1655 |
| Counsel for<br>William Savoy | Robert D. Stewart, Esq.<br>**McNaul Ebel Nawrot & Helgren PLLC**<br>600 University Street, Suite 2700<br>Seattle, WA 98101-3143 | Tel: 206-467-1816<br>Fax: 206-624-5128 |
| | Kathryn D. Horning, Esq.<br>**Allen Matkins Leck Gamble & Mallory LLP**<br>501 West Broadway, Suite 900<br>San Diego, CA 92101 | Tel: 619-233-1155<br>Fax: 619-233-1158 |
| | Cyrus R. Vance, Jr. Esq.<br>**Morvillo Abramowitz Grand Iason & Silberberg, PC**<br>565 Fifth Avenue<br>New York, New York 10017 | Tel: 212-856-9600<br>Fax: 212-856-9494 |

| | | |
|---|---|---|
| Counsel for<br>Daniel Stulac | Michael A. Attanasio, Esq.<br>**Cooley Godward LLP**<br>4401 Eastgate Mall<br>San Diego, CA  92121-1909 | Tel: 858-550-6020<br>Fax: 858-550-6420 |
| Counsel for<br>John J. Moores | John B. Quinn, Esq.<br>Harry A. Olivar, Jr., Esq.<br>David E. Azar, Esq.<br>Michael T. Lifrak, Esq.<br>Sarah J. Cole, Esq.<br>**Quinn Emanuel Urquhart Oliver & Hedges, LLP**<br>865 South Figueroa Street<br>10th Floor<br>Los Angeles, CA  90017-2543 | Tel: 213-624-7707<br>Fax: 213-624-0643 |
| | David J. Noonan, Esq.<br>**Post Kirby Noonan & Sweat LLP**<br>One America Plaza<br>600 West Broadway, Suite 1100<br>San Diego, CA 92101-3387 | Tel: 619-231-8666<br>Fax: 619-231-9593 |
| Counsel for<br>Charles E. Noell,<br>III | Brian E. Pastuszenski, Esq.<br>Christine Chung, Esq.<br>**Testa, Hurwitz & Thibeault**<br>125 High Street<br>High Street Tower<br>Boston, MA  02110 | Tel: 617-248-7000<br>Fax: 617-248-7100 |
| | Jane Hahn, Esq.<br>Alison Adema, Esq.<br>**Hahn & Adema**<br>501 West Broadway, Suite 1730<br>San Diego, CA  92101 | Tel: 619-235-2100<br>Fax: 619-235-2101 |
| Counsel for<br>Richard T.<br>Nelson | Robert S. Brewer, Jr., Esq.<br>Christian D. Humphreys, Esq.<br>**McKenna Long & Aldridge LLP**<br>Suite 3300, Symphony Towers<br>750 B Street<br>San Diego, CA 92101 | Tel: 619-595-5400<br>Fax: 619-595-5450 |
| Counsel for<br>Arthur Andersen | C. Stephen Howard, Esq.<br>Scott Vick, Esq.<br>Melissa E. Addison, Esq.<br>**Alschuler Grossman Stein & Kahan LLP**<br>1620 26th Street, Fourth Floor, North Tower<br>Santa Monica, CA 90404-4060 | Tel:  310-907-1000<br>Fax:  310-907-2000 |
| | Douglas M. Butz, Esq.<br>Steven C. Uribe, Esq.<br>**Butz Dunn DeSantis & Bingham**<br>101 West Broadway, Suite 1700<br>San Diego, CA 92101-8289 | Tel: 619-233-4777<br>Fax: 619-231-0341 |

2

| | | |
|---|---|---|
| Counsel for KPMG LLP | Bradley H. Ellis, Esq.<br>Garrett Craig, Esq.<br>**Sidley Austin Brown & Wood LLP**<br>555 W. Fifth Street, 40th Floor<br>Los Angeles, CA  90013 | Tel: 213-896-6632<br>Fax: 213-896-6600 |
| *Counsel for* Bindview Development Corporation | Robert E. Darby, Esq.<br>Norman D. Finch, Jr., Esq.<br>**Fulbright & Jaworski L.L.P.**<br>865 South Figueroa Street, 29th Floor<br>Los Angeles, CA 90017 | Tel: 213-892-9200<br>Fax: 213-680-4518 |
| | Gerard G. Pecht, Esq.<br>**Fulbright & Jaworski L.L.P.**<br>1301 McKinney, Suite 5100<br>Houston, TX 77010 | Tel: 713-651-5151<br>Fax: 713-651-5246 |
| Counsel for AWSC Société Coopérative, en liquidation | Robert S. Gerber, Esq.<br>Betty Santohigashi, Esq.<br>Luther B. Pilkinton, Esq.<br>**Sheppard Mullin Richter & Hampton LLP**<br>501 West Broadway, 19th Floor<br>San Diego, CA 92101-3598 | Tel: 619-338-6500<br>Fax: 619-234-3815 |
| Counsel for Ernst & Young Revisions-und Treuhandgesellsc haft mbH, Wirtschaftsprufu ngsgesellschaft Steuerberatungs Gesellschaft | A. Michael Nalu, Esq.<br>**Higgs Fletcher & Mack LLP**<br>401 West A Street, Suite 2600<br>San Diego, CA 92101-7910 | Tel: 619-236-1551<br>Fax: 619-696-1410 |
| | Utz P. Toepke, Esq.<br>**Law Offices of Utz P. Toepke**<br>70 West Red Oak Lane<br>White Plains, NY 10604-3602 | Tel: 914-697-4791<br>Fax: 914-697-4888 |
| | Paul E. Summit, Esq.<br>**Sullivan & Worcester LLP**<br>One Post Office Square, 23rd Floor<br>Boston, MA 02109 | Tel: 617-338-2800<br>Fax: 617-338-2880 |
| Counsel for Critical Path and Insight Enterprises, Inc. | Thomas V. Loran, III, Esq.<br>Andrew Lanphere, Esq.<br>Sanna R. Singer, Esq.<br>**Pillsbury Winthrop LLP**<br>50 Fremont Street<br>San Francisco, CA 94105 | Tel: 415-983-1000<br>Fax: 415-983-1200 |
| Counsel for BT Group PLC and British Telecommunicati ons plc | Todd E. Gordinier, Esq.<br>John F. Cannon, Esq.<br>**Stradling Yocca Carlson & Rauth**<br>660 Newport Center Drive<br>Suite 1600<br>Newport Beach, CA 92660-6422 | Tel: 949-725-4000<br>Fax: 949-725-4100 |

3

| Counsel for Douglas S. Powanda | Robert H. Logan, Esq. Gregory E. Copeland, Esq. **Keesal Young & Logan** 400 Oceangate P.O. Box 1730 Long Beach, CA 90801-1730 | Tel. 562-436-2000 Fax: 562-436-7416 |

4

## ATTACHMENT B
*VIII. Additional Related Cases*

1. <u>Bains, et al. v. Moores, et al.</u>
   United States District Court for the Southern District of California
   Judge to be assigned upon removal on 01/25/2005
   Docket Number to be assigned upon removal on 01/25/2005

2. <u>Peregrine Systems Inc. v. Arthur Andersen LLP, et al.</u>
   San Diego County Superior Court
   Judge Jeffrey B. Barton
   Docket Number GIC 796594

3. <u>Ariko v. Moores, et al.</u>
   San Diego County Superior Court
   Judge S. Charles Wickersham
   Docket Number GIC 821024

4. <u>Peregrine Litigation Trust v. John J. Moores, et al.</u>
   San Diego County Superior Court
   Judge Charles R. Hayes
   Docket Number GIC 788659